UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION


BLAINE KEITH MILAM,                    §
      Petitioner


Vs.                                    §        Civil Action No. 4:13cv545


WILLIAM STEPHENS, DIRECTOR    §
      Respondent


**<u>PETITION FOR WRIT OF HABEAS CORPUS</u>**
**<u>DEATH PENALTY CASE</u>**



Submitted by:

Don Bailey
Attorney for Mr. Blaine Milam
TBN 01520480
309 N. Willow
Sherman, Texas  75090
Donbailey46@hotmail.com
903-892-9185
Fax 903-991-8304

# TABLE OF CONTENTS

TABLE OF AUTHORITIES                                              4

JURISDICTION                                                     10

VENUE                                                            10

CLAIMS PRESENTED                                                 10

INTRODUCTION                                                     15

FACTUAL AND PROCEDURAL HISTORY                                   16

STANDARD OF REVIEW                                               62

INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD                       73

CLAIMS PRESENTED                                                 79
  *MARTINEZ CLAIMS*

    1-4 Failure to Secure a Voluntary Intoxication Instruction    81

    5    Mental Retardation and Emotional Age                     86

    *STATE HABEAS CLAIMS*

    6    Trial Counsel ineffective regarding Statement            93

    7    Appellate Counsel ineffective regarding Statement        96

    8    Counsel Ineffective regarding Prison System Violence     98

    9    Trial Counsel ineffective regarding impeachment of witness 100

    *Direct Appeal Claims*

    10   *Batson v. Kentucky* claim                               102

11    Jury selection error                                                    106

12    Comment on Mr. Milam's right to remain silent                           114

13    False impression created by the State                                   120

14    Prosecutorial misconduct during closing argument                       124

15    Texas Death Penalty Scheme is cruel and unusual                        129

16    Trial Court erred regarding mitigation instruction                     134

17    Failure to define terms is a violation of the Constitution             136

18    Texas Prosecutors' discretion is a Constitutional violation            140

19    Punishment issues should be proven beyond a reasonable doubt 143

20    Trial Court erred in admitting racial prejudice into the trial   147

21    Cumulative effect is a Constitutional violation                        151

CONCLUSION AND PRAYER FOR RELIEF                                            153

CERTIFICATE OF SERVICE                                                      154

## TABLE OF AUTHORITIES

*Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521 (1980)                     106

*Alcorta v. Texas*, 355 U.S. 28 (1957)                                   121

*Abdul–Kabir v. Quarterman,* 550 U.S. 233, 127 S.Ct. 1654 (2007)     85,128

*Alonzo v. State*, 67 S.W.3d 346 (Tex. App. Waco)                         97

*Andrade v. Lockyer*, 538 U.S. 63 (2003)                                  69

*Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242 (2002)            87, 142

*Arave v. Creech*, 507                                                    146
U.S. ___, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993)

*Batson v. Kentucky*, 476 U.S. 79 (1986)                              69, 102

*Beck v. Bowersox*, 257 F.3d 900 (8th Cir. 2001)                          70

*Bell v. Ohio,* 438 U.S. 637, 98 S.Ct. 2977 (1978)                        85

*Blankenship v. Estelle*, 545 F2d 510, 513 (5th Cir. 1977)             122

*Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990)                     76

*Bowling v. Commonwealth of Kentucky,* 163 S.W.3d 361 (Ky. 2005)         89

*Boyde v. California*, 494 U.S. 370, (1990)                              134

*Brasfield v. United States*, 272 U.S. 448,  47 S.Ct. 135 (1926)         131

*Breighner v. Chesney*, 301 F.Supp.2d 354 (M.D.Pa. 2004)                 73

*Buchanan v. Angelone*, 522 U.S. 269,  (1998)                           135

*Buckner v. Polk*, 453 F.3d 195 (4th Cir. 2006)                          76

*Busby v. Dretke,* 359 F.3d 708, 714 (5th Cir. 2004)                     77

*Bush v. Gore*, 531 U.S.  98 (2000)                                           141

*Callins v. Collins*, 114 S.Ct. 1127 (1994)                                   144

*Campbell v. Louisiana,* 523 U.S. 392 (1998)                                  104

*Canaan v. McBride*, 395 F.3d 376 (7th Cir. 2005)                              64

*Chambers v. Mississippi*, 410 U.S. 284 (1973)                                97

*Cherry v. State,* 959 So.2d 702 (Fla. 2007)                                 88, 89

*Childress v. Johnson*, 103 F.3d 1221 n.7 (5th Cir. 1997)                     71

*Coleman v. Thompson,* 501 U.S. 722,  111 S.Ct. 2546,                         81
115 L.Ed.2d 640 (1991)

*DeGarmo v. Texas*, 474 U.S. 973 (1985)                                       143

*Dietrich v. Ryan,* 740 F.3d 1237 (9th Cir. 2013)                            78

*Duncan v. Walker*, 533 U.S. 167 (2001)                                       72

*Dupart v. United States*, 541 F2d 1148, 1140-50 (5th Cir. 1976)           122

*Early v. Packer*, 537 U.S. 3 (2002)                                          66

*Eddings v. Oklahoma,* 455 U.S. 104,  102 S.Ct. 869 (1982)                   85,145

*Ex parte Briseno,* 135 S.W.3d 1 (Tex. Crim. App. 2004)                       89

*Ex parte Hearn,* 310 S.W.3d 424 (Tex. Crim. App. 2010)                       88

*Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997)                      74

*Furman v. Georgia*, 408 U.S. 238, 270-71 1972)                              141

*Giglio v. United States*, 405 U.S. 150 (1972)                               121

*Godfrey v. Georgia*, 466 U.S. 420, 100 S.Ct. 1759 (1980)  136,139

*Gonzalez v. Crosby*, 125 S.Ct. 2641 (2005)  65

*Gregg v. Georgia,* 428 U.S. 153, 195 (1976)  142

*Grey v. Mississippi*, 481 U.S. 648 (1987)  114

*Griffin v. California*, 380 U.S. 609 (1965)  119

*Guidry v. Dretke*, 397 F.3d 306 (5th Cir. 2005)  70

*Hall v. Florida,* 134 S.Ct. 1986, 1994 (2014)  86, 87

*Hitchcock v. Dugger,* 481 U.S. 393,  107 S.Ct. 1821 (1987)  85

*Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005)  76

*Holmes v. South Carolina*, 547 U.S. 319 (2006)  97

*In re Green,* 39 F.3d 582 (5th Cir. 1994)  10

*Johnson v.Texas*, 509 U.S. ___, 111 S.Ct. 2546 115 L.Ed.2d 640 (1991)  147

*Jurek v. Texas*, 428 U.S. 262 (1976)  140

*Kubat v. Thierot*, 867 F.2d 351, 369-73 (7th Cir.)  133

*Lambert v. Blackwell*, 387 F.3d 210 (3d Cir. 2004)  73

*Lisenba v. California*, 314 U.S. 219 (1941)  152

*Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 ( 1978)  144

*Lowenfield v. Phelps*, 484 U.S. 231 (1988)  131

*Market Co. v. Hoffman*, 101 U.S. 112 (1879)  72

*Maryland v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853 (1988)  137, 139

*McKay v. North Carolina*, 494 U.S. 433 (1990)                                   126, 127

*McLeskey v. Kemp*, 481 U.S. 279, 107 S.Ct.                                       145
1756, 95 L.Ed.2d 262 (1987)

*Miller v. Pate*, 386 U.S. 1 (1967)                                               121

*Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154                        77
L.Ed.2d 931 (2003)

*Miller-El v. Dretke*, 545 U.S. 231 (2005)                                        69, 70

*Mills v. Maryland*, 486 U.S. 367, 383, 108 S.Ct. 1860,                           130, 132
100 L.Ed.2d 384, ___ (1988)

*Murray v. Carrier*, 477 U.S. 478 (1986)                                          76

*Massaro v. United States*, 538 U.S. 500 (2003)                                   74

*Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976)                               142

*Mooney v. Holohan,* 294 U.S. 103 (1935)                                          121

*Napue v. Illinois*, 360 U.S. 264 (1959)                                          121

*Nelson v. Quarterman*, 472 F3d 287, 314-15 (5th Cir. 2006)                     135

*Nguyen v. Curry,* 736 F.3d 1287 (9th Cir. 2013)                                  80

*Nero v. Blackburn*, 597 F.2d 991 (5th Cir. 1979)                                 77

*Parr v. Quarterman,* 472 F.3d 245, 261 (5th Cir.2006)                           92

*Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910 (2001)                          69

*Penry v. Lynaugh,* 492 U.S. 302,  109 S.Ct. 2934 (1989)                         85, 147

*Pepper v. United States*, 131 S.Ct. 1229 (2011)                                 133

*Powers v. Ohio*, 499 U.S. 400 (1991)                                            104

*Purtell v. State*, 761 S.W.2d 360 (Tex. Crim. App. 1988)                         95

*Rice v. Collins*, 126 S.Ct. 969, 974 (2006)                                          72

*Robinson v. Hankins and Company*, 711 S.W.2d 619 (1986)              95

*Rogers v. Lynaugh,* 848 F2d 606, 608 (5th Cir. 1988)                     119

*Rompilla v. Beard*, 545 U.S. 374 (2005)                                        63,69

*Roper v. Simmons,* 543 U.S. 551 (2005)                                        86,91

*Sells v. State*, 121 S.W.3d 748 (Tex. Crim. App. 2003)                     99

*Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669 (1986)          84,85

*Smith v. Texas,* 543 U.S. 37, 125 S.Ct. 400 (2004)                          85

*State v. Williams*, 392 So.2d 619, 631 (La.1980)                            132

*Strauder v. West Virginia*, 100 U.S. 303 (1880)                            102

*Strickland v. Washington*, 466 U.S. 668 (1984)                            63,74

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004)                           72

*Tennard v. Dretke,* 542 U.S. 274, 124 S.Ct. 2562 (2004)                 85

*United States v. Bagley*, 473 U.S. 667, 679 (1985)                        122

*United States v. Barham*, 595 F2d 231, 242 (5th Cir. 1979)           122

*United States v. Cronic*, 466 U.S. 648 (1984)                             77

*United States* v. *O'Keefe*, 128 F.3d 885 (5th Cir. 1997)              121

*United States v. Phillips,* 210 F.3d 345 (5th Cir. 2000)                  77

*Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844 (1985)                 106

*Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)   138

*Ward v. Hall,*  592 F3d 1144, 1180-81 (11th Cir. 2010),                    135

*Weeks v. Angelone*, 176 F.3d 249 (4th Cir. 1999)                    63

*Wiggins v. Smith*, 539 U.S. 510 (2003)                    63

*Williams v. Taylor*, 529 U.S. 362 (2000)                    64,68

*Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770 (1968)                    106

*Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978,                    83
49 L.Ed.2d 944 (1976).

*Yung v. Walker*, 296 F.3d 129 (2d Cir. 2002)                    70

*Zant v. Stephens*, 462 U.S. 862, 103 S. Ct. 2733 (1983)                    137

## LAW REVIEW

Gillers, *Deciding Who Dies*, 129 U.Pa.L.Rev. 1, 27-28 (1980)                    146

## JURISDICTION

This petition for writ of habeas corpus is submitted on behalf of a person sentenced to death by a District Court out of Rusk County, Texas. Therefore, jurisdiction is pursuant to 28 U.S.C. § 2241, 2254.

## VENUE

Pursuant to 28 U.S.C. § 2241(d) venue in this case is proper in either the Eastern District of Texas, where Mr. Milam is located, or the Southern District of Texas, where the conviction occurred in Montgomery County, on a change of venue motion from Rusk County. *See In re Green,* 39 F.3d 582 (5th Cir. 1994). Pursuant to a previous notice to the court regarding venue, this action is being presented in the Eastern District of Texas.

## CLAIMS PRESENTED

There are three sets of claims that will be presented. There are 1) new claims which have not been previously submitted, or were submitted under the wrong legal theory collectively called *Martinez* claims, 2) claims presented and properly exhausted in the state application for writ of habeas corpus and lastly, 3) claims that were presented and exhausted on direct appeal.

*New Martinez Claims that Were Not Presented*

1.     **Trial Counsel was ineffective in violation of the Sixth Amendment for presenting extensive testimony about Petitioner's drug use and his "drug**

induced psychosis" at the time of the crime, and then failing to allow the jury a vehicle (i.e.; a jury instruction) to consider that testimony as mitigation of punishment, as allowed by Tex. Penal Code § 8.04, in violation of the Eighth Amendment.

    2.     The trial court erred in failing to include a requested jury instruction on voluntary intoxication when it was clearly warranted by testimony extensively developed by the Defense.

    3.    Appellate Counsel was ineffective for failing in violation of the Sixth Amendment for failing to bring in the Motion for New Trial and Direct Appeal the failure of trial counsel to include a requested jury instruction, and the trial court's failure to include a jury instruction when it had been requested, on voluntary intoxication as a vehicle of mitigation consideration by the jury.

    4.    State Habeas Counsel was ineffective for failing to allege in the state application for writ of habeas corpus that 1)trial counsel was ineffective for failing to insist on a voluntary intoxication instruction when the Defense was the one that developed the testimony, 2) the trial court erred in failing to provide a requested voluntary intoxication instruction in violation of the Eighth Amendment, and 3) appellate counsel was ineffective for failing to allege the voluntary intoxication issue in the motion for new trial and on direct appeal.

    5.    A) The evidence was sufficient to the preponderance standard to demonstrate that Mr. Milam was, and is, mentally retarded and thus both appellate and habeas counsel were ineffective for not asserting this claim for state review and exhaustion, in violation of the Sixth Amendment.
        B) The evidence was sufficient to demonstrate that Mr. Milam was functioning at somewhere between an 8 and 16 year old emotional level. Thus, his sentence of death violates the Supreme Court's mandate that persons below the age of 18 shall not be executed. *See Roper v. Simmons,* 543 U.S. 541 (2005) Appellate counsel was ineffective for not pursuing this claim once it had been established via a ruling by the trial court. Habeas counsel was ineffective for not asserting the appellate counsel was ineffective in exhausting this claim in violation of the Sixth Amendment.

*Claims Exhausted in State Habeas Proceedings*

6.     **Trial Counsel rendered Ineffective Assistance of Counsel in violation of the Sixth and Eighth Amendment by not relying upon the proper hearsay exception in attempting to have admitted the statement of the co-defendant.**

7.     **Appellate Counsel rendered Ineffective Assistance of Counsel in violation of the Sixth Amendment of the United States Constitution by failing to raise on direct appeal the Trial Court's refusal to admit the co-defendant Jesseca Carson's statement.**

8.     **Trial Counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment by failing to object to specific instances of violence introduced by the prosecution regarding violence in the Texas Prison System. The failure to object violates Petitioner's right to the 8th Amendment requirement of individualized sentencing.**

9.     **Trial Court rendered ineffective assistance of counsel in violation of the Sixth Amendment by failing to properly cross-examine Bryan Perkins in regards to bias in favor of Jesseca Carson, the co-defendant of Petition.**

*Claims Exhausted on Direct Appeal*

10.     **The Trial Court erred in denying petitioner's *Batson v. Kentucky* challenge to juror Jobess Shaw, after the trial court was made aware of the racial animus of the prosecutor in calling Ms. Shaw "an angry Black woman" in violation of equal protection and due process under the Fourteenth Amendment.**

11.     **The Trial Court erred in granting the State's challenge for cause of Juror Trzeciak, in violation of the Sixth and Fourteenth Amendments.**

12.     **The Trial Court erred in allowing the State to comment upon petitioner's invocation of his right to remain silent versus the facts of the offense with the State's and Defense expert in violation of the Court's order and the Petitioner's Fifth Amendment right to remain silent.**

**13.** The State knowingly created a false impression that petitioner refused to speak about the facts of the offense to the State's expert on advice of Counsel, in violation of the Fourteenth Amendment.

**14.** Prosecutorial misconduct in closing argument during sentencing denied Petitioner a fundamentally fair trial and the right to a reliable sentencing determination in violation of the Eighth and Fourteenth Amendments.

**15.** The Texas Death Penalty Scheme violated Petitioner's rights against cruel and unusual punishment and due process of law under the Eighth and Fourteenth Amendments by requiring at least ten "no" votes for the jury to return a negative answer to the punishment issues.

**16.** The Trial Court committed constitutional error by charging the jurors that they had discretion to decide whether a circumstance was mitigating.

**17.** The Texas Death Penalty scheme violates Petitioner's right against cruel and unusual punishment, an impartial jury and due process of law under the Sixth, Eighth and Fourteenth Amendments because of vague and undefined terms in the jury instructions at the punishment phase of the trial that effectively determine the difference between a life sentence and the imposition of the death penalty.

**18.** Texas Prosecutors' unfettered standardless and unreviewable discretion violates equal protection, due process and the Eighth Amendment.

**19.** The Texas death penalty scheme violates due process of the Fourteenth Amendment because the punishment special issue related to mitigation fails to require the state to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi* and it progeny.

**20.** The trial court erred by admitting the irrelevant and prejudicial evidence of petitioner's father's racial prejudice in the punishment phase of trial, in violation of equal protection, right to a fair trial and due process. Additionally, because trial and appellate counsel did not frame this issue in correct constitutional constructs, he was ineffective and habeas counsel was ineffective for not alleging same.

**21.** **The cumulative effect of the above-enumerated Constitutional violations denied Petitioner due process of law in violation of the Fifth and Fourteenth Amendments.**

# **INTRODUCTION**

On December 2, 2008, Blaine Milam was a person who defense and state experts agreed was in the category of retarded or borderline retarded "one way or the other."[1] Mr. Milam was in a destructive relationship with Jesseca Carson, who was likely suffering from postpartum psychosis. On the night of December 2, 2008, Jesseca's daughter, Amora, was horribly mutilated and murdered by either Jesseca, Blaine or both. The following morning, Blaine called 911 and reported the death of Amora.

On May 27, 2010, Blaine Keith Milam was convicted of capital murder and sentenced to death on a conviction out of the 4th Judicial District Court of Rusk County, Texas.[2] On May 23, 2012, the Texas Court of Criminal Appeals affirmed the conviction on direct appeal in an unpublished opinion.[3] The state application for a writ of habeas corpus was denied on September 11, 2013, in a half page order based upon a twenty-five page state application which alleged only four claims for

---

[1] Report of Dr. Gripon referenced in the testimony of Dr. Cunningham (RR 53)
[2] See *State v. Blaine Milam,* CR09-66
[3] *See Milam v. State,* AP-76,379 (Tex. Crim. App. May 23, 2012)

15

relief.[4] The current pleading is submitted within the one year statute of limitations

pursuant to 28 U.S.C. § 2244(d)(1).

## FACTUAL AND PROCEDURAL BACKGROUND

*Jury Selection*

During voir dire, the state would inform the potential jurors that they may

have to determine of Mr. Milam was "retarded." The State set out that if "ten or

more" of the jury found that Mr. Milam was retarded he would be exempt from the

death penalty. The State set out that it would be the Defense burden and they

would have to prove 1)"significantly sub-average intellectual functioning" as a

result of testing, 2) the sub-average intellectual functioning is "accompanied by

related deficits in adaptive functioning" and 3) the onset of the sub-average

intellectual functioning had an onset prior to age 18. (RR 37:145-148; 368-369)[5]

Thus, the state started out with a conjunctive test that required each part of a three

part test must be met before a person could be found to be "retarded" or as it is now

known as intellectually disabled.[6]

---

[4] *Ex Parte Blaine Keith Milam,* No. WR-79,322-01 (Tex. Crim. App. Sept. 11, 2013)
[5] Voir dire of Tina Nauman the last of the 46 jurors who were not subject to removal for cause, this pattern was repeated by the state on all potential jurors. The Court subsequently granted two additional peremptory challenges for the defense (RR 37:190) and thus the pool was increased to 48.
[6] The current DSM-5 allows that the term intellectual disability is the correct term to use as well as the current federal law and holding of the Supreme Court. *See Hall v. Florida,* ___U.S. ___, 134 S.Ct. 1986, 1990 (2014). In the current case, mental retardation was used throughout the trial and thus the terms will be used interchangeably.

On April 22, 2010, with a remaining panel of forty-eight potential jurors, the following were selected as jurors; 1) Robert Wallace, #9 2) Judy Bowles # 22 3) Sandra Peacock # 37 4) Charles Lynn # 48 5) David Crowe # 51 6) Jean Ann Kiker # 69 7) Eva Harris # 89 8) Keith Miller # 96 9) Tamara Laugharn # 100 10) Ricardo Brususelas # 108 11)  John McClean # 122 12) Marcel Fingers #124. Alternate jurors were David Hall # 141 and  Robert Cloran # 149. (RR 38:4-15)

The State used peremptory strikes to challenge # 34 Jo B. Shaw, # 36 Alphonso Lucas and # 111 Rodney Jackson,  three of the four potential black jurors. The defense submitted a *Batson*  challenge to the three strikes by the State to preclude 75% of the potential black veniremen from serving on the jury. (RR 38: 17-18)[7] The State responded that Ms. Shaw was anti-death penalty and had remarked off the record that she was "**an angry black female**". The defense noted that the State had spent a great deal of time on Ms. Shaw trying to get her struck for cause and the State agreed with this. The Court overruled the *Batson* challenge based upon the State's explanation.  (RR 38:19-23) With regards to Mr. Lucas the State pointed out that Mr. Lucas also did not believe in the death penalty and had a son serving a life sentence for murder. The Court overruled the *Batson* challenge based upon the explanation.

---

[7] Throughout this brief, RR is reporters record and CR is clerk's record.

*Guilt Innocence Phase*

On the morning of December 2, 2008, Mr. Milam called 911 to report the death of Amora Carson. Subsequently the mother, Jesseca Carson got on the phone with the 911 operator and described the injuries and then relayed information to Mr. Milam about attempting CPR. The child did not respond. (RR 42:103-114)

Mr. Milam was indicted for the capital murder of Amora Bain Carson on December 2, 2008. The indictment set out four alternate theories of death. First, Mr. Milam caused the death by striking Ms. Carson with his hands and she was under six years of age. Second, Mr. Milam caused the death of Ms. Carson by striking her with an object, the exact nature of which is unknown  and she was under six years of age. Third, Mr. Milam caused the death of Ms. Carson by striking her against an object, the exact nature of which is unknown, and she was under six years of age. Lastly, that Mr. Milam caused the death of Ms. Carson by strangling her and she was under six years of age. Additionally, the indictment alleged the use of a deadly weapon, that is a hand, hands or an unknown object (RR 38:42-43; CR 1:3-4)

Trial began on May 3, 2010. The State began their opening statement by stating that:

Amora was robbed of her life, and I submit to you she was robbed of her innocence, the only thing that this 13 month old child had to offer. You're going to hear some things, you're going to see some things in this trial. I submit to you, to know Amora, to hear her story, you're going to give up some of your innocence, and I'm sorry about that. I'm sorry about the things that I'll bring to you and that I'll show you. I expect that there will be times when that will be difficult. We talked about this some in jury slection. There will be times when you want to look away, I submit, when you want to hide, when you want to minimize it, when you want to make excuses, when you want to do anything but have to face the evil that robbed us of Amora Bain Carson.

(RR 39:46) Mr. Milam's counsel objected and the objection was sustained. An instruction was granted but a mistrial was denied. The State asked for an explanation of what was wrong with the opening statement and the court informed him that it was "the evil part of it."

Heather Mutina began the testimony by stating that Amora Carson was the daughter of her brother Arlen Mutina, who was in Iraq at the time of the trial and Jesseca Carson, who was his high school girlfriend. When Jesseca Carson was pregnant with Amora she lived for a while in the Mutina home. However, Arlen left for the military before Amora was born. Jesseca soon started dating Blaine Milam after Amora was born. A few days before thanksgiving in 2008, Blaine and Jesseca visited the Mutina home in Longview, Texas for three or four hours. Heather Mutina observed what she thought was a bite mark on Amora's right arm.

The bite mark was explained off by Jesseca  stating it was a dog bite. Soon

afterwards, Blaine returned and told Jesseca they needed to go. (RR 39:95-109)

On December 2, 2008, Kevin Roy was the patrol sergeant for the Rusk

County Sheriff's Department. Around 10:30 a.m. that morning he received a

dispatch call based upon a 911 call concerning the death of Amora Carson. Officer

Roy left Henderson, Texas and proceeded to the rural location where the 911 call

had originated arriving approximately 15 minutes later. (RR 39:121-131) Officer

Roy arrived at the mobile home from which the call had originated and there were

two ambulances present when he arrived. The home had trash strewn about and

was messy. When Officer Roy entered the home he found Ms. Carson and Mr.

Milam  kneeling over the body of Amora Carson.  Officer Roy had Ms. Carson and

Mr. Milam to step outside the home and he noted that Amora had circular bruises

on her body but could not tell what had occurred. (RR 39:132-142) Officer Roy

also noted that upon attempting to lift the right foot, Amora's body was cold and

was stiff. (RR 39:145-146) After securing the remainder of the home, Officer Roy

contacted Detective Amber Rogers because she was the investigator on call. (RR

39: 152-158)

Officer Roy asked Mr. Milam what had occurred. Mr. Milam stated that he

and Jesseca had left Amora in the home after feeding her at approximately 8:30

a.m. and they had left Amora to walk up the road to talk to a person named Clark about some land here Mr. Milam had planned on putting a home. They had returned approximately an hour later. (RR 39:162-163) Soon thereafter, investigator Rogers and Texas Ranger Ray arrived.

Kenny Ray was a Texas Ranger assigned to the Tyler, Texas area, which included Rusk County as well as two other counties. When Ranger Ray was notified of a deceased child, he and Investigator William Brown, of the Rusk County District Attorney's Office, went to the scene. When Ranger Ray arrived he observed Ms. Carson and Mr. Milam hugging and assumed it was grieving parents. (RR 39:220-227) Ranger Ray brought Mr. Milam to his car and recorded a witness interview. Mr. Milam noted he was 18 years old and worked as a mechanic when he could but had problems with his kidneys that prevented him from working currently. Mr. Milam had been with Ms. Carson since March of 2008, Mr. Milam told Ranger Ray the same version of events that he had given Officer Roy regarding leaving around 8:30 a.m. and going down to look at some land where he was to meet a Mr. Clark. Mr. Clark allegedly called and said he was not coming so they returned to the house approximately an hour to an hour and a half after the left. They had left Amora in her crib and when they returned she was not there. They looked around and found Amora in a hole in the floor and she was not

breathing. They called 911 and were told to start CPR. They removed Amora to the floor and started CPR until the EMTs arrived and then the police arrived. Mr. Milam believed it was either Toby Barnes or Robert Bradford who would be responsible for the death of Amora. Ranger Ray challenged Mr. Milam on his version of the events and told him that Amora had bite marks all over her and a search warrant would be secured to get dental impressions. Mr. Milam asked about calling a lawyer and the interview ended. (RR 59:exhibit F1)

After the interview, Ranger Ray went to the Rusk County Sheriff's Department where Mr. Milam had been taken. Ranger Ray secured a DNA consent form from Mr. Milam and took DNA swabs.  Ranger Ray also interviewed Jesseca Carson who initially denied anything had happened but later told of a ritual where Mr. Milam and her killed Amora in some type of ritual. Ms. Carson's statement was not allowed before the jury. (RR 40:5-62)

Shane Clark, the person who was allegedly supposed to meet Mr. Milam and allegedly called him to say he could not come, testified that he works in the timber business with Dwight Clark, his father. Shane Clark had met with Mr. Milam on November 22, 2008, to talk about cutting some timber on land owned by the Milam family. Mr. Milam was to come in on November 30th or December 1, 2008 to sign a contract for the timber but it did not occur. Mr. Clark did not have an

22

appointment with Mr. Milam on December 2, 2008, and did not talk to him on that date. (RR 40:111-117) Dwight Clark stated that he did not ever talk to Mr. Milam and he did not talk to Mr. Milam on December 2, 2008. (RR 40:121-126)

Dr. John Bruce Hillin, a dentist in Henderson, Texas, testified that he prepared study models of Blaine Milam's teeth on December 2, 2008, as well as study models of Jesseca Carson's teeth. Later, on November 30, 2009, Dr. Hillan made study models of Danny Milam, Blaine's brother. (RR 40:146-157)

Shirley Broyles was a nurse at the Rusk County Jail. On January 22, 2009, Nurse Broyles was making her rounds when Mr. Milam asked to see her. When Nurse Broyles arrived in front of Mr. Milam's cell he handed her a request to see Amber Rogers, the case investigator.  Because Mr. Milam appeared to be upset Nurse Broyles inquired if Mr. Milam was ok. Mr. Milam replied the he was going to confess. "I did it. But Ms. Shirley, the Blaine you know did not do this."  Mr. Milam further stated that his father had told him to be a man and he had been reading his Bible. Lastly, Mr. Milam requested that Nurse Broyles tell Ms. Carson that he loved her. Nurse Broyles then delivered the request to Investigator Rogers. (RR40:161-166)

Cassandra Shaw, the jail administrator at Rusk County, testified based upon a business record that Mr. Milam was visited by his sister Teresa Liesman on

December 13, 2008. (RR 40:170-174) Ms. Liesman subsequently became Teresa Shea and she testified that on December 2, 2008, she was living in Indiana when her younger brother, Blaine Milam was arrested for the capital murder of Amora Carson. On the night of December 1, 2008, Ms. Shea had received a call from Mr. Milam and they briefly talked. The following morning, on December 2, 2008, Ms. Shea received a call from Mr. Milam prior to 9:30 a.m. and he was crying and said that he had found Amora dead. Ms. Shea instructed Mr. Milam to call 911. Because of work, Ms. Shea was not able to travel to Texas until around December 12, 2008. On December 13, 2008, Ms. Shea and her mother, Shirley Milam, went and visited Mr. Milam in the Rusk County Jail. Mr. Milam told Ms. Shea that Ms. Carson had put some items under the home that Ms. Shea understood were related to the death of Amora. Ms. Shea never went out to the home to determine what Mr. Milam was talking about but she understood that the items might be helpful to Mr. Milam's defense. (RR 40:176-193)

In contradiction to Ms. Shea's testimony, Dena Gray, the aunt to Ms. Shea's husband, testified that Ms. Shea had asked her to take her to the home where Amora was killed in order to retrieve items from underneath the house. Ms. Shea notified Investigator Rogers about the conversation. (RR 40:195-198)

24

William Brown, the investigator for the Rusk County District Attorney's Office prepared and executed a search warrant on the Milam home on December 13, 2008. Upon arriving at the home Investigator Rogers went under the home and located part of a pipe wrench in a one gallon plastic bag and retrieved it for evidence. (RR 40:202-208) Investigator Brown also testified regarding the birth and death of Amora which established she was born on November 12, 2007, and thus was less than 13 months at the time of her death. (RR 40:210-213)

Investigator Brown testified extensively about the physical investigation of the crime scene and the collection of the evidence.  Although Investigator Brown agreed that the crime scene was not secured on December 2, 2008, and there was a multitude of mistakes, he did believe the rural officers and investigators did the best they could in properly documenting the scene and collecting and submitting evidence. He was also responsible for the collection of DNA swabs from Mr. Milam. (RR 40:213-322, 41:4-26)

Charles Helton, an investigator with the Rusk County Sheriff's Office, assisted with the execution of a search warrant on December 13, 2008, as well as the initial crime scene investigation on December 2, 2008. On December 2, 2008, Investigator Helton took photographs as the backup photographer and took swabs from bite marks. Investigator Helton was questioned extensively on cross-

examination on the proper procedures for crime scene investigation and evidence collection and preservation. (RR 41:27-136) Detective Helton also took swabs from Jesseca Carson. (RR 42:87-88)

Dr. Keith Pickard, a forensic pathologist who works for the Southwest Institute of Forensic Science in Dallas, Texas, testified as to the nature of the injuries to Amora. There were twenty-four bite marks throughout the body, extensive fractures to the back of the skull. The neck showed indications of strangulation. There were broken bones in an arm and a leg as well as eighteen rib fractures. There was also a laceration of the liver.  Lastly, there was a large tear in the vagina-rectum area caused by some large object. At the conclusion of the autopsy, Dr. Pickard could not point to any specific reason for death because it could have been one of four possible causes which all fit into the homicidal violence determination.  (RR 41:158-202)

Crystal Dopson, a manager of a pawnshop in Henderson, Texas, testified that Jesseca Carson came into her pawn shop at approximately 9:00 a.m.  on December 2, 2008, and pawned some tools. (RR 42:57-86)

David Marshall, an investigator with the Henderson Police Department went to Ms. Dopson's pawn shop to secure the video from the morning of December 2, 2008. (RR 42: 93-97) He also secured a video of a gas station in Henderson, Texas,

where Ms. Carson and Mr. Milam went the morning of December 2, 2008. (RR
42:100-103)

Missy Wolfe was an investigator with the Texas Attorney General's Office.
On December 11, 2008, Investigator Wolfe and Investigator Rogers secured a
consent to search the Milam home again and get a diagram of the crime scene. Ms.
Wolfe also was responsible for having the various items of evidence tested prior to
trial. (RR 42:103-142, 43:5-14)

Noel Martin, a crime scene investigator from Tyler, Texas. On December
11, 2008, Investigator Martin went out to the Milam home to conduct a crime
scene investigation.  Investigator Martin found several presumptive blood stains on
various items which were introduced at trial. (RR 42:143-235)

Angela Thomas, a serologist at the Southwest Institute of Forensic Science
(SWIFS) in Dallas, Texas, reviewed the evidence submitted for blood. While there
were items of clothing from Ms. Carson that contained blood, the clothing of Mr.
Milam did not have blood on it. (RR 43:21-72)

Angela Fitzwater, a forensic biologist for SWIFS, did the DNA testing in
Mr. Milam's case. Ms. Fitzwater had known samples from Ms. Carson, Amora,
Blaine Milam and his brother Danny Milam for comparison purposes. The DNA

27

testing did not reveal any specific information that would counter the previous investigation and testimony. (RR 43:84-206)

Patrick Hill, an investigator with the Department of Family Protective Services (CPS) went to the Milam home on December 4, 2008, to conduct a mandated investigation of a child under six years old. Mr. Hill took photographs at the scene but did not gather any evidence. Mr. Hill testified about the pictures he took at the scene. (RR 44:5-43)

Amber Rogers, the original lead investigator,  had left law enforcement to become a student by the time of the trial of Mr. Milam.[8] Investigator Rogers left the scene of the incident on December 2, 2008, to gather statements and evidence from Ms. Carson and Mr. Milam at the Rusk County Sheriff's Department. Ms. Rogers returned on December 11, 2008, with Investigator Martin to diagram the scene and retrieve evidence based upon a consent to search by Mr. Milam's mother. On December 13, 2008, Ms. Rogers returned to the Milam home to locate an item under the house. After securing a search warrant Ms. Rogers returned to the house and found the piece of the pipe wrench in a plastic bag under the house.[9] Ms. Rogers asserted at trial that she was not responsible for the crime scene because

---

[8] There were several changes in the Rusk County Sheriff's Department based upon a change of Sheriff's in January of 2009.
[9] There was a metal cross that Ms. Carson had purchased that was allegedly the item used to tear Amora in her bottom area as part of a exorcism by Ms. Carson. This item was never found as part of the investigation.

she was ordered by Lt. Humber, to go to the Sheriff's department shortly after she arrived at the crime scene and she assumed that he took over from the point that she left. (RR 44:44-66, 80-135)

Jesseca Carson was called outside the presence of the jury and invoked her right to remain silent and affirmed she would not be a witness in the case. (RR 44:69-70)[10]

Sherry Digby, Mr. Milam's sister stated that their mother Shirley Milam had stayed at her house in Louisiana on the three nights leading up to the death of Amora. Additionally, her brother Danny Milam had also stayed with her the previous night before the death was reported. (RR 44:137-144)

Gene Lawrence, a forensic scientist with the Texas Department of Public Safety testified that he found silicone oil on both the piece of the pipe wrench and the diaper of Amora. There was a tube of silicone oil (Astroglide) in the house but Mr. Lawrence could not say that the silicone oil was exclusive to any one item since there are many sources of silicone oil.[11] Mr. Lawrence had also noted that there was the possibility of cross-contamination based upon the way the items were handled. (RR 44:148-179)

---

[10] Ms. Carson had given a self-serving statement to the police in which Mr. Milam was the main actor in an exorcism ritual on Amora. However, this statement was not allowed before the jury.

[11] The state tried to show that the silicone oil was linked to the murder because of a lubricant found. However, silicone oil is widely known as WD40, which is used on tools.

Dr. Robert Williams, a forensic odontologist affiliated with SWIFS,
testified that human teeth and human dentition is unique (RR 44:200) Dr. Williams
took pictures of the bite wounds on Amora and received the dental impressions
taken by Dr. Hillin of Blake Milam, Danny Milam and Jesseca Carson. Dr.
Williams testified that there were approximately 25-30 bite marks on Amora and
he found eight that were consistent with Mr. Milam. One more bite mark under
Amora's chin, was consistent with Jesseca Carson. Dr. Williams noted on cross-
examination the problems with odontology that were pointed out in the 2009 book
by the National Academy of Sciences "Strengthening Forensic Science in the
United States: A path forward."  He also agreed that he could not establish if the
bite marks were prior or after death. (RR 44:189-286, 45:4-74)

On May 11, 2010, after seven days of trial, the state rested. A general
motion for directed verdict was denied.  On May 12, 2010, after the opening
statement by Mr. Milam's attorney, in which he stated the evidence would show
that Jesseca Carson murdered her baby and the bite mark evidence was suspect, the
defense called Heather Carson, Jesseca's mother. (RR 45:75-79, 46:23-27)

Heather Carson stated that Jesseca Carson grew up in Alabama and moved
to Longview, Texas with her. Jesseca had Amora and was living with Heather
Carson when she met Blaine Milam in January of 2008. In late April or May of

30

2008, Jesseca moved in with Mr. Milam. Around September of 2008, Ms. Carson began to notice a change in Jesseca in that she was subdued and was not paying too much attention to the way she dressed or presented herself. Jesseca had previously been a witness to the scene of her father's suicide by gunshot in 2001. Ms. Carson cut off contact with her daughter due to finding out that Jesseca had stated that Ms. Carson had killed her father as well as incidents of telephone harassment and a break-in.  Ms. Carson saw Jesseca in November of 2008 and she was concerned about her daughter's mental health at the time. However, Ms. Carson believed that this was a result of her daughter being with Mr. Milam. (RR 46:28-75)

Ricky Bessette, an acquaintance of both Mr. Milam and Ms. Carson testified that they and Amora were at his home on Thanksgiving of 2008. On the night of December 1, 2008, Mr. Bessette saw them again at a truck stop in Longview, Texas. At the truck stop, Jesseca went inside the store to purchase something and Mr. Milam and Amora stayed in the car. (RR 46:93-129)[12]

Noel Martin was recalled by Mr. Milam's attorney to set out the problems with the investigation as far as collection of evidence and the crime scene. The additional testimony did not create any new revelations about what had occurred in the investigation. (RR 46:130-196)

---

[12] Mr. Bessette was known to supply methamphetamine to Mr. Milam.

Lisa Taylor testified that she had known Jesseca Carson in Alabama when Jesseca was growing up. In October of 2008, Ms. Carson and Mr. Milam brought Amora to Ms. Taylor's home for a one night visit. Ms. Carson was making a bizarre accusation concerning Jesseca's mother so Ms. Tyler asked a neighbor, Officer Tim Lyles to talk to Jesseca. Jesseca was also indifferent to her child during the October visit.

On November 16, 2008, Ms. Carson and Mr. Milam came back to the home of Ms. Taylor. Again Ms. Carson was acting odd and not taking care of Amora. Mr. Milam was responsible for taking care of Amora if other family members did not and Ms. Carson appeared to be the one in charge of the relationship. On cross-examination, Ms. Taylor agreed that when she was interviewed by the police on the day after the murder, December 3, 2008,  she had stated that Ms. Carson was acting pretty normal and it was Mr. Milam who was acting weird. (RR 46:200-227)

Dr. Frank Murphy, a forensic psychiatrist, testified that he had reviewed an interview with Ms. Carson, as well as people who had interacted with Ms. Carson, and he was of the opinion that she it was more likely than not that Ms. Carson was suffering from psychotic depression. Dr. Murphy noted on cross-examination that he was not certified in forensic psychiatry and this was the first time that he was

asked to diagnose a person without actually being able to interview the person. (RR 46:230-281)

Dr. George Issac, a forensic odontologist, testified that he had reviewed the same material that was reviewed by Dr. Williams because Dr. Williams had consulted with him when he was forming opinions. Dr. Issac noted that odontology was much more subjective than DNA and there was a lot of room for error. Dr. Issac noted that several of the bite marks that Dr. Williams had stated belonged to Mr. Milam could in fact be either Mr. Milam or Ms. Carson and at least one of the bite marks that Dr. Williams had stated was Mr. Milam was in fact Ms. Carson. Thus, Dr. Issac found seven bite marks, four of which Mr. Milam could not be excluded and three of which Ms. Carson could not be excluded. Dr. Issac also noted that teeth are not a unique feature to an individual. (RR 47:5-68)

Cannon Levoy, a deputy with the Rusk County Sheriff's Office, testified that he went to the Milam house on December 2, 2008. Deputy Levoy was assigned the task of bagging evidence that was collected by another deputy.  One bag of items that were collected reflected that there was clothing in the bag but when the bag was opened at trial, no clothing was present. Mr. Levoy stated that he was told what to write on the bag and could not explain why there were not clothes with the other items present. (RR 47:69-85)

The defense rested and both sides closed. Although there were discussions about Mr. Milam testifying, there was a ruling by the Court that a previous conviction for solicitation of a minor could be used for impeachment. However, there was no record as to whether Mr. Milam wanted to testify despite the impeachment. On May 17, 2010, the Court read the charge to the jury and the parties argued the case for four hours. The jury came back with a guilty verdict that same evening. (RR 46:97-109, 47:4-208)

*Punishment Phase*

On May 18, 2010, the punishment phase began. After opening statements, Mark Hogberg, the adult probation director in Rusk County, testified that on August 22, 2008, Mr. Milam was placed on probation for solicitation of aggravated sexual assault which occurred on March 13, 2007. The conditions of probation included that he serve 180 days in jail and serve five years probation as well as stay away from children's facilities. (RR 49:21-50)

Paul Autrey was an investigator in the Rusk County Sheriff's Department in March of 2007 and was assigned to investigate a person who had left pornographic pictures in the chest of drawers of an eleven year old girl. The home was approximately 100 yards from the Milam home so Officer Autrey interviewed Danny Milam and then Blaine Milam. Blaine Milam told the officer that a Robert

34

Bradford forced him to go into the house at gunpoint and place the pornographic images with  notes such as "try this", "this position is the best one" and "try it with a boy older" amongst others written on the picture. RR 49:50-70)

Ranger Kenny Ray was recalled concerning the complete audio interview he conducted on December 2, 2008. Ranger Ray testified that Mr. Milam demonstrated the ability to read and write during the interview and knowledge of the mechanics trade. Mr. Milam also stated he had finished the sixth grade in school.  Mr. Milam told Ranger Ray that there had been an incident with an eight year niece where a 22 year old man was assaulting her and he had walked in and he had "taken care of it" but he was the one that got arrested. (RR 49:51-81)

Robert Bradford testified that he did not know Blaine Milam but he did know the alleged victim in the 2007 solicitation of sexual assault allegation because her family lived near his Grandmother's house, where he would visit. Mr. Bradford denied having anything to do with the incident which lead to the solicitation conviction of Blaine Milam. (RR 49:82-89)

Glenda Risinger was the assistant property manager at Courtyard Apartments in Longview, Texas, during the time that Jesseca Carson and Blaine

Milam lived in the apartments from August 1, 2008 to November 11, 2008.[13] When Ms. Carson and Mr. Milam moved out of the apartment it was left in a mess. Mr. Milam had approached Ms. Risinger while he was living there and asked her to notify him if anyone went to his apartment while he was gone. (RR 50:4-16)

Bryan Perkins was the security patrol at the Courtyard Apartments at the time Jesseca Carson and Blaine Milam were living there. Mr. Perkins was also the manager of an auto repair business. Blaine Milam had applied for a job at the auto repair business. Mr. Perkins hired him in June of 2008 to be a "tire buster" which did oil changes and changed tires. Mr. Milam could fill out work orders and generally performed his work as instructed.  During his employment Mr. Milam had informed Mr. Perkins that he had gotten into an altercation and would be on work release, spending his nights in jail and reporting to work during the daytime.

During the time that he was working at the auto shop, Mr. Milam talked to Mr. Perkins about finding a place to live closer to work. Mr. Perkins was the security person at the apartment complex so he recommended to Mr. Milam he live in the apartment complex.  Mr. Milam, Ms. Carson, along with Amora, would come over to Mr. Perkins apartment after they moved and play monopoly. Mr. Milam would bring Ms. Carson and Amora to work with him and they would be

---

[13] Ms. Risinger was recalled and stated that they had vacated the apartment by the end of October of 2008. (RR 50:127-129)

there all day because Mr. Milam did not trust Ms. Carson based upon a previous

boyfriend being present on an occasion. Mr. Perkins told Mr. Milam that he needed

to be less controlling. When Ms. Carson received a $ 25,000 inheritance Mr.

Milam quit coming to work. Eventually, Mr. Milam quit coming to work so he was

released from employment.

        After December 2, 2008, Mr. Perkins had written Ms. Carson numerous

times at the Rusk County Jail and visited her. He had also received numerous

letters from Ms. Carson. (RR 50:17-54)

        Monty Clark was a patrol officer for the Rusk County Sheriff's Office on

January 27, 2008, when he responded to a call where Blaine and Danny Milam

were in a fight on the side of a road. Deputy Clark determined it was Blaine Milam

who was the aggressor in the fight but both of them had been bloodied. Blaine

Milam was arrested for assault and family violence. (RR 50:55-71)

        Kenneth McDade, a former inmate of the Rusk County Jail and was

currently in prison, testified that he lived in a five man dorm with Mr. Milam while

at the Rusk County Jail. McDade stated that Mr. Milam was able to get dope and

dipping tobacco into the jail through a jail trustee. Mr. Milam told McDade that his

brother was going to call in a bomb threat on the jail so that they could escape and

Mr. Milam planned on going to Mexico. During the time in the jail, Mr. Milam

37

allegedly threatened Mr. McDade when they got into an argument by stating that he "would wake-up with a pencil in his side."

Mr. McDade's pending charge in Rusk County, unauthorized use of a motor vehicle, was dismissed after he talked to Investigator Rogers, on February 15, 2009,  about what he alleged had occurred in Rusk County Jail with Mr. Milam. He was subsequently given probation on the burglary of a habitation charge out of Smith County, which was revoked and he was sentenced to six years in prison. (RR 50:72-92)[14]

Crystal Zapata knew Ms. Carson from high school in Longview, Texas, and had met Mr. Milam when Ms. Carson began dating him. On one occasion after Mr. Milam's father had passed away, Ms. Zapata relayed a conversation that Ms. Carson had with Mr. Milam where he was going to shoot himself. The two went out to Mr. Milam's home and Mr. Milam allegedly discharged a firearm in the home. Mr. Milam then left the home and Ms. Zapata and Ms. Carson went back to her house. Mr. Milam came to the house later that evening. Ms. Zapata stated that when Mr. Milam was drinking alcohol he would be a mad drunk.  (RR 50:72-125) Subsequent to Ms. Zapata's testimony the State rested. (RR 50:126)

---

[14] Counsel had an investigator attempt to talk to Mr. McDade but he avoided contact.

Nelda Thornton was a teacher in Tatum, Texas, and taught 1st and 2nd graders, and taught Mr. Milam in what she believed was the first grade. Mr. Milam had poor attendance and she did not remember him as being a bright student. Mr. Milam had a speech problem and was a slow student but Ms. Thornton could not remember if she referred him for testing. When asked if she thought Mr. Milam was a median student Ms. Thornton responded that Mr. Milam was a quite student who probably needed a little help. (RR 51:4-24)

Carolyn McIlhenny was a second and third grade teacher in Tatum, Texas. Ms. McIlhenney taught Mr. Milam and remembers he did not receive good grades and was often absent from school, usually one day a week. Mr. Milam also had medical problems. Mr. Milam had a low self esteem and was an overall slow student. Ms. McIlhenney understood that Mr. Milam quit attending school in the fourth grade and was to receive home-schooling. (RR 51:25-39)

Larry Fitzgerald, a former employee of the Texas Department of Criminal Justice, Institutional Division, who worked as a public information officer, testified about the prison process in Texas. Specifically, he testified about 1)the classification process, 2)what a general population inmate does and is housed versus a death row inmate, 3)he specific process for an execution, 4) the rate of suicides in prisons. 5)rates of crime and sexual assault in prison. Mr. Fitzgerald

testified that a person serving a life without parole sentence could not work outside of the prison perimeter. Upon cross-examination, Mr. Fitzgerald noted that during an escape attempt in January of 2010, at the Polunsky Unit, five inmates had tried to escape by climbing the fence and three had been shot. Of those five, according to the prosecutor three were inmates who had received life without parole on a capital murder conviction and two were serving life, as well as numerous other occasions where persons serving life or life for capital murder had attempted to escape or seriously injured or killed persons while in prison or attempting to escape. (RR 51:40-125)

Mike Weinzettle was employed by the Montgomery County Sheriff's Department. Mr. Weinzettle was called to introduce records of the Montgomery County Jail which demonstrated that Mr. Milam arrived at the Montgomery County Jail on February 23, 2010 and through the trial and had no disciplinary issues since he had arrived at the jail and had remained in segregation during that time frame. (RR 51:125-139)

Shirley Milam, Mr. Milam's mother, testified that she grew up near Canton, Texas and her father had died when she was four and she went and lived with a relative where she was sexually abused by the relative's husband and son. Ms. Milam left school in the 9th grade. At the age of 14 or 15 Ms. Milam was told that

she was to leave the relatives house because they had found a man for her to marry and she needed to go marry him. The man was in his 20's and Ms. Milam was soon pregnant. After about a year, the two got divorced and Ms. Milam moved to her brother's house in Marshall, Texas, leaving the baby with her ex-husband. Ms. Milam went to work in a Doughnut shop and a gas station when she was sixteen.

Ms. Milam got into a relationship with Larry Donald and found herself pregnant again. Ms. Milam had a daughter, Teresa who was born December 23, 1977. Ms. Milam left Mr. Donald because he would not help support her and Teresa and she began working at a truck stop in Longview, Texas. Ms. Milam met Daniel Milam, the father of Blaine, when she was 20 years old. The two got married in 1981 after Ms. Milam got pregnant for a third time. The Milams would go out and drink alcohol until Ms. Milam passed out. During this time, Danny Milam was born in 1981.

The family moved to Keithville, Louisiana after Mr. Milam lost his job at a Construction company that went out of business. When Teresa began school she was placed in special education classes. Teresa failed the first grade and continues in special education classes. In 1985, Ms. Milam has her fourth child, Sherry Milam. In 1987, Daniel got hurt on the job and was laid off from work. The family

lost their home and filed for bankruptcy. The family would pick up cans on the side of roads and Daniel Milam would work odd jobs when he could find them.

In 1988, Ms. Milam was again pregnant, this time with Blaine Milam. During the pregnancy, Ms. Milam came down with pneumonia and a high fever and spent four days in the hospital. Ms. Milam also had a blood infection during this time. Blain Milam was born on December 12, 1989. When Blaine was young he had a speech problem and could not pronounce words properly. When Blaine got into kindergarten he was placed in speech therapy and his handwriting was "a whole lot off." In first grade, Blaine was also having problems with math. While still in first or second grade, Blaine had a kidney rupture and was forced to wear a bladder stent and urine bag for a month to school, where kids teased him. Blaine continued to struggle in school and after he was paddled in school, leaving a bruise,  in the fourth grade, he was removed from school by his parents. Ms. Milam estimated that Blaine was two or three years developmentally behind the other children at the age of 10.

In 2001, Daniel Milam had a heart attack and stroke. After a surgery several months later Mr. Milam went into a coma for several days and when he came out of the coma he had to learn to do everything again and was like a small child. Daniel Milam did not remember anyone including Blaine.  Blaine and his older

sister were then responsible for taking care of their father while Ms. Milam went to work. Blaine remained two years developmentally behind  other children his age and never went back to school. Additionally, Blaine did not learn to take care of himself, cook or live on his own without problems. Blaine could not control money nor was he able to get up on his own in the morning.  Blaine did not know that you had to get the right sized clothes and would purchase clothes that had to be returned because they did not fit. If Blaine was given a list of items to get at a grocery store he could not come out of the store with the items on the list and did not understand that he had not fulfilled the purpose of the trip. Blaine could not manage money and did not have a bank account.

Concerning the incident at the Hodges house, in 2007, Blaine liked the older daughter at the house but she matured and would not associate with Blaine because he was several years emotionally behind the other kids. The incident involving the pornography was a big shock to Ms. Milam and Blaine could not explain what happened.

Blaine met Jesseca Carson when he had recently turned 18 years old. It was his first girlfriend and he met her over the internet. Blaine would go to Jesseca's house and return home in the evening. After a couple of months, Blaine was talking about marriage. Jesseca moved in to the Milam's home until Blaine and Ms.

43

Carson moved into the apartments in August of 2008. Ms. Milam visited Blaine and Ms. Carson when they lived in the apartment and it was obvious  that Blaine could not take care of himself because the apartment was filthy. Jesseca took care of the money but there was piles of trash in the kitchen along with dirty dishes. There was dirty clothes strewn around the bathroom and bedroom and the floors were dirty.

Daniel Milam recovered enough to take care of himself but remained on disability. On September 10, 2008, Daniel Milam died. Blaine was very upset when his father died. Right before Halloween of 2008, Ms. Carson and Blaine moved back to the Milam home. The home had continued to deteriorate because of the lack of money and anyone to take care of the home. Ms. Carson became distant to Ms. Milam and demonstrated emotional changes. Blain would lie on the bed listening to the funeral music from his father's funeral. Ms. Carson called Ms. Milam one day and said that Blaine had taken some Vicidin while he was listening to the funeral music and was attempting to kill himself. Blaine then got a gun and held it to his head stating "I want to go be with my daddy." Ms. Milam had arrived home by this time and tried to grab the gun. Blaine shot the gun into the floor. Blaine was subject to a civil commitment in the jail. Blaine was released with instructions to report to a mental health agency in Longview, Texas.

Blaine and Ms. Carson began using a Ouija board and told Ms. Milam that they could communicate with the deceased Daniel Milam. They demonstrated how they could communicate with Daniel Milam and asked Ms. Milam to join in. Ms. Milam allowed that if she wanted to talk to her deceased husband she would do it through prayer. Ms. Carson was also communicating with her father through the Ouija board. Ms. Milam tried to convince the two to quit using the board because what they were saying was bizarre. Ms. Carson became convinced that her mother had done something to her father through the Ouija board and Ms. Milam became concerned for her mental health. When the two left the apartment at the end of October they left the Ouija board at the apartment.

Ms. Carson and Blaine went to Alabama twice during November of 2008. The second time they were going to move there but returned after a few days because Blaine wanted to return to his mother's house. Ms. Carson became interested in exorcisms.

Ms. Milam hurt her shoulder on November 30, 2008, and went to go stay with her daughter, Sherry.  Blaine and Ms. Carson were supposed to clean up the house. However, the house did not get cleaned and two days later Amora was dead. (RR 51:140-356)

Patricia Rosen, a medical toxicologist, testified that she had reviewed Mr.

Milam's toxicology report from blood that was collected at 6 p.m. on December 2,

2008. Mr. Milam's level of methamphetamine in his system was .17 milligrams per

liter of blood. Dr. Rosen said this was a high level of methamphetamine. The level

found in Mr. Milam's blood was ten times a therapeutic dose. Because the blood

was taken seven hours after his arrest, Dr. Rosen extrapolated that at the time Mr.

Milam called the police to report the death of Amora, his methamphetamine level

would have been  between .20 and .35 miligrams per liter of blood. Based on her

calculations, Dr. Rosen believed Mr. Milam took a dose of methamphetamine of

approximately 75 milligrams, which in a new user could be fatal. (RR 52:4-54)[15]

Cassandra Shaw, the jail administrator at Rusk County, testified about Mr.

Milam being in jail. With regards to the 180 days of jail time he was to do as part

of his probation he was effectively excused from that when Mr. Milam had the

mental health issue and he was told that once the mental health issue was resolved

he was to return to the work release program. Mr. Milam did not report again. (RR

52:55-79)

Teresa Shea, Mr. Milam's oldest sister, talked about growing up with Mr.

Milam and the rest of the family. Ms. Shea repeated what her mother had testified

---

[15] See Dr. Rosen's affidavit attached as exhibit 2 as to the purpose of her testimony in relation to methamphetamine use.

too about Mr. Milam's problems in school and the family history. Ms. Shea observed Mr. Milam when he and Ms. Carson attempted to live on their own and saw that they did not care of themselves or the apartment. Mr. Milam was always emotionally younger than he actually was. (RR 52:80-109) Sherry Digby, Mr. Milam's other sister, testified along the same lines as her mother and sister. (RR 52:111-126)

Chris Lay, a childhood friend of Mr. Milam, testified that Mr. Milam was slow and was often the subject of harassment and being picked on by other kids. Mr. Lay would often have to defend Mr. Milam. (RR 53:9-25)

Dr. Paula Lundberg-Love, a psychologist with a specialty in psychopharmacology, testified about the effects of methamphetamine on the brain. Dr. Love stated that based upon Mr. Milam's use of methamphetamine he would be experience paranoia and delusions as well as motor problems and irritability and assaultive behavior. Mr. Milam's use of methamphetamine would be at a chronic level prior to his arrest based upon an interview with his drug dealer, Ricky Bessette. (RR 53:45-165)

Dr. Mark Cunningham, a forensic psychologist, testified that he interviewed Mr. Milam for over nine and a half hours over three different sessions as well as several hours spent with his mother and sisters. Dr. Cunningham's task in the case

47

was to assess what had occurred up to the trial regarding Mr. Milam and what was likely to occur in the future regarding Mr. Milam if he received a life sentence without parole.

The first evaluation Dr. Cunningham did with regards to Mr. Milam was mental deficiency testing. On testing conducted by Paul Andrews via the WAIS-IV (Wechsler Scale), Mr. Milam scored a full scale intelligence quotient (IQ) score of 71. On the Stanford-Binet, Fifth Edition, test, Mr. Milam scored an 80. Dr. Tom Proctor administered the WAIS-IV and obtained a full-scale IQ score of 68. On a Reynolds Intellectual Assessment Scale Mr. Milam scored an 80 as a composite intelligence index.

With regards to adaptive functioning, Mr. Milam had multiple adaptive functioning problems which exceeded the two of the eleven factors stated in the DSM-IV. Mr. Milam had difficulty with math, reading ability, receptive language, expressive language, functional academic skills as well as inability to comprehend money. Based on family history, Mr. Milam had deficits in social and interpersonal skills. On deficit testing Mr. Milam scored 81 and 86 on sentence comprehension, 82 on word reading and 58 and 55 on math on scales where 100 would be a median population score. With regards to home living, Mr. Milam did poorly because of his inability to take care of himself and clean up after himself. In community

resources, Mr. Milam could not manage money or handle a bank account. He never traveled independently. In the area of self direction Mr. Milam did not set realistic goals given his deficits. He had difficulty staying with a task and could not take care of his personal hygiene. With regards to work, he could only do repetitive task, like changing oil or tires. He would forget to get out of the way whenever he unscrewed an oil pan and would come home with his clothes soaked in oil.  Mr. Milam would remain in the well of the oil lube place in Tatum during the time he worked while older workers would not work in the well. Regarding leisure, Mr. Milam did not have any hobbies beyond local fishing and a limited range of interests. Regarding health, Mr. Milam was pretty oblivious to his health and nutrition. Regarding safety, Mr. Milam would pull out onto the highway riding a four wheeler without looking to determine if there was any oncoming traffic. Mr. Milam cut into a live wire under the house electrocuting himself.

With regards to adaptive functioning, Dr. Cunningham used the Adaptive Behavior Scale to measure Mr. Milam's ability. In measuring Mr. Milam he measured in the developmentally disabled range in nine out of ten of the areas of measurement. Using this test, Mr. Milam functions at the level of an 8 or 8 and a half year old at best. Mr. Milam was diagnosed as mentally deficient. Based upon his testing, Dr. Cunningham opined that Mr. Milam was mentally retarded.

With regards to onset before the age of 18, Dr. Cunningham opined that there was onset before the age of 18. With regards to records of testing, Mr. Milam was in special education in elementary school but those records had all been destroyed.[16] Dr. Cunningham noted that the state's expert, Dr. Gripon came to the conclusion that it was either mental retardation or borderline intellectual potential and it was hard to discern which side the line Blaine Milam was on.

Dr. Cunningham went through the three different definitions of mental retardation. The first legal definition in Texas is that set out by the state in voir dire, that is a person determined by a licensed physician or psychologist to have sub-average general intellectual functioning  with deficits in adaptive behavior which originated before the age of 18.

With regards to the DSM-IV an IQ score of 70 or below, or 75 and below with consideration of the standard error of measurement. One must also have concurrent deficits in at least two areas of adaptive functioning.  With regards to Mr. Milam, there were deficits in all eleven areas of adaptive functioning.  The third prong under the DSM-IV is onset before the age of 18.

---

[16] Current counsel has also gone back through the Tatum School District in an attempt to gather any records beyond the attendance data records from the Texas Education Agency which were admitted as States Exhibit 298. After investigating the issue, Counsel agrees that the any testing records are reported as destroyed in 2007 and that complies with States Exhibit 300.

In regards to causation of Mr. Milam's mental retardation Dr. Cunningham stated that causation was not necessary but it appeared that Ms. Milam's medical problems during the fifth month of her pregnancy with Blaine and the administration of antibiotics for pneumonia and the blood infection could be a contributing factor. Dr. Cunningham also talked about Mr. Milam's physical problems and physical development problems he had while he was growing up. There were a number of other damaging factors to Mr. Milam's development including being removed from school, familial ties of alcohol and drug use, his father's demise, generational dysfunction, being sexually abused by an older male cousin who had Mr. Milam perform oral sex on him, as well as his methamphetamine dependence. Lastly, Mr. Milam's drug induced psychosis along with Ms. Carson's psychosis lead to the focus on Amora, which lead to the death.

Concerning future dangerousness, Dr. Cunningham was of the opinion that Mr. Milam was likely to have a non-violent adjustment to prison. Dr. Cunningham pointed out that the murder rate in Texas prisons is less than 10% of the murder rate in the free population for males in Texas. Dr. Cunningham had helped author several studies that showed that capital offenders were less likely to commit violence in prison than other inmates as well as people of a younger age who entered prison were less likely to commit violent offenses. (RR 53:178-368)

51

With regards to murders versus persons who had committed other crimes, Dr. Cunningham had found that murders were 20-25% less likely to commit violent acts than other inmates in Texas. Additional studies in Missouri and the Federal Bureau of Prisons showed similar results.

Upon cross-examination, the State made the point that Dr. Cunningham is always employed by a defense team in a capital murder case and that Judge McBryde had found that the State's expert were more persuasive in a federal habeas proceeding in Ft. Worth. The State also pointed out how much money Dr. Cunningham made on death penalty cases.

On re-cross, Dr. Cunningham allowed that he had testified for the prosecution numerous times but had never been asked too in capital case. Dr. Cunningham also noted that although Judge McBryde in Ft. Worth had not found his testimony persuasive, a number of federal courts across the nation, including the Supreme Court in *Panetti v. Quarterman* had found his testimony persuasive.

Dr. Cunningham stated that based upon his review of the various statements, what lead to Amora's death was a dual psychosis of both Ms. Carson and Mr. Milam which lead them to believe there was a demon inside of Mr. Milam and there was a demon inside of Amora. Thus, they were attempting an exorcism on

Amora when they died.[17] (RR54: 4-262) After Dr. Cunningham's testimony, the defense rested on punishment. (RR 54:263)

In rebuttal, the State called Gary Jenkins, the service manager at the tire shop that Blaine Milam had worked. Mr. Milam could successfully change oil and change and break down tires. He could also look for leaks and measure the tread on a tire. Mr. Jenkins noted that Mr. Milam was slow at first but then caught on to the tasks he was required to perform. (RR:53:263-293)

Melanie Dolive is a special education teacher at Tatum Primary School. However, she was not a teacher of Mr. Milam.  She was aware of Blaine Milam when he went to school and was aware that he had a speech impediment. However, she was not aware if Mr. Milam had ever been tested and any therapy had been provided by a speech therapist. (RR 54:293-312)

Sherry Brown, a teacher in Tatum, stated that she was sometimes tasked with teaching Mr. Milam, in a small group, reserved for students who had learning difficulty in the area of reading and writing. Ms. Brown noted that Mr. Milam was slow but she believed that was because he was sickly. Ms. Brown never made a

---

[17] The defense was prohibited from introducing the statement of Jesseca Carson to Ranger Ray in which she stated that the death of Amora was an exorcism which involved a cross that had been purchased at the truck stop. No cross was recovered as evidence. Jesseca had told Ranger Ray that the two had begun playing with the Ouija board in September and soon she became convinced that the devil was in Blaine. Later the devil went out of Blaine when she would yell "in the name of Jesus Christ, Satan go to hell." Soon the statement would no longer work and they both were convinced that Amora was possessed by the devil. During the night of December 1, 2008, Amora needed an exorcism and died while they were going to the pawn shop to try to pay for a priest. (*State v. Jesseca Carson*, No. CR2009-067 (4th Dist. Tx.) (Hearing held on April 24, 2009)

reference on Mr. Milam on mental retardation because she did not think he needed it. Many years later, Ms. Brown saw Mr. Milam in the pit of the oil change place where she got her oil changed. Ms. Brown had a brief conversation with Mr. Milam about his family and then she went on her way. (RR 54:312-320)

Mark Stover was a former employee of MHMR in Longview, Texas, under contract to Community Healthcore. Mr. Stover had been fired from his job there because he had left while a patient was unstable, endangering another staff member. During the time that Mr. Milam in the Rusk County Jail, Mr. Stover was responsible for doing assessments in the jail. During the incident in which Mr. Milam had threatened suicide and cut himself, during October or November of 2008. Mr. Stover did an evaluation, that lasted approximately 20 minutes,  on Mr. Milam and based upon him being able to respond to questions wrote down "average" as far as intelligence but admitted he had no background in IQ testing or assessment. At the time of trial, Mr. Stover did not remember Mr. Milam other than vaguely. (RR 55:4-76)

Melynda Keenon is a relative of Blaine Milam via his father, Daniel. Ms. Keenon does homeschooling and was contacted by Shirley Milam about homeschooling Blaine. Ms. Keenon visited with Blaine about three times but she

did not have time to devote to Blaine given the other children she was teaching so she referred it back to Ms. Milam. (RR55:78-86)

Sarah Hodges testified about the 2007 incident involving her younger daughter receiving pornographic images from Mr. Milam. Ms. Hodges homeschooled her children and talked to Ms. Milam about getting a curriculum and books for Blaine. Ms. Milam never followed up. Mr. Milam would come to the Hodges house on a regular basis until the date of the offense when her younger daughter found the pictures in her underwear drawer. The sheriff's department was called and Mr. Milam was arrested.  Mr. Milam was a year or two behind Ms. Hodges daughter, who was the same age but Ms. Hodges did not have any experience in determining if someone was retarded. (RR 55:86-130)

Dr. Tim Proctor, one of the two state's expert on punishment, is a forensic psychologist. Dr. Proctor stated that on the two WAIS-IV test that were administered by either him or Dr. Andrews, Mr. Milam scored a 68 and a 71, which was in the borderline mentally retarded range. With the RAIS test, Mr. Milam scored an 80 and Dr. Proctor disagreed with Dr. Cunningham regarding the utility of the RAIS[18] and he stated that the test is a broad form IQ test which is

---

[18] The Reynolds Intellectual Assessment Scale (RAIS) is not a full scale intelligence battery as noted below and it has traditionally been found that administering the RAIS versus the Wechsler (WAIS-III) results in significantly higher scores for those taking the RAIS versus the Wechsler. *A Comparison of IQ scores from the Reynolds*

widely accepted. Likewise, Dr. Andrews Stanford-Binet results were 80. Dr.

Proctor opined that Mr. Milam was borderline mentally retarded.[19]

With regards to adaptive functioning, Dr. Proctor disagreed with Dr.

Cunningham's scoring. He also disagreed with the onset before the age of 18 based

upon drug use after 18. Given this, it was the opinion of Dr. Proctor that Mr.

Milam was not retarded.

Upon cross-examination, Dr. Proctor noted that the other State expert, Dr.

Gripon had tested Mr. Milam and found his IQ to be between 65-75. Regarding his

Global Assessment Functioning, Dr. Gripon found his score to be 65. Dr. Gripon

found that Mr. Gripon had a AXIS II diagnosis of mental retardation. Dr, Gripon's

final conclusion was that Mr. Milam had a deficit that is in the ranger that can

conceivably in the upper mildly mentally retarded range and lower borderline

intellectual functioning. (RR 55:131-270) The state rested after the testimony of

Dr. Proctor. (RR 55:271)

Mr. Milam testified outside the presence of the jury that he did not wish to

testify on his own behalf.(RR 55:272-273) Both parties then closed.

---

*Intellectual Assessment Scales and the Wechsler Adult Intelligence Scale-Third Addition,* Intellectual and Developmental Disabilities, Vol 46 No. 3, pp 229-233, Umphress, Thomas (2008)

[19] There was no objection by defense counsel regarding Dr. Proctor's use of the RAIS.

The defendant requested an instruction on punishment regarding mental retardation which stated:

> A person with mental retardation means a person determined by a physician or psychologist licensed in this state by the State or Certified by the Texas Department of Mental Health and Mental Retardation to have sub-average general intellectual functioning concurrent with deficits in adaptive behavior exhibited prior to the age of 18.

(RR 55:280) The trial court denied the request. Additionally, given the testimony by even the State's witnesses that Mr. Milam was at least a year or two behind persons of his age group, the defense requested that the Court to find that it would be unconstitutional to assess the death penalty on Blaine Milam based on his mental age versus his physical age, which was 18 at the time of the offense. The Court denied this request. (RR 55:286-287) Based on varying testimony from the witnesses that he was from 2 to 10 years younger emotionally than his physical age.

*Voluntary Intoxication Instruction Request (claims 1-4 below)*

The defense, not the state, spent a great deal of time talking about Mr. Milam's intoxication on punishment through the testimony of Dr. Rosen (toxicologist), Dr. Cunningham (forensic psychologist), Dr. Love (psychologist) and family members either direct or proferred through expert testimony about Mr.

Milam use of methamphetamine and his "drug induced psychosis" at the time the crime occurred.

What was absent from the discussion regarding the charge, and is set out below in the new claims under the *Martinez* heading, was a motion by the defendant filed on November 6, 2009, titled "Motion to Preclude the Submission of a § 8.04 Instruction on Voluntary Intoxication on the Punishment Stage." (CR 1:116-118) In this motion, the Defendant's attorney requested that the instruction of "temporary insanity caused by intoxication" found in  Tex. Penal Code § 8.04 not be given and instead the following instruction be given:

> In arriving at your answer to instruction No. ___ above, you may consider the Defendant's voluntary intoxication as a mitigating circumstance to warrant that a sentence of life imprisonment rather than death be imposed.

(CR 1:117-118)

On February 11, 2010, after considering the motion, the Court entered an order in which they "carried" the motion. (CR II:453-461 at 453) Current counsel could not find any further mention of  the motion in the transcript or clerk's record.

The final charge given to the jury (CR IV:978-988) made no mention of voluntary intoxication despite a great deal of effort on defense counsel's part to develop involuntary intoxication as a mitigation factor under Texas law. This is also baffling to the experts who were called to testify about the methamphetamine

58

use.[20] Thus, the mystery is why did the Defense not urge their motion at the final charge conference to allow the Jury to consider the mitigation allowed under Texas law, whether it be temporary insanity caused by intoxication or their requested instruction of intoxication as mitigation. Either way, the spent a great deal of time developing a mitigation element through experts Dr. Rosen, Dr. Love, Dr. Lundberg, Dr. Cunningham as well as family members and **never** provided the jury with a vehicle where they could consider voluntary intoxication as mitigation.[21]

During close arguments, the defense attorney put a great deal of time and emphasis at the beginning of his closing argument on the amount of methamphetamine in Mr. Milam's blood at the time of the crime was at a level of between .25 and .34 milligrams per liter per Dr. Rosen. The attorney went over the testimony regarding methamphetamine use stated by Dr. Love. The methamphetamine testimony of Dr. Lundberg and finally the extensive testimony of Dr. Cunningham about methamphetamine use and drug induced psychosis. (RR 56:52-57)

In response, the prosecutor stated:

---

[20] See Dr. Cunningham and Dr. Rosen's affidavits attached. Counsel contacted Mr. Hagen to ask him why he did not re-urge his request for a mitigation instruction. Mr. Hagen stated he would have to review the case again.
[21] The state is likely to respond that there was a general mitigation instruction. However, why would defense counsel want to use a general instruction when a more helpful specific instruction is available?

His drug use. His own lawyer told you it's a sorry excuse, and I will agree with him on that. I'll let you decide just how rampant it was. I'll let you decide from the evidence, from all the divergent stories, of just how serious it was, but the bottom line is, as Counsel for the defense told  you over and over today in their two hours that, oh, he didn't have a choice. He couldn't control it. He couldn't stop it….

And the bottom line and the most important thing is, is they can talk to you all day long  about "oh, he couldn't stop." That's absolutely false. Because you heard from the evidence repeatedly that when he met Jesseca Carson, he stopped. He quit taking meth, according to them. He could stop. That is not--not sufficient mitigating circumstances.

(RR 56:142-143)

Lastly in closing, the prosecutor stated the following:

I thought I had seen everything…..
You know, through everything, I thought I had a pretty good handle on what one human being could do to another. I thought, in 16 years, I had seen depravity. I thought I had seen cruelty. I thought I had seen brutality and heinousness. I thought I'd seen meanness, and I even thought I had seen evil. And I've stood in front of juries before and told them, "Ladies and gentlemen, you have the worst of the worst." And I mean it at the time time. I really, at the time, thought it was true. But everything…

The defense objected based upon the personal opinion of the prosecutor and the testimony. The court sustained the objection and instructed the jury to disregard.

The Court denied a mistrial but the prosecutor continued;

Everything, everything was summarily surpassed on December 2, 2008, because now, I, we, you, all of us can truly say that we have together seen the absolute worse thing that one human can inflict upon another. Not just a human being, but the most innocent of human beings. She wasn't even old

enough to tell him to stop. I can tell you right now, I will never stand before a jury and tell them that they have seen the worst of the worst…

Again, the defense objected based upon the testimony of the prosecutor and the prosecutor attempted to begin again. The court told her to "stop" and then sustained the objection and instructed the jury to disregard. A mistrial was again denied (RR 56:153-156)

The jury was furnished with four special issues. The first two asked about future acts of violence and if Mr. Milam caused the death of Amora Carson. The answered yes to both questions. With regards to mental retardation and mitigation, the jury answered no. (RR 56:167-168) Thus, on May 27, 2010, the Trial Court sentenced Mr. Milam to death and informed him that he was appointing an appeal attorney. (RR 56:176-181)

On June 16, 2010, appellate counsel, Mr. Parks, filed a motion for a new sentencing trial asserting the special issue evidence was insufficient. (CR IV:1011-1012) There was no action on this motion from the trial court. As noted above, the direct appeal and the state application for writ of habeas corpus were subsequently denied by the Texas Court of Criminal Appeals. Mr. Milam's state habeas lawyer, Mr. Haas, filed a motion on September 20, 2013, to withdraw and have counsel appointed. Current counsel was appointed on September 23, 2013.

## STANDARD OF REVIEW
## THE ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT

*The Structure and Function of 28 U.S.C. §2254(d).*

While it is not uncommon for litigants, and even courts, to use terms like "deference" and "standard of review" as shorthand when describing §2254(d), these terms are actually both incorrect and misleading.  Such shorthand terms connote a legal prism through which the merits of disputed claims, as altered by the effects of the prism, must be examined and resolved. While using the "reasonableness" components of §2254(d)(1) or (2) in such a manner might promote a respondent's interest in minimizing the scrutiny with which a habeas petitioner's constitutional claims are examined by a federal habeas court, doing so would be inconsistent with the plain language of the statute, and its application by the Supreme Court.  Rather, as discussed below, §2254(d) not only permits, but requires a more exacting inquiry into the constitutional merits of a petitioner's claims.

Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Pursuant to the plain language of the statute's opening sentence, the threshold question is whether the particular claim under federal habeas review "was adjudicated on the merits in State court proceedings." If the state court to which the claim was previously presented failed to resolve the merits of a claim entirely, or failed to reach any component of the standard prescribed for the claim by federal law, then §2254(d) is inapplicable to the federal court's analysis of the claim or component. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] analysis"); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins*) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim de novo") (internal citation omitted); *see also*, *e.g.*, *Weeks v. Angelone*, 176 F.3d 249, 258-260 (4th Cir. 1999) ("When a petitioner has

63

properly presented a claim to the state court but the state court has not adjudicated

the claim, . . . our review of questions of law and mixed questions of law and fact

is de novo"); *Canaan v. McBride*, 395 F.3d 376, 382 (7th Cir. 2005) ("When a

state court is silent with respect to a habeas corpus petitioner's claim, that claim

has not been "adjudicated on the merits' for purposes of §2254(d). As a practical

matter, a federal court cannot apply . . . §2254(d) in the absence of any state court

decision on the issue").

For claims or portions of claims that were adjudicated on the merits by a

state court, the first step in correctly applying §2254(d) is to recognize that it is

concerned with limiting a federal habeas court's authority to grant relief once a

federal constitutional violation has been found to exist, not with attempting to

influence the federal court's discharge of its Article III mandate to determine the

existence vel non of constitutional error.[22]  That §2254(d) speaks to the

availability of a remedy, rather than to the existence of an error for which a remedy

might be warranted, is clear for at least two reasons.  First, the opening clause of

the statute – "An application for a writ of habeas corpus . . . shall not be granted" –

is an express direction to withhold the writ unless certain conditions are met; it

---

[22]    *See, e.g., (Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000) (§2254(d) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("The requirements for habeas relief established by 28 U.S.C. §2254(d) are thus satisfied").

says nothing, however, that purports to modify the ways in which federal courts analyze or resolve the constitutional questions which are necessarily anterior to any consideration of a possible remedy.

Second, when Congress created the limitation on relief in §2254(d) as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), it made no changes to §2254(a), which confers federal habeas jurisdiction only for the circumscribed purpose of determining whether a habeas petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." Taken together, §§2254(a) and (d) thus form a framework in which federal courts remain both authorized and obligated to determine the existence of constitutional violations in the first instance, but may no longer remedy such violations by issuing the writ of habeas corpus unless they further find one or more of the conditions enumerated in §2254(d)(1) or (2) to be satisfied.  *See Gonzalez v. Crosby*, 125 S.Ct. 2641, 2648 n.4 (2005) (defining a "merits" decision in a habeas case as "a determination that there exist or do not exist grounds entitling a petitioner to habeas corpus relief under 28 U.S.C. §§2254(a) and (d)").

With this framework, the function of subdivisions (1) and (2) of §2254(d) is straightforward.  Whereas the opening lines of §2254(d) establish the general

proposition that habeas relief "shall not be granted . . . unless" certain conditions are met, subdivisions (1) and (2) enumerate in broad terms what those conditions are.  Subdivision (1) authorizes a federal court to remedy a constitutional violation where the state court's "adjudication of the claim . . . resulted in a decision that was contrary to . . . clearly established Federal law," or "involved an unreasonable application of[] clearly established Federal law."  Subdivision (2) further authorizes a grant of relief where the state court's "adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Considered collectively and in the context of the statute as a whole, the "contrary to," "unreasonable application of," and "unreasonable determination of the facts" clauses of subdivisions (1) and (2) establish three broad categories of defects, any one of which, if found to exist in a state court's decision rejecting a claim the federal court later determines to be meritorious, will permit the federal court to issue the writ.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*) (state court adjudication can survive §2254(d)(1) only where "neither the reasoning nor the result of the state court decision contradicts" Supreme Court precedents). Importantly, it is only the actual contents of the state court's decision, and not any *post hoc* reasoning that a respondent may offer as an alternative means for

66

justifying the outcome of the state court proceeding, that is relevant to the

§2254(d) analysis.  *See Wiggins*, 539 U.S. at 529-530 (justifications for state

court's denial of relief offered by respondent in federal habeas proceedings but not

relied upon in actual state court decision have "no bearing" on federal court's

analysis under §2254(d)).[23]

By conditioning the availability of federal habeas relief not only on a finding

that the petitioner's constitutional rights were violated, but on the further

determination that the state court's failure to recognize or remedy the error was

attributable to a material defect in its adjudication of the claim, §2254(d)

effectively strikes a balance between insulating adequate state court decisions from

federal interference and maintaining the availability of federal habeas relief where

the state court's adjudication was demonstrably flawed.  This requirement of state

court error in failing to find an actual constitutional violation plus an identifiable

analytical mistake to which that error is attributable is precisely what Justice

---

[23]      In *Wiggins*, the Supreme Court examined whether trial counsel had made an informed strategic decision not to investigate certain matters relating to the petitioner's background.  The state court had denied relief on the mistaken belief that records counsel reviewed contained information about these matters, such that counsel possessed the information necessary to make an informed choice to investigate no further.  After establishing that the records counsel possessed actually did not contain the information the state court believed them to contain, the Supreme Court went on to reject the respondent's effort to rely upon a theory for denying relief that had not been part of the state court's rationale.  Noting that the respondent's theory had not been part of the reasoning set forth in the state court's decision, the Court declared that "[r]espondents' interpretation of [trial counsel's] postconviction testimony [as indicating the possibility that trial counsel obtained the same information from a different source] therefore has no bearing on whether the Maryland Court of Appeals' decision reflected an objectively unreasonable application of *Strickland*."  *Wiggins*, 539 U.S. at 529-530.

O'Connor meant when she explained that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *(Terry) Williams v. Taylor*, 529 U.S. 362, 411 (2000).

That federal habeas review of claims previously adjudicated on the merits in state court involves the sort of two-tiered analysis described above – as opposed to a more superficial "reasonableness" examination suggested by terms like "deference" or "standard of review" – is confirmed by the Supreme Court's decisions granting relief in cases governed by §2254(d).  For example, in *Williams*, *supra*, the Court engaged in a thorough, detailed examination of the constitutional merits of the petitioner's ineffective assistance of counsel claim, followed by an equally thorough examination of the ways in which the Virginia Supreme Court's adjudication of that claim was "contrary to" federal law (by applying the wrong constitutional rule to the petitioner's claim) and also "involved an unreasonable application of" federal law (by, inter alia, failing to consider all of the evidence relevant to the claim).  *See Williams*, 529 U.S. at 390-398. Likewise, in both *Rompilla* and *Wiggins*, the Court first undertook its own detailed review of the merits of the petitioners' contentions that their trial counsel were ineffective for

failing to adequately investigate, *see Rompilla*, 545 U.S. at 381-387; *Wiggins*, 539 U.S. at 519-527, and then performed a careful analysis of the ways in which the state courts' decisions rejecting the petitioners' claims were based on an "unreasonable determination of the facts," and involved an "unreasonable application of" federal law.  *See Rompilla*, 545 U.S. at 389-390; *Wiggins*, 539 U.S. at 527-534.  The Court took the same approach in *Miller-El v. Dretke*, 545 U.S. 231 (2005), again conducting a painstaking evaluation of the merits of the petitioner's claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), before further concluding that the state court's rejection of that claim was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding," such that federal habeas relief was appropriate.[24]

In short, when considering petitioner's claims for relief this Court must not merely determine whether it can be said at a glance that the state court's rejections of those claims it adjudicated on the merits were "contrary to" federal law, or somehow "unreasonable" in their treatment of the law or the facts.  Rather, for all claims subject to §2254(d), the Court must determine for itself (a) whether

---

[24]	To be sure, there are cases in which a petitioner's inability to satisfy §2254(d) may be so obvious – either because he relies upon a rule which has not been "clearly established . . . as determined by the Supreme Court," *Penry v. Johnson*, 532 U.S. 782, 795 (2001), or because the relevant federal standard affords state courts such wide latitude that only an exceptionally poor decision by the state court could conceivably be sufficient to authorize relief, *see Andrade v. Lockyer*, 538 U.S. 63, 71-73 (2003) – that the reviewing court need not pause long over a particular claim.  However, such is not the case with respect to any of Petitioner's claims.

petitioner's constitutional rights were violated, and if they were (b) whether the state court's failure to recognize and remedy those violations can be attributed to one or more defects within the categories enumerated in §2254(d)(1) or (2). Where these two questions are resolved in petitioner's favor, relief must be granted.

*Evaluation of State Court Factual Findings under the AEDPA*

As the Supreme Court demonstrated in *Wiggins*, and more recently in *Miller-El*, a faithful application of §2254(d)(2) cannot be accomplished without looking beneath a state court's factual "findings" and assessing the reasonableness of the conclusions reached by the state court in light of the evidence that was before that court.  *Miller-El*, 545 U.S. at 266; *Wiggins*, 539 U.S. at 528; *see also*, *e.g.*, *Guidry v. Dretke*, 397 F.3d 306, 328 (5th Cir. 2005) (granting relief in capital case where state court's decision was based on factual finding that ignored countervailing record evidence; under "§2254(d)(2), the district court concluded properly that the state court's adjudication of the claim was based on an unreasonable determination of the facts"); *Yung v. Walker*, 296 F.3d 129, 136 (2d Cir. 2002) ("[T]he focus of §2254(d)(2)" is "on whether the [state] court's factual findings are supported by sufficient evidence"); *Beck v. Bowersox*, 257 F.3d 900,

70

901 (8th Cir. 2001) (§§2254(d)(2) and (e)(1) "require meaningful federal court review of the evidentiary record considered by the state courts"); *Childress v. Johnson*, 103 F.3d 1221, 1226 n.7 (5th Cir. 1997) ("While the measure of deference afforded state court factual findings is substantial, we note that it is not absolute. Section 2254(d)(2) authorizes issuance of the writ if the state court decision 'was based on an unreasonable determination of the facts in light of the evidence presented'").

Moreover, while §2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence," this presumption is likewise far from absolute.  In fact, Congress clearly contemplated that habeas petitioners would challenge, and federal courts would consider, whether state court factual determinations are supported by the record when it enacted §2254(f) ("If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein . . .").  If an examination of the sufficiency of the evidentiary support for a state court's factual findings were off limits under §2254(d)(2) or §2254(e)(1), it would make no sense to provide, in an adjacent subdivision of the same statute, a mechanism for facilitating review of

71

precisely that question.  Furthermore, if federal courts are required by §2254(e)(1) to take state court factual determinations at face value, then *Wiggins* and *Miller-El* – both of which involved detailed examinations of the state court record and determinations by the Supreme Court that the state court's findings were not supported – were decided incorrectly.

On the surface, some tension appears to exist between §2254(e)(1), under which state court factual findings are to be presumed correct, and §2254(d)(2), which can only be read as requiring federal habeas courts to look beneath a state court's factual findings to assess their reasonableness in light of the record that was before the state court.  *See Rice v. Collins*, 126 S.Ct. 969, 974 (2006) (acknowledging but declining to resolve dispute over whether both §2254(e)(1) and §2254(d)(2) should apply to a particular state court factual determination).  As several courts have recently explained (*see infra*), however, this tension largely dissolves when the two provisions are viewed with a practical eye, and in light of the principle that a "statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *Market Co. v. Hoffman*, 101 U.S. 112, 115 (1879) (citation omitted) (quoted in *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

Under such a reading, it becomes clear that the function of §2254(e)(1), which is situated immediately preceding the provision limiting the availability of federal evidentiary hearings, *see* §2254(e)(2), is to define the substantial burden a prisoner must bear when seeking to disprove a state court's factual finding using evidence that was not before the state courts.  On the other hand, where the evidentiary record before the federal court is the same as the record considered by the state court, §2254(d)(2) – with its focus on the reasonableness of factual determinations "in light of the evidence presented in the state court proceeding" – provides the sole mechanism for dealing with a petitioner's contention that a state court's resolution of (or failure to resolve) a factual issue was objectively unreasonable.  *See generally Lambert v. Blackwell*, 387 F.3d 210, 235-237 (3d Cir. 2004); *Taylor v. Maddox*, 366 F.3d 992, 999-1008 (9th Cir. 2004); *Breighner v. Chesney*, 301 F.Supp.2d 354, 366 (M.D.Pa. 2004).

The specific ways in which these AEDPA provisions interplay with the claims raised are discussed within the body of each claim, *infra*.

## THE INEFFECTIVENESS OF COUNSEL
### *STRICKLAND V. WASHINGTON*

*Right to Effective Trial Counsel*

The Constitution of the United States guarantees to every criminal defendant the right to effective assistance of counsel.  *See* U.S. Const. amends. VI, XIV, § 1. An application for a writ of habeas corpus is the appropriate vehicle to investigate ineffective-assistance claims.  *Massaro v. United States*, 538 U.S. 500, 503-04 (2003).  Indeed, "in most ineffective assistance claims, a writ of habeas corpus is essential to gathering the facts necessary to adequately evaluate such claims." *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997).

In *Strickland v. Washington*, the Supreme Court stated:

> The right to counsel plays a crucial role in the adversarial
> system embodied in the Sixth Amendment, since access
> to counsel's skill and knowledge is necessary to accord
> defendants the ample opportunity to meet the case of the
> prosecution to which they are entitled.

466 U.S. 668, 685 (1984) (quotations and citations omitted).  *Strickland* established that an applicant is entitled to relief for ineffective assistance of counsel if he satisfies the following two prongs:

> (1) that trial counsel's performance was deficient,
> meaning that the performance fell below an objective
> standard of reasonableness—a standard determined with
> reference to prevailing professional standards and from
> counsel's actual point of view during the representation;
> and

74

(2) that but for counsel's deficient performance, there is a
reasonable probability the result of the proceeding would
have been different.

*Id.* at 687–91.

Thus, an applicant is entitled to relief based on ineffective assistance of
counsel if he demonstrates (1) trial counsel's performance was deficient, meaning
that the performance fell below an objective standard of reasonableness; and (2)
but for counsel's deficient performance, there is a reasonable probability the result
of the proceeding would have been different.  *Id.* at 687–88.  Courts should
determine "whether counsel's assistance was reasonable [after] *considering all the
circumstances*."  *Id.* at 688 (emphasis added).  Capital defense is sufficiently
specialized and regulated to have a national standard, reflected both in the Eighth
Amendment and the Guidelines of the American Bar Association.  *See Rompilla*,
545 U.S. at 387; *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 397.  With
respect to prejudice, a petitioner is not required to make a separate or additional
showing that his counsel's deficient performance rendered his trial "fundamentally
unfair."  *Williams*, 529 U.S. at 397.  A "reasonable probability" the result would
have been different is a "probability *sufficient* to undermine confidence in the
outcome" at trial.  *Id.* at 695.  This test is not outcome determinative.  The

75

*Strickland* Court itself expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Strickland*, 466 U.S. at 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*. (emphasis supplied). Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard.[25] The Supreme Court reiterated this point in *Williams v. Taylor*, 529 U.S. 362 (2000), expressly noting that a state court's use of a preponderance of the evidence standard rather than the lesser reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court. *Id*. at 405-06.

While courts hesitate to designate any error as ineffective assistance *per se*, it is possible that a single egregious error of omission by an applicant's counsel constitutes ineffective assistance as a matter of law. *See Murray v. Carrier*, 477

---

[25]      In *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), the Fifth Circuit recognized that the prejudice prong imposes "a lower burden of proof than the preponderance standard." *Id*. at 595. Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard." *Id*.; *see also Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) (reciting *Strickland* prejudice standard of "reasonable probability" as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n.18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of the evidence").

U.S. 478, 496 (1986); *United States v. Cronic*, 466 U.S. 648, 658–62 (1984); *Nero*

*v. Blackburn*, 597 F.2d 991, 994 (5th Cir. 1979).


*Right to Effective Assistance of Appellate Counsel*

"A criminal defendant has a constitutional right to receive effective

assistance of counsel on direct appeal." *United States v. Phillips,* 210 F.3d 345,

348 (5th Cir. 2000).  A claim of ineffective assistance of counsel on direct appeal

involves the same familiar two-prong analysis under *Strickland*, which requires

1) deficient performance, and 2) resulting prejudice.  *See* 466 U.S. at 687; *see also*

*Busby v. Dretke,* 359 F.3d 708, 714 (5th Cir. 2004) (applying *Strickland* test to

appellate counsel's performance).

*Right to Effective Assistance of State Habeas Counsel*

Likewise, the ineffectiveness issue may be raised on the first time in a

federal habeas proceeding when state habeas counsel fails to bring an issue of

ineffectiveness in state collateral proceedings thus avoiding procedural default. In

*Martinez v. Ryan*, the Supreme Court held that "a procedural default will not bar a

federal habeas court from hearing a substantial claim of ineffective assistance at

trial if, in the [State's] initial-review collateral proceeding, there was no counsel or

counsel in that proceeding was ineffective." 132 S.Ct. 1309, 1320 (2012).   The

Supreme Court in *Trevino v. Thaler* held that this rule equally applies to Texas's

post-conviction proceedings.  133 S.Ct. 1911, 1920 (2013).

Under *Martinez,* Mr. Milam has to establish that his underlying

ineffectiveness of counsel claim is "substantial" and that his state habeas counsel

was ineffective. 132 S.Ct. at 1318–19. Substantial is defined by the court as a

claim that has "some merit." *Id.* at 1318. *Martinez* makes this substantiality

standard equivalent to the standard for obtaining a COA. *Id.* at 1318–19 (citing

*Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)

(describing the standard for granting a COA)); *see also Dietrich v. Ryan,* 740 F.3d

1237 (9th Cir. 2013) (en banc) (noting that "the [ *Martinez* ] Court incorporated

[the COA standard] in its definition of substantiality"); *cf. Cook v. Ryan,* 688 F.3d

598, 610 n. 13 (9th Cir.) (noting that *Martinez* referenced *Miller–El* as "generally

analogous support"), *cert. denied,* —— U.S. ——, 133 S.Ct. 81, 183 L.Ed.2d 721

(2012). So, if a petitioner's IAC claim is not substantial enough to earn a COA, it is

also not substantial enough to form the basis for excusing the procedural default.

## CLAIMS PRESENTED
### *MARTINEZ CLAIMS*

*State Habeas Counsel was Ineffective*

### The State Application

The State habeas application in this case was twenty-four (24) pages long of double-spaced text. In this application, state counsel made four claims. These were:

1 & 2. Trial Counsel was ineffective for not using the proper hearsay exception to introduce the testimony of Jesseca Carson. Appellate counsel was ineffective for not raising on direct appeal the trial court's refusal to allow the applicant to introduce the evidence of Jesseca Carson's statement.

3. Trial Counsel was ineffective for failing to object to specific instances of violence in the Texas Prison System in violation of the Sixth Amendment.

4. Trial Counsel was ineffective for not properly cross-examining Bryan Perkins in regards to bias in favor of Applicant's co-defendant.

The trial court ordered affidavits from the appellate and trial attorneys in response to these allegations. The attorneys filed affidavits rebutting the claims

79

presenting. Both parties submitted proposed findings of fact and conclusions of law. On March 18, 2013, the trial court adopted the state's amended proposed findings of fact and conclusions of law. On September 11, 2013, the Texas Court of Criminal Appeals denied the application in a half page order adopting the trial court's findings as noted above. Given the brevity of the state application and the speed of disposal of this application on the merits, the question that must be asked, is "should there more?"

In *Martinez v. Ryan*, the Supreme Court held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 132 S.Ct. 1309, 1320 (2012).   The Supreme Court in *Trevino v. Thaler* held that this rule equally applies to Texas's post-conviction proceedings.   133 S.Ct. 1911, 1920 (2013).   Texas death row inmate Trevino's state-appointed habeas counsel failed to bring a claim that Trevino's trial counsel was ineffective for failure to investigate and present mitigating circumstances pursuant to *Wiggins v. Smith*, 123 S.ct. 2527).   The *Trevino* court noted that in *Martinez* the Court highlighted that "[t]he doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for

the default and prejudice from a violation of federal law." *Trevino*, at 1917 (citing

*Martinez*, at 1316.)

The elements for cause and relief from procedural default are that "(1) the

claim of 'ineffective assistance of trial counsel' was a 'substantial' claim; (2) the

'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during

the state collateral review proceeding; (3) the state collateral review proceeding

was the 'initial' review proceeding in respect to the 'ineffective-assistance-of-trial-

counsel claim'; and (4) state law *requires* that an 'ineffective assistance of trial

counsel [claim] ... be raised in an initial-review collateral proceeding.' *Id.* at 1918

(citing *Martinez,* at 1318–1319, 1320–1321 and *Coleman v. Thompson,* 501 U.S.

722, 732, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).  The Supreme Court

applied *Martinez* to Texas cases, stating that the denial of the right to challenge an

initial-review habeas lawyer's failure to bring an ineffective assistance claim

would deny a defendant of any opportunity to bring such a challenge.  *Id.* at 1921

(citing *Martinez* 132 S.Ct., at 1316.)

The *Martinez* exception to the procedural default bar also applies to post-

conviction counsel's failure to allege ineffectiveness of appellate counsel in

bringing claims on direct appeal that are in the record and should have been

brought. *Nguyen v. Curry,* 736 F.3d 1287 (9th Cir. 2013)

*Claims 1-4, Failing to Allow for Mitigation Regarding Voluntary Intoxication*

1.      **Trial Counsel was ineffective in violation of the Sixth Amendment for presenting extensive testimony about Petitioner's drug use and his "drug induced psychosis" at the time of the crime, and then failing to allow the jury a vehicle (i.e.; a jury instruction)  to consider that testimony as mitigation of punishment, as allowed by Tex. Penal Code § 8.04,  in violation of the Eighth Amendment.**

2.      **The trial court erred in failing to include a requested jury instruction on voluntary intoxication when it was clearly warranted by testimony extensively developed by the Defense and Trial Counsel was ineffective for not insisting on the instruction, in either form.**

3.      **Appellate Counsel was ineffective for failing in violation of the Sixth Amendment for failing to bring in the Motion for New Trial  and Direct Appeal the failure of trial counsel to include a requested jury instruction, and the trial court's failure to include a jury instruction when it had been requested,  on voluntary intoxication as a vehicle of mitigation consideration by the jury.**

4.      **State Habeas Counsel was ineffective for failing to allege in the state application for writ of habeas corpus that 1)trial counsel was ineffective for failing to insist on a voluntary intoxication instruction when the Defense was the one that developed the testimony, 2) the trial court erred in failing to provide a requested voluntary intoxication instruction in violation of the Eighth Amendment,  and 3) appellate counsel was ineffective for failing to allege the voluntary intoxication issue in the motion for new trial and on direct appeal.**

*Voluntary Intoxication Instruction*

As noted in the procedural and factual history above, the Defense attorneys

had requested on November 6, 2009, an instruction on voluntary intoxication that

would counter the requirement for temporary insanity due to voluntary intoxication

of § 8.04 of the Texas Penal Code. Section 8.04 allows that "Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of punishment of the penalty attached to the offense for which he was tried." Thus, the State of Texas, along with most jurisdictions, allows a specific vehicle for the jury to consider voluntary intoxication as mitigation when the Petitioner brings forth evidence of a "drug induced psychosis." The instruction that the defense wanted was a simple consideration as mitigation instruction versus the heightened standard of psychosis or temporary insanity.

The trial court considered this motion and carried it for purposes of trial. At trial and especially at punishment, Defense Counsel, **not the State,** repeatedly introduced Mr. Milam's history of drug use and on the night of the crime his "drug induced psychosis" through Dr. Rosen, Dr. Love, Dr. Lundberg, Dr. Cunningham and family members. *See factual and procedural history above.* These experts believed that their testimony was being submitted to support a charge of voluntary intoxication in mitigation of punishment.

Dr. Cunningham, in his attached affidavits set out that he was retained by the defense to discuss methamphetamine and his opinion that Mr. Milam was in a drug induced psychosis. Dr. Cunningham was unaware as to why defense counsel would

not have insisted on the voluntary intoxication instruction after they had spent so much time developing the issue.[26]

At the time this petition was being prepared, Dr. Patricia Rosen was also befuddled as to why she was tasked with discussing the level of methamphetamine in Mr. Milam's system and there was no instruction to the jury. Dr. Rosen set out in her attached affidavit that "It was my understanding from the Defense team that my testimony would support their request for a specific instruction on drug induced psychosis."[27] Dr. Rosen was unaware as to why the Defense team would not request an instruction after spending so much time developing the issue.

However, having spent so much time and effort introducing this testimony, the defense team failed to re-assert the issue of a voluntary intoxication instruction be given to the jury at punishment. Thus, when a specific vehicle for consideration of mitigation was allowed, the jury was not provided that vehicle because of the ineffectiveness of trial counsel at the charge conference.

The Supreme Court has repeated in unqualified language for more than 30 years stated the foundational rule that the Eighth Amendment requires in death penalty cases the admission of any mitigating evidence "that might serve 'as a basis for a sentence less than death.' " *Skipper v. South Carolina,* 476 U.S. 1, 5,

---

[26] See Exhibit 1, Dr. Cunningham's affidavit.
[27] See Exhibit 2, Dr. Rosen's affidavit

106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). Over that period, the Supreme Court has never invoked harmless error or suggested that this relatively simple Eighth Amendment mitigation rule, stated in many cases,[28] should be subject to "harmless error" analysis. The reason for this rule is that a mandatory death penalty that leaves out consideration of mitigation is unconstitutional. Each juror at the mitigation phase of the proceeding must have the discretion to spare the defendant's life. *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).[29] The *Lockett* line of cases insists that the jurors should make that judgment based on considering all mitigating factors weighed against the aggravating factors.

In this case, given that Counsel had spent considerable effort setting up a mitigation factor, he was ineffective for taking the next step and requesting an

---

[28] *Abdul–Kabir v. Quarterman,* 550 U.S. 233, 264–65, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007); *Smith v. Texas,* 543 U.S. 37, 45–48, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004); *Tennard v. Dretke,* 542 U.S. 274, 286–88, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004); *Penry v. Johnson,* 532 U.S. 782, 804, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); *Penry v. Lynaugh,* 492 U.S. 302, 317, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Hitchcock v. Dugger,* 481 U.S. 393, 398–99, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma,* 455 U.S. 104, 110–12, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Bell v. Ohio,* 438 U.S. 637, 642, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978).

[29] The Court in *Woodson* explained the mitigation requirement as follows: "In *Furman,* members of the Court acknowledge what cannot fairly be denied that death is a punishment different from all other sanctions in kind rather than degree. A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death." *Woodson,* 428 U.S. at 303–04, 96 S.Ct. 2978 (internal citations omitted).

available mitigation instruction. Thus, the jury was left with only considering

intoxication as an aggravating factor, which several of them noted when they were

interviewed in post judgment interviews, including Eva Harris and Jody Bowles.[30]

**5.    A) The evidence was sufficient to the preponderance standard to demonstrate that Mr. Milam was, and is, mentally retarded and thus both appellate and habeas counsel were ineffective for not asserting this claim for state review and exhaustion, in violation of the Sixth Amendment.**

**B) The evidence was sufficient to demonstrate that Mr. Milam was functioning at somewhere between an 8 and 16 year old emotional level. Thus, his sentence of death violates the Supreme Court's mandate that persons below the age of 18 shall not be executed. _See Roper v. Simmons,_ 543 U.S. 541 (2005) Appellate counsel was ineffective for not pursuing this claim once it had been established via a ruling by the trial court. Habeas counsel was ineffective for not asserting the appellate counsel was ineffective in exhausting this claim in violation of the Sixth Amendment.**

_A) Mental Retardation and Intellectual Disability_

In _Hall v. Florida,_ 134 S.Ct. 1986, 1990 (2014), the Supreme Court

overturned Florida's "rigid rule" requiring a capital defendant to score 70 or less

on an IQ test to claim intellectual disability because the rule "create[d] an

unacceptable risk that persons with intellectual disability will be executed."  The

Court noted that an individual's success in adapting to daily life "is central to the

framework followed by psychiatrists and other professionals in diagnosing

intellectual disability." _Id._ at 1990-91.   The three medical factors for determining

---

[30] The jurors were interviewed as part of a post-conviction investigation but did not provide affidavits. This will be presented as a basis for an evidentiary hearing at a later date.

intellectual disability are "significantly sub-average intellectual functioning,

deficits in adaptive functioning (the inability to learn basic skills and adjust

behavior to changing circumstances), and onset of these deficits during the

developmental period." *Id.*, at 1994 (citations omitted).   The Court noted that it

cited two medical definitions rejecting a rigid IQ analysis in *Atkins*.  *Id.*, at 1999.

Further, states do not have complete autonomy to make definitions of intellectual

disability, else the 8th Amendment would be nullified.  *Id.*  Although medical and

legal definitions are not exact, a state's rule must be informed by the medical

definitions of intellectual disability.  *Id.*, at 2000.

    In order to understand the *Hall* decision as it relates to Texas, the definition

in Florida of intellectual disability is the same. That is "significantly subaverage

general intellectual functioning existing concurrently with deficits in adaptive

behavior and manifested during the period from conception to age 18." *See Hall v.*

*Florida,* 134 S.Ct. 1986, 1994 (2014). The Supreme Court found that on its face

this statute could be found to comport with the *Atkins v. Virginia,* 536 U.S. 304,

122 S.Ct. 2242 (2002) holding preventing the execution of the intellectually

disabled. However, the Court went on to note that the Florida Supreme Court had

held that a person "whose test score is above 70, does not have an intellectual

disability and is barred from presenting other evidence that would show his

facilities are limited."*Hall v. Florida,* 134 S.Ct. at 1994 (*citing Cherry v. State,* 959 So.2d 702, 712-713 (Fla. 2007). Thus, the Supreme Court reversed Hall based upon the Supreme Court's interpretation of a law which is much like what Texas has developed.

In Texas, while Mr. Milam's trial was going on the Texas Court of Criminal Appeals entered an opinion in *Ex parte Hearn,* 310 S.W.3d 424 (Tex. Crim. App. 2010) in which they determined that other than the Standford-Binet, the WAIS or the Kaufman Assessment Battery other "clinical assessment as a replacement for full-scale IQ scores" would be precluded. *Ex parte Hearn,* 310 S.W.3d at 431. Thus, the question in this case is why Defense Counsel allowed the jury to rely heavily on Dr. Proctor's use of the RAIS and as noted above, it is not a full scale IQ battery and as noted in Footnote 18 above, it is inherently flawed as a testing instrument and provides scores consistently above the WAIS. However, this is not the main issue.

More importantly, what *Ex parte Hearn* also notes that in Texas, the Texas Court of Criminal Appeals **"interprets the 'about 70' language of the AAMR's definition of mental retardation to represent a rough ceiling, above which a**

**finding of mental retardation in the capital case is precluded."** *Id.* 310 S.W.3d

at 431, *citing numerous cases at FN 17.*

Thus, Texas, like Florida, stops the inquiry if the test scores are outside the

about 70 range accepted by the DSM. Specifically, Florida held in *Cherry v.*

*Florida,* 959 So.2d 702, 711-714 that Mr. Cherry's score of 72 precluded him from

relief under *Atkins. Cherry v. Florida,* also relied upon the holding in *Bowling v.*

*Commonwealth of Kentucky,* 163 S.W.3d 361 (Ky. 2005) in finding that 18 states

have came to the same conclusion regarding the 70 requirement. *Bowling,* 163

S.W.3d at 374.  Specifically, what makes Florida and Texas united in this venture

is the language upon which *Cherry* relied from Kentucky which set out that Texas

is one of three states that a person must have an IQ of 70 or below to qualify for

the *Atkins* exemptions. *Bowling, supra, citing Ex parte Briseno,* 135 S.W.3d 1, 14

(Tex. Crim. App. 2004)

Given the testimony in the current case, set out about in the factual and

procedural section, Mr. Milam is retarded. Dr. Gripon, the state's expert, had found

that Mr. Milam had an IQ between 65-70[31]. Dr. Proctor's, another state expert,

WAIS-IV results were 68. Dr. Andrews, a non-testifying defense expert, reported a

---

[31] There was conflicting findings in Dr. Gripon's report. He reported 65-70 and 65-75.

71 on the WAIS-IV. Dr. Cunningham went at length through adaptive functioning

factors and onset before the age of 18. This was not clearly rebutted by the State

and the juries determination that Mr. Milam was not mentally retarded to a

preponderance standard is inconsistent with the evidence in this case.

**Thus, what precluded the jury from finding Mr. Milam intellectually**

**disabled was three test scores of 71, 80 and another 80 from an inherently**

**flawed testing instrument. The fourth test was a 68, which Mr. Hall in Florida**

**never had. Texas can say they want to put on an appearance of being fair and**

**applying the law, but what started in Texas went to Kentucky and ultimately**

**to Florida, resulting in the reversal by the Supreme Court in *Hall* of the Texas**

***Briseno*, Kentucky *Bowling* and Florida *Cherry* standard.**

**The determination of mental retardation cannot stop at a score on an**

**intelligence test, the Supreme Court is very clear on this issue in *Hall*.**

At the close of the case, defense counsel made a motion for directed verdict

on the mental retardation issue. The Trial Court denied the motion. (RR 55:287)

Trial counsel failed to challenge the use of the RAIS as a testing instrument and

was thus ineffective. Appellate counsel failed to assert this issue and the mental

retardation issue as a whole on direct appeal. State habeas counsel failed to assert

90

ineffectiveness of trial and appellate counsel for failing to assert the issues at trial and on direct appeal. Given this, this Court may consider the issue under *Martinez* and *Nguyen* in conjunction with Petitioner's request for an evidentiary hearing on this matter which will be forthcoming upon the State's response to the Petition.

## B. *Roper v. Simmons violation*

At the conclusion of punishment, defense counsel notified that the court that they had previously filed a motion to preclude the death penalty because Mr. Milam had a mental or emotional age below that of 18, which all the experts had agreed upon as noted in the discussion above about the facts and procedural history.

Defense counsel requested the Court to find that a sentence of death upon Mr. Milam would violate the Constitution as interpreted by the holding of *Roper v. Simmons,* 543 U.S. 551 (2005). (CR II:312-324) The trial court denied the motion. (RR 55: 286-287)

Appellate counsel did not bring forth this claim on direct appeal. State habeas counsel failed to bring the issue on state habeas review. Thus, pursuant to *Martinez* and *Nguyen* this claim is now being presented as an ineffectiveness of habeas counsel claim.

Although the current view is that this claim is without merit, *See Parr v. Quarterman,* 472 F.3d 245, 261 (5th Cir.2006), *cert. denied,* 551 U.S. 1133, 127 S.Ct. 2974, 168 L.Ed.2d 707 (2007); *In re Garner,* 612 F.3d 533, 535–36 (6th Cir.2010) ("The *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ] Court did not hold that the Eighth Amendment prohibits a death sentence for an offender with a 'mental age' of less than 18.") In 2004, before *Roper*, it was ok to execute a 17 year old and many were executed. In 2001, before *Atkins,* it was ok to execute someone who was mentally retarded, and many were executed. This country has an evolving standard of decency which requires us to constantly reflect on the development of this nation and whether the death penalty remains a functional component of that society. In this case, no one from either side, even the State's expert, could say that Mr. Milam was functioning beyond the 16 year old level at the time of the crime, although he was 18 at the time. Most testified that he was "like a child" or functioned at an 8-11 year old level. Executing someone who is functioning at the 8-11 year old level is cruel and unusual punishment in violation of the Eighth Amendment under the evolving standards of decency. Appellate and Habeas Counsel's failure to bring this claim forward is a violation of the right to effective assistance of counsel under the Sixth Amendment and should withstand a procedural bar pursuant to *Martinez* and *Nguyen*.

92

*Claims Exhausted in State Habeas Proceedings*

**6.     Trial Counsel rendered Ineffective Assistance of Counsel in violation of the Sixth and Eighth Amendment by not relying upon the proper hearsay exception in attempting to have admitted the statement of the co-defendant.**

On December 2, 2008, both Petitioner and Jesseca Carson gave statements. During Jesseca Carson's statement, she changed her story and admitted that her initial story was a lie and that the exorcism was her idea.   She then recounted the Ouija board, demonic possession of the child, the need for an exorcism and the fact that she would rather her baby go to Heaven than live on earth and die and go to Hell.   Throughout the trial, the defense attempted numerous times to admit the contents of Jesseca's statements into evidence.  The defense argued that these statements were not hearsay since they were not being offered for the truth of the matter asserted, and were also an exception to hearsay by being a statement against interest under Texas law.   The State argued otherwise, and the Court sustained the State's objection.

The court allowed Dr. Frank Murphy, a defense expert, to testify at punishment.  Dr. Murphy stated the following:

> Q.     And in your opinion, based on that, the state of mind of Jesseca Carson, that played a significant role in the death of Amora?

A.    Yes, sir.

Q.    And what led you to that conclusion?

A.    Blaine and Jesseca are described by third party observers, including folks in Elba, Alabama, when they were there for those visits, of having shared delusions about the death of her father and the circumstances of that death being a murder instead of a suicide.  They both had anxieties and delusional beliefs about this Ouija board and about the apartment being possessed where they had used that Ouija board.  In her statement, Jesseca describes coming to believe that there was a demon inside of Blaine, that he was possessed, and Blaine also made reference to a belief that he was possessed by a demon.  They came to believe that Amora was possessed and jointly some need for an exorcism to remove the demon from her.  This offense occurred in a context, according to Jesseca's statement, where they were both present in the household, with her knowledge and understanding that some sort of exorcism was occurring that Blaine was doing to Amora.

Now, the significance of this is, as I described earlier, when you have somebody who's in the midst of a methamphetamine psychosis, and their own reality testing is distorted and fragile, and then when there's someone who's there who's psychotic and is participating in the same additional content of their own along these same lines, then it potentiates the psychotic experience for both of these individual's as they are feeding off of each other's delusional perceptions.  It increases the likelihood that they will act on these beliefs in a tragic fashion.

Q.  And in your opinion, Doctor, those are significant factors in this case that ultimately resulted in the death of Amora Carson?

A.  Yes, sir.

Although it could be argued that the crux of Jessica Carson's statement came in through the testimony of Dr. Murphy, this is not the same as the jury hearing this evidence directly from the tape recorded statement of Jesseca Carson herself. In addition, there was other relevant information contained in Jesseca Carson's statements that should have been heard by the jury, such as Jesseca's statement that the cover story and the exorcism was initially her idea.

Trial Counsel argued that the contents of Jesseca Carson's statements were not hearsay because they were not offered for the truth of the matter asserted. Trial Counsel further argued that if the statements were hearsay they were admissible pursuant to Texas Rule of Evidence 803(24), statement against interest. The trial court sustained the state's objection that the statement was not against penal interest.

However, the Texas statement against interest rule is broader than the Federal rule, in that it also allows statements which "make the declarant an object of hatred, ridicule or disgrace, that a reasonable person in declarant's position would not have made the statement unless believing it to be true." Tex. R. Evid. 803(24).   Texas cases *Purtell v. State*, 761 S.W.2d 360 (Tex. Crim. App. 1988) and *Robinson v. Hankins and Company*, 711 S.W.2d 619 (1986) make these statements admissible under Texas law.

Trial Counsel also failed to articulate an 8th and 14th Amendment justification for the introduction of this evidence at sentencing.  If it is determined that Trial Counsel waived these constitutional grounds, Petitioner would further show that he received ineffective assistance of counsel.  This statement was essential to the jury's determination as to whether there were sufficient mitigating circumstances or a circumstance which warrant a life sentence be imposed rather than  death.   These statements show Petitioner's actual role in the offense, i.e. the exorcism was not his idea but the mother's, and he and the mother were operating under delusional belief that Amora was possessed.

The 8th Amendment protects against arbitrary and capricious death sentences.   A capital punishment scheme must allow the sentencing authority to consider all mitigating circumstances.  In addition, *Pepper v. United States*, 131 S.Ct. 1229 (2011) stands for the proposition that no arbitrary limitations should be placed on information concerning the background, character and conduct that a district court (and logically, a jury) can consider for the purpose of imposing an appropriate sentence.

The trial court's finding that Trial Counsel was not ineffective despite not correctly offering this critical evidence resulted in a decision that was contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme

Court of the United States in *Strickland*, and resulted in a decision that

was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding.

**7.      Appellate Counsel rendered Ineffective Assistance of Counsel in violation of the Sixth Amendment of the United States Constitution by failing to raise on direct appeal the Trial Court's refusal to admit the co-defendant Jesseca Carson's statement.**

In addition, Trial Counsel offered this evidence under the Texas

Constitutional right to present a defense.   Texas and Federal Courts have

explained that the hearsay rules must be "flexible" and sometimes bend to the due

process rights of the Petitioner.  *Alonzo v. State*, 67 S.W.3d 346 (Tex. App. Waco),

*Chambers v. Mississippi*, 410 U.S. 284 (1973), *Holmes v. South Carolina*, 547 U.S.

319 (2006).  Trial Counsel argued that these statements should be admissible since

they were essential to the defense theory.  The trial court disagreed.  In spite of

Trial Counsel preserving the issue for appeal, Appellate counsel failed to brief and

present this issue to the Appellate court.

The trial court's finding that appellate counsel was not

ineffective despite not even raising the denial of the admission of

Jesseca's statement on any grounds resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the

United States in *Strickland*, and resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding.

**8.     Trial Counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment by failing to object to specific instances of violence introduced by the prosecution regarding violence in the Texas Prison System. The failure to object violates Petitioner's right to the 8th Amendment requirement of individualized sentencing.**

During cross examination of defense expert Larry Fitzgerald, a TDCJ

classification expert, the State was allowed to present evidence of specific acts of

violence in the Texas Prison System without objection.   (RR 54: 100-101).  In

particular:

1. a death row inmate was shot by a field squad outside the walls of the prison;
2. on January 29, 2010, five offenders on death row escaped, and three of the five were shot but survived;
3. seven offenders broke out of the McConnell unit in South Texas, killed a police officer, and were later captured in Colorado;
4. a death row inmate almost cut off a Chaplain's arm;
5. another inmate tried to escape;
6. a death row inmate escaped before drowning.

Trial Counsel rendered ineffective assistance of counsel by failing to object to these instances of specific incidents of violence in the Texas prison system.  The failure to so object violated Petitioner's 8th Amendment requirement of individualized sentencing.

The alleged instances of violence occurred prior to Petitioner ever entering the Texas prison system.   Painting the Petitioner with the broad brush of prior inmates is speculative as to his future behavior and denied him the heightened reliability in sentencing mandated by the 8th and 14th Amendments.  *See Woodson v. North Carolina*, 428 U.S. 280 (1976).   A Texas Court of Criminal Appeals decision in *Sells v. State*, 121 S.W.3d 748 (Tex. Crim. App. 2003) excluded such evidence regarding a video of an inmate held in administrative segregation.  The tape was not offered as information about the individual being sentenced or how he might be handled.   The court stated that how others had been controlled in the Texas prison system or that certain procedures are in place without specifically connecting those procedures to Petitioner was not evidence of consequence to the jury's factual determination of whether Petitioner would pose a continuing threat to society.  Rather than assisting the jury's factual determination of the danger that Petitioner posed to society, the video tape might have confused and misdirected the jury from its fact finding task, as it did here for Milam.  Thus, specific acts of

99

violence and procedural breakdowns in the Texas prison system, and the potential

opportunity for violence that is unrelated to Petitioner, is inadmissible and

constitutionally harmful.

The trial court's finding that Trial Counsel was not ineffective

despite not correctly objecting to this harmful and inadmissible

evidence resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States in *Strickland*,

and resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the

State court proceeding.

**9.    Trial Counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment by failing to properly cross-examine Bryan Perkins in regards to bias in favor of Jesseca Carson, the co-defendant of Petition.**

Trial Counsel rendered ineffective assistance by failing to properly cross

examine Bryan Perkins in regard to bias in favor of Petitioner's wife and co-

defendant Jesseca Carson. During the punishment phase, Bryan Perkins testified

for the State regarding Petitioner's bad acts, hot temper and controlling nature.

Mr. Perkins also testified as a witness in State v. Jesseca Carson, where it was

proven that Mr. Perkins was actively assisting Ms. Carson's defense.

Mr. Perkins admitted on cross examination that he and Jesseca Carson were

recorded on jail calls where he stated:

1. "We are getting a stronger case for you."
2. "I've got this.  You're getting out."
3. You're going to be out of there some day, and you'll be standing next to me."
4. "I'm out working with these guys just as hard as they are."

State of Texas v. Jesseca Carson (RR 15:  52).  Writ Counsel claims that Trial

Counsel admitted to him that he was aware of these conversations.  In spite of this,

Mr. Perkins was never cross examined by the defense in this regard concerning this

overwhelming evidence of bias.  If these conversations would have been brought to

the attention of the jury, Mr. Perkins's testimony would have been more closely

questioned.  We can only speculate how much weight the jury gave his testimony

and whether they would have answered the special issues similarly if they had

heard this evidence.

Trial Counsel has a duty to investigate and cross examine State's witnesses.

Mr. Perkins was an important state's witness in regard to future dangerousness,

had been Petitioner's boss and testified negatively regarding Petitioner's temper,

101

aggression and controlling manner.  There could have been no trial strategy for

Trial Counsel's failure to cross examine Mr. Perkins in regard to evidence of bias

toward Jessica Carson, Petitioner's co-defendant.

The trial court's finding that Trial Counsel was not ineffective

on this point resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States in *Strickland*,

and resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the

State court proceeding.

## *APPEAL CLAIMS*

## 10.   THE TRIAL COURT ERRED IN DENYING PETITIONER'S *BATSON V. KENTUCKY* CHALLENGE TO JUROR JOBESS SHAW, IN VIOLATION OF THE FOURTEENTH AMENDMENT.

The State used a peremptory challenge on prospective juror No. 34, Jo Bess

Shaw (RR 38:5) and responded to Petitioner's *Batson*[32] challenge by stating that

she was struck because of her strong opinions against the imposition of the death

---

[32] *Batson v. Kentucky*, 476 U.S, 79 (1986).

penalty, which she thought ought to be abolished.  Ms. Shaw had circled "E" on
the questionnaire and the State indicated that no person who circled "E" was left
on the jury.  (RR 38: 19-20). Petitioner responded that the State took more than
two hours in their portion of voir dire, more than any other prospective juror except
No. 36, Alfonso Lucas, another black juror upon whom the State used a
peremptory challenge.  Counsel for Petitioner also stated for the record that, when
Ms. Shaw entered the room for her interview, counsel for the State remarked that
she appeared to be an "angry black female".  (RR 38:21)

The trial court stated that it had no recollection of the event, without taking a
position on whether or not it happened.  (RR 38: 21-22)  Counsel for the State
responded that she had, indeed, made the remark, but only after questioning had
ended, and the fact that Ms. Shaw was African-American had nothing to do with
her exercising a peremptory challenge on her.  (RR 38: 22) The trial court
overruled Petitioner's objection.  (RR 38: 23)

 "It is well known that prejudices often exist against particular classes in the
community, which sway the judgment of jurors, and which, therefore, operate in
some cases to deny to persons of those classes the full enjoyment of that protection
which others enjoy."  *Strauder v. West Virginia*, 100 U.S. 303, 309 (1880); *see*

*also Batson v. Kentucky*, 476 U.S. at 86; *Miller-El v. Dretke*, 545 U.S 231, 237 (2005).  Racial discrimination by the State in jury selection offends the Equal Protection Clause.  *Id.* at 238.

A white defendant may challenge the prosecution's use of peremptory challenges in a racially discriminatory manner.  *Campbell v. Louisiana,* 523 U.S. 392 (1998); *Powers v. Ohio*, 499 U.S. 400 (1991).  Here, the State gave race-neutral reasons for exercising a peremptory challenge on the juror, her opposition to the death penalty.  However, there was evidence that a part of the reasoning in exercising the challenge was racial animus by the prosecutor in stating that she was an "angry black woman".

Under *Batson*, a defendant may establish a prima facie case of discrimination in the jury-selection process by "the totality of the relevant facts" regarding the prosecution's conduct during *voir dire*.  *See Batson*, 476 U.S. at 94, 96.  Once the defendant makes out a prima facie case, the burden shifts to the State to offer a neutral explanation for its conduct.  *Id.* at 97.  To meet this burden, "the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons."  *Id.* at 98.  It is then the trial court's duty to determine if the defendant has established purposeful discrimination.  *Id.*

Once a showing of racial discrimination is made, no showing of harm is required, and relief is mandated:

> Defendants are harmed, of course, when racial discrimination in jury selection compromises the right of trial by impartial jury, *Strauder v. West Virginia, supra,* at 308, but racial minorities are harmed more generally, for prosecutors drawing racial lines in picking juries establish "state-sponsored group stereotypes rooted in, and reflective of, historical prejudice," *J.E.B. v. Alabama ex rel. T. B.,* 511 U.S. 127, 128, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

*Miller-El II* at 237-238.  As the Supreme Court stated in *Batson*:

> The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice.

*Batson*, 476 U.S. 79, 88 (1986).

The Texas Court of Criminal Appeals's finding on direct appeal that the trial court did not clearly err resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in *Batson,* and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, that the prosecutor did not strike Shaw out of racial animus despite calling her an "angry black female" during voir dire.

105

**11.    THE TRIAL COURT ERRED IN GRANTING THE STATE'S CHALLENGE FOR CAUSE OF JUROR JERRY TRZECIAK, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The State infringes upon a capital murder defendant's right to a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution when even one prospective juror has been excused on a challenge for cause by the State, when that challenge is based solely on that venire person's opposition to the death penalty, unless that opposition to the death penalty results in the venireperson's inability to follow the law. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Later, the Supreme Court softened the standard of *Witherspoon* by holding "that a juror may not be challenged for cause based upon his views of capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

Finally, in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed2d 841 (1985), the Supreme Court reaffirmed the *Adams* standard, deciding that "no longer does a juror's bias have to be proven with 'unmistakable clarity'" and

requires that great deference be given to the trial judge's discretion in excusing for cause jurors who equivocate in their answers to death penalty issues.

The entire examination of prospective juror Jerry Trzeciak was as follows:

> [COURT]: All right.  Mr. Trzeciak.  There are no right or wrong answers.  You're entitled to your thoughts, your feelings, and your opinions.  We're not going to argue with you, and we're not going to try to change your mind, whatever you say.  We just need to know how you feel if it affects your ability to be a fair and impartial juror in this case.  Did you respond to my last question?
>
> [VENIREMAN]: Yes, I did, the very last one.
>
> [Q]: Tell us - -
>
> [A]: My thought on that is - - I wanted to share with the Court that I don't believe there's a circumstance where I could condone or vote for the death penalty, based on my personal religious beliefs.
>
> [COURT] All right.
>
> [PROSECUTOR]: Mr. Trzeciak, basically, you just wanted to come tell the Court that no matter what circumstances may be out there, you've already decided you could not consider the death penalty?
>
> [A]: I cannot do that, yes.
>
> [Q]: Irrelevant of whatever that may be?
>
> [A]: Irrelevant of whatever that may be.

[Q]: You felt compelled to come tell us that now, rather than waiting to questioning, because you feel that strongly about it?

[A]: Well, I feel that strongly about it, and I didn't want to waste the Court's time in the future.  I didn't know if that was going to be captured later on based upon the questionnaire that you put out, so I just wanted to let that be known now.

[DEFENSE COUNSEL]: Sir, at some point in time - - but let's say that you sit on a jury and you find an individual guilty of capital murder, where you go to the second phase of the trial, where you have to answer - - basically, a jury doesn't get to decide life or death.  What they decide is they answer questions.  If the Court asks you or instructs you to render a true verdict, meaning will you answer those questions truthfully, the first one being in essence from listening to all the testimony, can you make a decision as to whether or not the defendant will be a danger to commit future acts of criminal violence, to be violent in the future?  Could you answer that question truthfully, if so instructed?

[VENIREMAN]: Well, I'm going to try.  I understand the question you're asking.  If you're asking.  I would then go back to - - in today's society, is my opinion and the opinion of my church, there's no justification for the death penalty.  If I - - rendering some sort of verdict in phase two, the potential exists for the death penalty, I could not vote that way.

[Q]: Are you telling us that you would distort - - you would not give a truthful answer if you thought that that answer could lead to the death penalty?

[A]: Well, I would - - what I'm saying is, I feel that I'm being compromised in letting the Court know if the potential of - - me sitting on a jury, the potential exists that the outcome might be the death penalty, I'm against that.

[Q]: I understand you're against it. There may be some other people that are.  But the question is can you answer those questions truthfully?  That first question is going to be, do you believe this person will be a threat to commit criminal acts of violence in the future?  Kind of in layman's terms, if you hear the evidence and you believe that he will be a future danger to commit criminal acts of violence, will you answer that question truthfully?

[A]: Would I answer that?

[Q]: If proven to you beyond a reasonable doubt.

[A]: Yeah, I would always be truthful.

[Q]: Okay.

[A]: I don't think that's a question - -

[Q]: So you would answer the question truthfully, and then however those questions - - whatever the answers may be, for life or death, you're going to answer the questions truthfully, no matter what the result might be?

[A]: Well, I'm going to answer the questions truthfully, that is correct.  But I am just saying, for the record, I'm

comfortable with - - if the outcome was to keep that person out of society, that's fine.

[Q]: Okay.  Thank you.

[PROSECUTOR]: Let me ask a couple of questions.

[VENIREMAN]: Sure.

[Q]: Basically, what you told me is this - - told us is that you don't see any set of circumstances where the death penalty would be justified?

[A]: Right.

[Q]: It sounds like - - and you've told us that you feel like you would be very compromised to have to be in a situation - -

[A]: That's correct.

[Q]: Let's go back a little further.

[A]: Sure.

[Q]: You haven't had a chance - - we haven't had this long discussion with you yet, but if you should end up on the jury and be one of the people selected you would have to take a second oath, and that would be an oath to render a true verdict based upon the evidence.  Basically, that you answer those questions, and if it results in the death penalty, it does if it does.  If it results in life, so be it.  Nobody can hold a gun to your head and make you take that oath.  Okay?  And when you say to us that you feel like you would be compromised, it sounds to me like you would have some real qualms or real concerns about your ability to, in good faith, take that oath.

[A]: Well, that's true.  My beliefs - - and whether we want to look at the Texas Conference of Catholic Bishops or whether you wanted to look at the U. S. Conference of Bishops in 2000, or actually since '72, or you wanted to look at John Paul in 1995, the church - - the church that I follow pretty much - - not pretty much - - has established their beliefs for the death penalty in modern society.

[Q]: Okay.  As a result of how - - you've just quoted a bit of religion.  Very understandable.

[A]: I'm pretty involved in my religion.

[Q]: I can tell.  I'm trying to short-circuit this and not spend a bunch of time with you on it, but do you feel like your religious feelings about the death penalty are entrenched enough in who you are that they would substantially impair your ability to answer all these questions, based on the evidence?

[A]: Let me get back to you.  I would never intentionally tell something that I did not feel was true.  At the same time, I don't feel - - I would feel compromised - -

[Q]: That's why I'm asking you not whether you would be prevented from doing it, but would you fell enough compromise in your own self that your opinions and your feelings would substantially impair your ability to do it? Do you see the difference?

[A]: I don't know that I see the difference.

[Q]: Okay.  But that based upon your religious feelings, that you would be very, very compromised to be in this sort of a situation?

111

[A]: That's correct.

[Q]: Okay.  That's all I have for now.

[DEFENSE COUNSEL]: The long and short of it, sir, is based on your religious beliefs, you're going to be truthful with how you answer questions from the Court?

[A]: Yes.

[Q]: That's all we ask.

[PROSECUTOR]: Do you think you could, in good conscience, take the oath to render a true verdict, based upon the amount of compromise that could very well inflicted upon you?

[A]: Would I - - whatever I answer will be true.  I'm just just saying I would be, I, myself, and I believe my beliefs in my religion would be compromised.

[COURT]: Sir, let me ask you this question.  Can you return a verdict which assesses the death penalty in a case?  I understand you're never going to write "death penalty".

[A]: Right.

[Q]: But can you, in good conscience - - and I don't care what your answer is.  I just need to know.  Can you return a verdict which assesses the death penalty?

[A]: I could not.

[Q]: All right, thank you, sir.  Any further questions?

[PROSECUTOR]: No, Your Honor.

112

[DEFENSE COUNSEL]: No, Your Honor.

[COURT]: All right, have a seat right - - if you'll wait right outside the door.

[COURT]: Is there a challenge?

[PROSECUTOR]: Yes, Your Honor.

[MR JIMERSON]: Yes.

[COURT]: Grant the challenge.

[DEFENSE COUNSEL]: We object, based on Article 1, Section 2 of the Constitution, and the Fourteenth Amendment of the U.S. Constitution.  We believe this juror's views on capital punishment, although he is opposed to the capital punishment, has been very clear that he would answer the questions truthfully, and as such, we believe he is not challengeable for cause.

[COURT]: I'll note your objection.

[Q]: The objection is overruled?

[A]: Yes.

(RR 12: 74-81)

The questioning of Mr. Trzeciak did not go far enough to disqualify him. He never said he would not be able to follow the law in his answers to special issues in order to prevent the imposition of the death penalty.  Mr. Trzeciak did not waiver when asked whether he would answer the special issues truthfully, according to the evidence.  He always answered yes.  While he had concerns that

113

*his religious beliefs* could be compromised by his answers, he never indicated he would compromise his answers.

The trial court erred when it granted the State's unfounded challenge for cause, resulting in Petitioner being denied his right to a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution. The death penalty cannot be imposed if even one prospective juror has been excluded in violation of *Witherspoon*.  *Grey v. Mississippi*, 481 U.S. 648 (1987). The Texas Court of Criminal Appeals' finding on direct appeal that the judge did not abuse his discretion in excusing the juror and that Mr. Trzeciak's answers "concerning his inability to assess the death penalty under any circumstances" involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in *Witherspoon,* and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, i.e. that Mr. Trzeciak would not truthfully answer the special issues.

**12.    THE TRIAL COURT ERRED IN ALLOWING THE STATE TO COMMENT UPON PETITIONER'S FAILURE TO DISCUSS THE FACTS OF THE OFFENSE WITH THE STATE'S EXPERT IN VIOLATION OF HIS PREVIOUS ORDER AND THE PETITIONER'S FIFTH AMENDMENT RIGHT TO REMAIN SILENT.**

Prior to trial, the State filed its Motion for Psychological Evaluation of the

Defendant for Purposes of Rebuttal.  (CR 1:69)    The trial court conducted a pre-

trial hearing on the motion, where the defense agreed to allow the State's experts

examine Milam, with the provision that he not asked about the facts of the offense.

The defense  agreed to not allow Milam's experts to ask about the facts of the

offense so that the playing field was even.  As could be expected, the State

opposed that proposition, insisting that their experts be allowed to inquire about

the facts of the offense, whether or not the defense experts did the same.  (RR

22:124-32)

The trial court made the following ruling:

> All right.  The Court has reviewed the cases submitted to
> it, and the Court - - and primarily based upon language
> contained in Chamberlain, *I am going to limit the
> interview to exclude the offense, with the understanding
> that the defendant's experts be precluded from offering
> any opinions, findings, conclusions, or opinions based
> upon any interview or conversations of the defendant, by
> the expert of the defendant, concerning the offense itself.*
> And, of course, this does not preclude any opinions,
> findings, or conclusions obtained from sources other than
> the defendant. (Emphasis added).

(RR 22:132)

During the punishment phase of trial, while cross-examining Dr. Mark Cunningham, a defense witness the prosecutor violated the spirit, if not the letter of the trial court's order that limited the expert's examination to exclude the facts of the offense by attempting to impeach Dr. Cunningham for following the order of the trial court:

> [PROSECUTOR]: When you interviewed the defendant in those 9 1/2 hours that you spent with him, you did not ask him one thing about the capital murder for which this jury has convicted him, did you?
>
> [DR. CUNNINGHAM]: That's correct.
>
> [Q]: Why?
>
> [A]: Well, primarily because I was instructed by Counsel not to go into the circumstances, the events of the offense itself.[33]
>
> [Q]: Really?
>
> [A]: Yes, ma'am.
>
> [Q]: So you didn't talk to him about it, because the lawyers told you, "Don't ask him about it; don't talk to him about it'?

---

[33] It is a reasonable deduction that Dr. Cunningham had not been told that he was not to discuss the facts of the offense with Milam because the trial court had ordered it, or he would have said so at this point.

116

(RR 54:73)

Defense counsel then renewed the Fifth Amendment objection that had been originally made at the pre-trial hearing (RR 22:125) resulting in the court's ruling. (RR 54:74) The State responded that Milam had waived his right to remain silent and that they had the right to go into the fact he (Dr. Cunningham) made the decision not to talk to Milam about the facts of the case.  (RR 54:75) The prosecutor went on to say, "The fact of the matter, whoever made the decision, whoever made the decision, he did not talk to him about the facts of the offense, and I have every right to ask him about that, because it's - - once he waives, he waives."  (RR 54:75)

The fact of the matter is that the *trial court* made the decision, not defense counsel and not Dr. Cunningham.  Regardless of whatever the merits of the prosecutor's argument might be, she did not have the right to violate the trial court's order and use it as a weapon against Milam.  The trial court had set the parameters of the expert's interviews at the pre-trial hearing and those parameters should have been honored, both in letter and spirit.

The trial court overruled Petitioner's objections and gave a running objection to the line of questioning.  (RR 54:76) State's counsel continued on for

several more questions until the court sustained Petitioner's objection to an

argumentative question and instructed the jury to disregard that question and

answer, but denied Petitioner's motion for mistrial on the entire line of questions.

(RR 54:79)

In rebuttal of Dr. Cunningham the State's called Dr. Tim Proctor, who

testified it was his opinion that Milam did not meet the definition of mental

retardation (RR 55:180) the following exchange took place:

> [PROSECUTOR]: Okay.  Now, you have told us that you spent a
> significant amount of time interviewing the defendant?
>
> [DR. PROCTOR]: Yes.
>
> [Q]: Were you permitted to talk to this defendant, Blaine Milam,
> about the facts of the capital murder case for which he has been
> convicted?
>
> [DEFENSE COUNSEL]: Objection.  Improper comment on the
> defendant's right or refusal to testify about the facts of the case.

(RR 55:180).

In a bench conference, outside the hearing of the jury, Petitioner then

specifically objected under the provisions of Fifth, Sixth and Fourteenth

Amendments to the United States Constitution.  (RR 55:181)

After much "back and forth" disputing the wording of the previous order and the State's position that "a waiver is a waiver is a waiver" (RR 55:182), the trial court allowed the State to ask the witness if he was "able to speak with the defendant about the facts of the capital murder case for which he was convicted by this jury?" to which the witness answered "no".  (RR 55:185)

It is a violation of the Fifth Amendment for the prosecutor to comment on the defendant's failure to testify.  *Griffin v. California*, 380 U.S. 609 (1965).  The prosecutor asked the witness if he had been *prevented* from asking about the facts of the offense.  The later question about being *unable* to speak with Petitioner about the facts of the case does not prevent the question from being an improper comment in violation of the Fifth Amendment.

Prosecutorial misconduct may constitute a denial of due process where the misconduct implicates a specific provision of the Bill of Rights, as it did here in denying Petitioner his Fifth Amendment right to be free of harm for exercising his right to remain silent about the facts of his case in the face of questioning by the State's experts.  *Rogers v. Lynaugh,* 848 F2d 606, 608 (5th Cir. 1988).

Likewise, prosecutorial misconduct may constitute "generic substantive due process" *Id.*  Either types of prosecutorial misconduct may result in reversal.  One

of the issues to be determined by the jury was "do you find, by a preponderance of the evidence that the defendant, Blaine Keith Milam, is a person with mental retardation? (CR4: 987)

The issue of whether or not Milam met the definition of mental retardation was hotly contested throughout the punishment phase of the trial and the jury heard compelling evidence that would have justified an affirmative finding to the mental retardation issue, resulting in a life sentence.  As a result of the prosecutor's misconduct, the jury was left with the impression that Petitioner, on advice of counsel, was attempting to hide important information that bore on the issue.

The Texas Court of Criminal Appeals's finding on direct appeal that the prosecutor did not improperly comment on the defendant's silence nor left a false impression with the jury resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in *Griffin* and *Napue*, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

## 13.   THE STATE KNOWINGLY CREATED A FALSE IMPRESSION THAT PETITIONER REFUSED TO SPEAK ABOUT THE FACTS OF THE OFFENSE TO THE

**STATE'S AND DEFENSE EXPERTS ON ADVISE OF COUNSEL, IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

In *Mooney v. Holohan,* 294 U.S. 103 (1935), the Supreme Court held that the knowing use of false testimony by the prosecution violates a defendant's right to due process, because "a deliberate deception of the court and jury by the presentation of testimony known to be perjured" is inconsistent with "the rudimentary demands of justice." *Id.* at 112. In *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court condemned the State's knowing use of perjured testimony as a violation of the Fourteenth Amendment to the United States Constitution. This includes the knowing leaving of a false impression with the jury, even if the testimony was not technically false. The Supreme Court has held that a prosecutor also has a constitutional obligation to correct his witness's perjured testimony, even if he did not know the witness was going to lie. *Giglio v. United States*, 405 U.S. 150 (1972). Moreover, the prosecutor has a duty to correct a false impression that his witness created without committing perjury. *Miller v. Pate*, 386 U.S. 1 (1967); *Alcorta v. Texas*, 355 U.S. 28 (1957); *United States* v. *O'Keefe*, 128 F.3d 885, 897 (5th Cir. 1997). "[U]nder the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned

false impression of material evidence when it decides the question of guilt or innocence with all its ramifications." *United States v. Barham*, 595 F2d 231, 242 (5th Cir. 1979).

Furthermore, the testimony need not be "technically false, but merely leave the jury with a false impression." See *e.g. Blankenship v. Estelle*, 545 F2d 510, 513 (5th Cir. 1977); *Dupart v. United States*, 541 F2d 1148, 1140-50 (5th Cir. 1976)(per curiam).

A defendant is entitled to relief under *Napue* if (1) the testimony was false; (2) the State knew the testimony was false, and, (3) "there is any reasonable likelihood that the false testimony could have affected the jury's verdict." *Napue*, 360 U.S. at 269-72; see *Ex parte Adams*, 768 S.W.2d 281, 290 (Tex. Crim. App. 1989). The knowing use of false testimony renders the result of a proceeding "fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Bagley*, 473 U.S. 667, 679 (1985).

Here, the impression left by the State that Milam refused to speak about the facts of the offense, rather than it being the trial court's decision that the experts

not inquire about the facts of the offense was false and the State knew it was false, satisfying both the first and second prongs of *Napue.*

Finally, the third prong of a *Napue* claim - the effect of the false testimony on the trial - is not the same materiality showing applied to evidence suppressed by the prosecution.  The *Napue* materiality standard is more favorable to a defendant than the *Brady* materiality standard because, "the knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves a corruption of the truth-seeking function of the trial process."  *United States v. Bagley*, 473 U.S. at 681.  The *Napue* standard is equivalent to the harmless error standard of *Chapman v. California*, 386 U.S. 18 (1967), which requires the State "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. " *United States v. Bagley*, 473 U.S. at 679  n. 9; *Ex parte Castellano*, 863 S.W.2d at 485 ("the use of perjured testimony will be found to be material unless a reviewing court is convinced beyond a reasonable doubt that the perjury did not contribute to the prosecution or punishment.").

The requirements of *Napue* have been met.  The prosecution knew that the trial court had required the experts to refrain from asking about the facts of the offense, and the State's questions left the false impression that Milam and his

attorneys wer trying to pervert the process by refusing to discuss the facts of the offense.  That was a position favorable to the prosecution and the false impression was left to stand in order to discredit Milam and undermine his case for mental retardation.

The Texas Court of Criminal Appeals's finding on direct appeal that the prosecutor did not leave a false impression with the jury resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

## 14. PROSECUTORIAL MISCONDUCT IN THE SENTENCING-PHASE SUMMATION DENIED MILAM HIS FUNDAMENTAL RIGHTS TO A FAIR TRIAL AND HIS RIGHT TO A RELIABLE SENTENCING DETERMINATION.

The State denied Milam his constitutional rights to a fair trial and to a reliable sentencing determination through repeated misconduct in the sentencing phase, including inflammatory comments regarding Milam's use of his Eighth Amendment right to present mitigating evidence and to have that proffered

evidence at least considered by the jury.  These errors require reversal of Milam's

death sentence.  *See* U.S. Const. amends.  VI, VIII, XIV.

Milam had an Eighth Amendment right to present mitigation evidence at his

capital trial.  *See, e.g., Tennard v. Dretke*, 542 U.S. 274, 285 (2004).  The State

improperly argued as follows:

> [PROSECUTOR]: Mitigating evidence is that which
> lessens a person's moral blameworthiness for what he's
> done.  And yes, you have heard evidence from his
> background that is unfortunate.  You have heard things
> that I can agree was not the perfect life growing up;
> however, the problem is, the fundamental problem is that
> the one type of mitigating evidence that could explain
> this, that I would suggest to you might be sufficient to
> explain this act and this conduct and this crime, is not
> here.  If there was evidence before you that this
> defendant had been horribly abused as a child, horribly
> abused as a child, I could stand before you - -
>
> [DEFENSE COUNSEL]: Again, Your Honor, we'll
> object.  Counsel's injecting her own personal thoughts
> and opinions, not basing her pleas on inference from the
> evidence.
>
> [TRIAL COURT]: All right.  I'll overrule the objection.
>
> [PROSECUTOR]: If there was some evidence like that
> before you, I could stand before you and argue to you or -
> -

[DEFENSE COUNSEL]: Again, Your Honor, she is injecting her own thoughts, opinions, and beliefs.  She's not making a plea to law enforcement.  She's not asking he jurors to make a logical inference from the evidence.  It's improper.  We object to it.

[TRIAL COURT]: All right.  I'll give you a running objection to that line of questioning.

. . .

[PROSECUTOR]: If he had been somehow horribly abused as a child, bitten, beaten, violated, perhaps that would be mitigating evidence that would lessen his moral blameworthiness sufficiently to warrant life.  Folks, that's not here.  As much - - as much as the Milam family did not do right over the years, they did not abuse their kids, and nobody else did either.  That's  the bottom line, and I would suggest to you that really is the only kind of mitigating evidence that truly can explain why we're here and truly lessen moral blameworthiness for this.

(RR 54:151-53)

The State violated Milam's Eighth Amendment right to have "each juror . . .

to consider and give effect to [his] mitigating evidence." *McKay v. North

Carolina*, 494 U.S. 433, 442-43 (1990), by misrepresenting the definition of

mitigating evidence and the jury's role in weighing it.  First, the prosecutor

wrongly told the jury that only being horribly abused by being bitten, beaten, and

violated would lessen his moral blameworthiness.  It would not have been lost on

126

the jury that the prosecutor was describing what had happened to the victim in this case.  Second, the prosecutor wrongly told the jury that, in order to be mitigating, evidence must lessen the accused's moral blameworthiness.  In *Tennard v. Dretke*, 542 U.S. 274 (2004), the Supreme Court rejected the "nexus" test which Texas and the Fifth Circuit had been using as a restriction upon independent mitigating evidence.  *Tennard* teaches that mitigating evidence is any evidence that would serve an individual juror as a basis for a sentence less than death.  *Tennard* does not require that the evidence "lessen an accused's moral blameworthiness."  Just as a capital sentencing jury does not consider the issue of justification, it does not consider to what degree a convicted capital murderer is "morally blamed."  Such a person is morally blamed: he faces a minimum punishment of life imprisonment without the possibility of parole.  The State's arguments misstated the law on mitigation, misstated the special issue, and prevented Milam's jury from "giv[ing] effect to [his] mitigating evidence."  *McKay v. North Carolina*, 494 U.S. 433, 442-43 (1990).

The State similarly violated the Eighth Amendment and denied Milam a fair sentencing trial when it falsely argued that the jury had "no choice" but to assess the death penalty - insisting that:

> Sometimes the death penalty is society's last line of self-
> defense, and it is, as Mr. Jimerson told you, the one thing
> that we have to have to han[g] onto our humanity.  What
> does it say about our society that someone can do that?
> What does it say about that person, this defendant, that he
> can do that?  And what would it say about our society for
> him to not be given that ultimate penalty for it?  He has
> earned it, and you know it's the only choice.  Thank you.

(RR 56:158)

On the contrary, the jury did have a choice: indeed, it had a duty to give a

"reasoned moral response" to the defendant's mitigating evidence.  *Abdul-Kabir v.*

*Quarterman*, 550 U.S. 233, 264 (2007).  And that "reasoned moral response" was

one each juror was entitled to make individually.  *McKay,* 494 U.S. at 442-43.

Furthermore, as numerous courts have held, insisting that a jury has a duty to

decide a case a certain way is an egregious attempt to stir passions and, in effect,

intimidate the jurors into returning a particular verdict.  Such prosecutorial

misconduct requires reversal.[34]

---

[34] *See United States v. Young*, 470 U.S. 1, 18-19 (1985) (finding that "the prosecutor was also in error to try to exhort the jury to 'do its job'; that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice"); *id* at 30 (Brennan, J., concurring in part and dissenting in part).

The State's inflammatory jury argument for death violated Mr. Milam's rights to a fair trial and a reliable sentencing determination.  His sentence of death should be vacated and reformed to a life sentence or remanded to the trial court for a new punishment hearing.

The Texas Court of Criminal Appeal's finding on direct appeal that the prosecutor did not improperly argue the mitigation standard the jury resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in *Tennard*, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

**15.   THE TEXAS DEATH PENALTY SCHEME VIOLATED PETITIONER'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT ISSUES.**

All twelve jurors must answer the first special issue (future dangerousness) affirmatively before the trial court may impose the death penalty; a life sentence, on the other hand, requires that at least ten jurors answer a special issue negatively.

129

*See* TEX.CODE CRIM. PROC. ANN. art. 37.071 § 2(d)(2) (Vernon Supp. 1999).

Unanimity must also exist for the jury to enter a negative finding on the mitigation

issue, while only ten jurors must vote to grant leniency.  *See id.* § 2(f)(2).  The trial

court here instructed the jury accordingly.  (CR2 - 312).  The failure of a capital

jury to garner the requisite number of votes either way results in a life sentence.

*See id.* § 2(g).  Neither the trial court, parties, nor counsel may disclose to the jury

members that their failure to unanimously agree on an answer to either special

issue results in a life sentence.  *See id.* § 2(a).  This feature of article 37.071 creates

the potential for considerable confusion among reasonable jurors.

A.  The "Majority Rules" Harm Analysis

Texas' 12/10 Rule generates the danger that confused jurors otherwise

predisposed to hold-out on voting for a death sentence will conform to a "majority-

rules" mentality.  Potential holdout jurors may reasonably believe that their votes

in favor of a life sentence are worthless unless nine others join them.  If a majority

of other jurors are firmly voting "yes", holdouts may feel obligated to vote "yes"

since there would appear to be no possibility of a life sentence and the jury has

been instructed to return a verdict. *See Mills v. Maryland*, 486 U.S. 367, 383, 108

S.Ct. 1860, 1870, 100 L.Ed.2d 384, ___ (1988) ("common sense ... suggest[s] that

juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation [citation omitted] unless they are expressly instructed to do so.").

Support for this argument regarding minority juror "coercion" is found in the Supreme Court cases criticizing the practice by trial courts of inquiring into the numerical division of deadlocked juries prior to sending the jury back for further deliberations. *See, e.g. Lowenfield v. Phelps*, 484 U.S. 231, 239-40, (1988); *Brasfield v. United States*, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed.2d 345 (1926). In such cases, the Supreme Court has held that "inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear, in some degree, serious although not measurable, an improper influence upon the jury." *Lowenfield v. Phelps*, 484 U.S. 231, 239 (1988)(*citing Brasfield v. United States*, 272 U.S. 448, 450 (1926).)

Put another way, Texas' 12/10 Rule is a built-in impermissible "dynamite charge", which has been recognized as a possible Eighth Amendment violation in the capital sentencing context. *See Lowenfield*, supra.  In this way, Article 37.071's 12/10 Rule injects arbitrariness into the proceedings and creates the potential for unreliable sentencing determinations - a constitutional violation of the highest

order in the capital sentencing context.  *See State v. Williams*, 392 So.2d 619, 631

(La.1980) (on rehearing).  In *Williams*, the court stated:

> In the present case the jurors were not fully informed of the
> consequences of their votes and the penalties which could
> result in each eventuality ... *Instead, the members of the
> sentencing body were left to speculate as to what the outcome
> would be in the event there was no unanimity.*  Under these
> circumstances, individual jurors could rationally surmise
> that in the event of a disagreement a new sentencing hearing,
> and perhaps a new trial, before another jury would be
> required. [emphasis added.] *Id.*

Such a risk of speculation and confusion was held to be a constitutional

violation by the Louisiana Supreme Court.  *Id.*

B.  The *Mills* Principle

The 12/10 Rule also violates the Eighth Amendment principle in *Mills v.

Maryland*, 486 U.S. 367 (1988) that it is unconstitutional to instruct capital

sentencing jurors in a manner leaving reasonable jurors to believe that their

individual vote in favor of returning a life sentence based on particular mitigating

factors is worthless unless some threshold number of jurors agree that particular

mitigating factors exist.  That is, a constitutional violation occurs if a reasonable

juror could interpret the jury charge to instruct the jury that there must be a

meeting of the minds among some threshold number of jurors as to whether the

mitigating evidence offered by the capital defendant warrants either a negative

answer to the first special or second special issue, or an affirmative response to the

third, thus resulting in the imposition of a life sentence.  *Mills*, 486 U.S. at 373-75.

Unless jurors are informed of the result of a deadlock in such a situation, the risk

that one or more jurors will give into a "majority rules" mentality is too great to

pass Eighth Amendment scrutiny.

C.  The *Mills* Principle As Applied in Texas

Under *Mills*, a constitutional violation would occur under the Texas scheme

if reasonable jurors who were instructed pursuant to Article 37.071 were led to

believe that their votes in favor of a life sentence based on particular mitigating

factors would be worthless unless at least nine other jurors joined them.  In *Kubat*

*v. Thierot*, 867 F.2d 351, 369-73 (7th Cir.), *cert. denied,* 493 U.S. 874 (1989),

while finding a *Mills* violation, the Seventh Circuit was faced with a capital

sentencing scheme similar to the one at issue in the present case:

> Kubat's jurors were never expressly informed in plain and
> simple language that even if one juror believed that the death
> penalty should not be imposed, Robert Kubat would not be
> sentenced to death ... [T]here is a substantial possibility that
> one or more of Kubat's jurors might have been precluded from
> granting mercy to Kubat because of a mistaken belief that the

sufficiency of mitigating factors had to be found unanimously.
*Id.* at 373.

Therefore, reasonable jurors could have believed that they had no ability to give mitigating effect to any and all types of mitigating circumstances unless at least nine other jurors also voted for life.  Because "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant [mitigating] evidence," *Boyde v. California*, 494 U.S. 370, (1990), Petitioner was sentenced to death in an unconstitutional manner.  For these reasons, the judgment of the trial court should be reversed and the cause remanded for a new trial.

The Texas Court of Criminal Appeals declined to make factual findings on this issue and thus are not entitled to deference.

## 16.   THE TRIAL COURT COMMITTED CONSTITUTIONAL ERROR BY CHARGING THE JURORS THAT THEY HAD DISCRETION TO DECIDE WHETHER A CIRCUMSTANCE WAS MITIGATING.

Consistent with Art. 37.071 § (2)(f)(4), the trial court charged the jury that it "shall consider mitigating evidence to be evidence that a juror *might regard* as reducing the defendant's moral blameworthiness."  (CR3 :982) (emphasis added).  Both the statute and the court's instruction violate the Eighth Amendment, which

134

permits jurors no such discretion.  The United States Supreme Court's "cases have

established that the sentencer may not be precluded from considering, *and may not*

*refuse to consider*, any constitutionally relevant mitigating evidence."  *Buchanan v.*

*Angelone*, 522 U.S. 269, 276 (1998) (emphasis added) (citations omitted).  Indeed,

the Court has held that such mitigating circumstances as a defendant's "good

conduct in jail *is . . .by its nature relevant to the sentencing determination."*

*Tennard*, 542 U.S. at 285,287 (citing *Skipper*, 476 U.S. at 7 (emphasis added)).

Here, Petitioner presented evidence of his good jail conduct as well as such other

inherently mitigating, constitutionally relevant factors as low intelligence,

problems with school, love and dedication to family, and psychologically

damaging physical trauma.  (RR 53:200-202; RR 53:9-17; RR 51:241-47; RR

51:205-09)

Article 37.071 requires trial courts to *misinform* jurors that they can refuse to

treat mitigating evidence as mitigating, resulting in structural constitutional error

requiring reversal.  *Nelson v. Quarterman*, 472 F3d 287, 314-15 (5th Cir. 2006)

(rejecting harmless error analysis where jury precluded from giving full effect to

mitigating evidence); *see also* note 255, *supra* (collecting other authorities); U.S.

Const. amends. VI, VIII, XIV, Tex. Const. art. I, § 13.  In the alternative, in a close

case on both guilt and innocence issues, *Ward v. Hall,*  592 F3d 1144, 1180-81

(11th Cir. 2010), where the jury may well have returned a life verdict if properly

instructed, the error caused Milam egregious harm.

The Texas Court of Criminal Appeals's finding on direct appeal that the

court did not improperly instruct the jury on mitigation was contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States in *Buchanan*, and resulted

in a decision that was based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding.

**17.   THE TEXAS DEATH PENALTY SCHEME
VIOLATED PETITIONER'S RIGHTS AGAINST CRUEL
AND UNUSUAL PUNISHMENT, AN IMPARTIAL JURY
AND DUE PROCESS OF LAW UNDER THE SIXTH,
EIGHTH AND FOURTEENTH AMENDMENTS OF THE
UNITED STATES CONSTITUTION BECAUSE OF
VAGUE, UNDEFINED TERMS IN THE JURY
INSTRUCTIONS AT THE PUNISHMENT PHASE OF THE
TRIAL THAT EFFECTIVELY DETERMINE THE
DIFFERENCE BETWEEN A LIFE SENTENCE AND THE
IMPOSITION OF THE DEATH PENALTY.**

The failure to define the operative words and phrases violated the

constitutional requirement that each statutory aggravating circumstance genuinely

narrow the class of persons eligible for the death penalty and reasonably justify the

imposition of the death penalty.  *See Godfrey v. Georgia*, 466 U.S. 420, 100 S.Ct.

136

1759, 64 L.Ed.2d 398 (1980). Because the trial court failed to charge the jury in a constitutionally adequate manner so that its determinations are rationally reviewable, there was no rational process justifying the imposition of the death penalty upon this Petitioner in comparison to other cases in which other defendants received a life sentence.  This failure to properly instruct the jury violated Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The Texas special issues applied in this case function as aggravating circumstances.  An aggravating circumstance is any finding by a capital sentencer which "circumscribe[s] the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 878, 103 S. Ct. 2733, 77 L.Ed.2d 235 (1983).  An affirmative finding to the first special issue and a negative finding to the second comprise a finding on an aggravating circumstance as defined by the Supreme Court in *Zant*.  When an aggravating circumstance is vague, however, it fails to serve its constitutionally mandated narrowing function.  A sentence of death may not be imposed using a vague aggravating factor unless the state court cures such vagueness by applying a valid limiting construction, thereby providing the sentencer specific and detailed guidance concerning its scope.  *Maryland v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

137

Because the Texas special issues contain terms that are unconstitutionally vague, any of the special issues are unconstitutional as applied to Petitioner.  Her death sentence must therefore be vacated.  *See Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Lewis v. Jeffers*, 497 U.S. 766, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

In Texas, the Court of Criminal Appeals has held that the special issues perform the function of narrowing the class of death eligible defendants, and thereby comprise aggravating circumstances under the Constitution:

> [T]he function of Article 31.071 [is] to further narrow the class of death-eligible offenders to less than all those who have been found guilty of (capital murder) as defined under § 19.03 (capital murder statute).

*Smith v. State*, 779 S.W.2d 417, 419 (Tex. Crim. App. 1988); *Roney v. State*, 632 S.W.2d 598, 603 (Tex. Crim. App. 1982) (facts of crime alone do not provide death-eligibility, otherwise every murder in the course of robbery would warrant capital sentence).

138

However, the Texas special issues cannot suffice as a framework for the imposition of the death penalty if the special issues themselves contain crucial terms that are undefined and inherently vague.

The Texas Court of Criminal Appeals has refused to apply any limiting construction to the unconstitutionally vague terms in the special issues.  Special issues must channel sentencing discretion by adequately informing jurors "what they must find to impose the death penalty."  *Maryland v. Cartwright*, 486 U.S. at 362, 108 S.Ct. at 1858, 100 L.Ed.2d at ___; *Godfrey v. Georgia*, 466 U.S. at 428, 100 S.Ct. at 1765, 64 L.Ed.2d at ___.  Texas allows its capital juries virtually unfettered discretion in construing the statutory aggravating circumstances without the aid of specific definitions of crucial terms contained in the special issues.  *Roney v. State*, 632 S.W.2d at 603.  Yet that function is articulated through the use of the special issue questions, which employ broad terms that result in standard less capital sentencing determinations.  Such a result runs directly counter to the Eighth Amendment's requirement that there be a rational process for juries and appellate courts to decide who lives and who dies.

In the first special issue, the word "probability" has no common or uniform meaning.  Jurors in the instant case were left to apply any possible interpretations of

139

the word, including: about fifty percent; a substantial likelihood; or, technically, any chance at all.  Additionally, jurors were denied any meaning for the phrase "criminal acts of violence" or "continuing threat to society."

The various words and phrases in the special issues, viewed individually or as a whole, did not provide the jury any uniform guidance in how to apply terms crucial to the decision to impose the ultimate sentence.

In *Jurek v. Texas*, 428 U.S. 262 at 272 (1976), a plurality of the Supreme Court noted that "[t]he Texas Court of Criminal Appeals has yet to define precisely the meanings of such terms as "criminal acts of violence" or "continuing threat to society."  Twenty years later, the Court of Criminal Appeals still has not defined the vague terms in the first special issue *i.e.*, "probability," "criminal acts of violence," and "a continuing threat to society."  Such failure has rendered the first special issue unconstitutional.   The Texas Court of Criminal Appeals on direct appeal made no finding on this issue, and therefore their factual findings are not entitled to deference.

**18.    TEXAS PROSECUTORS' UNFETTERED, STANDARDLESS AND UNREVIEWABLE DISCRETION VIOLATES EQUAL PROTECTION, DUE PROCESS AND THE EIGHTH AMENDMENT.**

140

The trial court erred in denying Petitioner's request to quash the indictment herein because the unfettered discrition in seeking death was unconstitutional.  (CR 2:283; RR 6: 90)

Texas lacks statewide standards governing the discretion of local prosecutors to seek or decline to seek the execution of death-eligible defendants.  Art. 37.071.  *See also* U.S. Const. amends. V, VI, VIII, XIV; Tex. Const. art. I, § 13.

*Equal Protection*: "[U]niform" and "specific" vote-counting standards are required to prevent the arbitrary and disparate treatment of similarly situated voters.  *Bush v. Gore*, 531 U.S. 98, 105-06 (2000).  Because Texas's death penalty system concerns a right more fundamental than the right to vote - the right to life, *see Furman v. Georgia*, 408 U.S. 238, 270-71 1972) (Brennan, J., concurring) - its system must satisfy the equal protection principles enunciated in *Bush*.  Just as a "State may not, by . . . arbitrary and disparate treatment, value one person's vote over that of another," *Bush*, 531 U.S. at 104-05, a state may not, by arbitrary and disparate treatment, value one person's life over that of another.

Texas does just that and the result is disparate treatment of similarly-situated defendants.

*Due Process*: Due process requires a three-part balancing of: (1) the private interest "affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used;" and (3) the state's interest, including the burden entailed. *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).  Texas fails this test.  The interest at stake - the right to life - could not be more fundamental.  The lack of statewide standards and absolute discretion in each elected Texas district attorney increase the risk of erroneous deprivation by failing to ensure that the death penalty is limited to "the most serious adult criminal conduct." *Atkins v. Virginia*, 536 U.S. 304, 306 (2002).  Because statewide standards would reduce the risk of arbitrary application with relative ease, and state prosecutors' interest in maintaining this unbridled discretion is minimal at best, prosecutors' standardless discretion violates due process.

*Cruel and Unusual Punishment*: Capital sentencers' decisions must be guided by standards that narrow and guide their discretion.  *See, e.g., Gregg v. Georgia,* 428 U.S. 153, 195 (1976).  However, because a prosecutor's "decision whether or not to seek capital punishment is no less important than the jury's, . . . [his or her] 'discretion must [also] be suitably directed and limited so as to

minimize the risk of wholly arbitrary and capricious action.[35]  In *Gregg*, Justice

White asserted that prosecutors would not exercise their standardless discretion in

an arbitrary or capricious manner, and that "defendants will escape the death

penalty through prosecutorial charging decisions only because the offense is not

sufficiently serious, or because the proof is insufficiently strong."  428 U.S. at 225

(White, J., concurring).  However, it is now clear that Justice White was wrong.

Geography and the race of the victim, more than the nature of the offense or the

State's proof, are the most important predictors of when a prosecutor will seek the

death penalty.[36]  The Texas Court of Criminal Appeals did not make any findings

on this issue, so their factual findings are not entitled to any deference.

## 19.   THE TEXAS  DEATH PENALTY SCHEME VIOLATES DUE PROCESS PROTECTIONS OF THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATED TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING

---

[35] *DeGarmo v. Texas*, 474 U.S. 973, 974-975 (1985) (Brennan, J., dissenting from denial of cert.) (citation omitted).

[36] *See* Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 Hous. L. Rev. 807, n.31 (2008) (collecting studies showing that race of victim is highly significant predictor of who receives a death sentence, including in Texas); Richard Willing & Gary Fields, *Geography of the Death Penalty*, USA TODAY, Dec. 20, 1999 ("Differences in murder rates or population do not explain all the county-by-county disparities.  Instead, the willingness of the local prosecutor to seek the death penalty seem to play by far the most significant role in determining who will eventually be sentenced to death.").

**CIRCUMSTANCES BEYOND A REASONABLE DOUBT, CONTRARY TO *APPRENDI* AND ITS PROGENY.**

Justice Blackmun of the United States Supreme Court concluded that the death penalty, as currently administered in this country, is unconstitutional.  *See Callins v. Collins*, 114 S.Ct. 1127 (1994) (Blackmun, J., dissenting).  Justice Blackmun summarized his position in the following excerpt:

> ...Twenty years have passed since this Court declared that the death penalty must be imposed fairly, and with reasonable consistency, or not at all, see *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 346 (1972), and, despite the effort of the States and courts to devise legal formulas and procedural rules to meet this daunting challenge, the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake.  This is not to say that the problems with the death penalty today are identical with those that were present 20 years ago.  Rather, the problems that were pursued down one hole with procedural rules and verbal formulas have come to the surface somewhere else, just as virulent and pernicious as they were in their original form.  Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death, see *Furman v. Georgia*, *supra*, can never be achieved without compromising an equally essential component of fundamental fairness -- individualized sentencing. See *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 ( 1978).

> It is tempting, when faced with conflicting constitutional commands, to sacrifice one for the other or to assume that an acceptable balance between them already has been struck.  In the context of the death penalty, however, such jurisprudential maneuvers are wholly inappropriate. The death penalty must be imposed "fairly, and with reasonable consistency, or not at all."

144

*Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S. Ct. 869, 71 L.Ed.2d 1 (1982).

To be fair, a capital sentencing scheme must treat each person convicted of a capital offense with that "degree of respect due to the uniqueness of the individual." *Lockett v. Ohio*, 455 U.S. 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (plurality opinion). That means affording the sentencer the power and discretion to grant mercy in a particular case, and probing avenues for the consideration of any and all relevant mitigating evidence that would justify a sentence less than death. Reasonable consistency, on the other hand, requires that the death penalty be inflicted evenhandedly, in accordance with reason and objective standards, rather than by whim, caprice, or prejudice. Finally, because human error is inevitable, and because our criminal justice system is less than perfect, searching appellate review of death sentences and their underlying convictions is a prerequisite to a constitutional death penalty scheme.

On their face, these goals of individual fairness, reasonable consistency,  and absence of error appear to be attainable. Courts are in the very business of erecting procedural devices from which fair, equitable, and reliable outcomes are presumed to flow. Yet, in the death penalty area, this Court, in my view, has engaged in a futile effort to balance these constitutional demands, and now is retreating not only from the *Furman* promise of consistency and rationality, but from the requirement of individualized sentencing as well. Having virtually conceded that both fairness and rationality cannot be achieved in the administration of the death penalty, see *McLeskey v. Kemp*, 481 U.S. 279, 313 n 37, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the Court has chosen to deregulate the entire enterprise, replacing, it would seem, substantive constitutional requirements with mere aesthetics, and abdicating its statutorily and constitutionally imposed duty to provide meaningful judicial oversight to the administration of death by the States.

From this day forward, I no longer shall tinker with the machinery of death.  For more than 20 years I have endeavored-- indeed, I have struggled -- along with a majority of this Court, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor. [Footnote omitted.] Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated simply to concede that the death penalty experiment has failed.  It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies.  The basic question -- does the system accurately and consistently determine which defendants "deserve" to die? -- cannot be answered in the affirmative.  It is not simply that this Court has allowed vague aggravating circumstances to be employed, *see, e.g. Arave v. Creech*, 507 U.S. ___, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993), and relevant mitigating evidence to be disregarded, *see, e.g. Johnson v. Texas*, 509 U.S. ___, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).  The problem is that the inevitability of factual, legal, and moral error gives us a system that we know must wrongly kill some defendants, a system that fails to deliver the fair, consistent, and reliable sentences of death required by the Constitution. [Footnote omitted].

114 S.Ct. at 1129-30.  Justice Blackmun then discussed the "narrowing" of death-eligible offenders according to objective, fact-bound criteria; and the jury's subsequent discretion to consider relevant mitigating evidence.  *Id.*, at 1134.  Over time, Justice Blackmun came to conclude that this procedure simply reduces, rather than eliminates, the number of people subject to arbitrary sentencing.  *Id.* (citing Gillers, *Deciding Who Dies*, 129 U.Pa.L.Rev. 1, 27-28 (1980) (inherent

arbitrariness of death penalty only magnified by post-*Furman* statutes allowing

juries to choose among similarly situated defendants).  He concludes the opinion

with a lengthy reference to the role that racism plays in a defendant's chance of

being executed, and the diminished protection now afforded by federal courts

exercising habeas corpus jurisdiction.  *Id.*, at 1135-38.

The Texas capital sentencing scheme fails to adhere to principled guidelines

in weighing punishment evidence.  The focus upon aggravating circumstances, to

the exclusion of mitigating evidence, clearly violates the constitutional mandate of

individualized sentencing.  *See Penry v. Lynough*, 492 U.S. 302, 319 (1989).  The

federal and state constitutions prohibit the imposition of the death penalty until a

scheme is employed which eliminates the sentencer's total discretion to inflict

death while simultaneously permitting unrestricted consideration of mitigating

evidence.

The Texas Court of Criminal Appeals made no factual findings on this issue,

and is not entitled to deference on this point.

**20.   THE TRIAL COURT ERRED BY ADMITTING THE
IRRELEVANT AND PREJUDICIAL EVIDENCE OF
PETITIONER'S FATHER'S RACIAL PREJUDICE IN
THE PUNISHMENT PHASE OF TRIAL, IN VIOLATION
OF EQUAL PROTECTION, RIGHT TO A FAIR TRIAL
AND DUE PROCESS.**

**ADDITIONALLY, BECAUSE TRIAL COUNSEL AND APPELLATE COUNSEL FAILED TO SET OUT THE PROPER CONSTITUTIONAL CONSTRUCT FOR THIS CLAIM, AND WAS THUS INEFFECTIVE, AND STATE HABEAS COUNSEL FAILED TO BRING THIS CLAIM ON DIRECT COLLATERAL REVIEW IN THE STATE COURT, THIS CLAIM SHOULD BE CONSIDERED PURSUANT TO *MARTINEZ***

During the cross-examination of Chris Lay, a friend of Milam, the following

exchange took place:

[PROSECUTOR]: Okay.  Now, you told us he got pulled out of  school because of the fact that kids were picking on him.

[WITNESS]: Right.

[Q]: There was also some sort of a paddling thing - -

[A]: Yes, ma'am.

[Q]:  - - right?  And in conjunction with this paddling thing, there was another reason why he got pulled out of school, too, wasn't there?

[A]: This - - he was picked on, and stuff like that, and his dad was fed up.

[Q]: And you've - - you visited with Misty, our investigator, over the weekend, right?

[A]: She called me.

[Q]: Yeah.  And y'all talked.

[A]: Yes, ma'am.

[Q]: And you told her that part of the reason why he got pulled out of school was because his dad was upset because his principal was black.

[A]: Well, he was upset because - - yeah, that, too.

[Q]: Okay.  And I mean, that's not - - that's what you told her?

[A]: Right.

 (RR 53:23-24) Defense counsel then asked to approach the bench and the

following transpired, outside the hearing of the jury:

[DEFENSE COUNSEL]: I cannot believe that the State is introducing the racial prejudice of this defendant's father into these proceedings.  There was absolutely - - I want to hear the excuse, but there is no excuse for bringing in the racial prejudice of this man's father.

[PROSECUTOR]: She asked him about the paddling incident.  He said the paddling incident - - he explained the paddling incident, and then he told her that the reason he was pulled out of school was because the dad was so upset because he was a black principal.  That's what the - -

[DEFENSE COUNSEL]: I want to hear this out of the record (sic).  He did not introduce that; she did.  And I want to make a record on it.

[COURT]: The record speaks for itself.  Let's go ahead.

[PROSECUTOR]: Thank you.

                    (Conclusion of Bench conference)

[DEFENSE COUNSEL]: Your Honor, at this time, we make objection to the last question and answer that the State proposed, under Rule 403.  Ask the Court to

make a balancing test on the unfair prejudicial nature of introducing the racial bias of this man's father into the proceeding.

[COURT]: I'll overrule the objection.

(RR 53: 24-25)

Likewise, it was irrelevant that the principal who paddled Milam, causing his father to take him out of school, was African-American.  The point being made, during the punishment phase, was that Milam was bullied and removed from school by his father, causing him to be largely uneducated.  The racial bias exhibited by Milam's father was not of Milam's doing.  The State could have made the point Milam was removed from school because he was paddled, as well as bullied, without showing  the father's prejudice, which had no relevance to any decision the jury had to make in punishment.  Petitioner made his objection under Rule 403, TEX. R. EVID.  Since the complained of testimony had no relevance to the issues, the prejudicial effect greatly outweighed the probative value, if any. The admission of the testimony was error.  The gratuitous injection of irrelevant and prejudicial racial prejudice would have had a substantial and injurious effect on the verdict in the case and requires reversal.  Of particular harm in this case, one of the jurors who sentenced Milam to death was African-American.

On Mr. Milam's jury was one Black person, Mr. Marcel Fingers. The

introduction of racial animus on the part of Mr. Milam's family was thus

prejudicial to Mr. Milam and violated the equal protection of the Fourteenth

Amendment as well as the right to a fair and unbiased trial. Trial Counsel and

Appellate counsel did not bring this claim in terms of a Constitutional Construct

and thus State habeas counsel's failure to allege this error should be review in light

of *Martinez.*

**21.   THE CUMULATIVE EFFECT OF THE ABOVE-
ENUMERATED CONSTITUTIONAL VIOLATIONS
DENIED PETITIONER DUE PROCESS OF LAW IN
VIOLATION OF THE FIFTH AND FOURTEENTH
AMENDMENT OF THE UNITED STATES OF AMERICA.**

Due process in both the federal and state constitutions requires that Petitioner receive the fundamental fairness necessary to the due administration of justice. *Lisenba v. California*, 314 U.S. 219, 236 (1941). Petitioner cites many constitutional and statutory violations in the points of error. If this Court deems that none of these reasons taken alone justify reversing the trial court's judgment, then Petitioner prays the Court consider the cumulative effect of the errors in the trial court. Constitutional breaches so permeated the voir dire and trial of Petitioner's case so as to deprive her of the "fundamental fairness" implicit in the Fifth and Fourteenth Amendments. This case begs the question of whether a prosecutor with established racial animus can use unfair and unconstitutional tactics consistently through trial to obtain and have upheld a death penalty verdict against an intellectually disabled citizen who was still a teenager at the time of the offense. Consequently, the judgment of death should be set aside, and the cause remanded for a new trial.

The Texas Court of Criminal Appeal's finding on direct appeal that the there were no constitutional errors resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

## <u>CONCLUSION</u>

Tragedy has struck in this case and a young child's life has been taken in a horrific manner. However, the execution of someone is mentally retarded and functions at an 8-11 year old mental level is not going to soothe the wounds that this death has caused and violates the principles of the Constitution and this Nations evolving standards of decency.

Mr. Milam is requesting an evidentiary hearing to present testimony regarding his *Martinez/Nguyen* claims to demonstrate that the Constitution cannot tolerate the violations that have occurred. The motion for an evidentiary hearing will be submitted upon the State's response to the Petition. Mr. Milam is requesting that the court find that it is constitutional impermissible to execute him or alternatively that his case be reversed and remanded for a new trial.

Respectfully submitted,


 _/s/*Don Bailey*_____
Don Bailey
Attorney for Mr. Milam
SBN 01520480
309 N. Willow
Sherman, Texas  75090

Certificate of Service


This skeletal petition was served electronically via the CM/ECF system on October 9, 2014, to Ms. Heining, Texas AG's Office.


_____ */s/Don Bailey*
Don Bailey