IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

BLAINE KEITH MILAM, #999558,           §
                                        §
              Petitioner,               §
                                        §        CIVIL ACTION NO. 4:13-CV-545
v.                                      §
                                        §        JUDGE RON CLARK
DIRECTOR, TDCJ-CID,                     §
                                        §
              Respondent.               §

## MEMORANDUM OPINION AND
## ORDER OF DISMISSAL

Petitioner Blaine Keith Milam, a death row inmate confined in the Texas prison system, filed

the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He

is challenging his capital murder conviction and death sentence imposed by the 4th Judicial District

Court of Rusk County, Texas, in Cause Number CR09-066, in a case styled the *State of Texas v. Blaine*

*Keith Milam*.  The court finds that Mr. Milam's petition should be denied.[1]

## I.  PROCEDURAL HISTORY OF THE CASE

On May 27, 2010, Mr. Milam was convicted of the capital murder of thirteen-month-old Amora

Bain Carson, in violation of Tex. Penal Code § 19.03(a)(8).  The Texas Court of Criminal Appeals

("TCCA") affirmed the conviction and death sentence.  *Milam v. State*, No. AP-76379, 2012 WL

---

[1] "CR" refers to the clerk's record on direct appeal, preceded by the volume number and
followed by the page number.  "RR" refers to the reporter's record of the transcribed testimony during
the trial, preceded by the volume number and followed by the page number.  "SHCR" refers to the
State habeas clerk's record, preceded by the volume number and followed by the page number. On the
disc containing these documents the CR is in a file labeled AP-76,379. The RR is in a file labeled
"Reporter's Record."   The SHCR is in a file labeled WR-79,322.

1868458 (Tex. Crim. App. May 23, 2012) (unpublished). The mandate was issued on June 19, 2012.

He did not file a petition for a writ of certiorari.

Mr. Milam filed an application for a writ of habeas corpus in State court on May 21, 2012. On

March 18, 2013, the trial court adopted the State's proposed findings of fact and conclusions of law.

A recommendation was made to deny relief. The TCCA subsequently denied relief based on the trial

court's findings and conclusions and on its own review. *Ex parte Milam*, No. WR-79322-01, 2013

WL 4856200, at *1 (Tex. Crim. App. Sept. 11, 2013) (unpublished).

Mr. Milam began the present proceedings on September 20, 2013. He filed a skeletal petition

on September 10, 2014. The final petition (Dkt. #14) was filed on October 9, 2014. The Director filed

an answer (Dkt. #22) on March 9, 2015. Mr. Milam did not file a reply.

## II. FACTUAL BACKGROUND OF THE CASE

The opinion of the Texas Court of Criminal Appeals summarized the factual background of

the case as follows:

### A. The State's Guilt–Stage Evidence.

At 10:37 a.m. on December 2, 2008, [Mr. Milam] called 911, and the first thing he said was, "My name is Blaine Milam, and my daughter, I just found her dead." Rusk County Patrol Sergeant Kevin Roy arrived at [Mr. Milam's] trailer home outside Tatum twenty minutes later. Two ambulances were already there. EMTs were standing in the doorway of the master bedroom, where [Mr. Milam] and Jesseca Carson were kneeling on the floor. Sgt. Roy saw "an infant laying on the floor not moving, not breathing, bruised. The baby was laying on its back, and the face of the baby was just one large bruise." He thought that the circular bruises he saw on the child's body were caused by a Coke can. He did not recognize them as human bite marks.

After lead investigator Sergeant Amber Rogers arrived, Sgt. Roy took [Mr. Milam] aside to talk while Sgt. Rogers talked to Jesseca. [Mr. Milam] told Sgt. Roy that he and Jesseca had left Amora alone in the trailer and walked up the road to meet a man named Clark who was going to clear some land for him. They were gone about an hour, and, when they came back, they found "the baby in that condition." [Mr. Milam] was calm, collected, and cooperative. After the interviews, Sgt. Roy read the pair their *Miranda* rights. He told them that, when the crime-scene investigation was done, they would be taken to the Sheriff's office for more questioning and collection of their clothes.

Shortly thereafter, Kenny Ray, a Texas Ranger, arrived and noticed Jesseca and [Mr. Milam] embracing. To Ranger Ray, the two looked like "grieving parents," not suspects. Ranger Ray conducted an hour-long interview with [Mr. Milam] in the front seat of his patrol car. [Mr. Milam] told the ranger that authorities were "more than welcome" to search his car and home. [Mr. Milam] denied involvement in Amora's death. He also gave Ranger Ray names of possible suspects and said that whoever did this should "be hung." In that recorded interview, [Mr. Milam] explained that Jesseca was his fiancee and that Amora was Jesseca's child, but that they both lived with him and he was "raising that baby."

[Mr. Milam] then told Ranger Ray the same story that he had told Sgt. Roy. He added that, when he and Jesseca got home, they found Amora, not in her crib, but in a hole in the floor in the bathroom that he was remodeling. [Mr. Milam] said Amora had a blood ring around her mouth, and "it looked like she had been biting the insulation." She was still breathing, so they called 911. [Mr. Milam] later told Ranger Ray that Jesseca called 911 before they found Amora, and that when they found her, she was dead.

Ranger Ray's tone eventually became accusatory. He told [Mr. Milam] that he knew he was lying, that no one would believe his story, and that everyone would think he had beat the baby because he was the only male in the house. [Mr. Milam] again denied any involvement in Amora's death and offered to take a polygraph test. Finally, Ranger Ray told [Mr. Milam] that he was free to go, meaning that he was free to get out of the patrol car, but not to leave the scene. By then, Ranger Ray considered [Mr. Milam] a suspect.

The ranger also interviewed Jesseca. At first she "was crying and acting very distraught," but then there was a "pretty drastic" change in her demeanor. She referred to Amora as "that baby" and told Ranger Ray an "extremely bizarre story."

The medical examiner gave Amora's cause of death as homicidal violence, due to multiple blunt-force injuries and possible strangulation. He detailed her injuries: facial abrasions and bruises; twenty-four human bite marks; bruises, scrapes, and abrasions from head to toe; bleeding underneath the scalp; extensive fracturing to the back of the skull; bleeding between the brain and the skull; a laceration to the brain tissue as well as swelling, bleeding, and bruising; bleeding around the optic nerves; bleeding in the eyes and around the jugular vein; fractures to the right arm and leg; eighteen rib fractures; a tear to the liver; and extensive injury to the genitals. There were no old injuries suggesting a pattern of abuse.

The investigation quickly poked holes in [Mr. Milam's] story. Shane and Dwight Clark, of Clark Timber, denied any meeting with [Mr. Milam] on December 2nd. Crystal Dopson, manager of the Insta–Cash Pawn Shop in Henderson, said that, shortly after she opened the shop on December 2nd, Jesseca and [Mr. Milam] came in and pawned an electric chain saw and an air impact tool. Surveillance video showed the two in the pawn shop for about fifteen minutes. Surveillance video from the Exxon in Henderson picked them up shortly thereafter. Also, [Mr. Milam] had called his sister, Teresa Shea, that morning before 9:30 a.m., crying and saying that he had "found Amora dead." Teresa told him to call 911, but [Mr. Milam] did not do so until 10:37 a.m.

On December 11th, investigators conducted a second search of [Mr. Milam's] trailer and determined that the south end of the trailer, rather than the master bedroom, was probably the crime scene. They found blood-spatter stains, consistent with blunt force trauma, near the south bedroom. Among the items collected from the south bedroom were: blood-stained bedding and baby clothes; blood-stained baby diapers and wipes; a tube of Astroglide lubricant; and a pair of jeans with blood stains on the lap. DNA testing later showed that Amora's blood was on these items.

On December 13th, [Mr. Milam's] sister, Teresa, went to see [Mr. Milam] in jail. That night, she told her aunt that she "was needing to find a way to get back out to the trailer in Tatum" because "Blaine had told her that she needed to go out there to the trailer to get some evidence out from underneath of it." The aunt called Sgt. Rogers and told her that "she needed to get out to the trailer immediately, that Teresa was wanting to go out there to get some evidence out from underneath the trailer."

Sgt. Rogers immediately obtained a search warrant, crawled under the trailer, and discovered a pipe wrench inside a clear plastic bag. The pipe wrench had been shoved down "a hole in the floor of the master bathroom." Forensic analysis revealed components of Astroglide on the pipe wrench, the diaper Amora had been wearing, and the diaper and wipes collected from the south bedroom.

Dr. Robert Williams, a forensic odontologist, compared the bite marks found on Amora's body with bite dentition models obtained from [Mr. Milam], Jesseca, and [Mr. Milam's] brother Danny Milam. Dr. Williams testified that, to "a reasonable degree of dental certainty," [Mr. Milam's] dentition matched eight bite marks on Amora. He could exclude Jesseca from all but one of the bite marks, and he could exclude Danny from all of the bite marks.

Shirley Broyles, the nurse at the Rusk County Jail, testified that [Mr. Milam] called for her one day in January. She found him crying in his cell. He handed her a written request to talk to Sgt. Rogers, and told Ms. Broyles: "I'm going to confess. I did it. But Ms. Shirley, the Blaine you know did not do this. My dad told me to be a man, and I've been reading my Bible. Please tell Jesseca I love her."

**B. The Defense Guilt–Stage Evidence.**

[Mr. Milam's] defense focused on Jesseca as the murderer. The defense called Heather Carson, Jesseca's mother, who said that Jesseca and [Mr. Milam] starting [sic] dating around January 2008 and got engaged a few months later. Jesseca moved in with [Mr. Milam] and his parents that spring. When Jesseca turned eighteen, she received an insurance settlement from her father's 2001 death. Heather noticed an immediate change in Jesseca; she became withdrawn and stopped caring about her appearance. Jesseca started harassing Heather with telephone calls. When Heather learned that Jesseca was making serious and unfounded allegations against her, she stopped talking to her.

Lisa Taylor testified that Jesseca was her daughter's best friend while growing up in Alabama. Ms. Taylor knew Jessica as "sweet, outgoing, outspoken, funny." She said that Jesseca, [Mr. Milam], and Amora visited them in Alabama twice in the fall of 2008. First, they came for one night in October. Jesseca was making "bizarre" accusations about her mother. In November, the trio returned to Alabama for about four days and said that they were planning to move there. Ms. Taylor said that there was a "drastic change" in Jesseca's demeanor. She was "[w]eird, hollow ... [l]ike empty." Looking into her eyes was "like looking into a dark space." Jesseca was not taking care of Amora and did not give her a bath for the whole week. She had [Mr. Milam] change Amora's diaper and feed her. Jesseca seemed in charge, and when she told [Mr. Milam] to do something, he did it. Ms. Taylor was concerned that there was something profound going on in Jesseca's life and was worried about her and her baby.

A psychiatrist, Dr. Frank Murphy, testified that he was asked to "offer an opinion in this case of the mental state of Jesseca Carson for the time period beginning sometime around August of 2008 through December 2nd of 2008." Dr. Murphy read interviews with Jesseca and other materials but did not talk to Jesseca. Dr. Murphy said Jesseca's symptoms were consistent with a "psychotic depression. . . . The depression occurs first, and then it gets severe enough that psychosis or loss of touch with reality then occurs. . . . Psychosis means someone has lost touch with reality. The vast majority of times, that means either they're hallucinating or they're delusional."

The defense odontologist, Dr. Isaac, studied five of the bite marks, and could not exclude either [Mr. Milam] or Jesseca.

*Milam*, 2012 WL 1868458, at *1-4 (emphasis in original) (footnotes omitted). The TCCA specifically observed that Mr. Milam did not challenge the sufficiency of the evidence to support the guilty verdict nor the determination that he was not intellectually disabled. *Id.* at *1. On the other hand, he challenged the sufficiency of the evidence with respect to the "future-dangerousness" special issue, and the TCCA overruled the point of error. *Id.* at *13–*14.

### III. GROUNDS FOR RELIEF

Mr. Milam brings the following grounds for relief:

1. Trial counsel was ineffective in violation of the Sixth Amendment for presenting extensive testimony about Mr. Milam's drug use and his "drug induced psychosis" at the time of the crime, and then failing to allow the jury a vehicle (i.e.; a jury instruction) to consider that testimony as mitigation of punishment, as allowed by Texas Penal Code § 8.04, in violation of the Eighth Amendment.

2. The trial court erred in failing to include a requested jury instruction on voluntary intoxication when it was clearly warranted by testimony extensively developed by the

Defense, and trial counsel was ineffective for not insisting on the instruction, in either form.

3.     Appellate counsel was ineffective in violation of the Sixth Amendment for failing to raise in the Motion for New Trial and Direct Appeal the failure of trial counsel to include a requested jury instruction, and the trial court's failure to include a jury instruction when it had been requested, on voluntary intoxication as a vehicle of mitigation consideration by the jury.

4.     State habeas counsel was ineffective for failing to allege in the State application for writ of habeas corpus that 1) trial counsel was ineffective for failing to insist on a voluntary intoxication instruction when the Defense was the one that developed the testimony, 2) the trial court erred in failing to provide a requested voluntary intoxication instruction in violation of the Eighth Amendment, and 3) appellate counsel was ineffective for failing to allege the voluntary intoxication issue in the motion for new trial and on direct appeal.

5.     A) The evidence was sufficient by the preponderance standard to demonstrate that Mr. Milam was, and is, intellectually disabled and thus both appellate and habeas counsel were ineffective for not asserting this claim for State review and exhaustion, in violation of the Sixth Amendment.

    B) The evidence was sufficient to demonstrate that Mr. Milam was functioning at somewhere between an 8 to 16 year old emotional level. Thus, his sentence of death violates the Supreme Court's mandate that persons below the age of 18 shall not be executed. *See Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005). Appellate counsel was ineffective for not pursuing this claim once it had been established via a ruling by the trial court. Habeas counsel was ineffective for not asserting that appellate counsel was ineffective in exhausting this claim in violation of the Sixth Amendment.

6.     Trial counsel rendered ineffective assistance of counsel in violation of the Sixth and Eighth Amendments by not relying upon the proper hearsay exception in attempting to have admitted the statement of the co-defendant.

7.     Appellate counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution by failing to raise on direct appeal the trial court's refusal to admit co-defendant Jesseca Carson's statement.

8.     Trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment by failing to object to specific instances of violence introduced by the prosecution regarding violence in the Texas prison system. The failure to object violates Mr. Milam's right to the Eighth Amendment requirement of individualized sentencing.

9.    Trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment by failing to properly cross-examine Bryan Perkins in regards to bias in favor of Jesseca Carson, the co-defendant of Mr. Milam.

10.   The trial court erred in denying Mr. Milam's *Batson v. Kentucky* challenge to juror Jobess Shaw, after the trial court was made aware of the racial animus of the prosecutor in calling Ms. Shaw "an angry Black woman" in violation of equal protection and due process under the Fourteenth Amendment.

11.   The trial court erred in granting the State's challenge for cause of Juror Trzeciak, in violation of the Sixth and Fourteenth Amendments.

12.   The trial court erred in allowing the State to comment upon Mr. Milam's failure to discuss the facts of the offense with the State's expert in violation of his previous order and Mr. Milam's Fifth Amendment right to remain silent.

13.   The State knowingly created a false impression that Mr. Milam refused to speak about the facts of the offense to the State's and Defense's experts on advice of counsel, in violation of the Fourteenth Amendment.

14.   Prosecutorial misconduct in the sentencing-phase summation denied Mr. Milam his fundamental rights to a fair trial and his right to a reliable sentencing determination.

15.   The Texas death penalty scheme violated Mr. Milam's rights against cruel and unusual punishment and due process of law under the Eighth and Fourteenth Amendments by requiring at least ten "no" votes for the jury to return a negative answer to the punishment issues.

16.   The trial court committed constitutional error by charging the jurors that they had discretion to decide whether a circumstance was mitigating.

17.   The Texas death penalty scheme violates Mr. Milam's right against cruel and unusual punishment, right to an impartial jury, and right to due process of law under the Sixth, Eighth and Fourteenth Amendments because of vague and undefined terms in the jury instructions at the punishment phase of the trial that effectively determine the difference between a life sentence and the imposition of the death penalty.

18.   Texas prosecutors' unfettered, standardless, and unreviewable discretion violates equal protection, due process, and the Eighth Amendment.

19.   The Texas death penalty scheme violates due process of the Fourteenth Amendment because the punishment special issue related to mitigation fails to require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi* and its progeny.

20.     The trial court erred by admitting the irrelevant and prejudicial evidence of Mr. Milam's father's racial prejudice in the punishment phase of the trial, in violation of equal protection, right to a fair trial, and due process. Additionally, because trial counsel and appellate counsel failed to set out the proper constitutional construct for this claim, and the State habeas counsel failed to bring this claim on direct collateral review in the State court, this claim should be considered pursuant to *Martinez*.

21.     The cumulative effect of the above-enumerated Constitutional violations denied Mr. Milam due process of law in violation of the Fifth and Fourteenth Amendments.

## IV.  STANDARD OF REVIEW

The role of federal courts in reviewing habeas corpus petitions by prisoners in State custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir. 1993). Federal habeas corpus relief will not issue to correct errors of State constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S. Ct. 475, 480 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996), *cert. denied*, 520 U.S. 1242, 117 S. Ct. 1847 (1997). In the course of reviewing State proceedings, a federal court does "not sit as a super state supreme court on a habeas corpus proceeding to review error under state law." *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007), *cert. denied*, 552 U.S. 1314, 128 S. Ct. 1874 (2008) (quoting *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983), *cert. denied*, 466 U.S. 984, 104 S. Ct. 2367 (1984)).

The petition was filed in 2014; thus, review is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 326–29, 117 S. Ct. 2059, 2063–64 (1997). Under AEDPA, a petitioner who is in custody "pursuant to the judgment of a State court" is not entitled to federal habeas corpus relief

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98, 131 S. Ct. 770, 784 (2011). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010) (citation and internal quotation marks omitted). With respect to the first provision, a "state court decision is 'contrary to' clearly established federal law if (1) the State court 'applies a rule that contradicts the governing law' announced in Supreme Court cases, or (2) the State court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts." *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (en banc) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 15–16, 124 S. Ct. 7, 10 (2003)), *cert. denied*, 551 U.S. 1141, 127 S. Ct. 2974 (2007). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 1398 (2011). As such, "evidence later introduced in federal court is irrelevant." *Id.* at 184, 131 S. Ct. at 1400. "The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine Justices acknowledged." *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011) (footnote omitted), *cert. denied*, 568 U.S. 828, 133 S. Ct. 105 (2012). With respect to § 2254(d)(2), a Texas court's factual findings are presumed to be sound unless a petitioner rebuts the "presumption of correctness by clear and convincing evidence." *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005) (citing § 2254(e)(1)). "The standard is demanding but not insatiable; . . . [d]eference does not by definition preclude relief." *Id.* (citation and internal quotation marks omitted) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003)). More

recently, the Supreme Court held that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004)). The Supreme Court has explained that the provisions of AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693, 122 S. Ct. 1843, 1849 (2002). Federal habeas corpus relief is not available just because a State court decision may have been incorrect; instead, a petitioner must show that a State court decision was unreasonable. *Id.* at 694, 122 S. Ct. at 1850.

## V. DISCUSSION AND ANALYSIS

**Claim Number 1:** **Trial counsel was ineffective in violation of the Sixth Amendment for presenting extensive testimony about Mr. Milam's drug use and his "drug induced psychosis" at the time of the crime, and then failing to allow the jury a vehicle (i.e.; a jury instruction) to consider that testimony as mitigation of punishment, as allowed by Texas Penal Code § 8.04, in violation of the Eighth Amendment**

**Claim Number 2:** **The trial court erred in failing to include a requested jury instruction on voluntary intoxication when it was clearly warranted by testimony extensively developed by the Defense, and trial counsel was ineffective for not insisting on the instruction, in either form**

**Claim Number 3:** **Appellate counsel was ineffective in violation of the Sixth Amendment for failing to raise in the Motion for New Trial and Direct Appeal the failure of trial counsel to include a requested jury instruction, and the trial court's failure to include a jury instruction when it had been requested, on voluntary intoxication as a vehicle of mitigation consideration by the jury**

**Claim Number 4.** **State habeas counsel was ineffective for failing to allege in the State application for writ of habeas corpus that 1) trial counsel was ineffective for failing to insist on a voluntary intoxication instruction when the Defense was the one that developed the testimony, 2) the trial court erred in failing to provide a requested voluntary intoxication instruction in violation of the Eighth**

**Amendment, and 3) appellate counsel was ineffective for failing to allege the voluntary intoxication issue in the motion for new trial and on direct appeal**

The first four claims are related. Mr. Milam argues that trial counsel was constitutionally ineffective for presenting extensive evidence regarding his drug use and "drug induced psychosis" at the time of the crime, but he then failed to provide the jury with a vehicle to consider the testimony as mitigation, as allowed by Texas Penal Code § 8.04. In claims 2, 3, and 4, he relatedly complains that the trial court erred in failing to include a requested voluntary intoxication instruction; that appellate counsel was ineffective for failing to raise these issues in a motion for new trial or on direct appeal; and that State habeas counsel was ineffective for failing to raise all three claims on collateral review. He acknowledges that none of these claims are exhausted, but he argues that the claims may be considered at this juncture in light of the Supreme Court's decision in *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309 (2012).

The Director responded by arguing that the claims are unexhausted and procedurally barred. He further argues that none of the proposed claims are substantial, as required by *Martinez*.

Ineffective assistance of counsel claims are governed by the Supreme Court's standard established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *Strickland* provides a two-pronged standard, and the petitioner bears the burden of proving both prongs. *Id.* at 687, 104 S. Ct. at 2064.

Under the first prong, he must show that counsel's performance was deficient. *Id.* To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688, 104 S. Ct. at 2064. The standard requires the reviewing court to give

great deference to counsel's performance, strongly presuming counsel exercised reasonable professional judgment. *Id.* at 689, 104 S. Ct. at 2065.

Under the second prong, the petitioner must show that his attorney's deficient performance resulted in prejudice. *Id.* at 687, 104 S. Ct. at 2064. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. at 2068. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697, 104 S. Ct. at 2069.

The failure of Mr. Milam to present the first four grounds for relief to the TCCA raises exhaustion problems. State prisoners bringing petitions for a writ of habeas corpus are required to exhaust their State remedies before proceeding to federal court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). In order to exhaust properly, a State prisoner must "fairly present" all of his claims to the State court. *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971).

In Texas, all claims must be presented to, and ruled on the merits by, the TCCA. *Richardson v. Procunier*, 762 F.2d 429, 432 (5th Cir. 1985). When a petition includes claims that have been exhausted along with claims that have not been exhausted, it is called a "mixed petition." *See Galtieri v. Wainwright*, 582 F.2d 348, 355 (5th Cir. 1978) (en banc). Historically federal courts in Texas have dismissed the entire petition for failure to exhaust. *See, e.g.*, *Id.*

The exhaustion requirement, however, was profoundly affected by the procedural default doctrine that was announced by the Supreme Court in *Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546 (1991). The Court explained the doctrine as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750, 111 S. Ct. at 2565. As a result of *Coleman*, unexhausted claims in a mixed petition are now dismissed as procedurally barred. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995), *cert. denied*, 515 U.S. 1153, 115 S. Ct. 2603 (1995); *see also Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Such unexhausted claims would be procedurally barred because if a petitioner attempted to exhaust them in State courts they would be barred by Texas abuse-of-the-writ rules. *Fearance*, 56 F.3d at 642.

The procedural bar contained in Texas Code of Criminal Procedure Article 11.071, Section 5, as interpreted by the TCCA, is an adequate State ground for finding procedural bars. *Ibarra v. Thaler*, 691 F.3d 677, 684–85 (5th Cir. 2012), *abrogated in part by Trevino v. Thaler*, -- U.S. --, 133 S. Ct. 1911 (2013); *Balentine v. Thaler*, 626 F.3d 842, 856–57 (5th Cir. 2010), *cert. denied*, 564 U.S. 1006, 131 S. Ct. 2992 (2011). The procedural bar may be overcome by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Coleman*, 501 U.S. at 750–51, 111 S. Ct. at 2565; *see also Fearance*, 56 F.3d at 642.

Until just recently, Mr. Milam's first four claims would have unquestionably been foreclosed as unexhausted and procedurally barred based on Article 11.071, Section 5. However, in *Martinez*, the Supreme Court opened the door slightly in answering a question left open in *Coleman*: "whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to

raise a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 8, 132 S. Ct. at 1315 (citing

*Coleman*, 501 U.S. at 755, 111 S. Ct. at 2567). The Court in *Martinez* held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised
> in an initial-review collateral proceeding, a procedural default will not bar a federal
> habeas court from hearing a substantial claim of ineffective assistance at trial if, in the
> initial-review collateral proceeding, there was no counsel or counsel in that proceeding
> was ineffective.

*Id.* at 17, 132 S. Ct. at 1320. The Supreme Court specified that the standards of *Strickland* apply in

assessing whether initial-review habeas counsel was ineffective. *Id.* at 14, 132 S. Ct. at 1318.

The Supreme Court extended *Martinez* to Texas cases in *Trevino v. Thaler*, 133 S. Ct. 1911

(2013). Although Texas does not preclude appellants from raising ineffective assistance of trial

counsel claims on direct appeal, the Court held that the rule in *Martinez* applies because "the Texas

procedural system—as a matter of its structure, design, and operation—does not offer most defendants

a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal."

*Id.* at 1921. The Court left it to the lower courts to determine on remand whether Trevino's claim of

ineffective assistance of counsel was substantial and whether his initial State habeas attorney was

ineffective. *Id.*

The Fifth Circuit subsequently summarized the application of the rule announced in *Martinez*

and *Trevino* as follows:

> To succeed in establishing cause to excuse the procedural default of his ineffective
> assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims
> of ineffective assistance of trial counsel are "substantial," meaning that he "must
> demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2)
> his initial state habeas counsel was ineffective in failing to present those claims in his
> first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

*Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2821 (2014).

"Conversely, the petitioner's failure to establish the deficiency of either attorney precludes a finding

of cause and prejudice." *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013), *cert. denied*, 134 S.

Ct. 1786 (2014).  The Fifth Circuit subsequently reaffirmed this basic approach in *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 435 (2014).  The court will apply this analysis to each of the first four claims in turn.

In the First Claim Mr. Milam asserts that trial counsel was ineffective for presenting testimony about drug use and "drug induced psychosis' but then failing to provide a jury instruction on the issue. However, Mr. Milam's counsel filed a pre-trial motion addressing Section 8.04 of the Texas Penal Code.  1 CR 116–17.  The provisions of Section 8.04 concern the role of voluntary intoxication in criminal proceedings.  Counsel advised the trial court that they anticipated there would be evidence during the punishment phase of the trial that Mr. Milam was voluntarily intoxicated at the time of the offense. *Id.* They observed that Section 8.04 provides that "temporary insanity caused by intoxication" may be considered in mitigation of punishment. *Id.*; *see Jaynes v. State*, 673 S.W.2d 198, 202 (Tex. Crim. App. 1984) ("[W]hen evidence came in which might have led the jury to believe that appellant was intoxicated at the time of the offense . . ., it was proper for the court to instruct the jury on the appropriate law."), *overruled on other grounds*, *Chauncey v. State*, 877 S.W.2d 305 (Tex. Crim. App. 1994).  Trial counsel thus asked for an instruction on voluntary intoxication.  The trial court carried the motion, as well as fourteen other defense motions, until a later date.  2 CR 453–60.

During the trial, defense counsel repeatedly introduced Mr. Milam's history of drug use and, on the night of his crime, his "drug induced psychosis" through Dr. Rosen, Dr. Lundberg-Love, Dr. Cunningham, and family members. *See* 56 RR 52–54 (summarizing testimony). Mr. Milam stresses that their testimony was submitted for the purpose of supporting a charge of voluntary intoxication in mitigation of punishment.  Mr. Milam argues that despite having spent so much time and effort introducing this testimony, his attorneys failed to re-assert their request to have a voluntary intoxication instruction be given to the jury at punishment.  He argues that his trial counsel was ineffective for

failing to ask the trial court to give the jury a voluntary intoxication instruction in mitigation of punishment as provided by Section 8.04.

But, counsel did re-assert the issue. Following the close of evidence, counsel reminded the trial court of the carried motions. 55 RR 286–87. He specifically mentioned one of the motions concerning Mr. Milam's mental age. *Id.* at 286. While not specifically mentioning the request for a voluntary intoxication instruction, counsel cited the "other arguments made and set forth in our motion that you carried." *Id.* at 287. The trial court denied the motion. *Id.* The trial court's punishment charge did not give any instruction whatsoever on voluntary intoxication.

Nevertheless, during closing arguments, trial counsel urged the jury to consider Mr. Milam's voluntary intoxication evidence as mitigating. Trial counsel Hagen reminded the jury about the experts' testimony on the effects of methamphetamine. 56 RR 52–57. He referred to Dr. Lundberg-Love's opinion that the facts of this crime were "insanity." *Id.* at 84. He then argued that there were "mitigating circumstances that warrant the imposition of life in this case instead of death." *Id.* Co-counsel Jackson discussed Mr. Milam's voluntary drug use as a mitigating factor, suggesting that he was prone to drug addiction because of a family history of addiction. *Id.* at 98–99. Jackson summed up the proper way to consider Mr. Milam's voluntary intoxication as follows: "You know, we talk about intoxication or drug use is not a defense to the ultimate crime. It is a defense in mitigation to whether or not you should kill somebody for what happened." *Id.* at 99.

In the jury charge during the punishment phase of the trial, the court instructed the jurors that "you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." 4 CR 982. The jury was then asked in Special Issue Number Four whether "there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment rather than a death sentence be imposed." *Id*. at 988. Even though the jury charge

did not specifically provide a voluntary intoxication instruction, the court gave a global instruction that provided a vehicle for the jury to consider voluntary intoxication as a mitigating circumstance.

The record demonstrates that counsel filed a motion requesting a voluntary intoxication instruction during the punishment phase of the trial in accordance with Section 8.04. He asked the trial court to rule on that motion at the conclusion of the punishment phase of the trial. The trial court acted on that request and denied the motion. Counsel's representation cannot be viewed as ineffective simply because the trial court denied the motion. And, in spite of the trial court's denial of the instruction, counsel strenuously argued in closing that the jury should and could consider evidence of voluntary intoxication as a mitigating circumstance. Trial counsel appropriately pursued this issue and presented it to the jury. Counsel's representation did not fall below an objective standard of reasonableness. Mr. Milam has not shown that trial counsel's representation was deficient or that he was prejudiced by deficient representation on the part of counsel. In the context of *Martinez* and *Trevino*, Mr. Milam has not shown underlying claims of ineffective assistance of trial counsel that are substantial to overcome the procedural default. Consequently, Mr. Milam's first claim is unexhausted and procedurally barred. The claim is not saved by *Martinez* and *Trevino*.

Claim Number 2 is a variation on Claim Number 1. Mr. Milam argues in slightly different language that the trial court erred in failing to include a requested jury instruction on voluntary intoxication. He also claims that trial counsel was ineffective for failing to insist on the instruction. Once again, Mr. Milam acknowledges that he did not exhaust the claim, but he argues that it may be considered in light of *Martinez*. However, the rule in *Martinez* and *Trevino* only applies to ineffective assistance of counsel claims involving both trial and initial State habeas counsel. The Fifth Circuit has refused to extend the rule. *Wilkins v. Stephens*, 560 F. App'x 299, 306 n.44 (5th Cir. 2014) (claim about trial court's issuance of supplemental jury instructions without notifying petitioner or his

counsel, or reconvening the court, "does not fall within the scope of *Martinez* or *Trevino* and is therefore procedurally barred"), *cert. denied*, 135 S. Ct. 1397 (2015); *Ibarra*, 687 F.3d at 224 ("*Martinez*, by its terms, applies only to ineffective-assistance-of-trial-counsel claims"), *abrogated in part on other grounds by Trevino*, 133 S. Ct. at 1915; *Tabler v. Stephens*, 588 F. App'x 297, 306 (5th Cir. 2014) ("*Martinez* does not provide a vehicle to set aside procedural default of any constitutional claim, but only preserves ineffective-assistance-of-trial-counsel challenges forfeited because of ineffective assistance of habeas counsel."), *vacated in part on other grounds*, *Tabler v. Stephens*, 591 F. App'x 281 (5th Cir. 2015). The rule does not extend to claims of trial error by the court. Mr. Milam's second claim does not fall within the scope of *Martinez* or *Trevino*; thus, the claim must be rejected as unexhausted and procedurally barred.

In Claim Number 3, Mr. Milam presents Claims 1 and 2 in terms of ineffective assistance of appellate counsel. Once again, the claim is unexhausted. Mr. Milam relies on a Ninth Circuit case in arguing that the *Martinez* exception should extend to ineffective assistance of appellate counsel claims. *Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1296 (9th Cir. 2013). The Supreme Court has declined to extend *Martinez* ineffective assistance of appellate counsel claims. *Davila v. Davis*, -- U.S. --, 137 S. Ct. 2058 (2017). Claim Number 3 does not fall within the scope of *Martinez* or *Trevino*; it must be rejected as unexhausted and procedurally barred.

In Claim Number 4, Mr. Milam presents Claims 1, 2, and 3 in terms of a stand-alone claim of ineffective assistance of State habeas counsel. However, "the ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief." *Martinez*, 566 U.S. at 17, 132 S. Ct. at 1320 (quoting 28 U.S.C. § 2254(i)). The Fifth Circuit has specifically rejected stand-alone claims of ineffective assistance of State habeas counsel. *Reed*, 739 F.3d at 780 n.18 (citing *Sepulvado*, 707 F.3d at 554–55 & n.8). Instead, as has been explained by the

Fifth Circuit, *Martinez* and *Trevino* require a showing of both ineffective assistance of trial counsel and initial State habeas counsel. *Preyor*, 537 F. App'x at 421. A petitioner's "failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Sells*, 536 F. App'x at 492. Mr. Milam's failure to show a deficiency in trial counsel's representation on this matter precludes a finding of cause and prejudice with respect to claim number four. Claim Number 4 must be rejected as unexhausted and procedurally barred.

Mr. Milam's first four claims must be denied as unexhausted and procedurally barred. The claims are not saved by the rule announced in *Martinez* and *Trevino*.

**Claim Number 5:** **A) The evidence was sufficient by the preponderance standard to demonstrate that Mr. Milam was, and is, intellectually disabled and thus both appellate and habeas counsel were ineffective for not asserting this claim for State review and exhaustion, in violation of the Sixth Amendment.**

**B) The evidence was sufficient to demonstrate that Mr. Milam was functioning at somewhere between an 8 to 16 year old emotional level. Thus, his sentence of death violates the Supreme Court's mandate that persons below the age of 18 shall not be executed. *See Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005). Appellate counsel was ineffective for not pursuing this claim once it had been established via a ruling by the trial court. Habeas counsel was ineffective for not asserting that appellate counsel was ineffective in exhausting this claim in violation of the Sixth Amendment.**

Claim Number 5 is another unexhausted claim. Mr. Milam argues in part A of Claim Number 5 that the evidence at trial was sufficient to demonstrate that he was intellectually disabled[2] and thus exempt from execution, and both appellate and habeas counsel were ineffective for failing to assert this claim for State review. In support of the claim, he focuses on the Supreme Court's decision in

---

[2] The terms "mentally retarded" and "mental retardation" are used in this opinion only where they are part of a direct quote. Otherwise, the terms "intellectual disability" and "intellectually disabled" are used, which were adopted by the Supreme Court in *Hall v. Florida*, 134 S. Ct. 1986 (2014), and the Fifth Circuit in *Williams v. Stephens*, 761 F.3d 561, 565 & n.1 (5th Cir. 2014).

*Hall*, 134 S. Ct. at 2001 (rejecting Florida's rigid rule that a defendant must have an IQ of 70 or below to establish intellectual disability). In Part B of the claim, he argues that because the evidence showed that he was functioning at an emotional level of someone between the ages of eight and sixteen, his appellate counsel was ineffective for failing to raise a claim that his death sentence violates the Supreme Court's mandate that persons below the age of eighteen shall not be executed, as provided in *Roper*, 543 U.S. at 568, 125 S. Ct. at 1194. He asserts that these points should be considered in light of *Martinez* and *Nguyen*.

The State trial court in the present case followed the standard intellectual disability definition used in many cases, which was discussed in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004). The Supreme Court recently considered the use of seven additional "*Briseno* factors" announced by the TCCA in *Briseno*.[3] *See Moore v. Texas*, 137 S. Ct. 1039 (2017). The Supreme Court noted with approval that (as in the present case) the *Moore* trial "court had followed the generally accepted, uncontroversial intellectual-disability diagnostic definition, which identifies three core elements: (1) intellectual-functioning deficits (indicated by an IQ score 'approximately two standard deviations below the mean' - *i.e.*, a score of roughly 70 - adjusted for 'the standard error of measurement,' . . .);

---

[3] The seven "*Briseno* factors" are:

• "Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?

• "Has the person formulated plans and carried them through or is his conduct impulsive?

• "Does his conduct show leadership or does it show that he is led around by others?

• "Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

• "Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

• "Can the person hide facts or lie effectively in his own or others' interests?

• "Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?"

*Moore*, 137 S. Ct. at 1046 n.6 (quoting *Briseno*, 135 S.W.3d at 8-9).

(2) adaptive deficits ('the inability to learn basic skills and adjust behavior to changing circumstances,' . . .); and (3) the onset of these deficits while still a minor." *Id.* at 1045. The trial court in *Moore* found that Moore qualified as intellectually disabled and that relief should be granted. *Id.* at 1044. The Texas Court of Criminal Appeals, however, declined to adopt the judgment recommended by the trial court and denied relief based on the seven additional "*Briseno*" factors. *Id.* The Supreme Court vacated the decision and found that the additional "factors *Briseno* set out as indicators of intellectual disability are an invention of the [Texas Court of Criminal Appeals] untied to any acknowledged source." *Id.* at 1044. The Court held that the "*Briseno* factors 'create[e] an unacceptable risk that persons with intellectual disability will be executed." *Id.* (citing *Hall*, 134 S. Ct. at 1990).

In the present case, the State trial court instructed the jury "that 'mental retardation' means significantly sub-average general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period, onset prior to the age of 18. 'Significantly sub-average general intellectual functioning' refers to measured intelligence on standardized psychometric instruments of two or more standard deviations below the age group mean for tests used. 'Adaptive behavior' means the effectiveness with or degree to which a person meets standards of personal independence and social responsibility expected of the person's age and cultural group." 4 CR 980-81. The charge was consistent with the definition of intellectual disability that the Supreme Court described in *Moore* as generally accepted and uncontroversial. The jury charge in this case did not include any of the seven additional "*Briseno*" factors, and comports with constitutional standards.

Having considered whether the jury charge in the present case is constitutional in light of *Moore*, the court turns to the issue presented by Mr. Milam's Claim Number 5, part A: can he satisfy *Martinez/Trevino* in order to overcome the procedurally defaulted claim of intellectual disability? To do that he must show that both trial counsel and initial State habeas counsel were ineffective on this

issue.  Trial counsel presented evidence in support of all three of the core elements of the definition of intellectual disability, and the State presented evidence in rebuttal as to all three elements.  Counsel also asked for an alternative definition of intellectual disability.  More specifically, he asked that the charge specify that a "'person with mental retardation' means a person determined by a physician or psychologist licensed in this state or certified by the Texas Department of Mental Health and Mental Retardation to have sub-average general intellectual functioning concurrent with deficits in adaptive behavior, exhibited prior to the age of 18."  4 CR 967.  He argued the point before the trial court, but his request was denied.  55 RR 280.  Counsel then made a motion for a directed verdict on the issue, which was denied.  55 RR 287.  Copies of the entire jury charge were given to the jury prior to closing arguments. As discussed above the charge correctly set out the test for mental retardation or intellectual disability.  The charge was read to the jury prior to closing arguments.  56 RR 4–12.  In particular, the portions of the charge relating to intellectual disability were read to the jury as part of Special Issue Number Three.  *Id.* at 8–9.  The jury subsequently returned a verdict finding that Mr. Milam "is not a person with mental retardation."  4 CR 987.

The record makes it clear that trial counsel vigorously pursued this defense.  Trial counsel's representation did not fall below an objective standard of reasonableness.  Mr. Milam has not shown that trial counsel's representation was deficient or that he was prejudiced by deficient representation on the part of counsel.  He has not shown that trial counsel was ineffective on this issue.  He likewise failed to show that initial State habeas counsel was ineffective on this issue.  In the context of *Martinez/Trevino*, he has not shown a substantial claim of ineffective assistance of counsel to overcome the procedural default.

Mr. Milam, nonetheless, argues that both appellate counsel and State habeas counsel were ineffective for failing to assert this claim.  He argues that the claim may be considered based on

ineffective assistance of appellate counsel and State habeas counsel in light of *Martinez* and *Nguyen*. The Supreme Court has declined to extend *Martinez* to ineffective assistance of appellate counsel claims. *Davila v. Davis*, -- U.S. --, 137 S. Ct. 2058 (2017). Similarly, neither the Supreme Court nor the Fifth Circuit has recognized stand-alone claims of ineffective assistance of State habeas counsel. *Martinez*, 566 U.S. at 17, 132 S. Ct. at 1320 (citing 28 U.S.C. § 2254(i)); *Reed*, 739 F.3d at 780 n.18 (citing *Sepulvado*, 707 F.3d at 554–55 & n.8). The first part of claim number five must be rejected as unexhausted and procedurally barred. Moreover, since the trial court instructed the jury on the three core elements of the definition of intellectual disability and none of the additional *Briseno* factors, the additional requirements criticized in *Moore* had no impact on the jury's decision nor on the State courts' various decisions; thus, there is no basis to reevaluate this issue in light of *Moore*.

In the Claim Number 5, Part B, Mr. Milam argues that because the evidence showed that he was functioning at an emotional level of someone between the ages of eight and sixteen, his appellate counsel was ineffective for failing to raise a claim that his death sentence violates the Supreme Court's mandate that persons below the age of eighteen shall not be executed, as provided in *Roper*. Mr. Milam's claim is unexhausted. Since the Supreme Court has declined to extend *Martinez* to claims of ineffective assistance of appellate counsel, the claim must be rejected as procedurally barred. *Davila*, -- U.S. --, 137 S. Ct. 2058.

Mr. Milam acknowledges that trial counsel raised the claim at trial. 2 CR 312–24. The trial court rejected the claim. 55 RR 286–87. Trial counsel was not ineffective on this issue; thus, Mr. Milam cannot properly pursue the second part of claim number five via *Martinez/Trevino*.

Claim Number 5, Part B, may alternatively be rejected because it lacks merit. *Roper* "established a lower boundary": No one under the chronological age of eighteen may be executed. *Doyle v. Stephens*, 535 F. App'x 391, 395 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1294 (2014). *Roper*

simply does not apply to a defendant over the age of eighteen. *Id.* "The jury may still consider other factors during the punishment phase, including mitigating factors. . . . He is entitled to, and did, present evidence of his age and purported psychological and developmental shortcomings as mitigating factors." *Id.* at 395–96. The Fifth Circuit rejected efforts to undermine *Roper* by trying to extend it to "developmental age." *Id.* at 396 n.3; *see also United States v. Bernard*, 762 F.3d 467, 482–83 (5th Cir. 2014) (rejecting efforts to extend *Roper* to a mental age of less than 18), *cert. denied*, 136 S. Ct. 892 (2016); *Jasper v. Thaler*, 466 F. App'x 429, 438–39 (5th Cir. 2012) (rejecting efforts to extend *Roper* to immaturity), *cert. denied*, 133 S. Ct. 788 (2012). Mr. Milam's efforts to likewise extend *Roper* are unpersuasive. Both arguments presented under claim number five are unexhausted and procedurally barred. In the alternative, both arguments lack merit.

| Claim Number 6: | Trial counsel rendered ineffective assistance of counsel in violation of the Sixth and Eighth Amendments by not relying upon the proper hearsay exception in attempting to have admitted the statement of the co-defendant |
|---|---|

Claims 6 through 9 concern allegations of ineffective assistance of counsel that were raised in the State habeas corpus proceedings. Claim Number 6 focuses on the statement of co-defendant Jesseca Carson. Both Mr. Milam and Ms. Carson gave statements to Texas Ranger Ray on December 2, 2008. Ms. Carson did not testify at Mr. Milam's trial. Defense counsel made numerous attempts throughout the trial to have her statement admitted into evidence. Counsel argued that her statement was not hearsay since it was not being offered for the truth of the matter asserted, and that it should be admitted as a statement against interest, an exception to the hearsay rule. The State argued otherwise, and the court sustained the objection. Mr. Milam now argues that trial counsel was ineffective for not relying on the proper hearsay exception in order to have the statement admitted.

Ms. Carson's transcribed statement was attached to Mr. Milam's State habeas application as Exhibit C. 1 SHCR 44–54. Ms. Carson admitted to Ranger Ray that she had not been truthful when

she first spoke to him at the scene of the crime.  *See* 1 SHCR 45.  She admitted that she had initially told law enforcement that someone had entered their home and killed Amora while they were gone, but the statement was not true.  *Id.*  She stated that she and Mr. Milam used a Ouija board to communicate with their dead fathers, but they feared they were speaking to bad spirits through the board.  *Id.* at 46.  Thus, they threw the board away.  *Id.* After that, she came to believe that the Devil was talking to her through Mr. Milam.  *Id.* On the day before the murder, Mr. Milam told Ms. Carson that Amora was possessed by evil and there was a demon inside of her.  *Id.* at 47.  Mr. Milam told her that the demon was warping Amora's features and causing her to harm herself.  *Id.* at 48.  She stated that Mr. Milam and Amora were alone in the bedroom, and she "was hearing the demon growl and everything."  *Id.* Mr. Milam suggested an exorcism, and Ms. Carson agreed.  *Id.* Mr. Milam performed the exorcism, and they initially thought that it was successful.  *Id.* at 48–49.  However, the demon returned, and Mr. Milam tried to exorcize the demon again while Ms. Carson was asleep on the couch.  *Id.* at 49–50.  Mr. Milam was alone in the room with Amora at the time.  *Id.* at 50.  Ms. Carson believed that Mr. Milam had fought with the demon behind the closed door, and that the demon had tried to kill him.  *Id.*  Ms. Carson finally suggested that they go find a priest to perform the exorcism.  *Id.* They left the house to pawn items for money to pay a priest, but Mr. Milam told her as they left the pawn shop that God told him there was nothing they could do.  *Id.*  Ms. Carson agreed with Mr. Milam that she would rather see her child go to Heaven now than go to Hell later.  *Id.* Ms. Carson and Mr. Milam returned to the house where they found Amora dead; they unsuccessfully attempted to perform CPR and then called 911.  *Id.* at 50–52.  Ms. Carson admitted that the two of them tried to come up with a story to tell the police because she did not think anyone would believe their story of demon possession.  *Id.* at 52.

At trial, the defense argued that Ms. Carson's statement should be admitted because it was not being offered for the truth of the matter asserted, but to show her demeanor and state of mind, *see* 40 RR 33, and that the statements were excepted from the hearsay rule as they were against her penal interest. 40 RR 34; Tex. R. Evid. 803(24). Relying on *Walter v. State*, 267 S.W.3d 883 (Tex. Crim. App. 2008), the State argued against the admission of this statement under the Rule 803(24) exception because Ms. Carson minimized her own culpability while inculpating Mr. Milam, and according to the TCCA, such a blame-shifting statement is not admissible as a statement against penal interest. 40 RR 34–36. The trial court sustained the State's objections to the admission of the statement. 40 RR 37.

In his petition, Mr. Milam disputes the ruling and stresses that the Texas statement against interest rule is broader than the Federal rule, in that it also allows statements which "make the declarant an object of hatred, ridicule or disgrace, that a reasonable person in declarant's position would not have made the statement unless believing it to be true." Tex. R. Evid. 803(24). He asserts that Texas cases have found that these type of statements are admissible. *Purtell v. State*, 761 S.W.2d 360 (Tex. Crim. App. 1988); *Robinson v. Harkins & Co.*, 711 S.W.2d 619 (Tex. 1986).

Mr. Milam also complains that trial counsel failed to articulate an Eighth and Fourteenth Amendment justification for the introduction of this evidence at sentencing. He stresses that the Eighth Amendment protects against arbitrary and capricious death sentences. He emphasizes that a capital punishment scheme must allow the sentencing authority to consider all mitigating circumstances. *See Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229 (2011) (no arbitrary limitations should be placed on information concerning the background, character, and conduct that may be considered for the purpose of imposing an appropriate sentence).

Mr. Milam acknowledges that much of the same information was brought to the jury's attention through the testimony of expert witness Dr. Mark Cunningham[4] during the punishment phase of the trial:

Q.      And in your opinion, based on that, the state of mind of Jesseca Carson, that played a significant role in the death of Amora?

A.      Yes, sir.

Q.      And what led to your conclusion?

A.      Blaine and Jesseca are described by third party observers, including folks in Elba, Alabama, when they were there on those visits, of having shared delusions about the death of her father and the circumstances of that death being a murder instead of a suicide. They both had anxieties and delusional beliefs about this Ouija board and about the apartment being possessed where they had used that Ouija board. In her statement, Jesseca describes coming to believe that there was a demon inside of Blaine, that he was possessed, and Blaine also made reference to a belief that he was possessed by a demon. They came to believe that Amora was possessed and jointly identified some need for an exorcism to remove the demon from her. This offense occurred in a context, according to Jesseca's statement, where they were both present in the household, with her knowledge and understanding that some sort of exorcism was occurring that Blaine was doing to Amora.

Now, the significance of this is, as I described earlier, when you have somebody who's in the midst of a methamphetamine psychosis, and their own reality testing is distorted and fragile, and then when there's someone who's there who's psychotic and is participating in the same kind of delusional beliefs and, in fact, providing some additional content of their own along those same lines, then it potentiates the psychotic experience for both of these individuals as they are feeding off of each other's delusional perceptions. It increases the likelihood of the psychosis and delusion escalating, and it increases the likelihood that they will act on these beliefs in a tragic fashion.

Q.      An in your opinion, Doctor, those are significant factors in this case that ultimately resulted in the death of Amora Carson?

A.      Yes, sir.

---

[4] [4]Mr. Milam's Petition inadvertently attributes this testimony to defense expert Dr. Frank Murphy (Doc. #14 at 93) but it was actually the testimony of Dr. Mark Cunningham.

*See* 54 RR 260–61. Dr. Cunningham's testimony was before the jury during the punishment phase of the trial. Mr. Milam acknowledges that the crux of Ms. Carson's statement came in through this testimony, but he argues that it is not the same as the jury hearing the evidence directly from her tape recorded statement. He argues that counsel is at fault for failing to get her statement admitted into evidence.

The present ineffective assistance of counsel claim was fully developed during the State habeas corpus proceedings. Pursuant to an order of the trial court, defense counsel James R. Hagan filed an affidavit in response to allegations of ineffective assistance of counsel. He addressed the present claim as follows:

> I have reviewed the pertinent parts of the record in this cause regarding the allegation that I failed to bring an additional hearsay exception to the introduction of the recorded conversations of co-defendant Carson to the trial court's attention. After reviewing the record and refreshing my memory concerning this matter I believe I set forth the most applicable portion of Rule 803(24) concerning statements against the declarant's criminal interest. It was my belief then and now that there was no statement against the co-defendant's "societal interest" independent of her statements against her "criminal interest" in this cause. Additionally, even though I did not specifically mention a possible basis of admission being statements against the co-defendant's "societal interests," I did, on more than one occasion during my colloquy with court, emphasize and bring to the court's attention the co-defendant's statements that she believed if she told the truth of what happened she feared not only arrest, but that she would be placed in a "mental institute."

1 SHCR 86.

After collecting all of the evidence compiled on this issue, the State trial court issued extensive findings of fact on the claim. 3 SHCR 314–27. The State trial court found that counsel repeatedly argued that Ms. Carson's statement should be admitted because of the following reasons:

a. it was not hearsay because it was not being offered for the truth of the matter asserted, but to show her demeanor and state of mind, *see* 40 RR 33, 52-54;

b. if it was hearsay, it was nevertheless excepted from the hearsay rule and admissible pursuant to Tex. R. Evid. 803(24) as a statement against penal interest, 40 RR 34, 52, 54; and

c.  it was admissible as part of [Mr. Milam's] Constitutional right to present a defense—pursuant to the Fifth, Sixth, and Fourteenth Constitutional Amendments, as well as Article 10 of Texas Constitution—because Jesseca would not testify on his behalf, and the statement was essential to [Mr. Milam's] defensive theory, 40 RR 51-52.

3 SHCR 316–17.  The trial court found that sustained the State's objection to the admission of the statement on hearsay grounds because Ms. Carson's blame shifting statement is not admissible as a statement against penal interest under Rule 803(24) in light of the TCCA's decision in *Walter, supra*. *Id.* at 317.  The court further found that it sustained the State's objection to the admission of the statement and rejected the argument that the refusal to allow the statement impinged on Mr. Milam's right to present a defense. *Id.*  With respect to the argument that Ms. Carson's blame shifting statement was admissible because it was not actually true and demonstrates her state of mind, the court found that it sustained the State's objection that the statement was not admissible because  it was, in fact, a lie and it was therefore untrustworthy and not admissible under Rule 803(24). *Id.* at 318.  The court found that defense counsel asked the court to reconsider its decision at the close of the guilt/innocence phase of the trial, but the motion was denied. *Id.* at 318–19.  The court found that Ms. Carson's statement was hearsay and that it did not meet one of the numerous exceptions or exemptions to the hearsay rule. *Id.* at 319.  The court further found "that any additional argument on admissibility would have been futile." *Id.*

With respect to the specific allegations raised in the ineffective assistance of counsel claims, the trial court found that "trial counsel Hagan had reasonable, strategic reasons for making the four arguments advanced in favor of admission of Jesseca's statement." *Id.* at 321.  Moreover, counsel "made those arguments he believed were most likely to succeed." *Id.*

With respect to the Eighth Amendment arguments, the trial court found that defense counsel was able to present a defense suggesting that Mr. Milam and Ms. Carson were acting under a delusional

belief that Amora was possessed without presenting Ms. Carson's statement. *Id.* at 323. The court found that the evidence was before the jury through the testimony of Dr. Cunningham. *Id.* at 323–24. The court found that other witnesses supported Dr. Cunningham's testimony, including Ranger Ray, Mr. Milam's sisters, Mr. Milam's mother, Dr. Frank Murphy, Dr. Paula Lundberg-Love, and Dr. Tim Proctor. *Id.* at 325–26. The court finally found that "the evidence actually presented by the defense was more persuasive without Jesseca's statement." *Id.* at 327.

The trial court went on to issue extensive conclusions of law regarding the claim. 3 SHCR 343–52. The court concluded "that trial counsel did not perform deficiently in his attempts to admit Jesseca Carson's statement at trial." *Id.* at 343. The court concluded "that trial counsel was not deficient for failing to come up with additional arguments related to" Rule 803(24). *Id.* The trial court found that trial counsel's "performance fell within the wide range of 'reasonable assistance,' and that his chosen arguments were sound trial strategy." *Id.* at 343–44 (citing *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). The finding was made that trial counsel "strenuously advocated" for the admission of Ms. Carson's statement "under the most reasonable theories of admissibility, but without success." *Id.* at 344. The court found that "any additional arguments by trial counsel would have been similarly unsuccessful because Jesseca's statement was hearsay, it did not satisfy any exception to the hearsay rule allowing its admission, and it was not reliable." *Id.* With respect to Rule 803(24), the trial court concluded "that trial counsel made a reasonable strategic decision to pursue his strongest argument— that Jesseca's statement was against her penal interest—despite his belief that other exceptions could apply." *Id.* at 345. The trial court found "that trial counsel's performance was not deficient because additional arguments under Rule 803(24) would have been unsuccessful for the same reasons—the hearsay statement was unreliable and properly excluded." *Id.* The court specifically found that Mr.

Milam suffered no prejudice by counsel's failure to make additional Rule 803(24) arguments, because the statement was still inadmissible due to the unreliability of Ms. Carson's statement. *Id.* at 347.

The court concluded that trial counsel's representation was not deficient because he, in fact, urged admission of the statement under the Eighth Amendment, albeit unsuccessfully. *Id.* at 349. The conclusion was made that counsel's representation was not deficient for failing to make other futile arguments. *Id.* The court found that State rules of procedure and evidence still apply to the admission of evidence at the punishment phase, and such evidence must still be reliable. *Id.* at 350. The trial court found that Mr. Milam was not prejudiced by counsel's representation on this issue. *Id.* at 351. It was specifically found that Ms. Carson's statement was more damaging than "helpful because it placed the blame for the murder solely on him, and it suggested [Mr. Milam] was manipulating Jesseca." *Id.* at 351–52. The TCCA subsequently denied relief based on the trial court's findings and conclusions and its own review. *Ex parte Milam*, 2013 WL 4856200, at *1.

There is support in Texas law for the decision that Ms. Carson's statement did not qualify for admission under Rule 803(24) because she shifted the blame to Mr. Milam. *See Walter*, 267 S.W.3d at 899. Even "overwhelming corroborating circumstances" indicating the trustworthiness of a co-conspirator's narrative did not render "blame-shifting" statements in the narrative admissible under the rule. *Id.* at 899–900.

Mr. Milam stresses that a capital punishment scheme must allow the sentencing authority to consider all mitigating circumstances. He cites *Pepper* for the proposition that no arbitrary limitations should be placed on information concerning the background, character, and conduct a district court (and logically, a jury) can consider for the purpose of imposing an appropriate sentence. In response, the Director correctly noted that the Supreme Court merely held that a district court may consider a

defendant's evidence of post-sentencing rehabilitation during resentencing. *Pepper*, 562 U.S. at 490, 131 S. Ct. at 1241.

Even though the decision in *Pepper* may be of limited value, Mr. Milam's basic argument is commonly found in Supreme Court decisions. "The use of mitigation evidence is a product of the requirement of individualized sentencing." *Kansas v. Marsh*, 548 U.S. 163, 174, 126 S. Ct. 2516, 2525 (2006). In *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964–65 (1978), a plurality of the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (emphasis in original). The Court held that the sentencer must have full access to "highly relevant" information. *Id.* at 603, 98 S. Ct. at 2964. A majority of the Court adopted the *Lockett* ruling in *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S. Ct. 869, 874 (1982). The *Lockett* and *Eddings* decisions were revisited in *Johnson v. Texas*, 509 U.S. 350, 113 S. Ct. 2658 (1993). The Court read these cases narrowly:

> *Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all.

*Id.* at 361, 113 S. Ct. at 2666 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 456, 110 S. Ct. 1227, 1240 (1990) (Kennedy, J., concurring in judgment)). *Lockett* "does not deprive the State of its authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted." *Oregon v. Guzek*, 546 U.S. 517, 526, 126 S. Ct. 1226, 1232 (2006). "States are free to structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty." *Id.* (internal quotation marks omitted) (quoting *Boyd v. California*, 494 U.S. 370, 377, 110 S. Ct. 1190, 1196 (1990)).

In the present case, the trial court was entitled to require that the evidence submitted comply with evidentiary rules. Nonetheless, the record clearly reveals that the evidence contained in Ms. Carson's statement was not cut off in an absolute manner. The same evidence came in through a number of witnesses, including Dr. Cunningham, Ranger Ray, Mr. Milam's sisters, Mr. Milam's mother, Dr. Frank Murphy, Dr. Paula Lundberg-Love, and Dr. Tim Proctor. The State habeas court found that "the evidence actually presented by the defense was more persuasive without Jesseca's statement." 3 SHCR 327.

Claim Number 6 does not directly call into question whether Ms. Carson's statement should have been admitted; instead, the issue is whether counsel was ineffective in his efforts to get the statement admitted. In rejecting the claim, the State habeas court found that defense counsel's approach was a matter of trial strategy. The Supreme Court explained in *Strickland* that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *See Strickland,* 466 U.S. at 690–91, 104 S. Ct. at 2066. Federal courts "will not question a counsel's reasonable strategic decisions." *Bower v. Quarterman*, 497 F.3d 459, 470 (5th Cir. 2007), *cert. denied*, 553 U.S. 1006, 128 S. Ct. 2051 (2008). In applying *Strickland*, the Fifth Circuit held that "the failure to present a particular line of argument or evidence is presumed to have been the result of strategic choice." *Taylor v. Maggio*, 727 F.2d 341, 347 (5th Cir. 1984). Habeas corpus relief is unavailable if a petitioner fails to overcome the presumption that counsel made sound strategic decisions. *Del Toro v. Quarterman*, 498 F.3d 486, 491 (5th Cir. 2007), *cert. denied*, 552 U.S. 1245, 128 S. Ct. 1478 (2008). In the present case, trial counsel had reasonable, strategic reasons for making the arguments that he made in favor of admitting Ms. Carson's statement. He made the arguments that he thought were most

likely to succeed. Perhaps other arguments might have been made, but the court may not question his reasonable strategic decisions. Mr. Milam has not shown that his attorney's representation was deficient on this issue. Moreover, since the evidence was brought in through other witnesses, he cannot show prejudice. The ineffective assistance of counsel claim lacks merit.

Claim Number 6 must also be rejected because Mr. Milam has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

There is yet another basis for rejecting the ineffective assistance of counsel claim. In the context of § 2254(d), the deferential standard that must be accorded to counsel's representation must also be considered in tandem with the deference that must be accorded State court decisions, which has been referred to as "doubly" deferential. *Richter*, 562 U.S. at 105, 131 S. Ct. at 788. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* "If the standard is difficult to meet, that is because it was meant to be." *Id.* at 102, 131 S. Ct. at 786; *see also Morales v. Thaler*, 714 F.3d 295, 302 (5th Cir. 2013) (same), *cert. denied*, 134 S. Ct. 393 (2013). In the present case, counsel's trial strategy satisfies the "any reasonable argument" standard for rejecting the ineffective assistance of counsel claim. Mr. Milam has not satisfied his burden of overcoming the doubly deferential standard; thus, he is not entitled to federal habeas corpus relief on Claim Number 6.

**Claim Number 7:** **Appellate counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution by failing to raise on direct appeal the trial court's refusal to admit co-defendant Jesseca Carson's statement**

In Claim Number 7, Mr. Milam brings a follow-up claim to Claim Number 6. He argues that his appellate attorney was ineffective for failing to raise on direct appeal the trial court's refusal to admit co-defendant Jesseca Carson's statement. He observes that both Texas and Federal Courts have found that the hearsay rules must be "flexible" and sometimes bend to the due process rights of a petitioner. *Alonzo v. State*, 67 S.W.3d 346, 358–61 (Tex. App.—Waco 2001, pet. dism'd); *Holmes v. South Carolina*, 547 U.S. 319, 126 S. Ct. 1727 (2006); *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038 (1973). He notes that trial counsel argued that Ms. Carson's statement should be admitted since it was essential to the defense theory. Nonetheless, the trial court disagreed. He complains that even though trial counsel preserved the issue for appeal, appellate counsel failed to brief and present the issue to the appellate court. He argues that appellate counsel was ineffective for failing to raise the issue on direct appeal.

The two-prong *Strickland* test applies to claims of ineffective assistance of counsel by both trial and appellate counsel. *Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001), *cert. denied sub nom Styron v. Cockrell*, 534 U.S. 1163, 122 S. Ct. 1175 (2002). An indigent defendant does not have a constitutional right to compel appointed counsel to include every nonfrivolous point requested by him; instead, an appellate attorney's duty is to choose among potential issues, using professional judgment as to their merits. *Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 3312 (1983). "Counsel need not raise every nonfrivolous ground of appeal, but should instead present solid, meritorious arguments based on directly controlling precedent." *Ries v. Quarterman*, 522 F.3d 517, 531–32 (5th Cir. 2018) (internal quotation marks omitted) (quoting *Schaetzle v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003), *cert. denied*, 555 U.S. 990, 129 S. Ct. 485 (2008); *see also Adams v. Thaler*, 421 F. App'x 322, 332 (5th Cir. 2011) (same), *cert. denied*, 565 U.S. 942, 132 S. Ct. 399 (2011). To demonstrate prejudice,

a petitioner must "show a reasonable probability that, but for his counsel's unreasonable failure . . ., he would have prevailed on his appeal." *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001).

The issue of whether appellate counsel was ineffective for failing to brief and present a ground of error that the trial court erred in refusing to admit Ms. Carson's statement was fully developed in the State habeas corpus proceedings. Pursuant to an order of the trial court, appellate counsel Douglas H. Parks filed an affidavit in response to allegations of ineffective assistance of appellate counsel, which included the following:

1. As a result of my appointment to the direct appeal of this case, I did a thorough review of the Clerk's Record in the cause and reviewed and summarized the entire Reporter's Record. I identified potential points of error and eliminated several, by research and experience, as frivolous.

2. Those points of error I believed to be at least arguable were researched, briefed and presented to the Court of Criminal Appeals in [Mr. Milam's] Brief.

3. I gave consideration to the issue regarding the trial court's refusal to allow [Mr. Milam] to introduce Jesseca Carson's statements and determined that the issue was without merit for the following reasons:

   a. the statements were clearly hearsay if offered to prove the truth of the matter asserted (TRE 801(d)) unless there was an applicable exception as set out in TRE 803;

   b. trial counsel advanced the proposition that the hearsay statements were admissible as "demeanor/state of mind" and as a statement against interest. Trial counsel's theory was that the statement was not offered for the truth of the matter stated and was a lie, therefor it showed her "state of mind" at the time. I considered that argument to be nonsensical. If the statements were not offered to prove the truth of the matter asserted they were not hearsay and the exceptions to the hearsay rules did not apply in determining admissibility;

   c. if the statements of Ms. Carson could be considered hearsay (despite not being offered to prove the truth of the matter asserted) I determined that they would not be admissible under the theory that they were statements against the declarant's interest because they were clearly not trustworthy, as required by TRE 803(24) because, by counsel's own admission, they were lies;

      d.         I also considered the contention that the trial court's failure to admit the statements of Ms. Carson violated [Mr. Milam's] constitutional right to present a defense. [Mr. Milam] had a due process right to present competent, reliable, exculpatory evidence to rebut any of the elements of the offense. *See Ruffin v. State*, 270 S.W.3d 586 (Tex. Crim. App. 2008). It is my judgment that the proffered statements were neither competent, reliable or exculpatory and any argument that they were, in the face of trial counsel's admission that they were lies, would be frivolous; and

      e.         finally, the gist of Ms. Carson's statements came in through the testimony of Dr. Frank Murphy, at the guilt/innocence stage of trial in any event.

1 SHCR 83–84 (footnote omitted).

      After collecting all of the evidence compiled on this issue, the State trial court issued findings on this claim. 3 SHCR 327–30. The trial court observed that appellate counsel filed a brief on direct appeal that raised twenty points of error. *Id.* at 327. The court found that appellate counsel did not raise a point of error regarding Ms. Carson's statement. *Id.* at 328. The finding was made that appellate counsel filed a credible affidavit, that he thoroughly reviewed the record, and "identified potential points of error and eliminated several, by research and experience, as frivolous." *Id.* (quoting affidavit of Douglas Parks). The finding was made that, based on the credible affidavit of appellate counsel, Mr. Parks researched and briefed "[t]hose points of error [he] believed to be at least arguable[.]" *Id.* After discussing the reasons provided by appellate counsel, the trial court found "that counsel had reasonable, strategic reasons for not including a point of error regarding Jesseca Carson's statement in [Mr. Milam's] direct appeal." *Id.* at 329. The court specifically found that the decision to abandon these claims was strategic and based upon his professional judgment. *Id.* The court finally found that appellate counsel "chose only those [claims] with the best likelihood of success." *Id.* at 330.

      The trial court went on to issue conclusions of law on this claim. 3 SHCR 352–57. The finding was made that appellate counsel, Doug Parks, was not deficient for failing to raise on direct appeal a

point of error regarding Ms. Carson's statement. *Id.* at 352. The trial court found that appellate counsel made a thorough review of the record and made a reasonable, strategic decision not to raise any point of error regarding the statement. *Id.* at 353. The trial court further found that the claim that appellate counsel was deficient in this matter lacks merit because the statement was properly excluded. *Id.* The court found that appellate counsel was not deficient for failing to raise an Eighth Amendment argument because it would have been futile and frivolous. *Id.* at 354. The finding was made that Mr. Milam failed to overcome the presumption that appellate counsel's strategic decision was reasonable. *Id.* at 355. The trial court finally found that Mr. Milam had not shown prejudice. *Id.* at 356–57. The Texas Court of Criminal Appeals subsequently denied Mr. Milam's State application for a writ of habeas corpus based on the trial court's findings and conclusions and on its own review. *Ex parte Milam*, 2013 WL 4856200, at *1.

As with Claim Number 6, the present ineffective assistance of appellate counsel claim must be rejected because counsel's decision was reasonable strategy, and this court should not second guess well reasoned strategic decisions. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065 (reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and a defendant must overcome the presumption that the challenged action might be considered sound trial strategy). Judges should not second-guess reasonable professional judgments and impose on appellate counsel a duty to raise every "colorable" claim, which would "disserve the very goal of vigorous and effective advocacy." *Jones*, 463 U.S. at 754, 103 S. Ct. at 3314. Counsel did not believe that there was any basis for raising a point of error focusing on the trial court's refusal to admit co-defendant Jesseca Carson's statement.

Mr. Milam has not shown that appellate counsel's representation fell below an objective standard of reasonableness by failing to include this issue on direct appeal. Perhaps some attorneys

would have included the point of error on direct appeal, but the court may not question appellate counsel's reasonable strategic decisions. In addition to the foregoing, Mr. Milam has not shown that there was solid, meritorious arguments for presenting the ground of error on appeal based on controlling precedent. Overall, Mr. Milam has not shown that his appellate attorney's representation was deficient on this issue. Moreover, he cannot show prejudice since the evidence was brought in through other witnesses. He simply has not shown that he would have prevailed on appeal but for his appellate attorney's failure to raise the claim. The ineffective assistance of appellate counsel claim lacks merit.

Alternatively Claim Number 7 must be rejected becasue Mr. Milam has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Finally, the ineffective assistance of appellate counsel claim must be rejected because Mr. Milam has not satisfied the doubly deferential standard. Indeed, appellate counsel's strategy alone is a reasonable argument for rejecting the ineffective assistance of appellate counsel claim. Mr. Milam has not shown that he is entitled to federal habeas corpus relief on Claim Number Seven.

> **Claim Number 8:** **Trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment by failing to object to specific instances of violence introduced by the prosecution regarding violence in the Texas prison system. The failure to object violates Mr. Milam's right to the Eighth Amendment requirement of individualized sentencing.**

In Claim Number 8, Mr. Milam complains about evidence that was introduced by the State without objection while cross-examining defense expert Larry Fitzgerald. More specifically, the State was allowed to introduce the following specific acts of violence in the Texas prison system:

1. a prison guard was killed by a field squad, none of whom were convicted of capital murder, outside the walls of the prison;

2. on January 29, 2010, five offenders escaped from the Polunsky Unit, where death row is located, and three of the five were shot but survived;

3. seven offenders serving life sentences broke out of the McConnell Unit in South Texas, killed a police officer, and were later captured in Colorado;

4. a death row inmate almost cut off a Chaplain's arm;

5. another death row inmate spat a key out during his execution; and

6. a death row inmate escaped before drowning.

51 RR 100–108. Mr. Milam argues that his trial attorney was ineffective by failing to object to these specific incidents of violence. He further argues that the failure to object violated his Eighth Amendment requirement of individualized sentencing.

In support of the claim, Mr. Milam argues that painting him with the broad brush of prior inmates is speculative as to his future behavior and denied him the heightened reliability in sentencing mandated by the Eighth and Fourteenth Amendments. *See Woodson v. North Carolina*, 428 U.S. 280, 96 S. Ct. 2978 (1976). He noted that the TCCA upheld the exclusion of a videotape of administrative segregation since it "was not evidence of consequence to the jury's factual determination of whether *appellant* would pose a continuing threat to society." *Sells v. State*, 121 S.W.3d 748, 766 (Tex. Crim. App. 2003) (emphasis in original), *cert. denied*, 540 U.S. 986, 124 S. Ct. 511 (2003). The TCCA observed that "the videotape might have confused and distracted the jury from its factfinding task." *Id.* Mr. Milam argues that the unrelated specific instances discussed in the present case did the same and that they were inadmissible and constitutionally harmful. He finally disputes the trial court's finding that trial counsel was not ineffective despite not correctly objecting to this evidence.

The record reveals that counsel filed a motion in limine seeking to preclude testimony about violent acts committed by other TDCJ inmates. 1 CR 149–51. Counsel argued that such testimony

was irrelevant to Mr. Milam and that it would violate the Eighth Amendment requirement of individualized sentencing under *Jurek v. Texas*, 428 U.S. 262, 96 S. Ct. 2950 (1976), and *Lockett*, 438 U.S. at 604–05, 98 S. Ct. at 2964–65.  The motion was one of fifteen motions carried by the trial court. 2 CR 455.  However, the trial court never ruled on the motion in limine. 1 SHCR 87.

During the punishment phase of the trial, the defense called Larry Fitzgerald, a former information officer for TDCJ, with respect to the future dangerousness special issue. 51 RR 40–41. He discussed classification procedures and conditions on death row.  51 RR 58.  He presented statistics concerning the dangerousness of the prison system.  *Id.* at 64.  In 2009, of the 158,068 inmates confined in TDCJ, there was one homicide, 676 attempted suicides with 24 succeeding, 95 serious staff assaults, and 154 sexual assaults.  51 RR 64–67.  He opined that the statistics show that "the prison system works."  *Id.* at 66.  Moreover, the prison system knows how to take care of dangerous inmates.  *Id.* at 67.  He agreed that there is a possibility that an escape may occur, but he added that it is also possible that "the moon may be made out of green cheese."  *Id.*  He described the prison environment as harsh. *Id.* at 70–71.

In light of the evidence offered on direct examination, the State explored Mr. Fitzgerald's testimony further on cross-examination.  He acknowledged that murders, including capital murders, occur in the prison system.  *Id.* at 77.  He acknowledged that an officer supervising a "field squad" was murdered outside the walls of the prison by an inmate who was attempting to escape.  *Id.* at 100–01. He admitted that in 2010 offenders housed at the Polunsky Unit, where death row is located, attempted to escape.  *Id.* at 102.  Five offenders got over the first fence but were apprehended before they made it over the second fence.  *Id.*  Three of the offenders were shot during the attempt, but they survived. *Id.* at 102.  Fitzgerald was also questioned about the "Texas 7"—seven inmates who escaped from the McConnell Unit, killed a police officer and remained at-large for several weeks before being

recaptured. *Id.* at 103. Fitzgerald admitted that all seven inmates were serving life sentences and at least one was a capital murderer. *Id.* at 103–04. When the State referred to Fitzgerald's prior testimony about the "moon may be made out of green cheese," he agreed that the escape by the Texas 7 "was a giant failure of the system." *Id.* at 104. Fitzgerald confirmed that inmate Juan Soria almost cut off a chaplain's arm on death row. *Id.* He confirmed that inmate Ponchai Wilkerson spit a key out of his mouth at his own execution. *Id.* Fitzgerald confirmed that in 2004, two life sentenced capital murderers almost killed two guards at the Eastham Unit. *Id.* at 105. Finally, in 2000, eight death row inmates attempted to escape; one actually made it to the free world but drowned about a mile and a half away from the prison. *Id.* at 108. Fitzgerald agreed that statistics do not really matter, that a prisoner may be violent if he wants to be violent, and that ultimately the jury has to look at the individual characteristics of the person on trial. *Id.* at 108–09.

The issue of whether trial counsel was deficient for failing to object to the testimony of specific instances of violence within the prison system was fully developed during the State habeas corpus proceedings. Trial counsel James R. Hagen, John W. Moore and Stephen Jackson addressed the claim in their affidavits. Mr. Hagen addressed the issue as follows:

> The allegation that I failed to object to specific instances of violence in the Texas prison system is true. However, this was a decision made in consultation with my client and of necessity due to the fact that we had decided to introduce TDC classification testimony as well as risk assessment testimony from our expert witnesses. I was of the opinion that evidence of this character was admissible and determined that unsuccessful objection to it could result in unduly emphasizing its importance to the jurors.

1 SHCR 87.

Mr. Moore presented an extensive affidavit addressing the issue as follows:

> I have reviewed the pertinent parts of the record in this cause regarding the allegation that I rendered ineffective assistance of counsel in violation of the Sixth Amendment by failing to object to evidence of specific instances of violence in the Texas prison system. After reviewing the record, motions filed, and conferences with

trial counsel refreshing my memory concerning this matter, I believe I presented the evidence at trial in the light most favorable to my client. Our trial strategy was to show that the penal system could handle violent offenders. In doing so we called the best possible witness available to provide us with the statistics for the jury. In sponsoring this type of evidence we knew that through cross examination, the State would be allowed to inquire about specific acts, in an attempt to disprove this theory. It is well settled, through case law that this evidence is admissible when sponsored by Defense. When presenting evidence on future dangerousness our trial strategy was to attempt to show that our client would not [be] dangerous in the penal system, based on his offense, age of victim, his age and the circumstances surrounding his life experiences and education.

The specific instances of conduct complained of would have actually been in our client's favor based on his demeanor and offense. The evidence complained of coupled with other witness[es] showed that our client was not violent when dealing with his peers, which is what we were trying to show the jury, that he would be a good candidate for Life in Prison.

This was a decision made in consultation with my client and of necessity due to the fact that we had decided to introduce TDC classification testimony as well as risk assessment testimony from our expert witnesses. I was of the opinion that evidence of this character was admissible and determined that unsuccessful objection to it could result in unduly emphasizing its importance to jurors.

1 SHCR 175–76. Finally, co-counsel Stephen Jackson stated in his affidavit that he had read Mr. Hagan's affidavit, that Mr. Hagan made the decision regarding this witness, and that he had no reason to doubt the affidavit. 2 SHCR 300–01. He added "that on many occasions in my trial career, I have made the decision to not object to some form of testimony as to prevent drawing unwanted attention from the jury to the specific issue." *Id.* at 300.

After collecting all of the evidence compiled on this issue, the State trial court issued extensive findings of fact regarding the claim. 3 SHCR 330–36. The trial court discussed the aforementioned facts surrounding the claim and the affidavits of counsel. *Id.* at 330–32. After concluding that Mr. Moore's affidavit was credible, the trial court found "trial counsel developed a punishment phase strategy to show that the penal system could handle violent offenders. In furtherance of this strategy, counsel called what he believed to be the best possible witness available to provide statistics to the

jury." *Id.* at 332. The trial court found "that the defensive strategy also sought to show that [Mr. Milam] would not be dangerous in a penal system, based upon his offense, the age of the victim, his age, and the circumstances surround[ing] his life experiences and education." *Id.* at 332–33. The trial court found "that trial counsel knew, by sponsoring this type of evidence, the State would be allowed to inquire, on cross-examination, about specific acts of violence in an attempt to disprove the defense's theory that the penal system could handle violent offenders" and that such evidence of specific acts of violence was admissible. *Id.* at 333. The trial court further found that all three attorneys felt that "an unsuccessful objection could result in unduly emphasizing the importance of this evidence to the jurors." *Id.* at 334.

The trial court went on to issue conclusions of law. 3 SHCR 358–63. The trial court concluded "that trial counsel did not perform deficiently in failing to object to this line of questioning because the CCA has specifically found that testimony regarding the violent nature of prisons in Texas, including testimony regarding specific instances of conduct, is relevant to the future dangerousness issue and admissible." *Id.* at 358. As such, "any objection by defense counsel would have been futile, and counsel cannot be held deficient for failing to make a futile objection." *Id.* at 359. The court concluded, based on "the credible affidavits of trial counsel, that the decision to allow this evidence without objection was part of counsel's reasonable trial strategy." *Id.* at 360. The finding was made that trial counsel was not deficient for failing to object to the evidence. *Id.* The court found that Mr. Milam "also fails to demonstrate prejudice from trial counsel's decision not to object because any objection would have been unsuccessful as the evidence was admissible." *Id.* Moreover, the court found that "there is no reasonable likelihood that, had counsel successfully objected to this evidence, the outcome of the trial would have been different because the State's evidence in support of [Mr. Milam's] propensity for future dangerousness was overwhelming." *Id.* at 361. The Texas Court of Criminal

Appeals subsequently denied Mr. Milam's State application for a writ of habeas corpus based on the trial court's findings and conclusions and on its own review. *Ex parte Milam*, 2013 WL 4856200, at *1.

The question of whether a defendant will pose a future danger if given a life sentence, instead of death, is a basic issue that is raised in capital murder cases, and the TCCA has specifically found that testimony regarding the possibility of violence in prison is relevant and admissible to the future dangerousness issue. *See Lucero v. State*, 246 S.W.3d 86, 97 (Tex. Crim. App. 2008), *cert. denied*, 555 U.S. 818, 129 S. Ct. 80 (2008). The State is permitted to present testimony that violence is prevalent within the prison system to rebut testimony that the prison system has a classification system and controls in place to maintain security and safety. *Threadgill v. State*, 146 S.W.3d 654, 670–71 (Tex. Crim. App. 2004). Consequently, in light of the structure and design of Texas's capital litigation, Larry Fitzgerald has regularly been called as a defense expert with respect to the future dangerousness issue to discuss the prison system's classification and statistics. *See Devoe v. Stephens*, No. A-14-CA-151-SS, 2014 WL 5684997, at *2 (W.D. Tex. Nov. 4, 2014); *Gonzales v. Stephens*, No. SA-10CA-165-OG, 2014 WL 496876, at *5 n.42 (W.D. Tex. Jan. 15, 2014); *Escobar v. State*, No. AP-76571, 2013 WL 6098015, at *28 (Tex. Crim. App. Nov. 20, 2013); *Velez v. State*, No. AP-76051, 2012 WL 2130890, at *31 n.10 (Tex. Crim. App. June 13, 2012) (describing Fitzgerald's testimony as accurate and the State's expert's testimony as inaccurate); *Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010). Defense counsel's decision to call Fitzgerald as a witness in this case regarding the prison system's classification and statistics was consistent with the prevailing practice and cannot be viewed as falling below an objective standard of reasonableness. Moreover, defense counsel's failure to object to admissible rebuttal evidence involving specific instances of violence cannot be viewed as falling below an objective standard of reasonableness in light of clearly established precedent in Texas courts.

Counsel was not required to make frivolous or futile objections. *Johnson*, 306 F.3d at 255; *Koch*, 907 F.2d at 527. Claim Number 8 lacks merit.

The claim should also be rejected because the decision to call Fitzgerald, along with the decision not to object to evidence of specific acts of violence in an attempt to disprove the defense theory, was reasoned trial strategy. Once again, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066. Federal courts "will not question a counsel's reasonable strategic decisions." *Bower*, 497 F.3d at 470. The present ineffective assistance of counsel claim lacks merit.

Claim Number 8 must be rejected becasue Mr. Milam has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Indeed, the State court appropriately found that trial counsel's actions on this claim were the product of trial strategy, and relief was denied. The decision was consistent with Supreme Court precedent. Finally, the ineffective assistance of counsel claim must be rejected because Mr. Milam has not satisfied the doubly deferential standard. Indeed, trial counsel's strategy alone is a reasonable argument for rejecting the ineffective assistance of counsel claim. Mr. Milam has not shown that he is entitled to federal habeas corpus relief on claim number eight.

**Claim Number 9:** **Trial counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment by failing to properly cross-examine Bryan Perkins in regards to bias in favor of Jesseca Carson, the co-defendant of Mr. Milam**

Claim Number 9 concerns the testimony of Bryan Perkins, a friend of Mr. Milam and Ms. Carson, who testified at both of their trials. Trial records reveal that Mr. Perkins testified during the punishment phase of Mr. Milam's trial as a State witness. 50 RR 17–54. He testified that he hired Mr. Milam to work as a tire buster at Big 5 Tire in Longview. *Id.* at 22. He testified that he acted as a father figure to both Mr. Milam and Ms. Carson. *Id.* at 35. He observed that Mr. Milam was the dominant one in the relationship. *Id.* at 37. Mr. Milam had "control issues." *Id.* Mr. Perkins testified that Mr. Milam had a temper and a short fuse. *Id.* at 41–42, 51. On one occasion, Mr. Milam told him, "with that baby, he and Jesseca would never really have a life." *Id.* at 45.

Mr. Milam argues that trial counsel was ineffective for failing to properly cross-examine Mr. Perkins regarding his bias in favor of Ms. Carson. On cross-examination in Ms. Carson's trial, Mr. Perkins admitted that he and Ms. Carson were recorded on jail calls where he stated:

1.      "We are getting a stronger case for you."

2.      "I've got this. You're getting out."

3.      "You're going to be out there some day, and you'll be standing next to me."

4.      "I'm out working with these guys just as hard as they are."[5]

Mr. Milam notes that State writ counsel claims that trial counsel admitted that he was aware of these conversations; nonetheless, trial counsel never cross-examined Mr. Perkins concerning this overwhelming evidence of bias. He argues that "We can only speculate how much weight the jury gave his testimony and whether they would have answered the special issues similarly if they had heard this evidence." *See* Petition, DOC. # 14,1 at 101.

---

[5] The transcript of Mr. Perkins' testimony from Ms. Carson's trial is located at 2 SHCR 251–88. Mr. Perkins' acknowledgment with respect to these statements is located at 2 SHCR 267–69.

The Director argues that Mr. Perkins was properly cross-examined for bias, and that the ineffective assistance of counsel claim must fail because Mr. Milam has not shown prejudice.

On cross-examination, trial counsel questioned Mr. Perkins regarding the fact that, prior to the murder, he considered Mr. Milam to be a friend whom he wanted to help out, but after the murder he refused to have anything to do with Mr. Milam. 51 RR 54. Mr. Perkins replied that he had "never seen him since then." *Id.* Mr. Perkins was excused as a witness and was on his way home when the defense decided to recall him to the stand. *Id.* at 129, 131. Trial counsel asked Mr. Perkins whether he had had any contact with Ms. Carson since the murder, and he admitted that they had exchanged letters and that he had visited her in jail on one occasion. *Id.* at 130. He agreed with trial counsel's assertion that he had been supportive of Ms. Carson since the murder. *Id.* at 130–31.

The issue of whether trial counsel's representation was deficient for failing to properly cross-examine Mr. Perkins regarding bias was fully developed during the State habeas proceedings. All three attorneys responded to the claim in their affidavits. Mr. Hagen addressed the issue as follows:

> The allegation that I failed to properly cross examine Bryan Perkins in regard to bias in favor of the co-defendant is simply not true. I did in fact cross examine Perkins on the subject of his relationship and contact with the co-defendant. Specifically, I questioned Perkins about the fact he had corresponded and visited with the co-defendant while she was in jail on this charge. Mr. Haas' assertion that I was aware of recorded conversations between Perkins and the co-defendant is not true. I never admitted to Mr. Haas, or anyone for that matter, that, during the course of my representation of Mr. Milam, I was aware of "jail calls" between Perkins and Jesseca Carson or the substance of those conversations. No such recordings were made known or available to me by the State in this case and I was unaware of the existence of any such recording.

1 SHCR 87. Co-counsel Moore provided an essentially identical response. *Id.* at 176. Co-counsel Jackson provided a similar statement. 2 SHCR 301.

After collecting all of the evidence compiled on this issue, the State trial court issued findings of fact regarding the claim. 3 SHCR 337–41. The trial court found that trial counsel Hagan cross-

examined Perkins about his relationship with Mr. Milam and Ms. Carson. *Id.* at 337–38. The trial court found that Perkins acknowledged that he considered Mr. Milam a friend before the murder but had "never seen him since then." *Id.* at 337. The court found that Perkins acknowledged on cross-examination that he had written to Ms. Carson since the murder, that he had visited her once in jail, and that he had been supportive of her. *Id.* at 338. With respect to Ms. Carson's trial, the trial court found that Perkins did not deny making any of the statements attributed to him in phone conversations with her, although he did not recall several of them. *Id.* at 339 (referencing portions of the transcript from Ms. Carson's trial located at 2 SHCR 267–69). The trial court found that, based on the credible affidavits of trial counsel, none of Mr. Milam's three attorneys "recalled knowing about the recorded 'jail call' conversation, nor did they believe any such recording was made available to them at trial." *Id.* at 340. The trial court finally found that "defense counsel established, through cross-examination, that, after the murder, Perkins was supportive of Jesseca but not of [Mr. Milam]." *Id.* at 341.

The trial court subsequently issued conclusions of law with respect to this claim. 3 SHCR 363–65. The court found that there was no deficient performance from trial counsel's cross-examination of witness Bryan Perkins. *Id.* at 363. The court found that trial counsel effectively cross-examined Mr. Perkins regarding his post-arrest contact with Ms. Carson and potential bias in her favor. *Id.* The trial court found that additional cross-examination of Mr. Perkins regarding "jail call" would have been cumulative. *Id.* at 363–64. The trial court finally found that "[t]here is no reasonable likelihood that the outcome of the trial would have been different had the jury heard the full extent of Perkins's [sic] support for Jesseca and belief in her innocence." *Id.* The Texas Court of Criminal Appeals subsequently denied Mr. Milam's State application for a writ of habeas corpus based on the trial court's findings and conclusions and on its own review. *Ex parte Milam*, 2013 WL 4856200, at *1.

The record does not support Mr. Milam's Claim Number 9 that trial counsel rendered ineffective assistance of counsel by failing to properly cross-examine Mr. Perkins in regards to bias in favor of Ms. Carson. Trial counsel cross-examined Mr. Perkins on the issue of bias and obtained admissions to establish bias. Mr. Milam claims that Mr. Perkins should have additionally been cross-examined with evidence of his phone calls to Ms. Carson, but such evidence would have been cumulative. An attorney is not ineffective because he rejects the temptation to "guild the lily" by asking variations of the same question. He may get more forcible responses; or the witness may simply deny the statements. Mr. Milam has not shown that trial counsel's representation was deficient with respect to the cross-examination of Mr. Perkins, and he failed to show prejudice.

Alternatively Claim Number 9 must be rejected becasue Mr. Milam has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Instead, he merely makes a conclusory claim that the "trial court's finding that Trial Counsel was not ineffective on this point resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States in *Strickland*, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* Petition, DOC. # 14, at 102. Finally, the ineffective assistance of counsel claim must be rejected because Mr. Milam has not satisfied the doubly deferential standard. Indeed, he made no effort to satisfy the doubly deferential standard. Mr. Milam has not shown that he is entitled to federal habeas corpus relief on claim number nine.

**Claim Number 10:** **The trial court erred in denying Mr. Milam's** *Batson v. Kentucky* **challenge to juror Jobess Shaw, after the trial court was made aware of the racial animus of the prosecutor in calling Ms. Shaw "an angry Black woman" in violation of equal protection and due process under the Fourteenth Amendment**

In the remainder of the claims, Mr. Milam raises issues that were presented to the Texas Court of Criminal Appeals on direct appeal. In claim number ten, he alleges that the State improperly used a peremptory challenge to strike juror Number 34, Jo Bess Shaw, who was of African-American descent, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986). He observed that the prosecutor had referred to her as an "angry black female." 38 RR 21.

At the conclusion of jury selection and before the jury was selected, Mr. Milam raised a *Batson* challenge to the State's use of a peremptory challenge to strike Ms. Shaw. In making his prima facie showing, trial counsel stated that Ms. Shaw was of African-American descent and that the State had peremptorily struck all three African-American prospective jurors within their strike range. 38 RR 17–18.

The State responded by noting that there were four African-Americans within the strike range and that Marcel Fingers was accepted by the State and was seated on the jury. 38 RR 18. The State added that the prosecutors "found her to be a completely satisfactory juror and had every intention of keeping her." *Id.* The State accepted that the reasons for striking the other three jurors were "completely and utterly race neutral and had nothing to do with the fact that they were African-American." *Id.* at 19.

The State then went on to specifically discuss Ms. Shaw and to offer race neutral reasons for its peremptory challenge. The State observed that her response to the questionnaire indicated that she was not in favor of the death penalty. *Id.* at 19. When asked to describe her personal feelings about the death penalty in Question 3, Ms. Shaw responded, "Following a capital murder I feel that a person

should get life imprisonment without the possibility of parole. There have been too many false convictions and people put to death that were innocent. I do not believe in the death penalty." *Id.* In response to Question 4, Ms. Shaw circled (e), "I believe we should abolish the death penalty, and I will have a difficult time voting to impose it, regardless of the facts of the case." *Id.* Ms. Shaw further stated that she did "not believe in the death penalty." *Id.* In response to Question 6 concerning whether she had any moral, religious, or personal beliefs that would prevent her from returning a verdict that would ultimately result in the execution of another human being, Ms. Shaw said, "Yes. I am a Christian and do not believe in killing." *Id.* In response to Question 11, "on a scale of 10 to 0, 10 being always give the death penalty and 0 being never, she circled 0." *Id.* In response to Question 14, she again stated that she does not believe in the death penalty for capital murder. *Id.* at 19–20. The State argued that Ms. Shaw was not a suitable juror, despite her later assertions that she could follow the law. *Id.* at 20. The State asserted that they did not leave anyone on the jury who circled (e) in response to Question 4. *Id.* Examples were given to illustrate the point.

Defense counsel, in response, observed that the State took approximately two hours questioning Ms. Shaw, which was more than anyone else other than juror number 36, Mr. Lucas, who was also African-American. *Id.* at 21. Counsel also noted that the prosecutor had referred to Ms. Shaw as an "angry black female." *Id.*

The prosecutor admitted that she made the comment after the questioning of Ms. Shaw was completed. *Id.* at 22. She added that she made the comment in response to Ms. Shaw's answers, because of her demeanor and the way she acted on the stand, but it had nothing to do with the fact that Ms. Shaw was African-American. *Id.* She also explained that she questioned Ms. Shaw for two hours because she thought "we would get her for cause, because looking at her questionnaire indicated to me that she would be challengeable for cause." *Id.* Defense counsel did not provide any additional

comments in response to the State's explanation. The trial court, in turn, overruled the *Batson* challenge. *Id.* at 23. The court specifically found that the State "did not exercise its peremptory strike based on a race-related reason." *Id.*

The Equal Protection Clause forbids the State from challenging potential jurors solely on the basis of their race. *Batson*, 476 U.S. at 89, 106 S. Ct. at 1719. Under *Batson*, a defendant must establish a prima facie case that the State exercised its peremptory challenges on the basis of race. *Id.* at 96, 106 S. Ct. at 1723 Once the defendant has established a prima facie case of discrimination, the burden shifts to the State to provide a race-neutral reason for each strike. *Id.* at 97, 106 S. Ct. at 1723. The trial court then makes a determination of whether the defendant has established purposeful discrimination. *Id.* at 98, 106 S. Ct. at 1724. A State court's finding of the absence of discriminatory intent is "a pure issue of fact" that is accorded great deference and will not be overturned unless clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 364–65, 111 S. Ct. 1859, 1868–69 (1991).

In the present case, Mr. Milam established a prima facie case that the State exercised its peremptory challenge to Ms. Shaw on the basis of race. The State, in turn, refuted the claim and provided race-neutral reasons for the strike focusing on Ms. Shaw's opposition to the death penalty. The prosecutor acknowledged that she referred to Ms. Shaw as an "angry black female," but her characterization of her as such was the product of her demeanor and the way she acted on the stand, and it had nothing to do with the fact that Ms. Shaw was African-American. She added that she questioned Ms. Shaw for two hours because she thought she could get Ms. Shaw to provide answers that would justify challenging her for cause. After hearing the race neutral reasons, the trial court found that the State did not strike Ms. Shaw based on a race-related reason. The court must accord the finding great deference, and Mr. Milam has not shown that the finding was clearly erroneous. The claim lacks merit.

In analyzing the claim on direct appeal, the Texas Court of Criminal Appeals discussed the Supreme Court's decision in *Batson* and rejected the claim as follows:

> Because the State offered race-neutral reasons for its strike and [Mr. Milam] failed to rebut those reasons, we hold that the trial judge did not clearly err in denying [Mr. Milam's] *Batson* challenge. [Mr. Milam's] fourth point of error is overruled.

*Milam*, 2012 WL 1868458, at *11. Claim Number 10 should be dismissed for the additional reason that Mr. Milam has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Instead, Mr. Milam merely presented the conclusory claim that the TCCA made "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, that the prosecutor did not strike Shaw out of racial animus despite calling her an 'angry black female' during voir dire." *See* Petition, DOC. # 14, at 105. Nonetheless, the trial court's finding of fact was reasonable based on the record before it. The finding of fact is presumed sound because Mr. Milam did not rebut the "presumption of correctness by clear and convincing evidence." *Miller-El*, 545 U.S. at 240, 125 S. Ct. at 2325 (citing § 2254(e)(1)). Federal habeas corpus relief must be denied since fairminded jurists of reason could disagree on the correctness of the State court's decision. *Richter*, 562 U.S. at 101, 131 S. Ct. at 786. All relief should be denied on Claim Number 10.

**Claim Number 11:** **The trial court erred in granting the State's challenge for cause of Juror Trzeciak, in violation of the Sixth and Fourteenth Amendments**

Claim Number 11 presents another claim with respect to the selection of the jury. Mr. Milam argues that the trial judge erred by granting the State's challenge for cause against veniremember

Trzeciak.  In support of the claim, he cites *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770 (1968); *Adams v. Texas*, 448 U.S. 38, 100 S. Ct. 2521 (1980); and *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844 (1985).

In a capital prosecution, a prospective juror is not subject to a challenge for cause merely because he is opposed to or has "conscientious scruples" about the death penalty.  *Witherspoon*, 391 U.S. at 515, 88 S. Ct. at 1773.  But,

> nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

*Id.* at 522 n.21, 88 S. Ct. at 1777 n.21.  The Supreme Court subsequently held that prospective jurors who can set aside their beliefs against capital punishment and honestly answer the special issues are not properly subject to challenge for cause.  *Adams*, 448 U.S. at 45, 100 S. Ct. at 2526.  On the other hand, prospective jurors can be challenged for cause if their views about the death penalty would prevent or substantially impair the performance of their duties in accordance with their instructions and oath.  *Witt*, 469 U.S. at 424, 105 S. Ct. at 852.  The Supreme Court provided the following explanation for the standard:

> That standard is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. We note that, in addition to dispensing with *Witherspoon*'s reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with unmistakable clarity.  This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.  What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.  Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite

impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [And] this is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 424–26, 105 S. Ct at 852–53 (footnote and quotations omitted).

Quoting *Adams* and *Witt*, the Fifth Circuit has reiterated the basic rule that a "prospective juror thus cannot be challenged for cause because of his opposition to capital punishment unless said opposition would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Varga v. Quarterman*, 321 F. App'x 390, 394 (5th Cir. 2009) (internal quotations omitted), *cert. denied sub nom Varga v. Thaler*, 558 U.S. 1078, 130 S. Ct. 797 (2009). "Excusal of a juror for cause in violation of *Witherspoon* is reversible error and not subject to harmless error review." *Id.* "Whether a juror is excludable under the *Witherspoon-Witt* standard is a question of fact." *Ortiz v. Quarterman*, 504 F.3d 492, 501 (5th Cir. 2007), *cert. denied*, 553 U.S. 1035, 128 S. Ct. 2428 (2008). The TCCA's determination of this rule "shall be presumed to be correct." *Id.* (citing 28 U.S.C. § 2254(e)(1)). A petitioner has the burden of rebutting the presumption of correctness by "clear and convincing evidence." *Id.*

The examination of prospective juror Jerry Trzeciak is as follows:

| | |
|---|---|
| THE COURT: | All right. Mr. Trzeciak. There are no right [or] wrong answers. You're entitled to your thoughts, your feelings, and your opinions. We're not going to argue with you, and we're not going to try to change your mind, whatever you say. We just need to know how you feel and if it affects your ability to be a fair and impartial juror in this case. Did you respond to my last question? |
| MR. TRZECIAK: | Yes, I did, the very last one. |
| THE COURT: | Tell us -- |
| MR. TRZECIAK: | My thought on that is -- I wanted to share with the Court that I don't believe there's a circumstance where I could condone or vote for the death penalty, based on my personal religious beliefs. |

| | |
|---|---|
| THE COURT: | All right. |
| PROSECUTOR: | Mr. Trzeciak, basically, you just wanted to come tell the Court that no matter what circumstances may be out there, you've already decided you could not consider the death penalty? |
| MR. TRZECIAK: | I cannot do that, yes. |
| PROSECUTOR: | Irrelevant of whatever that may be? |
| MR. TRZECIAK: | Irrelevant of whatever that may be. |
| PROSECUTOR: | You felt compelled to come tell us that now, rather than waiting to questioning, because you feel that strongly about it? |
| MR. TRZECIAK: | Well, I feel that strongly about it, and I didn't want to waste the Court's time in the future. I didn't know if that was going to be captured later on based upon the questionnaire that you put out, so I just wanted to let that be known now. |
| DEFENSE: | Sir, at some point in time -- but let's say that you sit on a jury and you find an individual guilty of capital murder, where you go to the second phase of the trial, where you have to answer -- basically, a jury doesn't get to decide life or death. What they decide is they answer questions. If the Court asks you or instructs you to render a true verdict, meaning will answer you these questions truthfully, the first one being in essence from listening to all the testimony, can you make a decision as to whether or not the defendant will be a danger to commit future acts of criminal violence, to be violent in the future? Could you answer that question truthfully, if so instructed? |
| MR. TRZECIAK: | Well, I'm going to try. I understand the question you're asking. If you're asking, I would then go back to -- in today's society, in my opinion and the opinion of my church, there's no justification for the death penalty. If I -- rendering some sort of verdict in phase two, the potential exists for the death penalty, I could not vote that way. <br> . . . |
| PROSECUTOR: | Basically, what you told me is this -- told us that you don't see any set of circumstances where the death penalty would be justified? |
| MR. TRZECIAK: | Right. |

| PROSECUTOR: | It sounds like -- and you've told us that you feel like you would be very compromised to have to be in a situation -- |
| MR. TRZECIAK: | That's correct. |
| | . . . |
| THE COURT: | Sir, let me ask you this question. Can you return a verdict which assesses the death penalty in a case? I understand you're never going to write "death penalty." |
| MR. TRZECIAK: | Right. |
| THE COURT: | But can you, in good conscience -- and I don't care what your answer is. I just need to know. Can you return a verdict which assesses a death penalty? |
| MR. TRZECIAK: | I could not. |

12 RR 74–80.

The State challenged Mr. Trzeciak for cause, which was granted by the trial court. *Id.* at 80–81. Mr. Milam objected, arguing that Mr. Trzeciak said that he would answer the questions truthfully, despite his views on the death penalty. *Id.* at 81. The trial court overruled the objection. *Id.*

Mr. Milam argues that the questioning of Mr. Trzeciak did not go far enough to disqualify him. Mr. Milam stresses that Mr. Trzeciak repeatedly stated that he would answer the questions truthfully. However, Mr. Milam's argument overlooks Mr. Trzeciak's statement that he could not vote in a way where the potential exists for the death penalty. He unequivocally stated that he could not vote for the death penalty. His response supports a conclusion that his opposition to capital punishment would prevent or substantially impair the performance of his duties as a juror. The trial court appropriately granted the State's challenge for cause in light of the Supreme Court's decisions in *Witherspoon*, *Adams*, and *Witt*. Claim Number 11 lacks merit.

Alternatively Claim Number 11 must be rejected in light of the decision by the TCCA. On direct appeal, the TCCA discussed *Witherspoon*, *Adams*, and *Witt*, and the aforementioned exchange. The ground of error was rejected as follows:

> On this record we cannot find that trial judge abused his discretion in granting the State's challenge for cause. Mr. Trzeciak's answers concerning his inability to assess the death penalty under any circumstances were sufficient to support the trial judge's conclusion that he would be substantially impaired in his abilities as a juror. Accordingly, we overrule [Mr. Milam's] third point of error.

*Milam*, 2012 WL 1868458, at *10. Mr. Milam incorrectly argues that the questioning of Mr. Trzeciak did not go far enough. The record makes it abundantly clear that Mr. Trzeciak would not impose the death penalty under any circumstances. The ground for relief should thus be denied for the additional reason that Mr. Milam has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. The court finds that Mr. Milam has not rebutted the presumption of correctness that must be accorded to the State court's decision by "clear and convincing evidence." All relief should be denied on Claim Number 11.

**Claim Number 12:**      **The trial court erred in allowing the State to comment upon Mr. Milam's failure to discuss the facts of the offense with the State's expert in violation of his previous order and Mr. Milam's Fifth Amendment right to remain silent**

**Claim Number 13:**      **The State knowingly created a false impression that Mr. Milam refused to speak about the facts of the offense to the State's and Defense's experts on advice of counsel, in violation of the Fourteenth Amendment to the United States Constitution**

Claim Number 12 and Claim Number 13 concern testimony the State elicited from two experts, in which the experts stated that they had not been allowed to discuss the facts of the underlying crime in their pre-trial examinations of Mr. Milam.

Some background is necessary before the court addresses the merits of these claims. The State filed a pretrial motion to have Dr. Edward B. Gripon conduct a psychological evaluation of Mr. Milam for purposes of rebuttal. 1 CR 69–71. Citing *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997), *cert. denied*, 522 U.S. 917, 118 S. Ct. 305 (1997),[6] the State indicated that it has reason to believe that Mr. Milam "has submitted to, or will submit to a psychiatric or psychological examination as to competency, sanity, mental retardation, future dangerousness, mitigation, and/or other mental health issues." 1 CR 69. The issue was brought up by defense counsel during voir dire. 22 RR 124–32. The defense agreed to allow the State's expert to examine Mr. Milam, with the provision that he not be asked about the facts of the offense. The defense asserted that it had not let its own experts talk to Mr. Milam about the crime, and that none of them "have used any information that they gained through him concerning the offense in forming any opinions." *Id.* at 124–25. The defense opposed inquiry into the facts on a number of grounds, including the right to remain silent. The State objected, arguing that once a defendant waives his right to remain silent by talking to experts, he cannot dictate the questions that he is asked. *Id.* at 126–27.

The trial court issued the following ruling:

All right. The Court has reviewed the cases submitted to it, and the Court -- primarily based upon language in *Chamberlain*, I am going to limit the interview to exclude the offense, with the understanding that defendant's experts will be precluded from offering any opinions, findings, conclusions, or opinions based upon any interview or conversations of the defendant, by the expert of defendant, concerning the offense itself. And, of course, this does not preclude any opinions, findings, or conclusions obtained from sources other than the defendant.

---

[6] In *Lagrone*, the TCCA held that a trial court may "order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, *or plans to introduce*, its own future dangerousness expert testimony." 942 S.W.2d at 611 (emphasis in original).

22 RR 132.

Mr. Milam argues that the State violated the trial court's ruling in the following exchange while

cross-examining Dr. Mark Cunningham during the punishment phase of the trial:

| | |
|---|---|
| PROSECUTOR: | When you interviewed the defendant in those 9 1/2 hours that you spent with him, you did not ask him one thing about the capital murder for which this jury has convicted him, did you? |
| DR. CUNNINHGAM: | That's correct. |
| PROSECUTOR: | Why? |
| DR. CUNNINGHAM: | Well, primarily because I was instructed by Counsel not to go into the circumstances, the events of the offense itself. |
| PROSECUTOR: | Really? |
| DR. CUNNINGHAM: | Yes, ma'am. |
| PROSECUTOR: | So you didn't talk to him about it, because the lawyers told you, "Don't ask him about it; don't talk to him about it"? |
| DR. CUNNINGHAM: | Yes, ma'am, . . . |

54 RR 73.

Defense counsel approached the bench and objected to the line of questioning. *Id.* at 74.

Counsel argued that the line of questioning impinged directly upon Mr. Milam's right to remain silent

and his assertion through counsel of his right to remain silent. *Id.* Counsel asked that the entire line

of questioning be stricken from the record. *Id.* The State responded, "He didn't remain silent. He

waived his right to remain silent, and in talking to the expert, he -- there is no such thing as a partial

waiver. Once you waive, you waive, and he's the one that waived." *Id.* at 75. The trial court overruled

the objection and gave Mr. Milam a running objection. *Id.* at 76.

The State resumed cross-examination and later asked:

| | |
|---|---|
| PROSECUTOR: | Okay.  Well, I'll come back to that.  But you do talk to capital murderers about the facts of the capital murder they've been convicted of. |
| DR. CUNNINGHAM: | Infrequently.  Most of the time I do not.  Most of the time defense counsels do not authorize a discussion about the capital offense.  The defendant retains a Fifth Amendment right not to incriminate himself, even for an evaluation that's being performed for sentencing purposes, . . . |

*Id.* at 76–77.

In rebuttal, the State called Dr. Tim Proctor, and questioned him about whether he discussed the underlying crime:

| | |
|---|---|
| PROSECUTOR: | Okay.  Now, you've told us that you spent a significant amount of time interviewing the defendant? |
| DR. PROCTOR: | Yes. |
| PROSECUTOR: | Were you permitted to talk to this defendant, Blaine Milam, about the facts of the capital murder case for which he has been convicted? |
| DEFENSE COUNSEL: | Objection.  Improper comment on the defendant's right or refusal to testify about the facts of the case. |

55 RR 180.  In a bench conference, Mr. Milam specifically objected under the provisions of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  *Id.* at 181.  The trial court overruled Mr. Milam's running objection, and Dr. Proctor finally answered "no" to the question.  *Id.* at 185.

Mr. Milam argues that the trial court erred in allowing the State's exchanges with Dr. Cunningham and Dr. Proctor in violation of Mr. Milam's Fifth Amendment right to remain silent and the trial court's previous order.

The Fifth Amendment forbids comment by the prosecution on a defendant's silence. *Griffin*, 380 U.S. at 615, 85 S. Ct. at 1233; *Gongora v. Thaler*, 710 F.3d 267, 274 (5th Cir. 2013), *cert. denied sub nom Stephens v. Gongora*, 134 S. Ct. 941 (2014). The prosecution may not treat a defendant's exercise of his Fifth Amendment rights as substantive evidence of guilt. *Gongora*, 710 F.3d at 274.

A defendant may, however, waive his Fifth Amendment right. The Supreme Court has concluded that, where a defendant presents psychiatric evidence at trial, the defendant has no Fifth Amendment privilege against the introduction of his court-ordered mental evaluation to rebut his expert's testimony. *Kansas v. Cheever*, 134 S. Ct. 596, 601 (2013); *Buchanan v. Kentucky*, 483 U.S. 402, 422–23, 107 S. Ct. 2906, 2917–18 (1987). The Fifth Circuit has accordingly held that if "a defendant requests an examination on the issue of future dangerousness or presents psychiatric evidence at trial, the defendant may be deemed to have waived the fifth amendment privilege." *Vanderbilt v. Collins*, 994 F.2d 189, 196 (5th Cir. 1993). "[W]hen a defendant introduces psychiatric evidence on a critical issue, he waives his fifth and sixth amendment objections to the state's psychiatric testimony, provided that the state's evidence is used solely in rebuttal and properly limited to the issue raised by the defense." *Williams v. Lynaugh*, 809 F.2d 1063, 1068 (5th Cir. 1987), *cert. denied*, 481 U.S. 1008, 107 S. Ct. 1635 (1987). The TCCA has thus held that "if a defendant breaks his silence to speak to his own psychiatric expert and introduces that testimony which is based on such interview, he has constructively waived his fifth amendment right to refuse to submit to the State's psychiatric experts." *Chamberlain*, 998 S.W.2d at 234.

The Supreme Court has recognized "that when a defendant chooses to testify in a criminal case, the Fifth Amendment does not allow him to refuse to answer related questions on cross-examination." *Cheever*, 134 S. Ct. at 601. "A defendant 'has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.'" *Id.* (quoting

*Fitzpatrick v. United States*, 178 U.S. 304, 315, 20 S. Ct. 944, 948–49 (1900)). In *Cheever*, the Supreme Court applied these same principals to find that evidence from the government's psychological expert was admissible to rebut the defendant's expert's testimony even though that rebuttal evidence would have been barred under the 5th Amendment had defendant not presented psychological evidence in his defense. *Id.*

In the present case, Mr. Milam waived his Fifth Amendment rights by speaking with his expert and then introducing that expert's testimony at trial. The State was entitled to question Dr. Cunningham about matters that would otherwise be protected by the Fifth Amendment. The State acted permissibly by not only rebutting that testimony with its own expert testimony, but by inquiring into the evidence used by those experts to arrive at their conclusions. The State's questions to the experts did not violate Mr. Milam's Fifth Amendment right to remain silent.

The State also did not violate the trial court's order. The trial court's order only limited—at Mr. Milam's request—the expert's questioning of Mr. Milam. The trial court made no mention of what the experts could be asked at trial. 22 RR 132. The State was entitled to question the experts on what information they relied upon in reaching their conclusions.

Claim Number 12 should also be rejected for the reasons provided by the TCCA in denying relief:

> First, the trial judge did not err. This line of questioning did not violate his pretrial order: That order limited only the questioning of [Mr. Milam], not the questioning of testifying experts. And the questioning did not violate [Mr. Milam's] Fifth Amendment right to remain silent. [Mr. Milam] broke his silence to speak to his own psychiatric expert and introduced testimony based on that interview, so he constructively took the stand, and waived the Fifth Amendment "in the same manner as would his election to testify at trial." The State was then entitled to offer rebuttal testimony limited to the issues raised by the defense expert. It was permissible for the State to test Dr. Cunningham's opinions by questioning him (and Dr. Proctor) about how Dr. Cunningham arrived at those opinions. [Mr. Milam] may not testify through a defense expert and then use the Fifth Amendment as a shield against cross-examination of that expert on disputed issues.

*Milam*, 2012 WL 1868458, at *18 (footnotes omitted). Mr. Milam has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Mr. Milam is not entitled to relief on Claim Number 12.

In Claim Number 13, Mr. Milam argues further that the State knowingly created a false impression that Mr. Milam refused to speak about the facts of the offense to the State's and Defense's experts on the advice of counsel, in violation of the Fourteenth Amendment to the United States Constitution. In support of the claim, he focuses on the Supreme Court's decision in *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173 (1959). The Director argues that the State did not violate *Napue*.

"[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269, 79 S. Ct. at 1177 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 342 (1935)). Moreover, the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153, 92 S. Ct. 763, 766 (1972) (quoting *Napue*, 360 U.S. at 269, 79 S. Ct. at 1177). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* (citations omitted). The Fifth Circuit applied the standards set forth in *Napue* and *Giglio* in *Kutzner v. Cockrell*, 303 F.3d 333, 337 (5th Cir. 2002), *cert. denied*, 536 U.S. 978, 123 S. Ct. 14 (2002). A petitioner must prove that the prosecution knowingly presented or failed to correct materially false testimony during trial. *Id.* To prove a due process violation, a petitioner must demonstrate: (1) that the testimony in question was actually false, (2) that the prosecutor was aware of the perjury, and (3) that

the testimony was material. *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996), *cert. denied*, 519 U.S. 995, 117 S. Ct. 487 (1996). Perjured testimony is material only when "there is any reasonable likelihood that [the false testimony] could have affected the judgment of the jury." *Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000) (quoting *Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997)), *cert. denied*, 531 U.S. 1134, 121 S. Ct. 902 (2001).

In the present case, no witness testified inaccurately, and the State left no false impression on the jury. Mr. Milam repeatedly asserts that the trial court made the decision not to allow the experts to discuss the facts of the crime. *See, e.g.*, Petition, DOC. # 14, at 122–23. His claim misrepresents the facts. The record clearly shows that the limits placed on the experts were at the behest of Mr. Milam and his counsel. The trial court simply honored their request. 22 RR 124–32. In the hearing, trial counsel informed the trial court that he had already instructed his experts not to discuss the facts of the offense, and for this reason, the State's expert should also be prohibited from discussing the facts of the crime with Mr. Milam. *Id.* at 124–26. Trial counsel cited *Lagrone* in asking for limits be placed on the experts. *Id.* at 126, 130. Counsel was clearly aware of *Lagrone*, and he wanted to take advantage of the *Lagrone* line of cases to place limits on the experts. The Director appropriately observed that Dr. Cunningham was instructed by trial counsel not to discuss the facts of the crime *before* the trial court ordered the State's expert to also limit his inquiry. The trial court merely granted the defense's request.

There is no reason to believe that the trial court would have limited these expert examinations had Mr. Milam not requested and strenuously argued in favor of the limitations. Mr. Milam cannot avoid responsibility for the decision by blaming the trial court for giving him exactly what he asked for. Therefore, when Dr. Cunningham testified that he was instructed not to inquire into the facts of the crime, 54 RR 73–78, and when Dr. Proctor testified that he was not able to speak with the Mr.

Milam about the facts of the capital murder case, 55 RR 185, they made no false statements and left no false impressions. Mr. Milam has not satisfied the first two prongs in the *Napue* analysis.

Finally, Mr. Milam has not shown that there were any false or misleading statements that were material. He appropriately discusses the concept of materiality. *See* Petition, DOC. # 14, at 123–24. He did not show, however, that false or misleading statements were made in this case that were material and affected the judgment of the jury. Overall, he has not satisfied any of the prongs in the *Napue* analysis. Claim Number 13 lacks merit.

Dr. Cunningham clearly explained he did not talk about the crime with Mr. Milam pursuant to instructions from counsel, that the failure to talk about a crime with a defendant is the norm, and that a defendant retains a Fifth Amendment right not to incriminate himself. 54 RR 77. The trial court's jury charge in both phases of the trial instructed the jury that a defendant may choose not to testify and that the failure to testify shall not be held against him. 4 CR 937, 983. The jury presumably followed the trial court's instructions and did not hold it against him to the extent that he exercised his rights under the Fifth Amendment.

Claim Number 13 should also be rejected for the reasons provided by the TCCA in denying relief:

> Third, there was no false testimony. Dr. Cunningham testified he was instructed by counsel not to inquire into the facts of the case, and Dr. Proctor testified that he was not able to speak with [Mr. Milam] about the facts of the case. These were true assertions. They do not conflict with [Mr. Milam's] request to the trial judge and the trial judge's order based on that request.

*Milam*, 2012 WL 1868458, at *19 (footnotes omitted). Mr. Milam has not rebutted the TCCA's finding of fact that there was no false testimony with clear and convincing evidence. He simply has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the

Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.  Mr. Milam is not entitled to relief on Claim Number 13.

**Claim Number 14:** **Prosecutorial misconduct in the sentencing-phase summation denied Mr. Milam his fundamental rights to a fair trial and his right to a reliable sentencing determination**

Mr. Milam argues that two portions of the State's closing arguments violated his rights under the Eighth Amendment.  He initially complains about the State's comments, which he describes as inflammatory, about his right to present mitigating evidence and to have that proffered evidence at least considered by the jury.  He correctly observed that the Supreme Court has held that he has a right to present mitigating evidence at his capital trial.  *See, e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 285, 124 S. Ct. 2562, 2570 (2004).

Mr. Milam initially complains about the following portions of the State's closing arguments:

PROSECUTOR:  Mitigating evidence is that which lessens a person's moral blameworthiness for what he's done.  And yes, you have heard evidence from his background that is unfortunate.  You have heard things that I can agree was not the perfect life growing up; however, the problem is, the fundamental problem is that the one type of mitigating evidence that could explain this, that I would suggest to you might be sufficient to explain this act and this conduct and this crime, is not here.  If there was evidence before you that this defendant had been horribly abused as a child, I could stand before you --

DEFENSE COUNSEL:  Again, Your Honor, we'll object.  Counsel's injecting her own personal thoughts and opinions, not basing her pleas on inferences from the evidence.

THE COURT:  All right.  I'll overrule the objection.

PROSECUTOR:  If there was some evidence like that before you, I could stand before you and argue to you or --

| | |
|---|---|
| DEFENSE COUNSEL: | Again, Your Honor, she is injecting her own thoughts, opinions, and beliefs. She's not making a plea to law enforcement. She's not asking the jurors to make a logical inference from the evidence. It's improper. We object to it. |
| THE COURT: | All right. I'll give you a running objection to that line of questioning. |
| DEFENSE COUNSEL: | Thank you, Your Honor. |
| PROSECUTOR: | Thank you, Your Honor. |
| | If he had been somehow horribly abused as a child, bitten, beaten, violated, perhaps that would be mitigating evidence that would lessen his moral blameworthiness sufficiently to warrant life. Folks, that's not here. As much -- as much as the Milam family did not do right over the years, they did not abuse their kids, and nobody else did either. That's not here. That's the bottom line, and I would suggest to you that really is the only kind of mitigating evidence that truly can explain why we're here and truly lessen moral blameworthiness for this. |

56 RR 151–53.

Mr. Milam argues that the prosecutor's assessment of his mitigating evidence violated his Eighth Amendment right to have "each juror . . . to consider and give effect to [his] mitigating evidence." *McKoy v. North Carolina*, 494 U.S. 433, 442–43, 110 S. Ct. 1227, 1233 (1990). He asserts that the argument misrepresents the definition of mitigating evidence and the jury's role in weighing it. He argues that the prosecutor wrongly told the jury that only being horribly abused by being bitten, beaten, and violated would lessen his moral blameworthiness. He notes that it would not have been lost on the jury that the prosecutor was describing what happened to the victim in this case. He also argues that the prosecutor wrongly told the jury, that in order to be mitigating, evidence must lessen the accused's moral blameworthiness. He stresses that *Tennard* mitigating evidence is any evidence that would serve as a basis for a sentence less than death to an individual juror. He argues that the

State's arguments misstated the law on mitigation, misstated the special issue, and prevented the jury from giving full effect to his mitigating evidence.

Texas law provides that mitigating evidence is "evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071, § 2(f)(4). The prosecutor's comments tracked the language of the statute. The prosecutor did not misrepresent the definition of mitigating evidence as provided by Texas law. Previous versions of Texas' statutory scheme precluded juries from giving full effect to mitigating evidence, but the current "capacious definition of mitigating evidence employed in the Texas statute can encompass virtually any mitigating evidence." *McCoskey v. Thaler*, 478 F. App'x 143, 150 (5th Cir. 2012) (internal quotation marks omitted) (quoting *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007)), *cert. denied*, 133 S. Ct. 843 (2013). It does not preclude the jury "from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* (internal quotation marks omitted) (quoting *Roach*, 220 F. App'x at 277). In the present case, the prosecutor's arguments did not prevent the jury from giving full effect to Mr. Milam's mitigating evidence.

Mr. Milam also argues that the prosecutor's argument was improper because she injected her own thoughts, opinions, and beliefs. It is well established under Texas law "that proper jury argument must fall within one of the following categories: (1) summary of the evidence; (2) reasonable deduction from the evidence; (3) in response to argument of opposing counsel; and (4) plea for law enforcement." *Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990). Improper remarks by a prosecutor "are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair." *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008) (quoting *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002)), *cert. denied*, 556 U.S. 1239, 129 S. Ct. 2378 (2009). "Such unfairness

exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or . . . the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred." *Id.* (quoting *Harris*, 313 F.3d at 245). "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464 (1986)).

The prosecutor's statements in this case must be viewed in context. Just moments earlier, defense counsel had argued, "Listen, we can all cry for things that happened in our life that wasn't pleasant. That is nothing compared to what we heard about what [Mr. Milam's] life has been like." 56 RR 97. Counsel then proceeded to describe Mr. Milam's lack of education and a family that condoned it, a family history of addiction issues which led to Mr. Milam's addiction problems, Mr. Milam's childhood illness and the impact it had on Mr. Milam's life suggesting that it was part of the "horrible hand that was dealt" to him. *Id.* at 97–101. Counsel then summed up the reasons why Mr. Milam should be given life instead of death because of the mitigating evidence:

> [Mr. Milam] is the reason for this system. He's the reason why we don't say, "Guilty, death penalty." He's the reason why we say, "listen, let's take a look at is he as [sic] a future danger?" . . .
> You know, then you get to the mitigation question. How many mitigating factors are there? In fact, I think I have like three pages written down here of factors through this kid's life that could be mitigating and need to be considered . . . .

*Id.* at 102. A prosecutor may respond to the arguments of defense counsel. The prosecutor's comments in this case were legally proper and appropriate in response to the arguments of defense counsel. The prosecutor's comments did not violate Texas law and did not make his trial fundamentally unfair. The first portion of Claim Number 14 lacks merit.

Alternatively first Portion of Claim Number 14 should be rejected for the reasons provided by the TCCA in denying relief:

> The prosecutor did not misstate the law on mitigation or the mitigation special issue. Article 37.071(f) provides that the jury "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." Nor did the prosecutor prevent the jury from giving effect to [Mr. Milam's] mitigating evidence. The argument was a fair rebuttal to defense counsel's argument that [Mr. Milam]
>
> > is the reason for this system. He's the reason why we don't say, 'Guilty, death penalty' . . . . How many mitigating factors are there? In fact, I think I have like three pages written down here of factors through this kid's life that could be mitigating and need to be considered. . . . That's why we don't let the mob mentality decide these cases, because everything that you've heard mitigates against giving this boy death.
>
> For these reasons, we find nothing in the prosecutor's remarks to reflect that she was asking the jury to forego its duty and automatically answer the special issues in such a way that [Mr. Milam] would receive the death penalty. The trial judge did not err in overruling [Mr. Milam's] objection.

*Milam*, 2012 WL 1868458, at *20 (footnotes omitted). Mr. Milam has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Instead, he does nothing more than track the language of § 2254(d), cite *Tennard*, and argue that relief should be granted. Mr. Milam is not entitled to relief on the first portion of Claim Number 14.

In the second portion of Claim Number 14, Mr. Milam complains that the State falsely argued that the jury had "no choice" but to assess the death penalty:

> Sometimes the death penalty is society's last line of self-defense, and it is, as Mr. Jimerson told you, the one thing that we have to hang onto our humanity. What does it say about our society that someone can do that? What does it say about that person, this defendant, that he can do that? And what would it say about our society for him

to not be given that ultimate penalty for it? He has earned it, and you know it's the only choice. Thank you.

56 RR 158. The Texas Court of Criminal Appeals rejected this portion of the claim because Mr. Milam did not object at trial; thus, it was barred by the contemporaneous objection rule. *Milam*, 2012 WL 1868458, at *20.

Applying the principles set forth in *Coleman, supra*, the Fifth Circuit has held that the "procedural-default doctrine precludes federal habeas review when the last reasoned state-court opinion addressing a claim explicitly rejects it on a state procedural ground." *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004), *cert. denied*, 543 U.S. 1124, 125 S. Ct. 1067 (2005). With this in mind, the Fifth Circuit has consistently held that the Texas contemporaneous objection rule constitutes an adequate and independent ground that procedurally bars federal habeas review of a petitioner's claims. *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007), *cert. denied*, 551 U.S. 1193, 128 S. Ct. 34 (2007); *Cardenas v. Dretke*, 405 F.3d 244, 249 (5th Cir. 2005), *cert. denied*, 548 U.S. 925, 126 S. Ct. 2986 (2006); *Dowthitt v. Johnson*, 230 F.3d 733, 752 (5th Cir. 2000) ("[T]he Texas contemporaneous objection rule is strictly or regularly applied evenhandedly to the vast majority of similar claims, and is therefore an adequate procedural bar."), *cert. denied*, 532 U.S. 915, 121 S. Ct. 1250 (2001). The State habeas court explicitly rejected the claim because Mr. Milam did not object to it at trial. Mr. Milam made no attempt to overcome the procedural default by demonstrating either cause and prejudice or a fundamental miscarriage of justice; the claim in procedurally defaulted. *See Turner*, 481 F.3d at 301.

In the alternative, the prosecutor's comments were an appropriate plea for law enforcement under Texas law. The second portion of Claim Number Fourteen is procedurally barred and devoid of merit. Mr. Milam has not shown that he is entitled to relief on Claim Number 14.

**Claim Number 15:** The Texas death penalty scheme violated Mr. Milam's rights against cruel and unusual punishment and due process of law under the Eighth and Fourteenth Amendments to the United States Constitution by requiring at least ten "no" votes for the jury to return a negative answer to the punishment issues

The remainder of Mr. Milam's claims concern challenges to the Texas death penalty statute that have been authoritatively rejected in prior appellate decisions. Claim Number 15 is a challenge to Texas' 10-12 rule,[7] which purportedly violates *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860 (1988). He argues that potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless unless nine others join them. If a majority of other jurors are firmly voting "yes," holdouts may feel obligated to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict. *Mills*, 486 U.S. at 383, 108 S. Ct. at 1870 ("common sense . . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation [citation omitted] unless they are expressly instructed to do so.").

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

> In his thirteenth point, [Mr. Milam] challenges the "10-12" rule, arguing that it violates his rights under the Eighth and Fourteenth Amendments because it leaves jurors in the dark about the fact that their failure to unanimously agree on an answer to either special issue results in a life sentence. This Court has rejected these challenges.

*Milam*, 2012 WL 1868458, at *20 (citing *Estrada v. State*, 313 S.W.3d 274, 306 (Tex. Crim. App. 2010); *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Druery v. State*, 225 S.W.3d 491 (Tex. Crim. App. 2007); *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004)). Claim Number 15 is presented in the same way it was presented to the Texas Court of Criminal Appeals as

---

[7]Sometimes referred to as the "12-10" rule.

point of error thirteen. Mr. Milam has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Instead, he merely states that the "Texas Court of Criminal Appeals declined to make factual findings on this issue and thus are not entitled to deference." *See* Petition, DOC. # 14, at 134. The Texas Court of Criminal Appeals, decided the case on the merits, and Mr. Milam has not shown that the decision involved an unreasonable application of clearly established law as determined by the Supreme Court of the United States. Relief is unavailable because Mr. Milam has not satisfied the requirements of § 2254(d).

Likewise, the Fifth Circuit has found that the type of argument Mr. Milam is bringing lacks merit. "In *Mills*, the Supreme Court held that the Eighth Amendment was violated because the jury instructions may have precluded the jury from considering mitigating evidence unless all twelve jurors agreed that a particular circumstance was supported by the evidence." *Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir. 2000) (citing *Mills*, 486 U.S. at 384, 108 S. Ct. at 1870), *cert. denied*, 531 U.S. 849, 121 S. Ct. 122 (2000). The Fifth Circuit held "that *Mills* is not applicable to the capital sentencing scheme in Texas." *Id.* "Under the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance." *Id.* at 288–89 (quoting *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994), *cert. denied*, 513 U.S. 1067, 115 S. Ct. 711 (1995)). Since deciding *Miller*, the Fifth Circuit has repeatedly rejected challenges to Texas' capital sentencing provisions based on *Mills*. *See, e.g.*, *Druery v. Thaler*, 647 F.3d 535, 542–43 (5th Cir. 2011), *cert. denied*, 565 U.S. 1207, 132 S. Ct. 1550 (2012); *Parr v. Thaler*, 481 F. App'x 872, 878–79 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 842 (2013); *Adams*, 421 F. App'x at 335–36.

Relief based on *Mills* is unavailable. Mr. Milam's challenge to the 10-12 rule lacks merit in light of clearly established Fifth Circuit precedent. Mr. Milam is not entitled to relief on Claim Number 15.

**Claim Number 16:** **The trial court committed constitutional error by charging the jurors that they had the discretion to decide whether a circumstance was mitigating**

In Claim Number 16, Mr. Milam complains about the jury charge as it relates to the jury's consideration of mitigating evidence. Consistent with Article 37.071 § (2)(f)(4), the trial judge charged the jury that it "shall consider mitigating evidence that a juror *might regard* as reducing the defendant's moral blameworthiness." 4 CR 982 (emphasis added). Mr. Milam argues that both the statute and the court's instruction violate the Eighth Amendment, which permits jurors no such discretion. He stressed that the Supreme Court's "cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S. Ct. 757, 761 (1998) (citations omitted). He added that the Court has held that such mitigating circumstances as a defendant's good conduct in jail is "by its nature relevant to the sentencing determination." *Tennard*, 542 U.S. at 285, 124 S. Ct. at 2571 (quoting *Skipper v. South Carolina*, 476 U.S. 1, 6, 106 S. Ct. 1669, 1672 (1986)). Mr. Milam cited his mitigating evidence of good jail conduct and constitutionally relevant factors, such as low intelligence, problems with school, love and dedication to family, and psychologically damaging physical trauma. He asserts that the statute misinforms jurors that they can refuse to treat mitigating evidence as mitigating, resulting in structural constitutional error requiring reversal. *Nelson*, 472 F.3d at 314–15.

Mr. Milam's reliance on *Nelson* is misplaced. Nelson was sentenced under the pre-1991 sentencing scheme, which did not include a mitigating special issue. *Blue*, 665 F.3d at 667. The Fifth Circuit has concluded "that the amended statute does *not* unconstitutionally 'preclude[] [the jury] from considering, as a mitigating factor, any aspect of the defendant's character or record and any of the

76

circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001) (quoting *Lockett*, 438 U.S. at 604, 98 S. Ct. at 2964–65) (emphasis in original), *cert. denied*, 534 U.S. 945, 122 S. Ct. 329 (2001). The statutory definition of mitigating evidence does not limit the evidence considered under the mitigating special issue because "virtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability' apart from its relevance to the particular concerns embodied in the Texas special issues." *Beazley*, 242 F.3d at 260 (emphasis in original) (quoting Graham v. Collins, 506 U.S. 461, 476, 113 S. Ct. 892, 902 (1993)). More recently, the Fifth Circuit stressed that it "has reaffirmed its holding in *Beazley* in at least four unpublished decisions." *Blue*, 665 F.3d at 666. The Court specifically held that *Nelson* did not overturn *Beazley*. *Id.* at 667. Claim Number 16 lacks merit in light of clearly established law as decided by the Fifth Circuit.

The claim must also be denied in light of 28 U.S.C. § 2254(d). The Texas Court of Criminal Appeals denied relief on direct appeal, concluding that it had previously rejected this claim. *Milam*, 2012 WL 1868458, at *20 (citing *Estrada*, 313 S.W.3d at 306; *Threadgill*, 146 S.W.3d at 671). Claim Number 16 is presented in the same way it was presented to the Texas Court of Criminal Appeals as point of error fourteen. Mr. Milam has not shown, as required by § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Instead, he merely states that the Texas Court of Criminal Appeals' finding was contrary to *Buchanan*, but the Fifth Circuit has repeatedly rejected such arguments. In *Blue*, the Fifth Circuit found that the decision in *Beazley* that "the new special-issue scheme is constitutional is very strong evidence that it was reasonable for the CCA to reach the same conclusion."

*Blue*, 665 F.3d at 666. Claim Number 16 should be denied because it lacks merit and because Mr. Milam has not satisfied his burden under § 2254(d).

**Claim Number 17:** **The Texas death penalty scheme violates Mr. Milam's right against cruel and unusual punishment, an impartial jury, and due process of law under the Sixth, Eighth, and Fourteenth Amendments because of vague and undefined terms in the jury instructions at the punishment phase of the trial that effectively determine the difference between a life sentence and the imposition of the death penalty**

Mr. Milam next complains that the terms used in the jury instructions are vague and undefined. He argues that the failure to define the terms violates his rights under the Sixth, Eighth, and Fourteenth Amendments. He cites the terms "probability," "criminal acts of violence" and "continuing threat to society."

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

> In his fifteenth point, [Mr. Milam] argues that the trial judge's failure to define "probability," "criminal acts of violence," or "continuing threat to society" violated the constitutional requirement that each statutory aggravating circumstance genuinely narrows the class of persons eligible for the death penalty. We have repeatedly held that the trial judge need not define such terms because we presume that the jury understands them.

*Milam*, 2012 WL 1868458, at *21 (citing *Russeau v. State*, 291 S.W.3d 426, 434–35 (Tex. Crim. App. 2009); *Druery*, 225 S.W.3d at 509; *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007)).

Claim Number 17 is presented in the same way it was presented to the Texas Court of Criminal Appeals. Mr. Milam has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Relief is unavailable because Mr. Milam has not satisfied the requirements of § 2254(d).

The claim should also be denied because it lacks merit in light of clearly established federal law as decided by the Fifth Circuit. The terms "probability," "continuing threat to society," and "criminal acts of violence," have a "common-sense core of meaning and that criminal juries should be capable of understanding them." *Paredes v. Quarterman*, 574 F.3d 281, 294 & n.17 (5th Cir. 2009) (citing *Jurek*, 428 U.S. at 279, 96 S. Ct. at 2959) (White, J., concurring). More recently, the Fifth Circuit rejected the same basic claim with the following explanation:

> In this claim, Rivas complains that his due process rights were violated by the trial court's instructions to the jury with special issues that contained allegedly vague and undefined terms. Specifically, Rivas complains of the trial court's failure to define the terms "probability," "criminal acts of violence," and "continuing threat to society," included in the first special issue submitted to the jury. As with his previous claim, Rivas acknowledges that this claim is foreclosed by circuit precedent holding that these terms are not unconstitutionally vague and that their meanings may be readily understood. *See, e.g.*, *Woods v. Johnson*, 75 F.3d 1017, 1033–34 (5th Cir. 1996); *James v. Collins*, 987 F.2d 1116, 1119–20 (5th Cir. 1993); *Nethery v. Collins*, 993 F.2d 1154, 1162 (5th Cir. 1993). Rivas again maintains this argument to preserve it for further review. We deny a COA on this claim.

*Rivas v. Thaler*, 432 F. App'x 395, 405 (5th Cir. 2011) (footnote omitted), *cert. denied*, 565 U.S. 1096, 132 S. Ct. 850 (2011). The cases cited by the Fifth Circuit reveal that this issue was settled in the 1990s. Moreover, the Director persuasively argued that the claim is *Teague*-barred. Mr. Milam is not entitled to relief on Claim Number 17.

**Claim Number 18:** **Texas prosecutors' unfettered and unreviewable discretion violates equal protection, due process, and the Eighth Amendment**

In Claim Number 18, Mr. Milam argues that Texas prosecutors' unfettered discretion in seeking the death penalty is unconstitutional. He complains that Texas lacks statewide standards governing the discretion of local prosecutors to seek or decline to seek the execution of death eligible defendants. In support of his equal protection claim, he cites the vote counting standards articulated in *Bush v. Gore*, 531 U.S. 98, 121 S. Ct. 525 (2000). He noted that the Supreme Court held that a "State may not, by . . . arbitrary and disparate treatment, value one person's vote over that of another."

*Id.* at 104–05, 121 S. Ct. at 530. He argues that Texas does just that in the context of capital punishment and the result is disparate treatment of similarly situated defendants.

The Fifth Circuit has rejected similar equal protection challenges to prosecutorial discretion, specifically noting "*Bush v. Gore*'s utter lack of implication in the criminal procedure context." *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006) (citations omitted), *cert. denied*, 549 U.S. 1343, 127 S. Ct. 2030 (2007). The Fifth Circuit subsequently rejected another claim alleging "disparate treatment of similarly situated people accused of capital offenses" based on *Bush v. Gore* as foreclosed by *Coleman*. *Chi v. Quarterman*, 223 F. App'x 435, 439 (5th Cir. 2007), *cert. denied*, 551 U.S. 1193, 128 S. Ct. 34 (2007); *see also White v. Thaler*, 522 F. App'x 226, 235 (5th Cir. 2013) (Equal protection claim based on *Bush v. Gore* "is not well taken."), *cert. denied*, 134 S. Ct. 907 (2014).

Mr. Milam also argues that the unfettered discretion of prosecutors in deciding to seek the death penalty violates due process. He asserts that due process requires a three-part balancing of: (1) the private interest "affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used"; and (3) the State's interest, including the burden entailed. *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S. Ct. 893, 903 (1976). He argues that Texas fails this test. He notes that the right to life could not be more fundamental. He argues that the lack of statewide standards and absolute discretion in each elected Texas district attorney increase the risk of erroneous deprivation by failing to ensure that the death penalty is limited to "the most serious adult criminal conduct." *Atkins v. Virginia*, 536 U.S. 304, 306, 122 S. Ct. 2242, 2244 (2002). He also argues that the unfettered discretion of prosecutors amounts to cruel and unusual punishment in violation of the Eighth Amendment. *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 195, 96 S. Ct. 2909, 2935 (1976).

The Director persuasively argued in response that Mr. Milam's concern over the discretion placed in the hands of district attorney's offices is misplaced. Prosecutorial "discretion is essential to

the criminal justice process." *McCleskey v. Kemp*, 481 U.S. 279, 297, 107 S. Ct. 1756, 1770 (1987). The Supreme Court expressly rejected the complaint that the "state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense." *Gregg*, 428 U.S. at 199, 96 S. Ct. at 2937. "In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S. Ct. 663, 668 (1978). The discretion is tempered only by the Equal Protection Clause, meaning the selectivity in choosing when to seek the death penalty does not amount to a federal violation so long as it is not "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* at 668–69, 98 S. Ct. at 668–69 (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S. Ct. 501, 506 (1962)).

In the present case, Mr. Milam makes no allegation that the prosecutor sought the death penalty against him because of his race, ethnicity, or some other arbitrary classification. He merely alleges a broad complaint about the prosecutor's discretion. Mr. Milam has not shown a violation of the Constitution; Claim Number 18 lacks merit.

The claim must also be denied in light of 28 U.S.C. § 2254(d). The Texas Court of Criminal Appeals denied relief on direct appeal as follows:

> In his sixteenth point, [Mr. Milam] argues that the State's unfettered, standardless, and unreviewable discretion to seek the death penalty violates his rights under the Equal Protection and Due Process Clauses and results in cruel and unusual punishment. We have repeatedly rejected these contentions.

*Milam*, 2012 WL 1868458, at *21 (citing *Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007); *Hankins v. State*, 132 S.W.3d 380, 387 (Tex. Crim. App. 2004); *Threadgill*, 146 S.W.3d at 671; *Matamoros v. State*, 901 S.W.2d 470, 478 (Tex. Crim. App. 1995)). Claim Number 18 is presented in the same way it was presented to the Texas Court of Criminal Appeals as point of error

sixteen. Mr. Milam has not shown, as required by § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Instead, he asserted since the "Texas Court of Criminal Appeals did not make any findings on this issue, [] their factual findings are not entitled to any deference." *See* Petition, DOC. # 14, at 143. However, the decision by the Texas Court of Criminal Appeals was purely a matter of law, and Mr. Milam has not shown that it was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. Claim Number 18 should be denied because it lacks merit and because Mr. Milam has not satisfied his burden under § 2254(d).

> **Claim Number 19:** **The Texas death penalty scheme violates due process of the Fourteenth Amendment because the punishment special issue related to mitigation fails to require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi* and its progeny**

In Claim Number 19, Mr. Milam argues that the Texas death penalty scheme violates due process because the special issue related to mitigation fails to require the State to prove the *absence* of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and its progeny. His discussion of the claim does not develop his *Apprendi* argument; instead, he focuses on Justice Blackmun's lengthy dissenting opinion in *Callins v. Collins*, 510 U.S. 1141, 1143–59, 114 S. Ct. 1127, 1128–38 (1994).

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

In his seventeenth point, [Mr. Milam] argues that the Texas death-penalty scheme violates due process because the mitigation special issue fails to require the State to prove the absence of mitigating circumstances beyond a reasonable doubt, contrary to the *Apprendi* line of cases. . . . We have rejected these claims.

82

*Milam*, 2012 WL 1868458, at *21 (citing *Smith v. State*, 297 S.W.3d 260, 278 (Tex. Crim. App. 2009); *Fuller v. State*, 253 S.W.3d 220, 234 (Tex. Crim. App. 2008); *Escamilla*, 143 S.W.3d at 828). Claim Number 19 is presented in the same way it was presented to the Texas Court of Criminal Appeals as point of error seventeen. In response, Mr. Milam merely states that the "Texas Court of Criminal Appeals made no factual findings on this issue, and is not entitled to deference on this point." *See* Petition, DOC. # 14, at 147. Other than this conlusory comment, he has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Relief is unavailable because Mr. Milam has not satisfied the requirements of § 2254(d).

The claim should be also rejected because it lacks merit in light of clearly established circuit precedent. The Fifth Circuit has "specifically held that the Texas death penalty scheme did not violate either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the *absence* of mitigating circumstances." *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007) (emphasis added). Following *Scheanette*, the Fifth Circuit repeatedly rejected this same argument. *Allen v. Stephens*, 805 F.3d 617, 626–28 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 2382 (2016); *Sprouse v. Stephens*, 748 F.3d 609, 623 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 477 (2014); *Cobb v. Thaler*, 682 F.3d 364, 381 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 933 (2013); *Blue*, 665 F.3d at 668–69; *Ortiz*, 504 F.3d at 504–05. Again, the claim lacks merit.

Finally, Justice Blackmun's dissenting opinion in *Callins* has never been accepted, and the Fifth Circuit has observed that reasonable jurists could not debate a district court's decision rejecting such arguments. *Hughes v. Dretke*, 412 F.3d 582, 594 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177,

126 S. Ct. 1347 (2006); *see also Bigby v. Stephens*, 595 F. App'x 350, 355 (5th Cir. 2014) (citing

*Hughes*, 412 F.3d at 594), *cert. denied*, 135 S. Ct. 2359 (2015). Moreover, even if the claim had merit,

the Fifth Circuit observed that it would be *Teague*-barred. *Hughes*, 412 F.3d at 594. Mr. Milam is not

entitled to relief on Claim Number 19.

> **Claim Number 20:** **The trial court erred by admitting the irrelevant and prejudicial evidence of Mr. Milam's father's racial prejudice in the punishment phase of the trial, in violation of equal protection, right to a fair trial, and due process. Additionally, because trial counsel and appellate counsel failed to set out the proper constitutional construct for this claim, and was thus ineffective, and the State habeas counsel failed to bring this claim on direct collateral review in the State court, this claim should be considered pursuant to *Martinez*.**

Claim Number 20 concerns the trial court admitting evidence of Mr. Milam's father's racial

prejudice during the punishment phase of the trial. The evidence came in during the testimony of Mr.

Milam's friend Chris Lay. The defense began the exchange as follows:

| | |
|---|---|
| DEFENSE: | Okay. Now, you grew up with [Mr. Milam] throughout the years. |
| MR. LAY: | Yes, sir. |
| DEFENSE: | Let me back up. In growing up with [Mr. Milam], you said he's slow. Describe -- are you talking about educationally slow -- |
| MR. LAY: | Educationally. |
| DEFENSE: | -- or mentally slow? |
| MR. LAY: | Educationally, because, I mean, he got pulled out of school in the fourth grade because people picking on him, you know. His dad got tired of it and said he didn't want him in school no more, if everybody was going to mess with him like that. |

53 RR 12.

On cross-examination, the prosecutor revisited the topic of Mr. Milam being pulled out of school:

PROSECUTOR:       Okay.  Now, you told us that he got pulled out of school because of the fact that kids were picking on him.

MR. LAY:          Right.

PROSECUTOR:       There was also some sort of a paddling thing --

MR. LAY:          Yes, ma'am.

PROSECUTOR:       -- right?  And in conjunction with this paddling thing, there was another reason why he got pulled out of school, too, wasn't there?

MR. LAY:          This -- he was picked on, and stuff like that, and his dad was fed up.

PROSECUTOR:       And you've -- you visited with Missy, our investigator, over the weekend, right?

MR. LAY:          She called me.

PROSECUTOR:       Yeah.  And y'all talked.

MR. LAY:          Yes, ma'am.

PROSECUTOR:       And you told her that part of the reason why he got pulled out of school was because his dad was upset because his principal was black.

MR. LAY:          Well, he was upset because -- yeah, that, too.

PROSECUTOR:       Okay.  And, I mean, that's not -- that's what you told her.

MR. LAY:          Right.

        MR. HAGAN:        May we approach.  Your Honor?

        THE COURT:        Yes.

        (Conference at the Bench:)

MR. HAGAN: I cannot believe that the State is introducing the racial prejudice of this defendant's father into these proceedings. There was absolutely -- I want to hear the excuse, but there is no excuse for bringing in the racial prejudice of this man's father.

MRS. TANNER: She asked him about the paddling incident. He said the paddling incident -- he explained the paddling incident, and then he told her that the reason why he was pulled out of school was because the dad was so upset because he was a black principal. That's what the --

MR. HAGAN: I want to hear this out of the record. He did not introduce that; she did. And I want to make a record on it.

THE COURT: The record speaks for itself. Let's go ahead.

MRS. TANNER: Thank you.

(Conclusion of Bench conference).

MR. HAGAN: Your Honor, at this time, we make objection to the last question and answer that the State proposed, under Rule 403. Ask the Court to make a balancing test on the unfair prejudicial nature of introducing the racial bias of this man's father into this proceeding.

THE COURT: I'll overrule the objection.

MR. HAGAN: Move for a mistrial.

THE COURT: Denied.

53 RR 23–25. It is noted that the prosecutor did not ask any additional questions on this point, and the witness was dismissed soon thereafter. 53 RR 25.

Mr. Milam argues that it was irrelevant that the principal who paddled him was African-American. The point was that Mr. Milam was bullied during school and removed from school by his father, causing him to be largely uneducated. He argues that his father's racial bias was not of his doing. Mr. Milam noted that his attorney objected to the evidence pursuant to Rule 403 of the Texas

Rules of Evidence. He argues that the complained of testimony had no relevance to the issues, and the prejudicial effect greatly outweighed the probative value, if any. He argues that the admission of the testimony was error. Moreover, the gratuitous injection of irrelevant and prejudicial racial prejudice would have had a substantial and injurious effect on the verdict in the case and requires reversal. He noted that of particular harm in this case, one of the jurors who sentenced him to death was African-American. He argues for the first time that counsel should have raised the issue in terms of the Equal Protection Clause of the Fourteenth Amendment as well as the right to a fair and unbiased trial. He complains that trial and appellate counsel failed to bring the claim in terms of a constitutional construct; thus, State habeas counsel's failure to allege this error should be reviewed in light of *Martinez*.

In response, the Director noted that Mr. Milam's presentation of the claim omitted a discussion of additional salient facts. Before another witness was called, the defense established, outside the presence of the jury, that a black female juror was seated on the jury, and accused the State of eliciting testimony regarding Mr. Milam's father's racial prejudice for the purpose of prejudicing this juror against him. 53 RR 26–27. The prosecutor then clarified her reasons for asking the question:

> This was -- the witness testified that the defendant was pulled out of school solely because kids were picking on him. The witness had, just over the weekend, told our investigator that he was pulled out of school because he had been spanked by the principal, and the dad was upset about the principal spanking him, and he was black. It was to refute what they testified, the false impression they gave to the jury. That's all.

53 RR 27. After defense counsel renewed his request for a mistrial, the prosecutor clarified her reasons once again:

> And let me say this. If the witness hadn't have told our investigator not 24 hours ago that that's why he was pulled out, I wouldn't have asked the question, but that's what he said, which is directly contrary to what it was. Now, if I said, "Now, isn't it true," when I had no good faith basis to believe it, that would be fundamentally different.

53 RR 29. The court overruled defense counsel's motion for a mistrial, but agreed to instruct the jury "not to regard any racial statement in made by another person in connection with this defendant." 53 RR 28–29.

The trial court subsequently gave the jury the following limiting instruction:

I want to instruct you concerning some prior testimony this morning. You're not to hold any alleged racial statements allegedly made by this defendant's father against this defendant, or infer that this statement or these statements are or is the belief or view of this defendant, and any racial content of any alleged statement is not to be inferred upon this defendant.

53 RR 49.

On direct appeal, Mr. Milam argued that the trial court committed reversible error by allowing the admission of this evidence over his objection pursuant to Texas Rules of Evidence 403. The Texas Court of Criminal Appeals denied relief, concluding that the jury was instructed not to hold Mr. Milam's father's racism against him. *Milam*, 2012 WL 1868458, at *15. The Texas Court of Criminal Appeals added that there was "no indication that the jury disregarded the trial judge's instruction, and we must presume that it followed those instructions." *Id.* (citing *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005)).

Mr. Milam relies on two arguments. The first argument focuses on the trial court's evidentiary ruling. Grounds for relief based on State evidentiary rulings ordinarily are not cognizable on federal habeas review. *Wood*, 503 F.3d at 414; *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) ("Errors of state law, including evidentiary errors, are not cognizable in habeas corpus as such."). Still, an evidentiary ruling may violate the Due Process Clause if the evidence is "so unduly prejudicial that it renders a trial fundamentally unfair." *Wood*, 503 F.3d at 414 (quoting *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S. Ct. 2597, 2608 (1991)). "[T]he erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's

conviction." *Id.* (quoting *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998)). Finally, "[a]ssuming arguendo that the admission of [this evidence] was constitutional error, [the] claim still fails [if the petitioner] has not shown that the testimony had a 'substantial and injurious effect or influence in determining the jury's [] verdict.'" *Id.* (quoting *Janecka v. Cockrell*, 301 F.3d 316, 328–29 (5th Cir. 2002)). Mr. Milam goes no further than to argue that the trial court erred in admitting the evidence. He has not shown that the claim is cognizable in this habeas proceeding. Moreover, he has not shown that the evidence was so highly prejudicial that it rendered his trial fundamentally unfair. Finally, as noted by the Texas Court of Criminal Appeals, the jury was given a limiting instruction, and presumably the jury followed that instruction. Mr. Milam has not shown that he is entitled to relief based on the first part of the claim.

Mr. Milam's second argument on this point is that the claim may be reviewed in the context of an ineffective assistance of counsel claim in light of *Martinez*:

> The introduction of racial animus on the part of Mr. Milam's family was thus prejudicial to Mr. Milam and violated the equal protection of the Fourteenth Amendment as well as the right to a fair and unbiased trial. Trial Counsel and Appellate counsel did not bring this claim in terms of a Constitutional Construct and thus State habeas counsel's failure to allege this error should be review[ed] in light of *Martinez*.

*See* Petition, DOC. # 14, at 151. Mr. Milam did not develop the issue under *Martinez*. He did not show how any of his attorneys engaged in representation that was deficient with respect to this matter. At best, he alludes to a possible objection based on a denial of equal protection. He likewise failed to show prejudice. Furthermore, any effort to show prejudice would be difficult in light of the limiting instruction. The second part of the claim must be rejected because Mr. Milam failed to adequately brief it; thus, it is waived. *Summers v. Dretke*, 431 F.3d 861, 870 (5th Cir. 2005), *cert. denied*, 549 U.S. 840, 127 S. Ct. 353 (2006); *Woods v. Cockrell*, 307 F.3d 353, 357 (5th Cir. 2002); *Yohey v. Collins*, 985 F.2d 222, 224–25 (5th Cir. 1993). The argument is also conclusory, which is insufficient

to support a petition for a writ of habeas corpus. *See Miller*, 200 F.3d at 282; *Koch*, 907 F.2d at 530; *Ross*, 694 F.2d at 1011. Finally, the second argument is unexhausted and Mr. Milam has not shown cause and prejudice to overcome the procedural default. Mr. Milam has not shown that he is entitled to relief on Claim Number 20.

> **Claim Number 21:** **The cumulative effect of the above-enumerated constitutional violations denied Mr. Milam due process of law in violation of the Fifth and Fourteenth Amendments**

In his final claim, Mr. Milam argues that the cumulative effect of the various constitutional violations denied him due process of law, in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

The Texas Court of Criminal Appeals rejected the claim on direct appeal as follows:

> In points nineteen and twenty, [Mr. Milam] contends that the cumulative effect of these constitutional and statutory infringements violates the state and federal constitutions. Having found no such violations, we hold that these claims are without merit.

*Milam*, 2012 WL 1868458, at *21. Mr. Milam has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Relief is unavailable because Mr. Milam has not satisfied the requirements of § 2254(d).

Claim Number 21 must also be rejected in light of clearly established federal law. The Fifth Circuit has regularly rejected general cumulative error claims, noting that federal habeas relief is available only for cumulative errors that are of constitutional dimension. *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007); *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997), *cert. denied*, 522 U.S. 880, 118 S. Ct. 204 (1997); *Yohey*, 985 F.2d at 229. The Fifth Circuit has emphasized that

"[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (citing *Derden*, 978 F.2d at 1461), *cert. denied*, 519 U.S. 1094, 117 S. Ct. 773 (1997).

## VI. CONCLUSION

Having carefully considered all of Mr. Milam's claims, the court is of the opinion, and so finds, that he has not shown that he is entitled to federal habeas corpus relief and his petition should be denied.

## VII. CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order issued in a federal habeas corpus proceeding "[u]nless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Mr. Milam has not yet filed a notice of appeal, the court may address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1603 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). "When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should

issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484, 120 S. Ct. at 1604.

In this case, reasonable jurists could not debate the denial of Mr. Milam's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El*, 537 U.S. at 327, 123 S. Ct. at 1034 (citing *Slack*, 529 U.S. at 484, 120 S. Ct. at 1064). The court thus finds that Mr. Milam is not entitled to a certificate of appealability as to his claims. It is accordingly

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and the case is **DISMISSED** with prejudice. It is further

**ORDERED** that a certificate of appealability is **DENIED**. It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

So **ORDERED** and **SIGNED** this **16** day of **August, 2017.**

_____
Ron Clark, United States District Judge