1          REPORTER'S RECORD
          VOLUME 39 OF 74 VOLUMES
2       TRIAL COURT CAUSE NO.  CR09-066

3  THE STATE OF TEXAS          )   IN THE DISTRICT COURT
                               )
4  VS.                         )   OF RUSK COUNTY, TEXAS
                               )
5  BLAINE KEITH MILAM          )   4TH JUDICIAL DISTRICT

6

7       _____

8                JURY TRIAL,  5/3/10

9       _____

10

11

12                (Appearances listed next page)

13

14

15

16

17

18

19

20      On the 3rd day of May, 2010, the following proceedings

21  came on to be heard in the above-entitled and numbered cause

22  before the Honorable Clay Gossett, Judge Presiding, and a

23  jury, held in Conroe, Montgomery County, Texas.

24      Proceedings reported by computerized stenotype machine.

25

ORIGINAL

| | |
|---|---|
| 1 | **APPEARANCES** |
| 2 | Mr. Micheal Jimerson |
| | SBOT NO. 00789406 |
| 3 | County Attorney's Office |
| | Rusk County Courthouse |
| 4 | 115 N. Main St. |
| | Henderson, Texas 75652 |
| 5 | Telephone:  (903) 657-2265 |
| | Attorney for The State of Texas |
| 6 | |
| | Mrs. Lisa Tanner |
| 7 | SBOT NO. 19637700 |
| | Attorney General's Office |
| 8 | P.O. Box 12548 |
| | Austin, Texas 78711-2548 |
| 9 | Telephone:  (512) 463-2170 |
| | Attorney for The State of Texas |
| 10 | |
| | Mr. James R. (Rick) Hagan |
| 11 | SBOT NO. 00786430 |
| | Attorney at Law |
| 12 | P.O. Box 3347 |
| | Longview, Texas 75606-3347 |
| 13 | Telephone:  (903) 757-9877 |
| | Attorney for Defendant |
| 14 | |
| | Mr. John W. Moore |
| 15 | SBOT NO. 00794327 |
| | Attorney at Law |
| 16 | P.O. Box 2841 |
| | Longview, Texas 75606 |
| 17 | Telephone:  (903) 236-3500 |
| | Attorney for Defendant |
| 18 | |
| | Mr. Stephen D. Jackson |
| 19 | SBOT NO. 00784324 |
| | Attorney at Law |
| 20 | 215 Simonton |
| | Conroe, Texas 77301 |
| 21 | Telephone:  (936) 756-5744 |
| | Attorney for Defendant |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
 1                              INDEX

 2     VOLUME 39
       May 3, 2010
 3     Trial on Guilt/Innocence
                                              PAGE    VOL.
 4     Hearing on Objections and Motions in Limine   4      39
       Oath given to jury                     34      39
 5     Court's instructions to jury           34      39
       Witnesses were sworn and instructed    44      39
 6     Rule invoked                           44      39
       State's Opening Statement              45      39
 7
       STATE'S WITNESSES        DIRECT      CROSS         VOL.
 8     Heather Mutina          94, 119    113, 119       39
       Kevin Roy               121, 211    176           39
 9     Kenny Ray               220                       39

10

11                         EXHIBIT INDEX

12     STATE'S
       NO.    DESCRIPTION          OFFERED  ADMITTED  VOL.
13     2      Photo                112      112       39
       4      Map of Rusk Co.      129(Demo)129       39
14     5      Map of Rusk Co.      129(Demo)129       39
       6      Photograph           134      134       39
15     8      Photograph           134      134       39
       9      Photograph           134      134       39
16     12     Photograph           134      134       39
       15     Milam Interview by Ray 229    230       39
17     25     Photograph           134      134       39
       26     Photograph           134      134       39
18     34     Photograph           155      155       39
       35*    Photograph           134      134       39
19     (*Relabeled as State's No. 164 in Vol. 44.)
       36     Photograph           141      143       39
20     37     Photograph           144      144       39
       39     Photograph           169      169       39
21
       (*NOTE:  What was originally labeled in this volume as State's
22     Exhibit No. 35 was relabeled to be Exhibit No. 164 in Volume
       44, as there were two exhibits labeled as No. 35.  State's
23     Exhibit No. 35 is a swab from the mattress, which was offered
       and admitted in Volume 42.)
24

25
```

1  (Open Court, defendant present, no jury.)

2  THE COURT:  All right, I'll call Cause No.

3  CR09-066, State of Texas v. Blaine Milam.  I'll note all

4  counsel for defense and defendant are present.  All counsel

5  for the State are present.  This is for purposes of the 403

6  objections.  They're objections.  I don't know if both counsel

7  would say they're 403, but I guess they are, so we'll go ahead

8  and proceed at this time.

9  MR. HAGAN:  Well, actually, I've got some

10  objections.  This is primarily dealing with the audio

11  interview with Mr. Milam.  Are there any potential

12  witnesses --

13  THE COURT:  Are there any potential witnesses in

14  the courtroom?

15  MRS. TANNER:  Mr. Brown.

16  MR. HAGAN:  Okay, that's fine.

17  THE COURT:  Are we going to excuse Mr. Brown

18  from the rule at this time?

19  MR. HAGAN:  Yes, Your Honor, absolutely.

20  MRS. TANNER:  Your Honor, since we're on the

21  record, we would ask Mr. Brown and Ms. Wolfe to be -- as

22  investigator exceptions, to be excused from the rule.  I don't

23  anticipate either of them will be sitting in here the whole

24  time, but they'll be in and out, stuff like that.

25  MR. HAGAN:  I really don't have an objection to

---

1  William Brown, but Missy Wolfe, I believe, is going to be on a

2  very contested issue, Your Honor, so --

3  MRS. TANNER:  Well, she's one of our

4  investigators.  What I'm asking is not that she's allowed to

5  sit in here the whole time, but that, you know, she's going to

6  be running in and out with notes and things like that,

7  assisting us in the trial.  And that's what we would -- you

8  know, we don't want her to be precluded from testifying

9  because she walked in here to hand us something.

10  THE COURT:  As long as she's just not

11  continually present in the courtroom.

12  MR. HAGAN:  Provided she's not present during

13  the testimony of Detective Rogers.

14  MRS. TANNER:  That's fine.

15  MR. HAGAN:  Okay.  Anyway, it's primarily

16  objections under -- actually, it's for relevance 403, 404, and

17  hearsay on the audiotape interview conducted by Ranger Ray at

18  the scene on December 2nd.  And, Judge, I talked to Counsel

19  for the State, Mr. Jimerson, and I believe we're in agreement

20  on the vast bulk, the majority of them.  There are a couple of

21  them.  And if I could, maybe I'll just run through that

22  PowerPoint, the ones that I had, and then that way the Court

23  knows what we're in agreement on and then what we're not.

24  Does that sound right?

25  THE COURT:  The best or the quickest or easiest

---

6

1  is to tell me what you're not -- well, yeah, we need to make a

2  record of both.

3  MR. HAGAN:  See what I'm saying?

4  THE COURT:  Yes, that's fine.

5  MR. HAGAN:  Okey-doke.

6  THE COURT:  Just make sure and tell me which

7  ones that you are or are not in agreement on.

8  MR. HAGAN:  And I believe the first one I had

9  came in at page 34 on that transcript, and that's what me and

10  Mr. Jimerson had referred to in the audio.  And I believe he

11  actually went above that and deleted some other references to

12  Robert Bradford besides that one, and that's fine.  But

13  anyway, the first one at 20 minutes and 40 seconds -- excuse

14  me --

15  THE COURT:  20, 47?

16  MR. HAGAN:  20 minutes, 47 seconds into the

17  interview, page 34 on the transcript that was offered at

18  pretrial, lines 13 through 15.  And I believe we're in

19  agreement on that one.

20  THE COURT:  And what is the agreement?

21  MR. HAGAN:  That it will be redacted during the

22  guilt/innocence.

23  MR. JIMERSON:  Your Honor, I would rather go by

24  my notes, which I think is going to encompass that.  I've got

25  redacted pages 34, 35, 37, and 38 in their entirety.

---

7

1  THE COURT:  All right.  So that will encompass

2  page 34.

3  MR. HAGAN:  And I believe that covers the next

4  one that I had, and that was on page --

5  THE COURT:  Page 35?

6  MR. HAGAN:  Page 35, at 21 minutes and 50

7  seconds in.

8  THE COURT:  All right.

9  MR. HAGAN:  And page --

10  THE COURT:  The next one is page 36.

11  MR. HAGAN:  Uh-huh, 21 minutes, 58 seconds.  I

12  believe that one was the one that Mr. Jinerson just referred

13  to.  Is that right?

14  MR. JIMERSON:  All of pages 34, 35, 36, 37 and

15  38, Your Honor, I will agree to redact during the

16  guilt/innocence portion, absent some unusual circumstance that

17  would cause me to approach before I address it.

18  THE COURT:  All right.

19  MR. HAGAN:  That's fine.  And then, Judge, I

20  think this is one we're not in agreement about, and that is at

21  page 53, although I believe there is some of that that the

22  State has agreed to redact, and I'll just let Mr. Jimerson

23  address that.

24  MR. JIMERSON:  Your Honor, I agree to redact

25  page 53, line 18 through page 54, line 3.  I believe that's

1   still addressing by reference or directly Mr. Bradford, which
2   relates to an extraneous offense, so we've agreed to that much
3   of it.
4         THE COURT:  All right.  And so then the
5   remaining would be the remaining lines, page 54, beginning on
6   line 4, through -- well, where do y'all start back?  I mean,
7   I'm reading.  I've got the -- it begins on page 54, then page
8   55, page 56, page 57 --
9         MR. JIMERSON:  Your Honor, I don't agree to
10   redact anything again until we get to page 64.
11         THE COURT:  Okay.  That was what I --
12         MR. JIMERSON:  So all of this is in dispute from
13   page 54, line 3.  So starting with 54, line 4, through page 64
14   is in dispute.
15         MR. HAGAN:  Okay.
16         THE COURT:  All right.  And the Court has read
17   those and reviewed those, and I'll overrule the objections on
18   those.
19         MR. HAGAN:  Okey-doke.
20         MR. JIMERSON:  Your Honor, I do agree to page
21   64, to redact lines 4 through page 65, line 11.
22         MR. HAGAN:  Wait a minute.  I think you got --
23   do we go -- Judge, did you just rule on page 57, also?
24         THE COURT:  Yes, I did.
25         MR. HAGAN:  Okay, hang on.  I'm just trying to

---

1   catch up.
2         MR. JIMERSON:  Oh, no, Your Honor, forgive me.
3   I'm reading that wrong.  That is the part that's in dispute.
4   Yeah, page 64, lines 4 through page --
5         MR. HAGAN:  Hang on.  Judge, where did you rule
6   to, what page?
7         THE COURT:  Up to 64.
8         MR. HAGAN:  So page 59 is in.  Page 64, okay.
9         MR. JIMERSON:  Okay.  Your Honor, let me address
10   this now, Your Honor.  Counsel essentially wants all of page
11   64 redacted.  I have agreed to redact page 64, lines 4 through
12   11, because it addresses an alleged 404(b) extraneous offense.
13   So what would be in dispute, my understanding, Counsel, would
14   be starting on page 64, line 12, through the very start of
15   page 65.  Correct?
16         MR. HAGAN:  Judge, that's a continuation of that
17   same incident.
18         THE COURT:  Well, I read those.  I will sustain
19   the objection on 12 through 25, the remaining on page 64.
20         MR. HAGAN:  So page 64, from page -- or from
21   line 4 all the way through page 65, line 2?
22         THE COURT:  Yes.
23         MR. HAGAN:  Okay.
24         THE COURT:  Yes.
25         MR. JIMERSON:  And actually, Your Honor, I'll go

---

10

1   further than that.  I misspoke when I said page 64, line 4
2   through 11.  I see my notes here now.  I had agreed to page
3   64, line 4 through page 65, line 11.  So either it would be by
4   agreement or ruling of the Court, we'll take that out.
5         MR. HAGAN:  Okey-doke.
6         THE COURT:  That will be the ruling of the
7   Court.
8         MR. HAGAN:  Okay.  The next one, that was the
9   polygraph comment; is that right?
10         MR. JIMERSON:  Well, I'm going by my notes which
11   is page 64, line 4, through page 65, line 11.  Does that take
12   care of it?
13         MR. HAGAN:  That will take care of it.
14         MR. JIMERSON:  Okay.
15         MR. HAGAN:  And page 67, same thing.
16         MR. JIMERSON:  Your Honor, I'll agree on page
17   67, line 21, through page 68, line 19.
18         MR. HAGAN:  That's good enough, Judge.
19         THE COURT:  Okay.
20         MR. JIMERSON:  Now, there's two more sections,
21   Your Honor.  I'm going by my previous note.  There's two more
22   sections that I agreed to redact.
23         MR. HAGAN:  Wait, wait.  Let's go ahead, because
24   they're further down, let's go ahead and get page 70 in.
25   That's the hang 'em high.

---

11

1         MR. JIMERSON:  Actually, these are earlier, but
2   that's fine.  Go to page 70.
3         MR. HAGAN:  Judge, we object to it for the
4   simple fact it was invited by the investigator.  He was
5   told -- he asked if he would get in trouble for saying it.  He
6   said, "No, you will not."  They're essentially violating that
7   promise that the officer made to him, that he would -- they're
8   essentially using it against him, after communicating they
9   would not.
10         MR. JIMERSON:  They never indicated they would
11   not use it against him.  That's clearly not indicated at all.
12   It's not an extraneous offense at all.  If anything, what he's
13   doing, Your Honor, the whole purpose of this being offered is
14   it's false statements by the defendant and his assuring that
15   Ranger that it's true.
16         THE COURT:  I'm going to overrule the objection.
17   Page 70, line 4, through 13.
18         MR. HAGAN:  And we ask you to make a balancing
19   test on that.
20         THE COURT:  The Court will overrule the
21   objection.
22         MR. HAGAN:  And let's see, Your Honor.  Then
23   page 74.
24         MR. JIMERSON:  That's what you referred to as
25   the truth speech?

1    MR. HAGAN:  Right.  Your Honor, I'm going to
2  object to that.  That is essentially nothing more -- first
3  off, I object to the hearsay statements by Sergeant Kenny Ray.
4  That's essentially all those amount to, nothing more than just
5  simply hearsay injected into by the officer.
6    THE COURT:  That's page 74, lines 3 through 10?
7    MR. HAGAN:  Yes, Your Honor.
8    THE COURT:  All right.  I'll overrule the
9  objection.
10    MR. HAGAN:  Okay.  And same objections -- and
11  also -- I'm sorry, Your Honor, on page 74, if I could ask you
12  to make a balancing test on that as well.
13    THE COURT:  Yes.  The Court will do so.  Your
14  objection is overruled.  That's 402, 404, 403, and 802
15  objections.
16    MR. HAGAN:  And actually, when it says 802, that
17  should be 803.
18    THE COURT:  803, okay.
19    MR. HAGAN:  Same objections on page 75, Your
20  Honor.
21    THE COURT:  It will be 75, lines 1 through 24.
22  Correct?
23    MR. HAGAN:  Correct.
24    THE COURT:  I'll overrule those objections and
25  note the same 402, 403, 404, and 803 objections will be

1  overruled.
2    MR. HAGAN:  Thank you, Judge.  And on page 75.
3  Same objections under 803, 402, 404, and 403.
4    THE COURT:  Those will be overruled.
5    MR. HAGAN:  And also, Your Honor, in addition to
6  that, I would ask that it be limined out.  It essentially is
7  providing facts not in evidence, as far as what any particular
8  test or anything else would prove in the future.  And, in
9  fact, it goes beyond what was even offered by the State in the
10  pretrial in this matter, as far as proving that he bit the
11  child.  In fact, the evidence that they have proffered so far
12  does not do that, simply does not exclude him as a
13  contributor.
14    THE COURT:  Mr. Jimerson?
15    MR. JIMERSON:  No, Your Honor, everyone else is
16  excluded.  That's the way evidence works.  That's the way DNA
17  works.  Everybody else gets excluded.  You don't go, "This is
18  the match."  You exclude everybody else that's available and
19  close the population group.  So that's just really a play on
20  words.  Clearly this defendant's given the opportunity at that
21  time to address this issue, and he's confronted with it.
22  "We're going to match these bite marks.  If we match those
23  bite marks, we've got a right to show that to the jury."  It's
24  incredibly probative.
25    THE COURT:  The objection will be overruled.

---

                                    14

1    MR. HAGAN:  Your Honor, I would ask for a
2  limiting instruction until such time as they provide that
3  evidence in court.  We still continue to object to the
4  admission of that bite mark testimony.
5    MR. JIMERSON:  Your Honor, I would object to
6  that, because Counsel -- it's just a play on words.  He's
7  saying, "Well, it doesn't match."  Well, everybody else is
8  excluded.  That's the way all evidence works.  DNA works that
9  way.  That's the way bite marks works.
10    THE COURT:  All right.  I'm going to overrule
11  the objections.  Overrule the limiting request.
12    MR. HAGAN:  And lastly, page 78.  I believe the
13  State's already agreed to that.
14    THE COURT:  That's the porn?
15    MR. HAGAN:  The porn.
16    MR. JIMERSON:  Yes, Your Honor.  We haven't
17  stated it on the record, but there's two sections that address
18  porn that I have agreed to, and I have redacted from a
19  proposed one.  One is the one Counsel just referred to on page
20  78.  I believe that's whether there's any porn in the house is
21  the issue that addresses.  And the other, I believe, Your
22  Honor, is on page 35, isn't it, Counsel?
23    MR. HAGAN:  I think you're right, yes.
24    MR. JIMERSON:  I believe it's on page 35, Your
25  Honor, where he just asks him about porn in general terms.

---

                                    15

1    MR. HAGAN:  And I think we -- we covered that.
2    MR. JIMERSON:  We agreed to take page 35 -- no,
3  I'm sorry.  It's 35 on Counsel's PowerPoint, but it's actually
4  page 55 of the transcript under the section he's marked, "But
5  what about porn?"
6    THE COURT:  All right.  And, Counsel, what I'm
7  going to do is make a written order of this, is that I have a
8  copy of the State's trial brief opposing Rule 403 objections,
9  and it contains your PowerPoint in this.  That's what I have
10  referred to.  While y'all are referring, I have marked my
11  rulings on this, so I'm going to denote -- I don't believe
12  there's an order, but I will use this.  I'm going to write
13  "Order" over where it says "Copy" --
14    MR. HAGAN:  And just indicate your ruling on
15  those particular -- that would be very helpful.  Thank you,
16  Judge.
17    MR. JIMERSON:  And, Your Honor, when there's a
18  break or an opportunity, if we have an opportunity before we
19  get started, the redacted version is on a --
20    MRS. TANNER:  Thumb drive.
21    MR. JIMERSON:  Thumb drive.
22    MR. HAGAN:  USB drive.
23    MR. JIMERSON:  It's on a USB drive.  So we could
24  either give Counsel a copy or we could give him an opportunity
25  to view it before it's played to the jury.

1    MR. HAGAN:  If you give me a copy, that would be
2  great.  That's not going today, though, is it?
3         MR. JIMERSON:  Might.  Could possibly reach it.
4  Your Honor, I have another matter I ask the Court to take up.
5         MR. HAGAN:  I think we've got a couple of them.
6         MR. JIMERSON:  Yeah, but -- Mrs. Tanner is going
7  to handle some of these other matters.  Your Honor, the
8  criminal history of the witnesses, typically before this
9  Court, the Fourth Judicial Court, typically you direct me to
10 turn over the actual histories.
11        THE COURT:  Yes.
12        MR. JIMERSON:  Both Mrs. Tanner and Missy Wolfe
13 told me what I've already known, which to turn over those
14 histories is a violation of statute; it's a violation of law.
15 So what I would ask to do, Your Honor, is to submit these to
16 you.  I've got all but a few here.  Submit these to you.  Let
17 the Court review them in camera and turn over what the Court
18 deems appropriate, because I don't want to commit an offense
19 right in the presence of the Attorney General.
20        MRS. TANNER:  Oh, I don't have any clout.
21        MR. HAGAN:  If you hand them to the Judge, he
22 can hand them to me.
23        THE COURT:  What I'll do is, again, I'll review
24 them, if there's anything.  Then I'll provide it to Counsel.
25        MR. HAGAN:  Thank you, Judge.

---

1        (Mr. Jimerson handed documents to the Court.)
2         MR. JIMERSON:  One more issue, Your Honor.  I
3  was going back through my notes.  It appeared that I'm in
4  limined from addressing the testimony of Shirley Broyles, the
5  admission made to Shirley Broyles.  But the Court already
6  ruled on it at the motion to suppress hearing and overruled
7  the motion to suppress on that issue.  So, Your Honor, if that
8  is, in fact, correct, I would ask to be released from that in
9  limine.
10        MR. HAGAN:  Judge, we did that, and the State
11 was in agreement.  I've looked back at the transcript on the
12 pretrial, because it involves pretrial detention.  And it will
13 introduce the fact that Mr. Milam is in custody and was in
14 custody at the time he made those statements.  And for that
15 reason, the Court granted limine on it, because when they go
16 to introduce that, that's when I want to have a hearing
17 outside the presence of the jury, and ask the Court to make a
18 determination, based on the evidence that's been presented to
19 the Court during the course of the trial, of whether or not
20 the objection of pretrial detention would result in an unfair
21 prejudicial -- unfairly prejudicial to the defendant.  And so
22 we would ask that it be limined out until such time as they go
23 to offer that evidence.
24        MR. JIMERSON:  Your Honor, now, I don't know
25 whether that's the exact objection that was made in the motion

---

18

1  to suppress.  I may very well have agreed and been confused on
2  that issue.  I don't have to address that he's in pretrial
3  detention in the opening.  I mean, we can just say it's said
4  to a nurse.  Just say it's said to a nurse and don't have to
5  go into the circumstances, if that would be better.  Which I
6  submit the real issue is what's said, as opposed to the
7  circumstances, and what's said is clearly admissible.
8         MR. HAGAN:  Your Honor, you know, I can pull the
9  transcript back up for you.  I looked at it.  I specifically
10 asked for a limine on that, and Mrs. Tanner was the one that
11 agreed to it.  She said, "Oh, okay."  I mean, that's exactly
12 the passage in there.  And we ask that it stay in place until
13 we can have a hearing on it.
14        MRS. TANNER:  I think I went "Okay" because the
15 Court granted it.  I don't recall agreeing to it.  If I did
16 agree to it, I would ask to have that reconsidered.
17        THE COURT:  All right.  Well, in light of what
18 we're talking about here today, I'll allow you to stay away
19 from the circumstances.  You can make reference to it, but
20 treat this for the purposes of the limine right now.  You may
21 reference to it in your offense statement, but not -- but not
22 any circumstances indicating that he was in detention.
23        MR. JIMERSON:  Yes, sir.
24        MRS. TANNER:  Then I believe, Judge, I believe
25 the Court wanted to address Mr. Killingsworth's motion to

---

19

1  quash.
2         THE COURT:  I do.  I do, yes.  All right, and
3  Mr. Killingsworth we'll note is here as a result of a subpoena
4  that was issued for his client.
5         MR. KILLINGSWORTH:  Actually, Your Honor, it was
6  a subpoena for me and Dr. Allen, my expert.  The issue that we
7  have regarding my client is the issuance of a bench warrant to
8  have her testify in front of the jury for purposes of invoking
9  her rights under the Fifth Amendment.  And as the Court is
10 well aware, they're not entitled to do that.
11        With regard to our motion to quash, Your Honor,
12 I have copies of the case law citing it.  The motion, I have
13 provided copies to Mr. Hagan.  First of all, Your Honor, I had
14 not seen -- at the time I prepared this motion to quash, I had
15 not seen the subpoena.  It was sent to me by facsimile
16 transmission.  Article 24.04 of the Code of Criminal Procedure
17 says that a person may be served with a subpoena at their last
18 known electronic address, but it also requires an
19 acknowledgment of service to be included with it so they can
20 show that it was served.
21        In this case, there was no acknowledgment of
22 service.  I don't know whether Dr. Allen has been subpoenaed
23 or not effectively.  I don't know if he's received anything.
24 As set forth in our motion, it was requested matters which are
25 privileged under the attorney-client privilege.  I am an

1 attorney, and Dr. Allen is a representative -- my
2 representative, and as such is covered by the attorney-client
3 privilege.  And anything that is said to him is the same
4 effect of being said to me, whether it's in regard to any type
5 of examination or anything like that.
6       I believe under the rules that we're only
7 required to disclose that if and when we designate Dr. Allen
8 as a testifying witness, and then we're only required to
9 provide it for the State, since they have filed a motion
10 requesting those for our experts.  We would ask the Court to
11 quash the subpoenas, so that we don't have to provide what is
12 otherwise privileged information, either as attorney-client
13 privilege or product or any other privilege.
14       THE COURT:  Mr. Hagan?
15       MR. HAGAN:  Well, Your Honor, first off -- and I
16 recognize that he has an attorney-client privilege.  And as
17 far as whether or not the subpoenas actually call for
18 production of that, we're not asking for it.  What we are
19 asking for is any facts or other data, any mental health
20 records, any medical records that they have in their
21 possession concerning Ms. Carson.  That would not be
22 attorney-client.
23       And I would cite the Court to Pope v. State, 207
24 S.W.3d 352, Texas Court of Criminal Appeals, 2006.  They
25 essentially say, Your Honor, that work product does not shield

1 descriptions of potential witnesses and statements that would
2 reveal whether the party has spoken to potential witnesses.
3 Those are not work product.  The facts and the data underlying
4 an expert's opinion are not work product.  The only thing that
5 is work product is that which would cover the trial strategy
6 and -- hang on just a second -- the personal thought process
7 of the attorney, and that receives protection.  Other
8 materials such as documents, reports, or memoranda compiled by
9 the attorney or his agents are other work product and receive
10 only qualified protection.
11       And again, Pope v. State is a criminal case
12 discussing work product and the attorney-client privilege in a
13 criminal proceeding.  The case that Mr. Killingsworth cites is
14 a civil case, and rules obviously are different in civil.  For
15 example, there is no medical privilege in criminal court.
16 There is one in civil.  And so the things that we're seeking,
17 mental health records, medical records, in his possession,
18 subject to his control, are not attorney-client
19 communications.  They're not work product.  They're not
20 protected, and we ask that he produce those to the defense.
21       MR. KILLINGSWORTH:  May I respond briefly, Your
22 Honor?
23       THE COURT:  Yes.
24       MR. KILLINGSWORTH:  Your Honor, I provided case
25 law to the Court.  The Pittsburgh case, Pittsburgh Corning v.

22

23

1 Caldwell, which indicates that if any part of a document is
2 privileged, then the whole document is privileged.  Whatever
3 documents I may have and Dr. Allen may have are privileged,
4 because at least as far as Dr. Allen is concerned especially,
5 they were provided to Dr. Allen by the defendant.  I'll advise
6 the Court I have none of the records that Mr. Hagan's asking
7 for.  And I believe that as the lawyer's representative,
8 anything that may have been said to Dr. Allen in discussing
9 whatever documents they have requested, if there are any, are
10 covered by the attorney-client privilege.
11       Secondly, Mr. Hagan has the right -- the
12 opportunity to procure that same documentation by the issuance
13 of a subpoena to the persons having the documents in the first
14 place.  You can't go fishing in my file and Dr. Allen's file
15 to get documents he can subpoena from the originator, as
16 opposed to asking us to produce it for him.  We would ask the
17 Court to quash these subpoenas both on that basis and on the
18 basis of the fact that the subpoenas are not properly served.
19       MR. HAGAN:  Your Honor, well, as far as them
20 being properly served, he's represented to the Court Dr. Allen
21 is his agent.  Mr. Killingsworth is here in response to his
22 subpoena.  He's also here obviously in his capacity
23 representing Dr. Allen as his agent, so the question of
24 whether or not they were properly served is moot.  He's
25 appeared in court and moved to quash them.

1       THE COURT:  I'll order these documents to be
2 produced to the Court for an in camera review.
3       MR. HAGAN:  Sounds good.
4       MR. KILLINGSWORTH:  If there are any, Your
5 Honor.
6       THE COURT:  If there are any.
7       MR. HAGAN:  Obviously, Your Honor, if after
8 review, if there's any exculpatory or Brady material, we would
9 ask that it be provided to the defense.
10       MRS. TANNER:  We would ask to have a hearing on
11 that at some point.  If it comes up, I think we need to have a
12 hearing on it.
13       THE COURT:  Yes.
14       MRS. TANNER:  Judge, while Mr. Killingsworth's
15 here, he's going to tie into -- I know that the Court has set
16 his motion to quash the bench warrant of Jesseca Carson for
17 next week, because she's not here.  However, that issue, the
18 fact that they have sought a bench warrant for the codefendant
19 ties into our motion in limine.  So for purposes of that, I
20 would simply ask if we could have Mr. Killingsworth state on
21 the record what he has put in his motion to quash the Bench
22 warrant already:  That his client, Jesseca Carson, if called
23 by either side, would take the Fifth on any questions that
24 were being asked.
25       MR. KILLINGSWORTH:  That's correct, Your Honor.

1    MR. HAGAN:  And again, Your Honor, that's a
2  privilege only she can assert.  He cannot assert that for her,
3  and it only becomes effective when she is brought into court
4  and invokes that right.
5    THE COURT:  We understand that.  I'm
6  understanding he's just telling us what is going to be
7  asserted.
8    MR. HAGAN:  Correct.
9    MRS. TANNER:  Correct.  It's part of our motion
10  in limine, and I just wanted it in the record that the defense
11  is on notice that whenever they get her here, she will take
12  the Fifth.  That's all I'm asking, for purposes of our motion
13  in limine, since he's here.
14    MR. KILLINGSWORTH:  Your Honor, if they're
15  calling her solely for the purpose of her taking the Fifth in
16  front of the jury, I believe it's Rule 611 of the Rules of
17  Evidence says that claims of privilege should be -- will be
18  taken outside the presence of the jury.
19    THE COURT:  We're going to have a hearing
20  outside the presence of the jury.
21    MR. HAGAN:  Obviously, we're not going to do
22  that.
23    MRS. TANNER:  Essentially 515.
24    THE COURT:  We'll have a hearing outside the
25  presence of the jury for that purpose.

1    MR. KILLINGSWORTH:  All right, Your Honor.  I
2  was hoping to get this resolved today, so I don't have to come
3  back next Monday, but I'll be here.
4    THE COURT:  Okay.
5    MR. KILLINGSWORTH:  That's all I have, Your
6  Honor.  May I be excused?
7    THE COURT:  Yes.  What else?
8    MR. HAGAN:  A couple of motions in limine on
9  both sides, Judge.
10    THE COURT:  Okay.  State may proceed.
11    MRS. TANNER:  Your Honor, we filed two motions
12  in limine, the State's Motion in Limine and the State's Motion
13  in Limine Regarding Expert Witnesses.  Our motion in limine is
14  essentially a standard motion that -- to boil it down, it says
15  we ask that you follow the Rules of Evidence.  It has a number
16  of things, actually 27 things listed.  I don't know if the
17  easiest way would be for me to go through all of those --
18    THE COURT:  Mr. Hagan, if you'll just tell me
19  what you object to.
20    MR. HAGAN:  Well, specifically, Your Honor,
21  number two, any attempt to place into evidence any prior
22  statement by any witness, whether or not the witness
23  testifies, unless it's proper impeachment.
24    And that's just not the rules.  There are many
25  exceptions to the hearsay rule, other than prior inconsistent

26

1  statements.  And I would object to it as being overly broad in
2  limine.  Essentially, if that's the case, then about the only
3  opening statement the State or I can have is, "Good morning,
4  ladies and gentlemen.  We're going to prove our case to you.
5  Thank you."
6    MRS. TANNER:  Judge, what I'm getting at is just
7  an attempt to take, say, a written statement of the witness or
8  something like that and introduce it into evidence, or an
9  audiotaped statement of a witness and just introduce it into
10  evidence.  All I'm asking is that Counsel approach first, if
11  they're going to attempt to actually introduce that sort of
12  thing into evidence and let us know ahead of time.
13    For instance -- I'll give you an example.  If
14  they were to attempt to place into evidence the statements of
15  Jesseca Carson, there are a number of objections to those.
16  They're obviously hearsay, because they're statements
17  outside -- offered for the truth of the matter asserted, and
18  there would be a number of objections that would need to be
19  lodged to that.  We're not asking about just globally
20  everything, but what I'm getting at is prior actual, you know,
21  out of court formal statements.
22    THE COURT:  Okay.  Prior out of court formal
23  statements.
24    MR. HAGAN:  I don't understand what that means,
25  Judge.  If she's limiting it down to proper impeachment, there

27

1  are other ways that prior statements come in.  Is she talking
2  about a written statement?  I doubt seriously.  But there are
3  audiotape statements of various witnesses in this case.  There
4  are several exceptions to their admission, number one, of the
5  hearsay rule, because first off, they may or may not be
6  offered for the truth of the matter asserted.  If they're not
7  offered for the truth of the matter asserted, but to show
8  state of mind or some other condition, then they would be
9  admissible under those grounds.  I just -- it's just way too
10  global.  If she's saying don't introduce it into evidence
11  before we have a hearing, that's great.  The way I read the
12  motion is you can't even make an argument to the jury or
13  present your -- what you expect the evidence to show.
14    MRS. TANNER:  What I'm suggesting, Your Honor,
15  is exactly what he just said, which is, you know, if he has an
16  audio statement or a written statement of a witness that is
17  taken outside -- obviously, outside of Court, before they
18  attempt to just introduce it on its own -- I'm not talking
19  about impeachment.  I'm talking about actually introducing a
20  prior statement of a witness to stand on its own, that they
21  approach first, because I would anticipate that that would be
22  objectionable.
23    THE COURT:  All right.  Under those limiting
24  instructions, yes.
25    MR. HAGAN:  I think I understand.  Okay.  Well,

1   on No. 15, any testimony by the witness or arguments by

2   Counsel at guilt/innocence phase of trial regarding the ranges

3   of punishment.  And I understand, obviously, we don't talk

4   about punishment during guilt/innocence, but obviously, I

5   believe it's going to come up that this is a capital case and

6   ultimately those are the decisions being made.

7          MRS. TANNER:  No, I don't have no problem with

8   that.

9          MR. HAGAN:  Okay.  It's just rather --

10  extremely --

11         MRS. TANNER:  Sure.

12         THE COURT:  Just make an objection, Mrs. Tanner,

13  if you feel a necessity to do so.

14         MRS. TANNER:  All I'm asking for here is at the

15  guilt/innocence phase, there's not some discussion about

16  whether -- you know, whether someone thinks life versus death

17  is appropriate, and that kind of stuff.  That's punishment

18  phase stuff.  That's all.

19         MR. HAGAN:  Number 16, any testimony regarding

20  remorse of the defendant, except as testified by the defendant

21  himself during the -- Your Honor, I don't believe that would

22  be a proper area.  There certainly are exceptions to that.  I

23  haven't researched the cases that she cited there, but we'll

24  certainly approach.

25         MRS. TANNER:  Just approach.  That's all I'm

---

1   asking.

2          MR. HAGAN:  That's fine.  Judge, that's the only

3   ones I really see any problem with.  I have no problem with a

4   limine.

5          THE COURT:  Again, I have on the State's motion,

6   I don't know -- yes, I do have an order, and I will sign the

7   same.  And on there, I'm going to note "Granted" except to

8   notations made on the State's motion.

9          MRS. TANNER:  No objection.

10         MR. HAGAN:  Thank you, Judge.

11         THE COURT:  All right.  Take up defense motion.

12         MRS. TANNER:  We also have, Judge, while we're

13  at it, we have a Motion in Limine Regarding Expert Witnesses.

14         MR. HAGAN:  And the defense motion is identical

15  to it.

16         THE COURT:  All right.  I'll grant both motions.

17         MRS. TANNER:  Judge, just for purposes of the

18  record, so I'm clear, you know, all of our experts that will

19  be testifying have issued reports.  So y'all know what they're

20  going to -- I mean, have issued some sort of a report or have

21  testified previously.

22         MR. HAGAN:  It's your motion in limine, and it's

23  limited you to exactly what you wanted me to be limited to.

24         MRS. TANNER:  Okay.  All I'm asking -- Judge,

25  what I'm asking is for purposes of this is, as the Court well

---

1   knows, we don't get access to their results beforehand.  All

2   we want is an opportunity to find out what they're going to

3   say and what they're basing it on before they testify.  That's

4   all.  That's all that this --

5          THE COURT:  I understand both of y'all asked for

6   Daubert hearings.

7          MR. HAGAN:  It was my understanding, Judge, or I

8   think my motion in limine just goes further than that.  And I

9   think what she's concerned about is the same thing I'm

10  concerned about.  She doesn't want any expert testimony that

11  we intend to proffer to even be discussed to the jury in

12  argument.

13         MRS. TANNER:  No, that's not true at all.

14  That's not true.

15         MR. HAGAN:  Well, that's not the way your motion

16  reads.

17         MRS. TANNER:  My motion reads that I have the

18  opportunity before they testify that --

19         MR. HAGAN:  Your motion -- go ahead.  I'm sorry.

20         MRS. TANNER:  -- that they disclose, outside the

21  presence of the jury before they testify, that I have an

22  opportunity to talk to them outside the presence of the jury

23  before they testify.  That's all the motion's asking.

24         MR. HAGAN:  Well, it says not to mention, refer

25  to, make implications regarding, interrogate concerning, or

---

1   bring to the attention of the jury or the venire in any

2   manner, directly or indirectly.  So that's obviously the part

3   that I'll object to.  But if the State's going to be held to

4   that same level, then I'm good with that.

5          MRS. TANNER:  Well, we obviously intend to talk

6   about results of our experts at opening statement.  So if

7   that's what he perceives this as a limitation of, that is not

8   my purpose.  My purpose is that I have an opportunity to test

9   what the witnesses are going to say, what the qualifications

10  are, because I don't know what they're going to say, because

11  we don't get access to that.

12         THE COURT:  All right.  The ruling of the Court

13  will be the same for each, and that will be that each party

14  will have an opportunity to have a hearing outside the

15  presence of the jury, prior to the testimony of the experts,

16  to test their qualifications.

17         MR. HAGAN:  And that no mention be made of that

18  expert's testimony or expected results until such time?

19         THE COURT:  No, that's not what I'm ruling.  You

20  can say what you anticipate from either side.

21         MR. HAGAN:  Okay.

22         THE COURT:  Each side will be able to do so.

23         MR. HAGAN:  Okay.

24         THE COURT:  Again, that's for both defense and

25  State.  All right, anything further prior to seating the jury?

**Page 34**

1  MRS. TANNER:  I need a very brief little break.
2  THE COURT:  We'll take a 5-minute recess.
3  MR. HAGAN:  Your Honor, we issued a subpoena
4 this morning for a worker at CPS.  His photographs were made
5 available during discovery.  He was provided as a potential
6 State's witness.  They have not subpoenaed him.  I've issued a
7 subpoena for him.  And I ask if the Sheriff, who was here
8 earlier, if he could serve it.  He suggested Mr. Brown with
9 the D.A.'s Office.  I talked to Mr. Jimerson.  He said that's
10 fine, if the Court orders him to.  We would ask the Court to
11 direct the D.A.'s investigator to attempt to serve that
12 subpoena by fax.  I believe that's sufficient for the CPS
13 worker.
14  MR. JIMERSON:  Your Honor, my only concern is we
15 volunteered Mr. Brown several times to serve subpoenas for
16 defense.  It's not really our job, but we don't mind
17 volunteering him.  But Mr. Killingsworth raised the issue that
18 we didn't get him served properly.  I don't want that kind of
19 stuff to come up then, especially in this kind of case where
20 Mr. Brown does have an interest in the case, because he works
21 for -- of course, the Sheriff works for the State, too, but
22 he's working directly for the State.  What I don't want to
23 have happen is Mr. Brown not be able to get it done right,
24 even though he uses his best efforts.  Of course, that would
25 look suspect because of the kind of case it is.  That was my

**Page 35**

1 only concern.  If you order him to do it, then that takes away
2 that concern.
3  MR. HAGAN:  Well, it doesn't matter to me,
4 Judge.  The Sheriff, I think, is responsible for serving the
5 subpoena.  I've asked him to.  I don't particularly care.  The
6 person I'm trying to subpoena works for the State, is an agent
7 of the State, and went out to the residence and took
8 photographs on December 4th on behalf of a State agency.  I've
9 issued a subpoena for him.  I would just ask the Court that
10 our subpoena be enforced and be served by law enforcement like
11 it's supposed to be.
12  THE COURT:  Mr. Brown, I will order you to serve
13 the subpoena.  If you have any difficulties, just report back
14 to the Court, and we'll try to take care of it.
15  MR. BROWN:  I will, Your Honor.
16  MR. JIMERSON:  Via facsimile, correct, Your
17 Honor?
18  THE COURT:  Yes, by fax.  We'll stand in recess
19 for five minutes.
20  (Recess.)
21  (Jury entered the courtroom.)
22  THE COURT:  You may be seated.  Good morning,
23 ladies and gentlemen.
24  JURY:  Good morning.
25  THE COURT:  Go ahead and get this out of the

**Page 34** (continued)

1 way.  If each of you will please stand, raise your right hand
2 and take your oath as jurors.
3  (Oath was given to jurors.)
4  THE COURT:  You may be seated.  First of all,
5 good morning.  And some of you we have seen recently; some of
6 you it was a long time ago.  Anyway, we appreciate you being
7 here.  I'm going to get some kind of preliminary matters out
8 of the way and go through your instructions with you.
9  First of all, you know, as we've stated earlier,
10 we're going to be here anywhere from probably a couple of
11 weeks to maybe two and a half or three weeks.  We want to try
12 to do this in a manner whereby that you are comfortable, but
13 understand we have to do certain things.  We're going to have
14 to send you back in the room sometimes, and bring you in and
15 out, different things.  We're not trying to waste your time.
16 We're just following the rules of law that apply to the case.
17  But if there's anything during the trial that we
18 can try to help you with to make you feel more comfortable, if
19 it's turning the air up or down -- the air conditioner has not
20 been working today, so don't think we're trying to make you
21 hot.  We're trying to get this -- they're trying to get it
22 fixed.  But if there's something we can do to help y'all out,
23 please let us know.  If we can do it, we will do it.
24  I know somebody had some note pads.  You cannot
25 take notes during the trial.  That's just what the law says.

**Page 35** (continued)

1 I tell everybody that, too.  All right, I'm going to go
2 through some instructions at this time, if you'll please
3 listen carefully.
4  By the oath you have just taken as jurors, you
5 become officials of this Court and active participants in the
6 public administration of justice.  I am going to give you some
7 further instructions, which you must obey throughout this
8 trial.  It is your duty to listen and consider the evidence
9 and determine the fact issues later submitted to you, but I,
10 as the Judge, will decide all matters of law.  And do you have
11 the written instructions, Mr. Bailiff?
12  THE BAILIFF:  No, sir.
13  THE COURT:  If you'll try to locate those.
14 We'll make sure and hand those out at some point.  I'm going
15 to go over some instructions.  You'll be given these
16 instructions in writing.  If you'll please listen very
17 carefully as I read these to you.
18  Number one, do not mingle with nor talk to the
19 lawyers, witnesses, parties, or any other person who might be
20 connected with or interested in this case, except for casual
21 greetings.  They have to follow the same instructions, and
22 you'll understand it when they do.  We'll go ahead now and let
23 y'all introduce yourself and anybody you have working here
24 with you or any of your staff, so we'll make sure and get that
25 out of the way.  The State will proceed with that.

1        MR. JIMERSON:  Your Honor, Micheal Jimerson,
2  County Attorney for Rusk County, Texas.  Lisa Tanner,
3  Assistant Attorney General, prosecutor in this case
4  representing the State.  We also have present William Brown,
5  who's the District Attorney investigator for Rusk County,
6  Texas.  Jacob Crater, who is the Victim Affairs Coordinator
7  for Rusk County, Texas.  And not at my direction certainly,
8  but associated with the State is the Sheriff of Rusk County,
9  Danny Pirtle.
10        THE COURT:  All right.  Thank you, Mr. Jimerson.
11  Mr. Hagan?
12        MR. HAGAN:  Thank you, Judge.  Good morning.
13  I'm Rick Hagan.  Seated next to me is Blaine Milam.  Stand up.
14  And seated next to him, John Moore.
15        MR.MOORE:  Good morning.
16        MR. HAGAN:  And at the end of the table, Steve
17  Jackson.
18        MR. JACKSON:  Good morning.
19        MR. HAGAN:  With us is Lisa Perry.  There's a
20  lot of Lisas in this case.  She's an assistant to Mr. Moore.
21  And Mr. Jackson has some staff that may come running in and
22  out.  That's everybody who's here right now.  Thank you.
23        THE COURT:  The reason I'm introducing them, if
24  you run into any of these people in the hallway or incidental,
25  you understand that they cannot talk to you.  I mean, they may

---

1  say hi, but that's about it.  So that's the reason I wanted to
2  introduce them to you.
3        Number two, do not give or accept from any of
4  these individuals any favors, however slight, such as rides,
5  food or refreshments.  Number three, do not discuss anything
6  about this case or even mention it to anyone whomsoever,
7  including your wife or husband, nor permit anyone to mention
8  it within your hearing until you're discharged as jurors or
9  excused from this case.  If anyone attempts to discuss this
10  case with you, stop them, and then report it to me
11  immediately.
12        Number four, do not discuss this case among
13  yourselves until after you have heard all the evidence, the
14  Charge of the Court, and the arguments of the attorneys, and
15  until I have sent you to the jury room to consider your
16  verdict.  That will be down the line, so please understand
17  that.  You'll hear opening arguments this morning, but that's
18  not what we're talking about.  So you can't talk about this
19  case at all until I instruct you otherwise.
20        Number five, do not make any investigation about
21  the facts of this case.  Occasionally, we have a juror who
22  privately seeks out information about a case on trial.  This
23  is improper.  All evidence must be presented in open court, so
24  that each side may question witnesses and make proper
25  objections.  This avoids a trial based upon secret evidence.

---

38

1  These rules apply to the jurors the same as they apply to the
2  parties and to me.  If you know of or learn anything about
3  this case except from the evidence admitted during the course
4  of this trial, you should tell me about it at once.  You have
5  just taken an oath you'll render a verdict on the evidence
6  submitted to you under my rulings.
7        Number six, do not make personal inspections,
8  observations, investigations, or experiments, nor personally
9  view premises, things or articles not produced in court.  Do
10  not let anyone else do any of these things for you.
11        Number seven, do not tell other jurors your own
12  personal experiences, nor those of other persons, nor relate
13  any special information.  A juror may have special knowledge
14  of matters such as business, technical, or professional
15  matters, or he may or she may have expert knowledge or
16  opinions, or they may know what happened in this or some other
17  lawsuit.  To tell any of the jurors any of this information is
18  a violation of these instructions.
19        Number eight, do not seek information contained
20  in law books, dictionaries, public or private records or
21  elsewhere which is not admitted in evidence.
22        Number nine, I am instructing you specifically
23  that you're not to secure or attempt to secure any information
24  of any type relating to this case from the Internet or any
25  other source.

---

39

1        At the conclusion of all the evidence in the
2  case, I may submit to you a written Charge.  Since you'll need
3  to consider all the evidence by me, it is important that you
4  pay close attention to the evidence presented.  Texas law
5  permits proof of any violation of the rules of proper jury
6  conduct.  By this, I mean that jurors and others may be called
7  upon to testify in open court about acts of jury misconduct.
8  I instruct you, therefore, to carefully follow all
9  instructions which I have given you, as well as others that
10  you'll later receive while this case is on trial.
11        Now, kind of to let you know what you're looking
12  at and how we're going to proceed, after I get through talking
13  to you, the State, the prosecution, has an opportunity to make
14  an opening statement.  After they get through this with their
15  opening statement, the defendant by and through his attorneys
16  may or may not make an opening statement this morning, or they
17  may make it at a later time after the State has presented the
18  presentation of their evidence.
19        After opening statements are made, then the
20  prosecution will offer their evidence through their witnesses.
21  When the prosecution has finished the presentation of the
22  State's case, the defendant may or may not present evidence to
23  you.  As you'll recall, a defendant is never required to prove
24  themselves innocent.  The prosecutor may cross-examine any
25  defense witnesses, if any.  And likewise, the defense has an

1 opportunity to cross-examine the State's witnesses. When the
2 defense is finished with the presentation of its evidence, if
3 any, the prosecutor may put on rebuttal witnesses, and the
4 defendant may thereafter do the same.
5     At the conclusion of the presentation of all the
6 evidence, I'll read to you the Court's Charge, and each side
7 will present closing arguments to you. Then after closing
8 arguments, you will retire and begin your deliberations.
9     Now, as I told you, the attorneys may make
10 opening statements. An opening statement is not evidence, but
11 is given to you to help you understand the nature of the case
12 and the evidence. Your oath states that you'll render a
13 verdict only on the evidence submitted to you under the
14 rulings. Now, the evidence that you can consider will consist
15 of the testimony of witnesses, either in person or through
16 written transcripts, or testimony called depositions.
17 Evidence may also be presented in the form of physical objects
18 or documents called exhibits.
19     During the trial, as you know, the attorneys may
20 make objections. This is a necessary procedure. Whenever an
21 objection is made, then I will rule upon their objections.
22 There may be times when I send you to the jury room to allow
23 the parties to argue before me in the courtroom. You may
24 not -- or must not concern yourself with the objections, nor
25 my rulings. These are just purely matters of law. You must

1 not consider testimony or exhibits to which an objection was
2 sustained or that I instruct you to disregard. Some testimony
3 or exhibits may be introduced for a very limited purpose. If
4 that occurs, then I will instruct you to consider this
5 evidence only for the express limited purpose, and by your
6 oath, you may only consider that evidence under those
7 instructions.
8     Each of you must determine the facts as you see
9 them. To do so, you must evaluate the credibility of the
10 witnesses and decide the weight and value to be given to their
11 testimony. No actions, rulings, or remarks that I might make
12 at any time during the course of this trial is meant in any
13 way to indicate my opinion as to what the facts or the
14 evidence are, or to the guilt or innocence of this defendant.
15     In considering the weight and value of the
16 testimony of a witness, you may consider the person's
17 appearance, attitude, behavior, their interest in the outcome
18 of the case, their relationship to the defendant or to the
19 State of Texas, and the inclination of the witnesses to tell
20 the truth, the probability or improbability of their
21 statements, the reasonable inferences from those statements,
22 and any other factors that you feel will help you to give a
23 proper weight and value to that testimony or the degree of
24 credibility that you feel it deserves.
25     All right, at this time, the State may read the

42

43

1 indictment. If you'll please have the defendant stand.
2     MR. JIMERSON: In the name and by authority of
3 the State of Texas: The Grand Jury, for the County of Rusk,
4 State of Texas, duly selected, impaneled, sworn, charged, and
5 organized to inquire of offenses committed in Rusk County,
6 Texas, upon their oaths present in and to the 4th Judicial
7 Court that Blaine Keith Milam, on or about December 2, 2008,
8 and before the presentment of this indictment, in the County
9 and State aforesaid, did then and there knowingly cause the
10 death of an individual, namely Amora Bain Carson, by striking
11 Amora Bain Carson with the defendant's hand or hands, and the
12 said Amora Bain Carson was then and there an individual
13 younger than six years of age.
14     And it is further presented that the defendant,
15 on or about December 2, 2008, and before the presentment of
16 this indictment, in the County and State aforesaid, did then
17 and there knowingly cause the death of an individual, namely
18 Amora Bain Carson, by striking Amora Bain Carson with an
19 object, the exact nature of which is unknown to the Grand
20 Jurors, and the said Amora Bain Carson was then and there an
21 individual younger than six years of age.
22     And it is further presented that the defendant,
23 on or about December 2, 2008, and before the presentment of
24 this indictment, in the County and State aforesaid, did then
25 and there knowingly cause the death of an individual, namely

1 Amora Bain Carson, by striking Amora Bain Carson against an
2 object, the exact nature of which is unknown to the Grand
3 Jurors, and the said Amora Bain Carson was then and there an
4 individual younger than six years of age.
5     And it is further presented that the defendant on or about
6 December 2, 2008, and before the presentment of this
7 indictment, in the County and State aforesaid, did then and
8 there knowingly cause the death of an individual, namely Amora
9 Bain Carson, by strangling Amora Bain Carson, and the said
10 Amora Bain Carson was then and there an individual younger
11 than six years of age.
12     And it is further presented to the Court that the
13 defendant used or exhibited a deadly weapon, to-wit: The
14 defendant's hand or hands, or an object, the exact nature of
15 which is unknown to the Grand Jurors, during the commission of
16 the aforesaid offenses. Against the peace and dignity of the
17 State. Signed by the foreperson of the Grand Jury.
18     THE COURT: How does the defendant plead to the
19 indictment?
20     THE DEFENDANT: Not guilty.
21     THE COURT: You may be seated. The parties may
22 bring any witnesses who are present in at this time. I'll
23 just direct all counsel to be on the lookout during the trial,
24 in case any of your witnesses come in the courtroom, and try
25 to alert the Court. Witnesses, if each of you will remain

1    standing, please raise your right hand and take this oath.
2                   (Witnesses were sworn.)
3             THE COURT:  All right.  Witnesses, the rule has
4    been invoked.  That means that you'll be asked to leave the
5    courtroom.  Do not reenter the courtroom, unless you're
6    instructed to at the direction of the Court or someone at my
7    direction.  Do not discuss this case with anyone.  Do not
8    discuss your testimony with anyone, except the attorneys who
9    are involved in the case.  Do not read anything about this
10   case.  Do not access any information whatsoever about this
11   case.  All right, you may be excused from the courtroom.
12                  (Witnesses exited the courtroom.)
13            THE COURT:  One thing I forgot to discuss with
14   y'all, ladies and gentlemen, is during the course of the
15   trial -- again, this morning we started at 10:00, because this
16   is our first morning here, and we needed to get a lot of
17   things set up and do some things, so it took us some time to
18   do this.  In the future, we'll be starting at 9:00 every
19   morning, and if you'll just -- every morning, if you'll come
20   on in and have a seat in the jury room.  Don't come in the
21   courtroom, because we may be doing something.  I think you can
22   come in the other way.  Just have a seat in the jury room.
23            And again, we'll start trial around 9:00.  We'll
24   try to break about midway between 9:00 and 12:00.  We'll try
25   to take at least an hour recess for lunch every day.  Then

---

1    we'll go from 12:00 to approximately 5:00, somewhere give or
2    take, depending on how far we are along.  We may have to go a
3    little bit longer or we may get through a little bit earlier.
4    And we'll take a midafternoon break.  But having said that, I
5    do not want anyone to struggle or be uncomfortable.  If
6    there's a situation whatsoever, if you need a restroom break,
7    and it doesn't look like we're close, raise your hand and tell
8    me.  We'll take it for you.  Or if you, for some reason,
9    should feel ill, let us know that.  We want to make sure and
10   take care of that.  I don't want you to sit over there and
11   suffer from any means.  Okay?  So understand that during the
12   trial.  All right.
13            At this time, the State may proceed with its
14   opening statement.
15            MR. JIMERSON:  Your Honor, if we may have the
16   screen, we have a PowerPoint that's really -- I represent is
17   nothing but witness names and dates that we want to utilize.
18   May it please the Court?
19            THE COURT:  Yes.
20            MR. JIMERSON:  Counsel.
21                  STATE'S OPENING STATEMENT
22            MR. JIMERSON:  Morning, ladies and gentlemen of
23   the jury.  There are words on one of those boards over
24   there across the street that were never dwelt on, and we just
25   about never spoke.  Those three words:  Amora Bain Carson.  On

46

---

47

1    or about December 2nd of 2008, Amora was robbed of her life,
2    and I submit to you she was robbed of her innocence, the only
3    thing that 13-month-old child had to offer.  You're going to
4    hear some things, you're going to see some things in this
5    trial.  I submit to you, to know Amora, to hear her story,
6    you're going to have to give up some of your innocence, and
7    I'm sorry about that.  I'm sorry about the things that I'll
8    bring to you and that I'll show you.  I expect that there will
9    be times when that will be difficult.  We talked about this
10   some in jury selection.  There will be times when you want to
11   look away, I submit, when you want to hide, when you want to
12   minimize it, when you want to make excuses, when you want to
13   do anything but have to face the evil that robbed us of Amora
14   Bain Carson.
15            MR. JACKSON:  Objection.  Improper argument.
16   It's opening statement, not closing argument.
17            THE COURT:  I'll sustain the objection.
18            MR. JACKSON:  Ask the jury to disregard the
19   prior remarks of Counsel.
20            THE COURT:  The juror is instructed to disregard
21   that.
22            MR. JACKSON:  Ask for mistrial, please.
23            THE COURT:  Overruled.
24            MR. JIMERSON:  Your Honor, advise me what was
25   improper.

---

1             THE COURT:  The evil part of it.  You may
2    continue.
3             MR. JIMERSON:  Your Honor, without being heard,
4    I submit it was entirely appropriate.
5             THE COURT:  All right.
6             MR. JACKSON:  Objection, improper sidebar.
7             THE COURT:  I'll overrule.
8             MR. JIMERSON:  Justice for Amora Bain Carson is
9    worth facing.  It's worth facing what you're going to have to
10   face.  Amora Bain Carson was born on November 7th -- November
11   12, 2007, about 1:23 p.m., at Longview Regional Medical Center
12   in Longview, Texas.  She was born to Jesseca Bain Carson.
13   You'll find out Jesseca Bain Carson is also charged with
14   capital murder.
15            Now, Jesseca Bain Carson was only 17 at the time
16   of Amora's birth.  Jesseca Bain Carson lived pretty close to a
17   young man named Arlen Mutina.  I submit proximity and youth
18   often, in our experience, can bring people together, and Arlen
19   Mutina and Jesseca Bain Carson worked together.  They were
20   teenagers at the time.  She became pregnant.  And Arlen, Arlen
21   really wanted to try to better himself, so he went off to the
22   military.  Joined the Army.  At the time of this, December 2,
23   2008, you'll hear that he was in Korea.  And now he's
24   currently in Iraq, so you won't be hearing from him.
25            But Arlen kept in touch with both Jesseca and

his child, Amora Bain Carson, through Heather Mutina. His little sister was one of the many ways he kept in touch with her. Heather Mutina is just a teenager now. She's a senior in high school. So she was, you know, still a teenager, still in high school back at the time when Amora was born. But when Amora was born, Heather took a special interest in her, as you would expect of an aunt for her niece, especially at a young age. She spent time with her. Heather did something that's not very common for teenage people. Every time she was able to talk her parents, who were of pretty modest means, into spending some money, she talked them into buying things for Amora that Amora needed.

She'll tell you about the last time that she saw Amora Bain Carson alive. It was over Thanksgiving of 2008. At that time, Jesseca Carson brought the child over to the Mutina residence. Heather will tell you it was the first time that she ever met, herself, Blaine Milam. She'll tell you about what she thought was odd about that circumstance. One of the things she'll tell you is when Blaine Milam said, "Let's go," Jessca got up. That was different from the way that Arlen and Jesseca's relationship worked, in her experience.

It was a fairly short visit. It got shortened a little more. There was a certain amount of tension, because it was just a different view of the future for Amora from the

Mutinas and Heather and Jesseca Carson. It was the last time that Heather Mutina ever saw her niece alive.

December 2nd of 2008, Kevin Roy is a dispatch sergeant in Rusk County, Texas. Rusk County, Texas, is a fairly rural county, about 47,000 people. It's south of Longview, about 30 minutes south of Longview, about 30 miles or so. It's east of Tyler. Tyler's a much larger city, or a larger town. About 45 minutes east of Tyler. It's about 45 minutes north of Nacogdoches.

Kevin Roy had taken his vehicle in, his unit, as he refers to it, to have the oil changed. Where they changed the oil, that business is pretty much right across the street from the Sheriff's Department. It's just down the street. So he either got a ride or walked on over to the Sheriff's Office. As a patrol sergeant in Rusk County, Texas, he was in charge of maybe as many as three deputies. The county's divided up in three zones, and that's all, him and two or three deputies. He's off the street at that time in dispatch. It's in the morning, sometime after 10:00. And he's there in dispatch when the call comes in. He doesn't wait on his unit to be repaired or for the oil to be changed. He goes running out from the Sheriff's Office, because he hears the call come in in dispatch. And he jumps into the first available vehicle that's there.

Now, that vehicle is not going to have the gear

50

that Kevin Roy, the shift sergeant, would normally have in his vehicle. He didn't have any water in it, he'll tell you, one of the things he was looking for later on. And more importantly, it didn't have a video set up in the video recorder like those units would typically have. It was just the first available unit. And, in fact, it wasn't even at patrol at that time; it's just sitting there while his is being repaired. He takes it. And he'll tell you that he went out to the scene, which we will prove to you is in Rusk County, Texas, and that he ran what they call code, is the way he refers to it. What he means is what you think it does when something comes in in dispatch. He's got the lights on. He's driving as safe as is reasonable -- or as fast as is reasonable and safe.

Kevin Roy will also show you -- we may even demonstrate to you with a map of Rusk County -- where Elderville is, because Elderville is where the ambulances are coming. And Elderville is a little closer to this location. I won't confuse you by getting into all of these small areas, but it turns out that the paramedics got there a little bit quicker than Kevin. Kevin gets out there. He'll tell you that even driving code, when driving out there, it took him 20 minutes from Henderson, which is the county seat of Rusk County.

When he gets out there, he'll tell you that he

sees a trailer house, a manufactured home out there. And he goes up, walks up toward the trailer house. He notices that, you know, on the porch, there's clothes, there's trash. It's filthy. You'll find out throughout the house, it's filthy. There's stuff everywhere. When he comes in, he'll tell you that right to his right, as he walks through the front door of this trailer house, there's a doorway, and it's a master bedroom, or what we'll refer to later on as the master bedroom. And when he comes to that doorway, it's on the north end of the house. He looks down, and he sees the EMTs or paramedic, and he sees Jesseca Carson, and he sees Blaine Milam, but he can't see what they're kneeling over.

Now, he already has a good reason to know what it is, because he heard the dispatch call come in, but he can't see what they're kneeling over at the time. They get up, and they step out of that room. And when they do, Kevin's standing very near that doorway. And he looks in, and facing up right there, with the feet away from him and the head toward him, is a baby. And it's the first time that he sees that baby. And we'll offer a picture that's taken from essentially -- Kevin will tell you it's about the same vantage point that he had the first time he saw Amora Bain Carson.

What he sees is her face is discolored from the rest of her body. It's dark. It's a lot of injuries. And he sees marks on her, all over her body. Round marks. And the

51

**[Page 54]**

1  shift sergeant from rural Rusk County, he'll tell you that he
2  looks at them and that he's of the opinion they're pattern
3  injuries, which is a term of art in the forensic community,
4  but more commonly as well a term of art in law enforcement.  A
5  pattern injury can be anything that suggests like it sounds
6  like:  There's a pattern to the injury.  Somewhere out there,
7  there's typically going to be a match for a pattern injury.
8            He looks at these pattern injuries, and all this
9  shift sergeant can think at the time, he'll tell you is,
10  they're round, and it sort of looks like round like the bottom
11  of a Coke can, the indention of a Coke can.  And he thinks at
12  the time, you know, maybe the Coke can has been just jammed
13  several times on the child, a number of times.  But you'll
14  find out later on from other people who saw them differently,
15  and what you'll find out, I anticipate from the experts that
16  testify in this case, those are bites.  Those are human bites
17  on the child.  You'll find out there's 24 total.
18            But at this time, standing over, all that shift
19  sergeant of deep East Texas can think of, maybe it looks like
20  a Coke can.  He steps over the baby in the doorway.  All the
21  investigators that work that scene that day, if they're asked,
22  will likely tell you they stepped over that baby in the
23  doorway and stepped around.  Kevin will tell you he stepped
24  around the baby to where now he's facing the feet of the baby,
25  and he reaches down, and he pulls up the left leg of the baby.

**[Page 55]**

1  And he'll tell you that when he lifts that left leg, that
2  whole side of that child came up, including that arm.  Just
3  froze with the child moving, stiff.  He'll tell you the child,
4  as many of the other law enforcement officers on the scene
5  will tell you, the child was cold to the touch.
6            Next, Kevin is going to tell you that he did
7  what the only law enforcement officer on the scene is supposed
8  to do at that time, the shift sergeant.  It's not his job at
9  that time to collect evidence.  It's his job to apprise
10  himself of the situation of what he has and to do something
11  law enforcement officers call secure the scene.  Secure the
12  scene, he'll tell you, means that he goes through the house,
13  and he's looking for all sorts of things.
14            He's looking for whether there's an assailant or
15  a perpetrator somewhere in the house.  He's looking for, is
16  there another child or an adult who needs medical attention,
17  who needs help?  He goes through each room of the house.  He's
18  also looking, you know, maybe if there's weapons at the ready
19  somewhere.  They need to know that.  They need to secure the
20  scene, make sure that it's safe, and that there's nobody else
21  in there that the officers are not aware of.
22            He goes through every room in the house.  It's
23  just a cursory look.  Like I say, he's not looking for blood
24  droplets or evidence or things like that.  He just looks in
25  these rooms.  And he'll tell you that the master bedroom,

1  seated off over here to the north side, to his right side --
2  when he walks in the front door, walks into a big living area.
3  Directly to the left as he walks in, there's a kitchen off to
4  the side.  There's a little partial wall between the kitchen
5  and the hallway.  And then in this manufactured home, in this
6  trailer house, there's a little hallway to the left, towards
7  the south that comes off the living room.
8            He walks down that hallway, and he will tell you
9  that there's a little area here.  I may even have him just
10  kind of give you something demonstrative to look at here.  He
11  steps in that little area.  And to his right, there's a door.
12  To his left, there's a door.  There's two small rooms or
13  bedrooms, and then right in front of him is a bathroom.  He
14  comes on around.  There's a washer and dryer and the kitchen
15  to come back out to the front.  Now, what he'll tell you is
16  that there's nobody else in that house.  He comes back outside
17  after he's gone through the house.
18            And at this time, a detective has arrived.  And
19  it's Detective Rogers.  Detective Rogers happens to be the
20  detective on call.  That's the way it worked at the time.
21  That's the way it works pretty much now.  It's a small
22  Sheriff's Department, small unit.  The officer on call has the
23  case.  Kevin Roy will tell you that he's an investigator now,
24  and that he's had a murder case within three months of him
25  becoming an investigator.  They move up from patrol, become

1  investigators.  This officer had moved up from patrol, hadn't
2  been an investigator all that long, and she's got a murder
3  case.
4            There's other officers, though, who are more
5  senior officers, but I submit seniority doesn't necessarily
6  mean that they're ready to handle some of the things that they
7  deal with.  You know, one of the more senior investigators out
8  there, Jack Tully, will tell you he arrived at the scene.  And
9  there's a long video, because eventually -- and you may or may
10  not see it, where eventually Kevin Roy puts a video in his
11  recorder and just has his vehicle sitting out in front of the
12  house, recording.  He eventually realizes there's not a tape
13  in there, so he puts a tape in there and records it.
14            You know, Jack Tully -- during one point of that
15  tape, there's one officer that uses a curse word, not about a
16  civilian, but about one of his fellow detectives, because he
17  wants more help, and that's Jack Tully, the more senior
18  investigator out there.  And Jack Tully will tell you about
19  having to step around that baby, and that it was upsetting.
20            Now, Kevin Roy's instructions at that time,
21  because there's a detective on the scene now, even though
22  there's not a formal ceremony or anything, he's essentially
23  handing over the scene to that detective, and that detective
24  directs him.  At that time, that detective tells him,
25  "Separate these two, Jesseca Carson and Blaine Milam.

1  Separate them." Kenny Ray, the Ranger that you'll hear from,
2  will tell you that's part of police work.  You separate the
3  witnesses, take statements from them.
4            At that time, I submit to you, Kevin Roy's
5  intention is that he's not taking them into custody.  He's
6  just separating them.  And Kevin Roy ends up talking to Blaine
7  Milam out there.  He's not in custody.  He's just asking him
8  what happened.  As much as he can ask him, Mr. Milam's telling
9  him.  I expect what you'll hear from Kevin Roy about what he's
10 told is, Mr. Milam tells him that they were all there that
11 morning:  Amora Bain Carson, Jesseca Carson, and Blaine Milam.
12 And that Blaine Milam and Jesseca Carson left the 13-month-old
13 baby at the trailer house alone and walked off up the road.
14 It's a little country road, a little rural area out near Lake
15 Cherokee in Rusk County.  They walk up the road, and they're
16 looking at some property, what Mr. Milam's telling them,
17 looking at some property that they're going to have cleared to
18 put their own trailer house on.
19            And at that time, he's supposed to meet somebody
20 about this, a person named Clark, to discuss this.  And at
21 that time, as I said, Roy does not have him under arrest.  In
22 fact, Mr. Roy clarifies several times, because it's not his
23 scene anymore; it's the detective's.  "Is he in custody, is he
24 in custody?"  I mean, you know, where something's come up that
25 would cause him to be in custody.  "No, he's not in custody."

1  Or he understands he's not in custody.
2            Now, even though Kevin Roy's supposed to
3  separate him, there's a lot of things going on.  And Kevin Roy
4  ends up -- one of the things he does is he strings the crime
5  scene tape.  He's also advising people as they arrive and
6  doing other things at the direction of the detectives.  He's
7  also responsible for that shift that's out there.  And so
8  he'll tell you, he essentially lost track of Blaine Milam.
9            Now, Blaine Milam was close.  He was still just
10 at the back of Kevin Roy's patrol car or unit.  In the
11 meantime, of course, the call comes in.  It comes into the
12 D.A.'s Office to one of the people that offices with the
13 D.A.'s Office, the D.A.'s investigator, William Brown, that
14 stood up earlier.  Also there's a Texas Ranger there, Kenny
15 Ray, who offices there.  Kenny Ray hears the call.  Kenny
16 Ray's going to go get in his vehicle and go out there.  As you
17 can imagine, eventually all of the Criminal Investigation
18 Division of the Sheriff's Office gets turned out.  It's a big
19 case, a homicide.
20            Detective Ray is driving out there to the scene,
21 but Detective Ray knows more things about the scene than Kevin
22 Roy does when he gets there, because Detective Ray is getting
23 information about the situation.  He's getting what was seen
24 on the scene already that's getting back and getting relayed
25 to him.  When he pulls up out there, he looks out, and he sees

58

1  Blaine Milam with Jesseca Carson at the back of that patrol
2  car embracing, which Kenny Ray will tell you he thought was
3  odd.  Because if you've got witnesses, you keep them
4  separated; you get their statements.  You don't have them
5  together.
6            So Detective Ray does not go in the house, has
7  not seen the baby.  Now, he knows what's in its house, at
8  least to some extent, because he's been getting information
9  back and forth, but he doesn't go in there.  Now, at this
10 time -- this is in the front driveway of the Milam residence.
11 Kenny Ray will tell you it's kind of a circular driveway, and
12 he's over on the south end, whereas Kevin Roy is more toward
13 the middle, maybe still toward the south end.  On the north
14 end is a little garage, one of those portable garages.  Not
15 portable, that you can bring out there and put in place.  Got
16 the poles and the sheet metal top.  And a red Mustang is out
17 there.
18            There's no other vehicles at that time, except
19 for the paramedics, of course, and the investigators and law
20 enforcement officers who are coming out.  Detective Ray parks
21 there where he can still see the front of the house.  And at
22 that time where that patrol unit is, and Jesseca Carson and
23 Blaine Milam are embracing, is still within easy viewing
24 distance of the front door of the house.  In fact, he'll be
25 there the whole time that Ranger Ray conducts his interview.

1  Right inside that door will be that baby lying there, because
2  they haven't moved the baby yet.
3            Ranger Ray will interview Blaine Milam at that
4  scene.  Now, I expect Ranger Ray to tell you he's not in
5  custody.  He asked him to talk to him, and he makes a tape of
6  it.  Ranger Ray, you know, unlike Kevin Roy, who didn't
7  have -- didn't have his recorder at the time, didn't realize
8  it until later on and turned it on, Ranger Ray is a little
9  more prepared on this occasion.  Maybe that's not a fair
10 comment on Kevin, because he was just caught in dispatch,
11 waiting on his unit to get fixed.  But anyway, he is a little
12 more prepared, and he's got a digital recorder there.  So that
13 interview, that audio interview is recorded, and you'll be
14 able to hear that.
15            And on that digital recording, Blaine Milam
16 tells him, you know, essentially the same thing they told
17 Kevin Roy.  "We were all there at the house this morning, that
18 morning."  Jesseca Carson is there, Blaine Milam's there at
19 the Milam residence, and Amora Bain Carson is there.  And
20 he'll tell Ranger Ray that they left the 13-month-old baby in
21 the house alone to go up the road.  And then you'll hear about
22 how long it was, whether it was a half hour, more like an
23 hour, those kind of things, what he tells the shift sergeant
24 and the Ranger.
25            Goes up the road, and they're up there, and

59

they're looking at this property they're going to put a
trailer house on. They're supposed to meet a person named
Clark there. They come back. They find this awful situation,
that this child is dead with all of these injuries. And she's
in that same general area, although she may be found in the
bathroom and more of a low spot in the floor there. She's in
the same general area, the master bedroom, the north end of
the house when they find her. He ends up -- they end up
calling 911.

Now, Kenny Ray, Ranger Ray, who's now a
lieutenant, he's promoted. Several people have. The
detective on the scene, Detective Rogers, ends up working for
Crime Stoppers and then later on is now off in school. But
Charles Helton, you'll find out, is one of the detectives that
works up there -- out there, he ends up promoting and becoming
the lieutenant of the Criminal Investigation Division later
on. Ranger Ray was a sergeant at that time, but he's since
moved up and commands part of a company out of Midland of
Rangers. But he had had a very lengthy DPS career at that
time. Like most Rangers, he started on the road. He moved up
through investigations. Here, through narcotics.

And he was the Ranger assigned to Rusk County,
Texas, Van Zandt County, Texas, two fairly small rural
counties in East Texas. He's also the Ranger that's assigned
to Tyler, Texas, which, as I told you, is a much larger

metropolitan area. So he's got a pretty good bit of
experience at that time dealing with homicides.

And Ranger Ray is going to find out later on,
because he's going to go hunt up for him, and he finds a
Clark, Dwight Clark in Gilmer, Texas, who says he doesn't know
Blaine Milam, never heard of him. Finds a Shane Clark, who's
a relative of Dwight Clark, who's his son in Gilmer, Texas,
who also does the same kind of business, timber. And he says,
"Yeah, I have talked to Blaine Milam. You know, we were
talking about timber sales. But I didn't have an appointment
to meet him there December 2nd. I wasn't supposed to meet
him."

So the Ranger won't find that out at the scene,
but the Ranger's already conducting his investigation. In
effect, he's asking questions of the defendant. And he asks
him and confronts the defendant about the bites. And you'll
hear his response when he asked him, you know, those bites, we
can tell who makes bites. We can exclude others from it, you
know. And he confronts him at that time, "If those are your
bites." You'll hear what he says. The defendant denies it.

In fact, he assures the Ranger that essentially
he's the only father that child's ever known, how much he
cares for that child. Even tells the Ranger that he's being
truthful with him to give the Ranger the information he needs
to go out and do justice, to bring this person to justice, to

---

62

have -- you know, either justice or retribution for a father
brought to whoever did this. But I expect that you'll hear a
lot of evidence throughout this case that what he's telling
the Ranger is not right.

Now, at that time, the Ranger and Amber Rogers
are dealing with these two -- the only two people that are at
the scene are Jesseca Carson and Blaine Milam, and those
detectives go off in that direction in the investigation.
They end up in doing things like taking their clothes from
them. They'll ask them for consent to get DNA swabs. You
know, if nothing else, they would have that DNA and be able to
eliminate it if there's any other DNA, those kind of things.
But more and more, as that part of the investigation's going
along, the Ranger will tell you more and more suspicion is
falling on these two, especially after the interview.

Now, there's another group of detectives that
are working the crime scene: Jack Tully, Charles Helton,
Cannon Levoy. Most of them are working that -- well, all of
them are working that master bedroom and bathroom. I expect
that they'll tell you that some of them never walked down the
hall to the other end of the house. Those that did, walked
down there, just looked in for a minute, looked at those other
rooms, thought they were filthy like the rest of the house,
and just moved on back to what they were doing in the master
bedroom.

---

63

And I submit to you, one of the things that
common sense will tell you and that you see, the evidence of
the crime typically is going to be the evidence the criminal
chooses to leave, what is there or what isn't there. I also
tell all the juries -- I told you this as jurors during jury
selection -- that there's always one witness short in a
homicide case. But I also tell those jurors, and I'm telling
you now, that those victims, that they cry out through
circumstances and blood and DNA.

Now, in that master bed and bathroom, I expect
you'll hear there's not a lot of blood around. You'll see the
pictures of the baby. There's not a lot of blood on the baby.
There's not a lot of blood on the baby's clothes. And the
investigators don't examine the body. I don't know how they
do on some of these shows that we had on your questionnaire,
because I don't watch them, but they don't typically examine
the body. They may photograph it when the EMTs or the people
responsible for getting the child to the autopsy come out and
pick up the child, but they don't remove clothes, don't remove
diapers and underclothes and things like that, so these
detectives at that time will tell you they have no idea what's
inside that diaper on that child. They have no idea whether
there's any injuries there or not at that time.

Now, one of the things that the detectives do
try to do and did here was Texas Ranger Kenny Ray directs

1   Sergeant Helton, Charles Helton, to swab some of the marks on
2   the child, the bite marks.  So Detective Ray, it didn't come
3   into his mind that's a Coke can.  He picked up on it real
4   quickly.  He was open to the idea, and he swabbed those marks
5   or had Charles Helton swab those marks.
6           Now, you don't know this at the time, because it
7   takes time for those things to go out and come back.  But
8   essentially it's not fair to say, it's not correct to say
9   there's no DNA in them, but there's nothing significant in
10  terms of there's always going to be DNA, because you're
11  swabbing somebody's body, and those kind of things.  But
12  there's nothing significant in those seven marks at that time.
13  Much like there's no blood, there's nothing significant that
14  comes from that.
15          Now, on the other end of that house, there's
16  those two other bedrooms.  And Kevin Roy will tell you that
17  when he went in one of them, the floor kind of gave a little
18  bit.  He didn't spend much time in there.  He didn't spend
19  much time in the next one.  Like I said, a lot of those
20  detectives will tell you they never walked down and never went
21  in.  Some of them will tell you they went in one and not the
22  other.  William Brown, a 32-year investigator with the Rusk
23  County D.A.'s Office, who's investigated a lot of cases,
24  earned some statewide recognition for it.
25          He'll tell you he walked down there, and he

1   looked in that south bedroom.  Looking in it, he'll tell you
2   it looked filthy.  Looked like the rest of the house, just
3   covered in trash and junk.  In fact, they'll tell you there's
4   animal feces.  There's dogs, cats.  There's feces in there.
5   And nobody worked that end of the house.  In fact, he would be
6   hard-pressed to find a picture that in a general way was taken
7   toward that end of the house from the inside.  The focus and
8   everything is up on the master bedroom and the master
9   bathroom.
10          Time goes by.  This is December 2nd, 2008.
11  December 11th, a full nine days go by, and another
12  investigator enters the case.  Because I submit that, you
13  know, I've never tried the perfect case.  I certainly make
14  mistakes.  You can tell those of you who dealt with me later
15  in the day over there that sometimes I get things turned
16  around when I shouldn't, as a lot of us can do.  So I'm not
17  too proud to ask for assistance and ask for assistance from
18  the Attorney General, hence Mrs. Tanner in this case.  She
19  directs Missy Wolfe to come up.
20          Missy Wolfe comes up to Rusk County and meets
21  with, at that time, the case agent, Amber Rogers.  Later on,
22  like I said, she's going to promote out into Crime Stoppers,
23  and Charles Helton is going to promote up to lieutenant, and
24  essentially he ends up -- from January on or sometime
25  thereafter, every time we need something, we need to look at

66

1   evidence or something, he's pretty much the case agent.  But
2   at that time, it's Amber Rogers.
3           She's sitting down with Missy Wolfe on the
4   11th, and Missy Wolfe is looking at this with a different
5   eye.  It's an experienced eye, but it's different.  She wasn't
6   out there on 12-2 of '08.  She didn't step over that body when
7   she went into that room.  She has a different perspective, and
8   she starts asking questions.  What about this?  What about
9   that?  One of the questions that she asks is, "Can I see your
10  diagram?"  Diagrams can be important for a lot of different
11  reasons, you'll find out.  And Detective Rogers essentially
12  didn't have a diagram.
13          They end up -- the two of them end up going out
14  to the residence again.  First, they go by the Family Dollar,
15  because you'll find out that this is Shirley Milam's
16  residence.  So they end up out at the residence on December
17  11th on a consent to search with the consent of Shirley
18  Milam.  Missy Wolfe will tell you at that time she's dealing
19  with something else, too.  She's dealing with an issue
20  regarding a personal matter.  She's had a relative who's had a
21  wreck that day, a sister.  So she's on the phone checking in
22  on that while she's doing all this.  One of the things that
23  she does remember and think to do is she tells Shirley Milam,
24  "We're going out there to take a diagram.  If we see something
25  bloody or something like that, we're going to collect it."

67

1           They go back out to the Milam residence, Missy
2   Wolfe and Amber Rogers.  And Missy Wolfe goes into that
3   residence.  And she'll tell you that even though she didn't
4   process this scene, she's processed scenes before, which is
5   what essentially the term of art that they use for working a
6   crime scene.  And she sees things in that residence that she
7   thinks, you know, no offense to anybody, but maybe some more
8   work needs to be done.  There's more here than it looks like
9   y'all have addressed, which she'll tell you is not unusual to
10  come up and review agencies' work under those kind of
11  circumstances.
12          She steps out.  She comes out.  She is only in
13  that residence just a little while.  She comes back out.  And
14  she asks for help essentially.  She asks for, you know, the
15  D.A.'s Office and the Sheriff's Office to seek the assistance
16  of a crime processing unit, and they do.  And the one that
17  they call upon is in Tyler, Texas.  Smith County Sheriff's
18  Office has got a person named Noel Martin.  Noel Martin is not
19  only a detective, but he's come up and has some training, some
20  more advanced training in working crime scenes, some training
21  in putting crime scenes together in terms of what they refer
22  to as crime scene reconstruction.  Trying to make
23  determinations from the evidence as to what may have happened,
24  inferences from the evidence, just like it sounds like.
25          One of the areas that they address and that he's

1  got some training in is something called blood spatter.  I
2  submit to you you'll hear a little bit about his training in
3  that regard.  It's essentially, to some extent, it's pretty
4  much common sense.  And if I, you know, cut my finger and I
5  wipe it along this banister, it will leave a certain stain.
6  If I cut my finger and instead of wiping it, I just let it sit
7  here and drip, it's going to leave a certain stain in a
8  certain place at a certain general range of velocity, and that
9  stain's going to have a certain look to it.  And that look to
10  that stain, blood spatter, can tell you something sometimes.
11       Now, he also does a lot of testing, and it's not
12  like CSI, but it's -- I submit to you in a lot of ways, it's
13  about as close as we get.  It uses chemicals.  He does things
14  to see whether there's even small amounts of presumptive
15  bodily fluids, possibly blood, even in areas where it looks
16  like they're clean, where it looks like there's either been
17  nothing there or it's been wiped up or removed.  Sometimes
18  he's able to see whether or not there's something presumptive
19  for blood, is the term they use.  He won't say it's blood,
20  because he doesn't know.  It's presumptive for bodily fluids
21  with the testing and training he has.  Then he photographs
22  those areas.
23       Now, Missy has left at this time, Missy Wolfe.
24  She's gone on to see about her family and the wreck.  And so
25  it's Noel and Amber.  And then you'll find out that, you know,

1  they need somebody out there to help them work the scene.
2  It's the day shift again, and Kevin Roy's on duty.  Kevin Roy
3  will come out at that time on December 11th.  He doesn't do
4  what, in his opinion at the time, he thought was very much.
5  He just stood around.  He held the tape while Amber took some
6  measurements this way or another, while Noel Martin was going
7  through taking these photographs, took a huge number of
8  photographs.
9       Now we're going to have photographs of that
10  south bedroom.  We're going to have photographs of the rest of
11  the house.  And in that south bedroom, Noel Martin sees
12  something with his eye that some other people just didn't see.
13  Like I said, that's no attack on them in any way.  Noel
14  Martin's got a different perspective.  He's got a lot more
15  training with crime scenes, and he didn't step over that baby
16  that day, nine days before.
17       Now, he starts collecting some items from that
18  south bedroom that he thinks are pertinent.  Actually, he has
19  Amber Rogers collect them.  He tells her what to do.  He tells
20  her how to do it.  And he supervises, actually watches her
21  collect these items.  He collects the diaper back there from
22  that south bedroom.  He collects what's referred to as the
23  hooded -- footed sleeper, I'm sorry.  He collects a large
24  number of baby wipes.  He also collects a pair of jeans from
25  that south bedroom, adult jeans, not associated with the baby.

70

1  He also has Amber Rogers -- I say he collects, because he's
2  telling her what to do, but she's actually getting it.  He
3  collects the tile.  He'll tell you why he had her collect that
4  tile out of that south bedroom.
5       I anticipate that later on, you'll find out from
6  the testimony all that stuff got sent to the lab, and you'll
7  know what Noel didn't know at that time.  I anticipate that
8  lab person is going to testify to you and tell you that all of
9  that stuff had, to a greater or lesser extent, Amora's DNA or
10  blood on it, associated with it in the south bedroom, the
11  opposite end of the house from the north bedroom.
12       I expect Noel Martin will also tell you he
13  walked all through that house.  Because when he works a scene,
14  he works it all.  And I expect that he'll tell you that in his
15  opinion, based on blood spatter and crime scene
16  reconstruction, the only blood spatter consistent with the
17  possible crime scene where that child was killed or injured is
18  going to be the south bedroom, not the north bedroom.  I
19  expect he'll tell you the basis of that is the blood spatter
20  more than anything else, because items can get moved around
21  one way or another.
22       And one more thing about the 11th that you'll
23  find out.  There's a lot of stuff in that south bedroom.  It's
24  kind of got stuff just stacked all around.  The floor's
25  filthy.  It's got, as we said, dog feces.  You'll see -- on

1  the 2nd, you'll see the dogs on the porch.  On the 11th and
2  possibly on the 2nd, but for certain on the 11th, we've got
3  a picture of the dog sitting up on the couch in the living
4  room.  Animals are going in and out, the dogs.
5       He finds one more thing in that south bedroom
6  back there on the bed that he directs Amber Rogers to collect.
7  It's Astroglide.  Astroglide is a lubricant.  It's essentially
8  a silicone oil, is what I expect a lab person to tell you what
9  it is.  He actually refers to it more often as silicone oil,
10  as opposed to the brand name Astroglide.  Now, that's all on
11  the 11th.
12       Two more days pass by, and something happens.
13  December 13th of 2008, we'll be able to prove that there is a
14  meeting between Teresa Shea and Blaine Milam.  We'll be able
15  to prove that later on December 13th, 2008, Teresa Shea is at
16  Dena Gray's house.  Dena Gray is a friend of Teresa Shea's.
17  She's also an in-law.  That's her niece-in-law, niece by
18  marriage.  Dena's her aunt, I suppose, and Teresa Shea would
19  be the niece.  Teresa is Blaine Milam's sister.  And Dena has
20  known her long enough and is comfortable enough with her, she
21  refers to her as "Little T."  She's down here visiting from up
22  north where she lives.  And she's at Dena Gray's residence
23  sometime in the afternoon of December 13, 2008, after she's
24  had the opportunity to visit or meet with Blaine Milam early
25  that day.

71

1        There at Dena Gray's house, she has a portion of
2    her house she refers to as the smoking porch.  She goes out
3    there, and just like it sounds like, they smoke, and they talk
4    and everything.  And Dena has got a daughter who's present.
5    Teresa Shea at that time makes a comment that causes both them
6    to look at each other.  Dena Gray looks at her daughter right
7    after Teresa Shea makes this comment, and Dena Gray gets up
8    and excuses herself and finds a reason to get out of the room.
9    12-13 of 2008, Dena Gray calls Detective Amber Rogers.

10        Amber Rogers, after she talks with Dena Gray,
11   ends up contacting William Brown you saw in here earlier, the
12   D.A.'s investigator we referred to.  He'll tell you that one
13   of the things he does, in his career as D.A.'s investigator --
14   we only have one pretty small office -- is he helps and
15   assists agencies, law enforcement agencies, police departments
16   and the Sheriff's Office, in preparation of warrants and
17   affidavits for warrants.  And he does this on December 13,
18   2008.  He stops what he's doing, and he helps Amber Rogers
19   prepare the affidavit and warrant.

20        The warrant's issued.  They go back out to the
21   Milam residence December 13th, 2008, and this time when they
22   do, they're not so much going in the residence when they go
23   out there, they end up that Amber Rogers goes under the house.
24   You'll see the house out there.  It's a trailer home, so
25   there's underpinning under it.  You'll see pictures with Kevin

1    Roy, because he did walk all around it at one point, so
2    there's places where the underpinnings are coming open.
3    You'll also hear inside the house, there's weak points where
4    the floor's falling in.  Amber Rogers goes up under that house
5    on December 13th of 2008, and William Brown is out there,
6    Kenny Ray is there, the Ranger.

7        What she brings out is a wrench, part of a
8    wrench actually.  It's a piece of a pipe wrench.  It's the
9    handle, the bottom part of the pipe wrench.  It's not the --
10   there's an adjustable portion that sticks up at the other end
11   to work the teeth together, for lack of a better way to say
12   it.  That top part, that top set of teeth is not there.  This
13   is the bottom set and the handle to that pipe wrench.  It's in
14   a Ziploc bag when she comes out.

15       That wrench that's recovered on 12-13 of 2008,
16   the day all these other matters -- all these other events of
17   people have had interaction, that wrench goes off to the labs,
18   and there's different labs to do essentially different things.
19   There's one that we use, Southwest Institute of Forensic
20   Sciences, a Dallas medical examiner in Dallas.  That's where
21   the body went for the autopsy.  They did a lot of work in this
22   case, the Dallas Medical Examiner's Office and their forensic
23   side, their lab.  It's -- also, the Texas Department of Public
24   Safety has labs throughout the State:  Austin, Tyler, Waco.
25   Some of those labs do different things.

---

74

1        So items get shipped sometimes from one lab to
2    another lab.  This item, this wrench, gets shipped around
3    some.  They're looking for whatever might be there in regard
4    to the wrench.  They look for fingerprints.  No fingerprints
5    are on there, or nothing usable, identifiable.  One of the
6    things you'll find out is obtaining fingerprints is a little
7    harder than television, and obtaining a usable print with
8    enough detail in it to match depends upon a lot of different
9    factors.  But they end up, they don't find that.  They don't
10   find blood on the wrench.  Don't find DNA on the wrench.  And
11   they're still shipping the wrench around.  But one of the
12   things that they realize is, fairly early on, there were some
13   swabs taken of the wrench up at Southwest Institute of
14   Forensic Sciences.

15       Now, swabs, I point out swabs is just like it
16   sounds when they swab something, essentially.  It's more
17   detailed than this, and you'll hear about how it's done, but
18   it's essentially like it sounds.  They take something, and
19   they swab it.  They rub it.  They wipe it.  When they do that,
20   sometimes they'll send it off for possible prints and things
21   like that first, because you can imagine when you wipe
22   something, sometimes you destroy or remove the print.  So they
23   send these things off back and forth to these labs different
24   ways, because they don't want to do it all at one time.
25   They're not going to swab the whole thing at one time for

1    concern about losing prints, print evidence.  Some of the
2    things that they do to print work with and some of the tools
3    that they try to bring prints out are not conducive to some of
4    the other tests.  So there's some competing interests in
5    trying to get these forensics.

6        They end up realizing that there were some swabs
7    taken early on of the wrench, and they test them.  But this
8    time they're not testing them for DNA.  They're not testing
9    them for blood.  They're certainly not testing swabs for
10   prints.  I expect that you'll hear that that wrench, those
11   swabs had something on them that's not water-soluble, you
12   don't typically wash off with water.  Silicone oil.  The same
13   silicone oil that Gene Henderson, the lab technician we refer
14   to, when he tests the Astroglide, he'll tell you that's what
15   Astroglide is composed of, silicone oil.  Astroglide.

16       You'll also find out that some other things had
17   silicone oil, Astroglide.  That diaper from the south bedroom,
18   wipes from the south bedroom, the diaper she had on at
19   autopsy.

20       I told you, the investigators out on the scene,
21   they don't take that diaper off.  They don't lift that diaper
22   up.  Of course, when the child gets to autopsy, they do.  I'm
23   assuming you know that, because we tested it for the
24   substance.

25       At that time, what Dr. Pinckard, the autopsy

75

1  doctor from the Southwest Institute of Forensic Sciences, the
2  Dallas Medical Examiner's Office, I expect what he will
3  testify to you about and what he will tell you is that there
4  were injuries under where that diaper was. There were severe
5  lacerations to the labia minora, severe lacerations to the
6  vaginal vault, perforation between the vagina and the rectum.
7  The way he describes that -- and I mean, I use the exact
8  terminology to be appropriate, because it's what I expect
9  you'll hear from him -- it's a perforation between the vagina
10  and the rectum of that 13-month-old child such that external
11  injuries are continuous with the pelvic cavity. I expect that
12  he'll tell you he doesn't know whether the injuries started on
13  one end or the other end, but it's all perforated and open
14  now.
15        He'll tell you that there's ten milliliters of
16  clotted blood in the abdominal mid-brain of the child. He'll
17  tell you that, in fact, this goes so far that the liver's
18  lacerated. And he'll tell you that he has an opinion, based
19  upon his profession or reasonable medical certitude, that that
20  liver is lacerated from a blunt force trauma injury. He will
21  also tell you that he has an opinion, based on his profession
22  and having done this, and to a reasonable degree of medical
23  certitude, that these injuries are inconsistent with a human
24  penis, that some type of object would have had to have been
25  used.

1        That's not all the injuries. There's some other
2  injuries. There's spiral fractures of an arm, leg, some of
3  the ribs. Most of the ribs, actually. Spiral fractures, I
4  expect he'll tell you, those are a little different from maybe
5  just a clean break. Those are a twisting motion, a twisting
6  essentially of the bone that breaks it. He'll tell you
7  there's a detached left retina. He'll tell you that there's
8  multiple skull fractures, literally multiple skull fractures
9  to the child. There's brain swelling. A lot of the medical
10  terms that go along with multiple skull fractures of the
11  baby's head. There's a laceration of the frenulum. The
12  frenulum, I expect that he'll tell you that that's under the
13  tongue. There's a little bit of skin that holds the tongue in
14  place down there, and that's the frenulum, and that on this
15  child, it's lacerated.
16        He'll tell you some other things about the child
17  that's consistent with the history that he gets of the child
18  being about 13 months old. Of course, I expect we're going to
19  prove the age a lot of different ways, but you'll hear
20  evidence of that. She's about 23 pounds. She's about 2 1/2
21  feet tall. And he'll tell you there's 24 bite marks on the
22  body of this baby. They're all over. I expect either him or
23  Dr. Williams will tell you that they're on the feet, they're
24  on the arms, sometimes multiple places on the arm. There's
25  one right here on the neck.

78

79

1        Now, we'll ask him a lot of questions about the
2  manner and means, and he'll be able to give opinions as to,
3  you know, not exactly how these injuries occurred. It's not
4  like television or CSI, but he's permitted to give opinions as
5  to what these injuries are consistent with.
6        He'll also tell you, now, there's three things
7  found in the toxicology. One of them is a small amount of
8  acetone, that I expect that he'll also tell you that this
9  small amount of acetone does not necessarily indicate that
10  it's a foreign substance, that under certain circumstances,
11  the body can actually produce a small amount of acetone. I
12  expect that -- the body can produce it naturally, I expect
13  he'll tell you.
14        He's also tell you that there's some
15  Acetaminophen, Benadryl -- and Benadryl is more of what a
16  layperson, we refer to it. I probably can't say it right
17  without reading it, so I'll defer to him for the actual term,
18  but Benadryl is typically the over-the-counter name of the
19  this substance.
20        Now, he'll tell you that -- you know, you'll
21  also know by then that we did find a little bottle with some
22  Benadryl in it, or actually it's under the actual name that he
23  refers to it as, in the south bedroom. This Acetaminophen and
24  Benadryl, he'll tell you, is in a good quantity in the child's
25  system, but I expect he'll tell you it might be enough, you

1  know, to make the child sleep, but it's not enough to sedate
2  the child. It's not enough to keep the child, if you -- you
3  know, if you just gently awoke the child, the child would
4  wake. It certainly wasn't enough to sedate the child through
5  what she went through, and I expect that he'll make that
6  clear.
7        I expect that he'll also testify to you as to
8  his conclusions, and his conclusions, to a reasonable degree
9  of medical certitude, are going to be that the means of this
10  child's death is multiple blunt force trauma, which is just
11  like it sounds like. You'll know by then. Blunt force
12  trauma. And he included in his findings -- and actually he
13  signs the findings, and the other doctors there and
14  pathologists and D.O.'s up there and M.D.'s, they actually
15  sign off on it as well when they review the reports and the
16  notes -- included possible strangulation.
17        And I'll expect that he'll tell you there was
18  some indication that the child could have died of
19  strangulation of not -- essentially not getting air. And
20  that's not the right way to say it. He'll explain it to you,
21  because he'll tell you there can be certain circumstances when
22  the shock can be just so great to a system that the person may
23  be breathing, may be pulling in air, but they're not getting
24  the oxygen out of it. They're in such a great deal of shock,
25  there can be circumstances where it would work like

strangulation under those circumstances. But mostly, I expect he'll focus on, what he'll tell you, he'll describe as multiple blunt force trauma.

Now, those bite marks, those 24 bite marks, they'll swab those up there. Dr. Pinckard -- and there's another doctor that's going to be there, Dr. Lingamfelter. Dr. Pinkard is involved in all of this. They end up swabbing those 24 bite marks, so that they can send that to trace evidence. And what they get is really not significant on almost all of them. But there's one we refer to as 20-I, which is over on the left elbow, a little bit more out of the way.

And now, you know, we see on TV, where they say this is a match and that's a match. In real life, one of the things that these forensic scientists is they eliminate the other possibilities and testify about what is left with it, what is consistent. Then they have statistical models sometimes that they use to show how significant it is. It's up to you to determine this, but I anticipate that you'll hear testimony from that DNA analyst that 20-I, they can't exclude Blaine Milam and it's statistically significant.

Now, another thing that they're able to do sometimes on these television shows is they'll tell you about when something started and when it ended, fix a time of death. I expect Dr. Pinckard will tell you that's very, very

difficult to do. And when you're talking about, you know, any sort of finite time period, other than a tremendous amount of finite time, he's not going to get into that. The science does not permit him to say this child died at, you know, X time. But he will talk about given the nature of the injuries, I expect that he'll testify to you that this went on for hours, not minutes, is likely the way that he'll phrase it. Hours, not minutes.

He'll base that on not only the nature of the injuries, but he'll base that on the fact that when people are injured, they bleed. When they're dead, the body stops pumping blood. He's got ten milliliters of blood in that child's abdominal membrane, and he'll tell you about how much blood, you know, typically a child or a person would have.

He'll tell you that these injuries are what he refers to -- and what other pathologists typically refer to it as -- perimortem and antemortem. What that means is, perimortem, at or near the time of death. Antemortem, going to be before the time of death. Not a lot before. He didn't find any evidence of old injuries, two or three days or a week, or something like that, not a huge amount of time before, but they're before the death, and they're at or near the time of death. He didn't find postmortem injuries, after-death injuries. And he can tell that from physiology, the way the body responds to injuries, like we talked about

---

82

about bleeding.

Another thing that the body does is sometimes it puts together a response to some of these injuries internally, and I'll leave that more to him to address how the body formulates its response to these injuries when it's trying to defend and protect itself internally.

Time. You'll hear some other things about time. You'll hear that that 911 call from Blaine Milam and Jesseca Carson comes in about 10:37, and it takes a while to get help out there. And the 911 operator or the EMTs at their direction is on the phone with them, trying to tell them how to perform CPR and how to do that. I anticipate or expect that you'll hear that actual 911 call. You will also hear from a person named Crystal Dopson. The 911 call is at 10:37, December 2nd of 2008. It's the same time that Kevin Roy was standing in that dispatch back when we started.

Back before that, at 9:00 that morning, Crystal Dopson is a manager of Insta-Cash Pawn, a pawnshop in Henderson, Texas. And she's opening the door that morning, and shortly thereafter at about 9:03, according to the security video that I anticipate you'll see that she has, Blaine Milam and Jesseca Carson walk through the door. She'll tell you that Crystal had known the Milam family and knew Blaine Milam enough, well enough, she was able to recognize him without any trouble. Of course, you'll also have the

83

advantage of seeing the video and seeing what he wore that day and what he's going to be wearing a few hours later when you see him in photographs at the scene.

She'll tell you that, you know, he seemed pretty much the way he seemed. He didn't seem intoxicated or anything like that, but he did seem to be a little anxious, and that he kept going to the door and spitting. She just assumed he had a dip of snuff or something. And she met with Blaine Milam and Jesseca Carson. And there were some tools, and she asked whether they wanted to pawn or sell them. And Jesseca looks to Blaine or calls to Blaine, because he's wandering around the store. You can see him in the security video going around the store. And Blaine says, "Sell them." I mean, I'm sorry, just the opposite. I'm sorry. Forgive me. He says, "Pawn them."

"$20?"

Blaine Milam is all right with $20, so they pawn the tools for $20. But Jesseca Carson's got her driver's license there, and she's got everything out, so you'll see the pawn ticket, and it's made out to her. And it was obtained when Jack Tully got her wallet out of that red Mustang, and there's where the pawn ticket was.

Now, from there, that takes a little while, because there's something else that you'll find out that, you know, she interpreted as maybe the reason why he was a little

anxious. There's a little discussion there or issue about there was some items there that the family had previously pawned that Blaine wanted to get out of pawn, and there were some reasons why she wouldn't do that. You know, didn't actually have his driver's license, had Jesseca's, and she wasn't going to release them to Jesseca's. They were actually, I believe, in Shirley, the mother's name.

So they have a little bit of time there where they have a discussion like that. This is 9:03. Sometime thereafter, there's another security video that we were able to obtain, that detective -- Ranger Ray and William Brown are asking for assistance from some of the other officers, even some of the other units. You can imagine. It's a large crime for a small county. And Henderson police detective David Marshall gets driver's license photos of Jesseca Carson and Blaine Milam, and he goes and sits down through videotape at a convenience store called On the Run, Managed by Jared Walker or Johnny Walker, his father. I expect Jared will come and testify and prove that this is the authentic tape. It's a business record of the store, although Jared wasn't there, didn't sell anything to them, didn't see them there. But Detective Miley (sic) was able to identify them from this videotape.

What you'll see is Jesseca Carson comes in, buys a Coke or cigarettes or something, just an item, goes back

out. Out at the pumps, they've got videos, too. And out at the pumps, you'll see Blaine Milam sitting in the car with Jesseca Carson, and they actually lean over and share a kiss or share some close contact, which you'll be able to see from the video. That's around 9:17 and sometime thereafter.

Now, that 911 call is at 10:37, so it's more than an hour away. And Detective -- or Sergeant Roy will tell you that, running code, it takes about 20 minutes to get from Henderson. He's downtown, but downtown Henderson, the rest of Henderson, like you can imagine, is not all that far. That it takes about 20 minutes to get out there to this residence. So sometime thereafter, we know Blaine Milam or Jesseca Carson are at the residence, because the next time we have some sort of verification from the recordings, we've got the 911 call at 10:37. At around 10:57, 20 minutes after they get the call, that's going to be around the time I expect Sergeant Roy to tell you that he steps over the body, and he lifts that left leg up, and the body's just solid.

I expect you'll also hear from another witness, a Shirley Broyles. Shirley Broyles will tell you that she had a conversation with Blaine Milam, and Blaine Milam made a statement to her on or about January 22nd of 2009. And I expect that she will testify to you Blaine Milam said, "I'm going to confess I did it, Ms. Shirley. But Ms. Shirley, the Blaine Milam you know didn't do it. My dad told me to be

---

86

a man. And I've been reading my Bible. Please tell Jesseca I love her."

I expect one of the last witnesses that you'll hear from is Dr. Williams. Dr. Williams is an odontologist in Dallas, Texas. He's got an office up there where he, like every other dentist, works on regular folks fixing teeth. But one of the things that he got into a long time ago, among his other interests, was the Southwest Institute of Forensic Sciences, which is a Dallas Medical Examiner's Office. They needed a dentist who could compare pattern injuries, the kind of pattern injuries that dentists would compare, and that Dr. Williams got involved in this field at a fairly early age of his career. He's done a lot of it. He's board certified.

And I anticipate that he'll tell you that what he uses to make comparisons is he tries to get what they call study models -- what we call sometimes in law enforcement exemplars -- study models, and make comparisons preferably from a closed population group. As many as he can, err on the side of getting too many sometimes. And in this case, Dr. Hillin, who is a dentist in Henderson, Texas, made some study models. You'll likely hear from Dr. Hillin tomorrow. It may be a little bit out of order, because he's got another matter that he has to attend to.

But Dr. Hillin's more of a fact witness. He'll just tell you that he doesn't do the -- you know, he doesn't

---

87

do the comparisons, the forensic odontology. What he does is he makes study models for all sorts of purposes, generally to confer with other doctors about whether somebody needs certain dental work. So he knows how to make study models. And study models are what they sound like. They're casts, casts of a person's teeth.

And Dr. Hillin will testify to you that he made study models of Blaine Milam's teeth. It was on December 2nd of 2008. He let it cure overnight and provided it to Charles Helton the next day. He also on the same day -- now, there's some other witnesses that saw Blaine Milam in the chair getting the mold made. William Brown, Kenny Ray, Jack Tully, and Charles Helton either saw Milam or Jesseca Carson at different times over there getting these things made. And then Dr. Hillin lets them set up, marks on them whose they are, those kind of things, boxes them up, ships them out through Charles Helton.

Now, later on, much later on, the next year maybe, they end up also getting a set from Danny Milam, Blaine's brother, just, like I said, to close that population group, whether there's much indication that he was actually even available to be there or not, but they do. And I expect Dr. Williams will tell you right off that he excluded him. He does. He talks like the DNA people in terms of who you can exclude and who you can include. Danny Milam is not there.

1  He's excluded from those bite marks.
2         Now, Jesseca Carson, I expect that Dr. Williams
3  will tell you she's excluded from all but the possibility of
4  one, and he's just got one set of teeth on that one.  Now, I
5  expect Dr. Williams will tell you that Jesseca Carson has got
6  a certain -- like we all do, certain bites with our teeth, and
7  that to him, it looks like maybe she's had some sort of
8  orthodontia done, because it's just so good, so perfect the
9  way the teeth fit.  I expect he'll tell you in examining the
10  study model from Blaine Milam, it's not so perfect, not
11  fitting quite so good, that there's some things about the
12  upper teeth that are unusual, that aren't so close to perfect.
13  There's some things about the bottom teeth that are unusual,
14  not so close to perfect.  There's even something he refers to
15  where it's just -- you can see it yourself on his
16  photographs -- it just almost makes an "M."
17         Dr. Williams was involved in this case early on,
18  before the State ever retained him as an expert, because of
19  his affiliation with the Southwest Institute of Forensic
20  Sciences.  He'll tell you that there is a whole way that
21  experience has taught him to get in there and be a part, early
22  of the process, in photographing these bite marks.  He did
23  that in this case.  He'll also tell you that, you know, one of
24  the things he's so concerned about is because skin's not a
25  real good medium.  It loses -- it's not like those dental

1  molds that are made to hold the impression.  So he wants to
2  look at them, he wants to photograph, he wants to get to it.
3         I expect even though he'll tell you skin's a
4  poor medium, he'll tell you that he was able to exclude
5  Jesseca Carson from all but the possibility of that one.  Now,
6  he's not going to turn it around and say, "She was that one."
7  He just says he can't exclude it.  He does think that -- you
8  know, another reason he's prohibited from saying that she's
9  that one is because of the way that particular one, there's no
10  second part to it.  You know, there's a top and a bottom.
11  There's no second part to that one.  But he'll tell you that
12  on the others, the others, that he cannot exclude Blaine
13  Milam, because he sees those distinctive indentions in the top
14  teeth.  Those distinctive indentions in pattern, almost to
15  him, that you'll see in those bottom teeth.  And he can't
16  exclude Blaine Milam from 22 of 24 bite marks on that child.
17         He'll tell you it took him a long time to do it,
18  because he went through each one of them to determine whether
19  or not there was enough detail to make a comparison, and that
20  he was able to find enough detail to make a comparison to
21  those 22 that he'll tell you he can't exclude Blaine Milam
22  from.  And he'll actually describe to you how he sees that
23  distinctive and unusual shape there.
24         Some of you, back when we asked all the
25  questions in voir dire, some of you got to the point where you

1  just very bluntly asked me and Mrs. Tanner, "Given all that
2  the State has to prove to carry the burden of proof --
3         (Cell phone ringing.)
4         THE COURT:  It's a new phone.  I apologize.
5  I'll fine myself.
6         MR. HAGAN:  You're the last one, Judge.
7         MR. JIMERSON:  We all remember -- a lot of you,
8  not all of you, but there were several of you, you know, I
9  mentioned that sometimes I made mistakes.  There was sometimes
10  when the phone went off over there, is what we're referring
11  to.
12         But some of you likewise in that voir dire
13  process, where, like I say, we never dwelt on those three
14  words, rarely ever said them.  Some of you, you know, "How can
15  the State prove beyond a reasonable doubt all that it's got to
16  prove and carry its burden of proof?"  We just kept assuring
17  you that was our job.  You know, we represented to you we're
18  going to do it.
19         I expect after you hear the evidence in this
20  case, you will know, you will know that this baby, Amora Bain
21  Carson, spent the last few hours of her life suffering
22  horrific injuries.  And that she suffered those injuries as a
23  result of a betrayal.  And I expect that you will know who did
24  it, and that you will know what the worst of the worst means,
25  that you'll know what went on without me addressing it

1  anymore.  You're going to know something else.  You're going
2  to know something I submit is equally as important as
3  obtaining justice for Amora Bain Carson.  You're going to know
4  that Amora Bain Carson is not three words on a board over
5  there in that room.
6         THE COURT:  Thank you, Mr. Jimerson.  Does the
7  defense desire to make an opening statement at this time?
8         MR. HAGAN:  Your Honor, we'll reserve our
9  opening statement until we present our evidence.
10         THE COURT:  All right.  Ladies and gentlemen, we
11  will reconvene at 12:50 in this case.  It's 11:40 at this
12  time.  We'll take an hour and ten minute recess.  We'll
13  reconvene -- again, you'll reconvene in the jury room.  Be
14  ready to go at 12:50.  We'll stand in recess.  You may step
15  down.
16         (Recess.)
17  (Open court, defendant present, no jury.)
18         THE COURT:  We'll go on the record.
19         MR. HAGAN:  Judge, the first witness they plan
20  to call is going to purport to testify to a relationship
21  between her and the deceased, and we would object to that as
22  being based on hearsay.  The father, or the alleged biological
23  father of this child, was not named on the birth certificate
24  and is not -- the only way this witness could have any
25  information concerning the biological relationship with the

1  victim in this case would be through statements made to her by
2  either Arlen Mutina or the mother of the child, and we would
3  object to it as hearsay.
4        MRS. TANNER:  It's not being offered for the
5  truth of the matter asserted.  He was the presumed father.
6  His family and his entire family treated this as if he was the
7  father, Arlen, and she therefore treated this as if Amora was
8  her niece.  That's the relevance of it.  To require DNA
9  results in order for her to testify is preposterous.
10       MR. HAGAN:  Well, Judge, he was not the presumed
11  father is the problem.
12       MRS. TANNER:  He was referred to in the CPS
13  case.
14       THE COURT:  Wait.  One at a time.
15       MR. HAGAN:  Well, he was not the presumed
16  father.  They were not cohabitating together when the child
17  was born.  He was not named as the father on any birth
18  certificate or any other registry.  In addition to that, the
19  Texas Attorney General's Office filed a lawsuit attempting to
20  establish Arlen Mutina as the father, and that suit was
21  dismissed due to the fact that Arlen Mutina asserted his
22  rights under the Soldier and Sailors Relief Act to not be
23  served with process, and so therefore, that case was
24  dismissed, so he's not a presumed father under the Family
25  Code.

94

1        He has no relationship with the child and has
2  never been listed in any registry with the Court, or
3  otherwise, as a presumed father.  And therefore, any testimony
4  she would give concerning what she believes her relationship
5  to the child would be, would be nothing more than based upon
6  hearsay of what he said or what the child's mother said, in
7  any event, would still be hearsay.
8        MRS. TANNER:  Also, her observations of the
9  relationship, and secondly, she's testifying as her
10  observations of the victim, her presence around the victim,
11  her interactions with the victim.  And so whether there's a
12  DNA test that says it one way or the other is utterly
13  irrelevant.  The fact -- and actually, in Milam's interview
14  that comes in later, he confirms that Mutina is the father of
15  the baby.
16       THE COURT:  I'll overrule the objection and give
17  you a running objection to that line of testimony.
18       MR. HAGAN:  Thank you, Judge.  We would also
19  object under Crawford, as far as violating the confrontation
20  clause.
21       THE COURT:  I'll overrule that objection and
22  give you that objection as a running objection.
23       MR. HAGAN:  Thank you, Judge.
24       THE COURT:  You may bring in the jury.
25       (Jury returned to the courtroom.)

95

1        THE COURT:  You may be seated.  I think somebody
2  may have had the question, do you have to sit in the same
3  place?  No, you can sit -- it's musical chairs.  It doesn't
4  make any difference.  I know you have your instructions.  You
5  don't have to bring them in and out.  Read them one time.
6  Just keep them with you.  Refer to them if you need to.  You
7  do have your badges on now, I see.  Just make sure that once
8  you get here, you wear them until you leave in the afternoon.
9  Just leave them here, and then put them back on when you get
10  here every morning.  Okay?
11       MRS. TANNER:  Judge, we need the Court to switch
12  to the document camera.
13       THE COURT:  All right.
14       MRS. TANNER:  Thank you.  And State would call
15  Heather Mutina.
16       THE COURT:  Was this witness sworn this morning?
17       MRS. TANNER:  Yes, sir, she was.
18       THE COURT:  You were sworn this morning,
19  correct?
20       THE WITNESS:  Yes, sir.
21       THE COURT:  You may proceed.
22       MRS. TANNER:  Thank you, Your Honor.
23            HEATHER MUTINA,
24  having been previously duly sworn, testified as follows:
25            DIRECT EXAMINATION

1  BY MRS. TANNER:
2     Q.   Would you state your name for the jury, please,
3  ma'am?
4     A.   Heather Mutina.
5     Q.   Heather, it's rude to ask a female how old she is,
6  but you're young enough.  How old are you?
7     A.   18.
8     Q.   Okay.  And tell the jury where you live.
9     A.   Longview, Texas.
10    Q.   How long have you lived in Longview?
11    A.   17 years.
12    Q.   Almost your whole life?
13    A.   Yes, ma'am.
14    Q.   Okay.  And do you go to school?
15    A.   Yes, ma'am.
16    Q.   And what school do you go to?
17    A.   Longview High School.
18    Q.   And what year are you in?
19    A.   Senior.
20    Q.   Okay.  And are you fixing to graduate?
21    A.   Yes, ma'am.
22    Q.   When do you graduate?
23    A.   June 4th.
24    Q.   Getting excited?
25    A.   Yes, ma'am.

1    Q.    Do you have any plans for what you're going to do
2    after graduation?
3    A.    Yes, ma'am.  Go to Kilgore College and major in
4    nursing.
5    Q.    Okay.  And you're planning on becoming a nurse?
6    A.    Uh-huh.
7    Q.    Now, you said you live in Longview.
8    A.    Uh-huh.
9    Q.    Can you tell the jury basically where you live in
10   Longview?  What's your address?
11   A.    My address?
12   Q.    Well, that's all right.  I'll move on.  Do you live
13   in the neighborhood there?
14   A.    Yes, ma'am.
15   Q.    And who do you live with?
16   A.    My dad, my parents.
17   Q.    Who all lives in your home right now?
18   A.    Me, my dad, and my mom.
19   Q.    What's your parents' names?
20   A.    Richard and Dena Mutina.
21   Q.    Do you have any brothers and sisters?
22   A.    Yes, ma'am.  I have two brothers, Cody and Arlen
23   Mutina.
24   Q.    And tell me their ages.
25   A.    Arlen is 21, and Cody is 19.

1    Q.    And you're 18?
2    A.    Yes, ma'am.
3    Q.    So you're the baby of the family?
4    A.    Yes, ma'am.
5    Q.    Do your brothers, Cody and Arlen, do they still live
6    there at home with y'all?
7    A.    No, ma'am.
8    Q.    Where does your brother, Cody, live?
9    A.    With his girlfriend in Longview.
10   Q.    In Longview as well?
11   A.    (Nods head affirmatively.)
12   Q.    And what about your brother, Arlen?  Where is he?
13   A.    Iraq.
14   Q.    And how long has you your brother, Arlen, been in
15   Iraq?
16   A.    Since January.
17   Q.    Okay.  And for what purpose is he in Iraq?
18   A.    To serve.
19   Q.    Is he in the military?
20   A.    Uh-huh.
21   Q.    Okay.  And how long about -- I know you don't know
22   specific days, but about how long has your brother, Arlen,
23   been in the military?
24   A.    About three years.
25   Q.    Okay.  And do you recall, did he go in the

98

1    military -- (witness weeping).  If you need to take a break,
2    you let us know, okay?
3    A.    Okay.
4    Q.    Again, if you need to take a break, let us know,
5    okay?
6    A.    (Nods head affirmatively.)
7    Q.    Your brother, Arlen, when he went in the military,
8    was it while he was in school, right after school, as an
9    adult?
10   A.    Right after graduation.
11   Q.    From high school?
12   A.    Uh-huh.
13   Q.    Okay.  And when he first got out of high school, and
14   he enlisted in the Army, where did he go first; do you
15   remember?
16   A.    Oklahoma for training.
17   Q.    Okay.  And after he got out of training, do you
18   remember where he went?
19   A.    Korea.
20   Q.    Do you remember about how long Arlen was in Korea?
21   A.    I think a year.
22   Q.    Okay.  And then he came home from Korea, and where
23   did he go from there?
24   A.    To Seattle, Washington.
25   Q.    And then he went to Iraq this past January?

1    A.    (Nods head affirmatively.)
2    Q.    Do you know how long he's going to be over there?
3    A.    A year.  Maybe longer.
4    Q.    Has that got your family a little worried?
5    A.    A little.
6    Q.    Okay.  Now, you told us about your family, your mom
7    and your brothers.  Did you have somebody else in your family
8    that you were close to that you lost pretty recently?
9    A.    Amora.
10   Q.    Who was Amora, Heather?
11   A.    My niece.
12   Q.    And do you remember when Amora was born?
13   A.    November 12th -- (weeping) -- of '08.
14   Q.    Of '08?  Or '07.
15   A.    '07, I'm sorry.
16   Q.    That's okay.  That's all right.  Take your time,
17   okay?  And so Amora was born November 12th of 2007?
18   A.    (Nods head affirmatively.)
19   Q.    When did Amora pass away?
20   A.    December 2nd of '08.
21   Q.    So your niece was about 13 months old when she died?
22   A.    (Nods head affirmatively.)
23   Q.    Now, who were Amora's parents?
24   A.    Jesse -- Jesseca Carson and Arlen Mutina.
25   Q.    So your brother, Arlen?

99

1    A.   (Nods head affirmatively.)
2    Q.   And you said Jesseca Carson.  Did you know Jesseca?
3    A.   Yes, ma'am.
4    Q.   Did you know her from school or from dating your
5    brother or both?
6    A.   Both.
7    Q.   And about what years in school was your brother Arlen
8    in when he and Jesseca were dating?
9    A.   His senior year, when she was a junior.
10   Q.   She was a junior?  And you were --
11   A.   A freshman.
12   Q.   A freshman?  Okay.  And when he was a senior in high
13   school, and you were a junior -- and she was a junior in high
14   school, did she end up getting pregnant?
15   A.   Yes, sir.
16   Q.   And do you know whether or not there was talk or
17   discussion of marriage?
18   A.   Yes, ma'am.
19   Q.   Did that happen?
20   A.   No.
21   Q.   They did not get married?
22   A.   No.
23   Q.   Okay.  Now, your brother, Arlen, you said that right
24   after high school, he went in the military, and he was shipped
25   out?

1    A.   (Nods head affirmatively.)
2    Q.   When he was shipped out, was your niece Amora already
3    born or was she -- was Jess pregnant --
4    A.   She was still pregnant.
5    Q.   Okay.  And do you know how many times your brother,
6    Arlen, got to see Jesseca -- Amora?
7    A.   Maybe two or three times.
8    Q.   Now, while Jesseca was pregnant with Amora, did you
9    have contact with her?
10   A.   Yes, ma'am.
11   Q.   And, in fact, did there come a time when Jesseca
12   lived in the home with your family?
13   A.   (Nods head affirmatively.)
14   Q.   Yes?
15   A.   (Nods head affirmatively.)
16   Q.   I'm sorry.  I've got to get you to answer out loud.
17   A.   Yes.
18   Q.   And when, about, was that?
19   A.   Summer of --
20   Q.   It was the summer.  Was she pregnant?
21   A.   (Nods head affirmatively.)
22   Q.   So it was the summer she was pregnant?
23   A.   (Nods head affirmatively.)
24   Q.   And you said that you knew Jesseca, dating your
25   brother, Arlen, as well as through school.  Where did she live

102

1    before she moved in with y'all?
2    A.   She lived in our neighborhood.
3    Q.   Okay.  And so same street?  Different street, close
4    by?
5    A.   Different street, close by.
6    Q.   Okay.  And you said she lived with y'all through the
7    summer.  When she was living with your family, your folks and
8    you, did you all buy things for her to get her ready for the
9    baby, and that kind of stuff?
10   A.   Yes, ma'am.
11   Q.   What about you specifically?  Did you try to buy
12   stuff for the baby, and things like that?
13   A.   Yes, ma'am.
14   Q.   Okay.  Did you do that pretty often?
15   A.   When I had allowance, yes, ma'am.
16   Q.   When you had your allowance?
17   A.   Yeah.
18   Q.   Okay.  Were you pretty excited about having a niece?
19   A.   (Nods head affirmatively.)
20   Q.   You said that -- let me ask you this.  Was Jesseca
21   still living with your family when she gave birth?
22   A.   She moved out a little before she gave birth.
23   Q.   Where was she living then?
24   A.   She moved back to her mom's.
25   Q.   Okay.  So when she gave birth, you said it was

103

1    November 12, 2007.
2    A.   (Nods head affirmatively.)
3    Q.   Did you get to see Amora shortly thereafter?
4    A.   (Nods head affirmatively.)
5    Q.   How soon after?
6    A.   Maybe like -- like almost -- almost every day after
7    she was born.
8    Q.   Did you see her on the day she was born?
9    A.   Uh-huh.
10   Q.   Okay.  And did you -- you said you got to see Amora a
11   lot when she was just a baby?
12   A.   Yes, ma'am.
13   Q.   Did you feel like you were pretty close to her?
14   A.   (Nods head affirmatively.)
15   Q.   Heather, best as you can, tell us about Amora.
16   A.   Ma'am?
17   Q.   Tell the jury about Amora.
18   A.   She was --
19        MR. HAGAN:  Your Honor, I'm sorry.  I'm going to
20   have to object to narrative and relevance.
21        THE COURT:  All right.  I'll sustain the
22   objection.
23   Q.   (BY MRS. TANNER)  Was Amora a good baby?
24   A.   (Nods head affirmatively.)  She was quiet, never
25   cried hardly.

1    Q.   Was she a fussy baby?

2    A.   No.

3    Q.   Was she a baby -- I mean, you don't have kids of your

4    own.  Was she a baby that, for you, she was easy to be around,

5    easy to take care of?

6    A.   Yes, ma'am.

7    Q.   Did Jesseca, on occasion, bring Amora over to your

8    home, so that you and your family could see her, and that kind

9    of thing?

10   A.   Yes, ma'am.

11   Q.   And was this during the time when Arlen was overseas?

12   A.   (Nods head affirmatively.)

13   Q.   Okay.  Heather, do you remember the last time you saw

14   baby Amora?

15   A.   November -- last November, a little bit before

16   Thanksgiving.

17   Q.   Okay.  So if Thanksgiving -- that would have been

18   November of 2008?

19   A.   Uh-huh.

20   Q.   Okay.  If Thanksgiving was November 27th of that

21   year, just been a couple days before that?

22   A.   Uh-huh.

23   Q.   Was it therefore really close in time to when Amora

24   died?

25   A.   Uh-huh.

106

1    Q.   Tell me about that last visit.  How did that come to

2    pass?  Where did you see her?  How did she come to see you?

3    That kind of stuff.

4    A.   Well, Jesse and Blaine and the baby came to the

5    house, and I was getting ready to leave somewhere, and they

6    were visiting with my mom, and then my --

7    Q.   Let me stop you for a sec.  You said that Jesse and

8    Blaine and Amora came to your home there in Longview?

9    A.   Uh-huh.

10   Q.   And you said Blaine.  Did you know who he was?

11   A.   I knew of him.  I'd never met him.

12   Q.   Had you become aware that Jesse had gotten a

13   boyfriend?

14   A.   Uh-huh.

15   Q.   And prior to that day, a couple of days before

16   Thanksgiving, had you ever met him?

17   A.   No.

18   Q.   Okay.  And was he introduced to you as this person

19   that was the boyfriend of Jesse?

20   A.   Yes.

21   Q.   Okay.  And the three of them, Amora, Jesse and this

22   person you referred to as Blaine, came over to visit?

23   A.   Uh-huh.

24   Q.   Now, tell me about what transpired during the visit.

25   A.   My -- well, I was in my room getting ready to leave,

107

1    and my mom was talking to them, and my mom sent Blaine on an

2    errand.  And my brother, Cody, stopped by the house.  And I

3    was over -- I overheard a conversation between Cody and Jesse,

4    and he asked Jesse what was going on --

5         MR. HAGAN:  Your Honor, I'm going to object.

6    Hearsay.

7         THE COURT:  I'll sustain the objection.

8    Q.   (BY MRS. TANNER) Did you -- so there was a visit.  Do

9    you recall, did they stay a long time, a short time?

10   A.   Maybe like three to four hours maybe.

11   Q.   Three to four hours.  Okay.  And through the time of

12   this visit, was the person you referred to as Blaine, was he

13   there for a large part of it or just for a short bit of it?

14   A.   Maybe a short bit.

15   Q.   Okay.  Because your mom had sent him on an errand?

16   A.   Uh-huh.

17   Q.   And while you were on that visit, while you were --

18   did you play with Amora and hold her and do the kind of stuff

19   you do when you get to see your niece?

20   A.   Yes, ma'am.

21   Q.   And did you see anything on Amora that appeared to be

22   unusual?

23   A.   Yes, ma'am.

24   Q.   What was it that you saw?

25   A.   On her lower right forearm, there was a red mark.

1    And my brother mentioned it to Jesse, and I looked.  And it

2    was just a red mark on her lower right arm.

3    Q.   Show the jury on your arm where you're talking about.

4    A.   Like right here.

5    Q.   So you're talking about the inside of your forearm?

6    A.   Uh-huh.

7    Q.   On your right side?

8    A.   Uh-huh.

9    Q.   Below your elbow?

10   A.   (Nods head affirmatively.)

11   Q.   Okay.  And you said it was a red mark.

12   A.   Uh-huh.

13   Q.   Can you tell the jury basically what it looked like,

14   other than it was just a red mark?

15   A.   A bite mark.

16   Q.   Okay.  Well, was it square, was it triangular, was it

17   a line, was it round?

18   A.   Round.

19   Q.   And did it -- was it, you know, the size of a dime or

20   was it bigger?

21   A.   Kind of a little bit bigger than maybe a dime.

22   Q.   Okay.

23   A.   Bigger.

24   Q.   Okay.  But it was a round red mark --

25   A.   Uh-huh.

1  Q.  -- on her forearm.  And did you or your brother ask
2  about it?
3  A.  Yeah.  My brother asked Jesse, and she said it was a
4  dog --
5        MR. HAGAN:  Again, Your Honor, hearsay.
6        THE COURT:  Sir?  Mr. Hagan?
7        MR. HAGAN:  I said hearsay.
8        THE COURT:  All right.  I'll sustain the
9  objection.
10  Q.  (BY MRS. TANNER) Now, tell me how this visit on that
11  day ended.
12  A.  Blaine came back from running an errand, and he told
13  Jesse that they needed to go somewhere, and they just left
14  maybe 5 minutes after he came back.
15  Q.  So your mom had sent him away.  You'd visited for a
16  while with Amora.  He gets back from the errand, and you said
17  that he said they needed to leave?
18  A.  Uh-huh.
19  Q.  Okay.  And they left within minutes of that?
20  A.  Yes, ma'am.
21  Q.  Okay.  Now, when you saw Jesse -- you'd known her for
22  a while at this point, right?
23  A.  Uh-huh.
24  Q.  Did she seem like her normal self or different or
25  anything like that?

1  A.  She seemed different.
2  Q.  In what way?
3  A.  She was more quiet.
4  Q.  Just quieter than usual?
5  A.  (Nods head affirmatively.)
6  Q.  And when Blaine came back and said, "We need to go,"
7  did Jesse -- what was her reaction?
8  A.  She left.
9  Q.  Did she agree with him and immediately do that?
10  A.  Yes, ma'am.
11  Q.  And from what you observed of their interaction
12  between Jesse and Blaine, which one appeared to be kind of
13  calling the shots, if you will?
14        MR. HAGAN:  I'm going to object, Your Honor.
15  Calls for speculation on the part of the witness.
16        MRS. TANNER:  It's based upon her observation of
17  what she saw of the interaction between them.  It's not
18  speculation.
19        THE COURT:  I'll overrule the objection.
20  Q.  (BY MRS. TANNER) Which one of the two of them
21  appeared to be calling the shots, as far as you could see?
22  A.  Blaine.
23  Q.  Okay.  Now, when you left -- or when they left that
24  day, Blaine and Jesse and baby Amora, did you ever see baby
25  Amora alive again after that?

110

1  A.  (Shakes head negatively.)
2  Q.  How did you find out that she had died?
3  A.  The secretary from my -- (weeping.)
4  Q.  Did they contact you at school?
5  A.  Yes, ma'am.
6  Q.  Heather, do you see the person in the courtroom who
7  you've referred to as Blaine, as the boyfriend of Jesseca that
8  came to your house shortly before Thanksgiving in 2008?
9  A.  (Nods head affirmatively.)
10  Q.  Can you point him out for us?
11  A.  (Witness complied.)
12  Q.  Is he -- of the four male individuals at the table
13  from left to right, is he the second one?
14  A.  Uh-huh.  (Witness nods head affirmatively.)
15        MRS. TANNER:  We would ask the record reflect
16  the witness has identified the defendant.
17        MR. HAGAN:  I'm going to object, Your Honor.  I
18  believe the record will reflect what the record reflects, and
19  I would object to the Court being asked to comment on matters
20  of the record as far as what they would reflect, as it would
21  constitute a comment on the evidence.  And in that respect, I
22  would object to the request being made of the Court.
23        THE COURT:  I'll overrule the objection.  The
24  record will reflect the second from the left is Mr. Moore.
25        MRS. TANNER:  From my left, sorry.  Let me ask

1  another question.
2        THE COURT:  From my left.  I apologize.
3  Q.  (BY MRS. TANNER) Let me ask another question.  Of the
4  four men sitting at the table, there's one of them who's not
5  wearing a tie.  Which one is that?
6  A.  Blaine.
7  Q.  Thank you.
8        MRS. TANNER:  We would ask the record reflect
9  the witness has identified the defendant.
10        MR. HAGAN:  Again, same objection, Your Honor,
11  as far as requesting the Court make comments upon what the
12  record will reflect.  The record will reflect what it
13  reflects, and for the Court to make a comment upon it can
14  constitute a comment on the weight of the evidence, on the
15  evidence in general, and we would object to it.
16        THE COURT:  I'll overrule the objection.  The
17  record will so reflect.
18        MRS. TANNER:  Thank you, Your Honor.  May I
19  proceed?
20        THE COURT:  Yes.
21        MRS. TANNER:  May I approach the witness?
22        THE COURT:  Yes.
23  Q.  (BY MRS. TANNER) Heather, I want to show you what's
24  been marked State's Exhibit No. 2.  Do you recognize that
25  picture?

111

1    A.   Yes, ma'am.

2    Q.   Is that how your niece, Amora, appeared shortly

3  before she passed away?

4    A.   Yes, ma'am.

5    Q.   Is that a fair and accurate picture of Amora?

6    A.   (Nods head affirmatively.)

7         MRS. TANNER:  State would offer State's Exhibit

8  No. 2.

9         MR. HAGAN:  No. 2?  No objections.

10        THE COURT:  State's 2 will be received.

11   Q.   (BY MRS. TANNER) In fact, State's Exhibit No. 2, is

12  that a picture that you and your folks gave to us?

13   A.   (Nods head affirmatively.)

14   Q.   Is it framed at your home?

15   A.   Yes, ma'am.

16        MRS. TANNER:  May I display it to the jury, Your

17  Honor?

18        THE COURT:  Yes, you may.

19   Q.   Heather, State's Exhibit No. 2, can you see that on

20  the monitor before you?

21   A.   Yes, ma'am.

22   Q.   Is that how your niece, Amora, looked shortly before

23  she died?

24   A.   Yes, ma'am.

25   Q.   And that's a photograph that you have in your home

---

1  framed of her?

2    A.   Yes, ma'am.

3         MRS. TANNER:  I'll pass the witness.

4         THE COURT:  Mr. Hagan.

5              CROSS-EXAMINATION

6  BY MR. HAGAN:

7    Q.   Just a couple of quick questions.  Just looking at

8  State's Exhibit 2, that looks like that was taken August 24,

9  2008; is that right?

10   A.   Yes, sir.

11   Q.   You can look up there kind of on the left-hand

12  corner.  See where it says 08-24-2008?  Does that sound about

13  right?

14   A.   Yes, sir.

15   Q.   Okay.  So back in August, 2008, that's a good

16  representation of Amora there, isn't it?

17   A.   (No response from witness.)

18   Q.   That's how she looked in August of 2008, correct?

19   A.   (Nods head affirmatively.)

20   Q.   Okay.  You say Jess lived there in your house for a

21  couple of weeks?  About how long was that?

22   A.   Two to three months.

23   Q.   Two to three months during that summer?

24   A.   (Nods head affirmatively.)

25   Q.   Why did she move out?

---

1    A.   Because my brother and her broke up.

2    Q.   Broke up.  Okay.  Do you know if your brother ever

3  paid any child support for Amora?

4    A.   No.

5         MR. HAGAN:  Okay.  I pass the witness.

6         MRS. TANNER:  No further questions.

7         THE COURT:  You may step down, ma'am.

8         MRS. TANNER:  May she be excused, Your Honor?

9         THE COURT:  Any objection to this witness --

10        MR. HAGAN:  Hang on, Judge, just a second.

11        (Defense attorneys conferring.)

12        MR. HAGAN:  Hang on just a second, Judge.  I do

13  have some further questions.

14            CROSS-EXAMINATION (CONTINUED)

15  BY MR. HAGAN:

16   Q.   Just a couple of questions, Heather.  Do you remember

17  giving a statement to -- back on -- hang on just a sec -- back

18  on December 9th of 2008?  Do you remember giving a statement

19  to the police about this case?

20   A.   Yes, sir.

21   Q.   Okay.  Do you remember in that statement saying that

22  Jesse tried to be the leader and the boss in the relationship

23  with Blaine?

24   A.   No.

25   Q.   Okay.  Would you like to see that statement to

---

1  refresh your memory?

2         MR. HAGAN:  May I approach the witness?

3         THE COURT:  Yes, you may.

4         (Mr. Hagan put his laptop in front of the

5  witness.)

6    Q.   (BY MR. HAGAN) Okay, first off, is that your

7  signature right there, Heather?

8    A.   Yes, sir.

9    Q.   If you want to take a minute to read that.

10   A.   (Witness reading.)  Okay.

11   Q.   Does that help refresh your memory?

12   A.   Uh-huh.

13   Q.   Do you remember making that statement?

14   A.   Yes, sir.

15   Q.   Okay.  So that's kind of a little bit different

16  today, what you're saying, from what was said back then.

17   A.   Yeah.  That's when she was in a relationship with my

18  brother.

19   Q.   Oh, okay.

20   A.   That's what I meant.

21   Q.   When she was in a relationship with your brother, she

22  was the one that kind of --

23   A.   Uh-huh.

24   Q.   -- led things, was in charge?

25   A.   (Nods head affirmatively.)

1    Q.   And your brother's -- what branch of the military is
2    he in?
3    A.   I have no idea.
4    Q.   You don't know which -- is he in the Army?
5    A.   Uh-huh.
6    Q.   Oh, okay.  And what's he do in the Army?
7    A.   (Shakes head negatively.)
8    Q.   Army stuff?
9    A.   Acting like a mom.
10   Q.   Okay.  And how big is your brother?
11   A.   How big?
12   Q.   Uh-huh.
13   A.   6 feet, maybe like 179 pounds.
14   Q.   In pretty good shape?
15   A.   Uh-huh.
16   Q.   Okay.  And when Jess was involved in with him, she
17   liked to run the relationship; is that right?
18   A.   Uh-huh.
19        MR. JACKSON:  Can you please answer yes or no,
20   not uh-huh?
21   A.   Yes.
22   Q.   (BY MR. HAGAN)  Yes?  Okay.  And you say that you
23   noticed a change in Jess.  She got quieter?
24   A.   Yes.
25   Q.   And how was she taking care of the baby when you were

1    there, when you were around her?  Was she taking care of that
2    baby like a mama should, or did you have some problems with
3    her or concerns about her?
4    A.   When I was around her, how was she?
5    Q.   Uh-huh.
6    A.   She acted normal.
7    Q.   Okay.
8    A.   She was acting like a mom.
9    Q.   Acting like a mom?
10   A.   Uh-huh. .
11   Q.   Okay.  But she changed.  Do you know about when you
12   started noticing the change in her?
13   A.   No.
14   Q.   Okay.  Could it have been like back in August of that
15   year?
16   A.   I don't --
17   Q.   Or at some point?  But that day you noticed that she
18   was quieter; is that right?
19   A.   Uh-huh.
20   Q.   Okay.
21   A.   Yes.
22   Q.   Could you tell whether she was keeping herself up,
23   whether she was using makeup?  Did she have any makeup on that
24   day?
25   A.   What day?

118

1    Q.   The day that --
2    A.   The day she came over?  No.
3    Q.   How was her hair?  How did she fix her hair?
4    A.   It was in a ponytail.
5    Q.   Okay.  Did she usually have it like that or did she
6    usually do something else with her hair?
7    A.   (Nods head affirmatively.)
8    Q.   What did she usually do with her hair?
9    A.   However she wanted.
10   Q.   Okay.  But the way she had it then was just kind of
11   bunched up in a ponytail, not much to it, just something that
12   looks like she did real quick?
13   A.   Uh-huh.
14   Q.   Not wearing any makeup?
15   A.   (Nods head affirmatively.)
16   Q.   Acting kind of quiet?
17   A.   (Nods head affirmatively.)
18   Q.   Do you think that it was Blaine's idea to come over
19   there and visit with your mom and you and the baby?
20   A.   I don't know.
21   Q.   Okay.  Well, because you were saying before, he was
22   calling -- it seemed like he was calling the shots.  I'm just
23   wondering why he would have wanted to let y'all have a visit
24   with the baby.
25   A.   I don't know.

119

1    Q.   Okay.  Had y'all been wanting to see the baby?  Did
2    you ask to see the baby or was that just something that came
3    up out of the blue?
4    A.   My mom called Jesse and asked to bring the baby over.
5    Q.   Okay.  So it was Jess that decided to come over,
6    bring the baby over, probably not Blaine, huh?
7    A.   I don't know.
8    Q.   Okay.
9         MR. HAGAN:  I pass the witness.
10        REDIRECT EXAMINATION
11   BY MRS. TANNER:
12   Q.   So when you made reference to Jesse being the boss of
13   a relationship, you were referring to the relationship with
14   your brother, Arlen?
15   A.   Yes, ma'am.
16   Q.   And from what you could see of the relationship
17   between her and the defendant, did she appear to be the boss
18   of that relationship?
19   A.   No, ma'am.
20   Q.   Okay.  Thank you.
21        MRS. TANNER:  No further questions.
22        RECROSS-EXAMINATION
23   BY MR. HAGAN:
24   Q.   I think also in your statement, you said that the
25   back of Amora's head looked abnormal to you.

1    A.   Uh-huh.

2    Q.   What did you mean by that?

3    A.   It was wide and kind of flat.

4    Q.   Okay.  Did you point that out to Jess or anybody?

5    A.   No.

6    Q.   Okay.  And --

7         MR. HAGAN:  I pass the witness.

8         MRS. TANNER:  No further questions.

9         THE COURT:  Is there any objection to this

10   witness being excused?

11        MR. HAGAN:  Subject to recall, Your Honor.

12        THE COURT:  Ma'am, you may leave.  If you'll

13   just leave a phone number with Counsel for the State, where

14   they -- if need be, they could contact you to get you to come

15   back.  We understand you are not here.  It would be several

16   hours before you could get back, but if you'll do so.  Do you

17   have a contact number for her?

18        MRS. TANNER:  Yes, Your Honor.

19        THE COURT:  All right, you may leave.  You may

20   call your next witness.

21        MR. JIMERSON:  Your Honor, the State would call

22   Kevin Roy.

23        THE COURT:  All Counsel approach the Bench real

24   quickly.

25        COURT REPORTER:  Is this on the record?

---

1         THE COURT:  No.

2         (Discussion off the record at the Bench.)

3         THE COURT:  Were you sworn this morning, sir?

4         THE WITNESS:  Yes, sir.

5         THE COURT:  If you'll go ahead and take the

6    witness stand.

7                   KEVIN ROY,

8    having been previously duly sworn, testified as follows:

9                 DIRECT EXAMINATION

10   BY MR. JIMERSON:

11   Q.   You're Detective Sergeant Roy now, aren't you?

12   A.   Yes, sir.

13   Q.   Introduce yourself to the jury by telling them a

14   little bit about your law enforcement career.

15   A.   My name is Investigator Kevin Roy.  I've been

16   employed with the Rusk County Sheriff's Office for about seven

17   years.  For the past year and a few months, I've been with the

18   investigative division.  Prior to that, I was with the patrol

19   division.

20   Q.   And prior to that, you were in the military, correct?

21   A.   That's correct.

22   Q.   How long were you with the patrol division?

23   A.   A little over five years.

24   Q.   Tell the jury, is that the two primary divisions in

25   the small department, a patrol division and criminal

---

122

1    investigation division?

2    A.   Yes, sir, that and the jail division.

3    Q.   Of course, you're a peace officer, certified peace

4    officer, correct, went to the Academy and all those things?

5    A.   That is correct.

6    Q.   Did there come a time when you were a patrol

7    sergeant?

8    A.   Yes, sir.

9    Q.   Tell them what it is that you did when you were a

10   patrol sergeant.  What were some of your duties?  What were

11   you responsible for?

12   A.   Overseeing the patrol deputies.  Making sure their

13   reports were turned in with as few as grammatical errors as

14   possible.  Handling any of their needs.  If they get on a call

15   where they might need backup or need another officer, I would

16   be the one to respond to assist in backing up.  Or I would be

17   taking calls; if the patrol were so busy, they were all busy,

18   and there was a call that came through and needed to be taken,

19   I would take that.

20   Q.   About how many patrol deputies did you have, sir, did

21   you supervise when you were the patrol sergeant?

22   A.   I supervised three.

23   Q.   Did y'all have the county broken up into different

24   areas?

25   A.   Yes, sir.  They were broken up in sections.  There

---

123

1    was a northeast section, a northwest section and a south

2    section.

3    Q.   And when you say three, is that -- did they work in

4    teams or did each deputy have his own patrol car?

5    A.   Each deputy had his own patrol car and his own

6    section, but they weren't limited to that section.  If

7    somebody else needed help in another section of the county,

8    they would go to that section and assist that deputy.

9    Q.   Now, about -- and I'm not going to hold you to the

10   set number of miles, but about how far is Henderson, Texas,

11   from Longview, Texas, either in time or miles?

12   A.   About 25 miles, more or less.

13   Q.   Is Longview north or south of Henderson?

14   A.   It's north.

15   Q.   What about Henderson in relation to Tyler?  About how

16   long is it to Tyler and about what direction is Tyler in?

17   A.   It's about 25 or 30 miles west of Henderson.

18   Q.   Nacogdoches?

19   A.   About 30 miles south of Henderson.

20   Q.   What's the county seat of Rusk County?

21   A.   Henderson, Texas.

22   Q.   So where's the Sheriff's Office going to be in Rusk

23   County, Texas?

24   A.   In Henderson, Texas.

25   Q.   The morning of December 2, 2008, do you remember what

1  your shift was that day, December 2, 2008?  I mean, day shift,
2  what time did it start?
3      A.  Yes, sir.  The shift started at 7:00 in the morning.
4  I was short one deputy.  That deputy was attending a funeral
5  for a fallen officer in another county that day.
6      Q.  So how many deputies were you supervising?
7      A.  I had two deputies and myself working that -- working
8  the county at that time.
9      Q.  And did there come a time when you were not on the
10  road anymore that morning?
11      A.  I'm sorry?
12      Q.  Did there come a time when you went back to the
13  Sheriff's Office that morning?
14      A.  Yes.
15      Q.  Tell them about that.  What brought you back to the
16  Sheriff's Office?
17      A.  I don't think I understand the question, sir.
18      Q.  Did you have some work -- I'm sorry; I'm asking it
19  poorly.  Did you have some work done on your patrol car
20  that --
21      A.  Yes, yes.  My regularly-assigned patrol unit needed
22  an oil change.  I can't remember if it needed an oil change or
23  if it needed some type of work.  And I delivered it to a body
24  shop or to a mechanic that morning when they opened up, my
25  regularly-assigned patrol unit.

1  Q.  Did you sit there at the mechanic shop and wait on it
2  or did you go somewhere else?
3      A.  No, I went back to the Sheriff's Office.
4      Q.  And who's at the Sheriff's Office, the part that you
5  were in?  What section of the Sheriff's Office did you go to?
6      A.  The communication center, the dispatch center.
7      Q.  You refer to it also as the communications center,
8  the dispatch center.  Is that where the calls come in?
9      A.  Yes, sir.
10      Q.  I mean, the 911 system, is that where the calls come
11  in?
12      A.  All the 911 calls come into that center.
13      Q.  So it makes sense, if you're going to go wait on your
14  car, you're going to wait in there in dispatch so you can keep
15  up with what's going on, right?  Was that the intent?
16      A.  Well, dispatch, it's an area where we can go.  Or the
17  patrol room, we can go in there as well.  So either place
18  would be a good place to wait for the patrol unit to get
19  ready.
20      Q.  About what time that morning did the call come in
21  that led you to go out to the scene related to this case?
22      A.  If I recall correctly, it was around 10:30, 10:30ish.
23      Q.  Would about 10:37 sound about right?
24      A.  Yes, sir.
25      Q.  And from there, now, did you wait on your car to get

                                                        126

1  fixed, wait on your car to get out of the shop before you
2  left?
3      A.  No, sir.  Based on the gravity of the call, I went
4  ahead and grabbed the keys to another unit that was sitting
5  out there and jumped in it.
6      Q.  What was the -- just the information you were acting
7  on, just what was the call coming in as?
8      A.  I was in the dispatch center when it came in, and the
9  dispatcher told me that there was a dead baby at the Milam's.
10      Q.  Okay.  So you didn't -- you're not listening to the
11  call.  You're listening to the dispatcher, who's telling you
12  what information she's getting?
13      A.  That's correct.
14      Q.  And what vehicle did you take out there?
15      A.  I took a spare unit that none of the deputies were
16  using.
17      Q.  Do you know why none of the deputies were using it?
18      A.  Well, I had one deputy that was off that day, so his
19  unit was available.  And if I recall correctly, that was the
20  one he would have normally been in.
21      Q.  Did you have -- this spare unit, did you have it set
22  up the way your unit was?  Did you have all the same things in
23  it?
24      A.  It's pretty close.  My regular unit was a Ford F-150
25  pickup, is my regular unit.  The unit that I got into was a

                                                        127

1  Dodge Charger.  It has all the same equipment, just set up
2  differently.
3      Q.  Did it have the equipment that's individual to you
4  that you normally carry, like your water bottles or things
5  like that?
6      A.  I had no idea what was in this unit.
7      Q.  But later on, you get out to the scene.  Did it have
8  the stuff that you normally had?
9      A.  No, sir.
10      Q.  What -- just tell them, what are some of the things
11  that it didn't have that you normally would have in your unit?
12      A.  A few bottles of water, maybe some snacks or
13  something, in case there's a scene that I'm on that takes a
14  while.
15      Q.  Was there a videotape?  Now, I know you don't know
16  when you're going out the door, so that's probably causing the
17  confusion in my questions.  But did you realize that there was
18  not a videotape in the recorder of that vehicle that you took
19  out there to the scene?
20      A.  Not prior to leaving the office --
21      Q.  Okay.
22      A.  -- I did not.
23      Q.  But there comes a point, it's later on when you're
24  out at the scene, that you realize even though it's got a
25  system, there wasn't a videotape in there?

1    A.   That's correct.  I realized that prior to even

2  arriving at the scene.  Because once you get in the vehicle,

3  the display on the video system will say "No cassette" or "No

4  tape installed."  It will tell you that there's not a tape

5  installed.

6    Q.   And then later on, there comes a point in time --

7  just tell the jury whether or not things slow down enough that

8  you do put a tape in.

9    A.   Right.  I wasn't sure there was even a tape to put

10  in, but eventually I did find a tape that was in the unit and

11  put it in and got it going.

12    Q.   Now, this scene that you responded to -- you're

13  familiar with the geographical limitations and boundaries of

14  Rusk County, Texas.  Was it in Rusk County, Texas?

15    A.   Yes, sir.

16    MR. JIMERSON:  Your Honor, may I approach the

17  witness?

18    THE COURT:  Yes, you may.

19    Q.   I'm going to show you what I've marked as State's

20  Exhibits 4 and 5 just for demonstrative purposes.  Would they

21  appear to be something that would help or aid the jury in

22  showing them where this scene is in relation to where you were

23  at the time?

24    A.   Yes, sir.

25    Q.   Okay.

---

1    MR. JIMERSON:  Your Honor, we would offer

2  State's Exhibit Nos. 4 and 5 for demonstrative purposes.

3    MR. HAGAN:  No objections, Your Honor.

4    THE COURT:  4 and 5 will be received for

5  demonstrative purposes only.

6    Q.   (BY MR. JIMERSON) And, Investigator, can you identify

7  the document that has been received into evidence as State's

8  Exhibit No. 4?  What are we looking at there?

9    A.   That appears to be a map of Rusk County, Texas.

10    Q.   And I believe that screen, if the Court enables it, I

11  believe it will allow you to mark on it.  Try showing them

12  where Henderson is on that map.

13    A.   Just touching it?

14    Q.   Just touching it with a pen or with your finger

15  either one.  I think with your finger it will work fine, too.

16    THE COURT:  Is it working?

17    MR. JACKSON:  It worked.

18    Q.   (BY MR. JIMERSON) You put an X where Henderson is?

19    A.   Yes.

20    Q.   I just hit that color part, so if you could touch

21  Henderson again, you should be able to get a different color.

22  Okay, so we've got a little different color than that black.

23  It wasn't showing up quite as good.  So that's where you were

24  in dispatch when the call comes in, correct?

25    A.   Yes, sir.

---

                                                        130

1    Q.   Now, State's Exhibit No. 5, what we've done here,

2  sir, is we've taken this corner of State's Exhibit No. 4 over

3  here.  Would it appear that we've taken this corner and blown

4  it up for the purpose of this image, correct?

5    A.   Yes, sir.  That looks like the northwest quadrant of

6  Rusk County -- excuse me, northeast.  Northeast.

7    Q.   It would be northeast.

8    A.   Yes.

9    Q.   I mean, to orient the jury a little bit, that may not

10  be familiar with this, just show them -- you don't have to be

11  exact, but just show them the general direction up there.  Put

12  a mark on about where Longview would be.

13    A.   Longview would be --

14    Q.   I know it's off the map, but just to orient them.

15    A.   -- up in this area.

16    Q.   Now, can you show them approximately the route that

17  you took to get out to this residence?

18    A.   From Henderson, I took Highway 43, this FM 1716,

19  County Road 2125, to the residence.

20    Q.   Can you put a mark or something up there about where

21  the residence is?

22    A.   Right about there (marking on monitor screen.)

23    Q.   About how long is that, either in miles or in time,

24  that it took you to get out there?

25    A.   (No response from witness.)

---

                                                        131

1    Q.   Let me ask you a different question.  Do you know

2  about how long it took you to get out there on December 2nd?

3    A.   I would guesstimate about 15 minutes.

4    Q.   Okay.

5    A.   12 to 15 minutes.

6    MR. JIMERSON:  May I approach, Your Honor?

7    THE COURT:  Yes, you may.

8    Q.   I'm going to hand you the report, to give you the

9  advantage of looking at it.  Does your report recite about

10  when you got out there?

11    A.   Yes, sir.  At 10:57 a.m.

12    Q.   And does it recite about when you got dispatched?

13    A.   10:37.  So it's about -- that would be correct.

14    Q.   I understand.  It's in that range, but really what

15  your report reflects is about 20 minutes, isn't it?

16    A.   The report would be -- would be correct.

17    Q.   And I don't mean to give you a difficult time over 5

18  minutes.  The point is, it takes a little while to get out

19  there.

20    A.   Yes, sir.

21    Q.   And how are you traveling out there, between 10:37

22  and 10:57, in terms of how are you driving?

23    A.   I'm driving code, which would be with my lights and

24  sirens.

25    Q.   And just for our record, I know what you mean when

1  you say "code," and I certainly know what you mean when you
2  say lights and sirens, but can you elaborate a little more?
3  Are you driving fast?
4      A.  I'm driving as fast as I safely can.
5      Q.  This residence that you arrive at, it is in Rusk
6  County, Texas, correct?
7      A.  Yes, sir.
8      Q.  Now, tell the jury just what you see when you get out
9  there, when you arrive.
10     A.  (No response from witness.)
11     Q.  What do you arrive at?  I said a residence.  But you
12 tell them what you see when you get out there.
13     A.  I arrive at a residence.  It's a mobile home.  And
14 when I get there, there's two ambulance units already there,
15 which there are usually two paramedics or EMTs per unit, so
16 there were four EMTs or paramedics.  I don't know if they were
17 paramedics or EMTs, but they're one of the two that were
18 there.
19     Q.  Just since you brought it up, tell them what, in
20 general terms, the distinction is.  You deal with first
21 responders?
22     A.  I'm sorry?
23     Q.  What, in general terms, is the distinction that
24 you're making?  Paramedics, as opposed to EMTs.
25     A.  Some of them have higher qualifications than the

1  other ones, higher training.
2      Q.  But, I mean, to a layperson that may not know that
3  distinction, they're the people that ride with the ambulance,
4  first responders that go out with the ambulance.
5      A.  That's correct.  That's correct.
6      Q.  I know that's a dumb way to say it, but it helps me
7  understand it.  There are people that came out there with that
8  ambulance.
9      A.  Yes.  They were in uniform, in their EMT or paramedic
10 uniform for Champion EMS, I believe is the company that they
11 were hired.
12     Q.  So there's two ambulance units.  Do you remember how
13 many EMTs?  Like I say, I'm not being specific.  I'm using
14 that term generally to include paramedics.
15     A.  I believe there were four EMTs total there upon my
16 arrival.
17     Q.  As far as the outside of the house at that time, was
18 there any people outside the house, other than paramedics?
19     A.  No.  Not that I recall.
20         MR. JIMERSON:  Your Honor, may I approach?
21         THE COURT:  Yes, you may.
22     Q.  I'm going to hand you what I've had marked here as
23 State's Exhibits 6, 8, 9, 12, 25, 26, and 35.  Now, without
24 saying what they are at this time, are they all photographs
25 that you can identify?

                                                        134

1      A.  Yes, sir.
2      Q.  Now, do they all appear to be the way the residence
3  appeared, on or about December 2nd of 2008?
4      A.  Yes, sir.
5      Q.  In other words, is this what you saw?
6      A.  To my recollection, this is what I saw.
7          MR. JIMERSON:  Your Honor, we'll offer State's
8  Exhibit Nos. 6, 8, 35, 26, 25, 12, and 9.
9          MR. HAGAN:  No objections, Your Honor.
10         THE COURT:  All right, State's 6, 8, 9, 12, 25,
11 26, and 35 will be received.
12         MR. JIMERSON:  Your Honor, we've got these in
13 digital format as well.  Can we just use those from the PC?
14         THE COURT:  Is there any objection?
15         MR. HAGAN:  I don't object.  That's what we were
16 just talking about.  I just need them identified, as far as
17 the digital file numbers, so I can associate them.
18         MR. JIMERSON:  It would probably be better to do
19 it in digital, Your Honor, since Counsel wants a file number.
20 We'll be able to pull up a file number when we do it.
21         THE COURT:  That's fine, if there's no
22 objection.
23     Q.  (BY MR. JIMERSON) This is -- I'm going to refer to
24 you now as detective.  You weren't a detective at the time,
25 but that's your current grade; it's detective or investigator.

1  State's Exhibit No. 6.  Now, tell the jury what that is.
2      A.  That would be the residence of the Milams.
3      Q.  Is that where you got dispatched on December 2nd?
4      A.  That would be the residence where I was dispatched on
5  December 2, 2008.
6      Q.  Is that another view of that residence?
7      A.  Yes, sir.
8      Q.  Okay.  Tell the jury how that house is oriented, in
9  terms of north, south, east or west.  What are we looking at
10 it, from which angle, from which direction?
11     A.  This photograph looks like it was taken from the
12 north, facing -- you know, pointing south.  So that carport
13 that you see there would be on the north end of the residence
14 and the cars on the north end of the residence.
15     Q.  State's Exhibit No. 9, can you orient us with this
16 photograph?  What part of the residence are we looking at,
17 front or back?
18     A.  That appears to be the back, the back part of the
19 residence on the south end.
20     Q.  And is what you're calling the south end, is it down
21 there where that porch-looking structure is?  Is that what you
22 mean?
23     A.  Yes, yes.  The deck is on the south end of the
24 residence.
25     Q.  So essentially, the opposite of the photo we just

                                                        135

1   looked at?

2     A.   Yes, sir.

3     Q.   I put up State's Exhibit No. 26.  Is that that same

4   south end, but now we're looking at it from the south angle?

5     A.   That's correct.

6     Q.   Back toward what direction are we looking?

7     A.   Back towards the north --

8     Q.   South of the house, but we're looking north, back

9   toward the north, correct?

10     A.   That's correct.

11     Q.   What part of the house are we looking at here, front

12   or back?

13     A.   That appears to be the back.

14     Q.   Do you see just maybe a little part of that carport

15   over there on the one end of it?

16     A.   Yes, sir.

17     Q.   So what end of the house would you say that is?

18     A.   The left side of the photograph is the north end of

19   the residence.

20     Q.   Now, go to State's Exhibit No. 8, please, sir.  Now,

21   for our record, what are we looking at there at State's

22   Exhibit No. 8?

23     A.   That would be the front porch of the residence.

24     Q.   So that's a little closer view than State's Exhibit

25   No. 6 that we started off with.

---

1     A.   That's correct.

2     Q.   Is that the way that front porch area looked to you

3   on or about December 2nd of 2008?

4     A.   Yes, sir.

5     Q.   I mean, in terms of -- how would you describe that,

6   for our record?  What kind of state is that porch in?

7     A.   It was very messy.  There was garbage, looked like it

8   had been bagged, sitting on the porch.  It had been ripped

9   open.  Upon my arrival, there were dogs rummaging through the

10   trash.  It was just strewn all over the front porch in front

11   of the front door.

12     Q.   How would you describe that in relation to the rest

13   of the house and property?

14     A.   The property outside the house, it wasn't -- it

15   wasn't strewed -- it wasn't strewed like that.  But inside the

16   house, it was pretty messy, but I didn't see garbage strewed

17   around.  It was mainly clothes and other items.

18     Q.   State's Exhibit No. 35, is that the view you had when

19   you stepped in that front door?

20     A.   Yes.

21        MR. JIMERSON:  We'll offer State's Exhibit No.

22   35.

23        THE COURT:  I have 35 as being --

24        MR. HAGAN:  I think you already offered that.

25        MR. JIMERSON:  Okay, then I'll publish that.

---

                                  138

1     Q.   (BY MR. JIMERSON)  Now, tell the jury what they're

2   looking at.

3     A.   This picture was taken at the threshold of the front

4   door, looking into the living room.  Actually, there were two

5   of the EMTs standing just inside the doorway there to the

6   right -- of course, this picture was taken after the EMTs were

7   removed from the house.  Other than that, that's accurate to

8   what I saw.

9     Q.   To the right is what, in terms of what kind of room

10   was to the right?

11     A.   There was a bedroom just to the right as you walk in

12   the front door.

13     Q.   Which would be on what end of the house, north or

14   south?

15     A.   On the north end of the house.

16     Q.   And you said the EMTs were blocking your view.  Was

17   there anything else blocking your view of the floor in the

18   bedroom?

19     A.   The two EMTs were standing in the doorway there.  And

20   once I was able to get them removed, I saw the defendant and

21   Jesseca Carson kneeling on the floor just inside the bedroom.

22     Q.   Could you tell now -- from what you saw at that time

23   when you're standing there, were you able to see what they're

24   kneeling around or over, or were they blocking your view?

25     A.   I couldn't -- I couldn't see.  They were obstructing

---

                                  139

1   my view of the baby.

2     Q.   But at that time -- I mean, even though you knew

3   dispatch told you there was a baby, you hadn't actually seen

4   the baby at that time, correct?

5     A.   No, sir.  Not until I removed the defendant and

6   Ms. Carson.

7     Q.   Now, did there come a time when Jesseca Carson and

8   Blaine Milam moved?

9     A.   Yes.  I had requested that them and the EMTs step

10   outside.

11     Q.   You requested the EMTs to do so?

12     A.   Yes, sir.

13     Q.   I mean, maybe I'm jumping ahead.  It's clear the

14   child's not going to go in an ambulance to the hospital.  It's

15   clear the child's dead at this point.

16     A.   Yes.

17     Q.   Is that why you request them to step out?

18     A.   Yes.  And that's from what I had gotten from the EMTs

19   standing outside, who had already -- I'm assuming had already

20   observed the baby.  The fact that the EMTs weren't kneeling

21   down and working on the baby was another reason that I was

22   presuming the baby to be dead.

23     Q.   So actually what we've got in this picture, you would

24   be facing the living room, but actually you're standing in

25   this general vicinity (indicating), looks like where this

1    picture was taken, but you're facing right, to the right.
2    You're facing this master bedroom, correct?
3        A.    That's correct.
4        Q.    When Jesseca Carson and Blaine Milam move out of the
5    way, what do you see?  What do you witness in there on the
6    floor?
7        A.    I see a -- an infant laying on the floor not moving,
8    not breathing, bruised.
9        Q.    Bruised how?
10       A.    The baby was laying on its back, and the face of the
11   baby was just one large bruise is how it appeared to me.  And
12   then it was wearing a onesie with a rip where it was open on
13   the chest area, and I could see some circular bruising all
14   over the body.  That's what I saw.
15       Q.    What went through your mind at the circular bruising?
16   What were you thinking about?
17       A.    I was running through my head what could have caused
18   that kind of bruising.  I was thinking that possibly the
19   bottom end of a Coke can or something, was the first thing
20   that went through my mind.  I wasn't -- I wasn't sure.  I just
21   didn't know.
22       Q.    Did it occur to you at all at that time that they
23   could have been bites or human bite marks?
24       A.    No.
25       Q.    Had you ever had any sort of experience with those

1    kind of injuries before during your years on patrol?
2        A.    No, sir.
3                MR. JIMERSON:  May I approach?
4                THE COURT:  Yes, you may.
5        Q.    I'm going to hand you what I've marked as State's
6    Exhibit No. 36.  What is that a picture of?
7        A.    That's a picture of the baby.
8        Q.    Is that the way it appeared to you on December 2nd of
9    2008?
10       A.    Yes, sir.
11       Q.    Is that about the vantage point you had?
12       A.    Yes, sir.
13       Q.    Standing at the doorway of the master bedroom?
14       A.    That's very, very close to my vantage point.
15               MR. JIMERSON:  Your Honor, we would offer
16   State's Exhibit No. 36.
17               MR. JACKSON:  May we approach, please?
18               THE COURT:  Yes.
19               (Conference at the Bench:)
20               MR. JACKSON:  At this time, we would object to
21   State's Exhibit No. 36, for one, relevance.  Again, if it is
22   relevant, then the prejudicial value far exceeds any probative
23   nature of this photo.  The essence of the photo is -- we
24   believe it's overly prejudicial.
25               MR. JIMERSON:  Let me get the other photo.

                                                          142

1                THE COURT:  You're getting another photo?
2                MR. JIMERSON:  We're going to get another photo,
3    because we've got another photo that shows the --
4                (Photographs handed to the Court.)
5                THE COURT:  Let the record reflect that I am
6    having in my possession and reviewing State's Exhibit 36 and
7    now State's Exhibit No. 37.
8                MR. JACKSON:  37 is a more close-up view of 36,
9    I believe.  37, the prejudicial value far exceeds the
10   probative nature of this photo, a close-up photo of the
11   child's face.  The gruesomeness of it, we believe, will
12   prejudice the jury.
13               MR. JIMERSON:  Your Honor, I just -- I submit
14   this is a baby killing.  This is a baby murder.  There's going
15   to be photos of a dead baby.  Now, that's not offered to be in
16   any way unfairly prejudicial.  It's tremendously prejudicial,
17   because it's a murder, and this is a murder victim.  This is a
18   murder trial.  We offer those sorts of photos.  There's
19   nothing that, by any gruesomeness in it -- that's the way the
20   scene was that day.  It's important to have him describe it,
21   describe what he saw, describe the injuries there at the
22   scene.  But I really -- I'm not going to intend to respond to
23   the relevance objection of the picture of a murder victim on a
24   murder scene, Your Honor.
25               THE COURT:  I'll overrule 36 -- the objections

1    to 36 and 37.
2                MR. JACKSON:  We also object under due course of
3    law and also due process of law.
4                THE COURT:  I'll note the objection, and it will
5    be overruled.
6                MR. HAGAN:  And they're overruled?
7                THE COURT:  Yes.
8                (Conclusion of Bench conference.)
9                MR. JIMERSON:  Your Honor, may I publish State's
10   Exhibit No. 36?
11               THE COURT:  Yes, you may.
12       Q.    (BY MR. JIMERSON) Detective, is that what you saw
13   from that doorway?
14       A.    Yes.
15       Q.    Did you enter that room, Detective?
16       A.    Yes, sir.
17       Q.    How did you do it?
18       A.    After the defendant and Ms. Carson left the
19   residence, I stepped over to the left and around to the feet,
20   on that side of the baby, on the other side.
21       Q.    Did you have to step over the baby or very nearly
22   step over the baby?
23       A.    Yes, sir.
24       Q.    And once you stepped around to the side of the
25   baby -- does State's Exhibit No. 37, does that fairly and

                                                          143

1    accurately depict how the baby looked after you stepped around
2    the baby?
3        A.   Yes.
4            MR. JIMERSON:  Your Honor, we'll offer State's
5    Exhibit No. 37.
6            MR. JACKSON:  We would reurge the same
7    objections.
8            MR. HAGAN:  I think we just covered that as
9    well.
10            MR. JIMERSON:  I just technically hadn't offered
11    it.
12            MR. JACKSON:  That's fine.  For the purpose of
13    the record, we reurge the previous objections made on the
14    record.
15            THE COURT:  All right, and those objections will
16    be overruled.
17            MR. JACKSON:  Thank you, Judge.
18            THE COURT:  And 37 will be received.
19            MR. JIMERSON:  May we publish State's Exhibit
20    No. 37?
21            THE COURT:  Yes.
22        Q.   (BY MR. JIMERSON) Did you touch the child there,
23    Detective Roy?
24        A.   I did.  I knelt down at the feet, and I lifted --
25        Q.   Mark on your screen there where you touched the

1    child.
2        A.   I lifted this foot.  It's not working (indicating
3    monitor).
4            THE COURT:  You may have to activate it.
5        Q.   Might be a lot of work with the document camera.
6    That's your drawing you just made, correct?
7        A.   Yeah.  I lifted that foot right there (indicating).
8        Q.   And we can all see what you mean when you say "that
9    foot," but for our record, which would be the child -- which
10    foot would that be with regard to the child, when you orient
11    yourself to the child?
12        A.   That's the right foot.
13        Q.   And when you lifted that right foot, what happened,
14    Detective?
15        A.   I noticed that the foot was cold to the touch, and I
16    lifted it about two or three inches from the floor, and I
17    noticed the whole right side of the body moved along with the
18    foot when I lifted it.
19        Q.   What about the right arm?
20        A.   The right arm also came off the floor as I lifted the
21    foot.
22        Q.   Will you circle for us the right arm where that's at,
23    what we're referring to as the right arm?
24        A.   (Witness complied.)
25        Q.   How would you describe the child when you lifted the

---

146

1    child, in terms of whether the child was stiff or whether the
2    child was pliable?
3        A.   The child was stiff.
4        Q.   Now, those visible injuries we see on the screen in
5    State's Exhibit No. 37, can you point to the ones that you
6    referred to as -- that you referred to earlier as the circular
7    wounds?
8        A.   Circular wounds?  It was that one and that one.
9    Based on the shape and the size --
10            MR. JACKSON:  May the record reflect it's on the
11    right leg and the right upper chest of the child, he circled?
12            THE COURT:  The record will reflect the right
13    leg and the right upper region of the child has been circled.
14        Q.   (BY MR. JIMERSON) What I really asked you was not all
15    of them, but just of the ones that we can see from State's 37,
16    right?
17        A.   Yes.
18        Q.   Those would be the ones.  Okay.  And of those ones
19    that we see there in State's 37, just in general terms, what
20    kind of description do you use commonly, either as the shift
21    sergeant or a detective, in terms of injuries like that, in
22    terms of generally what you refer to?
23        Q.   Could you restate the question?
24        Q.   Just tell the jury not -- whether or not you referred
25    to them before -- those very injuries, you referred to before

1    as pattern injuries.
2        A.   As possibly inflicted with a Coke can?
3        Q.   I'm --
4        A.   I'm not --
5        Q.   I guess I'm being confusing.  I just mean in general
6    terms, what kind of category of injuries do they fall into?
7    Are they pattern --
8        A.   Circular bruises.
9        Q.   Are they pattern-type injuries?
10            MR. HAGAN:  Objection, Your Honor, leading.
11            THE COURT:  Who has the -- who has the witness
12    on cross?
13            MR. HAGAN:  Mr. Jimerson.
14            THE COURT:  On cross.
15            MR. JIMERSON:  Your Honor, I'll withdraw the
16    question.  It's all right.  It's all right.  I'm going to
17    withdraw that question.
18        Q.   (BY MR. JIMERSON) I mean, what made you think of a
19    Coke can?
20        A.   The circular pattern that it had, the circular
21    bruising.
22        Q.   The circular what that it had?
23        A.   Pattern.
24        Q.   So, in effect, by looking for a Coke can, it's fair
25    to say you're looking for a match to what that injury is?

1    A.   Yes.

2    Q.   You're thinking about it?

3    A.   I'm thinking about it.

4    Q.   I'm just asking this stuff poorly, so I need to make

5    it more clear.  Okay?  Now, at that time, what do you do next

6    after you've examined the body?

7    A.   (No response from witness.)

8    Q.   I'm going to ask it this way.  Did there come a point

9    in time when you secured the residence?

10   A.   Yes.  Yes.  After I -- after I was fairly sure that

11   the EMTs could no longer help the baby, I cleared the

12   residence.  I walked through the residence checking to make

13   sure there were no other people in the house, because we were

14   going to secure it and tape it off for the investigators to

15   follow up the investigation.

16   Q.   Just tell the jury, in general terms, what do you

17   mean when you say you secured the house?

18   A.   I walked into all the rooms of the house looking for

19   anybody else that might be there that might pose a threat or a

20   danger to the investigators as they investigate.

21   Q.   Are you looking for other things in the house?

22   A.   No.

23   Q.   At that time, are you necessarily looking for

24   evidence or blood or things like that?

25   A.   No, sir.

1    Q.   I mean, you're also looking for the possibility they

2    could be --

3         MR. JACKSON:  Objection, leading.

4         MR. JIMERSON:  Your Honor, I haven't asked the

5    question.  May I finish the question?

6         MR. JACKSON:  The problem is when you first

7    start the question, it's obvious it's a leading question.

8         MR. JIMERSON:  Your Honor, it's not obvious

9    until the question is finished.  The objection is untimely.

10        THE COURT:  Finish your question.

11        MR. JIMERSON:  Your Honor, given those

12   circumstances, I'll just withdraw the question.

13   Q.   (BY MR. JIMERSON) You go through the house, sir.  You

14   go through the house.  You step out of this room.  Go ahead

15   and clear our screen there.

16   A.   (Witness complied.)

17   Q.   You go through the house.  Tell me again, because I

18   lost my place in all of that, what were you looking for in the

19   house?

20   A.   People or threats.  In this case, I was also looking

21   for other animals as well that might have been in the house,

22   but none were found.

23   Q.   Did you find anything?

24   A.   No, sir.

25   Q.   If I were to ask you to, and I've asked you before,

---

150

1    do you believe that you could just draw us a demonstrative

2    diagram of how those rooms are in relation to each other that

3    you went through.

4    A.   Yes.

5    Q.   I know it won't be to scale, but just for purposes of

6    being able to see it, do you think you can do it?

7    A.   Yes, sir.

8         MR. JIMERSON:  Your Honor, I'm going to ask for

9    the easel and ask if the witness can step down.

10        THE COURT:  Yes, he may.

11   Q.   I know there came a later time when you went out and

12   took measurements and everything.  I'm not asking you about

13   that right now, Detective Roy.  I'm just asking you, in

14   general terms, just so they can see the layout of the house

15   and what you walked through, can you show them the house and

16   how it's laid out?

17        MR. JIMERSON:  We're going to mark this as

18   State's Exhibit 23.

19   Q.   (BY MR. JIMERSON) Go ahead.  Go ahead.

20   A.   (Drawing a diagram.)  It was a mobile home, which

21   this would be the north end.  The front door.  The porch area.

22   A wall.  A door here.  A bedroom.  There's a bathroom.

23   Q.   Now, where was the child?  Just put an "X" where the

24   child --

25   A.   The child was right inside the doorway of that door.

151

1    Something like that.  This was a utility room on the south end

2    of the house where the deck was located.  A bedroom here and a

3    bedroom here, with a bath in between.  These are walls that's

4    defining the kitchen area.  And that is a little hallway that

5    goes from the living room.

6    Q.   Just for the purpose of our record -- step back a

7    little bit so they can see.  For the purpose of our record,

8    "LR" is going to denote what on here?

9    A.   Living room.

10   Q.   What's "BR" going to denote?

11   A.   Bedroom.

12   Q.   What would you refer to as -- just in laymen's terms

13   or how y'all defined it that day, what was referred to as the

14   master bedroom?

15   A.   This one.  The north bedroom is the master bedroom.

16   It had its own bathroom.

17   Q.   Did these bedrooms open up into the bathroom directly

18   or not?

19   A.   No.  No.  There was from -- if I recall correctly,

20   there was a bedroom door to each bedroom and then a bathroom

21   door for the bathroom.

22   Q.   Did you go in the kitchen?

23   A.   Yes, sir.

24   Q.   Did you find anything that you were looking for in

25   the kitchen?  See anything like people or --

1    A.    No, sir.

2    Q.    Okay.  Back here in the utility area, did you at

3    least go cursory through there?

4    A.    I did.  I did not find anybody else in the house.

5    After I removed the EMTs and the defendant and Ms. Carson,

6    there was no other persons in the house.

7    Q.    Did you go in this bedroom?

8    A.    Yes, sir.

9    Q.    What was different about this bedroom from, say, the

10   living room or the master bedroom?

11   A.    I recall that bedroom didn't appear to be used for

12   sleeping.  It looked like a bunch of stuff.  There was like a

13   door laying in there on the floor on top of other things.  The

14   dogs had used that room to use the bathroom in.

15   Q.    How was the flooring in it?

16   A.    The flooring was weak.  I had to be careful.  There

17   was a closet, I believe, on this area over here, and I

18   couldn't see inside that closet from the door.  In order for

19   me to secure the house to make sure nobody was in there, I had

20   to look in there.  And I was stepping over the items and the

21   dog mess and whatnot and the weak floor.  I had to be careful

22   walking on the floor to get over to that closet.

23   Q.    Other than what you've described, was there anything

24   else in there that caught your attention?

25   A.    No.

---

1    Q.    Anything like people?

2    A.    No, sir.

3    Q.    The bathroom, can you describe the general state as

4    it appeared on December 2nd?

5    A.    It appeared normal.  It was very small.  Of course, I

6    was looking for people.  There was none.

7    Q.    Was it in a similar state of cleanliness, as compared

8    to the others, or was it --

9    A.    It was messy, in my opinion.

10   Q.    What about this bedroom?  What do you remember about

11   this bedroom?

12   A.    It looked like it was liveable.  There was a bed in

13   there, but there was clothes strewn about.

14   Q.    How would you describe it as to whether it's on the

15   north end or south end of the house?

16   A.    It's on the south end.

17   Q.    What else do you remember about it, other than there

18   being clothes strewn?

19   A.    Nothing that I can recall.

20   Q.    In terms of -- you described this one in a little bit

21   more detail.  You were describing that there were other things

22   on the floor, including animal feces.  What about this one?

23   Was it in a similar state or a different state?

24   A.    If I recall correctly, I think the floor had been

25   worked on or secured by a piece of plywood on the floor to

---

154

1    help the floor from -- to be sturdy.  Other than that, it was

2    a very messy bedroom.

3    Q.    Do you remember anything about the lighting in the

4    rest of the house, how lit it was, it wasn't lit?

5    A.    I don't -- I don't recall.

6    Q.    What about those back bedrooms?  Did you pay any

7    attention to anything about the lighting?

8    A.    No, sir.

9    Q.    Other than EMTs out there when you arrived -- EMTs

10   I'm calling paramedics, anybody that rides with an

11   ambulance -- who else was present on the scene?

12   A.    While I was walking through the house to make sure

13   there was nobody else there, Sergeant Rogers arrived, her and

14   Lieutenant Humber.

15   Q.    I guess the way I should have asked the question, you

16   go through all the house looking to see whether there's

17   anybody else there.  Is there anybody else there?

18   A.    No, sir.

19   Q.    So the only two civilians on the scene are Jesseca

20   Carson and Blaine Milam?

21   A.    That's correct.

22         MR. JIMERSON:  May I approach, Your Honor?

23         THE COURT:  Yes.

24   Q.    I'm going to hand you what I marked as State's

25   Exhibit No. 34.  Are the objects in that photograph that are

---

1    depicted, do they appear as they did on or about December 2nd

2    of 2008?

3    A.    Yes, sir.

4    Q.    I mean, you recognize the photograph, you recognize

5    the items depicted there and the people depicted, correct?

6    A.    That's correct.

7    Q.    Is that the way it looked on December 2nd of 2008?

8    A.    Yes, sir.

9         MR. JIMERSON:  Your Honor, we would offer

10   State's Exhibit 34.

11         MR. JACKSON:  No objection to State's 34, Your

12   Honor.

13         THE COURT:  State's 34 will be received.

14         MR. JIMERSON:  Your Honor, may I publish State's

15   34?

16         THE COURT:  Yes.

17   Q.    (BY MR. JIMERSON) Can you see that, Detective?

18   A.    Yes, sir.

19   Q.    That's a picture of what residence?

20   A.    That's the residence of the Milams.

21   Q.    Now, in the foreground of that picture is a vehicle.

22   What kind of vehicle is that?

23   A.    That's a Rusk County patrol unit.

24   Q.    Whose vehicle -- well, whose vehicle, it's going to

25   be Rusk County, but in terms of who was using it that day?

155

1     A.    That would have been the unit that I used to come to
2  that scene.
3     Q.    Is it the one that you earlier in your testimony
4  referred to as the spare unit?
5     A.    Yes, sir.
6     Q.    Now, who is pictured there next to that, what you
7  refer to as the spare unit?
8     A.    That would be Blaine Milam.
9     Q.    Is that the way he appeared that day?
10    A.    Yes, sir.
11    Q.    Is that the same jeans and shirt and everything?
12    A.    Yes, sir.
13    Q.    Those jeans, is that the way that they appeared to
14 you that day, where they're up over the boot cuffs, and the
15 way the waist fits and everything?  Is that the way they
16 looked that day?
17    A.    Yes, sir.
18    Q.    Is that the way Blaine Milam looked to you that day?
19    A.    Yes, sir.
20    Q.    Do you see Blaine Milam in the courtroom today?
21    A.    Yes, sir.
22    Q.    Can you identify him by pointing to him and
23 describing some article of clothing that he's wearing?
24    A.    He's got a blue suit jacket on and a white shirt.
25    Q.    Does he have a tie on?

---

1     A.    With no tie.
2           MR. JIMERSON:  Your Honor, I'd ask the record to
3  reflect he's identified the defendant.
4           THE COURT:  The record will so reflect.
5     Q.    (BY MR. JIMERSON) Does he look different today than
6  he did then?
7     A.    He looks a little heavier today.
8     Q.    I mean, because of that, his appearance is a good bit
9  different, isn't it?
10    A.    Yes.
11    Q.    But actually on December 2nd of 2008, this picture is
12 an accurate depiction of how he appeared, isn't it?
13    A.    That's correct.
14    Q.    And you come out of the house after securing it.  Did
15 somebody arrive on the scene with law enforcement in the
16 meantime or around that time?
17    A.    I'm sorry, I don't understand.
18    Q.    I'm just doing a poor job of phrasing, I think.
19 What's the next law enforcement officer that got out there?
20    A.    That would have been Sergeant Amber Rogers and
21 Lieutenant Humber.
22    Q.    Did Rogers get there first?
23    A.    If I remember correctly, I think they rode together.
24    Q.    Who was on call?  Who was the detective that was on
25 call?

---

158

1     A.    I believe that would have been Sergeant Rogers.
2     Q.    Now, you know the importance of me asking who's on
3  call, don't you?  Why is it important to ask who's on call?
4     A.    Because the detective on call is going to be the
5  detective that's going to be the case agent on that case.
6     Q.    And has that been your occasion -- since you've moved
7  into CID, is that the way it works with you?
8     A.    Yes.
9     Q.    Fairly soon after you moved into CID, did you get on
10 call for a murder?
11    A.    I did.
12    Q.    So the case -- the person who's on call that day is
13 Detective --
14    A.    Amber Rogers.
15    Q.    Okay.  And just -- does she give you some directives?
16 You don't have to tell me what she said, but does she give you
17 some directives out there when you meet with her?
18    A.    She does.
19    Q.    What do you do in response to that?
20    A.    I -- once the detective arrives on scene, when she
21 arrived on scene, I was in the process of securing the inside
22 of the residence at the time.  I went ahead and completed
23 securing the residence after she arrived and then released the
24 scene to her, being a lead investigator.
25    Q.    I think everybody's got a good idea what you mean by

---

159

1  releasing the scene, but state for our record, what do you
2  mean when you, as a patrol officer, say you release the scene
3  to a member of CID?
4     A.    That means that I'm no longer in charge of the scene.
5  It was the charge -- the charge went to the higher-ranking
6  detective.
7     Q.    Now, acting pursuant to that higher -- as you point
8  out, higher ranking, so she directs you, what did you do next?
9  What are you directed to do?
10    A.    Directed to separate Mr. Milam from Ms. Carson
11 outside the residence and set up a perimeter tape, the yellow
12 caution tape.
13    Q.    Now, at that time, is Mr. Milam or Ms. Carson, are
14 they under arrest?  Are you arresting them?
15    A.    No, sir.
16    Q.    Is that common or uncommon to separate witnesses
17 prior to them being interviewed?
18    A.    That's very common.
19    Q.    For what purpose are you doing that?  For what
20 purpose do you separate witnesses when you interview them?
21    A.    To hear their story, not a combined story.
22    Q.    Sir, do you do that?  Did you separate them?
23    A.    I did.
24    Q.    And do you talk to Mr. Milam?
25    A.    I do.  I did.  I'm sorry.

1   Q.   At that -- at this time, is he in custody?

2   A.   No, sir.

3   Q.   Had you read him his rights?

4   A.   Eventually I did.

5   Q.   Eventually? Okay. But even at that point, is he in

6   custody?

7   A.   No, sir.

8   Q.   Did you -- did you even clarify that or ask that

9   question of your superiors out there on the scene?

10   A.   Ask the question of --

11   Q.   Whether he's in custody. Did you seek to clarify

12   that at any point?

13   A.   Whether he was under arrest?

14   Q.   Yes.

15   A.   Yes, I did.

16   Q.   Was he under arrest?

17   A.   No, sir.

18   Q.   And, in fact, you checked and made sure things hadn't

19   changed; his status remained that way?

20   A.   That's correct.

21   Q.   Now, when you're interviewing him, what does he tell

22   you about what transpired?

23   A.   I asked him what happened, and he said that him and

24   Jesseca had walked up the road a little bit. I don't know how

25   far up the road, but they were gone.

1   Q.   What did they tell you about whether he took the baby

2   with them or not?

3   A.   No, they said they had left the baby in the house.

4   Q.   I'm sorry? We have to look around each other because

5   of this machine.

6   A.   He said him and Jesseca --

7        MR. JACKSON:   Your Honor, can we approach

8   briefly, please?

9        THE COURT:   Yes.

10        (Conference at the Bench:)

11        MR. JACKSON:   Judge, we would reurge the

12   objection to the statements of Mr. Milam, that there was no

13   Miranda warning given at this time. Proper warnings under the

14   Code of Criminal Procedure had not been given. We know, in

15   fact, that he was under custodial interrogation, so we move to

16   suppress this statement again.

17        MR. JIMERSON:   Prior to Mr. Jackson's appearance

18   in this case, Your Honor, the Court heard these matters

19   several days.

20        MR. HAGAN:   We're just making that record.

21        THE COURT:   I'll overrule the objection.

22        (Conclusion of Bench conference.)

23        THE COURT:   You may continue.

24        DIRECT EXAMINATION (CONTINUED)

25   BY MR. JIMERSON:

162

1   Q.   I believe the point we were at was Mr. Milam had told

2   you something about going away from the residence, walking

3   away from the residence that morning, and I had asked you what

4   did he tell you about whether the baby went with them or not?

5   A.   He said that he had left the baby in the house and

6   that he had just fed the baby at about 8:30 that morning. But

7   him and Jesseca had left the baby in the house and walked up

8   the road a bit to meet -- to meet a man named Clark. And they

9   were gone about an hour, and when they came back to the house,

10   they found the baby in that condition.

11   Q.   Did he tell you whether there was anybody else in the

12   house with the baby while they were up there for an hour? I

13   mean, did he tell you whether or not they were anticipating

14   anybody would come in or whether there was anybody else in the

15   house to look after the baby?

16   A.   No, he told me he was anticipating somebody to meet

17   him up the road, but he didn't say that somebody was going to

18   be in the house with the baby.

19   Q.   Who did he anticipate was going to meet you (sic) up

20   the road -- was going to meet him up the road? I'm sorry.

21   A.   Somebody named Clark. I didn't get his last name.

22   Q.   Did Mr. Milam tell you for what purpose him and

23   Jesseca Carson were going to meet this person named Clark?

24   A.   Something about moving a house in or preparing some

25   land for a house or something along those lines.

1   Q.   Does -- Mr. Milam tells you they're gone about how

2   long?

3   A.   About an hour.

4   Q.   What does he tell you that himself and Jesseca Carson

5   discover when they come back to the residence after about an

6   hour?

7   A.   He said that they found the baby had been beaten.

8   Q.   What condition, did he tell you -- if he didn't tell

9   you, he didn't tell you. I'm just wondering, did he tell you

10   what condition the baby was in, in terms of whether the baby

11   was alive or dead after that?

12   A.   I don't recall that he said anything along those

13   lines.

14   Q.   Did he tell you whether or not the baby was in the

15   master bedroom or master bath, or where in the house the baby

16   was located?

17   A.   He didn't say. I don't recall that he said that.

18   Q.   Now, where does this conversation with Mr. Milam,

19   where does it take place? Your conversation with him, where

20   does that take place?

21   A.   At the rear of my patrol unit.

22   Q.   So is it fair to say that -- well, go ahead and mark

23   on there about where you're standing in relation to him.

24   A.   We were both back -- back behind the patrol unit in

25   that area.

163

1    Q.  Did Mr. Milam tell you whether or not when he left
2  that morning, whether there was anything wrong with the baby?
3  What was the baby's condition when he left?
4    A.  He stated that he had just fed the baby, and the baby
5  was fine at about 8:30 that morning.
6    Q.  How would you describe Mr. Milam's demeanor in terms
7  of, you know, how he looks when he's talking to you, how he's
8  able to confer with you?
9    A.  He's very, very calm and collected.  Very calm,
10  cooperative.
11    Q.  Did you notice any sort of abrasions on Mr. Milam or
12  any sort of injuries on Mr. Milam?
13    A.  I don't recall.
14    Q.  Would it help if I offered you the opportunity to
15  review your report?
16    A.  (Nods head affirmatively.)
17    Q.  I mean, would that refresh your recollection?
18    A.  Yes.
19    Q.  (Handed document to witness.)
20    A.  Okay.
21    Q.  After you read that portion, does that refresh your
22  memory as to whether you saw any sort of abrasions on
23  Mr. Milam?
24    A.  Yeah.  I did notice an abrasion on Mr. Milam's hand.
25    Q.  Can you just describe it in general terms to the jury

1  what you mean by an abrasion on his hand?
2    A.  Just a blemish, maybe where it might have bled at one
3  time, but it wasn't a very serious injury at all.  I don't
4  recall; it was just an abrasion.
5    Q.  Now, the whole time you're out here at the car
6  talking to Mr. Milam, is -- where's the baby?
7    A.  The baby is just inside the front door, in the master
8  bedroom in the same location.  To my knowledge, the detectives
9  that were on the scene hadn't moved the baby.
10    Q.  Now, does there come a point in time when the Texas
11  Ranger arrives, Kenny Ray?
12    A.  (Nods head affirmatively.)
13    Q.  Did you know him prior to that date?
14    A.  Yes.
15    Q.  At that time, what are some of the things that you
16  were doing out there after you get through talking to Mr.
17  Milam, out at the crime scene?  What are some of the jobs that
18  you did and responsibilities you had?
19    A.  Keeping unauthorized persons from entering the crime
20  scene.  Making sure that nobody parks in a fashion that may
21  interfere with the investigation or with the detectives that
22  were working.  Pretty much just security for the detectives
23  while they worked the crime scene.
24    Q.  We see that yellow we refer to as crime scene tape,
25  different things.  Who strung that?

166

1    A.  I did.
2    Q.  Now, did you see Ranger Ray when he arrived?
3    A.  I don't -- I don't recall seeing him.  I remember him
4  there, but I don't recall when he arrived or seeing him
5  arrive.
6    Q.  Where is Mr. Milam waiting while you're doing these
7  things?  Where is Mr. Milam at?
8    A.  He's pretty much staying right there at the rear of
9  my patrol unit, standing there.
10    Q.  Did there come a time when you looked up, and he was
11  no longer at the rear of your patrol unit?
12    A.  I don't -- I don't recall.
13    Q.  Did there come a time when you saw him with Ranger
14  Ray in Ranger Ray's vehicle?
15    A.  I don't recall.
16    Q.  Do you know whether or not Ranger Ray spoke to him
17  out there at the scene, interviewed him there at the scene?
18    A.  (No response from witness.)
19    Q.  It's all right if you don't.  I'm just asking.
20    A.  I don't -- I don't recall ever seeing Mr. Milam
21  speaking with Ranger Ray that day.
22    Q.  Well, and just tell the jury whether or not -- is
23  that because he wasn't in custody?  You weren't responsible
24  for him?
25          MR. JACKSON:  Objection, leading.

167

1          THE COURT:  Sustain the objection.  Rephrase the
2  question.
3    Q.  (BY MR. JIMERSON)  Was he in custody at that time?
4    A.  No, sir.
5    Q.  Does he have handcuffs on him here in this picture?
6    A.  No, sir.
7    Q.  Did he have handcuffs on out there at any time you
8  were dealing with him?
9    A.  No, sir.
10    Q.  Did you ever see anything like that, him cuffed?
11    A.  I didn't see him cuffed out on the scene at all.
12    Q.  I mean, are there policies and requirements regarding
13  handcuffs and people who are confined and arrested?
14    A.  People who are arrested?  Yes.
15    Q.  They're policies of your department, aren't they?
16    A.  Yes, sir.
17    Q.  I mean, what are those policies?
18    A.  That if he's under arrest, especially with a case
19  like this, he would -- he would be restrained.
20    Q.  Did you do anything like that?  Did you restrain him
21  out there?
22    A.  No, sir.
23    Q.  I'm going to clear this up here on these jeans, that
24  circle that you had.  Did that denote where you were standing?
25    A.  That denoted where Mr. Milam was standing while I was

1   interviewing him.

2       Q.   These jeans that we see on the picture, I believe I

3   asked you about whether they're rolled up, whether they're up

4   on the boot cuff like that.  Is that the way they were out

5   there at the scene?

6       A.   Yes, sir, I recall them being up the boot like that.

7       Q.   How about the fit of them there?  How would you

8   describe that?

9       A.   Baggy.

10      Q.   Is that the way they looked out there at the scene,

11  baggy?

12      A.   Baggy.

13           MR. JIMBERSON:  May I approach?

14           THE COURT:  Yes.

15      Q.   Now, I'm going to hand you State's Exhibit No. 39,

16  and I'm going to represent to you that this one's not from the

17  2nd.  I showed you this before, correct?

18      A.   That's correct.

19      Q.   And essentially I asked you to find me a picture of

20  where Ranger Ray's vehicle was, correct?

21      A.   Yes, sir.

22      Q.   And you put these two photographs together, pinned

23  them together, correct?

24      A.   Yes, sir.

25      Q.   And from this picture, you can show us where Ranger

---

1   Ray's vehicle is in relation to the house, correct?

2       A.   That's correct.

3       Q.   And even though -- if I represent to you this photo

4   was taken at a much later time, December 11th, is it still

5   the same house?

6       A.   Yes.

7       Q.   It's the same house as December 2nd, correct?

8       A.   Yes, sir.

9       Q.   I mean, the trees and those kind of things, they

10  haven't moved, have they?

11      A.   Not that I'm aware.

12      Q.   In that sense, of being able to depict where Ranger

13  Ray parked, does it fairly and accurately represent --

14      A.   Yes, sir.

15      Q.   -- the house as of December 2nd?

16      A.   Yes, it does.

17           MR. JIMBERSON:  Your Honor, we would offer

18  State's Exhibit No. 39.

19           MR. JACKSON:  Your Honor, there's no objection

20  to State's 39.

21           THE COURT:  39 will be received.

22      Q.   All right.  Detective, did there come a point in time

23  where you realized that Ranger Ray was on the scene?

24      A.   Yes.

25      Q.   And what we were addressing a minute ago, before we

---

170

1   published this to the jury, was I asked you to locate a

2   photograph of where Ranger Ray's vehicle was, correct?

3       A.   Yes, sir.

4       Q.   And is it fair to say you had to put two photographs

5   together?

6       A.   Yes.  I had found a photograph depicting one area of

7   the house and then a separate photograph depicting the other

8   area of the property.  When you put them together, then you

9   can see where Ranger Ray parked in reference to the house.

10      Q.   And to avoid being misleading, we made the point now,

11  I represented to you these aren't taken from the 2nd.  These

12  are taken from later.  These are taken from the 11th.

13      A.   That's correct.

14      Q.   But it's the same house, isn't it?

15      A.   That's correct.  Same house.

16      Q.   So it's going to be the same general area.  Show us,

17  by making some sort of mark, where Ranger Ray was parked in

18  relation to the house on December 2, 2008.

19      A.   Ranger Ray was parked in that area (drawing on

20  monitor) on that side of the big tree and on that side of the

21  timber or logs that you see in that area on the south side.

22      Q.   From where he's parked there, his vehicle is facing

23  what direction?  Toward the house or away from the house?

24      A.   It's facing towards the house, I believe.

25      Q.   So it would -- there would still be a view from the

---

171

1   vehicle of the front of the house, or you could see the front

2   of the vehicle, whichever way you want to explain it?

3       A.   Yes.  Yes, sir.

4       Q.   Did there come a point when any other members of the

5   Milam family arrived?

6       A.   Yes.  Danny Milam and Shirley Milam arrived while we

7   were at the scene.

8       Q.   Do you recall about how long it was before they

9   arrived?  Do you remember about how long you were out there,

10  whether it was a short time or a long time?

11      A.   Medium amount of time, I suppose.

12      Q.   You were out there quite a while, weren't you?

13      A.   Yes, sir.

14      Q.   I mean, eventually, you got to -- did you eventually

15  get the video going?

16      A.   Yes, sir.

17      Q.   And it recorded a long time, didn't it?

18      A.   Yes, sir.

19      Q.   So at some medium amount of time, Danny Milam and

20  Shirley Milam arrived.  Did you talk to them?

21      A.   I did.  They had parked in an area where I thought

22  the investigators might complain, so I had them move -- move

23  their vehicle from that area of the property to another area.

24      Q.   What did you tell them?

25      A.   I told them to move their vehicle and park -- park in

1  a different area out of the way of the investigators, and that
2  one of the investigators would explain to them why we were
3  there.
4      Q.   Okay.  I mean, did you tell them the baby was -- did
5  you tell them there was a death in the house?
6      A.   I didn't.  I told them the investigators would tell
7  them why we were there.
8      Q.   Were you there when somebody else told them?
9      A.   I don't recall.
10     Q.   I mean, what was their demeanor like in terms of --
11  did they appear surprised or not surprised?
12     A.   I remember Danny Milam becoming emotional, and I
13  think Shirley Milam, which is Danny and Blaine's mother, she
14  was still sitting in the vehicle.  And I don't think she --
15          MR. JACKSON:  Objection, speculation.
16          MR. JIMERSON:  He's testifying to what he saw.
17          THE COURT:  I don't know what his answer is yet.
18  Complete your answer, and then I'll rule.
19     A.   I don't think she knew why we were there.  At the
20  same time --
21          MR. JACKSON:  Objection, speculation.
22          THE COURT:  I'll sustain the objection.
23          MR. JACKSON:  Ask the jury to disregard.
24          THE COURT:  The jury is instructed to disregard.
25          MR. JACKSON:  Move for a mistrial.

1          THE COURT:  Overruled.
2      Q.   (BY MR. JIMERSON:) Well, were you there when Danny
3  found out what y'all were there for?
4      A.   Yes.
5      Q.   Now, how did Danny react when he found out what you
6  were there for?
7          MR. JACKSON:  Objection, hearsay.
8          THE COURT:  Overruled.
9          MR. JIMERSON:  I'm asking how he reacted, Your
10  Honor.
11          THE COURT:  Overruled.
12     Q.   (BY MR. JIMERSON) You can answer that question.  How
13  did he react?
14     A.   I remember Danny telling me --
15     Q.   Don't tell me what he said, but you tell me how he
16  reacted.
17     A.   I remember Danny becoming emotional.  He was
18  concerned about why we were there.  And then I don't
19  specifically recall a detective telling me why we were there,
20  but I recall him becoming emotional at some point while
21  talking with the detective that was there.
22     Q.   Was he emotional before he heard about this?
23     A.   No.  He seemed concerned.  He kept asking me why, why
24  we were there, what was going on, and I told him that he
25  needed to talk to the detective.

174

1      Q.   In terms of whether he seemed surprised or not
2  surprised or reacting to this, how would you describe it?
3      A.   Surprised.
4      Q.   I asked you about -- you came back out there on the
5  11th, correct?
6      A.   Yes, sir.
7      Q.   And you held the tape and secured the scene and did
8  some other things; is that right?
9      A.   That's correct.
10     Q.   At the time, were you a detective or were you still
11  patrol?
12     A.   I was still patrolman.
13     Q.   Did you write a report about that?
14     A.   I did not.
15     Q.   Is that principally what we've described today and
16  those events out there when, I guess -- did you know who was
17  out there in terms of whether it was somebody from another
18  agency out there that day, the 11th?
19     A.   I know that another agency showed up that day.  Are
20  we still talking about the 11th?
21     Q.   Yes, sir.
22     A.   I know another agency showed up out there to do some
23  crime scene work.
24     Q.   Did you witness some of that crime scene work?
25     A.   I did.

175

1      Q.   But other than those events, what you witnessed out
2  there on the 11th and what we've talked about here today
3  from the 2nd, does that pretty well describe your involvement
4  in this case?
5      A.   Yes.
6          MR. JIMERSON:  Pass the witness.
7          THE COURT:  We'll take our afternoon recess.
8  We'll take a 15-minute recess, ladies and gentlemen, or a
9  20-minute recess.  You're under all the instructions I've
10  heretofore given you.  Do not discuss this case among
11  yourselves, nor with anyone else, nor allow anyone to discuss
12  the case with you, nor access any information concerning the
13  case.  You may step down and follow the bailiff.
14          (Recess.)
15          THE COURT:  Several things.  This is our very
16  first time in this courtroom.  So we're kind of -- you know,
17  we're all away from home.  We're feeling ourself around on how
18  we do things.  So the way we're going to start doing this, I
19  need to let y'all know, when we take our recesses, we'll keep
20  you in your room for five minutes or so.  Then we'll let you
21  go, and you can walk around.  Just be back in the room in
22  time.  You know, again, this is a little bit different from
23  how our courtroom's set up.  We're just trying to -- there are
24  certain things we have to do and precautions we have to take.
25  They're working on the air.  They promised me it will be fixed

1  by tomorrow, cooler, so we'll hopefully get that, too.  That's
2  the reason we've opened these doors to get some air in.  You
3  may cross-examine.
4       MR. JACKSON:  Thank you, Judge.
5                    CROSS-EXAMINATION
6  BY MR. JACKSON:
7       Q.  Is it Officer Roy or Sergeant Roy?
8       A.  (No response from witness.)
9       Q.  How do I address you now?
10      A.  Sergeant.
11      Q.  Sergeant.  Sergeant Roy, when you were out at the
12  trailer out there in Rusk County back on December 2nd, were
13  you the first police officer on the scene?
14      A.  Yes, sir.
15      Q.  Okay.  And what kind of training did you have prior
16  to December 2nd as a peace officer?
17      A.  (No response from witness.)
18      Q.  I'll ask it a little different.  You had the basic
19  police training for about a six-month period?
20      A.  I had basic -- the basic Police Academy, which was 16
21  weeks.
22      Q.  Okay.
23      A.  After that, in-service training.  2008, I had been
24  through basic S.W.A.T. training.
25      Q.  How long had you been a police officer in December of

1  2008?
2       A.  About five years.
3       Q.  Now, you would know that one of the most important
4  things, if you come onto a scene -- well, let's just call it a
5  crime scene.  You come up to a crime scene.  You want to make
6  sure that your safety's protected.  You also want to make sure
7  you preserve evidence, right?  Does that make sense?
8       A.  Yes, sir.
9       Q.  Okay.  Now, when you came out as, I guess, the first
10  responding police officer, you found four EMS people inside
11  the house, correct?
12      A.  I think I recall two in the house and two outside.
13      Q.  All right.  Do you know how many people had been
14  inside the house prior to you getting there, the EMS?
15      A.  No, sir.
16      Q.  Did you happen to ask that question?
17      A.  No, sir.
18      Q.  Now, you wrote a report about this, didn't you?
19      A.  Yes, sir.
20      Q.  I found a two- or three-page report, give or take.
21      A.  That's correct.
22      Q.  Okay.  And one of the reasons to make a report, that
23  you learned in your four months of police training, is to make
24  sure you properly document the facts as they occurred that
25  day, right?

178

1       A.  That's correct.
2       Q.  And you understand the importance of photographic
3  evidence or video evidence, do you not?
4       A.  I do.
5       Q.  Now, when you first get to a scene -- let's just talk
6  about this one.  When you came up, you found two EMS people
7  inside the house, correct?
8       A.  That's correct.
9       Q.  And did you talk to the other two EMS people as you
10  walked up to the house and ask them what was going on?
11  Without going into their conversation, did you --
12      A.  I believe so.  If there was some conversation, I
13  don't recall.
14      Q.  Okay.  And you go inside the house.  At this point in
15  time, you find four people inside the house; is that correct?
16      A.  That's correct.
17      Q.  You find Jesseca and Blaine, correct?
18      A.  Uh-huh.
19      Q.  Yes?
20      A.  Yes.
21      Q.  You've got to answer yes or no, because the court
22  reporter is taking that down.
23      A.  I'm sorry.
24      Q.  That's okay.  If you answer "Uh-huh" or "Huh-uh," it
25  comes out the same way for the court reporter.

1       A.  I understand.
2       Q.  Now, Jesseca and Blaine inside the house over the
3  baby, and you find the two EMS workers or EMT workers over the
4  child also, correct?
5       A.  That's correct.
6       Q.  And do you quickly ascertain that the baby has passed
7  away?
8       A.  Fairly quickly, yes.
9       Q.  At that point in time, it's got to go through your
10  head, you now have to preserve this as a crime scene, correct?
11      A.  Yes, sir.
12      Q.  Whether or not it's a crime or a natural death, you
13  have to basically -- you become a fact finder, right?
14      A.  (No response from witness.)
15      Q.  Or an evidence preserver?
16      A.  That's correct.
17      Q.  So you then -- how long, because your report doesn't
18  tell us, how long do you let these people stay in the house
19  while you're there?
20      A.  As soon as I enter the house, within about a minute,
21  everyone is out of the house.
22      Q.  Now, the concern I've got, you don't put that in your
23  report, so you basically have to either go off your memory or
24  you have to guess, correct?
25      A.  That's correct.

179

1    Q.   Okay.  You know, a dead baby, that's a huge deal, a
2  huge case for a police officer to work on, is it not?
3    A.   Very.
4    Q.   And Rusk County is a rural county.  You don't have
5  these kind of things happen every day, do you?
6    A.   That's correct.
7    Q.   Not like bein in Harris County in Houston, where,
8  you know, those things happen, and it's horrific, but it's not
9  as -- it's much more surprising in Rusk County, right?
10    A.   Yes, sir.
11    Q.   Okay.  So this had to really elevate your senses of a
12  police officer at that point, did it not?
13    A.   I would say so, sir, yes.
14    Q.   Okay.  And so your report doesn't tell us how long
15  these people stay in the house.  Were they on their knees, on
16  their hands?  Were they standing?  What were they doing?
17  Because your report doesn't tell us.
18    A.   Well, the EMTs were standing in the doorway, and
19  Mr. Milam and Ms. Carson were kneeling over the baby.
20    Q.   All right.  And when they're kneeling, were they with
21  their hands on the floor?  Were they touching the child?  What
22  were they doing?
23    A.   I couldn't see.  The EMTs were standing in the
24  doorway, and I didn't actually see Blaine Milam and Jesseca
25  Carson until they moved out of the way, and then I saw

1  Mr. Milam and Ms. Carson kneeling.
2    Q.   You said --
3    A.   I don't know if their hands were on the floor or not.
4    Q.   Okay.
5    A.   They were kneeling.
6    Q.   And you've since become a detective; is that correct?
7    A.   That's correct.
8    Q.   You get more training to become a detective, correct?
9  Or let me ask, did you get more training to become a
10  detective?
11    A.   After I became a detective, I was sent for more
12  training, that's correct.
13    Q.   So in Rusk County, you got promoted to detective, and
14  then they gave you training, right?
15    A.   That's correct.
16    Q.   Okay.  That's kind of a flip-flop of maybe how it
17  should be.  Typically, maybe, they should train you and then
18  call you Detective, shouldn't they?  Would that make a little
19  more sense?
20    A.   Well, the five years on patrol, it was technically
21  training --
22    Q.   Okay.  Great.
23    A.   -- and experience.
24    Q.   So on patrol, you were getting crime scene
25  investigation training, correct?

1    A.   Not specific crime scene investigation training, but
2  just experience.
3    Q.   So experience.  Let's talk about the experience.  As
4  a crime scene investigator, you know how important it is to
5  document physical evidence, right?
6    A.   Yes.
7    Q.   And it would be very important on December 2nd, 2008,
8  to make sure that we thoroughly and fully document everything
9  inside and outside that trailer as best as we could, correct?
10    A.   That's correct.
11    Q.   Because let's say you leave a crime scene, let's say
12  on December 2nd, and you come back the next day or the
13  following day or ten days later.  What's the risk of a problem
14  coming back later that you might face as a detective?
15    A.   I'm not following you, sir.
16    Q.   Okay.  You leave a crime scene unsecured.  You come
17  back the next day.
18    A.   It changes.
19    Q.   Exactly.  It changes.  And you leave a crime scene
20  for two days, potentially more changes, right?
21    A.   Correct.
22    Q.   You leave a crime scene unsecured for nine days,
23  would that cause you concern as maybe -- let's say you're the
24  lead detective on a case.  Would that cause you concern to
25  leave a crime scene unsecured for a period of nine days, where

1  you come back and document evidence?
2    A.   There's a possibility that things would be different.
3    Q.   You know, possibility, anything could happen.
4  Probability is much more likely.  More of a probability that
5  things can be changed or altered or destroyed or contaminated
6  when you leave that crime scene for that period of time,
7  correct?
8    A.   I would feel more comfortable remaining with the word
9  "possibility."
10    Q.   Wouldn't you feel more comfortable had you videoed or
11  photographed the entire house that day instead of nine days
12  later?
13    A.   No.  I didn't photograph or video the house at all.
14    Q.   Okay.  Now, let's just say you were the lead
15  investigator.  Now, in Rusk County, it's different than how we
16  do things here.  If you're the lead investigator, should you
17  be leaving the crime scene or should you be processing the
18  entire crime scene yourself?  What would you, if you're the
19  lead investigator on a case out there?
20    A.   That depends.  It's a case-by-case --
21    Q.   I'm just asking you, on one of the biggest cases Rusk
22  County has seen in a long time, if you're the lead
23  investigator, do you want to leave that crime scene or do you
24  want to make sure everything is handled appropriately, if
25  you're the guy in charge?

1    A.   I would -- I would remain on the scene.

2    Q.   Exactly.  And that's not what happened here, is it?

3    A.   No, sir.

4    Q.   Yeah.  Amber Rogers was your lead investigator on

5 this crime scene, and she actually left the crime scene and

6 went to the Sheriff's Department to go talk to Blaine and

7 Jesseca, right?

8    A.   To my recollection, yes.

9    Q.   You know, Officer Tully or Investigator Tully?

10   A.   Yes.

11   Q.   He wasn't too happy that Detective Rogers left the

12 crime scene, was he?

13   A.   I suppose not.

14   Q.   Yeah.  Because he realizes the problems with the lead

15 investigator leaving a crime scene like that unsecured,

16 unfinished, right?

17   A.   I'm sorry.  I don't understand the question.

18   Q.   You realize the problem leaving the crime scene

19 unfinished or unsecured, don't you?

20   A.   The crime scene wasn't ever unsecured or unfinished.

21   Q.   Really?  Who was still living in that house after

22 y'all left that day on December 2nd?

23   A.   Mr. Milam's mother.

24   Q.   Right.  Shirley Milam and Danny, right?  Isn't that

25 correct?

---

1    A.   I suppose, I don't know.

2    Q.   Now, when you came there on the 11th -- in fact,

3 you went back to the house December 11th, didn't you?

4    A.   I did.

5    Q.   You're part of a group of people that came in there,

6 right?

7    A.   Yes, sir.

8    Q.   That house was unlocked on December 11th, wasn't

9 it?

10   A.   I don't recall.

11   Q.   All right.  The house being unlocked, unsecured,

12 would that cause you some concern, as a detective, to make

13 sure whether or not this evidence has properly been preserved?

14   A.   I suppose.

15   Q.   Okay.  You know, we're talking about a man's life.

16 We're talking about that.  We want to make sure you do it

17 right.  Is this the proper way to handle things to make sure

18 justice is done either way?

19   A.   I'm not following the question.

20   Q.   Leaving a crime scene unsecured, the lead detective

21 leaving that crime scene before it's fully processed and

22 finished --

23   A.   Are we talking about December 2nd now?

24   Q.   I'm talking about from December 2nd all the way to

25 December 11th or 13th.  Is that the way you would want a

---

1 crime scene done if you're in charge, to make sure we actually

2 find out what happened?

3   A.   I would do, to the best of my ability, to process the

4 crime scene the first time.

5   Q.   So the answer to my question is that's not the way

6 you would have wanted it done, right?

7   A.   (No response from witness.)

8   Q.   It's a tough question.

9   A.   It is.

10   Q.   I understand.  But see, the fact of the matter is,

11 we're talking about doing things the right way to make sure

12 the right person gets charged, the right person goes to trial,

13 the right person's found guilty or not guilty, or the right

14 people.  Would you want -- if you're the lead detective, are

15 you going to handle things that way, the way this case was

16 handled?

17   A.   I don't -- I don't know.  I've never worked a case as

18 a lead detective at this --

19   Q.   You see the concern --

20   A.   I don't know what was going through the other

21 detectives' minds and why they made the decisions they made.

22   Q.   I'm not --

23   A.   You're absolutely right.  I think --

24   Q.   Long and short of it --

25   A.   -- that --

---

1    Q.   -- you would do it differently, would you not?

2    A.   I would.

3    Q.   Okay.  Now, you understand the concern with

4 contaminating evidence, do you not?

5    A.   Yes, sir.

6    Q.   Contamination of evidence could be -- let's say we

7 have two suspects, and we allow them to unseparate and get

8 back together and hug and talk closely away from law

9 enforcement.  That wouldn't be a smart thing to do, would it?

10   A.   I'm not -- not following the question again, sir.

11   Q.   Well, it can become pretty apparent here pretty

12 quick, but let me ask it better.  If you're the lead

13 detective, and let's say that suspects have already been

14 separated.  Somehow they get back together, and you see them

15 hugging and touching each other, rubbing their clothes against

16 each other.  That wouldn't be a good thing, would it?

17   A.   Probably not.

18   Q.   And the reason for that is because you could have

19 transfer of evidence, can you not?

20   A.   Yes, sir.

21   Q.   And that can be contamination from one clothing to

22 another, correct?

23   A.   Yes, sir.

24   Q.   Simply put, let's say that I have some type of

25 evidence on my shirt, DNA from -- whether it's blood or hair

1  fibers, whatever, and you and I hug.  That doesn't really
2  happen, but you and I hug.  I can transfer things to your
3  clothing, can I not?
4      A.   You can.
5      Q.   That's the reason we would keep people separated,
6  correct?
7      A.   Yes, sir.
8      Q.   We also don't want them talking, because there might
9  be a concoction of stories or who knows what, right?
10     A.   That's correct.
11     Q.   And see, you made an intent to separate Blaine and
12  Jesseca, correct?
13     A.   Yes, sir.
14     Q.   Okay.  And that would be the right thing to do,
15  correct?
16     A.   Yes, sir.
17     Q.   So when you separated them, at one point, I think you
18  were talking -- were you talking to Blaine, and Amber Rogers
19  was talking to Jesseca?
20     A.   That's correct.
21     Q.   And somehow -- well, let me ask you this.  Did you
22  find out or did you see that when Ranger Ray shows up on the
23  scene, he sees Jesseca and Blaine hugging?  Did you know that?
24     A.   I didn't know.
25     Q.   That wouldn't be a good thing, would it?

1      A.   (No response from witness.)
2      Q.   You already told me the answer.  I'm just
3  reaffirming.
4      A.   You're right, it's not good.
5      Q.   Right.  And so somehow -- if Ranger Ray tells us
6  that, somehow you or Amanda Rogers lost sight of them for them
7  to get back together and hug and talk?
8      A.   That's very possible.  I didn't -- I wasn't watching
9  them that closely.
10     Q.   Yeah, because you weren't the lead detective on this.
11  That would be Amanda (sic) Rogers, right?
12     A.   Amber.
13     Q.   Amber, I'm sorry.  That would be Amber Rogers, I
14  guess, is the lead person on the scene, right?  She's
15  ultimately the one who we could blame?
16     A.   She's the one that was typically calling the shots
17  out on the scene.
18     Q.   The lead dog in the hunt, right?
19     A.   (No response from witness.)
20     Q.   Okay.  So she's calling the shots.  Now, you get
21  there, and you don't know whether or not Jesseca or Blaine had
22  been touching the baby, do you?
23     A.   Not -- not after I got to the scene.
24     Q.   Okay.  But before you got to the scene, you knew that
25  they had held the baby or touched the baby, right?

190

191

1      A.   (Shakes head negatively.)  I don't know --
2      Q.   Did you --
3      A.   -- the -- the last time that I had gotten any
4  information where the baby had been touched by Blaine Milam or
5  Jesseca Carson was when Blaine told me he had fed the baby
6  about 8:30.
7      Q.   Were you aware there was an attempt to do CPR on the
8  baby?
9      A.   It was -- they were kneeling down, which they could
10  have been attempting CPR.
11     Q.   And, you know, in a stressful situation, you've
12  learned that people can sweat during stressful situations, can
13  they not?
14     A.   They can.
15     Q.   They can perspire.  And it's a natural bodily
16  reaction at times for some people, is it not?
17     A.   I suppose.  I don't know.
18     Q.   Well, I mean, as an investigator, you've made
19  comments before that someone's so nervous they were sweating.
20  That's one of the signs you can look for when someone's
21  nervous, right?
22     A.   Sure.
23     Q.   Okay.  And so if someone is sweating, they can --
24  sweat will transfer DNA.  I mean, if you took a person's
25  sweat, you could extract DNA from that, couldn't you?

1      A.   I suppose.
2      Q.   Okay.  And so if someone's sweating and they're
3  touching the child, they're trying to do CPR on the child,
4  that could transfer their DNA to the child, could it not?
5      A.   It's possible.
6      Q.   Exactly.  Now, so we don't have in your report how
7  long Blaine and Jesseca and the EMS people were in the house.
8  Also, I don't see in your report how long EMS had been there,
9  correct?
10     A.   (No response from witness.)
11     Q.   You didn't ascertain that, how long they had been in
12  the house?
13     A.   No, sir.
14     Q.   Didn't ascertain where all they walked through the
15  house, or had they?
16     A.   The EMS dispatcher should have a record of their time
17  of arrival.
18     Q.   But I'm asking you what you did.  You're the first
19  responder.  You're the report we have to rely on.  Did you
20  ascertain that from them?
21     A.   I did not.
22     Q.   Did you ascertain where all they had walked, what
23  they had stepped on, what paths they took to see, you know, do
24  we have a situation where evidence has been contaminated or
25  moved?

1    A.   I didn't ask that.

2    Q.   Did you happen to ask them whether they had moved the

3    child?

4    A.   I didn't.

5    Q.   So at that point, we really don't know anything.  We

6    just know that you finally, sometime after a minute or so, you

7    asked everyone to get out of the house, right?

8    A.   That's correct.

9    Q.   And then did you shut the door and secure the house?

10   A.   No, sir.

11   Q.   Okay.  You sent Blaine and Jesseca outside.  Did they

12   just walk out by themself or did you escort them out?

13   A.   They walked out by themself.

14   Q.   Okay.  And did you then, I guess -- did you have a

15   service revolver or a pistol on you?

16   A.   I did.

17   Q.   Did you pull the pistol and walk through the house

18   and secure it, or how did you do it?

19   A.   I did.  I pulled the pistol and looked for other

20   persons in the house.

21   Q.   Sort of like for us lay people -- a few people

22   haven't been a police officer in this room.  I'm sitting

23   beside two ex-police officers.  So I don't really know.  I'm

24   assuming, kind of what we see in the movies, you're being real

25   careful.  You're walking around corners to make sure someone's

---

1    not going to surprise you, and things like that?

2    A.   Correct.

3    Q.   Okay.  And you clear the house to make sure that

4    there's no one in there that's going to hurt you or destroy

5    evidence or that might be a potential suspect, right?

6    A.   That's correct.

7    Q.   And this is not a big trailer.  This is something you

8    cleared that house probably pretty quick, even being thorough,

9    based on the small size of that trailer, right?

10   A.   I suppose.

11   Q.   30 seconds to a minute, maybe a little longer?

12   A.   A couple, three minutes.

13   Q.   Okay.  Now, you -- let's see if I can -- Sergeant

14   Wolfe, if I can get you to step down.  Maybe we can go through

15   this demonstrative exhibit with the jury.  Okay, I'm looking

16   at demonstrative exhibit entitled State's Exhibit 23.  Now,

17   this, what I'm pointing at, if we had -- I guess there's north

18   to the top, so this is going to be east.  On the east side

19   of this trailer, there's a front door, correct?  It's the only

20   door that we see on the east side of the trailer.

21   A.   That's correct.

22   Q.   Okay.  So this is the only place that you would have

23   come through, you would have entered?

24   A.   Yes, sir.

25   Q.   Okay.  So where this exit is in the bedroom, you see

1    Jesseca and Blaine kneeling down by the baby, correct?

2    A.   That's correct.

3    Q.   You see EMS workers.  Are they in the living room or

4    are they in the bedroom?

5    A.   They're in the doorway between the living room and

6    the bedroom.

7    Q.   Okay.  So your view is fairly blocked.  I was just

8    out there a week ago.  That's a pretty small door.  I mean,

9    it's not one of these -- it's not a large double door.  It's a

10   small single door.

11   A.   That's correct.

12   Q.   Okay.  And you get them out, and they walk outside.

13   You don't walk out with them, correct?

14   A.   That's correct.

15   Q.   So then where did you -- do you start?  Because your

16   report doesn't tell us.  Where do you start your clearing of

17   this residence?

18   A.   When they leave the residence --

19   Q.   Yes, sir.

20   A.   -- I begin right in this master bedroom -- the master

21   bedroom.  And I walk into the bathroom, and then I come back

22   out the living room.  And I'm actually in the living room when

23   Sergeant Rogers walks in the door.

24   Q.   Okay.

25   A.   She sees my gun drawn, and she knows I'm clearing the

---

1    house because I tell her.

2    Q.   That's interesting, because your report doesn't tell

3    us that either.  We couldn't really ascertain when they showed

4    up.  So you're telling us now that Sergeant Rogers arrived

5    while you were in the living room clearing the house?

6    A.   That's correct.

7    Q.   And again, the concern I've got, you understand, is

8    that I'm having to go off your memory or your guessing as to

9    when she showed up, correct, because it's not written?

10   A.   Correct.

11   Q.   And there's no time date or time stamp, as to when

12   they arrived, on your report.

13   A.   Well, I was -- I didn't -- I was more concerned about

14   the suspects possibly in the house rather than looking at my

15   watch to see what time it is --

16   Q.   I understand that, but you understand a crime scene

17   of this magnitude, how important it is to document almost

18   everything you do, because you know there's probably going to

19   be a trial somewhere down the line, right?

20   A.   That's correct.

21   Q.   Okay.  So you're in the living room, and I guess

22   there's a couch in here.  Was there a mattress on the floor

23   over in this area?

24   A.   I don't recall.

25   Q.   Okay.

1    A.    There's a crib, I believe.

2    Q.    And then where did you go from there?

3    A.    I went down into the hallway and then entered this
4 bedroom.

5    Q.    This bedroom would be the first bedroom right to the
6 right, but on the east -- I'm sorry, on the west side of the
7 word "Hall." correct?

8    A.    That's correct.

9    Q.    Okay.  This is the bedroom that is really messed up.
10 There's -- I mean, it looks like no one's really sleeping in
11 that room, right?

12   A.    That's correct.

13   Q.    Okay.

14   A.    Then into the bathroom here between these two rooms.

15   Q.    Yes, sir.

16   A.    And then into this bedroom.  And then I came out,
17 went out to the back door, and then came back up to the
18 kitchen and exited the front door.

19   Q.    Okay.  Did you ever go into this, the bottom
20 southwest bedroom?

21   A.    I did.

22   Q.    Okay.  Now, the condition of that trailer was
23 deplorable, wasn't it?

24   A.    I'm sorry?

25   Q.    The condition of that trailer -- I mean, I use a lot

1 of adjectives.  Let's use deplorable.  Was it not?

2    A.    I'm sorry, I don't know --

3    Q.    What adjective would you use to describe the
4 condition of that trailer, from the walls to the flooring, to
5 how it was kept up?

6    A.    Messy?

7    Q.    Messy?  I have a 14-year-old that's messy.

8    A.    It's --

9    Q.    Would you allow someone to live in there if you had
10 the say-so?

11   A.    (No response from witness.)

12   Q.    Would you want to live in there?

13   A.    I would do some work on it before I would move in
14 there.

15   Q.    Right.  In fact, the wallpaper has been peeled off
16 the wall, it appeared.  Did you see that?

17   A.    I did.

18   Q.    Holes in the walls.  I mean, it's just a horrible
19 place, wasn't it?

20   A.    (No response from witness.)

21   Q.    Would horrible be a good adjective to use?

22   A.    Yes.

23   Q.    Okay.  And seeing things like this, you would want --
24 if you're the lead investigator, you're going to photograph
25 that entire place as it existed on December 2nd, right?

198

1    A.    (No response from witness.)

2    Q.    Wouldn't you photograph every room?

3    A.    Or have someone do it for you.

4    Q.    Oh, absolutely.  That's the great thing about being
5 maybe the lead person.  You can delegate, but you're going to
6 be in charge of that crime scene to delegate.  You might say,
7 "John Smith, you're taking photographs.  Suzy, you're going to
8 videotape.  John, you're going to bag evidence."  Right?

9    A.    That's correct.

10   Q.    And as you know, you would also have a crime scene
11 log as to every person coming into your crime scene, the time
12 they come in, who they are, and the time they leave, right?
13 You've been taught to do that, haven't you?

14   A.    Yes, sir.

15   Q.    And that didn't happen here either, did it?

16   A.    Not to my knowledge.

17   Q.    It's amazing.  This is probably one of the largest
18 crime scenes in this county in a long, long time, and we're
19 only on basically the second witness.  Can you see the
20 problems we're already facing?

21         MR. JIMERSON:  Object to the sidebar remark and
22 Counsel's characterization as "amazing."  I would ask the jury
23 be instructed to disregard Counsel's sidebars.

24         THE COURT:  I'll sustain the objection.

25         MR. JIMERSON:  Ask the jury be instructed to

1 disregard.

2         THE COURT:  The jury is instructed to disregard
3 the last statement.

4    Q.    (BY MR. JACKSON) Do you see the problems in the
5 investigation up to this point that we've been talking about?

6    A.    Yes, sir.  There were some mistakes made.

7    Q.    Okay.  Now, this crime scene log, we want to know
8 who's coming into the house, the time they're leaving, because
9 if -- and we also need to know who's there, because of
10 transfer of evidence, contamination of evidence, who's walking
11 through the house, who's doing what.  Those are not only
12 proper, that's what you're supposed to do on a crime scene,
13 correct?

14   A.    I suppose.

15   Q.    You suppose or you know?  You know now, right?

16   A.    Well, different types of crime scenes don't really
17 require that.  This one --

18   Q.    This one should.

19   A.    Yes.

20   Q.    Now, so Amber -- okay, you clear the house.  And at
21 that point -- let me ask you.  Humber, he comes -- I guess he
22 comes up to you and has a conversation with you after you've
23 cleared the house.  You talked to him, right?

24   A.    I don't specifically recall.

25   Q.    Well, didn't he come up to you and say something

199

1    along the lines of, "Hey, what do we have here?"  You tell
2    him, "Go inside and look."  Do you recall that?
3        A.  I don't recall that.
4        Q.  Okay.  Now, that would not be a smart thing to do, to
5    send someone just into the house who's not the lead crime
6    scene investigator, who could go in and trample on evidence
7    and destroy potential evidence in and around that child,
8    right?
9        A.  I don't recall that.
10       Q.  But if you did that, that would not be an appropriate
11   thing to do, right?
12       A.  I don't know.  Humber at the time was the senior
13   investigator.
14       Q.  Right.  Did you know at the time that he wasn't the
15   lead investigator on that case?
16       A.  He is over the lead investigator on all cases.
17       Q.  Okay.  But just because he might be a higher rank,
18   would you want someone going in and contaminating your crime
19   scene that you've preserved?
20       A.  I wouldn't -- I wouldn't want anybody going in and
21   contaminating a crime scene.
22       Q.  Okay.  Had you already cleared the house when Humber
23   got there?
24       A.  I believe Humber and Sergeant Rogers arrived at the
25   same time.

1        Q.  Did they come in the house together?
2        A.  No.
3        Q.  Now, did you talk to -- you talked to Blaine,
4    correct?
5        A.  Yes, sir.
6        Q.  Amber talked to Jesseca, correct?
7        A.  That's correct.
8        Q.  At this point, were there people walking through the
9    house, or do you know?
10       A.  I don't know.
11       Q.  Okay.  And there were dogs in the house, were there
12   not?
13       A.  There were.
14       Q.  And you didn't --
15       A.  I saw dogs on the porch.
16       Q.  You didn't see the dogs inside?
17       A.  I didn't see dogs inside the house.
18       Q.  Let's just say you were the lead investigator in this
19   case.  You wouldn't leave animals inside the house to tamper
20   with or destroy evidence, would you?
21       A.  No, sir.
22       Q.  The great thing about being a police officer is you
23   can actually -- when you secure a scene, you don't have to
24   release that scene and let other people come back and live in
25   that house.  At that point, you can say, "This is a crime

202

1    scene, and you guys aren't coming back until we finish
2    processing it."  Right?
3        A.  Yes, sir.
4        Q.  And when y'all left that night, the Milam family was
5    allowed to come back in the house, weren't they?
6        A.  I suppose.  I left a lot sooner than when the scene
7    was released.
8        Q.  You left around 2:30, give or take?
9        A.  (Nods head affirmatively.)
10       Q.  Yes, sir?
11       A.  That sounds about right.
12       Q.  Okay.  And you left about the same time as Amber
13   Rogers, right?
14       A.  I -- I don't recall.
15       Q.  Well, because Amber asked you to take Blaine or
16   Jesseca, which -- did you take both of them to the jail or to
17   the Sheriff's Department?
18       A.  Just Mr. Milam.
19       Q.  Okay.  And we know that Amber went to the jail to go
20   talk to them, so give or take, she left sometime either after
21   you or at the same time?
22       A.  I suppose, yeah.
23               MR. JACKSON:  May I have just a minute, Your
24   Honor?
25               THE COURT:  Yes.

1        Q.  (BY MR. JACKSON)  Now, while you were walking through
2    the house, I know you're clearing the house.  You're not
3    really looking for evidence.  I mean, you're making sure that
4    everyone's safe.  You got everyone out of the house, but did
5    you see anything that struck you as potential evidence as you
6    were walking through the house?
7        A.  I don't recall anything specific.
8        Q.  Okay.  Now, let's say, again, you're the lead
9    detective in a case of this magnitude.  You might want to get
10   fingernail scrapings or cuttings of fingernails, right, of
11   these suspects?  Make sense?
12       A.  Sure.
13       Q.  Because you're looking for potential evidence under
14   their nails, right?
15       A.  Okay.
16       Q.  Am I correct?
17       A.  Yes.
18       Q.  Okay.  And you wouldn't just take it from one
19   suspect; you would take it from both, wouldn't you?  That
20   would make sense, wouldn't it?
21       A.  Yes, sir.
22       Q.  Because what happens is, at times, you don't want
23   officers putting blinders on and just focusing on one person
24   and not everyone that might be a potential suspect there,
25   right?

203

1    A.   Okay.

2    Q.   Am I correct in saying that?

3    A.   Yes, sir.

4    Q.   Okay.  And again, that wasn't done here.  Can you --

5 if you would have -- in fact, you know that.  You know that

6 the nail scrapings weren't taken from Jesseca, right?  Did you

7 know that?

8    A.   I didn't know that.

9    Q.   And now can you see another problem that we have with

10 this case?

11   A.   Yes.

12   Q.   Okay.  That's something, as a detective on a case,

13 you're not going to do, are you?

14   A.   I try not to.

15   Q.   We don't have any pictures of the south part of that

16 house or that trailer from December 2nd, do we?

17   A.   I don't know.

18   Q.   Don't have any videos from the south side of that

19 house from December 2nd, do we?

20   A.   I don't know.

21   Q.   You didn't take them, right?

22   A.   I didn't.

23   Q.   Not something that you would recommend in processing

24 a crime scene, is it?

25   A.   I'm sorry?

1    Q.   I'll ask the question better.  If you're running the

2 crime scene, even though you've only been a detective for a

3 year or so, you're going to make sure we video and photograph

4 the entire place as it exists that day, right?

5    A.   Yes, sir.

6    Q.   Because if it's changed the next day, we know there

7 could be a problem, or you can't go back and reconstruct a

8 scene appropriately, correct?

9    A.   That's possible.

10   Q.   Now, you and Amber Rogers separated Blaine and

11 Jesseca and questioned them separately, right?

12   A.   Yes, sir.

13   Q.   Okay.  And after Amber questioned Jesseca, Amber came

14 and told you, "Hey, these people are suspects," right?  She's

15 the one that brought that to your attention.

16   A.   No.  She -- she only said, "Read them their Miranda

17 rights."

18   Q.   See --

19   A.   I don't know what her and Jesseca Carson's

20 conversation entailed.

21   Q.   Interesting, because you don't have to read people

22 Miranda warnings typically, unless they're in custody, right?

23 It's -- custodial interrogation is when you have to read

24 Miranda to somebody, correct?

25   A.   If you believed that they may say something that

206

207

1 would incriminate themselves, we read Miranda rights.

2    Q.   Well, but you understand the law, don't you?  I mean,

3 you've been trained as a peace officer, correct?

4    A.   I usually Mirandize anybody that I feel might be --

5 or could be a suspect --

6    Q.   Okay.

7    A.   -- just to --

8    Q.   And it wasn't your idea to do the Miranda warnings.

9 Now, we say Miranda warnings.  You have the right to remain

10 silent, things of that nature.  Things you see on TV.  You

11 have the right to have an attorney, right?

12   A.   That's correct.

13   Q.   But you understand that the law says, do you not,

14 that you don't have to Mirandize someone when you're

15 questioning them, unless it's a custodial interrogation.

16 They're in custody.  They're not free to leave.  That's when

17 the law says you have to do it, right?

18   A.   No.  I've -- I've read people their Miranda warnings

19 before without arresting them.

20   Q.   You're not answering my question.

21   A.   I'm not following you.

22        MR. JIMERSON:  Your Honor, may he answer the

23 question?  I object to cutting him off.

24        MR. JACKSON:  Then I'll just object to the

25 nonresponsiveness of the witness.

1        THE COURT:  I'll sustain the objection.  Restate

2 the question.

3        MR. JIMERSON:  Okay.  You sustain my objection,

4 Your Honor?

5        THE COURT:  I sustain his objection and overrule

6 your objection.

7    Q.   (BY MR. JACKSON) My question is this.  Am I correct

8 when I state the law says you don't have to Mirandize somebody

9 unless it is a custodial interrogation?  Is that true?  Yes or

10 no.

11        MR. JIMERSON:  Your Honor, the Court's the

12 determiner of the law, not the detective, especially the law

13 involving this case.

14        THE COURT:  All right.  I'll sustain the

15 objection as to the law.

16   Q.   (BY MR. JACKSON) Amber Rogers was much more

17 experienced than you on that scene, was she not?

18   A.   Yes.

19   Q.   And even with your lack of experience, you would have

20 done things better and different, correct?

21   A.   At the time, I wouldn't have known, but now, yes, I

22 do know.

23   Q.   Okay.  And it was Amber Rogers, lead detective, who

24 came and told you, "Read them their rights," right?

25   A.   That's correct.

1    Q.   Something Jesseca said kind of triggered her to say

2  that to you, right?

3           MR. JIMERSON:  Objection, Your Honor.  Calls for

4  speculation.

5           THE COURT:  I'll sustain the objection.

6           MR. JIMERSON:  Move the jury be instructed to

7  disregard the question.

8           THE COURT:  The jury is instructed to disregard

9  the question.

10    Q.  (BY MR. JACKSON) Blaine Milam wasn't free to leave at

11  that point in time, was he?

12    A.  Blaine and Jesseca were detained at that time.

13    Q.  Okay.  My question was, were they free to leave?

14  Could they have just walked away and drove off?  Would you

15  have let them?

16    A.  I would have gotten ahold of the lead detective, if

17  they were wanting to do that, to see if it was okay for them

18  to do that.

19    Q.  The lead detective would have probably been about 20

20  feet from you, right?

21    A.  Possibly.  I don't know.  They never attempted to

22  leave.

23    Q.  My question is, that were they free to leave, in your

24  opinion, at that time?

25    A.  No.  They were detained.

---

1    Q.  Okay.  Blaine wasn't holding up his pants like they

2  were falling down, was he?

3    A.  I don't recall.  I don't think so.

4    Q.  Okay.  I mean, had you have seen something out of the

5  ordinary, you would have probably put it in your report,

6  wouldn't you?

7    A.  If I didn't forget.

8    Q.  What else did you forget?

9    A.  I don't know.

10    Q.  Well, have you all of a sudden come to the

11  realization that there's other things that you have forgotten

12  that I haven't asked you about, that's not in your report?

13           MR. JIMERSON:  Objection, argumentative.

14           THE COURT:  I'll overrule the objection.

15    Q.  (BY MR. JACKSON) There's a lot not in your report.

16  What else have you forgotten to put in this report?

17           MR. JIMERSON:  Objection, multifarious.  Which

18  question is he answering, Your Honor?

19           THE COURT:  Sustained.  Restate the question.

20    Q.  (BY MR. JACKSON) What else did you forget to put in

21  this report?

22    A.  I don't know.

23    Q.  So basically, unless I specifically ask you about it,

24  we might never know if something's missing in here, right?

25    A.  A report can be -- it can be as descriptive as a

---

210

1  100-page report and talk about things that are mostly

2  irrelevant.  I put what I thought was relevant, from my point

3  of view, in the report.

4    Q.  Okay.  Now, you testified -- I'm assuming that -- let

5  me ask it better.  You testified for Mr. Jimerson that Danny

6  and Shirley Milam, the brother and the mother of Blaine Milam,

7  they showed up in about a medium amount of time.  I have no

8  idea what that means.  It's not in your report.  What is a

9  medium amount of time?

10    A.  I was trying to make the point that it was not a

11  short amount of time or a very long amount of time.  Sometime

12  in between.

13    Q.  We have nothing in your report that tells us about

14  when they showed up, do we?

15    A.  I don't believe so.

16           MR. JACKSON:  May I have just a minute, Your

17  Honor?

18           THE COURT:  Yes.

19    Q.  (BY MR. JACKSON) The long and short of it, if we're

20  going to define the future of a man's life, this is not the

21  way we would want to investigate a case, is it?

22           MR. JIMERSON:  Objection, Your Honor.  It's

23  argumentative.  It's speculation.  It's invading the province

24  of the jury.  We object to it under all of those grounds.

25           MR. JACKSON:  I made my point.  I pass the

---

211

1  witness.

2           MR. JIMERSON:  He has made his point.  For that

3  purpose, Your Honor, may the jury be instructed to disregard

4  that point?

5           THE COURT:  I'll instruct the jury to disregard

6  the last statement.

7           MR. JACKSON:  Pass the witness.

8           THE COURT:  Mr. Jimerson.

9               REDIRECT EXAMINATION

10  BY MR. JIMERSON:

11    Q.  At this time, were you a detective December 2nd of

12  2008?

13    A.  No, sir.

14    Q.  All right.  If we use the term "lead dog," as a shift

15  sergeant, were you the lead dog over the patrol officers or

16  were the patrol officers the lead dog over you?

17    A.  I would have been the lead dog of the patrol

18  officers.

19    Q.  Do they tell you what to do?

20    A.  No, sir.

21    Q.  Now, you were a sergeant at that time, correct?

22    A.  Yes, sir.

23    Q.  The CID officers, what grade, what level are they?

24    A.  They're also sergeants.

25    Q.  Criminal investigations division, are they the lead

1  dog over you or are you the lead dog over them?

2      A.  They're the lead dog over me.

3      Q.  Now, in this picture, State's 34, there's somebody

4  back in the background coming out of the house.  Who is that?

5      A.  That is CID Lieutenant Humber, Reynold Humber.

6      Q.  How many lieutenants do y'all have?

7      A.  Two.

8      Q.  And is a lieutenant -- is a detective like Detective

9  Rogers, is she lead dog over a lieutenant or is a lieutenant

10  lead dog over her?

11      A.  The CID lieutenant would be lead dog over her.

12      Q.  Now, even today, as a CID officer, who's your

13  lieutenant now?

14      A.  Lieutenant Helton.

15      Q.  What's Lieutenant Helton's first name?

16      A.  Charles.

17      Q.  Lieutenant Helton, was he out there on December 2nd?

18      A.  Yes, sir.

19      Q.  How many other investigators were out there?

20      A.  I believe three or four others.

21      Q.  Can you name some of them?

22      A.  Lieutenant Jack Tully, I believe -- I'm sorry,

23  Sergeant Jack Tully.  I think Sergeant Cannon Levoy was on the

24  scene, and Lieutenant Humber, Sergeant Amber Rogers.

25      Q.  Now, let's say, for instance, today, now that you're

214

1  a detective, if Lieutenant Helton orders you to go do

2  something like interview witnesses, orders you off scene, what

3  occurs?  Do you tell Lieutenant Helton, "You're lead dog," or

4  what happens?

5      A.  There's usually a -- if the Lieutenant ordered me to

6  do something, I would do it, whether I was the case agent or

7  not, the lead dog.

8          MR. JIMERSON:  Your Honor, may we have this

9  diagram?

10          THE COURT:  Yes.

11          MR. JIMERSON:  Your Honor, may the witness step

12  down again?

13          THE COURT:  Yes.

14      Q.  (BY MR. JIMERSON) When you were asked about your

15  experience and training, you mentioned something about "Tact."

16  What kind of training expertise do you have in "Tact."?

17      A.  The Rusk County Sheriff's Office has a Tactical Unit,

18  which is a S.W.A.T. team that does high-risk entries,

19  high-risk arrest warrants, and so forth.

20      Q.  Who commands that unit?

21      A.  I do.

22      Q.  Do you have some specialized training?  What does

23  that mean, that Tact. Team?  Tactics, what does that mean?

24      A.  They've got special training for house entry,

25  high-risk arrest warrants.

215

1      Q.  Have you had some specialized training, including

2  clearing houses?

3      A.  Yes, sir.

4      Q.  If you're standing on the north end of the house in

5  the master bedroom doorway, how would you go about clearing

6  that house, in terms of which end of the house and where would

7  you start?

8      A.  I would start at the north end of the house, because

9  I'm already there, and then work my way south through the

10  house, knowing that the rooms behind me were already cleared.

11      Q.  Now, why wouldn't you walk through the hallway and

12  start with this back room and then come up that way?

13      A.  Because of potential threats may come from any of

14  these areas along the way.  You check those areas.

15      Q.  So if somebody tells you that they're clearing the

16  house, and they're standing on this end -- I mean, they

17  represent to you that's where they were at at the time, would

18  it make sense for them to walk all the way to the end and

19  clear the house the other way?

20      A.  No, sir.

21      Q.  Can you think of a circumstance where you would do

22  that, knowing no more information than I've given you, where

23  you would walk down here with your back to the door?

24      A.  No, sir.

25      Q.  It's not so much tactics as common sense?

1      A.  Yes, sir.

2      Q.  Would you have to write that in your report how you

3  cleared that residence, which end you started with?

4      A.  I didn't feel that was relevant, the details on how I

5  cleared the house.

6      Q.  Well, another officer or somebody -- well, I take

7  that back.

8          MR. JIMERSON:  May I approach?

9          THE COURT:  Yes.

10          MR. JIMERSON:  Your Honor, I'm offering it to

11  bolster the witness.  It was said it wasn't in his report.

12  It's in his report is my point.  I'm going to ask him to read

13  these sections from his report.

14          MR. JACKSON:  Just ask him to refresh his

15  memory, Mr. Jimerson.  Lay the proper predicate.

16          THE COURT:  Is there an objection?

17          MR. JACKSON:  There would be an objection to

18  reading from a document not in evidence.  If he wants to ask

19  him a question, and he doesn't know, he can refresh his memory

20  with it.  I would have no objection to that.

21          THE COURT:  You may do so.

22      Q.  (BY MR. JIMERSON) Well, my -- it's my recollection

23  you were asked something about why you didn't document that

24  Blaine and Milam (sic) were kneeling in that room.  Do you

25  remember something about that --

1    A.   Yes, sir.

2    Q.   -- or where they were?  Did you document what they

3    were doing?

4    A.   That they were kneeling down over the baby.

5    Q.   Well, were you more specific than that?

6    A.   That Blaine was kneeling down over the head of the

7    baby, and Jesseca was laying -- was kneeling down over the

8    body.

9    Q.   Did you also denote their demeanor at that time?

10   A.   That Jesseca Carson was crying, and Mr. Milam's head

11   was directly over the victim's head.

12   Q.   So did you document where Blaine Milam and Jesseca

13   Carson was -- were when you came into that house?

14   A.   Yes, sir.

15   Q.   Then what is the -- what does the next sentence

16   immediately next indicate you did?

17   A.   It states that I then removed Blaine Milam and

18   Jesseca Carson from the bedroom and advised them to step

19   outside the residence with EMTs.

20   Q.   Now, why is that the next thing you did, instead of

21   noting how they were sitting and then looking at your watch

22   and making a notation of time and then doing it?  Why didn't

23   you make a notation of the time before you did it?

24   A.   Because I was more concerned about getting everyone

25   out of the house.

---

1    Q.   Did you note in your report -- you were asked

2    something to the effect of whether you noted in your report

3    that Amber Rogers and Lieutenant Humber arrived.  Did you do

4    so?

5        MR. HAGAN:  Your Honor -- I'm sorry.

6        MR. JACKSON:  Your Honor, objection, leading, to

7    that question.

8        MR. JIMERSON:  I don't know how to phrase it any

9    other way.

10       THE COURT:  I'll overrule the objection.

11   Q.   (BY MR. JIMERSON) You can answer the question, if you

12   can recall it.  Did you note in your report when Amber Rogers

13   and Reynold Humber arrived.

14   A.   I didn't annotate the exact time, but their arrival

15   is in the report.

16   Q.   Well, did you note what you were doing at the time

17   they arrived?

18   A.   Clearing the residence.

19   Q.   Had you completed clearing the residence when they

20   arrived?

21   A.   No.  I was in the process of clearing when they

22   arrived.  When Sergeant Rogers arrived, she was the only one

23   that came into the house while I was clearing the residence.

24   Q.   Well, why didn't you stop clearing the residence when

25   they arrived and note the time on your report?  Why didn't you

---

218

---

1    document the time at that point, stop what you were doing in

2    clearing the residence and document the time?

3    A.   I was searching for other people in the house at the

4    time.  My priority was clearing the house.

5    Q.   Why -- if you haven't finished clearing the house,

6    why wouldn't you -- why wouldn't you be able to just stop, leave

7    some rooms unfinished, and go document what time it was when

8    something happened?

9    A.   (No response from witness.)

10   Q.   What would you --

11   A.   If someone would have been there, it would have been

12   a safety -- a reason for safety.

13   Q.   Whose safety?

14   A.   My safety, Sergeant Rogers' safety, anybody else's

15   safety that came in the house to investigate.

16   Q.   Now, did there come a time -- I mean, did you ever

17   put a video in that unit?

18   A.   I did.

19   Q.   Where did that camera -- where did it aim?

20   A.   To the front door of the residence.

21   Q.   About how long had you been there when you put it in

22   there, do you know?

23   A.   Maybe 15, 20 minutes, 30 minutes maybe.

24   Q.   If I show you your report, would it refresh your

25   recollection at the time you put it in?

---

1        MR. JIMERSON:  May I approach?

2        THE COURT:  Yes.

3    Q.   Would it?

4    A.   It may.

5    Q.   What time did you put that video in?

6    A.   In the report, I put 11:20 a.m.

7    Q.   Well, actually, you put about 11 --

8    A.   About 11:20.  I know that that time was a little --

9    actually a little off than that.

10   Q.   And did that video cover the front door of the whole

11   rest of the time you were out there?

12   A.   Yes, sir.

13   Q.   Is it fair to say, if somebody came in the front

14   door, they've got to walk past that video?

15   A.   Any traffic through the front door was videotaped.

16   Q.   Does it also cover the approximate time when Shirley

17   Milam and Danny Milam arrived?

18   A.   Possibly through the audio.

19       MR. JIMERSON:  Pass the witness.

20       MR. JACKSON:  No further questions for this

21   witness, Your Honor.  Thank you.

22       THE COURT:  You may step down, sir.

23       MR. JACKSON:  Subject to recall in our case in

24   chief, please.

25       MR. JIMERSON:  But he can leave and go about his

---

219

1  business, as long as he remains subject to the rule.

2  MR. JACKSON:  Absolutely.

3  THE COURT:  Right.  You may call your next

4  witness.

5  MR. JIMERSON:  Your Honor, we call Kenny Ray.

6  THE COURT:  You were sworn this morning?

7  THE WITNESS:  Yes, sir.

8  THE COURT:  You may proceed.

9  KENNY RAY,

10  having been previously duly sworn, testified as follows:

11  DIRECT EXAMINATION

12  BY MR. JIMERSON:

13  Q.  Sir, please introduce yourself to the jury by telling

14  them your name and what you do for the citizens of the State

15  of Texas.

16  A.  Good afternoon, ladies and gentlemen.  My name is

17  Kenny Ray.  I'm a lieutenant with the Texas Rangers.  I'm

18  stationed in Midland.

19  Q.  Sir, can you briefly outline your law enforcement

20  career that has led you to be a lieutenant with the Texas

21  Rangers and the Texas Department of Public Safety?

22  A.  Yes, sir.  I've been with the Department of Public

23  Safety for 23 years.  I served five years as a state trooper.

24  I was a sergeant for five years, supervising troopers.  I

25  worked DPS narcotics for four years.  And the last nine years,

1  I've been in the Rangers.  I was a Field Ranger up until July

2  of last year, and I promoted to lieutenant, which is a first

3  line supervisor in the Rangers.  And I was transferred from

4  Tyler, which is where I worked as a Field Ranger, to Midland.

5  Q.  Back on December 2nd of 2008, you were -- you refer

6  to it as a Field Ranger, correct?

7  A.  Yes, sir.

8  Q.  Tell the jury what your duties and obligations were

9  as a Field Ranger, and what area of Texas -- I know you had

10  general jurisdiction and ability to work, but what area of

11  Texas you were specifically assigned to?

12  A.  I was stationed in Tyler, and I covered three

13  counties:  Van Zandt County, which the county seat is Canton;

14  Smith County, which the county seat is Tyler; and Rusk County,

15  which the county seat is Henderson.  And a Field Ranger with

16  the Department of Public Safety has three basic functions.

17  The majority of our time we're criminal investigators.  We

18  work major felony crimes, primarily assisting rural agencies

19  that need help from the state police.  We also investigate

20  what we call special investigations, which are normally public

21  officials.  We're normally assigned out of Austin to do those.

22  We also have responsibility for the safety of the governor and

23  his family if they come out of Austin and come to the field.

24  Q.  Sir, you said primarily assisting rural agencies.

25  Why primarily assisting rural agencies?

222

223

1  A.  The larger urban police departments and Sheriff's

2  Departments in the State of Texas have enough resources.  They

3  don't normally need assistance from the State Police.  Many of

4  our rural Sheriff's Departments and small police departments

5  don't have those resources.  They don't have the manpower.

6  They don't have the training.  They don't have the equipment.

7  They don't have the expertise.  So on major cases, we're often

8  asked, as the State Police, to come in and assist the smaller

9  rural agencies.

10  Q.  And, sir, where were you officing or one of your

11  offices that you were utilizing at that time on December 2nd

12  of 2008?

13  A.  I was in Henderson, Texas, at the Rusk County

14  courthouse.

15  Q.  And do you have an office in part of the Rusk County

16  courthouse, or did at that time?

17  A.  Yes, sir.

18  Q.  And were you in that office?

19  A.  I was, sir.

20  Q.  And, sir, what do you do when this comes in?  What do

21  you do when you discover that there's been a dispatch

22  involving a baby, a deceased baby?

23  A.  Myself and William Brown, the District Attorney

24  investigator, left the Rusk County courthouse and went to the

25  scene.

1  Q.  Now, as you're on your way to the scene, are you in

2  communication with people actually on the scene?

3  A.  I was driving, but Willian Brown was on the phone

4  talking to various people.

5  Q.  Without necessarily telling us what he said, is

6  William Brown -- just tell us whether or not he's relaying

7  information to you or not.

8  A.  That is correct.  Primarily, he's relaying

9  directions, because we're going somewhere -- he's intimately

10  familiar with the county, and we're going to a very remote

11  part of the county I had not been in.

12  Q.  Well --

13  MR. JIMERSON:  May I approach, Your Honor?

14  THE COURT:  Yes, you may.

15  Q.  Well, when you arrive on the scene --

16  A.  Yes, sir.

17  Q.  -- did you go into the house immediately?

18  A.  No, sir, I did not.

19  Q.  But did you have a good idea, in general terms, of

20  what's in the house?

21  A.  Yes.

22  Q.  Okay.  I'm not going to repeat showing it for the

23  jury, but I'm showing you State's Exhibit No. 37 and 36 --

24  A.  Yes, sir.

25  Q.  -- which is the pictures of the deceased child.

1    A.   Yes, sir.

2    Q.   You didn't actually see that yourself at that time,

3    but how would you describe the information that was relayed to

4    you about it?  You know, whether --

5    A.   It's accurate.

6    Q.   It's accurate?

7    A.   Yes, sir.

8    Q.   Did you get information about the injuries?

9    A.   Yes, sir, but not to that --

10   Q.   Not to that extent?

11   A.   Yes, sir.

12   Q.   I'm going to put State's Exhibit No. 39 up here on

13   the document camera.

14   A.   Yes, sir.

15   Q.   Lieutenant, that screen you've got in front of you

16   there will mark -- make a mark if you just touch it.  Can you

17   just touch about where --

18   A.   Now, I'm a country boy.  What do you mean?  I touch

19   the screen, and it's going to leave a mark?  You need to

20   explain this technology to me.

21        MR. JACKSON:  Highfalutin machines.

22   A.   That's what I'm thinking.

23   Q.   (BY MR. JIMERSON) Believe me, I appreciate that.

24   Yeah, just touch it with that pen there --

25   A.   And what do you want --

1    Q.   -- to literally make a mark where your car was, where

2    you parked.

3    A.   Oh, all right.  Now I understand.  (Marking monitor.)

4    I was sitting over in this area.  Probably actually more a

5    little to this direction, but over to the left of the house if

6    you're facing the house.

7    Q.   Is that -- that's where you parked out there?

8    A.   Yes, sir.

9    Q.   Ultimately, you're going to conduct an interview out

10   there I'm going to ask you about.  Were you parked in the same

11   spot out there when you did that interview?

12   A.   Yes, sir.

13   Q.   Were you facing the house or away from the house?

14   A.   Well, just like I made that mark, this is -- this is

15   a circular drive in front of this residence, and there's a

16   county road out here.  And I pulled my vehicle in, just like

17   if you were going to pull in and park, and I stopped right

18   there, and that's where my vehicle stayed.

19   Q.   Well, if I was sitting there with you out there, when

20   you pulled your vehicle in, in the front seat, would I be able

21   to see the front?  Would you and I be able to see the front of

22   the house?

23   A.   Yes, sir.

24   Q.   And at that time, as I said, you didn't go in there

25   and see the picture that I showed you --

---

226

1    A.   Not at that time.

2    Q.   Later on?

3    A.   I did.

4    Q.   You did.

5    A.   Yes, sir.

6    Q.   After you finished doing what you did in the video,

7    conducting the interview, did you actually go in the house

8    yourself?

9    A.   I did, sir.

10   Q.   And what I showed you, that picture of that baby, is

11   that the way it looked to you at that time?

12   A.   Yes.

13   Q.   I mean, the baby -- it's fair to say the baby didn't

14   come out while you were sitting out there watching the front

15   of the house.

16   A.   No, sir.

17   Q.   When you first arrived, and I'm going to put 34 up

18   here and ask you, can you identify -- I'm going to put 34 up

19   there, because I want to ask you to use 34, if you can, to

20   illustrate, just by telling us, where was Mr. Milam when you

21   arrived?

22   A.   In that general area.

23   Q.   Now, we don't have a very good picture, in terms of

24   it cuts off over here to the right.  But where was Jesseca

25   Carson when you arrived?

---

227

1    A.   In that same general area.  When I got there, they

2    were embracing.  They were hugging.

3    Q.   What comes to mind when you arrive on the scene --

4    what came to mind on December 2, 2008, when you saw them

5    embracing and hugging when you arrived?

6    A.   My initial thought -- and I've shared this.  My

7    initial thought was it's a set of grieving parents.

8    Q.   That's a fair answer.  I didn't ask the question the

9    way I probably should have.  In terms of outside of yourself

10   as a person, in terms of your training, you know, you know

11   there's two witnesses on your way out there.  They've already

12   told you that.  What did you think about those two witnesses

13   being that close together?

14        MR. HAGAN:  I'm going to object, Your Honor.

15   Asked and answered.  It calls for speculation.

16        MR. JIMERSON:  That's all right, Your Honor.

17   We'll withdraw.

18        MR. HAGAN:  I'm sorry?

19        THE COURT:  The question is withdrawn.

20        MR. HAGAN:  I would ask the jury to disregard

21   it.

22        THE COURT:  The jury is instructed to disregard

23   the question.

24        MR. HAGAN:  Move for a mistrial.

25        THE COURT:  Overruled.

1    Q.   (BY MR. JIMERSON) After you think to yourself it
2    looks like a couple of grieving parents, what did you think
3    and do, Ranger?
4    A.   I wanted to interview them.
5    Q.   Why did you want to interview them, sir?
6    A.   I'm a police officer, and they've got information
7    that I may need.
8    Q.   Are they under arrest at that time, so far as you're
9    concerned?
10   A.   No, sir.
11   Q.   I know you don't know everything that's gone on, but
12   so far as you're concerned, are they under arrest?
13   A.   No, sir.
14   Q.   Did they appear to be in any form of custody that
15   you're familiar with, as a peace officer in the State of
16   Texas?
17   A.   No, sir.
18   Q.   And how long have you been a peace officer in the
19   State of Texas?
20   A.   23 years, sir.
21   Q.   Did you have the opportunity to interview Blaine
22   Milam shortly thereafter?
23   A.   I did.
24   Q.   At that time, was he in custody?
25   A.   No, sir.

1    Q.   Did he agree to interview with you?
2    A.   Yes, sir.
3    Q.   Where did y'all conduct the interview?
4    A.   In the front seat of my vehicle.
5    Q.   The same vehicle that we showed where it was parked a
6    minute ago?
7    A.   Yes, sir.
8    Q.   Now, I asked you to look at a transcript today.  Did
9    you do so?
10   A.   I did.
11   Q.   Does it fairly and accurately represent what it
12   depicts?
13   A.   Yes, sir.
14        MR. JIMERSON:  Your Honor, at this time, we
15   would offer State's Exhibit No. 15, which is that interview,
16   pursuant to the previous matters addressed with the Court.
17        MR. HAGAN:  Judge, if we can approach the Bench
18   on that.
19        THE COURT:  Yes, but we're going to have to wait
20   just a moment, because we're having computer malfunction, and
21   I cannot adjust the sound up here.  I apologize, ladies and
22   gentlemen.  This is Judge Wood's system.  They'll have to come
23   in and fix it.  Now you may approach the Bench.
24        (Conference at the Bench:)
25        THE COURT:  Go ahead.

230

1        MR. HAGAN:  Thank you, Judge.  We just -- for
2    the record, we're urging those same objections as before,
3    under Article 5, Article 4, and Article 14 of the
4    Constitution; also, under Section 38.22, Code of Criminal
5    Procedure, as well as Miranda v. Arizona.  We reurge all our
6    objections to the introduction of the statement made by Mr.
7    Milam.  It was a custodial interrogation.  It does not comply
8    with the Code.
9        THE COURT:  The Court will overrule the
10   objections.
11        MR. HAGAN:  And also, under Article 10 of the
12   Texas Constitution, due course of law.  Is that overruled as
13   well?
14        THE COURT:  Yes, it is.
15        MRS. TANNER:  Just for logistical purposes, the
16   interview is on the hard drive of the computer at the moment.
17   We are going to burn a disk once we're finished today and mark
18   the disk and put it in as State's Exhibit 15.  We don't have
19   that at this moment, just from the logistics of getting all
20   this done today.
21        MR. JIMERSON:  Because we were prepared to edit
22   this morning.  We were waiting on the rulings.
23        MRS. TANNER:  We had to wait on the rulings.
24        THE COURT:  I assume there's no objection to
25   doing that?

231

1        MR. HAGAN:  No.  This doesn't need to be on the
2    record.
3        (Discussion off the record.)
4        (Conclusion of Bench conference.)
5        MR. JIMERSON:  For the record, this is going to
6    be State's Exhibit No. 15 that we've -- in our discussions
7    that we'll submit a CD of.
8        THE COURT:  Yes.
9        MR. JIMERSON:  What he's told me, Your Honor, is
10   there's a way to make it look like a condensed screen or a
11   full screen.  Go ahead and start it.  You turn the volume up
12   any?
13        THE COURT:  Turn it on, and we'll see.
14        (Audiotaped interview by Ranger Kenny Ray of
15   Blaine Milam at the scene was played.  This interview is
16   State's Exhibit 15, and a copy of the CD is in the exhibit
17   volume, Volume 64.  Transcriptions by others of exhibits that
18   are CD's and videotapes of interviews are located with the
19   pretrial hearing exhibits in Volumes 59 and 60 of the exhibit
20   volumes.)
21        MR. JIMERSON:  That concludes the exhibit, Your
22   Honor.
23        THE COURT:  All right, ladies and gentlemen,
24   we're going to go ahead and recess for the day.  You're under
25   all the instructions I've heretofore given you.  Do not

1   discuss this case among yourselves, nor with anyone else.  Do
2   not access any information whatsoever in any shape, form or
3   fashion concerning this case.  We'll reconvene tomorrow
4   morning at 9:00.  We'll stand in recess until then.
5              (Jury exited the courtroom.)
6              THE COURT:  Counsel approach, please.
7              (Discussion off the record at the Bench.)
8                 (OVERNIGHT RECESS)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    STATE OF TEXAS

2    COUNTY OF RUSK

3        I, Terri Boling, Official Court Reporter in and for the

4    4th District Court of Rusk County, State of Texas, do hereby

5    certify that the above and foregoing contains a true and

6    correct transcription of all portions of evidence and other

7    proceedings requested in writing by counsel for the parties to

8    be included in this volume of the Reporter's Record in the

9    above-styled and numbered cause, all of which occurred in open

10   court or in chambers and were reported by me.

11       I further certify that this Reporter's Record of the

12   proceedings truly and correctly reflects the exhibits, if any,

13   offered by the respective parties.

14       WITNESS MY OFFICIAL HAND, this the 22nd day of October,

15   2010.

16                              _Terri Boling_

17                        Terri Boling, Texas CSR 1508
                          Expiration Date: 12/31/11
18                        Official Court Reporter
                          4th District Court
19                        Rusk County Courthouse
                          115 N. Main Street
20                        Henderson, Texas 75652
                          Telephone:  (903) 657-0359

21

22

23

24

25