1        REPORTER'S RECORD
        VOLUME 54 OF 74 VOLUMES
2     TRIAL COURT CAUSE NO. CR09-066

3 THE STATE OF TEXAS   ) IN THE DISTRICT COURT
              )
4 VS.         ) OF RUSK COUNTY, TEXAS
              )
5 BLAINE KEITH MILAM   ) 4TH JUDICIAL DISTRICT

6

7     _____

8        JURY TRIAL, 5/25/10

9     _____

10

11

12      (Appearances listed next page)

13

14

15

16

17

18

19

20   On the 25th day of May, 2010, the following proceedings

21 came on to be heard in the above-entitled and numbered cause

22 before the Honorable Clay Gossett, Judge Presiding, and a

23 jury, held in Conroe, Montgomery County, Texas.

24   Proceedings reported by computerized stenotype machine.

25

ORIGINAL

```
 1                          APPEARANCES

 2     Mr. Micheal Jimerson
       SBOT NO. 00789406
 3     County Attorney's Office
       Rusk County Courthouse
 4     115 N. Main St.
       Henderson, Texas 75652
 5     Telephone:  (903) 657-2265
       Attorney for The State of Texas
 6
       Mrs. Lisa Tanner
 7     SBOT NO. 19637700
       Attorney General's Office
 8     P.O. Box 12548
       Austin, Texas 78711-2548
 9     Telephone:  (512) 463-2170
       Attorney for The State of Texas
10
       Mr. James R. (Rick) Hagan
11     SBOT NO. 00786430
       Attorney at Law
12     P.O. Box 3347
       Longview, Texas 75606-3347
13     Telephone:  (903) 757-9877
       Attorney for Defendant
14
       Mr. John W. Moore
15     SBOT NO. 00794327
       Attorney at Law
16     P.O. Box 2841
       Longview, Texas 75606
17     Telephone:  (903) 236-3500
       Attorney for Defendant
18
       Mr. Stephen D. Jackson
19     SBOT NO. 00784324
       Attorney at Law
20     215 Simonton
       Conroe, Texas 77301
21     Telephone:  (936) 756-5744
       Attorney for Defendant
22

23

24

25
```

```
 1                              INDEX

 2    VOLUME 54
      May 25, 2010
 3    TRIAL ON PUNISHMENT

 4                                            VOIR
      DEFENDANT'S WITNESSES    DIRECT    CROSS    DIRE    PAGE    VOL.
 5    Mark Cunningham          4, 182    44                      54
      Jury exited courtroom                              253     54
 6    Mark Cunningham (No jury) 253                              54
      Jury returned to courtroom                         258     54
 7    Mark Cunningham          258                               54
                                            VOIR
 8    STATE'S WITNESSES        DIRECT    CROSS    DIRE    PAGE    VOL.
      Gary Jenkins             263, 292  281                     54
 9    Melanie Dolive           293, 305  297, 310                54
                               311                               54
10    Sherry Brown             312, 319  316                     54
      Cindy Smith              320       324                     54

11

12                          EXHIBIT INDEX

13    STATE'S
      NO.        DESCRIPTION              OFFERED   ADMITTED   VOL.
14    298        TEA records for defendant 162      162        54
      299        Big 5 Tire Work Order     272      272        54
15    300        Smith's 2/16/10 Letter    322      322        54

16

17    DEFENDANT'S
      NO.        DESCRIPTION              OFFERED   ADMITTED   VOL.
18    578        Examination Booklet       204      205 (Sealed)54
      579        Score Sheet               204      205 (Sealed)54
19

20

21

22

23

24

25
```

4

1          (Open court, defendant present, no jury.)

2          THE COURT:  Y'all ready, Mr. Hagan?

3          MR. HAGAN:  Hang on just a second.  We're ready.

4          THE COURT:  State ready?

5          MRS. TANNER:  Yes, sir.

6          THE COURT:  You may bring in the jury.

7          (Jury returned to the courtroom.)

8          THE COURT:  Good morning, ladies and gentlemen.

9  Mr. Hagan, you may proceed.

10          MR. HAGAN:  Thank you, Judge.

11                  MARK CUNNINGHAM,

12  having been first duly sworn, testified as follows:

13          DIRECT EXAMINATION (CONTINUED)

14  BY MR. HAGAN:

15      Q.  Good morning, Dr. Cunningham.

16      A.  Good morning.

17      Q.  You indicated Blaine's status as a capital offender

18  was a factor pointing toward it being unlikely he would be

19  involved in prison violence.  Have you collected other data on

20  the behavior of murderers and capital offenders in prison?

21      A.  Yes, sir, I have.

22      Q.  How does the risk of prison violence by convicted

23  murderers compare to the rate of prison inmates convicted of

24  other offenses?

25      A.  That's a question that Dr. Sorenson and I address in

---

5

1  a scientific study that was just published this year.  We were

2  interested in examining the question of how do convicted

3  murderers and their conduct in prison compare to people

4  convicted of other offenses, and so we looked at 51,000 prison

5  inmates, including 5,000 who had been convicted of first

6  degree murder.  11,000 had been convicted of property

7  offenses, and altogether that was 51,000 inmates.

8          Now, the percentages that you see are the

9  percentages of inmates that were involved in that level of

10  infraction in a given year, and so we looked at total

11  violations.  That's a disciplinary write-up for anything at

12  all, all the way from not making your bed to a serious

13  assault.  We looked at potentially violent infractions.

14  That's threatening an officer, possession of a weapon, escape,

15  riot, fighting, assault without a weapon, assault with a

16  weapon, or robbery, then assaults, assaults with injuries, and

17  assaults with serious injuries.

18          Now, when we compare the murderers to the other

19  inmates in terms of disciplinary write-ups, in any particular

20  year, about a third of the convicted murderers got a

21  disciplinary ticket for something, but that's 20 to 25 percent

22  less than the inmates they're side by side with.  48 percent,

23  almost half of the property offenders, got a ticket.  And so

24  the first observation is, the murderers are getting in trouble

25  in prison less often than the other offenders.

---

6

1          Then we look at potentially violent misconduct.

2  Now, using a regression analysis, which is a statistical

3  technique for controlling for other factors, like age or

4  education or that kind of thing, the convicted murderers were

5  about 20 percent less likely to be involved in potential

6  violence than the people convicted of other offenses.  And so,

7  again, our -- the first reading of this is the murderers make

8  better inmates in general and are also involved significantly

9  less often in potentially violent infractions.

10          Now, once we get out to assaults, assaults with

11  injuries, or assaults with serious injuries, the murderers

12  look just like everybody else they're in prison with.  In

13  other words, the seriousness of the offense in terms of

14  committing a murder was not predictive of assaults.  Now --

15      Q.  Just a minute, Dr. Cunningham.  Now, we all know that

16  violence in prison occurs --

17      A.  Yes, sir.

18      Q.  -- correct?  Why is it, then, that these statistics

19  even matter?

20      A.  Well, because the question is what is the probability

21  the defendant would commit criminal acts of violence that

22  would constitute a continuing threat to society?  The question

23  is, what's the probability, and that's what this data is

24  describing; it's describing that probability.  Now, if you

25  turn it into any possibility -- is there any possibility this

---

7

1  could happen or is there ever any serious violence in prison

2  that happens?  Is there a remote likelihood that Blaine Milam

3  might commit such an act?  Once you turn it into any

4  possibility, then the answer is always yes in every capital

5  trial for every defendant.  And so now that issue doesn't help

6  us identify who gets the death penalty, because the answer

7  would then always be yes, if we make it any possibility.  So

8  certainly violence is happening in prison.

9          Notice what occurs, though.  And this is

10  something I described earlier.  As the severity of the

11  violence increases, its likelihood dramatically decreases.  So

12  in any given year, about 2 1/2 to 3 percent, about 2 to 3 guys

13  out of 100, are involved in an assault.  About 1 in 200 is

14  involved in an assault that results in an injury of some kind:

15  A scratch, a bruise, a red mark, something.  About 1 in 500, 2

16  per 1,000, are involved in an assault that resulted in

17  injuries more than first aid treatment.  And so as the -- as

18  the severity increases, it's likelihood dramatically

19  decreases.

20      Q.  Okay.  And this is data that you have published?

21      A.  Yes, sir.  This is a study that I did with Jon

22  Sorenson.  Now I'll describe one other thing about this study.

23  We looked at this data, and we said, wait a minute.  The

24  murderers, they may have been in prison longer than the other

25  inmates, and that's why their likelihood of violence in any

8

1  given year is no greater. They've kind of aged out or gotten
2  acclimated. So we looked at everybody that came to prison the
3  year before -- so now we've controlled for how long they're in
4  prison -- and the murderers look just like everybody else.
5          And we said, wait a minute. The murderers, they
6  probably went to higher security. Maybe that's the reason.
7  So we looked at everybody that came to prison the year before
8  and went to closed custody, which is what this prison system
9  designated their murderers to. And the murderers looked just
10 like everybody else. So no matter how we sliced and diced it,
11 been convicted of a murder was not predictive of violence in
12 prison. And the rates among all these inmates, including
13 those convicted of first degree murder, of serious violence,
14 was only 1 guy in 500 in any given year.
15     Q.  Okay. Have there been any other large research
16 studies that looked at inmates convicted of murder to see how
17 they behave in Texas prisons?
18     A.  Yes, sir, there have.
19     Q.  Can you describe that study?
20     A.  Yes, sir. This is a study by Jon Sorenson, a
21 research colleague of mine, and Rocky Pilgrim. And they
22 looked at over 6,000 inmates who had been convicted of murder
23 in Texas prisons, and they followed them in prison for an
24 average of about 4 1/2 years. And on the basis of that, they
25 extrapolated the risk of violence during a 40-year prison term

9

1  projected. Okay, so what percentage of these guys will be
2  violent, confined for the next 40 years?
3          And what they identified is that about 16
4  percent were projected, based on this, to be involved in
5  somewhat serious violence. 84 percent would not. Now, almost
6  all of that risk of violence was for an assault on another
7  inmate. Lifetime risk of an aggravated assault on a
8  correctional officer was projected to be 1 percent. Lifetime
9  risk of killing another inmate was a fifth of a percent, or 2
10 guys in 1,000. In other words, it was projected to happen,
11 but at an extremely low possibility.
12     Q.  Okay. And you also identified Blaine Milam's status
13 as a capital offender was associated with a low likelihood of
14 violence in prison.
15     A.  Yes, sir.
16     Q.  What additional data from Texas prisons supports this
17 conclusion?
18     A.  Well, this is looking at how often the almost 2,000
19 inmates in Texas prisons who have been convicted of capital
20 murder and sentenced to life, so there are about 1,920 of
21 those guys, and we looked at the rate of serious violence in
22 this group. Now, that's an injury that required more than
23 first aid treatment. Now, about 2 1/2 to 3 per 1,000 are
24 involved in that kind of assault on an inmate in any given
25 year, or at least in the year 2007/2008, less than 3 per

10

1  1,000. In terms of a serious inmate assault, it was about 1.4
2  per 100, about 1 1/2 for every 100 inmates.
3          Now, it's important to realize that you can't
4  take this number, multiply it by 50 or 60, which is the time
5  this person is likely to be in prison, 50 or 60 years, and end
6  up with a risk rate. Again, the likelihood of violence is
7  highest -- is higher among the younger guys, and the longer
8  somebody is in prison, the less likely it is to occur, if it
9  hasn't occurred already. So it's not so simple as to take
10 these rates and then multiply it by the number of years that
11 somebody's going to be in prison.
12     Q.  I see. And what is the next factor that points
13 toward Blaine Milam having a positive adjustment to prison?
14     A.  That he would be serving a life without parole
15 sentence.
16     Q.  Okay. And are there any other studies that have
17 examined the conduct of death sentence -- life-without-parole
18 inmates in prison?
19     A.  Yes, sir.
20     Q.  And could you please describe that study?
21     A.  Yes, sir. This is a study that I did with John
22 Sorenson and Dr. Tom Reidy. And in this study, we looked at
23 2,600 inmates in a high-security prison, and we looked at
24 their misconduct over an 11-year period of time, from 1991
25 until 2002. So 11 years, we're tracking these guys side by

11

1  side in this high-security prison. Now, this prison is
2  unique, called the Potosi Unit. And it is unique in that
3  Missouri has been mainstreaming their death-sentence inmates
4  since 1991. In other words, rather than putting them on a
5  segregated death row, they've been mixing them in the general
6  population of a high-security prison. That means they're
7  celled with nondeath inmates, on units with nondeath inmates,
8  out in the yard with nondeath inmates, at jobs and classes
9  with nondeath inmates and contact visitation with nondeath
10 inmates and their families.
11         Now, Missouri has been happy with this
12 experiment, but nobody had ever gone in and studied: So
13 what's the rate of violence among those death-sentence inmates
14 that are mainstreamed in the general population, and how do
15 they compare to people serving life without parole or to
16 parole-eligible inmates that they're side by side with on
17 those same units. So what we found is that the
18 life-without-parole inmates were about half as likely to be
19 involved in assaults as the parole-eligible inmates they were
20 side by side with on the same units over the same 11 years.
21         The inmates sentenced to death, despite the
22 severity of their offenses, looked just like the
23 life-without-parole inmates. They are half as likely to be
24 involved in violence and assaults in prison as those
25 parole-eligible inmates they're side by side with. Now, this

12

1  is the only apples-to-apples comparison of death-sentence
2  inmates out in the general population, life-without-parole
3  inmates out in the general population, parole-eligible
4  inmates.  Looking at all three of those, apples-to-apples,
5  same 11 years, what do we know about how these
6  guys compare to each other?
7      Q.  Okay.  Is there any other data that would persuade us
8  this finding isn't just a fluke of this one prison in
9  Missouri?
10     A.  Yes, sir.  There's another study that I did with
11  Dr. Tom Reidy and Dr. Jon Sorenson.  In this study, this is
12  the one where we looked at federal capital inmates who were
13  charged with death-penalty offenses and then either allowed to
14  plead to life terms or were sentenced by their juries to
15  life-without-parole sentences.  And then we tracked them for
16  11 years in prison -- I'm sorry, we tracked them for an
17  average of 6.7 years in prison.  The total time at risk was
18  about 14 years from the earliest guys.
19     Q.  Okay.  In this study, did you identify rates of
20  different severities of violent prison misconduct among these
21  offenders?
22     A.  Yes, sir, we did.  Now, we looked at two -- we broke
23  it up in two ways.  This is all 145, and about 100 -- just
24  over 100 of these cases, the government had alleged future
25  dangerousness.  They alleged there is a probability the

13

1  defendant would commit criminal acts of violence that would
2  constitute a continuing threat to society.  So along the way
3  in that prosecution, they asserted that as a nonstatutory
4  aggravating factor.  So we looked at how those guys did in
5  prison, based on the seriousness of the offense.
6          Now, the inmates against whom future
7  dangerousness or this probability of criminal acts of violence
8  was alleged, in fact, they were not different from the group
9  as a whole.  That assertion that they were going to be violent
10 in prison was not predictive of anything.  Now, as you can
11 see, as the severity increases, the likelihood decreases.
12 About 1 in 5 of these inmates over a 6-year period of time, on
13 average, assaults another inmate, about 1 in 5.  About 1 in 11
14 is involved in a serious assault.  That's an assault, not that
15 seriously hurts somebody, it's an assault that has that
16 potential.
17          So in other words, if I drop a padlock in a
18 sock, and I swing it at you and miss, and there's no injury,
19 in the federal system they're going to call that a serious
20 assault, because it had that potential.  So about 1 in 11 are
21 involved in a serious assault.
22          Less than 1 guy in 100 is involved in an assault
23 that sends somebody to the hospital with nonlife-threatening
24 injuries, less than 1 in 100.  Nobody assaults somebody else
25 causing life-threatening injuries that sent them to the

14

1  hospital.  Nobody kills anybody else in prison.  Nobody
2  engages in serious assaults on staff.  And so the level that
3  we would begin to be concerned, you're going to hurt somebody,
4  they're going to go to the hospital, that's happening with
5  less than 1 percent of these inmates.
6          So our first look at this, we've got two
7  conclusions.  Now, first, those against whom future
8  dangerousness is alleged are not more violent, number one.
9  Number two, the overwhelming majority, 90 percent of these
10 inmates over six years have not committed a serious assault,
11 and less than 1 percent an assault that would begin to really
12 get us concerned.
13          Now, the next question is, okay, so they're not
14 likely to be involved in serious assaults.  How do they
15 compare to the other guys they're in prison with?  Are they
16 disproportionately likely?  So we compared them to 18,000
17 inmates, on average, that are at the same level of security,
18 that are held at a U.S. penitentiary level or high-security
19 level.  There was no significant difference in any of these
20 rates.  In other words, at no area of violence were the
21 capital offenders more violent in prison than the other guys
22 they were side by side with at the same level of security.
23     Q.  Dr. Cunningham, how are rates of violence among
24 federal capital inmates relevant to violence among Texas
25 capital inmates?

15

1      A.  In all of these instances, the inmate has been
2  charged with a death-eligible offense, so these are at the
3  deep end of the pool.  Just like in a Texas capital case,
4  these are the most serious crimes that individuals have been
5  charged with.  Now, prison --
6      Q.  And convicted of.
7      A.  And been convicted of.  So, first, in both instances,
8  we're talking about the deep end of the pool.  Additionally,
9  the prison architecture, prison procedures, staffing, that
10 kind of thing, are very similar in correctional jurisdictions
11 throughout the United States.  In other words, they're
12 accredited by the same associations.  They adhere to the same
13 standards.  They go to the same meetings.  Often the prisons
14 are built by the same companies.  And so as I'm in prisons
15 around the United States, I am continuously struck by the
16 similarity in disciplinary procedures, architecture, security,
17 staffing, those kinds of things.  So this is kind of like, if
18 you did a study on fat levels and cholesterol from people
19 eating McDonald's in the northeast, what does that have to do
20 with people eating McDonald's in Texas?  Well, because there's
21 a lot of similarity of the menus.
22     Q.  I see.  Can you describe what you found about rates
23 of prison violence among all of the life sentence, federal
24 capital offenders, as well as those who had been targeted with
25 allegations of future dangerousness in their prosecutions?

16

1    A.   Yes, sir, that's what I described right here.

2    Q.   That's what you described.

3    A.   What I described.

4    Q.   And how do these federal capital inmates compare -- I

5  think you also talked to us about that.

6    A.   They're not different than any category from the

7  other inmates they're side by side with at the same security

8  level who have not been convicted of capital murder.

9    Q.   Okay.  Is there any other data that would persuade us

10  that this finding about life-without-parole inmates is sound?

11    A.   Yes.  There's another study that I did with Dr. Jon

12  Sorenson.  This time we looked at 9,000 inmates, all of whom

13  were facing long prison sentences.  We've got almost 2,000 --

14  1,897 -- that are serving life without parole, 1,985 that are

15  facing sentences of 30 years or more, and over 5,000 that are

16  facing prison sentences of 10 to 29 years.  9,000 inmates

17  altogether.

18    Q.   Okay.

19    A.   As we compared them, we found that the

20  life-without-parole inmates were not a disproportionate risk.

21  They were better than the guys serving 10 to 20.  Not quite as

22  good as the guys serving 30 years or more, but the differences

23  were very, very minor.  Only a half a percent, about 1 guy in

24  200 of those life-without-parole inmates committed an assault

25  resulting in serious injury -- that's more than first aid

17

1  treatment -- during the six-year period of the study, 1 guy in

2  200.  Now, these findings, as are obvious, are very

3  counterintuitive.

4    Q.   That's what I was going to say.  One would think that

5  an inmate facing a life sentence would be more violent in

6  prison, because they've essentially got nothing to lose?

7    A.   Yes, sir, and that's a question that we wanted to

8  examine.  That kind of makes intuitive sense.  Gee, there's no

9  parole carrot out there for them.  Are they then going to be

10  more violent in prison because they have nothing to lose?

11    Q.   Okay.

12    A.   In fact, inmates facing life-without-parole sentences

13  and long sentences have more to lose.  And this is a finding

14  that Flanagan identified back in about 1979 in his

15  dissertation.  He went on to become the Director of the Bureau

16  of Justice Statistics at the Department of Justice.  And he

17  identified that long-term inmates take a different approach to

18  doing time.  This is where they're going to be for a very long

19  time and potentially the rest of their lives, and because of

20  that, they are particularly motivated not to make this

21  experience any more horrible on themselves than it has to be.

22        And so, for example, when you're going to be

23  eating institutional food for the next 30, 40, 50 years, your

24  access to the ability to purchase a package of potato chips or

25  a can of beans from the commissary becomes more and more

18

1  important, the longer you're going to be there.  If you're

2  going to be there a year or two, "I don't care, so take it

3  away from me."

4        Now, in the same way, you can act out and be a

5  problem person in prison and spend the rest of your life

6  locked down in solitary in a cell the size of a walk-in

7  closet, or you can go along with the program and come out and

8  have a job to go to that helps pass the time and gives you

9  some sense of being productive.  It's all about how are you

10  going to behave?  The longer you're in prison, the greater the

11  incentive to maintain those small privileges of a little

12  commissary, come out of my cell to go to a job, go to

13  visitation, be able to pick up a phone and call my mama.

14  Those small privileges become more powerful the longer

15  somebody is going to be in prison.

16        The other thing this illustrates is when we talk

17  about prison violence, it's a bad idea to rely on your

18  intuition, like, "I just kind of think this should be

19  predicted."  That's why we went in and did these studies to

20  examine, okay, that kind of makes sense.  Murderers should be

21  more violent in prison.  Life-without-parole inmates have

22  nothing to lose.  Is that actually how it works?

23        Now, physical science was kind of in the same

24  position at one time.  That's why people thought the world was

25  flat for several thousand years, because just look out the

19

1  window.  Any fool can see the world is flat.  Only when you

2  actually run the numbers on it, it turns out the world is not

3  flat; it's round.  And so that intuitive perception is one

4  that can -- our expectation is one that can get us in trouble.

5    Q.   I see.  What about Texas capital inmates that were

6  predicted to be violent in prison by a psychiatrist or

7  psychologist after trial?  Do they end up being violent in

8  prison?

9    A.   Well, there's a study that examines that.  If you

10  want to know the answer to any of these questions, then you do

11  research, and you track the inmates, and you see.  This is a

12  study of 155 capital defendants in Texas where a psychologist

13  or a psychiatrist testified at their capital sentencing trial

14  and said there is a probability, and that inmate was then

15  sentenced to death.

16    Q.   Okay.  Well, now, let me see if I understand you.

17  This study involved 155 cases where a mental health expert

18  retained by the State evaluated the defendant or his record

19  and predicted that he would commit acts of criminal violence

20  in the future, and then he was sentenced to death?

21    A.   That's correct.

22    Q.   Okay.  I didn't mean to interrupt you.  Go ahead.

23    A.   There are three groups of this.  67 of them were

24  executed after serving an average of 12 years on death row.

25  40 of them, at the time of this study, were still on death

20

1  row.  They had averaged eight years in prison.  48 of them had
2  had their sentences reduced.  They had gotten relief from the
3  death sentences through the appellate process, and they had
4  served an average of about 22 years in prison.
5      Q.  Okay.  Well, now, did they -- did these inmates even
6  have the opportunity to engage in assaults while they were on
7  death row?
8      A.  Yes, sir.  Many of them did for a portion of this
9  exposure.  Up until 1999, between about 1986, '87, and 1999,
10 inmates on the Texas death row were segregated from other
11 inmates, but they were like in their own little self-contained
12 prison, and the majority of them were designated as
13 work-capable, which means they went to their own
14 self-contained factory, took their meals in common in an open
15 area on their units, had recreation with each other.  In other
16 words, they're not just isolated in their cell by themselves
17 23 hours a day in a super-maximum setting.
18         And so during a portion of this, they had access
19 to other inmates and also had unshackled access to staff.  In
20 other words, as they're working there in the garment factory
21 and using their scissors, and that kind of thing, there are
22 staff members that are there.  When the food's being served on
23 the unit, the staff is walking among these inmates.
24     Q.  Okay.  I'm sorry.  Continue with the findings of the
25 study, then.  I'm sorry.

21

1      A.  But it turned out it didn't matter which group you
2  were in.  If that prediction was intended to mean a more
3  serious assault, one that resulted in more than first aid
4  treatment, that prediction was wrong 95 percent of the time.
5  Whether they were executed, whether they're still on death
6  row, whether they got relief and went to the general prison
7  population didn't make any difference.  About 5 percent
8  committed an assault that required more than first aid
9  treatment.  1 percent, 2 of the 155 were criminally prosecuted
10 for assault.  Interestingly, 20 percent of them never got a
11 disciplinary ticket whatsoever.  In all those years in prison
12 that they had, they never even got a ticket, despite the
13 prediction that they were going to commit future acts of
14 violence.
15     Q.  Okay.  Dr. Cunningham, what about capital cases where
16 you have provided violence risk assessments or given
17 risk-related testimony, such as describing the effectiveness
18 of correctional departments in controlling and limiting
19 violence among its inmates, have you conducted any follow-up
20 regarding prison conduct of these inmates?
21     A.  Yes, sir, I have.  I have tracked cases that I have
22 provided testimony, like I'm giving today, to see what
23 happened to those inmates after they went to prison.
24     Q.  Okay.
25     A.  That follow-up was on 73 inmates.  It included 43 of

22

1  44 inmates who I have provided such testimony in federal
2  capital cases.  One inmate had disappeared from their record
3  system.  I think he was in an inmate kind of witness
4  protection program, so we couldn't get follow-up on him, but
5  had follow-up on 43 of 44.  Now, of about 120 or 125 state
6  cases where I provided such testimony, the prison departments
7  would only release the records on about 30.  Many states
8  wouldn't cooperate with us.  They said, "That's inmate
9  privacy.  We're not going to give you the data."  So I have 98
10 percent of the federal cases, and about 25 percent of the
11 state cases.
12     Q.  Okay.
13     A.  Now, they've averaged about 4 1/2 years in the prison
14 system at the time of follow-up.
15     Q.  Okay.  Did anyone besides you review these files?
16     A.  Yes, sir.  Here's what we did.
17     Q.  Okay.
18     A.  Both myself and members of my staff, separate from
19 me, first went through all of our old records and files to
20 identify the cases.  Then that staff member, separate from me,
21 wrote off to the prison systems, got the mail back, opened it
22 up and created the spreadsheets of this; had two different
23 staff members do that independently of each other.  It then
24 went off to Jon Sorenson for him to do the statistical
25 analysis on it, so I wasn't the one crunching the numbers on

23

1  it.  Then when it came back, I wrote about the study and its
2  implications of it, what it meant, sent it back to Sorenson
3  for him to review to make sure, in fact, this accurately
4  reflected the data.  So I try to do this in an arm's length
5  fashion through research assistants and through Dr. Sorenson,
6  so that although clearly I'm involved in writing the study,
7  the actual creation of the numbers and the crunching of the
8  numbers is done independently of me.
9      Q.  Okay.  And what do these numbers up here represent?
10 The capital life, 59 percent --
11     A.  Of those 73 cases, 59 percent of them were sentenced
12 to life sentences and 41 percent of them were sentenced to
13 death.
14     Q.  Okay.
15     A.  Now, here's how they did.  Of those inmates, 12
16 percent -- 12 out of 100 or about 1 in 8 -- ended up being
17 involved in an assaultive infraction.  Almost all of those
18 were simply fistfights.  One guy in this whole group had an
19 attempted serious assault.  Now, this is a federal inmate.
20 Now, remember you drop a lock in a sock, and you swing it at
21 somebody and you miss, that's not an attempted serious
22 assault; that's a serious assault.  So this is something less
23 than that.
24         Now, I can't tell you what it involved, because
25 the actual write-up of this offense was reported as lost, but

24

1 it is something less than the lock in a sock that missed, 1
2 guy out of 73. Nobody committed an assault that sent somebody
3 to the hospital with nonlife-threatening injuries. Nobody
4 committed an assault with major injuries, life-threatening
5 injuries. No homicides. No serious assaults on staff. Again
6 compared those individuals to 18,000 high-security inmates.
7 Again, there's no difference. These guys are not involved in
8 violence more often.
9    Q.   Okay.
10    A.   Now, in fact, this has now been -- actually, this has
11 been published. This was published in 2010 in the Journal of
12 the American Academy of Psychiatry and the Law.
13    Q.   Okay. Why was it important to break this out into
14 acts of varying severity?
15    A.   So that you could see, as clearly as possible, what
16 type of activity or violence are they engaged in. In other
17 words, it becomes important, when we look at these assaultive
18 infractions, to know that almost all of these are not much
19 more than fistfights. And so part of what this informs is
20 would you give the death penalty to somebody to prevent
21 somebody from having a fistfight some day or are you talking
22 about wanting to intervene to prevent something more serious?
23 The more serious you draw the line, like going to the hospital
24 with a major injury, well, gee, the incidence of that was
25 zero. Even going to the hospital with nonlife-threatening

25

1 injuries was zero. Which means if you had executed all of
2 these guys, you wouldn't have prevented even one of these,
3 because none of them happened. It wouldn't have had any
4 effect on this. That likelihood was zero at that point.
5    Q.   Have you prepared a chart that integrates the
6 outcomes of these two studies, the study of state experts in
7 Texas who predicted that the capital offenders should be
8 violent and your own cases where you found that serious prison
9 violence would be improbable?
10    A.   Yes, sir, I did.
11    Q.   Can you describe this table? And let's see what the
12 results are.
13    A.   Yes, sir. All right. So we had 155 cases where it
14 was predicted to be probable that criminal acts of violence
15 that would constitute a continuing threat to society would
16 occur. Now, again, if you base it on the standard of an
17 assault that resulted in more than first aid treatment or a
18 more serious assault, that was true 5 percent of the time. It
19 was wrong 94.8 percent of the time, that expert prediction
20 was. Now, as I said, it's improbable, if you treated that
21 attempted serious assault as an incident or, *Okay, that guy
22 did something, you know, more serious,* then that prediction
23 was in error 1.4 percent of the time, and those projections
24 were correct 98.6 percent of the time.
25         Now, in this testimony, I would never say, as an

26

1 absolute prediction, *Yes, he will* or *No, he won't.* I
2 would always describe the likelihood of whether it's probable.
3 What I have been testifying to historically is not that
4 there's only a 1 percent risk of a more serious assault. I've
5 been projecting that it's higher than that. I said it was
6 unlikely, it's improbable, but I thought the incidence was
7 greater than this. So at this point, what this points to is
8 even as I've been talking about it being improbable, even
9 that's been projecting more risk than actually occurred.
10    Q.   I see. So let me just cut down to the bottom line.
11 When the State predicts a capital offender will be violent in
12 this special issue, they're wrong 95 percent of the time.
13    A.   Yes, sir.
14    Q.   And when you say --
15    A.   And if you want to say sent somebody to the hospital,
16 then it's going to be wrong, you know, 99 percent of the time.
17 If you say, you know -- so the prediction becomes increasingly
18 in error the more severe the violence that you're talking
19 about. Be a serious assault, be wrong 95 percent of the time.
20    Q.   And when you say that violence is improbable, you're
21 right 98 to almost 100 percent of the time?
22    A.   Yes, sir.
23    Q.   Has the U.S. Department of Justice weighed in on this
24 issue?
25    A.   Yes, sir, they have.

27

1    Q.   Have they published any conclusions about the
2 relationship between the offense that the criminal did in the
3 community and his adjustment to prison?
4    A.   Yes, sir, they have.
5    Q.   Can you describe those conclusions?
6    A.   Yes, sir. These are conclusions of the U.S.
7 Department of Justice through subagencies or affiliated
8 organizations: The National Council on Crime and Delinquency,
9 sponsored by the U.S. Department of Justice, and the National
10 Institute of Corrections, which is a subagency of the U.S.
11 Department of Justice. These are findings that were published
12 back in the early '90s before my research colleagues and I
13 collected this large scale of data involving thousands of
14 inmates, where we looked at varying severities of violence.
15 Even then, here's what they identified, which, of course, our
16 research has confirmed.
17         Past violence in the community is not strongly
18 or consistently associated with prison violence. Number two,
19 current offense, prior convictions, and escape history are
20 only weakly associated with prison misconduct. In other
21 words, just have a little bit of influence. Number three, the
22 severity of the offense that sent somebody to prison is not a
23 good predictor of prison adjustment.
24    Q.   Okay. Have you prepared a model that demonstrates
25 how factors that resulted in someone being violent in the

28

1  community aren't the same in prison?

2      A.   Yes, sir, I have.

3      Q.   Can you describe that model?

4      A.   Yes, sir.  And this is a model that was proposed by

5  John Monahan about 30 years ago that's been very influential

6  in this science, and that's the idea that violence is almost

7  never a function of just the person.  It's almost never just

8  about this guy.  Instead it's a person who's in a particular

9  interaction in a given context, and it's out of that whole

10 matrix that you get violence.

11          Now, when you put somebody in prison, now you

12 have an inmate who is in interaction with other inmates and

13 vigilant staff.  Now, that's a critically important difference

14 in the interaction, because out in the community, the person

15 could tell himself, "This person's never going to know who I

16 am.  I'm never going to be caught."  But in prison, there's

17 nothing that you do to another inmate that he doesn't know who

18 you are, and now you have to deal with him and his cousins and

19 his friends, who you don't even know, for the rest of your

20 life, if that's the kind of sentence you're serving.  And

21 you're interacting with vigilant, well-trained staff, the same

22 staff who are going to be passing you your tray through the

23 door for the rest of your life, the same guys that escort you

24 down the stairs while you're handcuffed behind your back.

25 You're going to have to deal with these people from now on.

29

1          So it's a very different set of interactions in

2  a highly-restricted context.  Now, the effect of that is

3  essentially form a barrier that substantially blocks the

4  occurrence of the more serious violence, the most serious

5  violence.  It doesn't eliminate it.  But when you think about

6  half the guys in Texas prisons are there for a serious

7  violence felony, and yet the rate of one inmate killing

8  another in Texas prisons last year was less than 1 guy in

9  100,000 inmates --

10     Q.   And again, and I think we talked about this

11 yesterday, that's less than 1 per 100,000?

12     A.   Yes, sir.  It's like 1 per 180,000.  Actually, it's 1

13 per 160,000, because that's how many guys are in the Texas

14 prison system.

15     Q.   And the closest correlate we have of that is just

16 looking at the State of Texas, the murder rate --

17     A.   Among males that would --

18     Q.   -- in the open population?

19     A.   That would be 20 times that rate.

20     Q.   Okay.

21     A.   That's a demonstration that prison works.  It's very

22 effective.  It's not perfect.  It doesn't entirely eliminate

23 it, but it is extraordinarily effective in minimizing the

24 occurrence of serious violence.

25     Q.   Okay.  What is the next factor pointing to of Blaine

30

1  Milam having a low likelihood of serious violence in prison?

2      A.   The next factor is that he would be an inmate in the

3  Texas prison system.

4      Q.   Okay.  Are you familiar with rates of serious

5  violence among inmates in Texas prisons?

6      A.   Yes, sir, I am.

7      Q.   Can you describe those rates for the jury?

8      A.   Yes, sir, I can.  These are based on the Emergency

9  Action Services report that is produced by the Executive

10 Services Branch of the Texas Prison System every month.  And I

11 am on their distribution list, so I get this report each

12 month.  The most recent report is April 2010, and this

13 describes the rates back in 2009 of serious assault.  These

14 are assaults that result in more than first aid injury.  The

15 rate of those, in terms of inmate-on-staff assault, was 6 per

16 10,000 inmates in that year.  There were 6 of those for every

17 10,000 inmates.  Now, that incidence is just a very thin line.

18 You can see just a touch of red up there.  It's so small, you

19 can't get it to take color for more than just a line.  It's

20 just the thinnest line.

21          Now, the rate of inmate-on-inmate assaults of

22 that severity is 8 guys in 1,000.  8 in 1,000.  That's this

23 gray area here.  That means that 99.9 percent of inmates in

24 Texas prisons in 2009 did not commit an assault resulting in

25 injuries with more than first aid treatment.

31

1      Q.   Okay.  What about the possibility of a capital inmate

2  killing someone in prison?  Are there any group rates that

3  assist us in determining that possibility?

4      A.   Yes, sir, there are.  The rate in 2009 of one inmate

5  killing another was .63.  0.63 per 100,000 inmates, less than

6  1 in 100,000.  That was a particularly low rate.  If you look

7  at the three-year average, the three-year average is just over

8  2 per 100,000 inmates per year.  In terms of the likelihood

9  of -- if you would compare that to the general population

10 among males -- because remember, 90 percent of the people in

11 prison are males.  So if we compare these numbers to males,

12 the rate of homicide in the general population in the United

13 States, from little babies to old men, is 11.6 per 100,000.

14 In Texas, it's 11.2 per 100,000.  In Houston, it's 24.9.  That

15 means almost 50 times more likely than it was in Texas prisons

16 in 2009.  Over in New Orleans, it's 81 per 100,000, about 150

17 times greater incidents of homicides than in Texas prisons.

18 In Washington, D.C., it's 55 per 100,000.

19     Q.   Okay.  So again, I think it just goes without

20 question the rate of homicide in prison is way lower than it

21 is in the general community?

22     A.   Yes, sir.  It's fallen significantly.  The rate of

23 homicide in prisons nationwide has declined over 95 percent

24 since the 1980's, so prisons are becoming profoundly more

25 effective in reducing the incidents of that and managing their

1  inmates and creating a different prison culture.  In Texas,
2  it's fallen by even more than that.  I think the rate of
3  homicide in Texas prisons in the mid-1980's was close to 100
4  per 100,000.  Last year it was down to .6 per 100,000.  It's
5  fallen by over 99 percent, if you would go mid-1980's to 2009,
6  so it's dramatically fallen.  Some of the expectations that we
7  have about prison based on movies and shows and information as
8  we were growing up, and that kind of thing, might lead us to
9  think that the rates, in fact, are far higher.  Don't realize
10  what's happened to homicide in prison over these last 25 to 30
11  years.
12     Q.   I see.  What about an inmate killing a staff member?
13  How often does that occur?
14     A.   Nationwide, that happens less than one homicide like
15  that in a million inmates.  That typically happens about one
16  time in the entire United States in any given year.  The last
17  time it happened in TDCJ was about three years ago, was in
18  2007.  And so it occurs.  Thankfully, it is extraordinarily
19  rare.
20     Q.   Okay.  And so that we can put these rates of inmate
21  violence in some perspective, can you tell us the mix of
22  inmates in Texas prisons in terms of the types of offense that
23  sent them to prison?
24     A.   Yes, sir.  So we look at these rates, and it's
25  important to compare that, again.  So what was the population

1  that these rates occurred in?  Well, 56 percent of the
2  prison -- this should be TDCJ male inmate population; these
3  are the prisons, not the state jails or the SAFPF drug
4  treatment program -- 139,000.  56 percent of them have been
5  convicted of a violent felony.
6          Of those, as we look at those numbers, 16,000 of
7  those prison inmates have been convicted of a homicide.  Over
8  22,000 convicted of a robbery.  39,000 of other offenses.  So
9  we've got almost 78,000 inmates who are going into prison with
10  records of serious violent felonies.  Despite that, our rates
11  of serious violence in prison in any given year, 99.9 percent
12  of them are not engaging in a serious assault.  Of course, as
13  we look at our homicide rates, those are extraordinarily low.
14  You know, we're talking about less than one guy of those
15  77,000 engaged in a homicide.
16     Q.   Okay.  Dr. Cunningham, do you have a model that would
17  help explain why offenders who are such a risk for violence in
18  the community have low rates of serious violence in prison?
19     A.   Yes, sir.
20     Q.   Show us that model.
21     A.   Yes, sir.  On the right-hand side are the risk
22  factors that were associated with this person ultimately
23  engaging in criminality.  Now, when you put somebody in
24  prison, some of those risk factors are removed.  For example,
25  there's access to drugs in prison, but it's hard to sustain

1  the kind of habit that you would have in the community, to go
2  on a four- or five-day meth run.  And remember, they can drug
3  test you at any time they want to.  It's not like out in the
4  open community.  Now, they can drug test you at any point.  As
5  you're talking about drugs like meth, those stay in your
6  system for a pretty good period of time.  So although those
7  factors are there, we've taken out some of the factors, but
8  mostly the reason why the rates are so much lower in prison,
9  why it's so effective, is that we've stacked up the other side
10  of the scale with security and structure and staff and
11  confinement and consequences, and those effectively hold in
12  check somebody who otherwise had risk factors for violence in
13  the open community.
14     Q.   Okay.  Can you summarize these base rate findings
15  regarding prison violence?
16     A.   Yes, sir.  Capital inmates have low rates of violence
17  in the general prison population, and those rates are going to
18  decrease as the severity of what we're talking about
19  increases.  The severity of the offense that sent somebody to
20  prison does not predict their violence in prison, and those
21  infraction rates are going to fall as the inmate ages.  And so
22  it's not just one assessment.  The longer that Blaine is in
23  prison, the less likely it is that he'll be involved in
24  assaults.
25          Now, we looked at a lot of numbers, and those

1  are our anchoring points.  Those are what are called base
2  rates.  And Monahan and others have described that you want to
3  stay as close to those group rates as you can, all these
4  different rates that we've been looking at, because the
5  farther you deviate from those in your prediction, the more
6  likely you are to be in error.  Don't ignore the numbers.  I
7  wrote an article that's entitled, "Don't Confuse Me with the
8  Facts," which is about the tendency of people to not follow
9  the numbers, and instead let their intuition pull them toward
10  factors and a factor not predicting.
11          So as we would look at those, the lifetime
12  likelihood of an inmate, capital inmate, assaulting another
13  inmate, someplace between 20 and 30 percent.  The likelihood
14  of repetitive assaults, of repeated assaults, is someplace
15  around 10 percent.  Likelihood of aggravated assault on staff,
16  lifetime risk, 1 percent.  And we looked at studies that
17  looked at rates of sending somebody to the hospital.  That's
18  like 1 percent incidence that we have on our follow-up so far.
19  Lifetime likelihood of killing another inmate, depending on
20  the study, is somewhere between 1/5th of a percent, that's 1
21  guy in 500, to 1 in 100.  Likelihood of killing a staff member
22  is someplace around one chance in a million in any given year,
23  with no indication that capital offenders are any more likely
24  to engage in that kind of conduct towards staff than anybody
25  else.

**36**

```
1      Q.   Okay.
2      A.   In other words, if you're going to keep that from
3  happening, you would have to not have prisons.  You would just
4  have to kill all the inmates instead.
5      Q.   Or at least a million of them?
6      A.   Well, you don't know which one of the million are
7  going to do it.  So when you've got something like this that's
8  one shot per million, and it's not differentiated by the
9  offense that sent somebody to prison, then the only way to
10  keep it from happening is not to have prisons; to kill
11  everybody no matter what offense they've committed.  That's
12  the only way then to keep an event like that from occurring.
13      Q.   I see.  Relative to these group rates, what factors
14  could we use to individualize these numbers to Blaine Milam?
15      A.   Well, there are two -- as we have those anchoring
16  points, then there are factors that would raise or lower that
17  risk, as compared to those other inmates.  On the side of the
18  factors that would increase his risk somewhat, as compared to
19  other inmates, there is his age, his youthfulness at age 20.
20  Then there are a number of factors that would tend to lower
21  the risk:  Nonviolent behavior in custody for the last 17
22  months, correctional appraisal, as he first came into the
23  jail, community employment history, and continuing
24  relationship with family.  Those are all factors that would
25  tend to work toward a lower likelihood of violence.
```

**37**

```
1      Q.   Okay.  And using the actuarial risk model from one of
2  your other studies, where would Blaine Milam's risk fall,
3  relative to the other inmates?
4      A.   Well, there's several different actuarial models we
5  can look at.  These are like insurance company approaches that
6  combine information and try to identify a likelihood of risk.
7  It doesn't account for all of the factors about him that might
8  lower his risk, but it does some of them.
9      Q.   Okay.
10      A.   There's a study by Sorenson and Pilgrim.  This is the
11  one that projected the risk across a 40-year term.  And as we
12  would look at Blaine, he looks like the typical murderer going
13  into prison.  In other words, he does not have any factors
14  that raise or lower his risk, as compared to other murderers.
15  And so this is, you know, 16.4 percent lifetime risk of any
16  serious violence, 1 percent risk of aggravated assault on
17  staff, 1/5th of a percent, 1 in 500, likelihood of killing
18  another inmate.  And then not based on this study but data
19  nationwide, annual risk of homicide of a staff member is less
20  than one per million.  So that's one model.  That's the
21  Sorenson and Pilgrim study from 2000.  This is about 10 years
22  ago.
23      Q.   Okay.  Can that strictly statistical risk assessment
24  be broken down further regarding risk of particular acts?
25      A.   Yes, sir, and that's what I've done here.  Most of
```

**38**

```
1  the risk is for assault on another inmate.
2      Q.   Okay.
3      A.   Lifetime projected incidents of aggravated assault on
4  a staff member is 1 percent, 1 guy in 100.
5      Q.   Okay.  Have you done any research on factors
6  associated with prison violence among life sentence capital
7  offenders in prison?
8      A.   Yes, sir, I have.  And again, we've looked at -- we
9  made an actuarial model based on that.  This is looking at 136
10  life-sentenced capital offenders in Texas.  People charged
11  with capital murder, then sentenced to life.  They have
12  averaged, at the point of follow-up, about 2 1/2 years in
13  prison.  That's the zone where violence, if it's going to
14  occur, is most likely to happen.
15      Q.   Okay.
16      A.   Now, we had three risk groups in this study.  All of
17  them were unlikely to be involved in violence, but we had
18  three risk groups in terms of how unlikely were they.  Blaine
19  fell into the middle of those three risk groups.  In other
20  words, he's right in the middle of capital offenders that are
21  sentenced to prison, life without parole, in terms of then
22  what happens.  11 percent, 10.9 percent of the inmates in his
23  middle risk group engaged in assaults.  90 percent of them did
24  not in those first 2 1/2 years.  And 1.8 percent, about 2 guys
25  in 100, engaged in assault that required more than first aid
```

**39**

```
1  treatment.  98 percent of them did not.  So there is a
2  possibility but not a probability in this risk group.
3      Q.   Okay.  And using the actuary, the risk model from one
4  of your other studies -- oh, I believe we just covered that.
5      A.   There's another one as well.
6      Q.   There is another one?
7      A.   There is another one.  This time we looked at 14,000
8  inmates who were admitted to prison in 2002, and we looked at
9  their disciplinary records in their first year in prison in
10  2003.  14,000.  And again, Blaine was in the midrange of --
11  this isn't murderers.  This is everybody coming into prison,
12  into a large state prison system in that year, and he's in the
13  mid-range.  He's at the 63rd percentile.  In other words,
14  there are 37 percent that are more likely to be involved in
15  violence, and there is 63 percent, where he is, or below in
16  their risk.  Of that group that he's in, at that level, 10
17  percent engaged in potentially violent misconduct.  That's
18  everything from threats to fights to group disturbances to
19  assaults.  That's 10 percent.  Weapons possession as well.  90
20  percent did not.  10 percent did.
21      Q.   Okay.  And using the actuarial risk model from,
22  again, one of your other studies, where would Blaine Milam's
23  risk fall, relative to other inmates?
24      A.   There's one more study.  Actually, this one should be
25  numbered four instead of three.  This one we're looking at
```

40

1  those 111 capital inmates who were sentenced to death and then
2  got life. Because there were appellate issues, their death
3  sentence was taken away. They're out in the general prison
4  population. Remember, they've averaged almost ten years on
5  death row and then averaged eight years in the general prison
6  population.
7      We identified three risk classifications. In
8  this study, he was in the higher of the three risk groups. In
9  that group, 24 percent, in their lifetime in prison, one in
10 four in the group that he was assigned to, engaged in serious
11 assault. Those are ones that result in more than first aid
12 treatment. Importantly though, even in his higher risk group,
13 none of them were involved in assaults that resulted in major
14 or life-threatening injuries. None of them. And so he's in
15 the 24 percent, 1 in 4 did. 3 out of 4 did not. None of them
16 engaged in the more serious assaults.
17     Q.    Okay. And are there mechanisms available in the
18 Texas Department of Criminal Justice to control disruptive or
19 violent inmates?
20     A.    Yes, sir, there are.
21     Q.    And are you familiar with those mechanisms?
22     A.    Yes, sir, I am.
23     Q.    Can you describe those to the jury, please?
24     A.    Yes, sir. There are three broad approaches,
25 depending on what the source of that disruptive conduct seems

41

1  to be. First, there's treatment. There's treatment
2  available, if that's what seems to be the issue, through
3  counseling or medication or education. There's discipline.
4      Now, in prison, it's not like you have a trial
5  like this. There is a hearing of sorts that happens before a
6  disciplinary officer where you get to appear, but mostly if a
7  staff member says you did it, that kind of settles it. And so
8  the write-ups happen pretty easily. And there are these
9  privileges that I described that are so terribly important to
10 your life experience there that can easily be removed. And
11 those include cell restriction, loss of privileges, fines, and
12 loss of property, or putting you in administrative
13 segregation, which is solitary confinement or the hole.
14     Or if they think that you are disproportionately
15 likely to commit violence in prison -- whether you have yet or
16 not, they just think you're more likely to -- then you can be
17 assigned on a more enduring basis to administrative
18 segregation. That's where you're in a cell by yourself 23
19 hours a day. Any time the cell doors open, you back up to the
20 cell door where the bean slot is, where the food slot is, and
21 your hands are handcuffed behind your back before the cell
22 doors open, and then you're escorted to an area where you then
23 exercise by yourself, go into that exercise cell. They shut
24 the door. Lock it. You back up to it and get unhandcuffed.
25 Now, you're in this exercise area by yourself.

42

1      There are over 10,000 administrative segregation
2  beds in TDCJ. Over 10,000. And so if it is identified, once
3  Blaine got to prison, that he was a disproportionate risk,
4  then he could be assigned preemptively to administrative
5  segregation. In other words, the prison system can take
6  whatever action is reasonably related to a legitimate
7  penological interest, and they have wide discretion about
8  security decisions that are made.
9      Q.    Okay. Let me go into this issue of the context of
10 prison a little more. Is the likelihood of an inmates being
11 involved in violence in the Texas Department of Criminal
12 Justice affected by what security level he is held in?
13     A.    Yes, sir, it is.
14     Q.    And can you explain the custody options that would be
15 available in Blaine Milam's case?
16     A.    Yes, sir. There is the general population of the
17 prison. In other words, that he is assigned like other
18 inmates at his security level to a secure perimeter facility.
19 He could be assigned to administrative segregation -- that's
20 solitary confinement -- if he is identified as being a
21 disproportionate risk.
22     Now -- so, for example, if we look at the rates
23 of violence in administrative segregation -- and this is based
24 on data provided to me by the Emergency Action Center with the
25 Texas prisons several years ago -- at that time, that year,

43

1  there were no assaults on inmates whatsoever. Because,
2  remember, the inmate's in solitary confinement, and he's
3  handcuffed and escorted whenever he's moved. No assaults on
4  inmates.
5      There were some assaults on officers. In that
6  whole group in administrative segregation, 10,000 inmates,
7  there were 6 assaults that resulted in more than first aid
8  treatment, mostly head butts against the officer's face. Now,
9  what that represents is if the inmate were held in
10 administrative segregation for 40 years, and his risk never
11 went down as he was 40, 50, 60, 70 years old, the lifetime
12 risk of that kind of assault on a staff member is about 2.4
13 percent. So even among the worst of the worst held at this
14 security level, you have that incidence of more serious
15 assault.
16     Now, there's also the option of his going to the
17 Hodge Unit. The Hodge Unit is a unit for intellectually
18 limited individuals to help -- program specifically for them
19 and their needs and help prevent them from being victimized by
20 other inmates. Or because of the nature of his offense,
21 having been against a child, he could also end up being
22 assigned to protective custody, again for his safety so that
23 other inmates didn't act out on him. Those conditions of
24 confinement would look in many ways like administrative
25 segregation.

44

```
1      Q.    Okay.
2            MR. HAGAN:  I pass the witness.
3            THE COURT:  You my proceed.
4            MRS. TANNER:  Thank you, Your Honor.
5                 CROSS-EXAMINATION
6   BY MRS. TANNER:
7      Q.    Good morning, Dr. Cunningham.  How are you?
8      A.    Good morning.  I'm fine, thank you.
9      Q.    Good.  Could I please get a copy of your report?
10     A.    I did not prepare a report.  I provided these 200
11  slides.
12     Q.    Okay.  So you did the slides in lieu of a report?
13     A.    Yes, ma'am.
14     Q.    Do you have any notes?
15     A.    Yes, ma'am.
16     Q.    Okay.  Could I get those?
17     A.    Yes, ma'am.
18     Q.    Do you have -- let me go through the list before --
19  do you have documentation, in some fashion, of the interviews
20  that you did?
21     A.    Yes, ma'am.
22     Q.    Do you have your appointment affidavit?
23     A.    I may.  Let me look and see.  Yes, ma'am.
24     Q.    And do you have -- I've seen it called your
25  mitigation kit?
```

45

```
1      A.    I don't know what a mitigation kit is.
2      Q.    Okay.  So you have a stack of items up there?  Are
3   these all things that you've relied upon in some fashion in
4   your testimony and putting together of these slide shows that
5   you've done?
6      A.    Yes, ma'am, or that I referred to in the course of my
7   evaluation in this case.
8      Q.    May I take a look at those, please?
9      A.    Yes, ma'am.
10           (Witness handed documents to Mrs. Tanner.)
11     Q.    What about this one?
12     A.    Yes, ma'am, this one, too.
13     Q.    Okay.
14           MRS. TANNER:  Your Honor, I apologize.  I'm
15  going to need a little bit of time to look at this.
16           THE COURT:  All right, ladies and gentlemen,
17  we'll take a 20-minute recess.  You're under all the
18  instructions I've heretofore given you.  Do not discuss the
19  case among yourselves, nor with anyone else, nor allow anyone
20  to discuss the case with you.  You may step down and follow
21  the bailiff.
22           (Recess.)
23           THE COURT:  You may proceed, Mrs. Tanner.
24           MRS. TANNER:  Thank you, Your Honor.
25     Q.    (BY MRS. TANNER) Dr. Cunningham, thank you for
```

46

```
1   allowing me to look over your notes and your documentation you
2   relied upon.
3      A.    Yes, ma'am, glad to.  That's why I brought them.
4      Q.    Okay.  And I appreciate that.  The notebook that
5   Counsel was reading from --
6      A.    Yes, ma'am.
7      Q.    -- the white three-ring binder --
8      A.    Yes, ma'am.
9      Q.    -- with the slides, the questions that were written
10  in there, those were -- that was all prepared by you, right?
11     A.    Yes, ma'am.
12     Q.    Okay.  So you basically prepared the notebook for
13  Counsel and prepared the questions, and he just had to read
14  off the questions, so you could tell the jury your thing.
15     A.    Yes, ma'am.  He could make up his own, but I provided
16  questions that -- for him that would illustrate things he
17  could ask that would elicit the information on the slides.
18     Q.    Okay.  Now, you told us yesterday that you've
19  testified in 156 capital sentencing cases.
20     A.    Yes, ma'am.  That's approximately correct.
21     Q.    Okay.  And I guess today makes 157?
22     A.    Yes, ma'am.  It's someplace around 59 -- I mean,
23  about 98, 99 state cases and around 58 federal cases.
24     Q.    I was confused, because at one point this morning,
25  when you were talking about looking at cases that you had
```

47

```
1   testified in, you made reference to 125 state cases that you
2   testified in.
3      A.    No, ma'am.  There are about 125 cases where I was
4   involved -- State cases where I was involved in doing risk
5   assessments.  I wasn't called in all of those cases, and so I
6   was following up on cases that I had reviewed and provided
7   assessments, whether I was called by the attorney to testify
8   or not.
9      Q.    Okay.  So the 156 or so that you've told us about,
10  you basically came in and testified as to some aspects similar
11  to what you testified to this jury?
12     A.    It depends.  Those are cases -- some of those cases,
13  I only testified about development.  Other cases, I only
14  testified about risk.  Some cases were like today and
15  yesterday, where I testified about both issues.  Sometimes on
16  the risk assessment, I only testify about the general
17  scientific data and don't do an individualized risk assessment
18  of that defendant.  Other times, I testify about the
19  scientific data, and I do a risk assessment.  So it varies
20  some, but it's in the same general subjects.
21     Q.    But all of them are -- the 156 cases have all been
22  cases involving somebody who has already been convicted of
23  capital murder?
24     A.    Yes, ma'am.
25     Q.    And it is somebody who is looking at the potential of
```

48

1   a death sentence?

2       A.   Yes, ma'am.

3       Q.   Okay.  And in all 156 of those cases, you testified

4   on behalf of the defendant?

5       A.   No, ma'am, I never testify on anybody's behalf.  In

6   all of those cases, I was called by the defense.

7       Q.   So you -- the defense hired you.

8       A.   They retained me.  Typically, I'm paid by an indigent

9   agency or the Court, but the defense would retain me.

10      Q.   It is the defense attorney who contacts you and asks

11  you to help them with their case in some fashion.

12      A.   To provide an evaluation.  It may or may not be

13  helpful to them, which is why I may or may not be called to

14  testify.

15      Q.   And you have testified in 156 cases.  Now, what is

16  your going rate for not just the testimony, but for the work

17  that you do in anticipation of the testimony?

18      A.   Yes, ma'am.  The rate's all the same, whether it's in

19  anticipation or being here on the stand.  That rate is

20  currently $300 per hour.

21      Q.   So you charge $300 an hour for testifying?

22      A.   Yes, ma'am, whether I'm here testifying or whether

23  I'm doing interviews or reviewing records or analyzing the

24  results or the testing or creating slides.  The rate is the

25  same for all of those functions.

49

1       Q.   So, for instance, you were on the stand for six hours

2   yesterday.  That was $2,700 bucks or so -- $1,800.

3       A.   Well, six hours would be $1,800, but actually, I was

4   in court obviously much longer yesterday, so it was all the

5   time that I was here, whether I was observing the testimony or

6   whether I was testifying.

7       Q.   Yeah, we had a 12-hour day in court yesterday, so

8   that was about $3,600 bucks yesterday, right?

9       A.   Yes, ma'am.

10      Q.   Okay.

11      A.   And then there was some meetings with the attorney

12  after that, and I had been preparing for three or four hours

13  early yesterday morning reviewing materials, so, in fact, the

14  total day may have been -- yesterday may have been 15, 16

15  hours.

16      Q.   Okay.  So, basically, yesterday you probably made

17  $4,800.

18      A.   Likely, yes, ma'am.

19      Q.   A pretty good day of work.

20      A.   Oh, yes, ma'am.

21      Q.   Okay.  And that is in addition to however much you've

22  billed in anticipation of this?

23      A.   For the other evaluation functions that I did, yes,

24  ma'am, the other hours that I spent.

25      Q.   How much have you billed so far for this case?

50

1       A.   I can't give you an exact total, but it's closing in

2   on 100 hours.

3       Q.   So basically $30,000 worth?

4       A.   Yes, ma'am.

5       Q.   And --

6       A.   At this point in time, through today.  I apologize, I

7   can't give you a precise number, because I've been traveling

8   and have been here --

9       Q.   I understand.

10      A.   -- but we're close to that number of hours that I've

11  spent on this case.

12      Q.   Okay.  And the fact of the matter is, is that you've

13  made pretty good money testifying on behalf of capital murder

14  defendants in this state and other states and in the federal

15  system, correct?

16      A.   No, ma'am.  I've already described I don't testify on

17  anybody's behalf.  I certainly make a good income as a

18  forensic psychologist working on capital cases, as well as

19  other cases.  But, yes, ma'am, I have a good income.

20      Q.   In 2001, in fact, some nine years ago, you testified

21  in New York City, in one of the World Trade Center cases, that

22  you had netted $250,000 the year before in 2000, and 70 to 80

23  percent of that was in representing capital defendants?

24      A.   I don't remember the specifics of my income eight or

25  nine years ago.  That -- I wouldn't disagree with that, if

51

1   that's what the testimony reflected, but I don't have an

2   independent recollection, at this point, of exactly what my

3   income was eight or nine years ago.

4       Q.   Well, and just about a year ago, a Federal District

5   Court judge in a published opinion made reference to the fact

6   that you earned, quote, hundreds of thousands of dollars per

7   year from that activity, being an expert witness in death

8   penalty cases.

9       A.   Yes, ma'am.

10      Q.   You don't disagree with that, right?

11      A.   Sometimes I'm a witness, and sometimes I'm not, but

12  related to capital cases, yes, ma'am, I do earn several

13  hundred thousand dollars a year typically.

14      Q.   Testifying in capital murder cases that the person's

15  already been found guilty, after being hired by the defense?

16      A.   I only testify in maybe eight or ten cases a year.  I

17  work on a lot of cases that don't ultimately result in my

18  testimony.  They may plead out or other things may happen.  In

19  capital cases in total, whether I testify or not, I would

20  certainly agree that my fees are more than several hundred

21  thousand a year.

22      Q.   Okay.  Now, the hallmark of a good expert witness,

23  whether it be in any field, is that they be objective?

24      A.   Yes, ma'am.

25      Q.   And that they not be an advocate?

52

1    A.    That's correct.
2    Q.    Okay.
3    A.    They're an advocate for the data and for their
4    opinion, but not for one side or the other.
5    Q.    And that they not be biased for one side or the
6    other.
7    A.    That's correct.
8    Q.    That they come in, they give the data, and they
9    remain as unbiased as they possibly can?
10   A.    Yes, ma'am.
11   Q.    And that is a hallmark of being a reliable and
12   credible expert witness, is it not?
13   A.    It's the aspiration that a professional scientist and
14   psychologist would aspire to.
15   Q.    Now, there is a case out of Fort Worth, the Michael
16   Hall case, that you testified in both at trial and in
17   subsequent hearings, correct?
18   A.    That's correct.
19   Q.    And in that case, it was somewhat similar to this
20   case with respect to the fact that you testified as to risk
21   assessment, right?
22   A.    Yes, ma'am.
23   Q.    And you testified as to your opinion that Mr. Hall
24   was mentally retarded?
25   A.    Yes, ma'am.

53

1    Q.    And you testified as to your opinion regarding a
2    number of things that you perceived to be mitigating, if you
3    will, that they were things that were adverse developmental
4    factors in his life.
5    A.    Yes, ma'am, I testified about a number of adverse
6    developmental factors.
7    Q.    So in that sense, that case was fairly similar to
8    this one, with regard to the fact that those were the three
9    areas you testified in that case, and those are the three
10   areas you testified in this case?
11   A.    There is that similarity between those three areas.
12   Q.    Okay.  And about a year ago in the Hall case, the
13   Federal United States District Court for the Fort Worth
14   Division of the Northern District of Texas issued an opinion
15   with regard to your testimony in the Hall case, did they not?
16   A.    Yes, ma'am.
17   Q.    And in that opinion -- and that is a published
18   opinion that it will be in the annals of the laws of this
19   state and the federal courts for many, many years -- they made
20   reference to your testimony as an expert witness on behalf of
21   Mr. Hall, correct?
22   A.    It references my testimony being called by Mr. Hall.
23   I don't recall whether it refers to that as on his behalf or
24   not.
25   Q.    Okay.  Well, you testified for -- you were called by

54

1    the defense attorney?
2    A.    Yes, ma'am.
3    Q.    And there was a Dr. Randy Price who was called by the
4    State?
5    A.    That's correct.
6    Q.    And the jury's heard about Dr. Proctor having done
7    some work in this case.  Randy Price is actually Dr. Proctor's
8    business partner?
9    A.    That's my understanding.
10   Q.    Okay.  And the Federal District Court in Fort Worth,
11   after hearing both of your testimony, made some pretty harsh
12   findings with regard to your testimony, did they not?
13   A.    I don't recall the findings as being harsh.  I would
14   be glad to take a look at them again.  I recall that the Court
15   ultimately determined that it found Dr. Price's analysis to be
16   more accurate or more credible, but I don't recall the
17   findings regarding my testimony being harsh.
18   Q.    Okay.
19   A.    But certainly you could refresh me, if you hand me
20   the opinion.
21   Q.    Be happy to.
22         MRS. TANNER:  May I approach the witness?
23         THE COURT:  Yes, you may.
24   Q.    This highlighted portion.
25   A.    Yes, ma'am.

55

1    Q.    Okay.  Let me go ahead and show you this other
2    portion.  Two sections right here.
3    A.    Yes, ma'am.
4    Q.    Okay.  And in this opinion, in the Hall opinion, the
5    Federal District Court said of the expert testimony offered by
6    the parties, the Court finds that the evidence of Dr. Price is
7    more persuasive than that provided by Hall's expert
8    witnesses -- and you were his primary expert witness.  Then
9    the Court went on to say the latter -- that being you -- the
10   latter impressed the Court as serving more as advocates on
11   behalf of Hall that he should not be executed than as an
12   objective witness.  That is what the Court said regarding your
13   testimony in the Hall case, correct?
14   A.    I don't recall that I was the only expert that
15   testified in that proceeding.  Again, you might refresh me
16   with the record, but that is -- I am in the group that the
17   Court characterizes as serving more as advocates.
18   Q.    Then the Court went on to say, in contrast, Dr. Price
19   impressed the Court as being totally objective in his
20   evaluation of Hall's level of intelligence and behavior
21   attributes, with the goal of informing the Court rather than
22   to serve as an advocate for either side.  That's what the
23   Court said, right?
24   A.    That's what the Court said.
25   Q.    The Court then went on to say the Court is not

**Page 56**

1 persuaded by the opinions of Hall's experts on the subject of
2 adaptive functioning. Again, the Court's perception is that
3 the experts were advocating a case of mental retardation for
4 the benefit of Hall rather than to make objective
5 presentations to the Court. The Court finds Dr. Price's
6 testimony on the subject of adaptive functioning to be the
7 most persuasive. The other experts selectively used
8 information that would support their adaptive functioning
9 theory, and they seemed to have disregarded information
10 available to them that put into question their stated
11 findings. That's what the Court said.
12     A.   What the Court said. I would disagree with the
13 Court's findings and the Court's characterization. The Court
14 ruled that Michael Hall was not mentally retarded. The Court
15 wrote an opinion that would serve to serve and defend that
16 opinion when it went up to the Fifth Circuit and beyond. So
17 it is the Court's -- it's the Court's analysis of the
18 witnesses that came before the Court. The Court has decided
19 that he is not mentally retarded. The Court has prepared an
20 opinion describing the basis of that, that provides a
21 rationale and support for that determination. I disagree with
22 it, but that's what the Court said.
23     Q.   The Court basically felt that you were an advocate on
24 behalf of a result versus a disinterested expert?
25     A.   Again, I don't recall whether there were other

**Page 57**

1 experts that were involved, but the Court is grouping me with
2 witnesses that it regarded -- or says that it regarded as
3 being advocates.
4     Q.   Well, actually, about two paragraphs before the last
5 quote, the Court also mentioned by name that it was not
6 impressed by Dr. Cunningham's testimony regarding utilization
7 of the Flynn Effect. So they actually made reference to you
8 by name in that respect, did they not?
9     A.   Yes, ma'am. The Flynn Effect is a scientific finding
10 that the Court did not accept.
11    Q.   And you have not talked about the Flynn Effect in
12 this case.
13    A.   No, ma'am, the instruments that are being utilized in
14 this case are sufficiently recent, that corrections for the
15 Flynn Effect are unnecessary. The Flynn Effect is the
16 well-established, scientific observation that I.Q. scores are
17 inflating over time, so that if you use an old or obsolete
18 test that has old norms, then the results that you get are not
19 going to be reliable. That's very well-established in the
20 scientific literature. The Court did not accept that finding,
21 despite that scientific support.
22    Q.   They were not impressed with that aspect of your
23 testimony?
24    A.   That's what it says.
25    Q.   Okay. Now, tell the jury what observer bias is.

**Page 58**

1     A.   Observer bias is where you see what you want to see.
2 That's the problem, for example, with somebody who is -- let's
3 say you use a correctional officer to identify the likelihood
4 of violence in prison, and that officer has a history of
5 observing inmates, only the data that he's collecting is done
6 selectively. In other words, he has expectations about what
7 will occur and remembers selectively. That's why it's
8 important to gather data systematically, so that you reduce
9 the likelihood of affecting the results by your own
10 expectations and prejudices, and that kind of thing.
11    Q.   And the bottom line for observer bias is, we all know
12 that it's out there, but the really important thing and the
13 key is that folks are aware of people who are evaluating the
14 testimony or the data are aware of the observer bias that may
15 be present. Right? I mean, that's the key.
16    A.   Well, as a researcher, the key is that you try to
17 reduce and use methods that minimize the likelihood of
18 observer bias.
19    Q.   Let me --
20    A.   In other words --
21    Q.   Let me put it this way. Let's say the tobacco
22 industry commissions a study on the effects of tobacco on
23 people. Well, their data that they come up with may be
24 perfectly good, and it may be perfectly reliable, but really,
25 there ought to be some reference to the -- in the data to the

**Page 59**

1 fact that, you know, the tobacco companies are the ones behind
2 doing it. I mean, that's kind of what I'm getting at.
3     A.   Yes, ma'am. You're describing whether there are some
4 additional interests that are involved. And so often, in
5 research studies, if there is some external involvement or
6 funding -- for example, in a mental retardation study that is
7 currently in press, one of the -- one of the -- the statement
8 of interest on that study is it's pending being published,
9 that we provided, the authors provided that I have been called
10 as a witness by the defense in capital cases and have
11 testified regarding the Flynn Effect in those cases and in
12 correcting I.Q. scores for the Flynn Effect. That way, the
13 reader knows, as they begin to read this article, I've been
14 called by the defense in these cases and have testified along
15 these lines. That way, that's known as the person begins to
16 read.
17    Q.   And just like when we talked about before, it's
18 important to let the jury know that all of these times you've
19 testified to this, you've always only testified for the --
20 you've only been called by the defense?
21    A.   Yes, ma'am, that's correct. And I encourage defense
22 counsel to ask me that question, so that that would be clear
23 on direct exam.
24    Q.   Okay. Now, let me try to figure out everybody who's
25 involved in this case from the perspective of the work that

60

1   you did.  You did not administer any testing on this
2   defendant, Blaine Milam?
3       A.   No, ma'am.  I did use a single subtest from a Wide
4   Range Achievement Test, Fourth Edition.  That was a spelling
5   test, because I observed that Dr. Paul Andrews, who had
6   done -- who had utilized the WRAT, either didn't give the
7   spelling test or somehow that record was not included in the
8   results -- in the testing that he provided or the results, and
9   I was interested in that, and so I administered the WRAT.
10      Q.   Okay.
11      A.   That's the only testing that I directly administered
12  to Blaine Milam.
13      Q.   Now, Paul Andrews did two different series of tests
14  on the defendant, correct?
15      A.   I don't know that I would characterize it as two
16  series.  He did an assessment of cognitive ability.  That was
17  the Wechsler Adult Intelligence Scale and the Stanford-Binet.
18  Those are intellectual.  He also did some neuropsychological
19  screening test.  He also did some effort testing.
20      Q.   Well, he met with him once and did the WAIS-IV, the
21  Wechsler, and some other stuff.  Then he met with him a second
22  time a month later, and he did the Stanford-Binet.
23      A.   Yes, ma'am.
24      Q.   So there were two different series of testings that
25  he did?

61

1       A.   There were two testing appointments.
2       Q.   Two different days he came?
3       A.   Two different days he came.
4       Q.   Now, who is Paul Andrews?
5       A.   Paul Andrews is a clinical and forensic psychologist,
6   board certified forensic psychologist.  I think his offices
7   are in the Tyler area.
8       Q.   And I understand that he's no longer on the defense
9   team.
10      A.   I don't -- I don't -- he was contracted to do the
11  testing.  I don't know what else --
12      Q.   And that was it?
13      A.   -- his involvement has been.
14      Q.   Well, so he was just contracted to do the testing,
15  and that was it?
16      A.   I know that he did the testing.  I don't know what
17  his understandings were with defense counsel or what their
18  rationales are for who they call to testify.
19      Q.   And then there's somebody named Gerald Byington?
20      A.   Yes, ma'am.
21      Q.   And he's classified as a mitigation expert of some
22  sort.
23      A.   He's a mitigation investigator.  It would be his role
24  to gather available records and to try to identify third
25  parties to interview, generate summaries of those interviews.

62

1   Sometimes the mitigation investigator will also generate a
2   time line of events generationally in the life of the
3   defendant.
4       Q.   Well, what I'm curious about, is he's not listed as a
5   defense witness either.  Are you aware of that?
6       A.   I don't know who's been a witness, ma'am.
7       Q.   Okay.
8       A.   I don't know who's been listed as witnesses.
9       Q.   And I understand that the first person who did some
10  sort of an evaluation on the defendant was a Theresa Vail?
11      A.   Yes, ma'am.
12      Q.   And do you know approximately when that was?
13      A.   Yes, ma'am.  She -- I don't know that I know exactly
14  when it was.  I have a transcript of an interview that she
15  did.  Let me see if it's dated.  I have a transcript that
16  appears to be undated.  It certainly would have been after his
17  arrest in this case, because they're talking about his being
18  in custody on these charges.
19      Q.   Okay.  And do you have any record that Dr. Vail --
20  oh, by the way, do you know Dr. Vail?
21      A.   I do not.
22      Q.   Okay.  Do you know whether she's a psychologist, a
23  psychiatrist, an investigator, or what?
24      A.   It's my understanding that she's a psychologist.
25      Q.   Okay.

63

1       A.   But I don't know of her specific credentials.
2       Q.   By the way, Paul Andrews, he's a psychologist, too,
3   correct?
4       A.   That's correct.
5       Q.   Okay.  And do you know whether or not Dr. Vail did
6   any sort of testing on the defendant or did she just go talk
7   to him?
8       A.   I have no idea.  I only have the transcript of her
9   interview.
10      Q.   Okay.  And there's a fairly lengthy transcript of an
11  interview that's in your materials, right?
12      A.   Yes, ma'am.
13      Q.   Okay.
14      A.   It's approximately -- I can tell you exactly how long
15  it is --
16      Q.   Now, you told the jury that you interviewed the
17  defendant --
18      A.   That's correct.
19      Q.   That you interviewed his mother, Shirley Milam; his
20  sister, Sherry Digby; and his sister, Teresa Shea, correct?
21      A.   That's correct.
22      Q.   Now, when did you interview Shirley Milam?
23      A.   I interviewed Shirley Milam on May 1st of 2010, and
24  then I interviewed her again by telephone, I believe, on May
25  20th.

64

1    Q.   And you --

2    A.   Actually, it was May 19th.  It was a two-hour

3 interview by telephone.

4    Q.   Now, you told us -- and we're going to talk about it

5 more in detail later, but you told us that you administered

6 some sort of an adaptive functioning test to Mrs. Milam.  When

7 did you do that?

8    A.   That was on May 19th.  That was the two-hour

9 interview of her to gather more specific information about

10 adaptive functioning.

11    Q.   I mean, that's -- the adaptive functioning test that

12 you gave, I mean, that is an official test.  I mean, you've

13 got a score sheet, and you've got, you know, written

14 questions, and it's preprinted, and it's in a packet, and all

15 that kind of stuff, right?

16    A.   Yes, ma'am.  It's really more of a structured

17 interview.  It's an Adaptive Behavior Scale that is scored on

18 the basis of a detailed, structured interview.  But, yes,

19 ma'am, it is a standardized instrument that has specific items

20 that are scored, that are then compared against a norm group.

21    Q.   Okay.  And you conducted that analysis with Mrs.

22 Milam over the phone?

23    A.   That's correct.

24    Q.   Okay.  And you did that on May 19, 2010?

25    A.   That's correct.

65

1    Q.   Okay.  Are you familiar with what day this jury came

2 back and found the defendant guilty of capital murder?

3    A.   No, ma'am.

4    Q.   Would it surprise you if I told you it was May 17th

5 of 2010?

6    A.   I do not know when the jury came back.

7    Q.   So if, in fact, the jury came back on Monday, May

8 17th, 2010, the test that you gave Ms. Milam regarding the

9 adaptive functioning was a test that was conducted two days

10 after her son was convicted of capital murder and in the

11 middle of the State's -- of the punishment case being put on

12 in this case, correct?

13    A.   I would accept your representation that it was the

14 17th the jury came back.  I don't know when the jury came

15 back.

16    Q.   That didn't come up in your conversation with her?

17    A.   I don't recall that it did.  The timing of this was

18 driven more by the demands of my own schedule than by the

19 timing of whether he -- when he obtained the guilty verdict.

20    Q.   When did you first get involved in this case?

21    A.   I was first appointed on March 3rd, and I first saw

22 Blaine Milam on March 14th, so a couple of months ago.

23    Q.   So you were actually appointed on the day we started

24 jury selection in this case.

25    A.   I don't know when jury selection started.

66

1    Q.   Okay.  Now, when you were talking to Mrs. Milam and

2 Sherry and Teresa, you needed to get essentially a history

3 from them, right?

4    A.   Yes, ma'am.

5    Q.   And they knew what your purpose was.  They knew what

6 you were here for.  They knew what you were trying to get the

7 information for, correct?

8    A.   Yes, ma'am.  It was -- it's ethically necessary that

9 I inform the person who I am, what's going to happen to the

10 information, who has retained me.  Those are all important

11 disclosures to make at the outset, so the person knows what

12 the rules are as we begin.

13    Q.   Okay.  And to be fair, in the context within which

14 you were interviewing the defendant's sisters and his mother,

15 would you agree with me that it's just human nature and it's

16 natural that they have a pretty significant motive or desire,

17 whether it be conscious or unconscious, to kind of exaggerate

18 problems that occurred in the household maybe, maybe even

19 fabricate them, in an effort to help him?

20    A.   That's a potential.  My experience in these cases is

21 that there are two contrasting motives.  There's one motive,

22 which is the one we would expect, that they would be motivated

23 to try to exaggerate problems in themselves or family members.

24 The other motive is one of a desire to maintain family privacy

25 and make themselves look as good as possible.  And you would

67

1 think that in a case like this, that that motive to want to

2 assist, by coming up with bad things about the family, would

3 be dominant.  In my experience, that's typically not the case.

4       Very often in these families, in the

5 dysfunctional histories of these families, that they are not

6 readily disclosing negative events.  And many of them will

7 choose their own privacy or maintaining a better appearance of

8 themselves, as opposed to trying to pile on and talk about how

9 negative or disturbed the family system was.

10    Q.   Well, that's actually an interesting point, because

11 would you agree with me that from the start to the finish of a

12 criminal case, particularly a capital murder case in which the

13 death penalty becomes an issue, as the case progresses, the

14 likelihood or the possibility of the death penalty being the

15 result becomes kind of a bigger and bigger issue as it goes

16 along.  Wouldn't you agree with that?  I mean, it becomes more

17 of a reality as we progress from the day of arrest, to

18 indictment, to pretrial, up to trial, past jury selection, as

19 we go.  Wouldn't you agree?

20    A.   I guess it depends on the individuals and the events.

21 There are many individuals who will immediately realize that,

22 in fact, there is grave death penalty jeopardy, and they'll

23 recognize that from the outset.  There are others that they

24 will try not to think about that, because it's

25 anxiety-provoking and disturbing.

**68**

1    Q.   Well --
2    A.   Much like a cancer diagnosis, that there's some
3  people, they get the diagnosis.  They kind of snap to the fact
4  that their life expectancy is limited.  Other people may try
5  to avoid letting all of those circuits connect about what this
6  diagnosis means about their mortality.
7    Q.   Well, the point is that as we get through this
8  process, get a jury, get a guilty, get further along in the
9  process, the reality of the potential for the death penalty
10 gets closer and closer.  We can all agree with that, can't we?
11   A.   The potential for the death penalty is certainly
12 greater after the person has been convicted --
13   Q.   Okay.
14   A.   -- if you thought there was going to be a question
15 about their conviction.  In a case like this, there would seem
16 to be relatively little question that Blaine Milam was going
17 to be convicted of this offense, given the nature of the
18 evidence against him and Jesseca, and so this was not kind of
19 a whodunit.  Who did this to this baby?  There are only two
20 people that are potentially involved, Blaine and Jesseca.
21 She's got 24 bite marks.  All but one of them match his dental
22 pattern.  This is not a whodunit about whether he's going to
23 be convicted.
24   Q.   I'm glad you recognize that.  But my question is,
25 with regard to -- let's say family members.  There is an idea

**69**

1  that perhaps it's a good idea, from the perspective of talking
2  to them, to get an accurate assessment and an accurate story
3  of the historical data, to talk to them as quickly as possible
4  after the offense, before a significant period of time passes.
5  Would you agree with that?
6    A.   No, ma'am, not necessarily.  It really depends on --
7  it depends on the -- in many ways on the thoroughness of the
8  interviews that are done, the skill of that interviewer, the
9  ability of that interviewer to establish rapport.  It's not
10 unusual to require more than one interview before those
11 individuals are completely disclosing of the family history.
12       So had there been more time, and I could have
13 gone back to these individuals repeatedly and spent much more
14 time with them, the likelihood is that more disclosures, more
15 information about the family history could have been obtained.
16 Unfortunately, my schedule's intense, and there's only a
17 certain amount of resources the Court can dedicate, and so
18 some accommodation has to be made.  But I don't think that
19 it's particularly related to how quickly you go talk to them
20 after the offense.  I don't agree with that.
21   Q.   Let me ask you this.  If you had had more time to
22 talk to them and talk to them on more occasions, then probably
23 more stuff would have come out.  That's basically what you
24 just said.
25   A.   Yes, ma'am.  You get greater disclosure of even -- of

**70**

1  more details about the adverse developmental factors as you
2  spend more time with them.
3    Q.   More things that you can put into the mitigation
4  categories that you put on your PowerPoints, right?
5    A.   Yes, ma'am --
6    Q.   Okay.
7    A.   -- if those things are there.  If there's traumatic
8  history, the more trust that you establish and the more -- the
9  greater depth of those interviews, the more you get.
10   Q.   Now, you are aware that Shirley Milam, Sherry Digby,
11 Teresa Shea were all summoned before and testified before the
12 Grand Jury of Rusk County two weeks to the day after Baby
13 Amora was murdered?
14   A.   Yes, ma'am.  I've read their testimony.
15   Q.   And, in fact, their testimony, there are some -- I'm
16 not going to go into all the details at this point, but there
17 are some pretty significant differences in their testimony
18 before the Grand Jury versus the kind of stuff they told you
19 later on, a year and a half later.  Would you agree with that?
20   A.   There are some differences.  I don't immediately
21 identify discrepancies.  I know his mother had some
22 discrepancy.  She initially said that Blaine did not abuse
23 drugs, or that she did not have knowledge of that, in her
24 Grand Jury testimony.  I think her subsequent court testimony
25 that I read, she acknowledged that she thought he was using

**71**

1  drugs.
2    Q.   Okay.  So there's stuff like that.
3    A.   But not in terms of them saying then, "Gee, Blaine
4  had a lot of snap; he was really smart," and now saying, "You
5  know, he was childlike."  Or saying, "The dad was healthy to
6  the day he died," and saying, "No, now he has a stroke" and
7  those kind of things.  There aren't those sorts of
8  fundamental --
9    Q.   Hang on --
10   A.   -- discrepancies.
11   Q.   -- let me stop you.  Actually, his sister Sherry at
12 the Grand Jury testified that he was a normal little boy and
13 was perfectly normal, and then later on came -- at trial and
14 to you, and that was a little bit different.
15   A.   I don't think she said he was perfectly normal.
16 You'll need to hand me that portion of her transcript --
17   Q.   Okay.
18   A.   -- because I don't --
19   Q.   The point is --
20   A.   And some of it has to do with how's the question
21 posed to the individual?  I think she described him as a happy
22 little boy.  I don't know that she said everything was fine
23 with him until --
24   Q.   Okay.  Now, let me ask you this.  You said that you
25 interviewed the defendant, Blaine Milam.

76

1    Can we take this up outside the jury?  Isn't it past break
2    time here?
3              THE COURT:  No, we've already had a break.
4         MRS. TANNER:  Judge, the problem is that the
5    minute he agrees to talk to him about anything, a waiver is a
6    waiver.  You don't get to waive just for part of it.
7              THE COURT:  I'll overrule the objection and give
8    you a running objection to this line of questions.
9              (Conclusion of Bench conference.)
10             THE COURT:  You may proceed.
11        Q.   (BY MRS. TANNER) Now, you -- when you go to interview
12   defendants in capital murder cases, you do ask them about the
13   facts of the offense on occasion, don't you?
14        A.   If I'm permitted to by defense counsel, then I will
15   go into that with them, if -- after an informed consent
16   discussion with defense counsel about what the implications
17   are and what it would gain or not gain from doing that.
18        Q.   For instance, in the Hall case, the one we've talked
19   about, the one that you testified to mental retardation,
20   mitigation, risk assessment, you talked to him at length about
21   the facts of that particular capital murder.
22        A.   I no longer recall.  I think my testimony in that
23   case was about ten years or more ago, and I simply don't
24   recall the contents of the evaluation in that detail.
25        Q.   Okay.  Well, I'll come back to that.  But you do talk

77

1    to capital murderers about the facts of the capital murder
2    they've been convicted of.
3         A.   Infrequently.  Most of the time I do not.  Most of
4    the time defense counsels do not authorize a discussion about
5    the capital offense.  The defendant retains a Fifth Amendment
6    right to not incriminate himself, even for an evaluation
7    that's being performed for sentencing purposes, and so I
8    can -- I can get 90 percent of the way there in terms of the
9    history of how -- of how he came to this position without an
10   inquiry about the incident offense, and that inquiry of the
11   incident offense would do nothing to inform the violence risk
12   assessment.  And so there is a cost benefit equation against
13   the defendant's Constitutional right that the defense attorney
14   has to undertake to decide whether to authorize me to inquire
15   about those things.
16        Q.   Well, the defendant agreed to talk to you, right?  So
17   that's a waiver right there.
18        A.   No, ma'am.  No, ma'am, that's not --
19             MR. HAGAN:  Your Honor, can we approach again?
20             MRS. TANNER:  I'll move on.
21             THE COURT:  Well, you object?  I'll sustain.
22             MR. HAGAN:  No, we need to go ahead and talk
23   about it.
24             (Conference at the Bench:)
25             MR. HAGAN:  Judge, this has gotten way too far.

78

1              THE COURT:  I'll sustain your objection if you
2    make it.
3              MR. HAGAN:  Definitely object.
4              THE COURT:  Sustain the objection.
5              MR. HAGAN:  Move that be the jury to disregard.
6              THE COURT:  I'll grant that.
7              MR. HAGAN:  I move for a mistrial --
8              MR. JACKSON:  Before we leave, I've been
9    noticing throughout the past couple of days of testimony that
10   there's someone making comments or noises when the defense
11   makes an objection.  I haven't really figured out who it is up
12   until now.  Unfortunately, it's someone I've become friendly
13   with, but it's the Sheriff who's making comments or outbursts.
14   He just did it again.  He's like, "Oh, my God."  It's loud
15   enough where I finally figured out who's making it.  The
16   Sheriff has been real nice to me through the trial, but his
17   reactions to what we're doing are inappropriate.  They're
18   facial gestures; there are vocal gestures that are being heard
19   from defense Counsel.  I'm assuming the jury can hear them,
20   also.  We ask the Court to -- he needs to be admonished.  This
21   needs to stop.
22             THE COURT:  Well, I'll admonish everybody.
23             MR. JACKSON:  I know, but he just did it.
24             THE COURT:  Okay.
25             (Conclusion of Bench conference.)

79

1              THE COURT:  I'll grant -- I'll sustain the
2    objection.
3              MR. HAGAN:  Ask the jury to disregard the last
4    question and answer.
5              THE COURT:  The jury is instructed to disregard
6    the last question and answer.
7              MR. HAGAN:  Your Honor, I would ask the jury be
8    instructed to disregard this entire line of questioning.
9              THE COURT:  I'll deny that request.
10             MR. HAGAN:  Your Honor, move for a mistrial.
11             THE COURT:  And I'll deny that.  Ladies and
12   gentlemen, please make sure that there's no one in the gallery
13   that makes any audible responses or facial gestures.  All
14   right, you may proceed.
15        Q.   (BY MRS. TANNER) So Dr. Cunningham --
16        A.   Yes, ma'am.
17        Q.   It's your testimony that the facts of this capital
18   murder case, the facts of what the defendant did or did not do
19   to Amora Bain Carson had no bearing on any of the issues that
20   you talked to this jury about.  That's basically what you're
21   telling us.
22        A.   No, ma'am.  I have a tremendous amount of information
23   about the facts of what happened to Amora and about this
24   offense.  His account of that to me does not inform the
25   violence risk assessment.  The facts of this are established.

80

```
1    At the point I testify, he will have been found guilty of
2    this, so that's a starting place for that evaluation.  His
3    account of that does not inform that evaluation of what kind
4    of inmate he's likely to be in prison.  His account of this
5    offense does not inform how he came to be damaged.
6              Now, it may have some information about the
7    level of psychosis that he was experiencing at that time, and
8    the particular nature of the delusions, and the interaction of
9    him and Jesseca and their joint delusions in the course of
10   this occurring.  And so, for example, if there were an
11   insanity case, and I was testifying at the guilt phase about
12   the degree of insanity that was present, then that information
13   would be particularly relevant.  In this instance, we've got
14   all the background information that I described.  That's
15   independent of his kind of offense.  Whether he's a person
16   with mental retardation is independent and separate from his
17   account of the offense, exactly --
18        Q.   Well, actually --
19        A.   I'm not finished with my answer, ma'am.
20             MR. HAGAN:  Your Honor, we would ask that
21   Counsel be allowed to let the witness continue.
22             MRS. TANNER:  Well, I would object to the
23   nonresponsiveness and the narrative.
24             MR. HAGAN:  The witness was simply trying to
25   answer the question.  He was cut off.
```

81

```
1              THE COURT:  I'll overrule the objection.
2              MR. HAGAN:  Continue, Doctor.
3         Q.   (BY MRS. TANNER)  With regard to the issue of mental
4    retardation, in fact, there are significant factors as to
5    whether somebody's mentally retarded that go directly to the
6    facts of the crime.
7         A.   No, ma'am.  If you look at the User's Guide regarding
8    mental retardation that's published by AAIDD, the facts of the
9    crime typically have almost nothing to do with whether
10   somebody's a person with mental retardation, unless we're
11   talking about some sort of sophisticated stock fraud, and the
12   person then killed the individual they were defrauding, then
13   that financial transaction might have bearing.  But otherwise,
14   almost all capital murderers are the sort that could be
15   perpetrated by somebody who is mildly mentally retarded.  The
16   offense is not going to tell us much.
17        Q.   And if you're going to talk to this jury about some
18   degree of psychosis, surely whatever happened would play into
19   and be relevant to that testimony of psychosis.
20        A.   It would have a small bearing on exactly -- it would
21   have a bearing on exactly what was happening.  This is already
22   somebody who has established to have psychotic experiences in
23   the presence -- was an established meth addict.  We know that
24   meth from chronic use produces psychosis.  He's been observed
25   to express delusional beliefs --
```

82

```
1              MRS. TANNER:  I object to the nonresponsive.
2         A.   -- has meth use proximate to the events --
3              MRS. TANNER:  Object to the nonresponsiveness --
4         A.   -- that have been described.
5              THE COURT:  Doctor, whenever an objection is
6    made, stop and allow the Court to rule on it.
7              THE WITNESS:  Yes, sir.
8              THE COURT:  Then I'll allow you to continue or
9    not to continue.  All right, I'll overrule the objection.
10   Now, you may continue your question -- your answer.
11        A.   There is ample evidence of the causative factors of
12   his psychosis, the presence of that psychosis in the weeks and
13   months proceeding this offense, and his utilization of
14   methamphetamine proximate unto this offense, including his
15   expression of delusions about Amora being possessed and
16   Jesseca's perceptions of Amora being possessed.
17        Q.   (BY MRS. TANNER)  Let me ask you this.  You, of
18   course, are aware that the defendant was subsequently
19   interviewed by Dr. Proctor and Dr. Gripon?
20        A.   Yes, ma'am.
21        Q.   And do you know whether or not they actually wanted
22   to and felt they needed to be able to interview this defendant
23   as to the particular offense?
24        A.   I don't know that for certain, that they have made --
25   I have some recollection that there was discussion about that.
```

83

```
1    I don't know about the specifics of their inquiry in that
2    regard.
3         Q.   And the way that this works, if you don't ask him
4    about the offense --
5              MR. HAGAN:  Your Honor, can we approach again?
6              THE COURT:  I'll sustain the objection.
7              MR. HAGAN:  Move to disregard.
8              THE COURT:  The jury is instructed to disregard
9    the last question.
10             MR. HAGAN:  Move for a mistrial.
11             THE COURT:  Denied.
12        Q.   (BY MRS. TANNER)  Let me ask you this.  So you talked
13   to the defendant for 9 1/2 hours.
14        A.   Yes, ma'am.
15        Q.   In March of this year, a jury is being impaneled to
16   decide whether he should be found guilty, and if so, either
17   get life or death.  Would you agree with me that in that
18   context, there is a significant motive on their part, in the
19   examining, to perhaps exaggerate or fabricate when talking to
20   you?
21        A.   That's a possibility.  It's not what I have typically
22   observed.  In many instances, capital defendants in this same
23   position do not give up information about their family.  They
24   would rather put it on themselves than reveal that family
25   history, number one.  And number two, as Dr. Proctor and
```

84

1    Dr. Gripon were interviewing him, even after my interviews,
2    even deeper into this process, Dr. Gripon described him as
3    simplistic and gullible and naive --
4         MRS. TANNER:  Judge, I'm going to object to the
5    nonresponsiveness.
6         THE COURT:  Sustained.
7    Q.   (BY MRS. TANNER) Now, did you believe everything he
8    told you?
9    A.   No, ma'am.  I made note of it, and I sought to obtain
10   collateral and additional information that could help inform
11   the credibility of what he described.
12   Q.   By the same token, when you visited with his family,
13   Mrs. Milam and his sisters, did you believe everything they
14   told you?
15   A.   I would answer similarly.  I made note of it, and
16   then I sought to identify both -- I guess several things.
17   What corroboration was there for it?  How does this fit with
18   what third parties say?  How does this match against the
19   history and records that are available?  And so I maintained
20   what I would describe as some forensic skepticism.  I'm
21   seeking additional data and not just accepting it on face
22   value.
23   Q.   Okay.  Now, I want to visit with you about the second
24   part of your presentation, the risk assessment aspect of it.
25   A.   Yes, ma'am.

85

1    Q.   Now, most of the slides in that particular
2    presentation, or at least a significant number of those
3    slides, you've used repeatedly in presentation to
4    presentation, in state to state, and case to case, and then
5    you kind of just input the number -- input the name of the
6    individual on trial and a little bit of information about the
7    person on trial into the slides.  Fair enough?
8    A.   No, ma'am.  Let me -- you've asked me a compound
9    question, so let me answer the pieces of it that you've asked.
10   First, many of the slides I've used before, because the
11   research that is relevant doesn't change from one case to
12   another, number one.  Number two, the factors that are
13   predictive, that are associated with a greater or lesser risk
14   of violence in prison, are relatively few, as I've presented
15   them here.  And so I will then address those same factors from
16   case to case, because there are a limited number of those.
17        The data on the particular prison system,
18   whether it's in Texas or Illinois or Arizona, that data will
19   change from one state to another, because they have different
20   rates.  It will change to a minimal extent, because the rates
21   are low everywhere, but that will be somewhat different.  So
22   it will be individualized to that defendant, based on those
23   limited factors using the best available research.
24   Q.   Now, you've told the jury that essentially the kind
25   of work that you're doing where this risk assessment is

86

1    concerned is basically a corollary to that which is done in
2    the insurance industry using actuarial tables, right?
3    A.   Yes, ma'am.  It's also similar to what happens in
4    medicine.  But it's the application of looking at rates and
5    correlates of some outcome to better understand what's
6    associated with what.
7    Q.   And even with actuarial tables -- let's say insurance
8    companies -- they still need to know some personal information
9    about the particular person, whether they're going to insure
10   them or not, right?
11   A.   No, ma'am.  They need to have information about the
12   person that is relevant to some correlate.
13   Q.   Well --
14   A.   So, for example, the age of the driver is relevant.
15   What color his hair is, is not.  Whether he's --
16   Q.   Well, let me ask you --
17   A.   -- in a single-parent family may or may not be.  It
18   depends on whether there is a demonstrated relationship
19   between that factor and the outcome.
20   Q.   Let's say for life insurance.  There's all kinds of
21   different things about a person, aside from, say, the fact
22   that they're 40 years old, whether they are a good candidate
23   for life insurance.  Whether they smoke or they don't smoke.
24   Whether they're 150 pounds or 550 pounds.  Whether there's no
25   history of heart attacks in their family.  Whether there's

87

1    lots of history of heart attacks.
2    A.   Yes, ma'am.  All of those are established by research
3    to be associated with a greater or lesser likelihood of
4    mortality.
5    Q.   Right.  And as a result of that, you need to know
6    those things with regard to the person wanting the insurance
7    before they can really know whether it's a good risk or not.
8    A.   Yes, ma'am.  Based on the correlates that have a
9    scientific relationship with the outcome.  You don't need to
10   know information that has not been demonstrated to have a
11   scientific relationship.
12   Q.   And in the insurance industry, if they take a risk,
13   and the risk doesn't pay off -- they insure a 40-year-old
14   woman who appears to be healthy, and she drops dead a month
15   later -- the outcome is they're going to end up paying for it,
16   right?
17   A.   Yes, ma'am.
18   Q.   They're going to pay on the policy?
19   A.   The outcome is the insurance company is going to make
20   a profit, because they've identified what the likelihood of
21   that is.  Not that it's not going to occur, but what the
22   likelihood of its occurrence is, and they then set premiums
23   accordingly.  So it isn't that they made a mistake or an
24   error.  They're anticipating if the likelihood -- one of these
25   people out of 10,000 is going to die next year.  When that one

88

1  person dies, that doesn't upset their actuarial formula or the
2  profitability of that company.  That's what they're
3  projecting.
4      Q.   They don't -- if they insure, say, a 40-year-old
5  who's in great health, perfect health, no family history,
6  lean, doesn't smoke, doesn't drink, and they drop dead of a
7  heart attack a day or two later, that's outside of what they
8  expected, and they end up paying.  You would agree with that,
9  right?
10     A.   No, ma'am.  No, ma'am.  There is a mortality table
11 that would fit with everybody.  That's why, when you have
12 those characteristics, they don't say, "Gee, we'll sell you a
13 million dollars worth of insurance for only a dollar," because
14 you have virtually no likelihood of dropping dead next year.
15 They have a casualty rate for people like you described.  Now,
16 your premium is lower.  It's not that you don't have a
17 premium.  It's not a premium of a dollar.  Your premium is
18 lower, based on your likelihood, given those characteristics.
19     Q.   Now, with regard to risk assessment, if the insurance
20 is wrong, they pay.  But if a jury or a court or whoever is
21 wrong regarding the risk assessment, then by definition, that
22 means somebody is going to get hurt.  Would you agree with
23 that?
24     A.   Yes, ma'am.  Either a -- either many defendants will
25 be executed, they will die because, in fact, they never were

89

1  going to hurt somebody, or somebody out here in the prison
2  system will be hurt.  And that's why I identified what's the
3  likelihood that somebody out here in the prison system is
4  going to be seriously hurt?  So what we've identified is, in
5  some instances, if you killed all of the capital defendants,
6  it wouldn't prevent a single person from going to the hospital
7  with a serious injury, because that wasn't happening anyway,
8  or at least the incidence of it was so low it might be 300,
9  400 inmates would be killed before you got to preventing a
10 single serious assault.
11     Q.   Let's talk about your methodology.  Basically, in the
12 methodology that you use to give the jury all these risk
13 assessments that you've given them, you ask what is the
14 probability, what is the form of violence, what is the time
15 period, and what is the context?  With regard to the
16 statistics that you come up with, you kind of set the
17 parameters of what you're looking at.  I mean, by necessity,
18 if you're doing research, you set the parameters of what
19 you're going to look at.  That's just research, right?
20     A.   Again, you've asked a compound question.  It isn't
21 that I come up with the statistics.  The statistics in those
22 models, those formulas are already in existent.
23     Q.   Well, you --
24     A.   The data --
25     Q.   -- set the parameters of what you're looking for

90

1  though, right?
2      A.   Yes, ma'am.  That's why you'll see we set parameters
3  that look at any misconduct, potential violence, assaults,
4  assaults with injuries, assaults with serious injuries.  So we
5  try to frame that in a way where it's not cherry-picking just
6  one severity of violence.  We're describing what the spectrum
7  is and what the rates are at those different levels.
8      Q.   Now, let me ask you this.  You've talked about
9  probability.  What does probability mean to you in the context
10 of the research that you do?
11     A.   Well, from a -- we're describing -- as I look at
12 probability in the research that we do, we're describing
13 likelihood.  That's somewhat different than probability, as in
14 terms of, for example, more likely than not.  So I think it's
15 important, then, to differentiate -- one definition of
16 probability is any potential whatsoever, one in a million, one
17 in ten million, one in fifty million, that's a probability,
18 except if that's what probability means as a legal definition
19 then the answer is always yes, there's always a probability,
20 and there's no purpose for this issue in a capital sentencing
21 scheme.
22     Q.   Well, let me ask you this.
23     A.   So probability has to mean something more than a mere
24 possibility or else it's useless as a sentencing issue,
25 because the answer's always yes.  It doesn't help us decide

91

1  who gets the death penalty.
2      Q.   Well, and, in fact, the term probability, with regard
3  to the first special issue -- is there a probability the
4  defendant will commit criminal acts of violence that would
5  constitute a continuing threat to society -- the word
6  probability is not defined.
7      A.   Yes, ma'am.  The Fifth Circuit has declined to
8  provide that in Texas cases.  There are federal courts, which
9  you've referenced one earlier, that have defined probability
10 as more likely than not.
11     Q.   Hang on.  We're not in federal court.  In Texas --
12     A.   Yes, ma'am.  You were talking about Michael Hall, and
13 that was a federal judge and his opinions, so I was describing
14 to you how federal courts have identified this --
15     Q.   Dr. Cunningham --
16     A.   -- notion of the same issue.
17         MRS. TANNER:  I object to the nonresponsiveness.
18         THE COURT:  I'll sustain the objection.
19     Q.   (BY MRS. TANNER) We are not in federal court.
20     A.   Yes, ma'am, we're not.
21     Q.   We are in State court.
22     A.   Yes, ma'am.
23     Q.   We are governed by Texas law.
24     A.   Yes, ma'am, and federal law, constitutional law.
25     Q.   Well, this jury is governed by what the law in the

92

1  State of Texas is with regard to the issues before them,
2  right?
3      A.   Yes, ma'am.  And the United States Constitution.
4      Q.   Yes, of course.  And with regard to Texas law, there
5  is no definition of probability.
6      A.   The Fifth Circuit has declined to define it.  They've
7  said it has -- it's -- the definition is obvious.
8      Q.   There is no definition of probability.
9      A.   One's not specified.  The jury is expected to have a
10  definition of probability.  They essentially said it's
11  obvious.  They have not separately provided a definition in
12  Texas.
13     Q.   And it is up to the jury to make the determination of
14  where they decide a probability may lie.  Would you agree with
15  that?
16     A.   It is their determination.
17     Q.   Okay.  Now, one of the other things is that you, in
18  your data, you ask or you look at different forms of violence.
19     A.   Yes, ma'am.
20     Q.   Now, you've told the jury, with regard to most of
21  these slides, that when you're looking at it, you are
22  predominantly looking at assaults resulting in serious injury.
23     A.   No, ma'am.
24     Q.   That is the stat that you've looked at most with
25  regard to the slides.

93

1      A.   No, ma'am.  Most of the slides, as you will recall,
2  describe everything from any violent -- any disciplinary
3  misconduct at all through a serious assault, many of them
4  through assaults that even sent somebody to the hospital or
5  whether it resulted in a homicide.  There is some emphasis in
6  this sort of proceeding -- two factors.  The prison systems
7  are most concerned with the most serious violence, and in this
8  sort of proceeding --
9           MRS. TANNER:  Judge, I'm going to object to the
10  nonresponsiveness.  This is not an answer to my question.
11          THE COURT:  Sustained.
12     A.   I'm sorry, could you repeat the question?
13     Q.   (BY MRS. TANNER) Yes.  All right.  Many of your
14  slides make reference to assaults resulting in serious injury.
15  You have two other categories that you break things down to as
16  well, correct?
17     A.   No, ma'am.  Most of them have five categories.  Any
18  violation, potentially violent misconduct, assaults, assaults
19  with injuries, assaults with serious injuries.  Most of these
20  studies identify five different levels of misconduct.
21     Q.   Okay.  Now, Special Issue Number One, the future
22  dangerousness issue that you talked about at length, does not
23  require necessarily, by its words, that the State prove that a
24  capital murder defendant would kill again, does it?
25     A.   You've asked a compound question.  It's not a future

94

1  dangerousness issue.  It's Special Issue Number One, whether
2  there is a probability the defendant would commit criminal
3  acts of violence that would constitute a continuing threat to
4  society.  Nowhere in that language does it say future
5  dangerousness.
6      Q.   Okay.  We'll take out the word future dangerousness.
7  With regard to the question, whether there is a probability
8  that the defendant will commit criminal acts of violence that
9  would constitute a continuing threat to society, nowhere in
10  the words of that statute does it ask whether the defendant
11  will necessarily kill again?
12     A.   No, ma'am.  It only says that would constitute a
13  continuing threat to society, a severity that would constitute
14  a continuing threat.
15     Q.   Now, with regard to some of the lesser categories
16  that you talked about, you have broken things down into
17  potentially violent acts, correct?
18     A.   Yes, ma'am.
19     Q.   And a potentially violent act, according to you, is
20  if a person possesses some sort of a weapon.
21     A.   That's one of the categories -- it's one of the
22  misconducts within that category.
23     Q.   Okay.  And that can be a shank, a knife, a spear, all
24  kinds of different things.  All of those things, if a person's
25  found to possess a weapon they can harm somebody with, that's

95

1  just a potentially violent act, right?
2      A.   Yes, ma'am, that's correct.  It's unknown, in many
3  instances, whether that's being held for predatory or
4  defensive purposes.  It certainly has the potential of
5  violence in the future, and so that's why we record it as a
6  potentially violent act.
7      Q.   And you include as a potentially violent act an
8  escape.
9      A.   Or escape-related misconduct.  I don't know that
10  we've had any escapes from a secure perimeter facility in any
11  of our data, so that -- what we're describing there is
12  escape-related misconduct.
13     Q.   You don't include escapes, actual escapes where
14  people get away?
15     A.   Yes, ma'am, we would use an actual escape.  I don't
16  recall in this data pool that there have been escapes from
17  secure perimeter facilities that have occurred.  There are
18  escapes at lower levels of security.  There are walkaways of
19  people on work release.  For somebody to escape from a
20  high-security facility is an extremely rare event nationwide.
21     Q.   You're, of course, aware of the Texas seven?
22     A.   Yes, ma'am.
23     Q.   And the Texas seven, seven people got out of the
24  Connally Unit down in Beeville, right?
25     A.   Yes, ma'am.

96

1    Q.    And the Connally Unit is a maximum security unit,
2    right?
3    A.    Yes, ma'am.  I don't know that it's maximum.  I know
4    it's a higher-security unit.
5    Q.    It's a high-security unit, which is the kind of unit
6    you were just referring to, correct?
7    A.    Generally.  I don't recall the specific
8    classification of the Connally Unit, but yes, ma'am, I would
9    expect it to be a higher-security unit.
10    Q.    And seven inmates got out of Connally Unit, and they
11    were gone for several weeks before they were apprehended?
12    A.    Yes, ma'am.
13    Q.    And managed to make it to Colorado, right?
14    A.    Yes, ma'am.
15    Q.    And they murdered a police officer in the process and
16    injured several guards rather severely in the process of
17    getting out of prison, right?
18    A.    Yes, ma'am.
19    Q.    And the vast majority -- actually, all of those Texas
20    sevens were all people serving life sentences.
21    A.    That may be the case.  I don't recall their specific
22    in all cases.
23    Q.    Actually, at least one or two, I think, were even
24    capital murderers serving life sentences.
25    A.    Again, I don't recall the specifics.

97

1    Q.    And so that whole thing would fall within
2    escape-related conduct?
3    A.    No, ma'am.  Escape-related would represent escapes or
4    escape-related activities.  What I'm describing is that I
5    don't know for certain that any of our data includes -- that
6    any of them actually rose to a level of actual escape from a
7    high-security perimeter facility.  It's happened.  It's
8    happened here in Texas.  The incidence of that in the last ten
9    years with 150,000 inmates in prison is still extraordinarily
10    low.  It's tragic, but that incidence is extraordinarily
11    infrequent, and there's no indication that Blaine Milam has
12    any sort of special escape-related capability, as compared to
13    the other guys in prison.
14    Q.    Now, attempted escapes fall just into the category of
15    potentially violent acts?
16    A.    Yes, ma'am.
17    Q.    Okay.  So the group of capital murderers in January
18    of this year that made it over one fence and almost made it
19    over the other fence before they were apprehended, that just
20    falls into a potentially violent act.
21    A.    I'm not familiar with that incident.
22    Q.    Okay.  It happened in January of '05 -- or January of
23    this year.
24    A.    No, ma'am, I'm not familiar.
25    Q.    Okay.  And rioting, causing a riot, that is just an

98

1    act of potential violence.
2    A.    Yes, ma'am, unless that individual is identified as
3    somebody who then went on to engage in an assault as well.  In
4    other words, there may be a group disturbance, and it's
5    uncertain exactly who did what, and so we're going to tag them
6    with potentially violent misconduct.
7    Q.    Okay.
8    A.    We can't identify them as assaulting, because maybe
9    they're out there, and they never touched anybody.  And so
10    depending on what the disciplinary report is and how it reads,
11    we will then count that in different ways.
12    Q.    Now, threatening to inflict harm on another offender
13    is a potentially violent act?
14    A.    Yes, sir -- yes, ma'am.
15    Q.    Threatening to inflict harm upon a guard or other
16    staff member is a potentially violent act?
17    A.    Yes, ma'am.  No physical conduct has occurred with
18    the threat.  It has the potential of that, so we count that,
19    but it is not a contact assault.
20    Q.    Extortion, and things like that that go on in the
21    prison system, are potentially violent acts.
22    A.    Yes, ma'am.
23    Q.    And fighting.  Is that an assaultive act or a
24    potentially violent act?
25    A.    Typically, we have coded that as -- it may vary by

99

1    study.  In some studies, we may treat mutual fistfights as
2    potentially violent, and others we'll log those as assaults.
3    I would have to look at the particular study to identify how
4    it's counted in that study.
5    Q.    Now, what about chunking somebody, taking urine or
6    feces and throwing it all over a guard?  Is that a potentially
7    violent act, a violent act?
8    A.    It's typically counted as an assault in the -- that
9    would be treated as an assault against staff.  If it splashed
10    into their eyes or face, it may be characterized as a serious
11    assault.  We're simply going to follow the way it's coded by
12    the Correctional Department in those instances.  So if it's
13    coded as simply an assault on staff member, that's how we'll
14    count it.  If the prison system counts it as a serious
15    assault, and that's how they log it, then if we analyze it,
16    that's how we'll treat it.
17    Q.    Now, serious assaults are something that you define
18    as requiring more than first aid.
19    A.    No, ma'am.  It's in the -- Texas breaks out its
20    disciplinary data by all assaults and by serious assaults.
21    Their definition is an assault that requires more than first
22    aid treatment, and that's pretty common across prison systems,
23    and so we will adopt that characterization.  Now, we've
24    identified that really you would like to know more information
25    than that, so where possible, we try to identify exactly what

100

1  severity of injury actually occurred beyond first aid.
2      Q.   And essentially, unless you had to go to the
3  hospital, you don't fall into that category?
4      A.   Well, no, ma'am.
5      Q.   Okay.
6      A.   I mean, that means a cut that required stitches, a
7  broken bone, or concussion.  So you may go to the infirmary,
8  get stitched up.  That's a serious assault.  Maybe you were
9  briefly knocked unconscious; that's a concussion.  You don't
10 end up -- maybe even with a broken arm, you may be treated --
11 or a broken finger, that may be handled in the prison medical
12 area without evacuating you.  That's going to be treated as a
13 serious assault.  That's why I've said there is a desire to
14 know what happens, in addition to that.  How severe was the
15 injury?  So we, if at all possible, try to get data on the
16 severity of the injury that occurred to help differentiate how
17 bad are the assaults that we're talking about, even among the
18 serious assaults.
19     Q.   Okay, let me ask you this.  All of the things that
20 you have characterized as either potentially violent acts,
21 violent acts, or serious violent acts, they're all criminal
22 offenses, right?
23     A.   They are all disciplinary infractions.  I'm not
24 familiar with people being charged in free world courts for
25 threatening another inmate, typically.

101

1      Q.   In the free world, if I take a pen, and I say,
2  "Mr. Jimerson, I'm going to kill you with my pen right now,"
3  that is a criminal act that can be prosecuted.
4      A.   I assume so.  You're the District Attorney.  I would
5  trust your judgment on that.
6      Q.   Okay.  And if I -- and I would be a fool to do
7  this -- but if I walked over to Mr. Jimerson, because I'm sick
8  of working with him, and I just slug him as hard as I can in
9  the face, that can be prosecuted in the criminal courts of
10 this state as an assault.
11     A.   Yes, ma'am.
12     Q.   Okay.  And I can go to jail for it.
13     A.   Yes, ma'am.
14     Q.   And by the same token, it doesn't -- its
15 characterization as an assault doesn't change just because
16 there are bars in front of the windows, right?
17     A.   Well, the assault levels are different.  If you were
18 in a mutual fistfight with another woman out here in the hall,
19 I assume --
20     Q.   I wouldn't do that.
21     A.   I assume that apart from maybe some charge for
22 disrupting the peace or something, that potentially neither
23 one of you would be criminally charged, because it's a mutual
24 fistfight.  And they would say, "Gee, you're both in this, and
25 one's defending themselves against the other after this

102

1  argument escalates."  In prison, though, there would be a
2  sanction for that fistfight, even if you were just defending
3  yourself.  So potentially, the sanction in prison is more
4  severe than it would be -- if you didn't pick up the pen, if
5  you just said, "I'm sick of working with you; I'm so tired of
6  you, Mr. Jimerson I could just kill you," I don't think your
7  office is going to take a charge to prosecute you for saying
8  that in that heat of anger, because you didn't pick up a pen;
9  you didn't make any menacing gesture.  In prison, if an inmate
10 is reported to have said that to another inmate, and certainly
11 if he's reported to have said it to an officer, he can be
12 written up and sanctioned and disciplined for that, something
13 you would never touch as a civilian D.A.
14     Q.   If I threaten to kill somebody, I can be prosecuted,
15 right?
16     A.   Yes, ma'am, but you see the continuum that we're on.
17 Likely in the heat of anger saying, "I am so sick to death of
18 you, I could just kill you."  Now, you say that to a staff
19 member, you're in some serious trouble in prison.  You say
20 that out here, I don't think anything further is going to
21 happen, except you might lose your job.
22     Q.   Let me ask you this.  We have all these experts that
23 have testified on behalf of the defense.  You're familiar with
24 Larry Fitzgerald, right?
25     A.   You've asked me a compound question.  I don't know

103

1  all the experts that have been called by the defense or
2  whether they view themselves as testifying on anybody's
3  behalf.  I don't know that I know Larry Fitzgerald.
4      Q.   You don't know Larry Fitzgerald?
5      A.   It doesn't immediately ring a bell.
6      Q.   He testifies for capital murder defendants regarding
7  the probability of violence inside the Texas prison system.
8  He used to be a spokesman for the Texas prison system.
9      A.   I don't think I've met him.
10     Q.   Are you aware that when Mr. Fitzgerald came in and
11 talked to the jury, he told the jury that an assault on a
12 fellow offender is a criminal act of violence?
13     A.   I don't know what he testified to.
14     Q.   Are you aware that he told the jury that an assault
15 on a guard is a criminal act of violence?
16     A.   Again, I'm not familiar with his testimony.
17     Q.   Are you aware that he told the jury that possession
18 of a weapon or threatening somebody with a weapon in the
19 prison system is a criminal act of violence?
20     A.   I have no knowledge of his testimony.  I'm glad to
21 continue responding, but I simply know nothing about the
22 content of his testimony.
23     Q.   Okay.  Now, let me visit with you for a minute about
24 some of these slides.
25     A.   Is there a page number?

104

1    Q.   I'm getting to it.  Go to your slide number 22, if
2    you would, please.
3    A.   This one or this one?
4    Q.   Capital life inmates in TDCJ.
5    A.   Yes, ma'am.
6    Q.   Okay.  That particular slide is one that you shared
7    with the jury the results of your study.
8    A.   I don't recall whether this is from our study or
9    whether this is data that was provided by the Executive
10   Services Department.  I think it's the latter.  I don't think
11   this comes -- yeah, this is Executive Services 2008.  It's not
12   my study.  It's their data.
13   Q.   And with regard to that particular data, all that is
14   included on that are serious assaults requiring more than
15   first aid, having to go to the infirmary, correct?
16   A.   Yes, ma'am, that's correct.
17   Q.   That slide, you didn't make any representation at all
18   about the percentages of inmates that you would expect to see
19   who would be doing all these other things that we've talked about:
20   Attempting to escape, having weapons, assaulting other
21   inmates, assaulting guards, shoving guards, all that kind of
22   stuff.  That's not included on there?
23   A.   That's correct.
24   Q.   What are the numbers for those?
25   A.   I don't know if I know.  I would have to go back to

105

1    the data to see if it's even reported.
2    Q.   And with regard to the slide immediately prior to
3    that, incarcerated Texas murderers.  Once again, the only one
4    that is included there is serious violence, making somebody go
5    to the infirmary.  All these other things that we've talked
6    about are not included in that.
7    A.   No, ma'am, that's not correct.  This study is looking
8    at more serious misconduct.  It includes, as I recall,
9    robbery, sex by force, I think any assault on a staff member.
10   It is more serious assaults on inmates.  I'd have to go back
11   to the original study, but this study is talking about more
12   than just assaults that resulted in first aid treatment, and
13   certainly it's not just talking about assaults that sent
14   somebody to the hospital.
15   Q.   Well, up there, it says serious violent offenses in
16   prison reviewed.  And what you've represented to the jury,
17   which is what's up there, is that's all the data is for.  The
18   16.4 percent is with relation to serious offenses, i.e., based
19   on your definition, that which causes somebody to have to go
20   to the infirmary, correct?
21   A.   No, ma'am.  No, ma'am.  This is how the study
22   characterizes it, the study that I didn't write.  This is
23   Sorenson and Pilgrim.  Sorenson, Jon Sorenson is a
24   co-researcher with me, but I was not involved in collecting
25   this data.  That's how they characterize it as serious

106

1    violence.  They then provide a definition of what that
2    includes, as any good study does.  It says here's our
3    definition, operational definition of serious violence, and it
4    includes a half a dozen or so different categories that they
5    then study.  It isn't simply assaults that sent somebody to
6    the infirmary.
7    Q.   Okay.  Go back one more.
8    A.   Yes, ma'am.
9    Q.   Yeah, that one.  This is your Florida study.
10   A.   Yes, ma'am, that's correct.
11   Q.   Okay.  And your Florida study, that involves things
12   that are going on in the Florida prison system, not the Texas
13   prison system, correct?
14   A.   That's correct.
15   Q.   Okay.  And does Florida have the same type
16   classification system as Texas, with regard to G3's versus
17   G5's and what capital offenders can do and where they can be
18   housed?
19   A.   They don't have a G3, G5.  They have their own
20   classification system.  There is correspondence in terms of
21   capital offenders being assigned to what in Florida is called
22   close custody, which is a higher security level.  And that's
23   why we went back into the data on this study and looked at all
24   inmates that went to closed custody.  But it is Florida, not
25   Texas.  There is broad similarity from state to state --

107

1    Q.   Well, let me ask you this --
2    A.   -- in prison conditions and data.
3         MRS. TANNER:  Object to nonresponsiveness.
4    Q.   Let me ask you this.  Go to slide 26.  Once again,
5    slide 26, you've represented to the jury only your percentages
6    regarding serious -- assaults with serious injury during the
7    period of this study.
8    A.   Yes, ma'am.  That's what's on the slide.
9    Q.   Okay.  Did not include any of the other things:
10   Having weapons, throwing feces, hitting people, hurting people
11   where they need first aid, any of that kind of stuff, right?
12   A.   No, ma'am.  I recall the study that we published goes
13   into more detail than this does.  I was trying not to
14   overwhelm the jury with data.
15   Q.   Really?
16   A.   Yes, ma'am.  You can see where we could have gone, if
17   I had included everything about every study.  The other aspect
18   is -- addresses a proportionality issue that I referenced
19   earlier, and that's whether or not you would use an
20   intervention of death in order to prevent a threat against a
21   staff member.  Would you use an intervention of death in order
22   to stop a mutual fistfight?  And so there is some presentation
23   of the more serious offenses in prison, so that that is most
24   informative of what might otherwise be regarded as a
25   proportional intervention.

1    Q.    Well, let me ask you something.  You just used a
2  phrase, an intervention of death --
3    A.    Yes, ma'am.
4    Q.    -- to stop a fistfight.
5    A.    Yes, ma'am.
6    Q.    Essentially, what you're here to tell this jury in
7  that regard is --, or the way you're characterizing this is you
8  shouldn't give the death penalty to stop a fistfight.  That's
9  essentially what you said to them both earlier, as well as
10 today.
11   A.    The jury is free to assign the death penalty to
12 prevent somebody from not making their bed, I suppose, if they
13 want to treat that as somehow disrupting the order of the
14 prison.  I'm describing -- certainly from my own perspective,
15 I think there is a proportionality, and that when we think
16 about an intervention of death, that we're going to execute
17 somebody in order to prevent some criminal violence in the
18 future, that it does matter what level of violence we're
19 talking about.  Are we going to use intervention of death to
20 stop a mutual fistfight, or are we really thinking if we're
21 going to intervene with death, it ought to be for something
22 more serious than that, and it ought to be for more than just
23 a possibility?
24   Q.    And when you talk about the intervention of death in
25 conjunction with the fistfight, you make no reference

1  whatsoever to the fact that the whole reason you're here for
2  an intervention of death involves the death of a child, or
3  whatever the case may be.  There's just no reference at all to
4  that.
5    A.    Well, no, ma'am.  This is about this issue.  The
6  jury, under the Texas statute, reaches one determination about
7  how the mitigating factors work --
8              MRS. TANNER:  Object to nonresponsiveness, Your
9  Honor.  This is completely nonresponsive.
10             MR. HAGAN:  Your Honor, he is directly
11 attempting to answer her question.  It's directly responsive.
12             MRS. TANNER:  He's gone off into a completely
13 new area.
14             MR. HAGAN:  She doesn't like the answer, but it
15 is responsive.
16             MRS. TANNER:  I want the answer to be kind of on
17 the question that was asked.
18             THE COURT:  All right.  Restate the question.
19   Q.    (BY MRS. TANNER) Well, let me just move on.  Let me
20 move to 28.  When was this study done?
21   A.    2005 is when it was published.  The data would have
22 been collected in the two or three years prior to that.
23   Q.    Okay.  And that is in relation to where?
24   A.    Here in Texas.  These are 155 capital defendants in
25 Texas, where a mental health expert appeared at their capital

1  sentencing trials and said there is a probability -- and this
2  represents the follow-up of what happened to those
3  individuals, how they behaved in prison after they were
4  sentenced to death following that testimony.
5    Q.    Actually, that's the slide I want.
6    A.    This one?
7    Q.    Nope, next one.
8    A.    Yes, ma'am.  This is the outcome of those
9  predictions, based on more than first aid injury.
10   Q.    And once again, the only thing that you're showing on
11 your slides or representing to the jury is that which requires
12 somebody to go to the infirmary, not all the other things that
13 we've talked about.
14   A.    That's correct.  This is closer to a continuing
15 threat to society.
16   Q.    Okay.
17   A.    Which is what we're talking about with this issue.
18   Q.    Now, let me talk with you about --
19             THE COURT:  We'll take our recess here, if
20 you're at a breaking point.
21             MRS. TANNER:  Okay.
22             THE COURT:  All right, ladies and gentlemen,
23 we'll take our noon recess.  We'll reconvene at 1:00.  You're
24 under all the instructions I've heretofore given you.  Do not
25 discuss the case among yourselves, nor with anyone else, nor

1  allow anyone to discuss the case with you, nor access any
2  information about this case in any shape, form or fashion.
3  You may step down.
4              (Recess.)
5              THE COURT:  You may proceed.
6              MRS. TANNER:  Thank you, Your Honor.
7    Q.    (BY MRS. TANNER) Dr. Cunningham, could you go to
8  slide 47, please?
9    A.    Yes, ma'am.
10   Q.    Okay.  This is a slide that involves your most recent
11 research, correct?
12   A.    Yes, ma'am.
13   Q.    And on there, you indicate that inmates matching this
14 defendant were in the higher of three risk classifications,
15 correct?
16   A.    Yes, ma'am, of these capital offenders.
17   Q.    And what were the things that put him into the higher
18 of the three risk classifications?  The offense.  Right?  The
19 capital murder.
20   A.    All of -- this is a study of capital murderers.
21   Q.    Right.
22   A.    And so the only feature of the offense that's -- of a
23 capital murder that's been found to be predictive is if the
24 capital murder is committed in the context of a robbery or
25 burglary, then that's a factor that increases the risk

1  somewhat.  But other circumstances of the capital offense have

2  not generally been found to be -- found to be predictive.

3  This includes his age.  It includes consideration of

4  intellectual ability and education.  It includes, as I recall,

5  whether he's been to prison before.  I believe that in this

6  study, whether a gun only was used in the capital offense.

7       Q.  A gun only on the capital offense, but actually, it

8  puts you down a little lower, because guns are ones of the

9  things that are really, really hard to get in prison, right?

10      A.  Well, a gun is factor.  If a gun only is used in the

11  offense, that was a factor that was associated with a somewhat

12  lower risk of violence in prison.  The rationale for that is

13  not clear.  It isn't because -- it isn't necessarily because

14  that isn't available in prison.  We don't really understand

15  yet what that factor is about.

16      Q.  Okay.

17      A.  I would have to look at the study to identify other

18  factors that came out of this analysis.

19      Q.  And, in fact, you testified -- and, again, we'll

20  refer back to the Hall case.  You testified in the Hall case,

21  in fact, that age, a young age, tends to increase your risk

22  potential.

23      A.  I don't recall my testimony in that case, but age

24  does increase risk.

25      Q.  And do you recall whether or not you also testified

1  that a lower I.Q. increases risk?

2       A.  I don't recall that.

3       Q.  In fact, it is your testimony that it does, though,

4  right?

5       A.  We have this data from just this study.  I don't know

6  that there was data available at the time of Michael Hall's

7  case that associated lower I.Q.  In this particular study, it

8  isn't the lower I.Q. that was associated with increased risk.

9  It was the higher I.Q. was associated with a reduced risk, as

10  compared to other factors.

11      Q.  Okay.  Well, hold on a second.

12      A.  That's my recollection of the findings.

13          MRS. TANNER:  May I approach the witness?

14          THE COURT:  Yes.

15      Q.  Page 150.  And I'll show you the front page, after we

16  get done with this, to verify that that's your testimony in

17  the Hall case.

18      A.  Yes, ma'am, that's what my testimony was at that

19  time, based on my understanding of the data as it existed

20  then.

21      Q.  And that was in 2000, about ten years ago?

22      A.  Yes, ma'am, that was prior to much of the large-scale

23  research that I subsequently described.  It was a much less --

24  a much-reduced number of studies that could be used to inform

25  this.  We've had a lot of progress since then.

1       Q.  And at the time, you did testify that what you

2  characterized as a lower I.Q., a low I.Q. score, increases

3  risk.  You're now saying it doesn't increase risk, but risk

4  isn't decreased because of a low I.Q. score.  Fair?  Is that a

5  fair assessment?

6       A.  Yes, ma'am, based on the data that we have now.

7  Higher I.Q., higher education seems to be associated with less

8  risk.  I don't know that we have data demonstrating the

9  opposite.  That did not turn out on our actuarial analysis.

10  In this case, it wasn't that lower -- in the study, lower I.Q.

11  wasn't associated with greater.  Higher I.Q., higher education

12  was associated with less violence.

13      Q.  So the bottom line is that you came up with three

14  risk classifications for capital murderers?

15      A.  We divided that group into three categories.

16      Q.  Okay.  So there's three groups of capital murderers

17  in three different categories, and the defendant was in the

18  higher of the three risk classifications?

19      A.  That's correct.

20      Q.  Okay.  So if that's one that's the slowest risk, two

21  that's the middle risk, and three that's the highest risk,

22  he's in the category of people that's the highest risk.

23      A.  In the third group, which is the higher-risk group.

24      Q.  Okay.

25      A.  And this is the rate of violence among that group.

1       Q.  And the rate of violence in that group is, according

2  to your studies, 24 percent for serious assaults.

3       A.  Yes, ma'am, requiring more than first-aid treatment.

4  That's the prevalence rate across those 20 years at risk.

5       Q.  So across the prevalence rate of 20 years, capital

6  murderers in the exact same category of this defendant, you

7  would expect to see just under one in four of them, in the

8  course of their time in prison, put somebody in the infirmary.

9       A.  No, ma'am.  This isn't putting them in the infirmary.

10  This is an -- this is an assault resulting in more than first

11  aid.  They are going to get some medical attention.  They're

12  not going to be admitted to the hospital necessarily, but some

13  medical attention.  Then we break it out into what percentage

14  of them engaged in things that would send somebody to the

15  hospital.  We had no major or life threatening injuries even

16  in that higher-risk group.

17      Q.  So one in four -- essentially, one in four, with a

18  little bit of wiggle room, of capital murderers -- and these

19  are people who get life, who evidently a jury or somebody has

20  made a decision that they're not a future danger to society.

21      A.  No, ma'am.  All of these individuals, as I testified,

22  were sentenced to death.  The jury made a positive finding

23  about their risk of committing violence in the future.  They

24  average nine or ten years on death row.  They average then

25  nine or ten years out in the general prison population after

116

1    they come off of death row, and this is the rate of violence
2    among those violence-predicted inmates.
3        Q.   Okay, my mistake.  So one in four of them had some
4    sort of a serious assault?
5        A.   Yes, ma'am.
6        Q.   Okay.  And that statistic does not count all the
7    other kinds of assaults we've talked about, the potentially
8    violent offenses, the threats, the potentials for escape,
9    possession of a weapon, or any of that?
10       A.   That's correct.
11       Q.   Okay.  And just so we're clear, the percentage of
12   those kinds of offenses, assaults, weapons, and things like
13   that that are counted in the prison system, a tremendous
14   number of that goes unreported, does it not?
15       A.   There is unreported violence and unreported
16   infractions.  It's not clear that there is a tremendous amount
17   of that.
18       Q.   Well, in the system, inside the prison system, there
19   is some incentive not to report, is there not?
20       A.   Yes, ma'am.  It works both ways.  There are people
21   that may report to try to created some advantage for
22   themselves within that system, and there is an inmate code
23   that would discourage inmates from reporting, and you have
24   people that are pulled in both directions on that.  Then you
25   have the close supervision, that they're being observed.

117

1        Q.   And none of the factors that you use at all to
2    elevate somebody's risk or anything along those lines, none of
3    those factors include whether or not there is some sort of
4    sexual deviancy as to that particular individual, do they?
5    You don't have a sexual deviancy meter that you up the risk or
6    lower the risk with any of the tables that you've shown us?
7        A.   No, ma'am, that's not the case.  There is research,
8    where we have looked at different types of capital offenses
9    and the sort of offense that was associated with that capital
10   charge.  We have not found a capital offense associated with a
11   sexual assault or the assault of a child to be associated with
12   a greater likelihood of violence in prison.  The only offense
13   factor that we've identified is if that capital offense is
14   committed in the context of a robbery or burglary.
15       Q.   Well, what I'm asking you -- go back to slide 43.
16   There is no upward or downward deviation from the base
17   rate of serious violence regarding whether somebody has some
18   sort of sexual deviancy in their past, correct?
19       A.   Yes, ma'am, because it wasn't predicted.  This study
20   looked at like 30 or 40 different factors, and only the ones
21   that had some predictive relationship ended up becoming part
22   of the scale.  All the others were not predictive.  Other
23   research that we've done has looked at sex offenders in prison
24   and finds that they have lower rates of violence in prison as
25   compared to offenders that are convicted of other offenses.

118

1        Q.   Okay.  Let me ask you this, while we're on this
2    slide.  This is a study from 2000, correct?
3        A.   Yes, ma'am.
4        Q.   And I looked at a number of your other studies and
5    research models.  And on here, you're putting a zero next to
6    age 20.
7        A.   Yes, ma'am.
8        Q.   And, in fact, on a number of your other research
9    things, you actually add a 5.5 increase, because of the fact
10   that the person is under the age of 21, right?
11       A.   On some studies, we've identified that as a factor
12   that increases the risk.  In this study, the individuals who
13   were 20 to 25 did not have a lower risk of violence or a
14   higher risk.  They were essentially a reference group.  The
15   guys that were younger than 25, you added risk points on.  If
16   somebody is 20 to 25, they don't get points added or
17   subtracted.  20 to 30, you subtract some.  30 to 35, you
18   subtract more.  Over 35, you subtract like 14 percent off of
19   this risk, so that guy would have a 2.4 percent risk rate, if
20   he didn't have any of the others, because he's over age 35.
21   So in this study, 20 to 25 is a reference category that
22   doesn't raise or lower it.
23       Q.   So whether something is an indicator or a higher
24   indication of risk depends on the study?
25       A.   Sometimes the results are different by study.  Every

119

1    study that we've done has demonstrated that age is a factor.
2    When you create your scale --
3        Q.   Let me ask you this.  Every study indicates age is a
4    factor, but in this study, you didn't include age as a factor.
5    You put it in, but put a zero next to it.  That necessarily
6    means it's a wash, right?
7        A.   No, ma'am, that's not what it means.  It means that
8    as this scale was constructed, if you were between the ages of
9    20 and 25, it did nothing to increase or decrease your risk
10   relative to this 16.4 percent.  If you were younger than 20,
11   it increased your risk.  If you were older than 25, it began
12   to progressively decrease your risk.  At this level, with this
13   scale, it doesn't act to increase or decrease it.  It's the
14   nature of how the scale is constructed, based on the data from
15   a particular study.
16       Q.   So the results of each study depends on how the scale
17   is constructed and kind of how -- where you set the
18   parameters?
19       A.   No, ma'am.  The results are the same.  The way the
20   model is constructed and what gets more or less points is
21   going to depend on how that data is analyzed and how the scale
22   is constructed.  Each of these scales is taking age into
23   account.  As you would add or subtract points, they are
24   calibrated in different ways to do that.
25       Q.   Okay.  Let's talk, then --

1        MRS. TANNER:  Your Honor, can I have the
2   document camera?
3        THE COURT:  Yes.
4   Q.   This is one of your studies, right?
5   A.   Yes, ma'am, it is.
6   Q.   Oper- --
7   A.   Operationalizing.
8   Q.   Thank you.  I'm tired.  It's got your name on it.
9   It's a study that you actually did, and you did it in 2006 --
10  2007.
11  A.   Yes, ma'am.  It was published in 2007.
12  Q.   Okay.  Here's another one of your charts.  This chart
13  or a derivative of this chart, apparently, has not made it
14  onto the PowerPoint that we've had yet, right?
15  A.   This one is not on a PowerPoint.
16  Q.   Okay.
17  A.   I have about 30 published studies, and we drew the
18  line.
19  Q.   Okay.  And the table is the prevalence of violent
20  rule infractions by predictor variables among the TDCJ sampled
21  murderers.
22  A.   That's correct.
23  Q.   Okay.  So it is a study of murderers in the Texas
24  prison system?
25  A.   That's correct.

1   Q.   And it breaks it down to a number of categories, and
2   the first one is age.  17 to 20 years old, those folks have
3   41.5 percent incidents of potentially violent acts, right?
4   A.   That's correct, during the period of time of the
5   study.  As I recall, it's several years.
6   Q.   And a 14.4 percent of assaultive violations and a 2.8
7   percent of assaults resulting in serious injuries?
8   A.   That's correct.
9   Q.   Okay.  And then even folks who have not had a prior
10  prison commitment who were in prison for a murderous offense,
11  26.6 percent potentially violent acts, 8.4 for assaultives.
12  1.9 for assaults resulting in serious injury.  Right?
13  A.   That's correct.
14  Q.   Capital murder, they are in for capital murder, 29.6
15  percent potentially violent, 16.2 percent assaultive, 4.6 --
16  which is higher than the other ones -- 4.6 percent for serious
17  assaults.
18  A.   That's correct.
19  Q.   And those who are doing life sentences for capital
20  murder, 28.2 for potentially violent acts, 12.4 for assaultive
21  offenses, and 4.4 for serious assaults?
22  A.   That's correct.
23  Q.   So when you're looking at this, again, with regard to
24  the assaultive violations and the potentially violent acts,
25  those are the things that are typically somewhat

1   underreported, right?
2   A.   The more minor the infraction is, the greater the
3   likelihood is it would go unreported.  So as we're talking
4   about the problem of unreported misconduct or violence in
5   prison, that's most likely to involve lesser forms of
6   violence.
7   Q.   Because, I mean, if there is -- I mean, it's common
8   sense, that, you know, if somebody's stabbed and bleeding all
9   over the place, it's a little hard to hide that, compared to
10  if somebody gets beat up.
11  A.   That's correct.
12  Q.   Okay.  And this is another one of your studies with a
13  whole other set of numbers.
14  A.   No, sir -- no, ma'am.  The numbers are specific to
15  that study, but they reveal the same trend the other studies
16  have, that as the severity of violence increases, its
17  likelihood dramatically decreases.  That there is no category
18  of murderers who are more than about 4 percent likely to
19  commit serious assaults in prison.  And so it does happen.
20  The capital offenders in this study are somewhat more likely
21  to be involved in assaultive misconduct than other forms of
22  murderers.  This does not provide a comparison with the
23  population at large -- that's what we did in the Florida
24  study -- but it does say that those offenders are more often
25  involved in assaultive misconduct than lesser murderers.

1   Q.   Now, let me ask you this.  When you were talking
2   about this defendant and the things that you saw in him that
3   made you believe that there was an increased risk of violence
4   for him --
5   A.   Was a single factor.
6   Q.   Which was the age.
7   A.   Yes, ma'am.
8   Q.   You did not take into account anything regarding the
9   incident with Kenneth McDade, correct?
10  A.   I was aware of the incident with Kenneth McDade.
11  Q.   You were aware of it, but it didn't bear into your
12  numbers.
13  A.   Well, it did and it didn't.  Violence in the
14  community is not predictive -- are you talking about the other
15  inmate that he was in prison --
16  Q.   The other inmate, yes.
17  A.   I was aware of that incident.  It did not represent
18  an assault.  I think I described it in my earlier testimony,
19  acknowledged what happened, and the problems with what to do
20  with that in terms of how to account for and interpret that
21  incident.
22  Q.   And this is my characterization.  You kind of
23  pooh-poohed that off and said, "Well, you know, those are the
24  kind of things that people come forward and trade for
25  information.  Information is golden."  You know, that kind of

124

1  thing.  That was the gist of your testimony on direct
2  regarding that.
3      A.  No, ma'am, I didn't pooh-pooh it off.  I did describe
4  that as you try to interpret an incident like that, it's
5  important to be aware of the context in which these sort of
6  allegations may be made, to pay attention to what action the
7  correctional professionals took in response to that, and
8  whether he was -- got a write-up, or that kind of thing, and
9  also to acknowledge that this is a threat and not a direct
10  assault.
11      Q.  And let me ask you this.  Were you aware or -- and
12  you weren't here for the testimony.  Did you hear the
13  testimony -- I don't think you were here to hear the testimony
14  of Cassandra Shaw earlier this week, did you?
15      A.  I did not.
16      Q.  And if, in fact, Cassandra Shaw shared with this jury
17  that the way that that came out was that a jailer overheard a
18  conversation between inmates and got ahold of the detectives,
19  and the detectives pulled him out and asked him about it, that
20  wasn't a situation where he was coming forward to try to trade
21  information or anything like that.  You would agree with that,
22  right?
23      A.  It reduces the likelihood of it.  Whether somebody is
24  saying something so they can be overheard or whether, in fact,
25  they are simply being overheard is not always clear, but it

125

1  reduces the likelihood that he was volunteering it.
2      Q.  Now, let me ask you this.  You've given the jury tons
3  and tons of numbers, and I understand that.  Let me just ask
4  you a question.  Let's say that someone -- not you, not me,
5  but someone has a son or a father or a husband or a boyfriend
6  or an uncle or a cousin or whoever, who gets in a whole lot of
7  trouble because he's stolen a whole bunch of money from his
8  employer.  And he gets a first degree felony offense, and he
9  gets sentenced to 50 years or more in prison for it.
10      A.  Yes, ma'am.
11      Q.  He's in one of those counties, and they just hammered
12  him for the money he's stolen.
13      A.  Yes, ma'am.
14      Q.  And he gets to prison, and he goes in as a G3.  And
15  he goes through diagnostic, and he calls his folks or his wife
16  or whoever, and he says, "Well, honey, I got a new cellie
17  today, and we're in a double cell.  We got bunks.  And my
18  cellie is -- well, he's a sex offender.  And my cellie, he
19  really liked to beat people up on the outside.  And my cellie
20  has killed, not with a gun or anything like that, but actually
21  with his hands, and my cellie kind of likes to bite people,
22  and he's kind of a dirty fighter.  And I know that he actually
23  threatened a fellow cellie once before with a pencil.  And I
24  understand he's a meth user."  Do you think that the --
25  whoever's on the other end of the phone is going to say, "Oh,

126

1  thank God you're not with one of those felony DWI people.  I
2  am so glad that's who your cellmate is."  I mean, do you think
3  that makes sense?
4      A.  Yes, ma'am.  I guess it depends, with the person on
5  the other end of the phone, how much they know about this
6  data, how much they know about factors that are predictive,
7  how much they know about whether meth was central to the
8  involvement that that individual had in their prior violence.
9  If it also included, you know, growing up, this person was
10  regarded as entirely passive.  Probably he's mentally
11  deficient.  The aggressiveness conduct that he's had in the
12  community was all meth-related.  There's no indication that he
13  ever liked to bite anybody, except associated with an offense
14  when he was almost certainly psychotic in response to
15  methamphetamine.  I would think if you had that information,
16  and this person is now in prison, and his meth use can be
17  controlled, that, in fact, upon hearing that, if you were
18  aware of this kind of data, in that context you would say
19  thank goodness that he is not with somebody who has a history
20  of serious assaults in prison, who is a known predator of
21  other inmates.
22      Q.  And that falls into kind of the category you talked
23  about already for this jury of don't go with your intuition,
24  go with the statistics.
25      A.  Well, go with the science, yes, ma'am.  When you look

127

1  out the window, don't go with your inclination about whether
2  the world is flat.  Trust the science that tells you what
3  shape the world is.
4      Q.  Now, let me ask you this.  Tell me again what the
5  statistics are for murderers in the Texas prison system by
6  year.  You told us earlier it was -- you know, that they may
7  be one -- what was the numbers?  One per year or something
8  like that?
9      A.  In the last year, in 2009 -- if we can come back up
10  on the screen, I'll simply pull up the slide.
11      Q.  Sure.
12      A.  Last year in 2009, there was a single
13  inmate-on-inmate homicide among 160,000 inmates in TDCJ.  That
14  represents a rate of .6 -- 0.6 per 100,000 inmates per year.
15  We talk about homicide in rates of per 100,000, because the
16  rate is so low that that's the only way to kind of make it
17  meaningful and understandable.  That was very unusual to have
18  only a single homicide in the Texas prison in a given year.
19  That's why I provided a three-year average to say that was
20  unusually low.  If we look at the average over the last three
21  years, then the rate is about 2 per 100,000 inmates per year,
22  which is going to represent roughly about 3 inmate -- 3 to 4
23  inmate-on-inmate homicides a year.
24      Q.  Well, we got out of here about 8:30 last night, and
25  we're back here at 9:00 this morning.  Are you aware that last

128

1  night in the Ferguson Unit, an inmate was murdered by another

2  inmate between the time we left here and the time we came

3  back?

4      A.  I'm not aware of that, but obviously in a given year,

5  if there are 3 homicides, then there will be 3 days or nights

6  in that year when that happens.  Last year, that happened on 1

7  of the 365 nights and did not happen on any other night of the

8  year.

9      Q.  And that was actually in the Ferguson Unit, which is

10  the unit that houses capital offenders.  It's about 45 minutes

11  from here.  You were not aware that occurred last night?

12     A.  No, ma'am.

13     Q.  Did you know that last week in the Stiles Unit down

14  in Beaumont, another inmate was murdered by another inmate?

15     A.  I don't have the specific information of what

16  inmates -- I get the monthly reports of how often it's

17  happening in the system.  I don't know what units it happens

18  in, on what dates.

19     Q.  So the month of May of 2010, as we're talking about

20  all these numbers, we've had essentially 100 percent increase

21  since we left here last night.

22     A.  Well, no, ma'am, that's not a fair way of looking at

23  the statistical data.  There will certainly be incidents that

24  occur.  It may be over the course of a year that two of them

25  happen in the same month, and then there aren't any for the

129

1  next six, eight, nine months.  And so it's inappropriate to

2  consider that we got this huge surge when, in fact, these are

3  isolated events across a period of time.  That's why you look

4  at it on an annual basis, so you get a truer sense of how

5  often is this happening.

6      Q.  All right.  Now, I want to turn your attention to

7  your discussion with Counsel from yesterday evening or

8  yesterday afternoon with regard to the other issues that

9  you've testified to.

10     A.  I'm sorry?

11     Q.  With regard to the other issues that you've testified

12  to, both the issue of mental retardation and the issue of

13  mitigation.

14     A.  Yes, ma'am.

15     Q.  And specifically, I want to visit with you about the

16  I.Q. testing that was performed in this case by both Dr.

17  Proctor and Dr. Andrews.

18     A.  Yes, ma'am.

19     Q.  Now, you talked a fair amount yesterday about the

20  various tests that were done.  And the fact of the matter is,

21  is that any I.Q. testing that is conducted on anybody can be

22  dramatically affected by a number of different variables,

23  correct?

24     A.  It can be affected by a variety of variables.

25  Whether it's dramatically affected depends on what variable

130

1  are you talking about.

2      Q.  Okay.

3      A.  Many of them have only a very minor effect, if any.

4      Q.  First of all, all of the I.Q. tests that are done,

5  they're normed against the entire population, right?

6      A.  What's considered to be representative of the

7  population.  They aren't normed on 300 million people in

8  America.  You'll take two, three, four thousand people that

9  are selected from various states and economic levels and

10  ethnicities, and you'll use -- you'll try to make it

11  representative of the census.

12     Q.  Okay.  And, in fact -- I don't believe you testified

13  to this yesterday, but, in fact, a lack of education can

14  effect the I.Q. results in that it can artificially lower

15  them, correct?

16     A.  Yes and no.  Someone who is mentally deficient, for

17  example, is likely not to go very far in school.  Maybe

18  they'll even be put in a state school when they're a kid.

19  Their mental deficiency predated their lack of education.

20  Now, it is true that if you have intact intellectual ability,

21  but you've never been to school, you've never read a book,

22  then your score is going to be lower on some of those

23  subtests, because they're dependent on information that you

24  would get from books and education, and that kind of thing.

25  So -- but it would be inappropriate to say that education is

131

1  going to reduce I.Q. scores.  Ideally, what we're measuring,

2  is what exists before the person starts to school or exists

3  underneath their education.

4      Q.  Now, so you've said that a lack of education can

5  decrease some of the subtests.  Well, you ultimately average

6  everything out, so if it decreased some of the subtests, it's

7  going to necessarily as well decrease the ultimate final

8  result --

9      A.  It has --

10     Q.  -- because the subtests are part of the final, right?

11     A.  It has that potential.

12     Q.  Okay.

13     A.  But what you're actually trying to measure is what we

14  call G, which is the actual intellectual horsepower of this

15  individual.  And that's why you're sampling many different

16  abilities, some of which have no particular relationship to

17  what you learn in school.

18     Q.  Okay.  Now, let me ask you this.  Also, the

19  environment within which one takes a test can affect the

20  results of the test.

21     A.  Yes, ma'am.

22     Q.  Okay.  And, for instance, if the person is taking the

23  test in an environment that is very noisy, with lots of

24  distractions and banging around and stuff like that, that can

25  detrimentally affect the results.  It can cause the results to

132

1  be lower than they would be if they were in a nice, quiet
2  classroom, just the two of you, and a perfect environment,
3  right?
4      A.   Yes and no, again.  If a test is administered by a
5  psychologist in an environment that, in fact, is adverse to
6  it -- the psychologist is giving the test.  There's noise
7  going on.  People are coming and going.  The professional and
8  ethical response is to stop the test and come back another
9  time, request a different setting.  To persist in giving a
10 test under conditions that were noisy and with interruptions,
11 and that kind of thing, would be unprofessional.  The higher
12 the stakes that were involved, the more important those scores
13 are, the more unprofessional it would be to administer a test
14 under conditions that were clearly adverse to reasonable
15 effort.
16     Q.   And if, in fact, a person is not engaged with the
17 examiner, if there's kind of -- you know, standoffish, not
18 comfortable with the examiner, that can have some effect as
19 well.
20     A.   It's unlikely to have a significant effect, unless
21 we're talking about a level of detachment and lack of
22 interaction that is clearly interfering.  And again, as an
23 examiner began a test and was aware that the person he was
24 dealing with was not attending to him and was not making a
25 reasonable effort, the appropriate professional response would

133

1  be stop the test.  It's not as if you have to continue this
2  once you begin the first subtest.  Stop the test and
3  reschedule it for another time.
4      Q.   Okay.
5      A.   Identify what the problem is.  Develop some rapport.
6  This is not a -- this is not an activity to be done by clerks
7  who just plop down in front of somebody, and off they go,
8  regardless of what's going on around them.
9      Q.   Right.  And another thing that can decrease I.Q.
10 testing is depression?
11     A.   If it is severe enough that the person is obviously
12 slowed down in their motor skills, inattentive, that sort of
13 thing.  It's not that you can't give an I.Q. test, though, to
14 somebody who also may have some degree of depression.  Again,
15 if the psychologist identifies that this person is clearly
16 distracted, morose, tearful, slowed down in their motor skills
17 from depression, then you would not administer the test, you
18 would seek treatment for them, and you would come back and
19 test them again.
20     Q.   And it's common for capital murderers, people who are
21 on trial, who are in jail charged with capital murder facing
22 the potential of the death penalty, to be depressed, isn't it?
23     A.   Not necessarily clinically depressed.  They are under
24 some stress, but most capital offenders are not on
25 antidepressant medication.  They are not regarded as

134

1  clinically depressed.
2      Q.   But they're not in a happy state, and they're not in
3  a happy place.
4      A.   Well, it is not a good life situation to be in.  That
5  isn't to say, though, that something this is representing a
6  significant interference with their test-taking abilities.
7      Q.   By the same token, anxiety can affect I.Q. results.
8      A.   If it is sufficient enough to form that sort of
9  interference.  And, again, that's what the psychologist is
10 paying attention to as he's interacting with the defendant.  I
11 did not find Blaine Milam to be particularly anxious as I
12 interacted with him.  He was pretty relaxed.  That gullible,
13 naive, he's not entirely --
14         MRS. TANNER:  Objection to --
15     A.   -- snapping to this.
16         MRS. TANNER:  -- nonresponsiveness.
17         THE COURT:  Sustained.
18     Q.   (BY MRS. TANNER) And ultimately, as well, a lack of
19 effort can affect I.Q. test results, correct?
20     A.   Yes, ma'am.
21     Q.   Now, even if none of those things are present -- you
22 know, you've got a good education, you're in a good
23 environment, the person is not depressed, they're not anxious,
24 and they're doing their very best -- I.Q. testing is still not
25 100 percent accurate, correct?

135

1      A.   That's that standard error of measurement.  I would
2  qualify that it's not required that they have a good education
3  in order to give them an I.Q. test and get valid results, but
4  there is some degree of error --
5          MRS. TANNER:  That is nonresponsiveness, Your
6  Honor.
7          THE COURT:  I sustain the objection.
8          MR. HAGAN:  Your Honor, it was directly in
9  response to the question.  The Doctor was trying to answer the
10 question.
11         THE COURT:  I'll sustain the objection.  Restate
12 the question.
13     Q.   (BY MRS. TANNER) And due to the inherent -- well, due
14 to the fact that it's not 100 percent accurate all the time,
15 that's why we have the five points either way, that you get a
16 number, and we'll say it's somewhere within five points each
17 direction of the test.  That's the built-in margin for error,
18 correct?
19     A.   Yes, ma'am.
20     Q.   Okay.
21     A.   Depending on what degree of certainty you want to
22 have, then that band will be wider or more narrow, but that's
23 what that's about, is what's called the standard error of
24 measurement.
25     Q.   And the standard error of measurement is the five

1  points either direction.

2      A.  Well, actually, the standard error of measurement is

3  about 1.5 or -- it's about -- it's about 2 to 3 points, and

4  because you want to have a 90 or 95 percent certainty, then

5  you go two standard errors of measurement out from the score.

6  So actually when we do that 5 points, it's about 1.9 standard

7  errors of measurement on either side.

8      Q.  Well, the bottom line is, is that for I.Q. testing,

9  when you get a number, you consider 5 points on one side and 5

10  points on the other side as being within a standard margin for

11  error, correct?

12     A.  No, ma'am.  You've simplified it again.  That's --

13     Q.  Well, I'm a simple girl.

14     A.  I'm sorry.  And I didn't mean -- I don't say that

15  perjoratively.  It's -- what you can say, when you do that 5

16  points, is there is about a 90 percent likelihood that this

17  individual's true I.Q. score is between that 5 or 6 points on

18  either side.

19     Q.  And it could even be even higher or, conceivably, I

20  suppose, it could be even lower?

21     A.  Well, that's what I -- that's why I said there's a 90

22  percent likelihood or 95 percent likelihood.  That means there

23  is a 5 percent or 10 percent likelihood that it lies outside

24  of those bounds.

25     Q.  All right.  Now, yesterday you talked a great deal

1  about the difference between the Wechsler test, the WAIS-IV,

2  and the Stanford-Binet 5, and that there are differences

3  between the two tests.  You talked about that yesterday,

4  correct?

5      A.  No, ma'am.  You've asked me a couple of questions.  I

6  didn't talk a great deal about --

7      Q.  Actually, I only asked you the question:  Did you

8  talk about it yesterday?  That's all I'm asking.

9      A.  No, ma'am, there was a clause that was before that

10  about I talked about it a lot, which I did not, but I did

11  describe that there are differences between those tests.

12     Q.  Okay.  And you've told the jury and showed the jury

13  that on the Stanford-Binet 5, the defendant scored an 80.

14     A.  Yes, ma'am.

15     Q.  Okay.  And within the standard margin for error for

16  the 80 that he scored on the Stanford-Binet, that's between a

17  75 and an 85.

18     A.  Yes, ma'am.

19     Q.  Okay.  If that test is accurate, you can agree with

20  me that he is outside the range of people who fall into the

21  category of potentially mentally retarded.

22     A.  Yes, ma'am, if that's identified as the dispositive

23  measure, and we just looked at that, then you would say that

24  I.Q. score is outside the range.

25     Q.  Okay.  And he therefore -- if it is the dispositive

1  measure, he therefore does not meet the definition of a person

2  who is mentally retarded?

3      A.  If that's all you had.  If you just had that score

4  alone, then you would say this score is outside the range.

5      Q.  And so that he therefore does not meet the definition

6  of a person who would be mentally retarded?

7      A.  That's correct, if that's the only score you had and

8  you made that what you relied on.

9      Q.  Now, you've also talked about the fact that commonly,

10  there is a difference between the WAIS and the Stanford-Binet,

11  but the fact of the matter is that typically the

12  Stanford-Binet comes out lower than the WAIS.

13     A.  No, ma'am, that's not correct.

14     Q.  We talked about that yesterday.

15     A.  Yes, ma'am, if I could --

16     Q.  There's 74 people that were tested, and when there

17  was a difference between the two, the Stanford-Binet came out

18  different -- or came out lower than the WAIS, and that was the

19  Stanford-Binet 4 and the WAIS-IV.

20     A.  Okay.  In the earlier editions of these tests, the

21  there is a difference between the Stanford-Binet and the earlier

22  editions of the WAIS, in that study, what those earlier

23  editions -- testing the same people, the WAIS scores were 16

24  points higher than the Stanford-Binet, which is a startling

25  disturbing finding, that you're measuring the same person and

1  getting results that are that different with these two tests.

2  And I said the problem is we don't have data about -- what do

3  we have now?  The WAIS-IV is a brand-new test.  There's a new

4  test, new standardization, many new items, new factor

5  structure.  The Stanford-Binet is a new test, new items, new

6  standardization, new factor structure.  We don't have tests --

7  we don't have studies that are testing the same people with

8  that instrument to know how far are they off from each other.

9  Is that now reversed?  Has it been overcompensated and now the

10  Stanford-Binet is higher and the Wechsler scales are lower?

11  So we're in a position of now saying, as we would look at all

12  the data, what scores seem to have the best ecological

13  validity?  What are most consistent with the totality of the

14  data?

15     Q.  And with regard to the tests that were done, with

16  regard to the previous difference between the WAIS and the

17  Stanford-Binet, the general consensus in the community was the

18  Stanford-Binet was a harder test, right?

19     A.  No, ma'am, I wouldn't agree with that.

20     Q.  Okay.  Now, you also testified to the fact that

21  Dr. Proctor gave the defendant the RIAS test.

22     A.  That's correct.

23     Q.  And that one, as well, came out to be an 80?

24     A.  That's correct.  And not an I.Q. score, but an

25  intelligence index of 80.

140

1    Q.   An intelligence index of 80.  And an intelligence
2    index of 80, again, falls outside the parameters of a person
3    who meets the definition of mental retardation.
4    A.   No, ma'am.  You would not use this score to qualify
5    or not qualify somebody for a diagnosis of mental retardation.
6    Q.   And with regard to the RIAS test, the RIAS test --
7    you essentially told the jury yesterday that it's not
8    something that you would really rely upon.
9    A.   As a screening instrument, if you need to assess a
10   lot of people quickly, then this only takes 20, 25 minutes to
11   give, and so it may be useful as a screening measure.  It
12   doesn't have sufficient breadth in the abilities that it's
13   assessing to be utilized to diagnose mental retardation, if
14   someone is or is not mentally retarded.
15   Q.   And there's actually been several articles that have
16   come out fairly recently regarding the RIAS.  One is the -- in
17   the Journal of Applied Neuropsychology, right?
18   A.   Yes, ma'am.  I haven't seen this test -- this
19   article, but this is in the Journal of Applied
20   Neuropsychology.
21   Q.   And in the very front page there, the article says
22   that Wechsler and company, which is the WAIS series of tests,
23   have been given their first real competition by Dr. Cecil
24   Reynolds and a psychometrically well-executed Reynolds
25   Intelligence Assessment Skills or the RIAS.  Right?

141

1    A.   Yes, ma'am.
2    Q.   And additionally --
3    A.   That's not to say it's a replacement for it.  It's to
4    say that it also -- there's nothing wrong with the
5    construction of it in terms of what it does.  It's a
6    narrow-band test.  It's well-constructed and
7    well-standardized.  It is simply not a substitute for a
8    broad-breadth I.Q. assessment.
9    Q.   And then the review of the test in the archives of
10   clinical neuropsychology, the first line says that the
11   Reynolds and Intellectual Assessment Skills was developed as a
12   theoretically and psychometrically-sound instrument designed
13   to measure general intelligence.
14   A.   Yes, ma'am, on a narrow-band basis.  Again, looking
15   at a narrow band.  You wouldn't publish a test that you
16   consciously knew was psychometrically unsound and did not
17   measure what it's purported to measure.  It's to say this is
18   not accepted by the professional community as the instrument
19   that you would rely on to make this assessment.  It's
20   supplemental.  It's a screening test.
21   Q.   Well, and then at the very last page of the review,
22   the very last line of the review, it says the RIAS is at the
23   forefront of the next generation of intelligence testing.
24   A.   It's a positive review.
25   Q.   Okay.

142

1    A.   It's still a screening test.  It's a screening test
2    with a positive review, but remains a narrow-band screening
3    test.
4    Q.   And the screening test result was the same as the
5    result -- the same number as the result of the Stanford-Binet,
6    right?
7    A.   That's correct.
8    Q.   Okay.  Now, the bottom line is, too, that you've
9    reviewed the report of Dr. Andrews and you've reviewed the
10   report of Dr. Proctor, correct?
11   A.   Yes, I have.
12   Q.   And they are the two people who have administered any
13   tests to this defendant?
14   A.   With the exception of the WRAT4, the spelling
15   subtest.
16   Q.   The spelling subtest.  They are the only people who
17   have done I.Q. testing of this defendant?
18   A.   To my knowledge.
19   Q.   And Dr. Andrews, the one who was at some point on the
20   defense team, ultimately issued a report, and you have that
21   report up there.
22   A.   I believe that I have it.  I have his raw data.
23   Q.   And --
24   A.   And I don't recall if I have his report up here or
25   not.

143

1    Q.   In his report --
2         MR. HAGAN:  Here you go.  Here's you a copy.
3         THE WITNESS:  Thank you.
4    Q.   (BY MRS. TANNER) -- Dr. Andrews from both tests
5    characterized the defendant as either being borderline or low
6    average.  Right?
7    A.   He characterized a score of 71 as borderline
8    intellectual functioning range, third percentile.
9    Q.   And then he --
10   A.   He said it's very near the cutoff level for mental
11   retardation.
12   Q.   And then he characterized the Stanford-Binet as
13   suggesting low average?
14   A.   Yes, ma'am.
15   Q.   And Dr. Proctor actually gave an Axis II diagnosis as
16   to the defendant, and he said that he is not mentally
17   retarded, correct?
18   A.   Let me turn to that report.  His conclusion under
19   Axis II was borderline intellectual functioning.  And then in
20   his conclusions, he said, "It is my opinion the defendant does
21   not meet criteria for mental retardation."
22   Q.   Let me go back for just a second, back to this RIAS.
23   I have the manual here for it, the manual for how to
24   administer.  Do you have this manual?
25   A.   I do not.

144

1    Q.   Have you ever administered it?

2    A.   I have not.

3    Q.   Specifically on Page 12 of the manual, it says,

4  "Although the RIAS is rapid to administer, relative to the

5  majority of other comprehensive measures of intelligence, it

6  is not an abbreviated measure or a short form of intellectual

7  assessment."  That's what the manual says, right?

8    A.   It is characterizing itself as that, yes.

9    Q.   Okay.

10    A.   I don't agree with that self-characterization, but

11  that's what the manual that publishes the test says.

12    Q.   Your self-characterization of it as a screening, that

13  it's a screening, the manual and others disagree with you --

14    A.   No, ma'am.

15    Q.   -- fair enough?

16    A.   No, ma'am.  It's not a self-characterization --

17    Q.   It's you --

18    A.   -- it's not about me --

19    Q.   -- yourself --

20    A.   -- it's my -- it's my characterization to take some

21  caution in how that manual, represented by the publishers,

22  characterizes this test that has limited subtests on it.

23    Q.   Okay.  Now, let me ask you this.  We talked earlier

24  before lunch about the issue of bias.

25    A.   Yes, ma'am.

145

1    Q.   And that as an expert, one of the things -- and we

2  talked about observer bias and other things.  One of the most

3  important things for an expert to do is to -- you know, if

4  there is evidence or data out there that's contrary to that

5  expert's opinion, that they share that as well.  Would you

6  agree with that?

7    A.   Yes, ma'am.  If it's on point with their conclusions,

8  then you want to be open to discrepant data and be transparent

9  about it.

10    Q.   Well, you talked yesterday to some length about the

11  various I.Q. tests that were performed on the defendant.

12    A.   That's correct.

13    Q.   And specifically, you did talk about the work that

14  Paul Andrews did and the work that Dr. Proctor did.

15    A.   I referenced that they were the ones that

16  administered the report -- the instruments.

17    Q.   Okay.  And you referenced the instruments that were

18  done.

19    A.   I recall -- I didn't talk about all of the

20  instruments that they gave of a neuropsychological nature.  I

21  did describe the WRAT scores, and I talked about the

22  intelligence-related testing.

23    Q.   Well, what is conspicuously absent in your testimony

24  yesterday was any reference at all to Page 6 of Dr. Andrews'

25  report, which were the results of the Word Memory Test, the

146

1  WMT.

2    A.   Yes, ma'am.  I didn't talk about that or the Test of

3  Memory Malingering, the TOMM, or --

4    Q.   The TOMM --

5    A.   -- or the effort testing that was done by Dr.

6  Proctor.  All of them ended up concluding that he was in that

7  mentally deficient range, borderline intellectual functioning.

8  None of them were saying they were setting their findings

9  aside on the basis of his not giving adequate effort.  You

10  have --

11    Q.   Well, let's talk about the Word Memory Test.  The

12  first thing that Dr. Andrews says is that the results of the

13  Word Memory Test were problematic.  That's what he said,

14  right?

15    A.   Yes, ma'am.

16    Q.   On the first day of testing, this man's scores for

17  the memory component averaged 53 percent, which is far below

18  what is seen in the general population or even clinical cases

19  of head-injured patients thought to be making good effort.  In

20  addition, the scores for the motivation component ranged from

21  75 to 95 percent correct, which is suggestive of significant

22  fluctuations of motivation.

23    A.   Yes, ma'am.

24    Q.   And then he said -- so that was the first day he met

25  with him, when he administered the WAIS.  And then he said the

147

1  WMT was presented again during the second session of testing,

2  at which time the examining scores on the memory part were

3  essentially the same, average 55 percent, with lower scores on

4  the motivation component, 65 to 80 percent.  Again, results

5  suggest fluctuating levels of motivation and, in fact, are

6  thought to represent poor efforts and/or attempts to feign

7  cognitive difficulties, according to the test author.

8    A.   That's what it says.

9    Q.   So Dr. Andrews, who used to be a part of the defense

10  team, according to the Word Memory Test, saw some significant

11  issues with regard to the defendant's motivation, his effort,

12  and attempts to feign cognitive difficulties.

13    A.   Yes, ma'am, I don't think that's a fair

14  characterization.  Dr. Andrews went on to give him another

15  test of effort called the Test of Memory Malingering.  On

16  the --

17    Q.   And that's the TOMM test, right?

18    A.   That's the TOMM.  On the Test of Memory Malingering,

19  the results that he obtained were evidence of strong effort

20  and gave no indication at all of attempting to feign cognitive

21  difficulties.  So now we've got a problematic score on the

22  Word Memory Test, but we have findings of good effort on

23  another test that is designed to measure how much effort

24  somebody is putting forth.  So you've got these discrepant

25  findings.  Then Dr. Proctor also uses --

148

```
1    Q.   Hold on --
2    A.   -- the TOMM and some other tests.
3         MRS. TANNER:  Object to nonresponsiveness.
4         THE COURT:  I'll overrule the objection.
5    Q.   (BY MRS. TANNER) Actually, on the TOMM test or on the
6    reference to the TOMM test, Dr. Andrews specifically mentions
7    that this test has not been shown to be as sensitive to poor
8    effort as the Word Memory Test.  So it's not as sensitive to a
9    lack of effort as the Word Memory Test, i.e., the Word Memory
10   Test is better at picking up a lack of effort than the TOMM
11   test, right?
12   A.   I wouldn't necessarily agree with that, particularly
13   in a mentally deficient population.  Part of the problem with
14   all of these measures of effort is they have not been
15   standardized on a mentally deficient population.  We don't
16   entirely know exactly how those individuals will perform on a
17   test like this.
18   Q.   So --
19   A.   When they score well, like they do on the TOMM,
20   that's evidence that they are putting forth good effort.  If
21   their scores are problematic, now you're not entirely sure how
22   to interpret those, because we don't have good standardization
23   at that level.
24   Q.   Well, actually, at the end of that, Dr. Andrews
25   mentioned the discrepancy between these results and those from
```

149

```
1    the Word Memory Test might be explained by difficulties in
2    verbal memory, problems attending to oral stimuli, or
3    fluctuation in the motivation, depending on the nature of the
4    stimuli.  But the bottom line is, is that as to the Word
5    Memory Test, there were some concerns in Dr. Andrews' testing
6    regarding the defendant's level of motivation.  Correct?
7    A.   No, ma'am.  He's describing how this would be
8    interpreted as the test author describes this instrument.  He
9    then looks at it in conjunction with another effort test that
10   he gives.  Just like if the physician found one test that he
11   gave you that revealed one thing, one lab test, and another
12   lab test he gave you that revealed something else.  Well, now
13   he has to make sense of those two different values.  It isn't
14   that he just sticks, then, to the one that was a problem and
15   pays no attention to this other one that shows good effort or
16   shows something else.  So as he integrates that, he says, not
17   this is a problem with effort, but it may be explained by
18   problems with verbal memory, that that may be an area of
19   particular deficiency for Blaine, or problems attending to
20   oral stimuli.  That also has to do with his intellectual
21   processing.  But the examiners --
22   Q.   Hang on.  There's one other part of that sentence you
23   left off:  Or fluctuation in motivation.
24   A.   Depending on the nature of the stimuli.
25   Q.   Depending on the nature of the stimuli.
```

150

```
1    A.   Yes, ma'am.
2    Q.   So --
3    A.   Not a malingering sort of thing, but as the task
4    is -- that some tasks may be more difficult for him to attend
5    to and stay motivated.
6    Q.   Okay.  Now, the fact of the matter is, is that if, in
7    fact, there is a lack of effort, a lack of effort can
8    artificially decrease the results of the tests that are being
9    performed.  Right?
10   A.   Yes, ma'am.
11   Q.   Okay.  Now, the other fact of the matter here is that
12   the two people who actually administered the tests to the
13   defendant, neither one of them, based upon the testing they
14   did, opined that he was mentally retarded, based upon the
15   testing?
16   A.   That's correct.  Neither one of them collected
17   extensive adaptive behavior data that would let them identify
18   which of their tests are likely to be most accurate.
19   Q.   Okay.
20   A.   They were simply doing the testing without that other
21   critically-important piece of data that would help them make
22   sense of it.
23   Q.   You're saying that Dr. Proctor didn't do any adaptive
24   functioning work?
25   A.   I'm unaware of his using an adaptive functioning
```

151

```
1    scale.  He doesn't -- he provides some anecdotal examples in
2    the course of his report, many of those supported with
3    deficits, but I'm not aware of his using any kind of adaptive
4    behavior instrument.
5    Q.   And that actually -- one other thing I wanted to ask
6    you, before we went on to the adaptive functioning aspect, is
7    when you were showing your slides yesterday about how people
8    are, if they're mildly mentally retarded versus how people are
9    if they're moderately versus how they are when they're
10   severe --
11   A.   Yes, ma'am.
12   Q.   One of the things that you said and is in your slides
13   and is in the DSM-IV is that a person who is mildly mentally
14   retarded is expected to read between a first and sixth grade
15   level.
16   A.   Yes, ma'am, that's correct.
17   Q.   Okay.  And that is a person who has gone through
18   school, I mean, who has -- you know, at some level.  Who has
19   had some degree of education, even as a mentally retarded
20   individual, they are expected to read between a first and
21   sixth grade level?
22   A.   That's usually what you would observe in somebody
23   who's mildly mentally retarded.  They -- you're going to have
24   some individuals that read at a higher level.  You'll have
25   some that don't -- that aren't even in the first grade.  But
```

152

```
1    that's what you would generally expect.
2        Q.   And, in fact, this defendant, when Dr. Proctor tested
3    him, he concluded that he reads at an eighth grade level.
4    You're aware of that, right?
5        A.   One of the tests results that he had on the WRAT, a
6    screening test, reflected that.  Let me turn to that.  Word
7    reading was at a 6.9 level.  Sentence comprehension was at an
8    8.2 level.  So he is variously at some stage of sixth grade or
9    eighth grade, again on this screening measure.  This is not a
10   full-scale assessment of intellectual ability, but on this
11   screening measure, he's at sixth and eighth grade.
12       Q.   Okay.  And for this individual, he -- we can all
13   pretty well agree he was not really formally educated past the
14   fourth grade.
15       A.   That's correct.  A little homeschooling after that;
16   fifth grade at best.
17       Q.   All right.  So the fact that he's hitting the eighth
18   grade levels with that level of education is actually pretty
19   good, isn't it?
20       A.   Well, yes, ma'am.  And that's -- that would be an
21   area of some strength for him, and also argues that he is
22   making a good effort on these tasks, since that would be so
23   easy to dial down your abilities and not know the answers to
24   the reading comprehension questions.
25       Q.   Now, let me talk to you about the adaptive
```

153

```
1    functioning component of things.
2        A.   Yes, ma'am.
3        Q.   You relied very significantly on the reporting of
4    this defendant, of his mother, of his sisters regarding the
5    various types of adaptive functioning deficits that you said
6    you found.
7        A.   I wouldn't say that I relied heavily on him.  I did
8    inquire of him about those.  But my primary reliance were --
9    was on third-party descriptions of him.  His mother was a
10   major historian, because she's the one who had the most
11   sustained and closest observation of him.
12       Q.   And, in fact, when you were putting all your slides
13   up yesterday, and there was all this talk about, you know,
14   that he couldn't cook, he couldn't make a bed, he couldn't do
15   this, he couldn't do that, he'd never been in a plane, all
16   that kind of stuff, at the bottom was the name of his mother,
17   Shirley Milam, over and over and over and over and over
18   again, right?
19       A.   That's correct.  There were similar descriptions
20   about pieces of that that were provided by his sister, Sherry,
21   or that are in the records, but I was describing who gave me
22   that specific information.
23       Q.   Okay.  And so the predominant historian that you got
24   all of the adaptive functioning -- most of the adaptive
25   functioning documentation and information was from his mother?
```

154

```
1        A.   She was a significant source.
2        Q.   Okay.
3        A.   There were many -- there were many other sources of
4    information, but she was a significant source.
5        Q.   And, in fact, she is the one person that you
6    administered that test to?
7        A.   That's correct.  I used the Adaptive Behavior Scale
8    with her.
9        Q.   You did the Adaptive Behavior Scale on the
10   defendant's mother two days after he was convicted of capital
11   murder, and that is a standardized test, right?
12       A.   Yes, ma'am.
13       Q.   Okay.
14       A.   Not in the same way that the WAIS is, but it's based
15   on the standardization, and it has more of a structured
16   interview.  The WAIS has very specific, detailed questions.
17   You ask exactly that question.  This instrument is not like
18   that, but it does have a good standardization.
19       Q.   And do you have that up there with you, the adaptive
20   functioning, these tests that you did with Mrs. Milam?
21       A.   Yes, I -- are you talking about the notes that I made
22   as I gave it?
23       Q.   Well, the actual booklet.
24       A.   Yes, I do.
25       Q.   And the -- where the little grid where she answers
```

155

```
1    the questions?
2        A.   Let me retrieve that.
3        Q.   There it is.
4        A.   This is -- she's not -- she is not -- doesn't have
5    this in front of her.  I have this.  I'm asking her questions,
6    and in the course of interviewing her about these different
7    areas, I'm identifying what it is that he is doing and not
8    doing.
9        Q.   Okay.  Can I see that, please?
10       A.   Yes, ma'am.
11       Q.   Thank you.  So this is the examination booklet of the
12   Adaptive Behavior Scale, Residential and Community?
13       A.   Second Edition.
14       Q.   Second Edition, that you performed on Shirley Milam
15   on May 19th of 2010.
16       A.   She was the respondent.  Actually, we're gathering
17   data on Blaine, so I'm not doing it on her --
18       Q.   Sure.
19       A.   -- but she is the respondent.
20       Q.   Well, she is the person you're talking to about him?
21       A.   Yes.
22       Q.   Okay.  Now, you asked a series of questions, and
23   somewhere you have -- is it at the back where you have what
24   the number is as far as the result?
25       A.   Those are here.
```

1    Q.   Okay.  That's what I'm looking for.  And it asks a
2    series of things about independent functioning, physical
3    development, economic activity -- various things --
4    self-direction.  Number VII is prevocational and vocational
5    activity, right?
6        A.   Yes, ma'am.
7        Q.   And that is Domain VII, which is right here.  The
8    first item that's asked in that is -- it's item 56, job
9    complexity, and you're basically asking them a question about
10   the person who's being tested, in this case, the defendant.
11   And the question is, can this person perform a job requiring
12   use of tools or machinery, e.g. shop work or sewing, et
13   cetera.  That's the first option.  The second option is:  Can
14   perform simple work, e.g. simple gardening, mopping floors,
15   emptying trash, cleaning chalkboard erasers, et cetera.  Then
16   the third one is:  Can perform no work at all.
17       A.   Yes, ma'am.
18       Q.   Okay.  And in regard to that, Shirley Milam's answer
19   to that caused you to check which one of those three
20   categories?
21       A.   I checked the middle one, that he can perform simple
22   work.  I did not see him as capable, for example, of working
23   in a garment factory, where he is sewing or using tools or
24   machinery of complexity.  He is unscrewing bolts and putting
25   on filters, and he's tightening belts, and some things like

1    that.  I did not think that rose to the level that we might
2    expect of somebody who was actually doing shop work and is
3    routinely working with machinery.
4        Q.   Can perform a job requiring use of tools or
5    machinery, e.g. shop work, sewing, et cetera.  You knew that
6    this defendant was changing oil.
7        A.   Yes, ma'am.
8        Q.   Rotating tires.
9        A.   Yes, ma'am.
10       Q.   Changing filters.
11       A.   That's correct.
12       Q.   Doing mechanical work, and by all accounts was doing
13   a good job at it.
14       A.   Yes, ma'am.  Of those simple -- of those simple
15   tasks.  Again, he is in a mid-range level.  It's not as if his
16   capabilities are such that you would turn him loose in a
17   machine shop, but he can perform a limited range of things.
18   Now, he goes to work for Nichols Marine.  Again, this is her
19   as respondent --
20            MRS. TANNER:  Hang on.  Objection,
21   nonresponsive.
22            THE COURT:  Sustained.
23       Q.   (BY MRS. TANNER) The result that you came out with,
24   with regard to Domain VII, the prevocational and vocational
25   activities, where that he was in the age equivalent of a 3- to

1    9-year-old based upon the results that Shirley Milam gave you,
2    right?
3        A.   Yes, ma'am.
4        Q.   Doctor, would you like to have a 3-year-old changing
5    the oil on your car?
6        A.   No, ma'am.
7        Q.   Would you like to have a 9-year-old changing the oil
8    on your car?
9        A.   Yes, ma'am, if he was of stature and had done that
10   repetitively, individuals who have the age equivalent of a
11   9-year-old can, in fact, be engaged in activities like that.
12       Q.   And, you know, he was also breaking down tires and
13   doing all kinds of different mechanical work at his jobs, and
14   by all accounts doing a pretty good job at it.  But yet
15   according to the results that Mrs. Milam gave you, he couldn't
16   do any of that stuff?
17       A.   You've asked me a whole series of questions there.
18       Q.   You knew he was changing tires, breaking down tires?
19       A.   He was breaking down tires.
20       Q.   Okay.  And according to the result Mrs. Milam gave
21   you, he couldn't be trusted in a shop at all?
22       A.   No, ma'am, that's not the case.  She described that,
23   in fact, he -- that's a different area.  That has to do with
24   responsibility and self-direction.  Here we're talking about
25   prevocational activities, and this is how she -- this rating

1    isn't based on that single item.  In fact, there are six or
2    seven different items that she responded to that are part of
3    this test, that are then compared against these
4    developmentally disabled individuals in the community and
5    folks that don't have those disabilities.
6        Q.   So what we talked about just now was a microcosm of
7    the result.  That's one incident, one situation where, based
8    upon her answers, she said he was between a 3- to 9-year-old.
9        A.   I'm sorry?  He was at about a 4-year-old
10   age-equivalent level, based on her answers of age equivalent.
11       Q.   I misspoke, actually.  When you put 3 dash 9, that
12   wasn't 3- to 9-year-old; that was 3 years, 9 months.
13       A.   That's correct.
14       Q.   Okay.  So she gave him -- I misspoke.  She gave him
15   the abilities of what you consider to be essentially a
16   3-year-old 9-month-old person?
17       A.   No, ma'am, it's not what I consider.  We took her
18   answers.  We scored those.  I then compared them against the
19   standardization sample of the test, and that's the score that
20   was generated from that.
21       Q.   Now, with regard to using these kinds of tests to
22   determine adaptive functioning in a setting like what we're
23   in, there's actually been a fair amount of literature
24   suggesting to you that using those kinds of tests are not a
25   good idea in this setting.  Would you agree with that?

160

```
1        A.   No, ma'am.  Not when we are this close to his being
2   in the community.
3             MRS. TANNER:  May I approach the witness?
4             THE COURT:  Yes, you may.
5        Q.   The Journal of Law and Human Behavior in 2009 issued
6   an article called the "Susceptibility of Current Adaptive
7   Behavior Measures to Feigned Deficits."
8        A.   Yes, ma'am.
9        Q.   And specifically on Page 340, it says the results of
10  the current study indicate that reliance on the information
11  obtained from standardized measures of adaptive behavior in an
12  Atkins assessment -- and an Atkins assessment is a mental
13  retardation assessment, right?  An Atkins assessment --
14       A.   Yes, ma'am.
15       Q.   -- is what we, in our field, call a mental
16  retardation study.
17       A.   That's correct.
18       Q.   The results of the current study indicate the
19  reliance on the information obtained from standardized
20  measures of adaptive behavior in an Atkins assessment may
21  jeopardize, rather than enhance, the validity of the
22  evaluation, and consequently may impede the interest of
23  justice.
24       A.   That's what their conclusion is.
25       Q.   Okay.  And in another study from 2007, in the Journal
```

161

```
1   of the American Psychological Association, the article was
2   entitled, "Four Practical and Conceptual Assessment Issues
3   that Evaluators Should Address in Capital Case Mental
4   Retardation Evaluations."  And specifically, on Page 172, the
5   article says:  Ultimately, evaluators who do choose to use
6   measures to assess the current level of adaptive functioning
7   for adult inmates must be aware that there are legitimate
8   reasons to believe that these measures may be inappropriate
9   for use in an incarcerated population.  Given the potential
10  bias that can result from the overemphasis on or lack of
11  understanding about a specific test score, evaluators should
12  avoid using an adaptive functioning measure that may produce a
13  biased score.
14       A.   That's what it says.
15       Q.   So is it any wonder Dr. Proctor didn't use adaptive
16  functioning measures like you did?
17       A.   Yes, ma'am, I think that there is cause for concern
18  about that.  It's -- as in the use of any instrument, there is
19  reason to use it carefully, to not just take this data in
20  isolation, but compare it against other sources of information
21  you have, the descriptions of third parties in the records.
22  What using an adaptive scale does provide you is a comparison
23  against a known standardization group, so that rather than me
24  just trying to think about do I think this is consistent or
25  inconsistent with mental retardation, did I have a known
```

162

```
1   standardization group that I'm comparing this against?  And in
2   that sense, it is part of the standard of practice to use
3   measures, standardized measures of adaptive behavior to make
4   these assessments, if the person has recently been in the
5   community and if there are good historians who can provide
6   that.
7        Q.   Now, Doctor, you talked about historical issues,
8   things like that.  Did you review the defendant's records from
9   the Texas Education Agency?
10       A.   Not beyond attendance records.  Those are the only
11  educational records I'm aware of.
12            MRS. TANNER:  Your Honor, at this time, the
13  State would offer into evidence State's Exhibit No. 298, the
14  business records of -- the defendant's records with the Texas
15  Education Agency that have been on file with this Court for a
16  number of weeks.
17            MR. HAGAN:  No objection.
18            THE COURT:  298 will be received.
19       Q.   (BY MRS. TANNER)  Those are records reflecting this
20  defendant, correct?
21       A.   That's correct.
22       Q.   And they show --
23       A.   I'm familiar with these.
24       Q.   Okay.  And they show his attendance at the Tatum
25  Elementary School and the Tatum ISD, Tatum Primary School for
```

163

```
1   kindergarten, first grade, second grade, third grade, fourth
2   grade.
3        A.   Yes, ma'am, that's what it is.  Kindergarten, first,
4   second, third, fourth --
5        Q.   And they do not --
6        A.   -- broken out by six weeks.
7        Q.   Right.  And they do not reflect anywhere through
8   there that he was ever held back in school.
9        A.   That's correct.
10       Q.   Okay.  And let me see if I can blow those up a little
11  bit more.  With regard to kindergarten, they reflect some days
12  of absences, not a tremendous number, but there are some.
13  Particularly one of the six-week periods, there's six
14  absences, but there are some absences, right?
15       A.   Yes, ma'am.
16       Q.   And then first grade, there's more.  Actually, going
17  all the way through this, there's a significant number of
18  absences in the defendant's records, right?
19       A.   In any given year, as reflected there,
20  there are routinely, you know, 20 to 25 absences.  More by the
21  time he is in third grade.  And again, there's a period of six
22  weeks in fourth grade.  One in third grade.  Twelve absences
23  in a six-week period.  Another instance of twelve absences in
24  a six-week period.  But he is pretty routinely gone -- always
25  gone one day during the six weeks.  In many instances, two or
```

164

1    three days in six weeks.  And in two instances, as many as 12
2    days out of, you know, 29.
3        Q.    Okay.  So if we had schoolteachers come and tell the
4    jury that, you know, the biggest issue that this defendant had
5    was that he was missing too many days of school, that's
6    certainly borne out by these records.
7        A.    That was one of the issues that he had.  That wasn't
8    the only one, but it was one of the issues.
9        Q.    Well, that statement is borne out by the records,
10   correct?
11       A.    Yes, ma'am.  One of the teachers identifies
12   attendance as being a major issue.  There's another that --
13   other teachers that talk about recalling limited abilities
14   that he had along with the attendance.
15       Q.    Now, the second page of the records, that's called
16   the PEIMS Special Education Data Sheet, right?
17       A.    That's correct.
18       Q.    Okay.  And that shows, for the corresponding years
19   after kindergarten, first grade, second grade, third grade,
20   and fourth grade, it shows primary disability as speech
21   impairment.
22       A.    That's correct.
23       Q.    Right?  And specifically down below that, it says
24   secondary disability, none reported.
25       A.    That's what it describes.

165

1        Q.    Tertiary disability, none reported.
2        A.    That's correct.
3        Q.    Right?  Now, if, in fact, the defendant had -- well,
4    obviously, the defendant had been in some capacity tested in
5    order to get the primary disability on there.  That's a fair
6    assessment, right?
7        A.    He would have had some speech and language testing,
8    not necessarily any assessment beyond that.
9        Q.    And any assessment that would have suggested that he
10   was learning-disabled or autistic or mentally retarded or
11   anything along those lines would have been included in one of
12   these other disabilities, if it was present.
13       A.    Had he been assessed, and that had been identified,
14   then that would have been specified.
15       Q.    And are you familiar with the -- what very, very few
16   records are present from the Tatum ISD that reflects that --
17            MR. HAGAN:  You need to introduce it first.
18            MRS. TANNER:  I'll just ask him about it,
19   because we're going to introduce it through someone else.
20       Q.    (BY MRS. TANNER) Are you familiar with the fact that
21   his last full and individual evaluation was conducted on
22   February 8th of 2000?  Are you familiar with that document?
23       A.    I don't recall it saying that it was conducted in
24   2000.  You might pass that to me and let me look at it.
25            (Mrs. Tanner handed document to witness.)

166

1        A.    Yes, ma'am.  February 8, 2000, it indicated a speech
2    impairment.
3        Q.    Okay.  So that was referred to as a full and
4    individual evaluation.
5        A.    That's what they characterize it as.
6        Q.    Okay.  Now, you would agree that this defendant has a
7    history of being employed in shop-type work?
8        A.    I wouldn't characterize it as shop-type work, but he
9    has a history of what I consider to be relatively menial
10   employment in the automotive arena.
11       Q.    It requires mechanical ability, does it not?
12       A.    Of a minor extent.
13       Q.    And it requires -- well, now, you characterize the
14   employment that he did as just menial.  But as we talked about
15   before, he was changing oil, he was rotating tires, he was
16   changing brakes, he was being trained as a salesperson.
17   Right?
18       A.    I don't recall all those are the case.  I recall that
19   he -- in response to the last part of that -- that they were
20   considering training him as a salesperson, not that he was
21   being trained as a salesperson.  I recall them saying he was
22   breaking down tires and checking brakes.  He did change oil.
23       Q.    Did he fill out work orders?
24       A.    As I recall, there may be mixed reports about that.
25   He filled out work orders.  Some of the third parties that

167

1    were interviewed described him as filling out work orders --
2    I'm trying to remember if there was another individual that
3    described him having some difficulty with the work order part
4    of that.
5        Q.    Now, you yourself did not talk to any of these folks?
6        A.    That's correct.  I listened to the audiotape of
7    Tamara Templeton who owned the M & M Lube.  And other
8    individuals, I read the summaries of interviews that had been
9    done of them by either defense or Attorney General Office
10   investigators.
11       Q.    And Ms. Templeton did say that -- and she was at the
12   M & M Quick Lube, that he was one of their better employees,
13   as far as getting in there and being able to change the oil
14   and doing the work that needed to be worked.  She said that.
15       A.    I don't recall her saying that he was one of the
16   better ones in doing that, because it's such a simple job.  I
17   do recall her saying he was one of the better employees, and
18   that seemed to have to do with coming to work and working
19   steadily, and those kind of things.
20       Q.    Okay.  Now, you have reviewed his audiotaped
21   statements with Texas Ranger Kenny Ray?
22       A.    No, ma'am, I didn't.  I read the transcript of the
23   statement that was admissible at the time that I was reviewing
24   those transcripts.  It was unclear -- or those records.  It
25   was unclear which parts of those statements and records were

168

1  going to be admissible and which were not.

2      Q.  Well, you did not listen to the audiotape interview

3  of this defendant with Texas Ranger Kenny Ray?

4      A.  No, I listened to Jesseca's.  I did not listen to

5  his.

6      Q.  You did not -- you are aware that he told Texas

7  Ranger Kenny Ray a story that was not true.

8      A.  Yes, ma'am.

9      Q.  Okay.  And you are aware that Texas Ranger Kenny Ray

10  talked to him at length and interrogated him, and the

11  defendant never cratered, if you will.  He never broke down

12  and admitted it was a lie.  He stuck to his story.

13      A.  I have knowledge of a single transcript of a

14  statement that was marked that it was admissible.  I don't

15  know what the contents were of other statements or

16  interrogation materials, interrogation facts that may have

17  emerged.

18      Q.  Okay.  Now, are you aware that the defendant got his

19  driver's license the day after he turned 18?

20      A.  I was aware he had a driver's license.  And I recall

21  that he couldn't get it until 18, because, I think -- that was

22  in his interview with Dr. Proctor and Dr. Gripon.  He said

23  that he got it the day after he turned 18, because -- because

24  he wasn't in school.  He couldn't get a license before that.

25      Q.  Because if you don't take driver's education, you

169

1  can't get a license until you turn 18.

2      A.  And if you drop out of school, then you may not be

3  able to get a license.

4      Q.  If you don't take driver's education, you can't get

5  the earlier license at 16, or any of that.  You've got to wait

6  until you turn 18.  Right?

7      A.  Yes, ma'am.

8      Q.  And the day after he turned 18, he went down there,

9  and he got his license.

10      A.  I don't have a -- I don't have records describing

11  that one way or the other.  His self-report, as I recall, to

12  Dr. Proctor was that he got his -- or Dr. Gripon, was that he

13  got his license right after he turned 18.  I have not seen

14  records regarding that.

15      Q.  And that requires, to get your license without having

16  taken driver's ed -- I guess to get your license either way --

17  you have to take a written exam.

18      A.  Yes, ma'am.

19      Q.  And he reported to Dr. Proctor that he made -- he

20  scored a 48 out of 50 on the written exam.

21      A.  That was his self-report.

22      Q.  And that he had to take the driving test, and that he

23  passed that as well?

24      A.  Yes, ma'am.

25      Q.  So the first time out of the box, he goes down, day

170

1  after his 18th birthday, passes the written test, passes the

2  driving test, and gets the license?

3      A.  I don't know what happened or what the sequence was

4  or what his score was.  That is what he described to Dr.

5  Proctor.

6      Q.  I'm curious about what appears to be some sort of an

7  inconsistency, because on the one hand you've talked, sort of

8  at this phase, about how his work history is very menial, you

9  know, that essentially he was too dumb to do much of anything.

10  But then in the future dangerousness risk assessment, you were

11  talking about that one of the really great things about him is

12  his work history.  So I'm kind of confused.  That seems to be

13  somewhat inconsistent with one another.

14      A.  Yes, ma'am.  Would you like for me to address that?

15      Q.  Sure.

16      A.  The critical issue is does this person seek to occupy

17  himself in a productive and constructive way?  Not the

18  sophistication of the task, but instead, that they seek to

19  support themselves and to have some sense of autonomy or to

20  establish what self-reliance and productivity they can.  And

21  so the sophistication of the task and the motivation to be

22  industrious are two separate issues.  Now, much of the work in

23  prison is of the rote and menial nature.  So as he occupies

24  himself industriously, there are roles for him to do that in a

25  correctional setting.

171

1      Q.  Now, with regard to all of these things that you

2  refer to as adverse developmental factors, there was a

3  significant number of those that you reported or you relied,

4  again, on the self-reporting from the defendant's mother, from

5  the sisters, and from him.  Right?

6      A.  Yes, ma'am.  His is a self-report.  The others are

7  reporters about him.  They're third-party reports.

8      Q.  I got you.  And a lot of this discussion about

9  corruptive family influences, about who was doing what and who

10  was doing when and what family member in the history had this

11  problem or that problem, all of who was hooked on what, and

12  all of that, that's largely derived from information provided

13  to you by Shirley Milam, Sherry, and Teresa.

14      A.  Yes, ma'am.  They are ratting out themselves and each

15  other, as they describe that.

16      Q.  Okay.  And you are aware, of course, that all three

17  of them testified here last week.

18      A.  That's my understanding.

19      Q.  And I'm sure that you are aware that they obviously

20  desperately wanted to be able to come and help the defendant

21  through their testimony.

22      A.  They were willing -- they were certainly willing to

23  come.  I don't -- I don't know what their level of desperation

24  about that was.

25      Q.  And when they came and they testified before this

172

1   jury, there was no testimony from Teresa about her corrupting
2   him or her husband corrupting him, or anything like that, or
3   from Sherry or any of those folks, when they came and
4   testified before this jury.  Are you aware of that?
5       A.   I don't know the content of -- I know the content of
6   Shirley's testimony.  She's the only one that I know what
7   questions were asked that were posed about any of those
8   matters.
9       Q.   And you talked at length about -- maybe not at
10  length, but you did talk to some degree about the defendant's
11  interaction with his brother, Danny?
12      A.   Yes, ma'am.
13      Q.   And you are aware, of course, that in Danny's Grand
14  Jury testimony, he talked about the defendant actually
15  splitting his head open with a pipe wrench and pulling a gun
16  on him, right?
17      A.   I'm familiar with his report about the pipe wrench
18  and that testimony.  There are conflicting reports, as I
19  recall, about who had a gun on who at what time.
20      Q.   And I noticed in the interview with Theresa Vail that
21  the defendant gave on Page 46 of the first interview --
22      A.   Let me turn to that.  Hang on just a moment.
23      Q.   Sure.
24      A.   Yes, ma'am.
25      Q.   That actually, in the that interview that's in your

173

1   material, that I assume you at least in part relied upon, the
2   defendant admitted to her that he'd hit his brother in the
3   head with a pipe wrench.
4       A.   He said, "It was about -- I hit him in the head with
5   a pipe wrench, and he hit me in the head with something.  I
6   don't know what it was, but he hit me."
7       Q.   Okay.
8       A.   "Me and him, we try not to get into it too often,
9   because he gets wild."
10      Q.   And another thing that you testified to yesterday was
11  this alleged incident of sexual abuse upon the defendant by
12  one of his cousins?
13      A.   Yes, ma'am.
14      Q.   Now, you are aware, of course, that this defendant
15  has a history of having lied about being sexually abused in
16  order to get out of trouble, if you will.
17      A.   Yes, ma'am.  I recall associated with this -- with
18  the offense that he was charged with regarding Karah Hodge,
19  that his story at that time was that he was held at gunpoint,
20  and I think forced to perform oral sex on an older man, and
21  then also compelled to do this act.  That's my general
22  recollection of what he reported at that time.
23      Q.   And I noted on all of the 120-some-odd slides you
24  had, when you were referring to all of these adverse
25  developmental factors, you mentioned this alleged sexual abuse

174

1   by a cousin, but you did not mention any sexual abuse by
2   Robert Bradford, correct?
3       A.   That's correct.
4       Q.   Because the alleged sexual abuse by Robert Bradford
5   we know to be a lie?
6       A.   Because I asked him about it, and he said, "That's
7   not what happened.  I lied about that.  I was afraid.  I was
8   on meth at that time as well.  It makes you think crazy sexual
9   things.  I made up that story."
10      Q.   So in answer to my question, you didn't include it,
11  because you knew that it was a lie?
12      A.   Yes, ma'am.  It was not true.
13      Q.   Okay.  And with regard to this business with the
14  cousin, if you look at Page 14 of Ms. Vail's interview with
15  him --
16      A.   Of the first section of it?
17      Q.   Yes, sir.
18      A.   Yes, ma'am.
19      Q.   And specifically, Dr. Vail asked him about being
20  sexually abused, and he told her that the only sexual abuse
21  anybody had ever inflicted upon him was Robert Bradford, and
22  that he had framed him for that offense.
23      A.   That's correct.
24      Q.   And then if you go on to Page 15, she specifically
25  asked him if there was any issues of sexual abuse in the

175

1   family.  And his response was that, no, there wasn't anything.
2       A.   On Page 15?
3       Q.   Yes, sir.
4       A.   That's correct, at the bottom of the page.
5               "But nobody in your family" --
6           He says, "No, ma'am."
7           -- "had issues with you in sexual abuse?"
8           And he says, "No, ma'am."
9       Q.   "Nobody in your family had issues with you in sexual
10  abuse?"  I.e., the only sexual abuse he tells Ms. Vail about
11  is this Robert Bradford business, and the cousin thing doesn't
12  ever come up.
13      A.   That's correct.
14      Q.   Okay.
15      A.   Her interview approach to him is not one that's very
16  thorough or inducing of specific data.
17      Q.   Okay.  And with regard to all of this drug use that
18  you've talked about on the part of the defendant --
19      A.   Yes, ma'am.
20      Q.   -- you have testified to, and it is clear from the
21  record, that when he met Jesseca Carson, according to him, he
22  stopped using methamphetamines.
23      A.   He described there were a couple of times after that
24  that he used with his brother, Danny, but that routine abuse
25  that he'd been sustaining, he said, ended pretty soon after he

1  got involved with her.
2      Q.   And you told us yesterday that he stopped using
3  methamphetamines when he went to Alabama, when they were
4  looking into moving over there?
5      A.   Well, there were two trips that they made to Alabama.
6      Q.   The second trip, the one where they --
7      A.   In one of them, he's sleeping for extended periods of
8  time.  And that behavior is inconsistent with a meth run,
9  because he's sleeping all the time.  There was another one
10  when he's in Alabama --
11      MRS. TANNER:  Objection to nonresponsiveness.
12  Your Honor.
13      THE COURT:  I'll sustain the objection.
14      Q.   (BY MRS. TANNER) According to what you told us
15  yesterday, he stopped using methamphetamines when they went to
16  Alabama for the longer trip to potentially move there, right?
17      A.   I --
18      Q.   That's just a "Yes" or "No."
19      A.   I can simply describe to you -- what I would say to
20  you in answer to that question is that he is observed to be
21  agitated on one of the trips that he's there and not --
22      MRS. TANNER:  Objection to nonresponsive.
23      A.   -- be able to sit still.
24      Q.   (BY MRS. TANNER) That's not the question I'm asking.
25  I'm asking a "Yes" or "No" question.

1      MR. HAGAN:  Your Honor, the witness is
2  attempting to answer the question, as best as he can answer
3  the question.  It's directly responsive to what Counsel was
4  asking him.
5      MRS. TANNER:  I'm trying to ask him what he told
6  us yesterday.  I'm not trying to go into a whole, historical
7  hoo-ha.
8      THE COURT:  Restate the question.
9      Q.   (BY MRS. TANNER) When you testified yesterday --
10      MR. HAGAN:  And, Your Honor, just also, for the
11  record, I again object to Counsel's sidebar comments, as far
12  as hoo-ha or any other such comments and ask the Court to have
13  the Counsel refrain from making such statements.
14      MRS. TANNER:  I apologize.
15      THE COURT:  All right.
16      Q.   (BY MRS. TANNER) When you testified yesterday, you
17  told the jury that when he went to Alabama on the second trip,
18  he stopped using methamphetamines.  Yes or no?
19      A.   I don't recall on which trip he was using and on
20  which trip he was not.  On one trip, he was observed as being
21  agitated.  On another trip, he was observed as spending much
22  of the time sleeping.  I don't recall which is which.
23      Q.   But you told the jury that when you went to Alabama,
24  he stopped using methamphetamines?
25      A.   On one of the trips --

1      Q.   Right.
2      A.   -- for several days, he appears to be in a crash.
3      Q.   And you testified yesterday that when he met Jesseca
4  Carson, he made the decision to stop using methamphetamines?
5      A.   After he began to see her, he did discontinue the
6  regular use of methamphetamine that he had had for sometime.
7      Q.   So he made the decision and he executed on the
8  decision to stop using methamphetamines after he began to see
9  Jesseca.
10      A.   Yes, ma'am.  He was successful in stopping for
11  several months.
12      Q.   Okay.  And have you reviewed the presentence
13  investigative report of the defendant from when he was placed
14  on probation in 2008, before the murder of Amora?
15      A.   No, ma'am.
16      MRS. TANNER:  May I approach the witness?
17      THE COURT:  Yes.
18      Q.   Pretty standard procedure in a presentence
19  investigation to ask about substance abuse history, right?
20      A.   Yes, ma'am.
21      Q.   Okay.  And the defendant self-reports with regard to
22  his substance abuse with regard to marijuana and amphetamines.
23  He does admit that he uses both occasionally, that he started
24  at the age of 16, and that the date last used was in 2006.
25  Correct?

1      A.   That's correct.
2      Q.   And that report was issued on July 29th of 2008.  Do
3  you have any qualms with that?
4      A.   No, ma'am.
5      Q.   Okay.  That is a self-report that occurred prior to
6  him being charged with capital murder?
7      A.   Yes, ma'am.  He was charged with a sex offense at
8  that time.  That's a presentence report for that sex offense,
9  but it is prior to being charged with capital murder.
10      Q.   And the sex offense occurred in 2007.
11      A.   Yes -- or 2006.  He was 17 at the time of its
12  occurrence.
13      Q.   Okay.  But the bottom line is, is that with regard to
14  the sex offense, when he self-reported back in those days,
15  back in July of '08, he did not attempt to blame the sex
16  offense on the meth, according to the report that we have in
17  the PSI.
18      A.   No, ma'am.  At that point, he had had a story about
19  being forced to engage in this at gunpoint, an incredibly
20  improbable story.
21      Q.   Okay.  Now, one of the things that you talked about
22  yesterday is the family script.
23      A.   Yes, ma'am.
24      Q.   Essentially that a family puts together -- a family
25  history creates a script for a person's life?

1    A.   Has a significant influence on that script.

2    Q.   And with regard to the family script in this case,

3  essentially the family script was that most -- that everybody

4  in the family dropped out of school, right?

5    A.   Yes, ma'am, dropping out of school is part of the

6  script.

7    Q.   And then the script is --

8    A.   That most of them seem to have.

9    Q.   I'm sorry?

10   A.   That most of them seem to have.

11   Q.   Okay.  And then the family script involved

12  essentially getting a job of some menial nature?

13   A.   Yes, ma'am.  The employment that they had tended to

14  be menial.

15   Q.   And get married.

16   A.   Early marriage, early parenting.

17   Q.   Okay.

18   A.   Maybe premature marriage, premature parenting.

19   Q.   And to essentially live a modest, blue-collar life.

20   A.   I don't know if that's part of the -- what you would

21  describe as the script.  Their aspirations seem to be

22  blue-collar.  That also is consistent with their abilities.

23  There's also a significant script for substance abuse in that

24  family system.

25   Q.   Well, with regard to the Milam family script that you

1  have told us about, there is nothing in the Milam family

2  script that included becoming a sex offender, did it -- is

3  there?

4    A.   Not in his immediate family.  Depending on what you

5  do with the cousin and with the abuse that he has by his

6  sister's -- his brother's girlfriend, there is certainly -- it

7  would be deviant family sexuality in that way.  So that part

8  is part of the family, but there's not an indication of a

9  widespread sexual deviancy through this family system.

10   Q.   So the family script that's set forth that you told

11  us about did not include becoming a registered sex offender,

12  did it?

13   A.   No, ma'am.  I don't know that I've seen a script that

14  included something that specific.  It does include premature

15  parenting.  It does include drug abuse.  It does include low

16  educational achievement.

17   Q.   Also, the family script, as you've told us about, in

18  no way, shape or form included anything remotely close to

19  torturing a baby to death, did it?

20   A.   No, ma'am, but the precursors of that, the drug

21  abuse --

22        MRS. TANNER:  Objection to nonresponsiveness.

23        THE COURT:  Sustained.

24   Q.   (BY MRS. TANNER)  Doctor, nobody else in the Milam

25  family has anything even remotely close to what this defendant

1  has been convicted of doing, right?

2    A.   That's correct.

3        MRS. TANNER:  No further questions.

4        THE COURT:  All right, ladies and gentlemen,

5  we'll take a 20-minute recess.  You're under all the

6  instructions I've heretofore given you.  Do not discuss the

7  case among yourselves, nor with anyone else, nor allow anyone

8  to discuss the case with you, nor obtain any information

9  concerning this case.  You may step down.  We'll stand in

10  recess.

11        (Recess.)

12        THE COURT:  Mr. Hagan, you may resume.

13              REDIRECT EXAMINATION

14  BY MR. HAGAN:

15   Q.   Dr. Cunningham, how many times have you testified at

16  capital sentencing cases?

17   A.   Close to 160.

18   Q.   Okay.  And I think you had said earlier -- how many

19  of those were federal capital cases?

20   A.   About 60.

21   Q.   Is there any other mental health expert in the

22  country who has testified in more federal capital cases than

23  you have?

24   A.   No, sir.

25   Q.   Have you ever been called to testify by the

1  prosecution in a criminal case?

2    A.   Yes, sir.

3    Q.   And on one occasion or how many occasions?

4    A.   On many occasions.

5    Q.   Okay.  Have you ever been called to testify by the

6  prosecution in a capital case?

7    A.   No, sir, I haven't.

8    Q.   Are you opposed to the death penalty?

9    A.   No, sir.

10   Q.   Would you be willing to testify in a capital case if

11  you were called by the prosecution?

12   A.   Yes, sir.

13   Q.   And if you were called by the prosecution, what would

14  you testify about?

15   A.   I would testify about the same thing that I testified

16  about called by the defense.  I would describe the defendant's

17  history, his adverse developmental factors.  I would present

18  my best understanding of the research about his likelihood of

19  violence in prison and what studies inform that.  I would give

20  the same testimony I did in the last couple of days.

21   Q.   Okay.  Has the prosecution, either the State or

22  federal, ever called on you to provide consultation in capital

23  murder cases?

24   A.   No, sir.

25   Q.   Why have you not been called by the prosecution to

184

1  testify to capital --
2       MRS. TANNER:  Objection, calls for speculation.
3       MR. HAGAN:  I believe he can answer.  If I can
4  finish my question.
5       MRS. TANNER:  He finished his question.  It
6  calls for speculation.
7       THE COURT:  Finish your question.  If you have
8  an objection, you may make it.
9    Q.   (BY MR. HAGAN) Why have you not been called by the
10  prosecution to testify in a capital sentencing, even though
11  you are a leading scholar in the capital sentencing arena?
12       MRS. TANNER:  Objection, calls for speculation.
13       MR. HAGAN:  Judge, I believe he can answer the
14  question.  He's qualified.
15       THE COURT:  You may answer if you know.
16    A.   Yes, sir.  The research data is very clear that
17  childhood matters, that what happens to you in childhood
18  significantly, substantially affects your likelihood --
19       MRS. TANNER:  Objection to the
20  nonresponsiveness.  He asked him why hasn't he been called.
21       MR. HAGAN:  Your Honor, he's attempting to
22  answer the question.
23       THE COURT:  You may finish your answer.
24  Mrs. Tanner, after he finishes his answer, if you have further
25  objection, you may make your objection.

185

1       MR. HAGAN:  May I point out, Your Honor, the
2  objection to nonresponsiveness cannot be made by the opposing
3  party.
4       THE COURT:  Well, I overrule it at this time.
5       MR. HAGAN:  Thank you, Judge.
6    Q.   (BY MR. HAGAN) Go ahead, Doctor.  Try and finish your
7  answer.
8    A.   Yes, sir.  My testimony is anchored to science.  The
9  science is very clear that childhood matters.  I will never be
10  called by the State to testify about the importance of
11  childhood factors.  I'm not biased about it.  It's that's
12  what -- that's what the research says.  The research is very
13  clear that the overwhelming majority of capital offenders will
14  never be violent in prison, that the rates of serious violence
15  in prison are very low, that prisons are extraordinarily
16  effective in minimizing the occurrence of serious violence.
17  That is simply the scientific reality.  I will never be called
18  by the State to provide that testimony.
19    Q.   Doctor, I'm going to feign confusion here.  If you're
20  only called by one side, why doesn't that represent bias?
21    A.   Well, it would, if you were in a situation that was
22  just about your own subjective impressions one way or the
23  other.  For example, if it was competency to stand trial, and
24  you always said the person was not competent, clearly that
25  would reflect bias, because that's a judgment that you're

186

1  making.  In this instance, I'm like a researcher that studied
2  the relationship between cigarette smoking and cancer and
3  found a relationship.  I will never be called by the tobacco
4  companies.  Not because I'm biased, but because that's what my
5  data says, and I'm married to that data.
6            This is a similar situation.  There is very
7  clear science about the importance of developmental factors
8  and about who's violent in prison and what's associated with
9  that.  I'm married to that data and that science.  Now, you
10  might call me to keep the defense honest if they had gone too
11  far with it.  But at this point, the primary attack on my
12  testimony is that I'm only called by the defense.  As soon as
13  I start being retained by the State to consult with them,
14  that's gone, and that avenue of attack is no longer there.
15    Q.   Is the prosecution typically familiar with your
16  testimony, your methods, and the statistical data you rely on?
17    A.   Yes, sir.
18    Q.   And has the prosecution ever called an expert who has
19  peer-reviewed publications in the developmental psychology or
20  risk assessment fields to assert that your methodology or
21  statistical data was in error?
22    A.   No, sir.
23    Q.   Has the prosecution ever handed you a peer-reviewed
24  article that demonstrated that your methodology or data was in
25  error?

187

1    A.   Not regarding things like the importance of
2  developmental factors or violence risk assessment.  I might be
3  handed an article that says -- like today -- look, this says
4  this test is good for this purpose, or that kind of thing, but
5  not fundamentally about the importance of developmental
6  factors or about what predicts violence in prison.
7    Q.   And your extensive capital case experience throughout
8  the U.S., are you aware of any case where the prosecution has
9  called a mental health expert to present the research
10  sponsored by the Department of Justice or other well-regarded
11  scholarly sources regarding the relationship between what
12  happens to someone in childhood and their likelihood of
13  criminality and violence as an adult?
14    A.   No, sir, I've never seen the prosecution offer the
15  research that demonstrates the nexus between childhood and
16  criminal violence in adulthood.
17    Q.   Are you aware of any capital sentencing cases where
18  the prosecution has sponsored testimony of a psychologist or
19  psychiatrist to detail the group statistical data that is
20  critical to an active determination of violence risk in
21  prison?
22    A.   Not regarding the behavior of murderers or capital
23  murderers.  On occasion, if it was a gang-related case, and
24  they had some gang data in prison, I've seen that offered, but
25  not in terms of how capital defenders and murderers behave in

188

1    prison, or whether the offense that sent somebody to prison
2    has anything to do with how they're going to behave in prison.
3        Q.   Okay.  Are you ever asked by -- well, and you were
4    asked today about money.
5        A.   Yes, sir.
6        Q.   Okay.  You state you make a very comfortable living
7    as a forensic psychologist; is that right?
8        A.   Yes, sir, that's correct.
9        Q.   Are you ever asked -- well, let me just ask you this.
10   How much -- about how much have you been paid in this case,
11   again?
12       A.   I expect that the total billing will be in the
13   neighborhood of $30,000, about 100 hours of work.
14       Q.   Okay.  How does your rate compare to other forensic
15   psychologists who practice on a national basis or experts who
16   are called by the State?
17       A.   On those who are practicing on a national basis, my
18   hourly rate is on the lower end.  Those that are called by the
19   government that are practicing nationally charge anywhere from
20   $400 to $650 an hour.
21       Q.   Okay.  Dr. Cunningham, when did you begin to travel
22   extensively and become heavily involved in doing capital
23   cases?
24       A.   About 1999, '98, '99.
25       Q.   Okay.  And is that national practice that you have

189

1    now, was that something you foresaw, or how did that come
2    about?
3        A.   No, sir.  It's not something that I foresaw.  I
4    became board certified in forensic psychology in 1995.  At
5    that point, only about 30 or 40 percent of my practice was
6    court-related, and the rest was clinical in nature.  I simply
7    anticipated that it might increase a little bit.  Maybe I
8    would be half forensic, and I would just do a better job at
9    it.  I didn't anticipate that I would ever be completely be
10   forensic in focus, nor did I foresee that I would practice on
11   a national basis.
12       Q.   Okay.  And Counsel for the State asked you about the
13   Hall case; is that correct?
14       A.   That's correct.
15       Q.   And I believe the Hall case, that was originally at
16   the trial court level.  Hearing on the question of M.R. was
17   denied by the Court.
18       A.   The Federal Court initially denied a hearing on that
19   mental retardation -- it was a state case in Federal Court.
20   The Court had denied a mental retardation hearing.
21       Q.   Okay.  And that was reversed by the Fifth Circuit?
22       A.   Yes, sir.  That went up to the Fifth Circuit, federal
23   criminal circuit court, and they reversed that decision --
24       Q.   And in essence told that judge that he would conduct
25   a hearing.

190

1        A.   Yes, sir.
2        Q.   And you were appointed by the Court?
3        A.   Yes, sir.
4        Q.   And the Court conducted a hearing?
5        A.   Yes, sir.
6        Q.   And the Court denied relief --
7        A.   That's correct.
8        Q.   -- again.
9        A.   Yes, sir.
10       Q.   Okay.  Are you also familiar with the published
11   opinion in the United States v. Stitt?
12       A.   Yes, I am.
13       Q.   And that's in the Fourth Circuit Court of the U.S.
14   State Court of Appeals in Virginia?
15       A.   Yes, sir.
16       Q.   And were you a participant in that case?
17       A.   I -- in a way.  The defense had had an opportunity to
18   retain me and then did not.  It was a privately-funded case.
19   The defense was paying for his own defense.  The lawyer was
20   going to have to take my fee out of his pocket, and so he did
21   not appoint me and instead appointed somebody who was less
22   expensive.  The Fourth Circuit then remanded the sentencing
23   phase of that federal capital case for a new sentencing trial,
24   identifying that I was a recognized expert in violence risk
25   assessment for prison and that the defense had foregone my

191

1    appointment, although I was available and they were in touch
2    with me, in favor of an expert that was much less experienced
3    and knowledgeable.  And the Court identified a conflict of
4    interest in the defense attorney's performance in that way and
5    returned the case for a new sentencing phase.
6        Q.   Okay.  And were you involved in the new sentencing
7    phase as well?
8        A.   Yes, I was.  Well, it's -- that's now pending.
9        Q.   Okay.  And were you also -- are you also familiar
10   with the published opinion in U.S. Supreme Court in the case
11   of Panetti v. Quarterman?
12       A.   Yes, sir, I am.
13       Q.   And is your testimony cited favorably by the majority
14   opinion in that case?
15       A.   Yes, sir, it is.
16       Q.   And that case involved what?
17       A.   That case involved a defendant who was psychotic.  He
18   had been sentenced to death, was on death row, but was
19   psychotic.  And the question was, was he so psychotic that
20   either he did not know that his execution was imminent or that
21   he didn't know the reason that he was being executed?  I
22   testified in his Federal District Court hearing about that,
23   and I described that while he had a factual recognition that
24   he was about to be executed, that his belief was that he was
25   not being executed for the crime that he was convicted; he was

1  going to be executed for preaching the gospel. And this was
2  not being orchestrated by the State as a lawfully-constituted
3  authority, but under false flag. That he thought it was
4  actually the Wiccans who were going to be putting him to
5  death. In fact, they might poison him even before the
6  trial -- even before his scheduled execution could occur. In
7  other words, he had a factual understanding, but there were
8  grave problems in his rational understanding.
9         At that point in time, the law, under a case
10  called Ford v. Wainwright, was not clear about whether the
11  defendant simply had to have a factual understanding or
12  whether he had to have a rational understanding as well. The
13  conceptualization that I described, and that discrepancy
14  between factual and rational understanding, was then the focal
15  point of the appeal that went to the U.S. Supreme Court. And
16  the majority opinion by the U.S. Supreme Court then modified
17  that longstanding case, Ford v. Wainwright, and said that, in
18  fact, there was a necessity that the defendant have a
19  rational, as well as factual understanding.
20     Q.   And then --
21     A.   My testimony was cited by the majority of the Supreme
22  Court in describing their rationale for that opinion.
23     Q.   And are you also familiar with the opinion in the
24  United States District Court for the Western District of
25  Tennessee in the case of the United States v. Shannon Shields?

1     A.   Yes, sir, I am.
2     Q.   And did you testify in that proceeding?
3     A.   Yes, sir, I did. That was a federal hearing
4  regarding whether this federally-charged capital defendant was
5  a person with mental retardation.
6     Q.   And what was the outcome of that case?
7     A.   The Court found that Mr. Shannon Shields was a person
8  with mental retardation, and in that published opinion, cited
9  my findings and testimony favorably.
10         MR. HAGAN:  And could we have the screen again,
11  Your Honor?
12         THE COURT:  Yes.
13     Q.   I believe -- did we -- you've got an excerpt from
14  that case?
15     A.   Yes, sir. Let me get a computer here.
16     Q.   Sure, go right ahead. I'll provide Counsel with a
17  copy. And again, that's the cite of the case, the United
18  States v. Shannon Shields --
19     A.   Yes, sir.
20     Q.   -- correct?
21     A.   That's correct.
22     Q.   Cause No. 04-2254. And if you could, show us the
23  excerpt from that order. And this is "The Evaluation of
24  Dr. Cunningham;" is that correct?
25     A.   That's correct.

1     Q.   Would you read that for the jury, please?
2     A.   Yes, sir. "The Evaluation of Dr. Cunningham. The
3  Court finds that Dr. Cunningham was likewise very credible.
4  To be sure, Dr. Cunningham does not specialize in diagnosing
5  or treating mental retardation, and as will be seen, Dr.
6  Cunningham believes that the defendant suffers from deficits
7  in more areas of adaptive functioning than were found by
8  Dr. Tasse. Nevertheless, Dr. Tasse testified that he approved
9  of Dr. Cunningham's report and concurred in his ultimate
10  conclusion that the defendant is mentally retarded. Moreover,
11  the Court found Dr. Cunningham's testimony to have been lucid,
12  direct, and cogent, and the Court believes that Dr. Cunningham
13  conducted a very careful and thorough review of the records
14  related to the defendant's background. Given Dr. Tassie's
15  endorsement of Dr. Cunningham's work and conclusion, and the
16  Court's own assessment of his testimony, the Court credits
17  Dr. Cunningham as a witness."
18     Q.   Okay. Now, and again, that was on the issue of M.R.,
19  correct?
20     A.   That's correct.
21     Q.   And we talked a little bit -- TASSE's?
22         MRS. TANNER:  Can you take that off the screen?
23         MR. HAGAN:  No. I'm fine with it.
24     Q.   (BY MR. HAGAN)  So --
25         MRS. TANNER:  Are you done asking about it? If

1  so, then it needs to come off.
2         MR. HAGAN:  Your Honor --
3         THE COURT:  He can leave that up there during
4  the pendency of his examination.
5         MR. HAGAN:  Thank you, Judge.
6     Q.   (BY MR. HAGAN)  Okay. We talked a lot about the
7  testing that you looked at --
8     A.   Yes, sir.
9     Q.   -- in this case that both Dr. Andrews conducted and
10  Dr. Proctor conducted.
11     A.   Yes, sir.
12     Q.   And we talked about effort --
13     A.   Yes, sir.
14     Q.   -- in these standardized testing. Let me ask you a
15  hypothetical situation. Let's assume, for the sake of our
16  discussion, that you have an individual with an I.Q. of 80.
17     A.   Yes, sir.
18     Q.   And that individual is trying to feign mental
19  retardation or trying to make himself appear that he is not as
20  high as an 80?
21     A.   Yes, sir.
22     Q.   How likely would it be that that individual could
23  take one WAIS-IV -- is it WAIS or Wechsler?
24     A.   It's WAIS.
25     Q.   WAIS-IV.

196

```
1       A.    That's the Wechsler Adult Intelligence Scale, Fourth
2  Edition, and the abbreviation is the WAIS-IV.
3       Q.    That's a lot easier to say.
4       A.    Yes, sir.
5       Q.    This individual can take the WAIS-IV full-scale I.Q.
6  test and then score in at a 71, and then almost six months
7  later take that test again by a different examiner and score
8  within 2 points.  How likely is that?
9       A.    That would be a difficult task to accomplish.  I'm
10 not sure that I could do that, even as familiar as I am with
11 the test.  That separated by six months, I could dial in a
12 score that was two or three points apart.  I'm not aware of
13 any research that's directly investigated can a malingerer do
14 that?  But that's a challenging task, separated by six months,
15 for somebody who's otherwise identified as being borderline in
16 their intelligence --
17      Q.    Okay.
18      A.    -- and having deficits -- in other words, it's not as
19 if anybody thinks Blaine has an I.Q. of 130.  But for somebody
20 of his ability level and with the memory-related issues that
21 he does, for him to deliberately dial in a score that close,
22 six months apart, is quite improbable.
23      Q.    Be very impressive.  That would show a lot of
24 intelligence, wouldn't you agree with that, to be able to do
25 that?
```

197

```
1       A.    Yes, sir.
2       Q.    And again, just assuming that someone with an I.Q. of
3  80, that makes it very unlikely, though, doesn't it?
4       A.    That's correct.  If that's the raw material that
5  they're working with, to then try to accomplish that.  It also
6  is unclear why they would then on the -- on a RIAS test, why
7  not dial that one down, too, while they're at it?  And by the
8  way, why tell them that you passed your driver's license test
9  on the first try?
10      Q.    Well, that's neither here nor there.  We'll get to
11 that in a minute.  But the Word Memory Test --
12      A.    Yes, sir.
13      Q.    And that was cited by Dr. Andrews and Dr. Proctor.
14      A.    Yes, sir.
15      Q.    And they both administered the Word Memory Test to
16 Blaine Milam, correct?
17      A.    Dr. Andrews did.  Dr. Proctor in his -- he used -- he
18 did make use of effort testing.  Let me turn to his report.
19 He did not give the Word Memory Test.  He used three different
20 effort testing.
21      Q.    Okay.
22      A.    He used the Dot Counting Test, the Rey 15-Item Test,
23 and the Test of Memory Malingering or the TOMM.
24      Q.    Okay.
25      A.    In other words, Blaine has had five effort-testing
```

198

```
1  instruments in total:  Two administrations of the TOMM, the
2  Word Memory, a Dot Counting Test, and a Rey 15-Item Test.
3       Q.    And, in fact, I think it was Dr. Andrews that tested
4  him twice on the Word Memory Test.
5       A.    That's correct.
6       Q.    So he's had two Word Memory Tests?
7       A.    Yes, sir.
8       Q.    And the scores were pretty consistent with one
9  another on that, weren't they?
10      A.    That's correct.
11      Q.    And he took -- he was administered the TOMM by
12 Dr. Andrews.
13      A.    That's correct.
14      Q.    And the TOMM's by Dr. Proctor.
15      A.    That's correct.
16      Q.    And those scores were consistent with one another,
17 weren't they?
18      A.    Yes, sir, they were.
19      Q.    And what were the other effort tests that Dr. Proctor
20 administered?
21      A.    The others were the Dot Counting Test and the Rey
22 15-Item Test, and both of those demonstrated that he was
23 putting forth acceptable effort.
24      Q.    Okay.  Really?
25      A.    Yes, sir.
```

199

```
1       Q.    So of the five memory tests -- or six, I guess,
2  because you count the Word Memory Test twice.
3       A.    Two Word Memory Tests, two TOMM's, a Rey 15-Item, and
4  a Dot Counting Test.  Six administrations of effort testing.
5       Q.    And all with consistent results.
6       A.    Yes, sir.
7       Q.    And the Word Memory Test with almost identical
8  results, consistent results, as being low?
9       A.    Yes, sir.
10      Q.    All the others being -- showing positive effort.
11      A.    Yes, sir.
12      Q.    No sign of feigning.
13      A.    That's correct.
14      Q.    Okay.  What would that tell you, Doctor?
15      A.    That he has deficits in that word memory arena, that
16 this isn't an effort-related problem.  That -- because we have
17 so many other instruments that are showing good effort.
18 Again, if there's -- there's no malingering strategy that you
19 could identify to say he's going to dial down his performance
20 on this one test, and then on these others, he's going to
21 display good performance.
22      Q.    Okay.  And the Stanford-Binet 5 --
23      A.    Yes, sir.
24      Q.    -- has there been any correlation, any studies made
25 that correlates the scores from the Stanford-Binet 5 to the
```

200

1  WAIS-IV?

2      A.  Yes, sir.  The Stanford-Binet 5 correlates with the

3  Wechsler scales and with many other measures of intelligence.

4  Here's the issue, though, is that you can have a test that

5  consistently is 10 or even 15 points discrepant from another

6  test.  And as long as that distance is about the same, but

7  everybody who takes it, you get a very high correlation.  In

8  other words, that means as one goes up, the other goes up.  It

9  doesn't tell you how equivalent the scores are, as you would

10  compare them person to person.  And so that's part of the

11  problem in this arena, is that we are describing correlations

12  between these instruments, and there's relatively little

13  research that does side-by-side comparison of the scores that

14  are obtained from the same person on these different scales.

15      Q.  Okay.  In your profession, based on your professional

16  judgment and knowledge, what is the most prevalently used

17  intelligence testing score in determining or in making

18  determinations concerning mental retardation?

19      A.  The Wechsler Scales, whatever the current version of

20  the Wechsler Scale is, either the child version or the adult

21  version.

22      Q.  Why is that?

23      A.  It is simply the most widely used, most accepted.

24  Psychologists have the most experience with it.  It is simply

25  far and away the most widely-relied upon and utilized

201

1  intellectual assessment measure, and particularly in the

2  diagnosis of mental retardation, assuming the person can see

3  and hear and manipulate objects, and that kind of thing.

4      Q.  Okay.  And Dr. Proctor's report mentioned something

5  about noises and distractions.

6      A.  Yes, sir.

7      Q.  And have you looked at that report -- and you looked

8  that over.  Do you have any concerns in that area?

9      A.  (No response.)

10      Q.  Well, first, let me ask it to you this way.  Have you

11  ever administered the WAIS-IV?

12      A.  Oh, yes, sir, on many occasions.

13      Q.  Okay.  And are you knowledgeable in how to administer

14  it?

15      A.  Yes, sir.

16      Q.  And are you knowledgeable with the documentation that

17  comes from the authors of the examination, what they

18  recommend, what are suitable testing conditions, and all the

19  things like that?

20      A.  Yes, sir, I am.

21      Q.  Okay.  Are there any protocols concerning the testing

22  environment?

23      A.  Yes, sir.  The testing environment should be under

24  conditions that provide confidence in the results, that

25  they're valid.  And so if the examiner is in a situation, and

202

1  he recognizes that, in fact, it's noisy or there are

2  distractions that are sufficient to interfere with

3  performance, then you don't proceed to administer the test,

4  and say, "But by the way, I'm not sure the results are valid."

5  You don't administer the test.  You just stop and arrange for

6  better quarters for this test to be administered --

7      Q.  Let me ask you --

8      A.  -- or if it happens along the way, you stop.  You've

9  gotten two subtests into it.  Noise starts up.  You stop the

10  test, and you finish it in another location or on another

11  occasion.

12      Q.  Doctor, based on your training and experience and

13  knowledge in the field of psychology and in administering the

14  WAIS-IV, would a reasonable and prudent psychiatrist

15  administer the WAIS-IV in conditions that would not provide

16  reliable results?

17      A.  Well, it would be a psychologist that administers,

18  but --

19      Q.  I'm sorry.  Did I say psychiatrist?

20      A.  But, no; sir, a reasonable and prudent psychologist

21  would not administer an I.Q. test under conditions that would

22  cause him or her to doubt the validity of it, particularly as

23  the stakes for that evaluation increase.

24      Q.  Okay.  So if a reasonable and prudent and

25  knowledgeable psychiatrist -- psychologist --

203

1      A.  Psychologist would administer the test.

2      Q.  I'm sorry.  I keep getting those two confused.  A

3  reasonably prudent and competent psychologist conducted a

4  WAIS-IV examination, you would assume that he made the

5  judgment call that the conditions were appropriate and were

6  not enough to -- or were sufficient enough to continue the

7  test.

8      A.  Yes, sir.

9      Q.  You don't believe that they would continue a test

10  knowing or holding the opinion that it was so noisy or so

11  distracting that it was going to affect the validity of the

12  instrument?

13      A.  No, sir.  That would not represent good practice or

14  sound professional judgment.

15      Q.  Okay.  Now, going back to a few more things.  We

16  talked about the Adaptive Behavior Scale --

17      A.  Yes, sir.

18      Q.  -- Residential and Community, that you conducted?

19      A.  Yes, sir.

20      Q.  Let me mark these two items.  First off, are these

21  copies of your examination booklet and the score sheet?

22      A.  Yes, sir.  And there may be some provision that's

23  needed to put this raw test data under some sort of seal, so

24  that it's not broadly available in the community.

25      Q.  Okay.

204

1    A.   That's part of what protects the validity and
2  usefulness of these instruments is not to have raw test data
3  that's part of the open record and file.
4    Q.   Okay.  And we'll take -- we'll address those concerns
5  with the Court.  That's no problem.  But I'm going to mark as
6  Exhibit 578 your examination booklet and as Defendant's 579
7  the score sheet.  And, again, these are copies that you use?
8    A.   Yes, sir.
9    Q.   These are documents that you use and rely upon in
10  your field, in your practice; is that correct?
11    A.   Yes, sir.  I purchase the forms and then fill them
12  out in the course -- the examination booklet.  This is part of
13  what provides the stems or the areas that I will be inquiring
14  about.  And then I mark those answers on these sheets and then
15  do the scoring and transfer that to another sheet.  What you
16  have is a Xeroxed copy -- or a Xeroxed copy of this same
17  question booklet and score sheet.
18    Q.   That have been filled out?
19    A.   Yes, sir.
20        MR. HAGAN:  I tender it to opposing Counsel.
21        MRS. TANNER:  Judge, due to the concerns, I
22  don't mind him testifying to it, but I would object to the
23  actual introducing this into evidence.
24        MR. HAGAN:  Judge, we're going to introduce them
25  into evidence for all purposes.  And along with that, and due

205

1  to the concerns that the doctor expressed, I will ask that
2  they be sealed at the end of these proceedings for the
3  appellate -- for the appellate record only.
4        THE COURT:  They'll be received and ordered
5  sealed, and just included for the record, after the conclusion
6  of these proceedings, for the appellate record only.
7        MR. HAGAN:  Thank you, Your Honor.
8    Q.   (BY MR. HAGAN) Now, do you have the original there
9  with you?
10    A.   Yes, sir.
11    Q.   Let me go ahead and just -- here we go.  This is the
12  examination booklet; is that right?
13    A.   That's correct.
14    Q.   And the first part contains the instructions; is that
15  correct?
16    A.   Yes, sir.
17    Q.   Okey-doke.  Now, I guess what I'm going to try and
18  do -- it's probably just going to be easier -- we'll go ahead
19  and zoom it in and move it around as we need to.
20    A.   Yes, sir.
21    Q.   Now, can you briefly tell the jurors what this
22  booklet is, how it works, what you do?
23    A.   Yes, sir.  These are -- the scale identifies ten
24  different areas or arenas of adaptive functioning and then has
25  items in areas of inquiry to make that would inform each of

206

1  those ten.  And these different levels of functioning -- for
2  example, use a table knife for cutting or spreading, feeds
3  himself neatly with a spoon or fork, that kind of thing -- you
4  don't ask that question directly.  Instead, I'm interviewing,
5  in this case, Shirley, asking her to tell me about his
6  behavior at the table and what he does or doesn't do, and tell
7  me about what utensils he makes use of, and that kind of
8  thing.  And on the basis of that discussion with her about
9  that, I'm obtaining information about where we are on these
10  different arenas.  And those inquiries start pretty open-ended
11  in terms of "Tell me about," and then may narrow as I'm trying
12  to differentiate between two different levels.
13    Q.   Okay.
14    A.   I then circle or sometimes put a slash mark through
15  the number that corresponds to what has been described, and
16  that then results in -- depending on which one has been
17  identified as being characteristic of this person's behavior
18  in that area in the community.  In this case, that first item
19  was a 4, so I put a 4 here, then ultimately will sum these for
20  these different areas.
21    Q.   Right.  The 4 that you circled says what?  Feeds
22  self?
23    A.   Yes, sir.  So in that inquiry, she identified that he
24  does feed himself, but that he spills a lot with his fork or
25  spoon.  He doesn't use a knife.  He'll use his fork to cut

207

1  with or he'll tear it with his hands, but he spills a good
2  deal as he is eating.
3    Q.   Okay.
4    A.   And so that was good for a 4.  If he fed himself
5  neatly, that would be a 5.
6    Q.   Okay.
7    A.   But because he spills with his fork or spoon, that's
8  been reduced to a 4.
9    Q.   And then Item 2 talks about eating in public, and he
10  scored very high there, didn't he?
11    A.   Yes, sir.  When I asked her about that, she said
12  that -- I asked her, "Where does he eat out?"  And she
13  described some places including Olive Garden.  And I said,
14  "What does he do when he's there?  How does he order his
15  food?"  And she said, "Well, he uses a menu."  I said, "He can
16  read the menu?"  And he could.  And so in that one, she's not
17  trying to dial down that he can't order any more than a
18  hamburger or that he always orders the same thing.  She's
19  said, yeah, in Olive Garden, he looks at the menu; he orders
20  what he wants.  That's good for a 3.
21    Q.   Okay.  Now, this next item, drinking, and that was --
22  one was scratched out.  What's going on there?
23    A.   Yes, sir.  I was asking her about his using a glass
24  and drinking with one hand, and that kind of thing, and so I
25  initially scored that a 3.  And then she said "Although

208

1  sometimes he drinks too rapidly and spills it on himself out
2  of the corners of his mouth." And so then I dialed that down
3  a -- one notch, not so much to where we had considerable
4  spilling, but this says drinks without spilling. And she
5  described sometimes that isn't what happens, and so I then
6  scored that as a 2, because that's "S.T." -- sometimes spills.
7      Q.  Okay.
8      A.  So that's the additional note that I made beside the
9  scoring on that item.
10     Q.  Okay.  So that's kind of a judgment call on your
11  part.  It could have been a 3, could have been a 2, and you
12  scored that as a 2; is that right?
13     A.  Yes, sir, because of that spilling.
14     Q.  And let's see.  Item No. 4, what does that concern?
15  Table manners?
16     A.  Table manners.  And this one is going to be scored
17  when the answer is no.  And so when I put a slash mark through
18  it, that means that's the one she's designated.
19     Q.  Okay.  So --
20     A.  Throws food --
21     Q.  She indicated he didn't throw his food?
22     A.  Doesn't swallow his food without chewing.
23     Q.  Okay, so he chews his food.
24     A.  But he does chew his food with his mouth open.
25     Q.  Okay.

209

1      A.  He is dropping food on the floor or the table.  The
2  place around his plate is messy.
3      Q.  Talks with his mouth full.
4      A.  And on this one, on the napkin, she said that in
5  terms of using a napkin, very seldom, but she hands it -- if
6  not handed to him.  I went ahead and gave him credit for that,
7  because he will use it when it's handed to him.
8      Q.  Okay.  And takes food off others' plates.  He doesn't
9  do?
10     A.  No, sir.
11     Q.  And I can't read that.
12     A.  That says eats too fast or too slow.  And she
13  described that he does gulp his food.
14     Q.  Okay.  And doesn't play with his food, though; is
15  that correct?
16     A.  No, sir.  She said that he did until he was eight,
17  but he doesn't anymore.
18     Q.  Okay.
19     A.  And so on that one, of a total of eight items, he has
20  gotten credit -- I guess nine items, he's gotten credit for
21  five.
22     Q.  Okay.  And --
23     A.  Under toilet training, she described that he does
24  occasionally have toilet accidents during the day.
25     Q.  Okay.

210

1      A.  He will wet on himself.  Now, that, again, is going
2  to be some judgment call.  That seems to be associated with
3  the urological problems that he has, that when the urge to
4  urinate occurs, that if he doesn't act quickly on it, that he
5  may wet himself, and so there is a physiological component to
6  that.
7      Q.  Okay.
8      A.  But he does have toilet accidents during the day.
9      Q.  And in other parts of self-care, it looks like he
10  scored very well there.
11     A.  Yes, sir.  The only thing that he did not do was
12  flush his toilet after use.  That isn't consistently done.
13  But otherwise, she's describing him as having good and
14  independent habits at the toilet.  She isn't dialing that down
15  in a noticeable way.
16     Q.  And what about cleanliness, generally?  How does he
17  score there?
18     A.  Well, there's a mix of that in terms of washing his
19  face and hands.  That he does need prompting to wash his
20  hands.  Doesn't typically wash his face.  He will use soap
21  when he goes in to do it.  Doesn't wash his face with soap.
22  Doesn't wash his face at all except in the bath.  He does dry
23  his hands and face.  And so he gets some of those correct.
24  But is not washing his hands as routinely as indicated.
25     Q.  Okay.

211

1      A.  In terms of bathing, that he is washing and drying
2  himself completely without prompting or helping, although he
3  does often call for soap or a towel after he gets in.
4      Q.  Okay.
5      A.  In spite of that, I'm still treating that as being
6  completely without prompting.  Because he routinely is calling
7  for items that most of us would otherwise have available to us
8  in the bath, I did not score him as a 6.
9      Q.  Okay.  And I see on some of these, they get points
10  for individual items, and on some of these -- I guess it's
11  graduating, I guess you would say.
12     A.  It's a yes/no with a number of different subparts.
13     Q.  I see.  Okay.  And personal hygiene?
14     A.  Under, "Has strong underarm odor," she described that
15  she would have to -- he does have strong underarm odor at
16  times and forgets to wear his deodorant.  The second item is
17  "Does not change underwear regularly by self."  She would have
18  to take him clean underwear, but I am still giving him credit
19  for wearing clean underwear, even though she says he has to
20  take it to him clean or he doesn't wear it.
21     Q.  So even out of a possible there of 4, he gets 3.
22     A.  That's correct.
23     Q.  Okay.  And again, the next item is appearance?
24     A.  We've got brushing his teeth here.
25     Q.  Oh, I'm sorry.

212

1    A.  And he is getting a 5 for that.  She said that he
2    does brush his teeth.  He has to be prompted to do that.  She
3    doesn't know if he uses an up-or-down motion as he does that,
4    but I scored that as a 5, given that he does brush, and she
5    was uncertain of whether it's sideways or up and down.
6    Sideways would have been a 4, up and down is a 5, and so he
7    received a 5 on that.
8    Q.  Okay.  And this looks like the next one, as far as
9    appearance goes.  Where you gets the points there is the
10   negative of these items; is that right?
11   A.  That's correct.
12   Q.  Okay.  And so out of that, there's a possible --
13   what?  Looks like 8.
14   A.  That's correct.
15   Q.  And he scored a 6.
16   A.  She that his stomach sticks out because of his
17   posture.  And regarding walking with his toes in or out, she
18   recalled that he walked -- one foot is more straight, and the
19   right one is turned outward a little.
20   Q.  Okay.
21   A.  And so on the basis of that, he got a yes in terms of
22   that walking -- that gait.
23   Q.  Well, you would think on items, if it seems like
24   Mrs. Milam was trying to stretch or make things up, that she
25   would say that his mouth hangs open --

213

1        MRS. TANNER:  Objection to leading, Your Honor.
2    Q.  -- slackjawed.
3        MRS. TANNER:  Excuse me.  Objection to leading.
4        THE COURT:  Sustained.
5    Q.  (BY MR. HAGAN)  The fact that his mouth doesn't hang
6    open, is that significant?  What would that indicate to you?
7    A.  She could describe that it did.  On any of these
8    items, she could dial him down.  She could describe things
9    about -- that he's doing that are not true.  Now, I've spent
10   time with Blaine, and I know that he doesn't sit with his
11   mouth open.  So had she done that, then I would say, "Gee,
12   there is an obvious discrepancy between my own observations
13   and what Mom is telling me."
14   Q.  I understand.  But I guess what I was trying to say
15   is if one was trying to portray someone as a slackjawed
16   idiot --
17   A.  Yes, sir.
18   Q.  -- a good way to do it --
19       MRS. TANNER:  Objection to leading, Your Honor.
20   Q.  -- would be to say --
21       MRS. TANNER:  Excuse me.  Objection to leading.
22   Q.  (BY MR. HAGAN)  What would be a good way to do that?
23       THE COURT:  I'll overrule the objection.
24   Q.  Go ahead and answer the question, Doc.
25   A.  Yes, sir, she could describe him as having a

214

1    stereotypic appearance of somebody who is not very smart.
2    Q.  Okay.  Now, the next section is clothing?
3    A.  Yes, sir.
4    Q.  And how did he do on that?
5    A.  She described that -- in terms of wearing clothing
6    that does not fit properly if not assisted, she described that
7    he would bring items home from the store that he had bought.
8    Go into the clothing store, buy clothes, but without attention
9    to whether they were his size or not.  And so then she would
10   have to have him take those back to get the correct size.  So
11   for that reason, that wears clothes that do not fit properly
12   if not assisted, that's where that no is coming from, because
13   he's coming home from the store with items that don't fit.
14   Q.  I see.  And I think the work shoes and dress shoes,
15   you had that checked.  I believe you wrote a note in it.
16   A.  Well, actually, let me go back to this.
17   Q.  Sure.
18   A.  This first item says wears clothes that do not fit
19   properly if not assisted.  I said no to that.  Once he is
20   putting them on at home, those he does unassisted.  But the
21   buying is a problem.
22   Q.  I see.
23   A.  In terms of wearing torn or unpressed clothing if not
24   prompted, he does that.  He doesn't worry about his clothes
25   being pressed.

215

1    Q.  Uh-huh.
2    A.  Rewears dirty or soiled clothes if not prompted.
3    That's true, too.  If his clean clothes are not delivered to
4    him, he'll put the dirty ones back on.
5    Q.  And you checked "No" for wears clothing -- color
6    combinations if not prompted, but then you got the note that
7    says "Mainly wore blue jeans."  Can you explain what that's
8    all about?
9    A.  Yes, sir.  As I was asking about those matching
10   different items in his wardrobe, she said "Well, he always
11   wears blue jeans.  There's nothing to match."  So that's
12   the -- that's the scoring.
13   Q.  Okay.  So, in effect, what you're doing there is
14   you're giving him the point.
15   A.  Yes, sir.  That's correct.
16   Q.  Okay?  Because you could have easily checked that the
17   other way, couldn't you?
18   A.  That's correct.  And it would be easy for her to say,
19   "Well, no, he'll wear flashing colors.  He'll wear plaids and
20   stripes at the same time."  Instead she says, "All he wears
21   are blue jeans, so there's not a lot to screw up on things not
22   matching."
23   Q.  Okay.  And we're going to --
24   A.  Does not know the difference between work shoes and
25   dress shoes.

1    Q.  That's the one I was asking you about earlier.

2    A.  Yes, sir.  Well, she described that he would -- if

3 you asked him, "Blaine, which ones are your dress shoes?" that

4 he could tell you.  But functionally, he would wear his dress

5 shoes to work.

6    Q.  Down in the pit.

7    A.  Down in the pit, as opposed to the work shoes, so

8 that's where the scoring for that item comes from.

9    ·Q.  Okay.  And does not wear special clothing, raincoat

10 or anything, for different weather conditions?

11    A.  That's correct.  She said that he would wear a coat

12 if it was cold.  But he doesn't attend to it raining outside.

13 He just goes ahead and runs through the rain and tries to get

14 there.

15    Q.  Okay.  And for care of his clothing, he didn't score

16 too well on that; is that right?

17    A.  No, sir.  Doesn't attend to his shoes.  Doesn't put

18 up his clothes in a drawer.  Does not hang up his clothes

19 without prompting.  Does not bring it to her attention if his

20 clothing is missing buttons or items like that.

21    Q.  Okay.  And be a fair thing to say that that's

22 probably been borne out by other items and things that you've

23 seen in this case as well?

24    A.  Yes, sir.

25    Q.  Okay.  And dressing, it looks like he scored pretty

1 high there.

2    A.  Yes, sir.  I scored him as a 4, completely dresses

3 self with verbal prompting only.  And the reason he didn't --

4 I didn't score him as a 5 on that, is she described, "Yeah, he

5 gets himself dressed."  But as we're talking about it, she

6 said, "But he'd head off to work with his pants unzipped."

7 And she would routinely have to remind him to get his pants

8 zipped up.  So that's what happened that he scored a 4 on that

9 instead of a 5.

10    Q.  Okay.  And so again, kind of a judgment call, but

11 could have been a 5.

12    A.  Yes, sir.  And part of the value of using an

13 instrument like this, as you can see, is that it prompts the

14 examiner to ask about many different things, that it helps you

15 take a much more detailed history, as well as giving you then

16 standardized comparison data.

17    Q.  Okay.  Now, on undressing, is that at appropriate

18 times?

19    A.  Yes, sir, undressing at appropriate times.

20    Q.  He scored as high as you could there; is that right?

21    A.  That's correct.  She could have told me that he

22 sleeps in his clothes and doesn't get undressed when he goes

23 to bed, but she described, "Oh, yeah, he takes off his

24 clothes.  He does fine in that area."

25    Q.  Okay.  Next item, shoes?

·1    A.  Puts his shoes on without assistance, yes.  Ties his

2 shoes without assistance, yes.  Interestingly, this next one,

3 unties his shoes without assistance.  She said, "Well,

4 actually what Blaine would do is he would take off his shoes

5 without untying them, and then he would put them back on

6 without untying them."  In other words, he would avoid the

7 effort of having to go through untying and tying his shoes

8 back.

9    Q.  Okay.  And this other, attaches or detaches Velcro on

10 shoes.

11    A.  Same thing.  He is putting -- rather than undoing the

12 Velcro, he's just pulling his shoe off, and then is forcing

13 his foot back in without -- he knows how -- he can tie the

14 shoe, he can use the Velcro, but he's not untying it as he

15 gets out of his shoes.

16    Q.  Okay.  So out of a possible 5, there's a 3 there; is

17 that right?

18    A.  That's correct.

19    Q.  And let's see the next item.

20    A.  Has to do with travel.

21    Q.  Sense of direction.  He scores well on that?

22    A.  That's correct.

23    Q.  Transportation?

24    A.  He rides safely in private cars, but has never done

25 any of these others.

1    Q.  Okay.  And mobility?

2    A.  Got all of those.

3    Q.  He scored well on that.

4    A.  That's correct.  Yes, we went through those items,

5 and he does all of those things.

6    Q.  Okay.  Safety on the street or school ground?

7    A.  Yes, sir.  On that one, he scored a -- there's a

8 possible 3 points he could have gotten.  He scored a 2, and

9 that was because of her descriptions of his roaring out into

10 the road on his four-wheeler.

11    Q.  Or lawn mower?

12    A.  Lawn mower, you know, and also cutting the electrical

13 wire under the house.  That, in fact -- and not routinely

14 using a seat belt.  That all of those contributed, I think, to

15 not being appropriate to give him full credit for "Shows

16 awareness of possible dangers."

17    Q.  Okay.  Well, actually, I think the electrocution item

18 comes up a little bit later, but out of a possible 3, he got 2

19 points there; is that right?

20    A.  That's correct.

21    Q.  Okay.  And telephone?  Looks like he does about --

22 well, not real low, not real high.

23    A.  Yes.  In terms of -- and again, this is made up of

24 various things regarding using a telephone directory.  She

25 said she only saw him open up a directory on a few occasions.

220

1    She's never actually seen him find anything in the directory.
2    That's why he scored a no.  She has seen him use a pay
3    telephone.  He had a cell phone and made use of it for private
4    telephones.  Answers the phone appropriately.  In terms of
5    taking phone messages, she said that he would take them, but
6    then he would forget to tell whoever it was he took a message
7    for, until they might be talking about that person, and then
8    he would say, "Oh, yeah, she called a day or two ago."
9         Q.   And independent functioning.  Let's see, out of a
10   possible -- what was that--
11        A.   Possible 6, he gets 3.
12        Q.   Okay.
13        A.   The first one has ordinary control of appetite; eats
14   moderately.  And she described no, he ate great volumes of
15   food.  He ate a lot.
16        Q.   Okay.
17        A.   So he did not get credit for that.  She never saw him
18   give any demonstration of knowing postal rates or buying
19   stamps or that kind of thing.
20        Q.   Okay.
21        A.   He would look after his personal health.  He would
22   change out of wet clothing.  She said -- I asked her about how
23   he deals with things if he burns himself or cuts himself, and
24   that's where she described that he would just leave it, and
25   then after a while, he would finally show it to her for her to

221

1    doctor in some way.  This is even when he's 17 or 18 years
2    old.
3         Q.   Okay.
4         A.   No indication -- he never made any effort to make any
5    doctor or dentist appointment.  In terms of knowing the
6    locations of hospitals and things in the community, she
7    thought he knew where those were, and that he knew his own
8    address.
9         Q.   And again, if we were looking to shave points here
10   and there, I mean, those are clearly things that Shirley Milam
11   could have told you that he just didn't do?
12        A.   Yes, sir.  She could claim he didn't know his own
13   address or -- no, I don't think he does know where the
14   hospital is in town.
15        Q.   Okay.  And then we get into physical development.
16        A.   In all of these areas, she is giving him full credit,
17   that he doesn't wear glasses, he has no difficulty hearing.
18   She was unsure about his balance, in terms of what he could do
19   in standing, and that kind of thing, but didn't note any
20   problems in that.  Walking and running were fine.  So in this
21   area, he is getting full credit for almost every item.
22        Q.   Okay.  And again, if we were looking at wanting to
23   take points off or -- you know, these are all items that would
24   be pretty easy to say, "You know what?  He" --
25             MRS. TANNER:  Objection to leading.

222

1         Q.   (BY MR. HAGAN)  Isn't that true?
2              MRS. TANNER:  Objection to leading.
3              THE COURT:  Sustained.
4              MR. HAGAN:  Okay.  We'll move on.
5         Q.   (BY MR. HAGAN)  Right over here, and is that
6    continuation of physical development, Item No. 29?  Control of
7    hands?
8         A.   Yes, sir, it is.
9         Q.   And same thing there; is that right?
10        A.   That's right.  He's getting full credit.
11        Q.   And same thing with limb function?
12        A.   Yes, sir.
13        Q.   Okay.  And then economic activity?
14        A.   We had some safety things up in the top left --
15        Q.   Oh, I'm --
16        A.   -- that we skipped over, I think.
17        Q.   No, I think we covered that.
18        A.   We covered that?  Well, I guess we didn't mention
19   that he would pick up -- as I'm talking to her about safety in
20   the home, that he would pick up hot pans with his hand.  On
21   many occasions, he would do that.  He would grab onto
22   something hot off the stove without using a heat pad and would
23   burn himself.
24        Q.   I -- oh, okay.  Yeah, we did.  Item 24, I'm sorry.
25   You're correct.  And that's what you -- so you scored that?

223

1         A.   Yes, sir.  That's where that says "Tried to pick up
2    bare-handed.  He was burned a lot."  This one just above that
3    is "Careful about the danger of hot foods and beverages or hot
4    dishes or pans."  And she's describing, no, he's likely to go
5    up to the stove and just grab onto the hot handle of a pan.
6         Q.   Okay.  And again, that's a scale you look at in all
7    of those areas, we can assume, that asks whether an unfamiliar
8    object is safe to touch or consume, that that was not
9    appropriate to respond to either, correct?
10        A.   Well, yes, sir.  These are getting more sophisticated
11   as you go --
12        Q.   As you go up.
13        A.   As you go up.  So when he's not careful about this,
14   then that's as high as we're getting on those items.
15        Q.   I got you.  Okay, then we get into economic activity.
16        A.   Yes, sir.  She was confident, as I talked to her
17   about this, that he could -- she thought he could add coins of
18   various denominations up to a dollar.
19        Q.   Okay.
20        A.   That in terms of making change correctly, she said,
21   "Well, but he doesn't count them.  He just takes whatever
22   money is given to him and puts it in his pocket."  She would
23   take it from him to count.  That's why he didn't get credit
24   for that.
25        Q.   In this area of money handling, is that an area that

224

1  was also identified by Dr. Gripon?
2      A.  Yes, sir, it is.
3      Q.  Okay.  And the next one on banking.
4      A.  Yes, sir.  That he did not use banking facilities
5  independently, did not maintain an account without assistance.
6  No indication he ever filled out a deposit or withdrawal slip.
7  He did have an ATM card or debit card for a little while.
8  That's where they said they had to take it away from him,
9  because if he had the card, he thought he had money.
10     Q.  I see.  Then we get into the others.  Budgeting, he
11  didn't do well in there at all.
12     A.  No, sir.  What he would do is give money to his
13  father so that he wouldn't have it.  If there was something he
14  was trying to save up for, either his father would take the
15  money from him or Blaine would give it to him.  He didn't have
16  any ability to independently budget and restrain himself from
17  spending.
18     Q.  Okay.  And the same inquiry with errands?
19     A.  That's correct.  He gets, actually, 3 points for
20  that.  He could go into a shop.  If you told him, "Go in there
21  and buy me a gallon of milk," that he could do.  But in terms
22  of going to several shops to specify different items, that's
23  where he couldn't get -- she said he couldn't be depended on
24  to get multiple items.
25     Q.  Okay.  And so, in fact, just the scoring was higher

225

1  on that than what it actually could have been; is that right?
2      A.  Yes, sir.  In terms of going in and purchasing
3  things, to send him on an errand for simple purchasing without
4  a note, it's kind of questionable whether he could do that, if
5  he had very many things.  But he did get credit, because he
6  could go into a shop for a single item.
7      Q.  Uh-huh.  And purchases.  And I think you wrote some
8  notes up there at the top as well.
9      A.  Yes, sir.  Why he didn't get full credit for buying
10  his own clothing, she said he sometimes would buy a shirt or
11  pants without trying it on, and then they would have to return
12  it for the right size.  He would just grab the style he
13  wanted.  He would buy the wrong size belt.  But he was able to
14  make minor purchases.
15     Q.  Okay.
16     A.  And so it's not that he's not making purchases that
17  are more substantial.  It's that they are not the right size.
18  Or he's buying something that's broken and doesn't work.
19     Q.  Okay.  And then I think there's the total there for
20  the economic domain of a 9; is that right?
21     A.  That's correct.
22     Q.  And occasionally, that's what we see are these
23  subtotals.  And we'll get into these in a minute, but they
24  show up here on 579.  And that's the actual scoring; is that
25  right?

226

1      A.  Yes, sir.  Those are the raw scores on those
2  different items.  And then we look up a standard score that
3  goes along with that, and also a percentile for how he
4  compares to other persons who are developmentally disabled in
5  the community.  And you can see in many of these arenas, he's
6  right around the 50th percentile.  His domestic activity and
7  prevocational activity are particularly low.  He does better
8  with numbers and time in terms of percentile.  And his
9  language development is better than many of them.  Economic
10  activity is right in the middle.  He's just about like most
11  individuals who were developmentally disabled in the
12  community.
13     Q.  And physical development, he's in the 99th
14  percentile?
15     A.  Yes, sir.  His physical development seems to be very
16  positive.  Now, she -- I don't know, in fact, if Blaine can
17  stand on his tiptoe on one foot for 15 seconds or whatever it
18  is, but Mom thought that he could do these things.
19     Q.  Okay.  And we'll get to that in a minute.  Okay.
20  Language development, and it talks about writing.
21     A.  Yes, sir.  She said, when I was asking her about
22  this, that only some of his letters, she said, are
23  understandable or complete.  Only some of those.  But he does
24  write short notes or memos.
25     Q.  And again, this was something that -- a finding that

227

1  was substantiated by the State's experts.
2      A.  That's correct.
3      Q.  Okay.  And handwriting?
4      A.  Handwriting, I asked her about him reversing letters
5  or writing backwards.  He didn't do either one of those.  She
6  said that his writing is sometimes illegible.  Sometimes she
7  can tell what he's written, and sometimes she can't.
8      Q.  Okay.
9      A.  And that's why he got a 3 on that total instead of 4.
10     Q.  And again, that's something that's borne out by the
11  State's experts as well?
12     A.  That's correct.
13     Q.  Okay.  Preverbal expression.  I think he scored
14  rather well there, didn't he?
15     A.  Yes, sir, got all those.  He nods his head or smiles
16  to express happiness.  He indicates hunger.  He indicates what
17  he wants by pointing, if he needs to.  He can imitate sounds
18  of objects, animals.  Expresses pleasure or anger.
19     Q.  Okay.  Then we get down to articulation; is that
20  right?
21     A.  Yes, sir.
22     Q.  Okay.
23     A.  And he got credit for all of those items as well.
24     Q.  Okay.  And let's see.  Sentences?
25     A.  That he sometimes uses complex sentences that contain

228

```
1    a clause like "because" or "but," so he got full credit for
2    that item.
3        Q.   Okay.  And again, Doctor, just looking at the expert
4    reports by the State, that's an area that I think the evidence
5    in this case would reasonably dispute --
6              MRS. TANNER:  Objection to leading.
7        Q.   (BY MR. HAGAN) -- wouldn't you agree?
8              MRS. TANNER:  Objection to leading.
9              THE COURT:  I'll overrule the objection.
10       Q.   (BY MR. HAGAN) You can go ahead and answer.
11       A.   Yes, sir.  This is not just talking about in writing,
12   but also in speech.
13       Q.   Oh, okay.
14       A.   That as he speaks, he uses clauses like this.  Not
15   necessarily when he writes, but as he communicates, Blaine can
16   say "because" or "I did this, but this, too."
17       Q.   Okay.  So that wasn't necessarily talking about
18   writing.  This is a different arena.  This is just actually in
19   his speech.
20       A.   That's correct.
21       Q.   Okay.  And so, again, he scores well --
22       A.   3 points for that.
23       Q.   And word usage.
24       A.   That he can talk about what's going on in a picture
25   when he's looking at it.
```

229

```
1        Q.   Okay.  And Item 43?
2        A.   This is -- now, we're in reading comprehension, and
3    he is scoring a 5 on that.  She said that he would read the
4    Thrifty Nickel.  He would look at but not read car magazines.
5    And on this one, in terms of reading books suitable for
6    children 9 years or older, I thought that description of the
7    Thrifty Nickel was the equivalent of that.  Although he's
8    really not reading books and isn't even reading the car
9    magazines; he's only looking at the pictures.
10       Q.   Okay.  But again, he got full credit --
11       A.   That's correct.
12       Q.   -- in that arena.  Okay, Item 44, comprehension of
13   spoken instructions?
14       A.   Yes, sir.  In this one, she said in terms of
15   understanding a complex instruction involving a decision, "If
16   you do this, then you need to do this," that, he couldn't
17   track.
18       Q.   Okay.
19       A.   Understands instructions involving a series of steps.
20   First do this, then do this, then do this.  That he couldn't
21   keep track of beyond the first couple.
22       Q.   Okay.
23       A.   So he didn't get credit for that one.  He can answer
24   simple questions, so that's where he got credit.
25       Q.   Okay.  And Item No. 45, conversation.
```

230

```
1    A.   Yes, sir.
2    Q.   Looks like he got full credit there.
3    A.   Yes, sir.
4    Q.   Hang on just a second.  I want to go back to
5    Item 40 -- bear with me just one second, okay, Doc?
6    A.   Yes, sir.
7    Q.   Okay.  Item 45, conversation.  He scored well there.
8    A.   Yes, sir.  Got all the credit for those.
9    Q.   And on language development, how did he do?
10   A.   Well, that is -- that's mixed.  When I asked her
11   about could he be reasoned with, and we had a discussion about
12   that, she described that he -- you had to go over it again and
13   again, and that he was very slow to grasp things or to heed
14   the warnings he was given, or that kind of thing.  That it's
15   not that he is incapable of being reasoned with, but it is so
16   arduous and you have to repeat so much that I scored that a
17   no.  Obviously responds when spoken to, yes.  Talks sensible.
18   yes.  Reads books, newspapers, magazines for enjoyment, no.
19   He just looks at the car -- pictures in the car magazine.  He
20   can repeat a story with little or no difficulty, although she
21   said, "But he couldn't keep everything straight back to back."
22   That if he told the story one way one time, the next time he
23   told the story, it might have important details that were
24   different.
25   Q.   I see.
```

231

```
1    A.   And then that less one, fills in the main items on an
2    application form, no.  Shirley filled these in for him.
3    Q.   Okay.  Shirley or, in fact, Jesseca?
4    A.   That's correct.  And what she's describing about his
5    adaptive functioning in these arenas, these are the same
6    descriptions that Blaine had given me about his own behavior
7    in those same arenas.  So what Shirley is describing is
8    consistent with what Blaine has told me about what he can do
9    and what he's doing and not doing around the household and the
10   other areas of his life.
11   Q.   Okay.  And actually, I just misspoke about something.
12   I said, "And Jesseca would help him fill out applications as
13   well," but, in fact, when he met Jesseca, he was 18 years old
14   at the time.  Correct?
15   A.   Yes, sir.
16   Q.   And so what this goes back to is, again, looking at
17   things as it occurred prior to age 18?
18   A.   Well, these are --
19   Q.   As well as his current abilities?
20   A.   Yes, sir.  As I'm asking Mom about this, I'm asking
21   her about when he's living in the household most recently
22   before his arrest.
23   Q.   Okay.
24   A.   But those clearly are -- it isn't that he was
25   performing really well with these things, and then in the six
```

232

1  months before his arrest, now he can't -- doesn't know nothing
2  from nothing.
3      Q.    Right.
4      A.    I'm getting her most recent descriptions. Those are
5  reflective of deficits that he has had historically.
6      Q.    And that's what I was getting ready to say. This is
7  not like she's explaining one-time events. These are things
8  that she's talking about that have consistently occurred over
9  time.
10     A.    Yes, sir. This is what he does. And particularly,
11  what he was doing close to the time -- independent of the drug
12  abuse, what's been historically present about his
13  capabilities.
14     Q.    Okay. And would you agree with me that if you
15  factored in the drug abuse to some of these areas, I mean, he
16  would, in fact, score lower in some of these areas?
17          MRS. TANNER: Objection, calls for leading.
18          THE COURT: Sustained.
19     Q.    (BY MR. HAGAN) Do you have an opinion as to whether
20  or not drug abuse would affect the scoring in a lot of these
21  categories we've gone over and some that are coming up?
22     A.    Well, some it would, and some it wouldn't. It might
23  impact on how often he's bathing, for example. It's not going
24  to change number concepts, time concepts, understanding of
25  money, complexity of social sorts of things, materials that

233

1  can be read. There are a lot of things that are not going to
2  be affected by drug abuse. Someone's general life status is
3  likely to decline in the face of that.
4      Q.    Okay. And -- okay. Numbers and time?
5      A.    Yes, sir.
6      Q.    How did he do on that?
7      A.    She thought he could do simple addition and
8  subtraction, but he could not do division and multiplication.
9      Q.    Okay. And again, that's something that's borne out
10  by the State's experts.
11     A.    And by the testing that was done.
12     Q.    Correct. Item No. 48, time?
13     A.    This is all about time. She said he would just wear
14  a wristwatch one day and take it off.
15     Q.    Okay.
16     A.    And so he was not regularly telling time, that she
17  could detect, or tracking that with a watch. This was scored,
18  in part, based on my own direct observation of handing him my
19  wristwatch as well.
20     Q.    Okay.
21     A.    And at least to add additional information to what
22  Mom was describing.
23     Q.    Okay.
24     A.    He could read a digital clock. He did understand the
25  difference between one hour or another, in terms of when his

234

1  programs came on television, like "American Idol." He did not
2  know, she said, these equivalents, like a quarter past 9:00 as
3  the same as 9:15.
4      Q.    Okay.
5      A.    He could associate the time on the clock with various
6  actions and events. And he would look for the TV menu about
7  when "American Idol" was coming on.
8      Q.    Okay. So in some of those concepts -- and as a
9  matter of fact, the bottom one, time concepts, he did quite
10  well on it. He scored as high as you could, correct?
11     A.    Yes, sir. Names of the days of the week. Correctly
12  refers to morning and afternoon. Understands the difference
13  between a day and a week, a minute and an hour, a month and a
14  year.
15     Q.    Okay. Domestic activity?
16     A.    Yes, sir. This was an area of pretty poor
17  performance. She described that he did not clean his living
18  area or his room. He doesn't do anything in terms of laundry
19  functioning whatsoever. That he never set the table. Now,
20  this is in the context that she's saying this, of describing
21  other things that he does. Yeah, he can drive his car, and he
22  can navigate around independently, and he can do this, and he
23  does that, but this arena, he is not functioning with any
24  degree of independence at all.
25     Q.    And again, just so the jurors will understand, this

235

1  is not a checklist you go down --
2      A.    No.
3      Q.    -- and talk to her about, correct?
4      A.    No. I'm talking to her about these areas. That's
5  why my interview of her in this area took a couple of hours,
6  and that's after I already had some information from the first
7  six or seven hours that I spent with her.
8      Q.    Okay. And he didn't score too well continuing in the
9  domestic area; is that right?
10     A.    That's right. He could prepare things like
11  sandwiches and cereal, but could not cook or mix ingredients,
12  or that kind of things.
13     Q.    Okay.
14     A.    Even simple things. He would use the microwave, but
15  he would burn things if they were put on the stove.
16     Q.    Okay. And again, washes dishes well, makes bed
17  neatly, helps with household chores, does household tasks
18  routinely, loads the dishwasher correctly, small electrical
19  appliances correctly --
20     A.    Only the microwave, is the only electrical appliance.
21     Q.    Okay. Which was accounted for in the earlier? Okay.
22  And prevocational, vocational activity?
23     A.    Yes, sir. Now, this is scored with Shirley as the
24  respondent. And potentially, if he were scored and the
25  respondent was somebody at a work site, there are some of

236

1  these that he might score somewhat better on.  I've already
2  described the scoring for why I didn't give him a 2 on shop
3  work or sewing, in terms of the level of machinery that he's
4  using.
5      Q.   Okay.
6      A.   In terms of work, school, and job performance, she's
7  observing him around the house, and those activities.  He's
8  not a careful worker.  He doesn't avoid accidents to himself
9  or others in that setting; although at work, he is not
10 routinely injuring himself there.  Again, you might have a
11 difference in the scoring with different respondents.  She
12 described that in terms of tools, his father's tools, as he
13 was out in the garage, he would just lay the tool down on the
14 floor or the yard or wherever it was.  That he did not
15 reorganize or put up the tools unless he was prompted to do
16 that.
17     Q.   Okay.
18     A.   That he would work steadily and productively.  That,
19 you know, his father took him to work, and then he would --
20 once there, he would work steadily and productively.  And in
21 terms of being neat or accurate, she did not observe that
22 about him as she observed his work activities.  Now, again, on
23 the work site, another responder or observer would -- might
24 well score that one differently.  These are her observations
25 of what she knows of him.

237

1      Q.   Okay.
2      A.   And in terms of *As careful worker, avoids accidents
3  to self or others," this is where she described he would be
4  drenched in oil, that he had it all over him when he came
5  home.
6      Q.   When he came home, it would be all over him?
7      A.   Yes, sir.
8      Q.   Okay.  And his work or school habits, late for work
9  or school without good reason?
10     A.   Yes.
11     Q.   Is often absent from work or school?
12     A.   Yes.
13     Q.   And let's see --
14          Does not complete jobs without constant supervision
15 and encouragement.  She saw that kind of supervision and
16 encouragement as being necessary for him.  Leaves work station
17 without permission; she said, no, he'll stay on the job.
18     Q.   Okay.
19     A.   And does he grumble or gripe about work or school?
20 And she said, "You know, only sometimes.  Maybe monthly he
21 would gripe about something about his job, but only
22 infrequently."  That's another area that would be really easy
23 to say, "Oh, yeah, he complained and griped all the time."
24     Q.   Okay.  And then self-direction, No. 59?
25     A.   Yes, sir.  Under initiative, she described that he

238

1  would go to Wal-Mart and do that.  This is about does he do
2  behaviors independently?  The highest level is initiates most
3  of his own activities.  Tasks, games, that kind of thing.  The
4  second level, is asks to do -- if there is something to do or
5  explores his surroundings.  So she reported he'd ask and we
6  would go to Wal-Mart or to take him someplace.  But not -- but
7  otherwise wasn't initiating most of his own activity, so he
8  got a 2 on that one.
9      Q.   Okay.  And that next one is passivity?
10     A.   Yes, sir.  She viewed him as needing -- the
11 experience with him was that he needed constant encouragement
12 to complete a task, that he had to be made to do things.  Has
13 ambition; she said, yes, he wants to be a singer or a comedian
14 or songwriter.  Because those goals are so unrealistic to his
15 life situation and his abilities, I identified those as being
16 unrealistic, and for that reason, not qualifying as legitimate
17 ambition.
18     Q.   Okay.
19     A.   He finishes his task late because -- or he finishes
20 his task last because of wasted time; she'd observed that.  Is
21 unnecessarily dependent on others for help, yes.  Movements
22 are slow and sluggish, no.  Now, again, some of these, some
23 work supervisors might identify that he was able to do that
24 function without being dependent on others, as he changed the
25 oil or did it in an efficient fashion.  Her observation of him

239

1  is that he's not able to do those things.
2      Q.   Okay.  And Item 61, perseverance?
3      A.   Yes, sir.  In terms of paying attention, she said it
4  depends on the activity, but he could pay attention to an
5  activity for 15 minutes or more.
6      Q.   Okay.
7      A.   That's full credit.
8      Q.   So he got full credit there.  And persistence, he
9  didn't score so well.
10     A.   No, sir.  She said she had never seen him organize a
11 task of any sort.  He becomes easily discouraged.  He fails to
12 carry out tasks.  In terms of jumping from one task to
13 another, she said only at times.  So that one was scored a no.
14     Q.   Okay.
15     A.   He does need encouragement to complete a task.  That
16 was scored yes.
17     Q.   Okay.  And leisure time and activity?
18     A.   He does not have a hobby.  That's the next item up
19 here.  Painting, embroidery, collecting stamps, coins,
20 baseball cards.  He will go fishing sometimes, but no hobbies.
21 In terms of participates in organized leisure activity if it's
22 arranged for him, it's not so much organized as it is he's
23 going to the lake to fish.  He'll get on the four-wheeler and
24 go down to the nearby lake and fish.  And so that was scored a
25 2.  It's more than just watching TV and listening to the

240

```
1   radio.  It isn't as advanced as if he actually has a hobby of
2   some kind.
3       Q.  Okay.  And responsibility?
4       A.  She identified that he was not dependable at all,
5   that with his clothes and personal items, that he seldom took
6   care of them at all.  That what he bought would get torn up.
7   He would leave it laying out.  Didn't put it up.  Didn't
8   attend to it.  So he got a 1 for that one.
9       Q.  Okay.
10      A.  General responsibility.  She viewed him as being
11  unreliable, in terms of carrying out something that was
12  assigned to him.  He might say that he was going to do it, but
13  then not do it until somebody came back and prompted him and
14  structured that activity.  Now, at work, they regarded him as
15  reasonably dependable and responsible, in terms of doing the
16  tasks that were assigned to him.
17      Q.  Okay.  And so somebody at work may score him a little
18  higher than that, possibly a 2 or a 3?
19      A.  Yes, sir.  Personal responsibility, she viewed him as
20  usually maintaining self-control.  And if you can bring the
21  screen up, I've got some notes that are attached to some of
22  these others.
23      Q.  Sure.
24      A.  Understands the concept of being on time.  She
25  described that he would acknowledge that he needed to get up
```

241

```
1   in the morning, but still was difficult to awake, and somebody
2   else had to go in there and get him.
3       Q.  Okay.
4       A.  Seeks help and accepts help on instructions; he does
5   that.  He would go to his dad, and then his dad would
6   typically get up and show him how to do it.  Not tell him, but
7   actually go demonstrate how to do something.
8       Q.  Okay.
9       A.  And that he would go tell his dad to come look and
10  update him on his progress, so he got credit for most of those
11  items.
12      Q.  Okay.  And socialization.
13      A.  He is willing to help if asked --
14      Q.  Okay.
15      A.  -- but did not usually offer assistance to other
16  people.  Did not show much interest in the affairs of others.
17  Did not take care of others' belongings.  Did not direct or
18  manage the affairs of others as needed.  He did show
19  consideration for other people's feelings.
20      Q.  Okay.  And awareness of others, he scored --
21      A.  All of those --
22      Q.  -- looks like, very well.
23      A.  That's right.  He knows who his family is.  He knows
24  information about them.  He knows their names.
25      Q.  Okay.  Interaction with others?
```

242

```
1       A.  He interacts with others in group games or
2   activities.  He got a 3.
3       Q.  Okay.  And participates in group activities?
4       A.  He participates in group activities if he's
5   encouraged to do so.  On this one, she said it kind of depends
6   on what it is.  That part of the problem is he's not involved
7   in or seeking activity in groups.  And so given the
8   discrepancy between these two, because he's not,
9   in fact, seeking group activities, I viewed that as being more
10  of a passive response to those group interactions.
11      Q.  That included group activities like going to church,
12  things like that?
13      A.  Yes, sir, or -- yeah, any kind of organized -- that's
14  what you expect teenagers to be extensively involved in, are
15  their peer activities and group activities.  He was not doing
16  that as a teen.
17      Q.  Okay.  And selfishness?
18      A.  He got credit for all of those.  He takes turns.  He
19  shares with others.  He doesn't get mad if he doesn't get his
20  own way.  Would not interrupt somebody who's trying to help
21  somebody else.  He said he would end up interrupting them as
22  he joined in to try to assist.  And his injecting himself into
23  the situation to try to help might interrupt it and disrupt
24  it.
25      Q.  Okay.  And social maturity?
```

243

```
1       A.  She thought that he was too familiar with strangers.
2   He wasn't afraid of them.  That he was gullible and eager to
3   please and would do too much to get other people's approval
4   and to make friends, but he's not trying to hold strangers'
5   hands or ride up on somebody's elbow.
6       Q.  Okay.  So when we talk about this -- and this is a
7   standardized booklet that you use, correct?
8       A.  Yes, sir.
9       Q.  And the rest are just areas that we're not involved
10  in this part, correct?
11      A.  The other parts of it are looking at problem
12  behaviors.
13      Q.  Okay.
14      A.  You know, what's he doing that is disruptive or
15  problematic in nature?  What behavior disturbances does he
16  display?  That was not the focus of my evaluation.  My
17  evaluation was on his adaptive functioning, not on problem
18  behaviors that he has.
19      Q.  Okay.  And that was 578.  And 579 is the score sheet,
20  correct?
21      A.  Yes, sir.  Do you want the original?
22      Q.  No, you can hang on to it.  I've got the copy here.
23  I'm just going to hand you your book back.
24      A.  Thank you.
25      Q.  And again, I think you showed this to the jurors a
```

1  minute ago. That's the scores for all of these subgroups; is

2  that correct?

3      A.  Yes, sir. These are the raw scores. And from these

4  raw scores, you then go to a table of individuals that were

5  his age, you know, at the time that she's making these

6  observations, when he's 18 years old. And that generates a

7  standard score, and that standard score has a mean of 10. So

8  you can see some items, he is less than is expected for

9  developmentally disabled, and some he's greater. That then

10 translates, in another table, to the percentile rank. In

11 other words, here he is higher than 84 percent. You might

12 slide this over a little bit, so we can see what these are.

13 That he is higher than 84 percent of developmentally disabled

14 in terms of numbers and time but is particularly deficient in

15 domestic activity and, as his mother views it, in

16 prevocational activity. But in many of these arenas, he is

17 very much like individuals that are developmentally disabled

18 and are in the community. Then there's still another table

19 that generates an age equivalent of those scores.

20     Q.  Okay. And that would be an age equivalent to someone

21 without disabilities?

22     A.  That's correct, who is living -- is in the community

23 and does not have mental retardation.

24     Q.  Okay. So in some of these areas, your scoring was

25 off by 2 points, 3 points. How much difference are we talking

---

1  about, as far as percentile rank would go or the age

2  equivalence?

3      A.  If, for example, the prevocational activity was

4  scored out by a supervisor, and he gained additional points on

5  that, that would increase this, but he has a long way to go

6  before he is different than other developmentally disabled

7  individuals in the community.

8      Q.  Okay.

9      A.  And so as you -- as you look at the -- as you look at

10 Shirley's responses to these items, her responses to them are

11 not significantly discrepant from other descriptions of

12 Blaine, except in that kind of vocational arena.

13     Q.  And did you look at the vocational, prevocational,

14 vocational activity arena and, in essence, adjust it up?

15     A.  Well, no, sir.

16     Q.  Now, I'm talking about this afternoon --

17     A.  No.

18     Q.  -- when me and you talked.

19     A.  No. Oh, you're talking about did I look at how would

20 this change if you gave him additional points --

21     Q.  Yes.

22     A.  -- the way somebody would --

23     Q.  (Moving head up and down.)

24     A.  Yes, sir, we looked at that.

25     Q.  And what would that result in?

---

246                                                                           247

1      A.  Well, it would boost up -- instead of being, for

2  example, at a -- about like a 4-year-old, that he might be

3  more like a 6- or an 8-year-old, depending on in terms of his

4  work capabilities, in terms of how much additional credit you

5  gave him for some of those items.

6      Q.  Okay. And again, I think all of these, it would be

7  pretty hard for someone that's not sophisticated --

8          MRS. TANNER:  Objection to leading.

9      Q.  (BY MR. HAGAN) How hard would it be for someone

10 that's unsophisticated, especially in recognizing these

11 adaptive behaviors, how hard would it be for them to jiggle

12 with the scores, so to speak?

13     A.  They could certainly provide a description that would

14 result in lower scores. That wouldn't be that hard. The

15 difficulty would be to provide a description that was

16 consistent with the description the person gave about himself

17 independently, that was also consistent with descriptions that

18 were given by other third parties who were reviewed

19 independently, and would be consistent with some of the

20 information in the records. So, yeah, it's easy enough to

21 say, "Yeah, he can't do this, and he can't do this, and he

22 can't do this." That happens pretty readily. Much more

23 difficult to do that so that it matches what other people say,

24 matches the records, matches the defendant and is consistent

25 with those Wechsler I.Q. scores. That's a tougher road.

---

1      Q.  Okay. And that's another thing I was going to ask

2  you about. When you look at the behaviors that you did, these

3  adaptive behaviors, if you don't do this standardized test,

4  what are you left with?

5      A.  Well, what I had done, you're left -- potentially

6  you're left with what I did initially, which is to obtain

7  detailed anecdotal accounts of what he is not able to do,

8  where the deficits are, from different people who have had

9  close observation. Go to the records, see what indication

10 there is of it in that arena. Look at other information about

11 the range of his social interactions, and that kind of thing.

12 What this provides, in addition to that, that other approach

13 is going to be as good as the depth of the interviews you do

14 about these different areas, how many hours you spend

15 interviewing these individuals about these areas. What this

16 provides, in addition to that, is it gives you prompts to make

17 pretty detailed inquiries, and it gives you a mechanism to

18 compare this person in a systematic way to other people that

19 have disabilities.

20     Q.  Okay. And the decision to use or to not use the

21 adaptive behavior measure, does that have anything to do with

22 how far out from the developmental period the subject is?

23     A.  Yes, sir.

24     Q.  And why is that?

25     A.  These instruments are designed to be used by people

248

1 who have had recent observation of the individual. And so
2 let's say Blaine had been in prison for 10 or 15 years, and
3 now we're talking about -- now the issue of mental retardation
4 comes up, and we're trying to extrapolate what he was like
5 back in the community 15 years ago. And then I sit down with
6 Shirley, and I say, "Tell me what he was like," and let me go
7 through an instrument like this. That's a problem, because
8 now you're asking somebody not to recall relatively recent
9 events, but to recall things from 15 years ago. So in that
10 instance, you might not be able to reasonably rely on
11 something like this. You would have to rely on the records
12 and on people's anecdotal stories and descriptions about the
13 individual.
14      Q.   Okay.  Now, a couple of times, you were trying to
15 answer some of the questions by State's Counsel, and I don't
16 think we got an opportunity to hear your answer.  On the
17 Alabama trips --
18      A.   Yes, sir.
19      Q.   -- what was that you were trying to explain about the
20 Alabama trips?
21      A.   I don't have a precise recollection --
22      Q.   Okay.
23      A.   -- about -- I mean, I understand the question.  I
24 don't have a precise recollection of which trip was which.  On
25 one trip, he was observed to be sleeping a great deal of the

249

1 time.  On another trip, he was observed to be agitated and
2 pacing, and they thought he looked like he was a meth head.
3      Q.   Okay.
4      A.   And I don't remember from the descriptions of those
5 individuals --
6      Q.   If I --
7      A.   -- which trip they're talking about.
8      Q.   If I represent to you that it's previously been
9 testified that the first trip to Alabama was a one-day trip
10 that occurred sometime in October, and the second trip, the
11 longer trip, was one of a four-day, or so, duration that
12 occurred sometime in November, does that help sort it out for
13 you?
14      A.   My general recollection -- let me turn to my notes --
15      Q.   Sure, go right ahead.
16      A.   -- that I made from those -- from those interviews.
17 This is the joint interview of Charles Russell Taylor and Lisa
18 Lee Taylor, who were people in Elba, Alabama.  They were
19 interviewed by the Elba -- by Andy Gunter of the Elba Police
20 Department.  And they described that Blaine slept a lot the
21 first few days he was there.  When he woke up, he was jittery
22 like he was on something.  He admitted he had done something;
23 ice.
24           And so it sounds like that, with the benefit of
25 these notes, for the first several days that he's there, it's

250

1 as if he's crashing.  Then he's observed to be jittery and
2 activated again, as if he's done something.  And so the answer
3 is did he use meth when he was in Alabama?  I guess the answer
4 would be yes and no.  He crashed, and then it appears that he
5 was using again.
6      Q.   Okay.  And State's Counsel, I think, didn't let you
7 finish up on a question.  I think basically what you were
8 trying to describe was what were the precursors to the
9 injuries to Amora Carson in this case, in your opinion?
10           MRS. TANNER:  Objection, Your Honor.  Calls for
11 speculation.  He didn't speak with the defendant about the
12 crime; therefore, I'm going to object to him speculating about
13 it, since he did not even talk to him about the facts of this
14 case.
15      Q.   (BY MR. HAGAN) Let me ask you this --
16           MRS. TANNER:  Calls for speculation.
17           THE COURT:  All right.
18      Q.   (BY MR. HAGAN) Let me ask you this.  Were you -- was
19 it made available to you statements of Jesseca Carson
20 concerning the injuries to Amora Carson?
21      A.   Yes, sir.
22      Q.   Did you review those statements?
23           MRS. TANNER:  Judge, may we approach?
24           THE COURT:  Yes.
25           (Conference at the Bench:)

251

1           MRS. TANNER:  He's trying to go behind the
2 Court's ruling.
3           MR. HAGAN:  I am not.
4           MRS. TANNER:  705(d), the State is going to
5 object he did not speak with Jesseca Carson.  He chose not to
6 speak to this defendant.  As a result, this is an attempt to
7 go behind the Court's ruling, and we're going to object.
8           MR. HAGAN:  Your Honor, he listened to the
9 statements of Jesseca Carson, and I think he next testified
10 that information such as that is something that is normally
11 used by experts in his field and relied upon, and that it
12 forms a basis of his opinion.  And if the Court -- or the
13 State wants to keep out the exact statements, then they can
14 make their objection at that time if I choose to introduce
15 them, and I will try.
16           THE COURT:  Well, I've already ruled that those
17 exact statements are inadmissible.
18           MR. HAGAN:  I understand.
19           THE COURT:  Okay.
20           MRS. TANNER:  Judge, I'm going to object to
21 him -- he's not a medical examiner.  He cannot speak about the
22 precursors of injuries, particularly when he has not
23 endeavored to interview any of the people involved.
24           MR. HAGAN:  Judge, the precursor of injuries are
25 the circumstances surrounding the offense, and he can

252

1  definitely testify to the opinions he has formed and all the
2  information he has been provided, including the statements of
3  Jesseca Carson.
4        MRS. TANNER:  His opinions are not helpful to
5  the jury under Rule --
6        MR. HAGAN:  They clearly are.
7        MRS. TANNER:  Let me finish, Counsel.
8        MR. HAGAN:  Do it.
9        THE COURT:  Y'all settle down.
10       MR. HAGAN:  I did.
11       MRS. TANNER:  Under 702, his opinions in this
12 regard are of no benefit to the jury and, therefore, should be
13 excluded under Nenno and under Daubert, because in addition to
14 the fact that they are not a benefit, he did not interview any
15 of these people.  As a result, under 702, his opinions are
16 not -- do not aid the jury in the decisions they are to make
17 in this case.
18       THE COURT:  I've ruled.
19       MR. HAGAN:  It's the same opinion testimony
20 that's already been admitted in this case.
21       THE COURT:  Okay.  I've ruled.  Well, I mean,
22 the exact statements, he cannot testify to.
23       MRS. TANNER:  That's -- I agree.
24       MR. HAGAN:  I disagree.
25       MRS. TANNER:  I don't see how he can ask these

253

1  questions.
2        THE COURT:  He can ask the questions, and he
3  can -- whatever he knows, he knows, but he wouldn't be able to
4  testify to the exact statements Jesseca Carson made.
5        MRS. TANNER:  We probably need to ask outside
6  the presence of this jury, because the way this expert goes,
7  he's going to skew off into something.
8        THE COURT:  Okay.
9        (Conclusion of Bench conference.)
10       THE COURT:  All right, ladies and gentlemen, I
11 need to recess you back to the jury room.  We'll go ahead and
12 do this.  What we'll do is we'll take -- we'll reconvene at
13 5:00.  We're not going to eat dinner tonight, but we're not
14 going to go near as late as we did last night.  So with that
15 understanding, we'll take a 20-minute recess.  We'll reconvene
16 and proceed.  Again, you're under all the instructions I've
17 heretofore given you.  Do not discuss the case among
18 yourselves, nor with anyone else, nor access any information
19 about the case.  You may step down.
20       (Jury exited the courtroom.)
21       THE COURT:  All right, outside the presence of
22 the jury, you may proceed, Mr. Hagan, with the proposed
23 testimony.
24       MR. HAGAN:  Thank you.
25       REDIRECT EXAMINATION (CONTINUED)

254

1  BY MR. HAGAN:
2     Q.   Oh, where were we, Doc?  Let's see.
3     A.   Precursors.
4     Q.   What were the precursors to the injury of this -- of
5  the child in this case, Amora Carson?
6     A.   These are the precursors that are part of the family
7  script, of this family system.  And those precursors are
8  premature --
9        COURT REPORTER:  I'm sorry, I can't hear.
10    A.   I'm sorry.  These are the precursors of that family
11 script that he grew up in, and those precursors are premature
12 parenting and drug abuse, and that's what creates the context.
13 And more specifically, abuse of stimulants and methamphetamine
14 that is occurring among his siblings.  And those -- the
15 interaction of those premature parenting responsibilities and
16 the drug abuse, those are the family script precursors that
17 lead to this offense.  Now, thankfully, that tragic
18 intersection has not occurred with his siblings, but as they
19 have been in harm's way with volatile relationships and early
20 parenting and heavy drug abuse, those are conditions that much
21 increase the likelihood of child abuse.
22    Q.   Okay.  And you talked or -- talked, excuse me; strike
23 that.  You listened to the conversations that Jesseca Carson
24 had with Lieutenant Kenny Ray?
25    A.   Yes, sir, and also observed the videotape

255

1  interrogation that you provided.
2     Q.   With Kenny Ray?
3     A.   That's correct.
4     Q.   And she details, in her opinion, what happened to
5  Amora Carson and how she was injured.
6     A.   She provides an account of that and the interaction
7  between her and Blaine before and during that offense and
8  their mutual perceptions.
9     Q.   And in your opinion, based on that, did the state of
10 mind of Jesseca Carson play a role in the death of Amora
11 Carson?
12    A.   Yes, sir.
13    Q.   And what led you to that conclusion?
14    A.   Blaine and Jesseca are described by third-party
15 observers, including these folks in Elba, Alabama, of having
16 shared delusions about the death of her father and the
17 circumstances of that.  They both have anxieties and
18 delusional beliefs about this Ouija board, about the apartment
19 being possessed.  In her statement, Jesseca describes coming
20 to believe that there was a demon inside of Blaine, that he
21 was possessed.  And Blaine made reference to that as well, to
22 his being possessed.
23       That they came to believe that Amora was
24 possessed and jointly identified some need for an exorcism to
25 remove that demon from her.  And that this offense occurred in

256

1    a context where they were both present in the household, with
2    her knowledge and understanding that some sort of exorcism was
3    occurring that Blaine was doing to Amora.  Now, the
4    significance of this, as I described earlier, is that when you
5    have someone who is in the midst of a methamphetamine
6    psychosis, and their own reality testing is distorted and
7    fragile, when there is someone else there who's also
8    psychotic, who is participating in the same kind of delusional
9    beliefs, and is, in fact, providing additional content of
10   their own along those same lines, it potentiates this
11   experience for both of those individuals and increases the
12   likelihood of it escalating and their acting on it, in this
13   case in a very tragic way.
14        Q.   And in your opinion, those are significant factors
15   that resulted in the death of Amora Carson?
16        A.   Yes, sir.  I think the synergistic interaction of
17   their psychoses were a critical nexus with this offense.  Now,
18   Jesseca provides an account of how that's occurring, how their
19   psychoses are interacting at the time of this offense.  The
20   tremendous damage and bizarre injuries that are inflicted on
21   this little child are their own evidence of this being done by
22   individuals who are profoundly disturbed, particularly in this
23   context of known methamphetamine abuse and psychosis on his
24   part, and the reports of Jesseca's sharing in that same
25   delusional system and her own psychosis.

257

1         That with that historical or that recent history
2    of observations of their shared delusional beliefs, and the
3    nature of the injuries that are done to this child, and the
4    context of her describing an exorcism being done, all of that
5    provides a critically important context and explanation of how
6    this offense is rooted in mutual mental illness that is
7    synergistically interacting.  I can't imagine anything of
8    greater relevance to moral culpability and mitigation than
9    people acting on the basis of shared psychosis.
10            MR. HAGAN:  That's what we would offer.
11            MRS. TANNER:  May I have just a minute?
12            THE COURT:  Yes.
13            (State's attorneys conferred.)
14            MRS. TANNER:  If his testimony is that, and only
15   that, the State has no objection.
16            MR. HAGAN:  Then you're just going to have to
17   pretty much get that printed out for me so I can repeat it,
18   because I -- I'll do my dead level best.
19            MRS. TANNER:  With the understanding, of course,
20   that they can't open their own door.  I mean, if this is an
21   attempt to open the door to a bunch of extrinsic evidence, we
22   would object, but if that's all they want to do right there,
23   we won't object.
24            THE COURT:  All right, the Court will --
25            MR. HAGAN:  Well, that's obviously not all we

258

1    want to do, but given the constraints that I'm under from the
2    Court, that is what we offer.
3            THE COURT:  All right, with the understanding,
4    from the Court's perspective, that that's not opening the
5    door.
6            MR. HAGAN:  That it's not opening the door, and
7    without waiving any other objections to the --
8            MRS. TANNER:  Sure, I understand that.
9            MR. HAGAN:  -- request and repeated request for
10   evidence in this case to come out.
11            THE COURT:  Yes.  All right.  How do you want to
12   proceed, Mr. Hagan?
13            MRS. TANNER:  Can we get excerpt that from --
14            MR. HAGAN:  Can we excerpt that real quick, so I
15   can just --
16            (Court reporter provided excerpt to the
17   attorneys.)
18            (Jury returned to the courtroom.)
19            THE COURT:  You may be seated.  You may
20   continue, Mr. Hagan.
21            MR. HAGAN:  Thank you, Your Honor.
22         DIRECT EXAMINATION (CONTINUED)
23   BY MR. HAGAN:
24        Q.   Doctor, let's kind of pick up where we left off.
25        A.   Yes, sir.

259

1         Q.   What were the precursors in this case that resulted
2    ultimately in the death of Amora Carson?
3         A.   Some of those precursors --
4            THE COURT:  Hold on one second.  Let me get the
5    sound.  Okay.
6         A.   Two very important precursors of this offense were
7    related to Blaine's family scripts.  And those family scripts,
8    out of his own family history, included premature parenting
9    and significant drug abuse, including abuse of stimulants, of
10   cocaine, and methamphetamine.  And it's the intersection of
11   those two things, of premature parenting and amphetamines,
12   that provide the context for this offense.  Now, with his
13   siblings, thankfully a tragedy was avoided in their lives so
14   far, with their children, although the raw material for that,
15   in terms of premature parenting and abuse of alcohol and
16   particularly stimulants has been present, which provided a
17   significant zone of risk for them, although thankfully it
18   wasn't realized.
19        Q.   Okay.  Now, when we left off a minute ago, I was
20   talking to you about the statements Jesseca Carson made --
21        A.   Yes, sir.
22        Q.   -- in this case.  You've listened to those
23   tape-recorded conversations and videotaped conversations that
24   she had with Kenny Ray --
25        A.   Yes, sir, I have.

260

1    Q.   -- is that right?  And she details, in her opinion,
2    what happened to Amora Carson and how she died.
3    A.   Yes, sir, she does.
4    Q.   And she provides an account of that and --
5    A.   Yes, sir.  She provides -- she provides an account of
6    what happened to Amora, and also the interaction between her
7    and Blaine during that offense, and their mutual perceptions
8    that were occurring at the time of that offense.
9    Q.   And in your opinion, based on that, the state of mind
10   of Jesseca Carson, that played a significant role in the death
11   of Amora?
12   A.   Yes, sir.
13   Q.   And what led you to that conclusion?
14   A.   Blaine and Jesseca are described by third party
15   observers, including folks in Elba, Alabama, when they were
16   there on those visits, of having shared delusions about the
17   death of her father and the circumstances of that death being
18   a murder instead of suicide.  They both had anxieties and
19   delusional beliefs about this Ouija board and about the
20   apartment being possessed where they had used that Ouija
21   board.
22            In her statement, Jesseca describes coming to
23   believe that there was a demon inside of Blaine, that he was
24   possessed, and Blaine also made reference to a belief that he
25   was possessed by a demon.  They came to believe that Amora was

261

1    possessed and jointly identified some need for an exorcism to
2    remove the demon from her.  This offense occurred in a
3    context, according to Jesseca's statement, where they were
4    both present in the household, with her knowledge and
5    understanding that some sort of exorcism was occurring that
6    Blaine was doing to Amora.
7            Now, the significance of this is, as I described
8    earlier, when you have somebody who's in the midst of a
9    methamphetamine psychosis, and their own reality testing is
10   distorted and fragile, and then when there's someone who's
11   there who's also psychotic and is participating in the same
12   kind of delusional beliefs and, in fact, providing some
13   additional content of their own along those same lines, then
14   it potentiates the psychotic experience for both of these
15   individuals as they are feeding off of each other's delusional
16   perceptions.  It increases the likelihood of this psychosis
17   and delusion escalating, and it increases the likelihood that
18   they will act on these beliefs in a tragic fashion.
19   Q.   And in your opinion, Doctor, those are significant
20   factors in this case that ultimately resulted in the death of
21   Amora Carson --
22   A.   Yes, sir.
23   Q.   -- is that right?
24   A.   Yes, sir.  I think the synergistic interaction of
25   their psychoses was a critical nexus in the context of this

262

1    offense.  Now, Jesseca provides an account of how that's
2    occurring, about how their psychoses are interacting at the
3    time of this offense.  The tremendous damage and bizarre
4    injuries that are inflicted on this little child are their own
5    evidence of this offense being done by individuals who are
6    profoundly disturbed, particularly when you have a known
7    context of methamphetamine abuse and psychosis on his part,
8    and third-party descriptions of her being delusional and
9    sharing in the same delusional belief system on her part, out
10   of her own delusional system and her own psychosis.
11            And with that historical or recent history of
12   observation of their shared delusional beliefs, and the nature
13   of the injuries that are perpetrated on this poor little
14   child, and the context of her describing how this is -- an
15   exorcism is occurring, all of that provides a critically
16   important nexus and explanation of how this offense is rooted
17   in their mutual mental illness and in the way their mental
18   illnesses are synergistically interacting with each other.
19            MR. HAGAN:  Pass the witness.
20            MRS. TANNER:  No further questions.
21            THE COURT:  You may step down.
22            THE WITNESS:  Thank you, sir.
23            THE COURT:  Is this witness excused or retained
24   here for your purposes?
25            MRS. TANNER:  No objection.

263

1            MR. HAGAN:  That's fine.  And, Your Honor, the
2    defense rests.
3            THE COURT:  State have any rebuttal witnesses?
4            MR. JIMERSON:  Yes, sir, Your Honor.  We call
5    Gary Jenkins.
6            THE COURT:  You may proceed.
7                    GARY JENKINS,
8    having been first duly sworn, testified as follows:
9                 DIRECT EXAMINATION
10   BY MR. JIMERSON:
11   Q.   Tell this jury your name and what you do for a
12   living.
13   A.   Gary Jenkins, and I work for Big 5 Tire & Auto.
14   Q.   About how many years have you worked for Big 5 Tire &
15   Auto?
16   A.   Going on my 15th year.
17   Q.   What do you do for Big 5 Tire & Auto?
18   A.   Sir, I'm the head technician and also the service
19   manager.
20   Q.   And about how many of those years have been at Big 5
21   Tire & Auto in Longview, Texas?
22   A.   All 15.
23   Q.   When you say you're the head technician, tell the
24   jury what that is.
25   A.   Well, what it is, I oversee all the cars that comes

264

1    in, and also train the new employees that comes in, also, on
2    their job duties.
3         Q.   And, sir, did you have occasion to train Blaine
4    Milam?
5         A.   Yes, sir, I did.
6         Q.   And you recognize him sitting in the courtroom today?
7         A.   Yes, sir, I do.
8         Q.   Can you identify him by describing some article of
9    clothing that he's wearing and pointing to him?
10        A.   He's wearing a black jacket with the gray shirt on
11   and khaki-looking pants.
12             MR. JIMERSON:  Your Honor, I ask the record to
13   reflect he's identified the defendant.
14             THE COURT:  The record will so reflect.
15        Q.   Tell the jury about training Blaine Milam.  What is
16   it you trained him to do?
17        A.   Sir, what it is, we make sure that they know how to
18   check the vehicles out, as far as front-end parts, check
19   tires.  We have a tread-depth gauge that we check tread on it.
20   We have to write it down on a piece of paper.  Check for
21   looseness on the front ends.  Check the fluid levels on the
22   vehicles.  And in his case, he had to change oil and oil
23   filters on it.  And --
24        Q.   You mentioned changing oil.  What's required, other
25   than just taking the plug out of the pan?

265

1         A.   Well, you've got to take the drain plug out, then
2    take the oil filter off and make sure the gasket don't stick
3    to the motor part at all, because if the oil filter ring stays
4    on the motor itself, it could burn up a motor.  You've got to
5    make sure that the O-ring is also on your drain plug before
6    you put it back in.  If not, it will burn the motor up.
7         Q.   How do you know what filter to use?
8         A.   Sir, you have to look them up in a book.
9         Q.   Did you train Blaine to do this?
10        A.   Yes, sir, I did.
11        Q.   Does it matter about the make of the car?  Does that
12   make a difference?
13        A.   Yes, sir.
14        Q.   What are some of the other factors in figuring out
15   what filter goes in a car?
16        A.   You've got to know what motor size it's got, whether
17   it's a 2-wheel drive, 4-wheel drive, what body style it is, is
18   the items that you have to really check out.
19        Q.   Was Mr. Blaine Milam able to locate the proper filter
20   using this reference manual?
21        A.   Yes, sir.  We never had a problem.
22        Q.   And when he removed the drain plug, tell the jury
23   whether or not he was able to get out of the way of the hot
24   oil as it came down or whether it poured down over him?
25        A.   No, sir, he was able to get out of the way.  He knew

266

1    he had a drain pan to drain it in.
2         Q.   As far as the -- what else did you teach him, because
3    I interrupted you.  You were talking about -- you got to the
4    point where you were talking about changing the oil.  What
5    else?
6         A.   Also, about making sure that that O-ring was off.
7    Also, I got him to -- taught him how to check brakes and make
8    sure the brakes was proper and everything, making sure they
9    wasn't too low, and everything.
10        Q.   Well, what goes into -- you know, some people may not
11   have ever worked in a place like this, and they may have a way
12   of looking at this like it's just menial labor.  Tell them
13   what goes into checking the brakes.
14        A.   Well, what it is, you have to pull the wheels off and
15   check the brake pads and make sure there's no oil or brake
16   fluid, or whatever, may be getting on the brake pads and
17   shoes.
18        Q.   Was Mr. Blaine Milam -- did he have any difficulties
19   in doing this?
20        A.   No, sir.
21        Q.   And I may not have mentioned this, but to check the
22   brakes, you take the tires off, correct?
23        A.   Yes, sir.
24        Q.   You take the wheels off?
25        A.   Yes, sir.

267

1         Q.   Did Mr. Blaine Milam, did he also break down tires?
2         A.   Yes, sir.
3         Q.   Tell the jury about that, what he did in that respect
4    and who taught him.
5         A.   What it is, you have to let the air out of them,
6    break the tires down with a machine, and all, in order to put
7    the new ones on.
8         Q.   What kind of machine?
9         A.   A tire machine.  It's operated by electric and air.
10        Q.   What does it do?  Can you describe it?
11        A.   Well, sir, it -- once you take the tires off the
12   wheels and everything, then you've got to put the new ones
13   back on with the machine, and everything, and air it back up
14   to the proper air pressure, which the air pressure is on most
15   of your door panels.  That's something else that I had trained
16   him to check out.
17        Q.   Is it fair to say that machine that you were
18   describing, is that something that you would see in a tire
19   shop, in a shop?
20        A.   Yes, sir.
21        Q.   In a tire shop?
22        A.   Yes, sir.
23        Q.   What about tools?  Was Mr. Blaine Milam able to work
24   with tools?
25        A.   Yes, sir.  He was able to work with all the tools

268

1    that we had there, and everything.
2        Q.   Was he able to keep up with them, or did he just
3    break them or throw them down?
4        A.   No, sir, he put them back in place, and all, once he
5    got through with them.  He had a roll-around cart that he
6    always placed them back where he got them from.  And also, on
7    the putting the tires on and everything, we also used what
8    they call a torque wrench, and everything.  And that's very
9    important to not overtighten the tires, and everything,
10   whenever you put them back on a vehicle, and he did use that.
11       Q.   I mean, is there any certain kind of setting or any
12   certain kind of amount of torque you're looking for?
13       A.   Yes, sir.  These torque sticks, you have different
14   ones that goes on different nuts, and everything, different
15   size.
16       Q.   Tell the jury -- maybe they're not familiar at all
17   with a torque stick.  What are you talking about?
18       A.   Well, a torque stick, what it is, these things are --
19   you know, start out about 50 pounds, and they'll go up to
20   about 130 pounds.  And you can sit there and hammer on these
21   torque sticks, and everything, with an air gun, and all it
22   will do is flex, and everything, once it gets to the pressure
23   that it's supposed to be at.
24       Q.   Can you hurt yourself with any of this stuff, the
25   tire break-over machine, and that kind of stuff?

269

1        A.   Yes, sir, you could.
2        Q.   Did Blaine have any safety issues at work?  Did he
3    hurt himself?
4        A.   No, sir.
5        Q.   How would you describe -- you trained him.  How would
6    you describe his training?  How did he do in his training?
7        A.   He did very well in his training.
8        Q.   Could he --
9        A.   I didn't have no problem of him picking it up, you
10   know.  He would ask me occasionally about a different part or
11   something, you know, because that's what I was there for.
12       Q.   What kind of employee did he make in terms of -- you
13   know, was he able to do -- to do this or was he somebody you
14   just had to stand over all the time?  I mean, what --
15       A.   No, sir, he knew what -- he knew what his job duties
16   was, and everything.  He didn't only do tires and oil changes,
17   but he also kept the shop, and all, clean and kept the tools
18   up.
19       Q.   Did you have to prompt him to do that?
20       A.   No, sir.
21       Q.   Did he demonstrate there at the Big 5 Tire, did he
22   ever have any goals of any future with the company, moving up,
23   or anything like that?
24       A.   No, sir.  As a matter of fact, Bryan, the store
25   manager, had started trying to train him, and everything, on

270

1    the computer to become a salesman.
2        Q.   Did Blaine take to that or not take to that?  Was
3    that something he wanted to do?
4        A.   Well, he wasn't there long enough, but he had started
5    being trained on it.
6        Q.   I mean, is it fair to say that was a goal that Blaine
7    Milam had?
8        A.   Yes, sir.  Yes, sir.
9        Q.   That's what he --
10       A.   That's what he wanted to do.
11       Q.   How was he -- and I should have made this clear, but
12   Bryan Perkins, who's testified earlier in this case, explain
13   his job in relation to yours with Big 5 Tire.
14       A.   Okay.  Bryan was the store manager.  He oversaw the
15   whole store, and everything.  And him and I would interview
16   the people that came in, and everything, but Bryan would have
17   to do the official hiring and also firing.
18       Q.   You mentioned Blaine Milam was working some with the
19   computer.  Just tell the jury what are some of the tasks he
20   was doing with the computer.
21       A.   What he had started teaching him how to do is look up
22   different sized tires, the prices of them, what the tires cost
23   us, and some of the labor stuff that we have in the computer.
24       Q.   Some people on the jury may not know; is there a
25   difference between tires from one vehicle to another?

271

1        A.   Yes, sir.  You have, you know, 13-, 14-, 15-inch
2    tires, and you may have 10 or 12 sizes in that same -- you
3    know, in a 15 or 13, whatever, you know.  So you've got to
4    know which one you're looking up.
5        Q.   And how do you look those up on the computer and
6    compare the prices?
7        A.   Sir, I don't mess with the computer that much.  It's
8    just that -- you go by the different sizes, and all, what you
9    have to do.
10       Q.   So he was -- at that point, he was moving into an
11   area -- Perkins was bringing him into an area that you don't
12   do.
13       A.   Yes, sir.  I do not mess with the computer.
14       Q.   Did there come a time when Mr. Milam didn't work
15   there anymore?
16       A.   Yes, sir.
17       Q.   And then did there -- did he come back?
18       A.   Yes, sir.
19       Q.   Well, tell the jury why you would take him back after
20   that.
21       A.   Well, the reason we brought him back, and everything,
22   he had caught on quickly, and everything, quicker than some of
23   them that we have trained, and everything.  And he was a good
24   employee, and we did care for him, and everything.  But he was
25   a very good employee when he was there.  We didn't have to

**272**

1  tell him what to do.  He knew what to do, so --
2     Q.   And the problem became that he wouldn't show up.
3     A.   Yes, sir.
4          MR. JIMERSON:  May I approach, Your Honor?
5          THE COURT:  Yes, you may.
6     Q.   I'm going to show you State's Exhibit 299.  Do you
7  recognize what that is?
8     A.   Yes, sir, I do.
9     Q.   Did I, or somebody at my direction, ask you to bring
10  that with you?
11    A.   Yes, sir, you did.
12    Q.   Okay.
13         MR. JIMERSON:  Your Honor, we'll offer State's
14  Exhibit 299.
15         MR. JACKSON:  There's no objection, Judge.
16         THE COURT:  All right, what was the number on
17  that, Mr. Jimerson?
18         MR. JIMERSON:  299, Your Honor.
19         THE COURT:  State's 299 will be received.
20         MR. JIMERSON:  Can I display that on the
21  document camera, Your Honor?
22         THE COURT:  Yes, you may.
23    Q.   (BY MR. JIMERSON) I can't quite get all of that on
24  there, but tell the jury what they're looking at there.
25    A.   What you're looking at is a work order that we have

**273**

1  to check off on each vehicle that comes in there.  On one
2  side, where it has the tires on the left-hand side there --
3     Q.   Well, let's do this.
4     A.   Oh, I'm sorry.
5     Q.   No, you're fine.
6     A.   Okay.  First off --
7     Q.   You're going to kind of walk us through it.
8     A.   Okay, whoever --
9          THE WITNESS:  Can I stand up and show them, Your
10  Honor?
11         THE COURT:  Yes.
12    A.   All right.  First off, up here, and everything, at
13  the top, the store manager puts the name and address, and all,
14  on it of the person that's in.  He also normally fills out the
15  year model and make and model.  And what Blaine's job was to
16  do is continue -- fill out the engine size, license number,
17  and mileage.  Then you come over here, and we have to put the
18  tires, what make tires it is.  And if it had Uniroyals on it,
19  you put that down.  If it had mixed tires, you know, like two
20  or three different types, we wrote down "Mix" on it.
21    Q.   Was that Blaine's responsibility?
22    A.   Yes, sir.
23    Q.   Continue, sir.
24    A.   Then right here, you wrote down the size, you know,
25  what size the tire was, you know, whether it was a 235/75-15

**274**

1  or 235/85-16, whatever may be.  Here's the correct air
2  pressure, you know.  Again, that goes to your door panel and
3  everything, where most of them is posted.  Here, we put the
4  pressure that's in each tire.  We've got to check each tire
5  and see what pressure is in it, you know.  Somebody may --
6  know -- somebody may put 50 pounds in one that's supposed to
7  have 35 pounds.  That could cause an accident, you know, so
8  that was important.  Right here, we had to put the tread
9  depth, and everything.  If a tire is less than 3/32nds, and
10  everything, you're definitely supposed to recommend replacing
11  it, so we had to put that down.
12    Q.   Now, the gauge that you use, is it just a "go/no go"
13  gauge on that --
14    A.   Yes.
15    Q.   -- or does that list the actual --
16    A.   It lists the proper tread depth.  You just push it
17  down, and it says 2/32nds, 3, 4, whatever, you know.
18    Q.   So you actually read it and record it on there?
19    A.   Yes, sir.  And you have to write it down.  Okay?
20  Over here is your shocks -- about your shocks and struts, you
21  know.  And what it is, if they're leaking, you know, he knew
22  to write them up, and everything.  If he saw the tires
23  cupping, and everything, that's normally due by the shocks
24  being bad, so --
25    Q.   When you say "he," you're referring to Blaine Milam

**275**

1  filling out this form?
2     A.   To Blaine, yes.  Yes, sir.  And what you would have
3  to do on that, you know, if it needs it, you would mark an "X"
4  and circle it, you know, is what we would do, you know.  And
5  he was instructed to do that, and we didn't have a problem
6  with it.
7     Q.   What about over here, brakes?
8     A.   Okay.  On the brakes, same thing.  You just check the
9  brakes, see how much was left, and everything, or --
10    Q.   For people who's not familiar with that at all, what
11  are you talking about when you talk about how much is left?
12    A.   We really looked at the depth of it, and everything.
13  If it's about 2/32nds, we would recommend it, or if it's
14  getting close to the rivets and everything, you replace them.
15    Q.   You're looking at the brake pad?
16    A.   Yes, sir, the brake pad itself.  Also if there was
17  any fluid, brake fluid, and all, that has gotten on them, and
18  everything, you replace them.  Or rear-end grease, you know,
19  that's something he knew to look at, you know.
20    Q.   Is that important or not important?
21    A.   That's very important, yes, sir.  So what you would
22  do, you know, is mark down here if it was leaking, and
23  everything, and then right here, "Recommended," and
24  everything, and circle it, you know.
25    Q.   Go ahead to the next section, suspension and

276

1  steering. Was there anything to fill out on that?

2  A. Yes, sir. Now, you checked ball joints. Springs,

3  you didn't have to worry about too much, and everything,

4  because they didn't sag all that much. Bushings and A frames,

5  U-joints, engine mounts.

6  Q. Just real quickly, for the jury's benefit, in case

7  somebody doesn't know what ball joints or are bushings or

8  U-joints --

9  A. Okay, ball joints is mostly on your upper and lower

10 control arms. If they get bad and break, you know, you won't

11 have no steering, you know, cause a wreck, and everything.

12 And he did know how to check those out with a pry bar, you

13 know.

14 Q. Tell them how you do it with a pry bar.

15 A. Okay. What you do, let the vehicle down about that

16 far off the ground (indicating), take a pry bar and see if

17 it's got any slack in it. If it does, he ends up calling me,

18 and I check it, and everything, to make double-sure, you know,

19 it's bad.

20 Q. Was he able to do that?

21 A. Yes.

22 Q. Was Blaine Milam able to do that?

23 A. Yes. He could check it, and then if he had any

24 doubts, he would call me and ask me, you know. Sealer links,

25 you know, that has to do with the steering, also, and he knew

277

1  how to check that out. The next one is for front-wheel drive

2  vehicles, and some rear wheel; you have CV boots or drive

3  axles, and everything, instead of U-joints. And that goes

4  through your transmission, you know, and if one of those

5  breaks, you know, or the boot gets bad, and everything, you

6  need to replace it, and everything.

7  Q. And we -- I didn't ask you what U-joints were, but

8  somebody might not know what a U-joint is. What is it?

9  A. Sir, that goes on your drive train, you know, drive

10 shaft, you know. If they get loose, they just need to be

11 replaced. You very seldom have an accident over something

12 like that, but they could cause vibration. The drive shaft

13 itself could drop on the ground.

14 Q. Could fall out if they get really worn?

15 A. Yes, sir. Yes.

16 Q. And boots, tell them what you mean in general terms

17 when you talk about boots --

18 A. Okay. It's called a constant velocity boot, and

19 everything. It's a rubber boot that goes around the drive

20 axle that holds the grease and all in it, you know. And if

21 all that grease gets out, and everything, it ruins that

22 knuckle and could cause the drive axle to drop out.

23 Q. CV joints?

24 A. That has to do with the same thing, sir. The boot

25 covers that CV joint.

278

1  Q. Alignment and chassis?

2  A. Alignment --

3  Q. Alignment checks, I'm sorry.

4  A. Yes, sir. What it is, you look at the way the tire

5  is wearing. If it's wearing bad on the inside, and

6  everything, that means the camber's real bad. Or if it's kind

7  of scraping across the tire sideways, you know, that means the

8  toe's out. And he knew how to check the tires and everything,

9  as far as looking at them and seeing if the tires was wearing

10 properly or not.

11 Q. That rack and pinion?

12 A. Rack and pinion, that has to do with your steering.

13 And normally on that, if the boot -- you know, if it goes to

14 leaking and everything, he knew to look for leaks, and

15 everything, coming out of the rack and pinion.

16 Q. Over here, the next section refers to tie rod ends?

17 A. Tie rod ends, yes, sir, that goes -- you have an

18 inner one and you have an outer one, and some of them's even

19 got a sleeve on it. Now, that does -- with the steering, it

20 will go out to your wheels, and everything, and to your

21 connecting rods, to your rack and pinion, and all. And if

22 those was to break, it could cause an accident, and he knew

23 how to check it for slackness.

24 Q. You mentioned tie rod sleeves. What about the idle

25 arm?

279

1  A. Idler Arm, Pitman Arm, again, that's with the

2  steering. They don't normally break. They just get real

3  loose, and that can cause tire problems and everything,

4  shaking going down the road, you know, if they get too bad.

5  Q. Tell them about this section over here marked

6  "Belts/hoses/filters."

7  A. Okay. What that is, is checking your belts, seeing

8  if it has cuts in it, cracks, and everything. That is just a

9  feature for the person to know, where it won't break on them

10 going down the road, and everything, where you wouldn't have

11 no power steering and all, if the belt was to break. And he

12 knew how to check it for cracks and all.

13 Q. Is there a place here for the person to sign?

14 A. Yes, sir.

15 Q. What do you call the person that does this? Does he

16 have a title?

17 A. Right here on the description, what that is, is we --

18 Bryan, the store manager, normally fills that out. And if

19 somebody comes in for oil change, he writes it down. Or if he

20 wants -- they want the brakes checked, the tires rotated, and

21 everything, it will be in this column here. And then whatever

22 Blaine has to recommend, and everything, has to go below that

23 after he has checked these here off and put an "X" where it

24 says, "Recommended." Then right here, what it is, whenever we

25 finished the work and all, they're supposed to sign that he

280

1  did the oil change and tightened the lug nuts back up, so --
2  that's in case a wheel was to fall off, and everything, we
3  would know who to go back to.
4      Q.  The same with the filter change?
5      A.  Yes, sir.
6      Q.  Transmission fluid?
7      A.  Well, I'm the one that does that, you know.
8      Q.  Okay.  So Blaine would just fill in the --
9      A.  Yes.
10     Q.  -- wheel lug nuts?  Mr. Milam?
11     A.  Yes, sir.
12     Q.  And the purpose of that, as well as the purpose of
13  signing up there, is that so that you can hold the employee
14  accountable if something does go wrong?
15     A.  Yes, sir.  That way you'll know that if something
16  went wrong, it wasn't one -- you know, you know who it was.
17     Q.  Can you recall any problems with Mr. Blaine Milam?
18     A.  There was only one time, that I know of, out of all
19  the time he was there, that he left the wheel loose.
20     Q.  Did he do it again after that?
21     A.  No, sir.
22     Q.  You may take your seat, sir.  Mr. Jenkins, you spent
23  some time with this little girl, didn't you?
24     A.  Yes, sir.
25     Q.  Tell the jury about how often a week she came up to

281

1  work.
2      A.  It was often, you know.  It was, most of the time, at
3  least three or four times a week.
4      Q.  How did she get up there?
5      A.  He would bring her and his girlfriend up there.
6      Q.  Was that Jesseca Carson?
7      A.  Yes, sir.
8      Q.  Did they stay a good while when they were up there --
9      A.  Yes, sir.
10     Q.  -- Jesseca and Amora?
11     A.  Whenever he brought her up there, she would have to
12  stay the rest of the day.
13     Q.  Well, how was Amora, as far as a baby?  Was she that
14  much trouble, or do you recall?
15     A.  Wasn't none at all.  She was a very good baby.  She
16  never did cry all the time that they brought her up there.
17         MR. JIMERSON:  Pass the witness.
18         MR. JACKSON:  May I proceed, Judge?
19         THE COURT:  Yes.
20              CROSS-EXAMINATION
21  BY MR. JACKSON:
22     Q.  Mr. Jenkins, how long did Blaine Milam work you?
23  From July, August, to about --
24     A.  About five months, something like that.
25     Q.  He started, what, about sometime in July of 2008?

282

1      A.  Probably, June, July, something.
2      Q.  July, August, September, and he stopped showing up
3  right around the first of October, didn't he?
4      A.  Well, for one week.
5      Q.  Okay.  And when did he come back?
6      A.  Just -- it was around a week after that.  You know,
7  after he quit showing up, he came back and asked for his job
8  back, him and his girlfriend.  She was the one that came back
9  and actually said that he had a problem, and everything, that
10  he was worried about coming back and asking for his job.
11     Q.  You were happy to hire him back, weren't you?
12     A.  Yes, sir.
13     Q.  And, in fact, at the time, you kind of liked Blaine,
14  didn't you?
15     A.  Yes, sir.
16     Q.  Now, obviously, you noted, I believe, that Blaine
17  wasn't the smartest person you had ever hired, I believe; is
18  that right?
19     A.  Yes, sir.
20     Q.  And, in fact, I think you even noted that he's slow,
21  right?
22     A.  Well, at first, he was.  That was doing the job
23  duties, and everything, as far as breaking down tires, and
24  stuff like that, at first, but --
25     Q.  Right.

283

1      A.  -- sir, he got his --
2      Q.  I understand --
3         MR. JIMERSON:  Can he answer the question, Your
4  Honor?  May he be permitted to answer?
5      Q.  (BY MR. JACKSON) I didn't mean to interrupt.  Please
6  continue.
7      A.  He was just as good as the other employees that we
8  have hired.  Once he got trained, and everything, we didn't
9  have a problem with Blaine.
10     Q.  Yeah, I know that.  In fact, you liked him.  You
11  didn't have a problem with him as a person, did you?
12     A.  No, sir.
13     Q.  But in fact, I think you made note that he was slow
14  at first, right?
15     A.  At first.
16     Q.  Yeah.  And, in fact, I think you made note that he
17  would just -- as a person, he was also slow.  Right?
18     A.  Huh?
19     Q.  Do you remember that?
20     A.  No, sir.
21     Q.  No?  Okay.
22     A.  I mean, I don't recall him being that slow, no, I
23  don't.
24     Q.  You just don't recall him being that slow.  Okay.
25  Now, being an auto mechanic, that's kind of a vocational

**284**

```
 1   skill, isn't it?
 2      A.   Yes, sir.
 3      Q.   It's something that some people can take when they're
 4   in high school.  They can take like a vocational track, and
 5   they can start learning things like that, right?
 6      A.   Yes, sir.
 7      Q.   Now, you can go to -- there's different, I guess,
 8   levels of being a mechanic.
 9      A.   Yes, sir.
10      Q.   Some people go to school for quite sometime to learn
11   how to really break down engines and work with computers, with
12   the new engines that we've got now.
13      A.   Yes, sir.
14      Q.   Some people go to become a diesel mechanic, which is
15   pretty highly technical, isn't it?
16      A.   Yes, sir.
17      Q.   It takes a lot of training, and these people can make
18   a lot of money doing this, can't they?
19      A.   Yes, sir.
20      Q.   Now, as a society, we rely on shops like yours to
21   keep our cars in general good maintenance or good working
22   order, don't we?
23      A.   Yes, sir.
24      Q.   And make sure our brakes are good, our tires are
25   good.  But Blaine was not doing the highly technical engine
```

**285**

```
 1   work that we would see from somebody who's had a lot of
 2   training, like going into breaking down our engines or diesel
 3   mechanic, was he?
 4      A.   Sir, I don't do that.
 5      Q.   Exactly.  That's what I'm getting at.  This is
 6   more -- I don't want to say simplistic, because I can't do it.
 7   It would take a lot of training to teach me to do what you do.
 8      A.   Yeah.
 9      Q.   But someone -- in fact, do you know that -- whether
10   or not someone can be mentally retarded but can learn
11   vocational skills?  Do you know that?  Have you heard that?
12      A.   No, sir.
13      Q.   Okay.  Would it surprise you to find out that
14   that's -- a mild form of mental retardation, that's one of the
15   things that they talk about to us, is that they can learn to
16   do vocational skills such as this.  Did you know that?
17      A.   Okay.
18      Q.   Did you know it?
19      A.   No, sir.
20      Q.   Okay.  And you initially said, when you started
21   training him, that Blaine was slow in picking up, but he
22   definitely learned how to do it, right?
23      A.   Yeah.
24      Q.   You had to show him.  It was more than just telling
25   him.  You had to get hands on and show him, "This is what you
```

**286**

```
 1   do," and things of that nature.
 2      A.   Sir, I have to do that with all of them, you know.
 3      Q.   But it's what you had to do with Blaine, also?
 4      A.   Yeah, that's everybody.  I mean, if they've never had
 5   anything to do with automobiles, you have to do that with any
 6   of them.
 7      Q.   And it definitely helps if Blaine had had prior
 8   teaching, maybe from his dad or someone, how to work on
 9   general auto -- to do general auto maintenance, right?
10      A.   Yes, sir.
11      Q.   So did it appear that he had had some assistance
12   before, in knowing how to do some general auto maintenance?
13   Did he come with some prior knowledge?
14      A.   Yes, sir.
15      Q.   Okay.  Did you know he learned that from his daddy or
16   did you find that out?
17      A.   No.  He told me that he learned part of it from a
18   place that he worked at in Tatum.
19      Q.   That's right.
20      A.   You know, at an oil place.
21      Q.   At an oil change place.
22      A.   Yes, sir.
23      Q.   Again, that oil change place, that's kind of what we
24   consider -- like around here, that we have Quick Lubes or
25   things of that nature, right, where you go and pull the car in
```

**287**

```
 1   the bay, and they have like a set routine they go through to
 2   change your oil and check your fluids, correct?
 3      A.   Yes.  Yes, sir.
 4      Q.   They might even have a checklist of this is --
 5   like -- let me back up.  Like, if you go someplace like Quick
 6   Lube -- I guess it's a national chain or maybe a chain down in
 7   this neck of the woods.
 8      A.   Yes, sir.
 9      Q.   They will have set routines on how to optimize or be
10   efficient in changing your oil, right?
11      A.   Right.
12      Q.   Or they might have a checklist they're going to teach
13   their employees.  The first thing you do, you're going to
14   check maybe the VIN Number, the oil.  You know, see if there's
15   any kind of stickers on the car, what kind of oil was put into
16   it.
17      A.   Yes.
18      Q.   You're going to check the miles.  You have a
19   checklist you go through, right?
20      A.   Yes, sir.
21      Q.   It's not really asking you to think outside the box.
22   You're going to follow their routine.  Don't screw up their
23   routine.  Right?
24      A.   Yes, sir.
25      Q.   Okay.  Now, and a lot of that is kind of what you do,
```

288

1  also.  That form Mr. Jimerson showed you, there's a routine
2  you want your employees to follow, so they don't mess things
3  up, right?
4      Q.  Yes, sir.
5      Q.  Okay.  And you taught Blaine, "This is what you're
6  going to fill out.  This is -- you're going to check the
7  mileage."  The engine size, I think I've even learned how to
8  do that.  You can check that from the VIN underneath the hood?
9      A.  No, sir.  Normally, there's a --
10     Q.  Tell me where that's found.
11     A.  A decal, and everything, on the -- underneath the
12  hood itself.
13     Q.  I was close.
14     A.  Some of them's got it on the motor --
15     Q.  Okay.
16     A.  -- you know.
17     Q.  But there's set places you can teach someone where to
18  go look, right?
19     A.  Yes, sir.
20     Q.  Now, if you were teaching me -- well, let me ask you.
21  You don't have to have a high school diploma to come work for
22  you?
23     A.  No, sir.
24     Q.  It's not a prerequisite.
25     A.  No, sir.

289

1      Q.  If I came to you as an employee and said, "Listen,
2  I've got a fifth grade education.  I've got some general auto
3  mechanicking in my past.  Can I apply for a job?"  Is that
4  going to preclude me from coming to work for you?
5      A.  No, sir.
6      Q.  Okay.  So you would teach someone like Blaine, if a
7  person comes in -- I think Mr. Jimerson said they've got to
8  check -- Blaine would check engine size, model of the vehicle,
9  and the mileage.  There's set places to go look for these on
10  vehicles, right?
11     A.  Yes, sir.
12     Q.  It obviously goes without saying we know where the
13  mileage is.  You write those numbers down.
14     A.  Uh-huh.
15     Q.  The model of the vehicle; we know it's a Ford or a
16  Chevy.  Usually we can see that written on the outside of the
17  car somewhere.
18     A.  Right.
19     Q.  Okay.  And the engine size, there's a set place under
20  the hood where they can go find that.
21     A.  Yes, sir.
22     Q.  Okay.  Now, the size of the tire, it kind of goes
23  without saying, usually you're going to find it on the outside
24  of the tire.  It's going to be kind of a raised black on the
25  tire?

290

1      A.  Yes, sir.
2      Q.  Okay.  So that's something he could go write down.
3  And then you teach your employees to go to the computer.  I
4  think don't you press the letter "P" on your computer?  You
5  have some button you can press where the size of the tires
6  pull up --
7      A.  As far as -- like I say, I don't mess with the
8  computer that much, but you've got to know whether it's P or
9  LT or --
10     Q.  LT might be for light?
11     A.  Light truck.
12     Q.  Yeah.
13     A.  And then there's another class of them, also --
14     Q.  Okay.
15     A.  -- but I don't mess with those.
16     Q.  I trust not.  Trust me, with my computers, also.  I
17  guess the point is that it's pretty easy to pull up on your
18  system, start pushing a P or LT, and you're going to come up
19  with those size of those tires.  And you can even write the
20  size of those tires down, take it to the computer, type that
21  in, and it's going to come up on your screen pretty easy for
22  your employees to check availability, in stock, or the price
23  of those tires, right?
24     A.  There's certain deals that they've got to go through
25  to get to that, though.

291

1      Q.  Okay.
2      A.  You know, it's not just go press P and then, you
3  know, the tire size.  There's something else that they have to
4  go through to do that --
5      Q.  All right.
6      A.  -- you know.
7      Q.  There were at least two incidents, I think, where
8  Blaine had a little issue with some customers.  I think one of
9  them, he didn't tighten the lug nuts down correctly, and I
10  guess the tire came off on someone's car?  Do you remember
11  that?
12     A.  Yes, sir.
13     Q.  And I think there was another one where -- same
14  thing.  The tire wasn't tightened down right or he didn't use
15  the torque wrench appropriately.  I guess the rim wobbled,
16  messed the rim up a little bit?
17     A.  The only one that I know of is one that he had to
18  purchase the rim on.
19     Q.  Yeah.
20     A.  That's the only one that I know of.
21     Q.  Okay.  And I guess the tread depth, do you have some
22  kind of device you stick on the tread where it lets you know
23  how much tread's left?
24     A.  Yes, sir.
25     Q.  Okay.

292

1       MR. JACKSON: Pass the witness. Thank you, Your
2  Honor.
3                    REDIRECT EXAMINATION
4  BY MR. JIMERSON:
5       Q.   You were asked something about highly technical work
6  like diesel mechanics, and you said, "I don't do that." What
7  do you mean?
8       A.   Sir, I don't work on diesels. We'll change the oil
9  and oil filters and fuel filters, but as far as any inside
10 jobs, you know, what we call heavy line, we do not do, you
11 know. We don't get into the motors itself, tear them down.
12      Q.   Y'all just pretty much change oil, tires, brakes --
13      A.   Yes, sir, and belts and hoses, stuff like that, on
14 all on them, yes, sir.
15      Q.   And you made a career out of that for how many years?
16      A.   I've been working on vehicles for close to 30 years.
17      Q.   Mr. Jenkins, I don't say this to insult you. I say
18 this to ask the question. Is there anything slow or special
19 about you?
20      A.   I'm a little slow myself, and everything. I'm not as
21 fast as I was years ago, no, sir, you know.
22      Q.   Have you ever been diagnosed mentally retarded?
23      A.   No, sir.
24      Q.   Do you have any sort of -- is there any sort of
25 special program that y'all go to to get employees to --

293

1  because, you know, for any idea that maybe the mentally
2  retarded are better suited for changing oil?
3       A.   No, sir.
4       Q.   Anything like that going on?
5       A.   No, sir.
6       Q.   Were the words "mentally retarded," in your
7  experience and your time, were they ever associated with
8  Blaine Milam, prior to him being charged with capital murder?
9       A.   No, sir.
10           MR. JIMERSON: Pass the witness.
11           MR. JACKSON: No further questions, Judge.
12 Thank you.
13           THE COURT: You may step down, sir.
14           THE WITNESS: Thank you.
15           MR. JIMERSON: May he be excused, Your Honor?
16           MR. JACKSON: Absolutely.
17           THE COURT: Yes, sir, you may be excused. You
18 may call your next witness.
19           MR. JIMERSON: Melanie Dolive.
20           THE COURT: You may proceed.
21                    MELANIE DOLIVE,
22 having been first duly sworn, testified as follows:
23                    DIRECT EXAMINATION
24 BY MR. JIMERSON:
25      Q.   Prior to your appearance, ma'am, I may not have

294

1  pronounced your name properly. Would you help me say your
2  name correctly.
3       A.   It's Melanie Dolive.
4       Q.   Dolive?
5       A.   Yes.
6       Q.   Tell the jury what your profession --
7       A.   I'm a --
8       Q.   -- is or was for 30 years.
9       A.   I'm a special education teacher at Tatum Primary
10 School in Tatum, Texas.
11      Q.   And when you say Tatum Primary School, it's part of
12 Tatum Independent School District, correct?
13      A.   Yes, sir.
14      Q.   For those of us from -- for those who may be from
15 larger areas, is there just one primary school or is there
16 several?
17      A.   There's -- there's just one primary school. It's
18 through the third grade.
19      Q.   So is it first grade through third grade, or does it
20 go --
21      A.   Pre-K through third.
22      Q.   And how long have you been at Tatum Primary School?
23      A.   30 years.
24      Q.   How long have you been involved in special education
25 at Tatum Primary School?

295

1       A.   21 of those 30 years.
2       Q.   Can you tell the jury what your role is, in that
3  regard, in the special ed department at Tatum Primary School?
4       A.   My job is to implement and plan an individual
5  education plan for students who have been identified with a
6  special need, and my job is to instruct them in whatever
7  subject area they need help in.
8       Q.   And for at least some of your career, were you the
9  special education department for Tatum Primary School?
10      A.   I am the special education department right now.
11      Q.   For about how long has that been the case?
12      A.   For the last -- the last three years, it's just been
13 me. Two or three years prior to that, in the -- probably in
14 the '90s.
15      Q.   Tell the jury -- you remember Blaine Milam, correct?
16      A.   Yes, I do.
17      Q.   And you remember back when he was in first grade,
18 second grade? You remember that?
19      A.   Uh-huh, yes.
20      Q.   And you're aware -- you're aware that he had a speech
21 impediment issue?
22      A.   Yes, sir.
23      Q.   But as far as the special education services that you
24 provided, as pretty much the special ed department, did you
25 ever teach Blaine Milam?

296

1    A.   No, sir, I did not.

2    Q.   And in your 30 years, have you dealt with children

3 who were mentally retarded?

4    A.   Yes, sir.

5    Q.   About how many?

6    A.   In the 30 years, approximately 5 or 6.

7    Q.   Was that diagnosis or label ever associated with

8 Blaine Milam prior to this case?

9    A.   Not to my knowledge, no, sir.

10    Q.   Did you have some knowledge of Blaine Milam outside

11 of Tatum Primary School?

12    A.   Yes, sir.  His older sister and my daughter were

13 friends and classmates growing up.

14    Q.   Tell the jury about that.  Did you have occasion to

15 visit at the Milam home?

16    A.   Yes.  My daughter would go over there to play or

17 spend the night, and I would go and pick her up.

18    Q.   Tell them what you observed over there.

19    A.   Just normal, you know, family things going on.

20 Nothing out of the ordinary.

21    Q.   Was Blaine Milam there on some of these occasions?

22    A.   Oh, yeah.  Yeah.  Running around.  The little

23 brother.

24    Q.   Did your daughter play with him?

25    A.   Uh-huh.

297

1    Q.   How would you describe how Mr. Blaine Milam

2 interacted and behaved on these occasions?

3    A.   He was probably the typical little brother.  He liked

4 to -- he liked to bug the girls.

5    Q.   But was there anything unusual or --

6    A.   No, sir, there was nothing in his behavior that would

7 make me think there was anything wrong.

8    Q.   And I know I asked you about first grade, but just

9 in -- in all those years at Tatum Primary School, did you

10 ever -- as a special ed teacher, did you ever teach Blaine

11 Milam for any sort of learning problems or disabilities?

12    A.   No, sir.

13    Q.   Did you ever diagnose him or was he ever referred to

14 you for a diagnosis or an evaluation?

15    A.   No, sir.  That's handled by a diagnostician, but to

16 the best of my knowledge, I've never -- I did not teach him.

17         MR. JIMERSON:  Pass the witness.

18                   CROSS-EXAMINATION

19 BY MR. JACKSON:

20    Q.   About --

21         MR. HAGAN:  Did -- no, go ahead.  I'm sorry.

22         MR. JACKSON:  May we talk for one second?

23         THE COURT:  Yes.

24         MR. JACKSON:  One-minute break.

25         (Mr. Jackson and Mr. Hagan conferring.)

298

1         MR. JACKSON:  All right.  I think we flipped a

2 coin, Judge.

3    Q.   (BY MR. JACKSON) Mrs. Dolive, how are you doing?

4    A.   I'm fine, thank you.

5    Q.   Is Dolive the appropriate pronunciation?

6    A.   It depends on what side of my husband's family you

7 talk to.  We go with Dolive.

8    Q.   It's 6:00.  After about three months of being here,

9 I'm going to do it your way.  Dolive.  You don't know whether

10 or not Blaine Milam was ever tested by a diagnostician at

11 Tatum Independent School District or anything like that, do

12 you?

13    A.   No, sir, not -- I don't.

14    Q.   And all the records have since been destroyed.  Do

15 you know that?  At least, I think we've seen everything

16 they've got.  Basically, it was just attendance records.

17    A.   They're required to keep them for a certain time, and

18 then they do purge records, because special ed generates a

19 large amount of paper.

20    Q.   So since special education generates a large amount

21 of paper, you end up purging them after so many years?

22    A.   Right.

23    Q.   Okay.  Now, you did teach and still do teach special

24 education students?

25    A.   Yes, sir.

299

1    Q.   And that would -- special education, I've learned

2 from dealing with this, it could be speech impediments.  It

3 could be learning disabilities.  It could be someone who's

4 been clinically diagnosed as mentally retarded.  It could be a

5 whole slew of things, could it not?

6    A.   Yes.  Generally, the speech is handled by a licensed

7 speech therapist.

8    Q.   And are you a licensed speech therapist?

9    A.   No, sir.

10    Q.   Okay.  So what dealings or interactions did you have

11 with Blaine at Tatum Primary or Tatum School District?

12    A.   I just knew him from my daughter and -- daughter

13 being friends with his sister, and knew him from the class --

14 you know, being in the school.  It's a small school district.

15    Q.   Okay.  So you didn't teach him at all?

16    A.   No, sir.

17    Q.   He wasn't in any of your classes, homeroom, nothing

18 like that?

19    A.   No, sir.

20    Q.   And how old was your daughter?  What's the age

21 between your daughter and Blaine, do you know?  How old is

22 your daughter?

23    A.   She's 24.

24    Q.   Okay.  So four years older.  At what time period was

25 your daughter coming over to the Milam household?

300

```
1     A.    They were in the latter part of elementary into
2  middle school.
3     Q.    So your daughter would have been in elementary, so
4  either --
5     A.    It's probably 11 -- 10 or 11, 12, 13, that age range.
6     Q.    So that puts Blaine 6, 7 or 8.
7     A.    Uh-huh.
8     Q.    That puts him still in school at the time.
9     A.    Right.
10    Q.    Now, with your dealings with -- do you deal with any
11 mildly mentally retarded children?
12    A.    At the present time, no, sir.
13    Q.    Have you dealt with any mildly mentally retarded
14 children?
15    A.    No, sir.
16    Q.    Okay.  And can you tell us, you know, what a mildly
17 mentally retarded person looks like?
18    A.    (No response.)
19    Q.    Looks just like me and you, right?
20    A.    I guess so, yes, sir.
21    Q.    Okay.  And --
22    A.    It usually doesn't affect your appearance.
23    Q.    Exactly.  So at times, if a child's out running
24 around and playing, you might not have any idea if they were
25 diagnosed or would have been diagnosed as mild mental
```

301

```
1  retardation, would you?
2     A.    No, sir.
3     Q.    Okay.  And so when you see this young child running
4  around the house playing -- when you come over there -- and
5  wanting the sisters to play with him, that wouldn't tell us
6  one way or another whether or not that child -- at any point
7  in time, this child was mentally retarded, would it?
8     A.    No, sir.
9     Q.    Okay.  Now, you understand, obviously, the importance
10 of education, don't you?
11    A.    Yes, sir.
12    Q.    If I were to come to you and say, "I think it's a
13 good idea that I'm going to pull my fourth grade student out
14 of school forever and not formally educate him," what would
15 you say to me about that?
16    A.    I would tell you that that is your right to do that
17 as a parent, or whatever, and --
18    Q.    As a human being, it's your right --
19    A.    -- well --
20    Q.    -- to do as you want with the kids, to an extent,
21 but --
22    A.    -- but I would also --
23    Q.    From an educational standpoint, though.
24    A.    From an educational standpoint, I would ask you if
25 you had a plan in place to continue his education.
```

302

```
1     Q.    No, I just plan on pulling them out.  Let's say I
2  have no real plan.  I'm not really formally educated myself.
3  Tell me, I mean, what do you think that's going to do to my
4  child?
5     A.    Well, as an educator and as a school professional,
6  it's not my business to tell a parent how to raise their
7  child.
8     Q.    No, I know that, but come on now.  You're educated.
9  Where did you go to college?
10    A.    I have a Bachelor's degree from the University of New
11 Hampshire and a Master's from Stephen F. Austin.
12    Q.    Wow.  So you have your Master's, also?
13    A.    Yes, sir.
14    Q.    So listen to my question.  Try to answer it for me.
15 What do you think it's going to do to a child if he receives
16 no education?  How is that going to affect him?
17    A.    Well, it puts them at an educational disadvantage.
18    Q.    How does it put them, disadvantage or advantage, for
19 the rest of their life?.
20    A.    Disadvantage, because they're not -- I mean, we gain
21 certain skills from being in the classroom, and you learn
22 certain skills that are required to go into the work force,
23 and those kinds of things.
24    Q.    We learn more than just that.  I mean, we learn
25 social skills, don't we?
```

303

```
1     A.    Yes.
2     Q.    All right.  I think it's -- I mean, you kind of
3  paused when you say that --
4     A.    Yes, we do learn social skills from interaction with
5  other children.  That's -- a lot of school is the
6  give-and-take of children in a classroom, learning to -- learn
7  to take turns, learn to share, learn to wait your turn, those
8  kinds of things.
9     Q.    You learn everything from waiting to take turns to
10 how to deal with interpersonal conflicts --
11    A.    Uh-huh.
12    Q.    -- with other kids, do you not?
13    A.    That's true.
14    Q.    "Johnny took my pencil.  Suzy's pulling my hair."
15 How to react appropriately to situations like that, don't you?
16    A.    Yes, sir.
17    Q.    And how do you think it affects a child when you take
18 that childhood -- those social interactions away from a child?
19    A.    Well, I would think that they're -- they're not going
20 to learn those skills in a -- you know, the same way as a
21 child that's exposed to education.
22    Q.    We basically start to make this person different,
23 don't we, than the social norm of other children?
24    A.    I guess so, in your opinion.
25    Q.    No, listen, you're the educator here.  I want to know
```

304

```
1   your opinion. I mean, is this a great idea --
2       A.   My opinion is that I've been a public schoolteacher
3   for 30 years, and I think public school is the place to be.
4   But that's also a parent's right to remove a child from school
5   and educate them the way they see fit.
6       Q.   See, we have compulsory education laws, don't we?
7   Right?
8       A.   Yes, once you turn 7.
9       Q.   Right. Once you turn 7. These compulsory education
10  laws require you to educate your child either through the
11  public education system or private school, or you can have the
12  option of homeschooling them, don't you?
13      A.   Yes, sir.
14      Q.   But the problem is that those homeschooling laws here
15  in Texas really aren't very effective to make sure we educate
16  kids, are they?
17      A.   I don't think so. I think they're kind of iffy.
18  There's a lot of gray area.
19      Q.   Yeah. It's kind of loosey-goosey. You can do about
20  whatever you want, and there's no reporting -- there's no one
21  you really have to report to, to a state agency, to confirm
22  that you're really doing this, right?
23      A.   Right.
24      Q.   Okay. Now, your daughter would go over there and
25  play at the Milam household from -- you said about 10, 11, 12,
```

305

```
1   so that would put Blaine at the maximum age about 8 years old.
2   So is your last contact, basically, this interaction with
3   Blaine around the age of 8, or did you have other contact?
4       A.   I was around -- I saw him when he worked at the --
5   kind of the Jiffy Lube thing there in Tatum.
6       Q.   Right.
7       A.   And just in passing in Wal-Mart, those kinds of
8   things.
9       Q.   So let's say in the past, oh, 12 years, how many
10  conversations have you had with Blaine Milam, give or take?
11      A.   Last 12 years? Probably one or two.
12          MR. JACKSON:  Nothing further.
13                    REDIRECT EXAMINATION
14  BY MR. JIMERSON:
15      Q.   During those conversations, how did he behave? Did
16  he conduct himself appropriately?
17      A.   Yes, sir.
18      Q.   Do you remember whose class Mr. Blaine Milam was in
19  or any of his teachers?
20      A.   I believe he was in Ms. Thornton's room for first
21  grade.
22      Q.   How was his attendance?
23      A.   It was not the best thing. We have a small school
24  district, and attendance is a big conversation a lot of times.
25      Q.   I'm going to hand you what I marked as State's
```

306

```
1   Exhibit 298, or what's been received in evidence, and ask you
2   to look through that. Just as an educator, I suspect you can
3   determine something from those records, can't you? Does it
4   appear that Blaine Milam went through those series of grades;
5   he didn't get held back?
6       A.   Yes. It looks to me like he went through, yes. It
7   goes straight through K, 1, 2, 3, 4.
8       Q.   I'm going to put this up here on the document camera.
9   What I had showed you and you just looked through, it looked
10  like he went straight through. That was this page, correct?
11      A.   Right here?
12      Q.   I'm sorry, I should have pointed that out.
13      A.   I'm looking up there. That's where they are in our
14  classroom. It's not there.
15      Q.   It's not on your screen?
16          MR. JACKSON:  That screen hasn't been working
17  much.
18          THE COURT:  Look up here behind you.
19          THE WITNESS:  Okay.
20      Q.   (BY MR. JIMERSON) Is that what you were referring to?
21      A.   Yes, sir.
22      Q.   Does it also show the days absent?
23      A.   Yes, sir.
24      Q.   Now, the next page, as a special education teacher,
25  do you see a record there of a possible speech impairment or a
```

307

```
1   speech impairment?
2       A.   Uh-huh.
3       Q.   Then you see something called secondary disability.
4   What does it say under that?
5       A.   None reported.
6       Q.   And tertiary disability, what does it say under that?
7       A.   None reported.
8       Q.   What does that indicate to you?
9       A.   That that was only -- that shows a record only for
10  speech therapy.
11      Q.   Does it indicate there were any other special
12  education issues at all regarding this student?
13      A.   No, sir, it does not.
14      Q.   What's Rusk County Shared Services Arrangements?
15  What is that?
16      A.   It's a group of school districts that share services
17  for special education students, such as speech therapists,
18  visually and handicapped teachers, physical therapists, and
19  diagnosticians.
20      Q.   I'm going to hand you State's Exhibit 300. I know
21  this is not yours, but are you able to -- do you know what
22  that is?
23      A.   Yes, sir.
24          MR. JIMERSON:  Your Honor, we would offer
25  State's Exhibit 300.
```

308

```
 1          MR. JACKSON:  May I approach?
 2          THE COURT:  Yes.
 3          (Conference at the Bench:)
 4          MR. JACKSON:  Your Honor, this document is
 5   hearsay.  She's not the custodian of records, as far as I
 6   know, of Tatum ISD.
 7          MR. JIMERSON:  He could have said that out
 8   there, Your Honor.  I've got the person to prove it up.  We'll
 9   just move along.
10          MR. JACKSON:  Mike, wait a second.  As an
11   officer of the Court, if you have this person here, I'm not
12   going to waste the Court's time, if this person's here to
13   testify and she's custodian of records.
14          MR. HAGAN:  Are you going to call her anyway?
15          MR. JIMERSON:  Yeah.
16          MR. HAGAN:  Prove it up through her.
17          MR. JIMERSON:  Okay.
18          (Conclusion of Bench conference.)
19     Q.   (BY MR. JIMERSON)  That record that I showed you from
20   the Texas Education Agency, as an educator, as a special
21   educator, does that indicate to you that there were any issues
22   at all --
23          MR. JACKSON:  Objection, still hearsay.
24          THE COURT:  Sustained.
25          MR. JIMERSON:  Your Honor, that's not in
```

309

```
 1   reference to that record.  That's specifically in reference to
 2   the Texas Education Agency --
 3          THE COURT:  I'm sorry.  I misunderstood you.
 4          MR. JACKSON:  Maybe I misunderstood, too, Mike.
 5          THE COURT:  Which record are you referring to?
 6          MR. JIMERSON:  Not that one; not State's 300.
 7   I'll put it back up there.  I'll do that.
 8          THE COURT:  Okay.
 9          MR. JACKSON:  For the record, would you state
10   the exhibit number for me?
11          MR. JIMERSON:  Yes, sir.  299 (sic).
12     Q.   (BY MR. JIMERSON) This is the record we actually
13   looked at a minute ago, correct?
14     A.   Yes, sir.
15     Q.   And I was asking -- I asked you those questions as a
16   special educator, what this record indicated to you, correct?
17     A.   Yes, sir.
18     Q.   Okay.  And I asked you whether there was anything
19   listed under secondary disability.  What is it?  Anything?
20     A.   It says none reported.
21     Q.   What about tertiary disability?
22     A.   None reported.
23     Q.   Under primary disability, what's listed?
24     A.   Speech impairment.
25     Q.   As a special educator, you get these records.  Does
```

310

```
 1   that indicate what are the issues regarding this person?
 2     A.   It would indicate to me that he's serviced as a
 3   speech therapy student.
 4     Q.   And would that indicate the lack of anything else
 5   reported?  Would that indicate that there's no other issues?
 6     A.   Right.  Right.  Because it would--it would be up
 7   there.
 8     Q.   When you say "It would be up there" --
 9     A.   There would be another diagnosis.  There would ---
10   something else would be in those two spots, or two diagnoses,
11   or three.
12     Q.   Like, for example, mental retardation, if that were
13   diagnosed, would you expect to see that on that record?
14     A.   Yes, sir.  That probably would be first.
15          MR. JIMERSON:  Pass the witness.
16              RECROSS-EXAMINATION
17   BY MR. JACKSON:
18     Q.   Do you know Tatum ISD -- Tatum ISD is in Region VII,
19   are they not?
20     A.   Yes, sir.
21     Q.   Did you know Tatum ISD spends less money on these
22   situations, on special needs kids, than any other school
23   district in Region VII?
24     A.   If you say so.  I don't know so.
25     Q.   Would you find that hard to believe?
```

311

```
 1     A.   Yes, I would.
 2     Q.   Okay.  And it's hard to properly, at times, diagnose
 3   kids with certain situations when they basically stop coming
 4   to school in the fourth grade, isn't it?
 5     A.   Yes.  But if they stop coming to school and they're
 6   pulled out of school, then they're no longer the school
 7   district's --
 8     Q.   I'm not blaming the school district here.
 9     A.   I'm just saying the school district couldn't diagnose
10   them -- if they're not enrolled in school --
11     Q.   Absolutely.
12     A.   -- they wouldn't be diagnosed.  They'd be diagnosed.
13     Q.   You're exactly correct.
14          MR. JACKSON:  Thank you, Judge.  Pass the
15   witness.
16            FURTHER REDIRECT EXAMINATION
17   BY MR. JIMERSON:
18     Q.   For those not familiar with it, Tatum's one of the
19   wealthier districts in the area, isn't it?
20     A.   Yes, sir.  In fact, we send a lot of money to other
21   people.
22     Q.   But you also devote a lot of money to the students,
23   correct?
24     A.   Yes, sir.
25          MR. JIMERSON:  Pass the witness.
```

312

1      MR. JACKSON: Nothing further.

2      THE COURT: You may step down, ma'am.

3      MR. JIMERSON: May she be excused, Your Honor?

4      MR. JACKSON: Yes, sir.

5      THR COURT: Yes, ma'am, you may be excused.

6      THE WITNESS: Thank you.

7      MR. JIMERSON: Sherry Brown.

8      THE COURT: While they're doing that, Counsel,

9  for the record, maybe I marked wrong -- I had 299 as the Big 5

10 employment records. Am I off or --

11     MR. JIMERSON: I may have misspoke. Let me

12 check. I suspect I did.

13     MR. JACKSON: It is. Yeah, that's that estimate

14 sheet.

15     THE COURT: Okay.

16     MR. JIMERSON: Then what I had, Your Honor, this

17 is 298. I apologize, a number off. It's 298, is the Texas

18 Education Agency records that I referenced. I mistakenly

19 referred to it as 299 during the testimony of the preceding

20 witness, Your Honor.

21     THE COURT: All right. You may proceed,

22 Mr. Jimerson.

23                 SHERRY BROWN,

24 having been first duly sworn, testified as follows:

25            DIRECT EXAMINATION

313

1  BY MR. JIMERSON:

2      Q.  Tell the jury your name and your profession.

3      A.  Sherry Nell Brown. I'm a retired schoolteacher.

4      Q.  Tell them about how many years you taught and where

5  you taught at.

6      A.  I taught 32 years. 2 years in Leggett and 30 years

7  in Tatum ISD.

8      Q.  Did you teach Blaine Milam?

9      A.  No.

10     Q.  Who was his teacher during the grade that you taught?

11     A.  Nelda Thornton.

12     Q.  And what grade were you teaching at that time?

13     A.  First grade.

14     Q.  However, did you have any interaction with Blaine

15 Milam?

16     A.  Yes. Sometimes we would work with small groups on

17 kids that needed extra help on alphabet or sounds or stuff,

18 and we would pull them out of each other's classroom, and

19 sometimes he was in my group then.

20     Q.  And did you work with Blaine Milam?

21     A.  Just on those occasions, when we pulled them out for

22 small group.

23     Q.  How was his attendance?

24     A.  He missed a lot of days. He was kind of -- he was

25 kind of sickly.

314

1      Q.  At that time, did he have any sort of devices or

2  special excuse of medical devices with him?

3      A.  No, not at that time.

4      Q.  Tell the jury about -- when you did teach him, was he

5  able to follow instruction? Was he able to do the work?

6      A.  Yes. It took him a little longer to get some of the

7  concepts, but I added that up to the fact that he had to miss

8  so much school, because he was sick.

9      Q.  And, I mean, if you had thought that he had a serious

10 issue like mental retardation, what do you --

11     MR. JACKSON: Objection, leading.

12     MR. JIMERSON: I haven't finished the question.

13     THE COURT: Finish the question.

14     MR. JACKSON: The way the form of it is --

15     THE COURT: Finish the question, and I'll rule

16 on it.

17     MR. JIMERSON: Your Honor, may I finish the

18 question?

19     THE COURT: Yes, you may.

20     Q.  (BY MR. JIMERSON) Did you ever make any referrals of

21 Blaine Milam?

22     A.  No, I did not.

23     Q.  Specifically, did you ever make any referrals for

24 mental retardation?

25     A.  No, I did not.

315

1      Q.  Well, why didn't you do that?

2      A.  I didn't think he needed it.

3      Q.  I mean, had you ever heard that term associated with

4  Blaine Milam prior to him becoming a defendant in a capital

5  murder case?

6      A.  No.

7      Q.  Did you see Blaine Milam later on in life?

8      A.  Yes. I saw him when he was around 18, I guess it

9  was, 18 or 19.

10     Q.  Tell the jury about that, where you saw him at.

11     A.  He worked where I got the oil changed in my car. He

12 was under the car, undoing the plug and the filter, and all

13 that, and another guy was up top putting in the oil and stuff.

14 And he asked me if I remembered him, and I told him yes, I

15 did. And I asked him about his family, and we talked --

16     Q.  What --

17     A.  -- when I would go --

18     Q.  What did he tell you? What was that visit like?

19     A.  It was good. Blaine and I always got along. He was

20 one of the ones I liked as a young man. And we talked about

21 his family, and he told me he was doing okay. And he changed

22 the oil in my car, and I went.

23     Q.  How did he conduct himself, I mean, as whether he

24 behaved appropriately or whether he was inappropriate?

25     A.  He behaved appropriately. He was always real shy,

316

1 but he did okay.
2        MR. JIMERSON:  Pass the witness.
3                    CROSS-EXAMINATION
4 BY MR. JACKSON:
5    Q.   Ms. Brown, how are you?
6    A.   I'm good.
7    Q.   Been here all day?
8    A.   Not all day.
9    Q.   All right.  I'm sorry we got you caged up a little
10 bit.  So Blaine had Miss Nelda Thornton --
11   A.   Right.
12   Q.   -- as his first grade teacher?
13   A.   Yes, sir.
14   Q.   That's your basic memories of Blaine, was from first
15 grade?
16   A.   Yes.
17   Q.   Okay.  And he would have been sixish, sevenish, give
18 or take?
19   A.   Yes.
20   Q.   And then you have, I think, a memory of one time when
21 he was changing your oil about the age of 18 or so, 17?
22   A.   He worked, and he did it -- I think he helped with it
23 more than once.
24   Q.   Okay.  But you remember him needing extra assistance.
25 You pulled him out, I guess, to your group to give him some

317

1 help with reading, writing, things of that nature?
2    A.   Yes.
3    Q.   Okay.  And you don't have any memories, other than
4 that, until about late teenage years of 17 or 18; is that
5 correct?
6    A.   That's right.
7    Q.   Okay.  And the memories you have from a long time
8 ago, when you used to pull him out to give him extra help, was
9 that he was a polite child?
10   A.   He was.  He was shy.
11   Q.   And so he wasn't one of these aggressive kids in
12 school that you recall from first grade?
13   A.   Not that I recall.
14   Q.   And you've got some of those, also, don't you?
15   A.   Yes.
16   Q.   Okay.  And when you talked to him, he was 17 or 18.
17 You also recall him being shy and polite, nice?
18   A.   Yes.
19   Q.   Okay.  We just had another educator come in here,
20 been with Tatum ISD for over 30 years, I think, and she kind
21 of related to us the necessity of educating a child.  I know
22 it goes without saying, but I want to hear it from you.  Tell
23 me, if I were to come to you and say, "Listen, I want your
24 advice.  You're a long-term educator.  What kind of effects am
25 I going to have with my child if I pull my child out of school

318

1 in the fourth grade and give him no education?"
2    A.   I would be against that, because I think each child
3 needs an education, and they need that interaction, I feel,
4 with other kids to be successful in life.
5    Q.   And, you know, if we were to, say, "Listen, we've got
6 100 kids.  We're going to educate some.  We're going to not
7 educate some."  How do you feel those uneducated kids are
8 going to fare against those other kids?
9    A.   They're going to be at a disadvantage, because
10 they're not going to be prepared for what comes in life.
11   Q.   You know, I like how you put that.  What comes in
12 life.  It's not just work that we've got to worry about; it's
13 also the social interaction.  It's dealing with other people
14 in life, isn't it?
15   A.   Yes, it is.
16   Q.   How important to you is that social interaction with
17 age-appropriate kids, with kids their own age?
18   A.   It is important for kids to relate to other kids and
19 to learn how to deal with problems as they come up, and things
20 that happen in life.
21   Q.   Do you agree that really puts a child at a severe
22 disadvantage when they don't get to be around other children
23 on a day-to-day basis, doesn't it?
24   A.   In some instances, yes, it does.  I would think they
25 would need to be around other kids.

319

1    Q.   Now, obviously, there are some instances that could
2 be more extreme than others.  Like, if I were to give you a
3 hypothetical and say, "Listen, I'm going to pull a child out
4 of school in fourth grade.  And I'm going to leave this child
5 with a parent who is severely ill, and that child is basically
6 going to become the caretaker of that parent.  He may be alone
7 with that parent at home for many years, taking care of that
8 parent, with very little social interaction during the day
9 other than that parent."  How do you think that child is going
10 to fare later on in life?
11   A.   There could be two different ways they could fare.
12 Yes, they would be very caring, but then I also think they
13 would have trouble relating to people of their own age.
14   Q.   Yeah.  And have you ever seen that happen where you
15 might have someone -- you know, at times, when you have, like,
16 a child who stutters real bad and may not be socially accepted
17 by his peers.  At times, they will get along better with
18 younger kids who don't prejudge them.  Does that make sense?
19   A.   You'll have to say that again.  I didn't get it.
20   Q.   Well, that's okay.  I tell you what.  I appreciate
21 you coming down.
22   A.   Thank you.
23        MR. JACKSON:  Pass the witness.
24                  REDIRECT EXAMINATION
25 BY MR. JIMERSON:

1    Q.    None of that's any excuse to beat a baby to death, is
2  it?
3    A.    No, sir.
4          MR. JIMERSON:  Pass the witness.
5          MR. JACKSON:  I have no further questions,
6  Judge.
7          THE COURT:  May this witness be excused?
8          MR. JIMERSON:  I have no objection.
9          MR. JACKSON:  I have no objection.
10         THE COURT:  Thank you, ma'am.  You may be
11 excused.
12         MR. JIMERSON:  Call Cindy Smith.  Your Honor,
13 may we approach?
14         THE COURT:  Yes, you may.
15         (Conference at the Bench:)
16         MR. JIMERSON:  This all I've got.  She's
17 literally just going to prove up a business record.
18         THE COURT:  Dr. Parks will be testifying in the
19 other court in the morning.
20         MRS. TANNER:  We'll have enough to keep it --
21         (Off the record discussion at the Bench.)
22         (Conclusion of Bench conference.)
23         THE COURT:  You may proceed.
24                CINDY SMITH,
25 having been first duly sworn, testified as follows:

1                DIRECT EXAMINATION
2  BY MR. JIMERSON:
3    Q.    Please introduce yourself to the jury by telling them
4  your name and your profession.
5    A.    My name is Cindy Smith.  I'm a special education
6  director for Rusk County Shared Services Arrangement.
7    Q.    And could you briefly outline the background that's
8  led you to hold that position and how long you've held that
9  position?
10   A.    I have been a director for a little over ten years.
11 My background, I have certification in the area of
12 mid-management for administration.  I have also generic
13 special education, zero to 21 certification.  Also, I'm a
14 speech language pathologist, educational diagnostician.  I
15 have supervisor certification, special ed supervisor
16 certification, elementary certification for grades one through
17 eight.
18   Q.    And you said you were a director of the Rusk County
19 Special Education Shared Services Arrangement.  You're not
20 just a director.  You're literally the director of it?
21   A.    I am the director, yes.
22   Q.    Now, as far as Blaine Milam, let's make clear, did
23 you ever teach him, ever have any contact with him directly?
24   A.    No.
25   Q.    I mean, did you ever -- did you ever have any

1  recollection of supervising anyone who did teach him?
2    A.    No.
3    Q.    But you were asked by several sources to search and
4  determine whether or not you had any records that related to a
5  Blaine Milam, correct?
6    A.    Yes.
7    Q.    I'm going to hand you what I marked as State's
8  Exhibits 300.  Without going into detail as to what it is, do
9  you recognize it?
10   A.    Yes.
11         MR. JACKSON:  Judge, for judicial purposes, we
12 have no objection to this document.
13         THE COURT:  All right.  State's Exhibit 300 will
14 be received.
15         MR. JIMERSON:  Your Honor, may I publish it to
16 the jury?
17         THE COURT:  Yes, you may.
18   Q.    (BY MR. JIMERSON) And Ms. Smith, since we made the
19 point, as far as any personal knowledge of Blaine Milam, you
20 don't have it.  Your knowledge is limited to this document,
21 correct.
22   A.    Correct.
23   Q.    Can you read this document to the jury?
24   A.    February 16, 2010, concerning Blaine Keith Milam.
25 Date of birth, 12/12/89.  According to our records, his

1  special education records were destroyed in 2007.  His last
2  full and individual evaluation report which indicated a speech
3  impairment was dated February 8, 2000.  Cindy Smith, Director
4  of Special Education.
5    Q.    And as I said, I know you have no personal knowledge
6  of this defendant, but just from the record, if it states
7  "indicated a speech impairment" and does not indicate anything
8  else, how would you interpret that, as Director of Special
9  Education?
10   A.    Based on the last testing, dated February 8, 2000, it
11 indicates speech impairment.
12   Q.    And when you say testing, does it refer in the
13 document as full and individual evaluation?
14   A.    Yes.  The full and individual report, full and
15 individual evaluation report.
16   Q.    Now, parties have brought to your attention from both
17 sides of this case that they want that report.  Tell the jury
18 whether or not we were able to get that report.
19   A.    No.
20   Q.    Tell the jury why.
21   A.    Well, we're required to keep special education
22 records for seven years once a student has been withdrawn or
23 dismissed from our district.  So we are required to keep it
24 for seven years.  So that's why the record was 2000, February
25 8, 2000.  And the records, according to our records, the

324

1  special ed records were destroyed in 2007.
2          MR. JIMERSON:  Pass the witness.
3                    CROSS-EXAMINATION
4  BY MR. JACKSON:
5      Q.   Hi, Ms. Smith, how are you?
6      A.   Fine.
7      Q.   Do all children now, in 2010, are they tested for
8  mental retardation?  Are they given standardized testing in
9  school to see where they fall?
10     A.   Yes.  When we do testing, we do a full and individual
11 evaluation.
12     Q.   Okay.  And now, the letter that Mr. Jimerson showed
13 you, that was written in, I think, 2000 February, give or
14 take?
15     A.   The letter?
16     Q.   Right, at least -- I'm sorry, the last testing or the
17 last entry, was somewhere around February of 2000; is that
18 correct?
19     A.   That's according to the records, yes.
20     Q.   Right.  And as an officer of the Court, I'll tell you
21 Blaine's date of birth is December of 1989.  That would put
22 him ten years old and maybe two months.
23     A.   Okay.
24     Q.   Okay.  So it appears that that was drawn up before
25 Blaine Milam was pulled out of the Tatum ISD.  Do you know

325

1  when he was pulled out of school?
2      A.   I do not.
3      Q.   So you don't know whether or not he was in school
4  every year and graduated from Tatum High School?
5      A.   I do not know.
6      Q.   Okay.  You don't know whether or not he was an honor
7  student or if he was pulled out in fourth grade about the time
8  this letter -- or that last report was done?
9      A.   No.
10     Q.   Okay.  Let me give you a hypothetical, then.  Let's
11 say a child is pulled out of school in the fourth grade and no
12 further education takes place.  How do you feel, as an
13 educator and a professional in that -- in that line of
14 profession, how do you feel that that child is going to fare
15 later on in life?
16     A.   Well, being in education, I value education a lot,
17 and I feel like it's very important for you to get your
18 education.
19     Q.   Like if I had a scale of 1 to 10, 1 being ain't no
20 big thing if we don't educate a kid after the fourth grade and
21 10 being kind of, oh, my gosh, where would you put that of how
22 serious it is?
23     A.   Well, I think it's important that a child get
24 education.
25     Q.   So you would put it a 10?

326

1      A.   I value education, so, yes, it is very important.
2      Q.   You didn't answer my question, though.  On a scale of
3  1 to 10, 1's no big deal, 10 is one of the situations you're
4  just looking at someone like why would you not educate your
5  child?  That is that serious.  Give your child a chance.
6  Would you put it, 1 to 10, of how serious it is?
7      A.   Well, as far as me personally?
8      Q.   Sure, you personally.
9      A.   If it was my child, I value education, so I would
10 say, you know, a 10.  They need -- they need an education.
11     Q.   What other reasons do you want them to be in school
12 with other kids and not pulled out?  What other reasons can
13 you think of for this jury to understand the importance of
14 attending school with other kids?
15     A.   Well, as opposed to what?
16     Q.   To not being around kids their own age.  How about
17 the social interaction?
18     A.   Well --
19     Q.   How important is that to you?
20     A.   Well, I think it's important to have social
21 interaction with others their own age.  Also, the academic
22 aspect is important.  I mean, education is just not -- is not
23 just academic; it's also social interaction.
24     Q.   Tell me a little bit more about that.  Why is that
25 important?

327

1      A.   You have to be able to get along with people, because
2  when you get out of school, you're going to have to function
3  in society with people.
4      Q.   We really -- as a parent, if I pull my child out of
5  school, I am handicapping my child.  Whether or not they're
6  mentally retarded or not, I'm giving them a handicap they're
7  going to carry throughout their life, am I not?
8      A.   If you pull them out --
9      Q.   And --
10     A.   -- and not do anything?
11     Q.   Sure.
12     A.   Don't --
13     Q.   Don't educate them.
14     A.   -- educate them at all?
15     Q.   Right.
16     A.   I would think they would be at a disadvantage.
17     Q.   Okay.  Now, you say that you have -- you're a special
18 language -- I guess you're a language pathologist or a speech
19 pathologist?
20     A.   Speech language pathologist, uh-huh.
21     Q.   What kind of disadvantages can kids go through early
22 on if they have speech problems?  How do other kids tend to
23 treat them at that young age?
24     A.   Well, it depends on what type of speech impairment
25 they might have.

328

```
1      Q.    Okay.
2      A.    Because there are several different kinds, so it
3  depends.
4      Q.    Could be different, if they stutter or --
5      A.    They -- it could be stuttering.  It could be
6  articulation.  It could be voice.  It could be language.
7      Q.    Do you see other kids bully children with speech
8  impediments or pick on them at times?
9      A.    Uh --
10     Q.    Do they make fun of them because they're different?
11     A.    Since I'm not on the campuses on a regular basis, I
12 probably --
13     Q.    You don't really get to see that?
14     A.    I really don't get to see that, and from what I hear
15 of the students that have speech impairments, I wouldn't say
16 that they're picked on.
17     Q.    Okay.
18     A.    You know, they're accepted.  I mean, kids are
19 accepted.
20     Q.    Okay.  Now, make sure I understand.  Never had any
21 contact with Blaine Milam.  If you would have walked in here,
22 and someone had said, "Who's Blaine Milam?  Pick him out of a
23 crowd."  Could you have done it?
24     A.    Could I have done that?
25     Q.    Uh-huh.
```

329

```
1      A.    Based on --
2      Q.    Did you know who Blaine Milam was before they brought
3  these records to you or asked you for these records?
4      A.    I had heard the name.
5      Q.    Okay.  But you never taught him, never had a
6  conversation, didn't know anything else about him?
7      A.    I didn't know he attended any school in any of my
8  schools.  I did not know that until I heard information about
9  it.
10     Q.    Now, seeing that you head up some special education
11 for Tatum ISD, I've asked this question before and I know it's
12 all rhetorical, but someone with mild mental retardation, tell
13 us what they look like.
14     A.    I don't know that you can tell what they look like.
15     Q.    Exactly.  They could look like me or you, couldn't
16 they?
17     A.    Yeah.  You can't look at -- you can't tell if someone
18 has mild mental retardation by looking at them.
19     Q.    And at times you can even have a conversation
20 with them and not realize it; isn't that right?
21     A.    It -- I don't know --
22     Q.    It varies from person to person, doesn't it?
23     A.    Probably their abilities.
24     Q.    Sure.  And Tatum ISD has a vocational -- like a
25 vocational track for students, do they not?
```

330

```
1      A.    (No response.)
2      Q.    Do you have vocational training for students at Tatum
3  ISD?
4      A.    I understand what you're saying, but I'm not sure if
5  they have that track or not.
6      Q.    Okay.  You know, I guess, through some of your
7  training that a mild mentally retarded person can learn
8  vocational skills; you've been taught that, haven't you?
9      A.    Yes.  Uh-huh.
10     Q.    Appreciate you coming, Ms. Smith.
11          MR. JACKSON:  Pass the witness.
12          MR. JIMERSON:  May she be excused?
13          MR. JACKSON:  Absolutely.
14          THE COURT:  All right, ladies and gentlemen,
15 we'll stand in recess for the day.  Again, you're under all
16 the instructions I've heretofore given you.  Do not discuss
17 this case among yourselves, nor with anyone else, nor allow
18 anyone to discuss the case with you.  Do not obtain or seek
19 out any information whatsoever outside the courtroom
20 concerning this case in any shape, form or fashion.  We'll
21 convene tomorrow morning at 9:00.  You may step down.
22          (Overnight recess.)
23
24
25
```

1   STATE OF TEXAS

2   COUNTY OF RUSK

3       I, Terri Boling, Official Court Reporter in and for the

4   4th District Court of Rusk County, State of Texas, do hereby

5   certify that the above and foregoing contains a true and

6   correct transcription of all portions of evidence and other

7   proceedings requested in writing by counsel for the parties to

8   be included in this volume of the Reporter's Record in the

9   above-styled and numbered cause, all of which occurred in open

10  court or in chambers and were reported by me.

11      I further certify that this Reporter's Record of the

12  proceedings truly and correctly reflects the exhibits, if any,

13  offered by the respective parties.

14      WITNESS MY OFFICIAL HAND, this the 22nd day of October,

15  2010.

16

17

18              Terri Boling, Texas CSR 1508
                Expiration Date: 12/31/11
19              Official Court Reporter
                4th District Court
20              Rusk County Courthouse
                115 N. Main Street
21              Henderson, Texas 75652
                Telephone: (903) 657-0359

22

23

24

25