AP-76379

REPORTER'S RECORD
VOLUME 55 OF 74 VOLUMES
TRIAL COURT CAUSE NO. CR09-066

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| VS. | ) | OF RUSK COUNTY, TEXAS |
| | ) | |
| BLAINE KEITH MILAM | ) | 4TH JUDICIAL DISTRICT |

JURY TRIAL, 5/26/10

(Appearances listed next page)

FILED IN
COURT OF CRIMINAL APPEALS
OCT 26 2010
Louise Pearson, Clerk

On the 26th day of May, 2010, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Clay Gossett, Judge Presiding, and a jury, held in Conroe, Montgomery County, Texas.

Proceedings reported by computerized stenotype machine.

ORIGINAL

## APPEARANCES

Mr. Micheal Jimerson
SBOT NO. 00789406
County Attorney's Office
Rusk County Courthouse
115 N. Main St.
Henderson, Texas 75652
Telephone: (903) 657-2265
Attorney for The State of Texas

Mrs. Lisa Tanner
SBOT NO. 19637700
Attorney General's Office
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 463-2170
Attorney for The State of Texas

Mr. James R. (Rick) Hagan
SBOT NO. 00786430
Attorney at Law
P.O. Box 3347
Longview, Texas 75606-3347
Telephone: (903) 757-9877
Attorney for Defendant

Mr. John W. Moore
SBOT NO. 00794327
Attorney at Law
P.O. Box 2841
Longview, Texas 75606
Telephone: (903) 236-3500
Attorney for Defendant

Mr. Stephen D. Jackson
SBOT NO. 00784324
Attorney at Law
215 Simonton
Conroe, Texas 77301
Telephone: (936) 756-5744
Attorney for Defendant

INDEX

VOLUME 55
May 26, 2010
TRIAL ON PUNISHMENT


| STATE'S WITNESSES | DIRECT | CROSS | VOIR DIRE | PAGE | VOL. |
|---|---|---|---|---|---|
| Mark Stover | 4 | 43 | | | 55 |
| Hearing (No jury) | | | | 77 | 55 |
| (Jury present) | | | | 78 | 55 |
| Melynda Keenon | 78 | 85 | | | 55 |
| Sarah Hodges | 86, 128 | 115 | | | 55 |
| Tim Proctor | 131, 188 | 186, 189 | | | 55 |
| | 254 | 268 | | | 55 |
| State rests | | | | 271 | 55 |
| Hearing (No jury) | | | | 271 | 55 |

| DEFENDANT'S WITNESSES | DIRECT | CROSS | VOIR DIRE | PAGE | VOL. |
|---|---|---|---|---|---|
| Blaine Milam (No jury) | 272 | | | | 55 |
| Jury present | | | | 275 | |
| Defendant rests | | | | 275 | 55 |
| State and Defendant close | | | | 276 | 55 |
| Hearing (No jury) | | | | 277 | 55 |
| Objections to Court's Charge on Punishment | | | | 277 | 55 |


EXHIBIT INDEX


| STATE'S NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 301 | Dr. Proctor's C.V. | 188 | 188 | 55 |

(Open court, defendant present, no jury.)
*THE COURT:* Is the State ready?
*MRS. TANNER:* Yes, sir.
*THE COURT:* Defense ready?
*MR. JACKSON:* Yes, sir.
*THE COURT:* Bring in the jury.
(Jury returned to the courtroom.)
*THE COURT:* Good morning, ladies and gentlemen.
*JURY:* Good morning.
*THE COURT:* The State may proceed.
*MR. JIMERSON:* Your Honor, we call Mark Stover.
*THE COURT:* You may proceed.

**MARK STOVER,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. JIMERSON:**

Q. Please tell the jury your name, sir.
A. What?
Q. Tell them your name.
A. Mark Rollins Stover.
Q. You and I had the opportunity to visit for the first time last night, and you told me -- are you originally from Colorado?
A. Yes, sir, I'm from Colorado.
Q. And tell the jury what your Bachelor's Degree is in and where it was from?



A. Bachelor's Degree in mathematics, and that was University of Northern Colorado in Greeley, Colorado.
Q. And you got the Bachelor's in mathematics. What field did you go into after that?
A. I was looking to get a job temporarily to get some money and then go back and get my Master's and my Doctorate in mathematics, but that did not happen. I got a job driving an ambulance and then became an emergency medical technician and then became a paramedic. I served as a paramedic for six years. During that time, the Sheriff of Douglas County, Colorado, asked me to be a reserve officer, so I was a reserve officer for the Sheriff's Office, and the coroner --
Q. Where is Douglas County, Colorado?
A. Huh?
Q. Where is Douglas County, Colorado?
A. Douglas County, Colorado, is between Denver and Colorado Springs.
Q. So you're a paramedic and you're a reserve deputy. Where does that take you? Where is the next step?
A. The next step was that -- while I was also working 24-hour shifts as a paramedic, the coroner of Douglas County, Colorado, asked me to be a deputy, and so I was a deputy coroner for two years, and then the coroner resigned and suggested to the commissioners, since it was an elected official, that I be appointed. I was appointed for a two-year period, and then ran and was elected three different terms as coroner of Douglas County, Colorado.



Q. And in Texas, I'll represent to you if we have coroners, I haven't dealt with them, so just tell the jury just briefly what a coroner is.
A. A coroner is in charge of the medical/legal death investigation within the county. My responsibility was to do the investigation, along with law enforcement, as to the cause and manner of death. And also I had the facility where, if necessary, I would have a forensic pathologist come in to do the autopsies, and I would assist him in that work.
Q. But you're not a pathologist?
A. No, sir.
Q. You're similar, in Texas, to a Justice of the Peace who can hold a death inquest --
A. Yes.
Q. -- and order an autopsy?
A. Yeah, I would hold -- could hold inquests and, as I said, be in charge of the medical/legal death investigation and sign the death certificate.
Q. Well, what made you leave the elected office of coroner?
A. The people of Colorado put term limits on elected officials, and I knew the end was coming. So I went back to school and got my Master's degree in counseling psychology from Regis University in Denver.



Q. And with your Master's in psychology, were you able to go into that field? What were you able to do?
A. Yes. I was a psychotherapist in private practice for several years after leaving the coroner's office.
Q. In Colorado, could you just do that with a Master's in psychology, as opposed to --
A. Yeah, I could be a psychotherapist while working on my -- working to become a licensed professional counselor.
Q. Explain briefly for the jury the difference. You've got a Master's degree in psychology and counseling, but as opposed to, say, a licensed public counselor or a psychologist or a psychiatrist?
A. Yeah. In Colorado, it would be called an unlicensed psychotherapist. The big difference is in the licensing process, it's about a two-year process to get licensed. You have to work under a supervisor and have your work supervised and show 2,000 hours of contact time with clients and discuss those with a supervisor, and pass a written test.
Q. But even though it's unlicensed up there, is that legal? Was that legal for you to do that?
A. Yes.
Q. What brought you to Texas?
A. I was not doing real well in that private practice,

and my wife was from Texas, and we decided to come down.
Q. What part of Texas is your wife from?
A. Longview.
Q. Were you able to find work in Longview?
A. Yes. After a period of time, I got to work with Community Healthcore -- at that time was Sabine Valley Center, which is the Mental Health and Mental Retardation Office for this -- that region of Texas.
Q. About how long did you work with them?
A. I worked with Community Healthcore for three years.
Q. And after that, I mean, what caused you to leave or move on or --
A. I was in crisis services doing crisis assessments, and I got terminated. I was accused of having left the office when there was an unstable client in the office and endangering the secretary by being gone, which was false. Number one, I was in my office doing reports at the time that I supposedly left, and I was working on reports. As each report was done, I would file it, so it was in the computer with the time and date that I had done the report, so it could be shown that I was in the office. And for the secretary to be endangered, she would have had to have called the secretary at the outer office and had the man allowed through a security door, and he was not allowed back. When I did eventually see him, when I was told he was there, he was in the -- still in



the outer office. I went out immediately, and a nurse from outpatient services, and I evaluated him, and she accompanied me across the parking lot to outpatient services, where he was given a shot of medication, which he got every two weeks.
Q. And about when did all this happen?
A. This is August of last year that this occurred.
Q. And I'm sorry to have to ask you about these kinds of things, but as far as anything to do with this case, was that patient, you know, anybody involved in this case at all?
A. No.
Q. After Community Healthcore, you ended up going back to Colorado and working in some after-school programs?
A. I was -- went back to Colorado to look for work. In my opinion, the community was poisoned by Community Healthcore against me. I went back, and I was working part-time in a school district -- well, actually, for a charter school and after-school program, and then made the decision to come back down to Texas. We moved back last week.
Q. You were employed by Community Healthcore back in the months of October and November of 2008, correct?
A. Yes, sir.
Q. Okay. Just tell the jury what Community Healthcore was, and what was your role in that organization during that period of time?
A. Community Healthcore is the mental health and mental



retardation provider for a six-county region, including Gregg County, Rusk County, Marion County, Harrison.
Q. Who did you work with in Rusk County? Who was the mental health --
A. In Rusk County, as a crisis assessor, I would be going into either the emergency room of the hospital or possibly into the jail or into a doctor's office. I even got called into probation several times to do an evaluation to see if someone needed to be hospitalized immediately for mental health problems or if they needed to be scheduled for outpatient services through Community Healthcore.
Q. Who was it at the Sheriff's Office that you were dealing with?
A. I was working with Shirley Broyles. She was the LVN who was in charge of mental health, as well as medical services in the jail.
Q. And was it common or uncommon for you to come over and do the evaluations on site at the jail?
A. It was common for Shirley to call and say that they had someone in the jail that needed evaluation. A lot of times, it was someone who had been brought to the jail, was not actually processed into the jail, but simply being held there at the jail for us to evaluate to determine if they needed hospitalization or follow-up. It could be someone who had not actually been charged with a crime, or had been



charged with, say, an assault or family disturbance and would -- could be bailed out or given a -- given bail quickly, if we wanted to dispose -- you know, make a disposition of services, either outpatient or inpatient.
Q. That was your understanding when you were called in in regard to this person, this defendant?
A. Yeah. My understanding was he was not -- that he had not been processed into the jail. The deputies had been called to the house for a disturbance. They found that he had cut himself. He was brought down to the jail. I was -- I was the one that was assigned to go down and talk to him and evaluate him, do an assessment on him, to see, again, whether he needed a 72-hour hold in a mental hospital or if he needed to be scheduled for a follow-up with our office, a licensed professional counselor, or other services in the community.
Q. Well, and you're telling the jury what options you were looking at. Just before you go in there to meet with the -- with this person or with any other person, are those the options that you would look at and see if they're immediate -- put them immediately in a mental institution?
A. That is certainly one option. We have several facilities available to us, depending on circumstances. There was a Behavioral Hospital in Longview, which I did actually contact to see if they had a bed, if need be, not that I thought he needed to be in there. You know, after my

evaluation, I did not feel he needed immediate hospitalization, but I did make sure there would be a bed available if -- in his follow-up with the licensed professional counselor in our office the next morning, if he felt it was necessary, and we had already been assured that there was a bed available.
Q. Ultimately, neither one of you did, correct?
A. (No response from witness.)
Q. Neither one of you did?
A. No.
Q. I'm going to show you this. For our record, I'm showing you part of Defendant's Exhibit 575 which were some jail records, but do you also recognize those records?
A. Yeah. This would be my crisis assessment that I did on him.
Q. And, in fact, you've got a copy of this?
A. Yes.
Q. Or you had a copy in regard to this?
A. Yes.
Q. Just go ahead and thumb through that and see if that looks like that's the correct one.
A. Yes, that's a copy of my report.
*MR. JIMERSON:* Your Honor, may I publish this, with the aid of the defendant --
*THE COURT:* Yes.



*MR. JIMERSON:* -- with Dr. Stover.
Q. Let's just go through this document, sir, with your assistance, Mr. Stover. We see up there handwritten, "Friday, 10:00 a.m." Who wrote that?
A. I wrote that. That was when I was making my recommendation, or, you know, my assessment. I wrote that up there, because I would be turning my report in to my office, and the secretary needed to know that Friday at 10:00 a.m., he had an appointment in our office.
Q. And that's with the licensed professional counselor you referred to earlier?
A. Yes.
Q. What's his name?
A. That was Russell Montgomery.
Q. Okay. Now, the date, sir, what's that date reflect?
A. 10-30 of '08. October 30th.
Q. I asked that poorly, but does that reflect the date of the assessment?
A. Yes.
Q. And under client name, sir, what do you have there?
A. It has Blaine Milam.
Q. And do you also have something here to indicate the time?
A. Yeah. That would be the time I actually started talking with him and then the time I stopped, and then the



lines below indicate I saw him at the jail, and it was Rusk County Jail.
Q. Tell us -- it may just not be clear to me on the other side. What time did you start and stop the assessment or the interview?
A. It started at 9:05 a.m. and ended about 9:55 a.m.
Q. So you spent approximately 50 minutes?
A. Yes.
Q. Was all of that time spent with Mr. Milam?
A. Yeah. It would be when I was actually with him.
Q. Now, you've got something marked over here for the type of service that you're providing. Tell the jury what that is.
A. It's crisis intervention. It would be our -- doing our assessment on him and that he was -- was a new client or was a client at that point.
Q. And then you just make a notation of whom you're providing the service, correct?
A. I'm sorry?
Q. Did you make a notation as to whom you're providing the service?
A. Yeah.
Q. And then "provided at," is that the location?
A. Yeah, county and residence and location of screening was Rusk County Jail.



Q. What do these -- and by the way, you completed this record, correct?
A. Yes.
Q. What do these notations here, notification time, referral contact time, what do those signify?
A. Notification time would be when I received the call from my office. I believe I was in the office, and they told me that I was being called down to the Rusk County Jail. And I left immediately, so the referral contact means that's when we then told Rusk County that I was en route.
Q. And then age? What does that indicate?
A. Excuse me?
Q. Does age indicate the client's age?
A. Yeah. I'm sorry, I'm hard of hearing. Yeah. COPSD has to do with if there was any drugs involved that were causing a mental disorder. And at that point, it was unknown, and --
Q. And then that time frame, the next --
A. That's urgent, because in doing the evaluation, I determined it was urgent. He needed to be followed up with our office. The other one would be emergent, which means hospitalization.
Q. And I'm going to move over to payer source and go on to disposition. What do you have listed as disposition?
A. It says, "See Russell."

Q. Which again is a reference to whom?
A. To Russell Montgomery, the licensed professional counselor he was going to see the next morning.
Q. And just that final box denotes that you haven't seen this client before, correct?
A. That's true. There's no -- I have not seen him before.
Q. What does this section refer to, resolution disposition request?
A. That means what I felt that disposition should be, and it was urgent care, which means following up with Russell in the office.
Q. As opposed to -- what if you had marked emergent care, what would that --
A. That would then be either put him in a psychiatric hospital, have him evaluated immediately in the E.R., or be immediately seen by a psychiatrist at our office.
Q. Who is CHC? What does that refer to?
A. Community Healthcore.
Q. And here, is this person to be hospitalized? And what did you denote there?
A. Yeah.
Q. What did you mark though, as to whether he's to be hospitalized?
A. No. I did not feel he needed hospitalization at that



point.
Q. And then the more pertinent -- you checked a lot of those boxes that are nonapplicable?
A. Yeah. Because if we were going to hospitalize him, we needed to be able to say exactly who it was, whether it was me, and if it was me and a physician, or other people that felt he needed to be hospitalized. And then do I agree with it or not? Because a lot of times, if we're going to have someone put in, we do have to go in front of a Judge. And the Judge wants to know if we agree with, say, a doctor's opinion that the person needed to be hospitalized against their will. So the Judge is going to want to know if it's an emergency room doctor who feels the person needs to be in the hospital, and we do or do not agree with that. We may feel that they just need follow-up, and the judge is going to want to know that when he's making a decision, if he's going to order the person be incarcerated -- or be put into the mental health hospital.
Q. So if there's an emergency --
A. Yeah.
Q. -- involuntary commitment, that's going to involve some sort of court proceedings; is that right?
A. Yes, it will.
Q. There's a section marked: If client is not hospitalized, what are recommendations and/or safety plan?



You probably write real clear, but I had a little bit of a hard time making it out. Could you read it to the jury?
A. Just follow-up with crisis services 10:00 a.m. tomorrow. And then line 2 says crisis line information. In other words, he was provided information on how to get hold of us in an emergency.
Q. Under this section marked personal data, tell the jury what you listed there. What were some of the more pertinent items?
A. Ethnicity, white. Age 18. Date of birth, 12/12/89. Male. Resident county is Rusk. Phone number and his social security number. Financial responsibility, I put indigent. Location of intervention was Rusk County Jail. Contact person was Shirley. That's Shirley Broyles, the mental health officer and also the nurse for the jail. Primary language, English. Marital status, never married. Living arrangements, with family. Currently unemployed, but wants to work. Verbal communication. Education, unknown. We really didn't get into that when I talked to him. Referral source would be other/unlisted, because it was the jail that called us. Legal information, adult with guardian of person. At that point, he was -- even though he wasn't formally in the jail, he was at that time under their direction and under their restriction. I mean, he couldn't walk out on his own, so I put him as an adult with guardian of person, at that point. And the



responsibility party is same as client. He was responsible for himself.
Q. But I understand when you say "with guard. of person," you mean physically, there's guards --
A. Yeah, he was --
Q. -- there as opposed to a legal guardian?
A. Yeah. Yeah, at that point, he was simply being detained for evaluation.
Q. What does responsible person denote?
A. Just who is responsible, in case he was -- did have a guardian of his state, then who that person would be, or if it were a minor, that would indicate who the parents were.
Q. The presenting problem is present or presenting. That's a term of art in your field, isn't it?
A. Yeah. It's how he presents what we are observing, what he is telling us. And so I put, "Client states he has had hard time getting over father's death. Has seemed to screw up each time he tries to get ahead. Client states he cuts self when family tried to take knife away from him. Family can keep safe until a.m. when released from jail." In other words, the jail was not going to be holding him once I did the evaluation, if someone would take responsibility for him to make sure he got to the appointment.
Q. How big a factor was it, the self-reporting about the cut when the knife was trying to be taken away from him, as

opposed to being cut in the actual suicide attempt?
A. As I recall, the cuts were minor and were more consistent with just more of an accidental cut than a deliberate cut that intended to cause major bleeding.
Q. I mean, tell the jury, did it look like to you like a suicide attempt as a result of the cuts, or not?
A. No, it did not look like a suicide attempt.
Q. Did it look consistent with what you were told?
A. Yeah. What he was telling me, and went along with what the family said. I talked with the brother during the course of being down there, and they thought possibly he was somewhat suicidal, but again, there's no indication of any -- when I was talking to him, there was no indication that he was really suicidal and bent on hurting himself.
Q. What do you base that on?
A. Just in my conversation with him, and him explaining what happened. In my evaluation, I did put that he was depressed over his father's death, and failures to get ahead in life. But I did not see, nor did he really indicate, that he was suicidal.
Q. The last notes on this page, where it says Family/LAR/Collateral Statements, what is that going to be referring to?
A. That would be statements that I got from other than him. The cuts on the wrist, the family -- his brother felt he might be suicidal, and then also his brother said possibly there was a drug abuse issue.
Q. What did Blaine Milam -- what did he address about possible drug abuse issue?
A. He said that he was on Darvocet and an antibiotic, but that he -- they were making him sick, so he flushed them down the toilet.
Q. Did he ever address anything about methamphetamine or cocaine?
A. No.
Q. This is the next page, of course. Did you note any psycho, social, or environmental problems?
A. No. I'm a little surprised I didn't put down just that, as far as support group, you know, his little -- you know, his family was there to give him some support, and yet, you know, it sounded like there was a little disturbance within the family, you know, as far as him saying he was going to cut himself, or having the knife in his hand and they thought he was suicidal and tried to take it away from him.
Q. Suicidal risk factors, what did you list there? What did you check?
A. I checked depression, possible substance -- you know, possible substance abuse, male, and age. Those are all factors that you have to take into consideration, or you should take in consideration when you talk to someone about



being suicidal.
Q. Now, you just said possible substance abuse, but what you checked was substance abuse.
A. Yes. Substance abuse would be because it had been mentioned to me. Even though he didn't mention it, it had been mentioned to me, so I did put that down as a factor to be considered.
Q. These questions now, client report of suicidality.
A. Yeah. He did not -- he did not say anything about being suicidal or homicidal. In my conversation with him, there's no -- you know, he did not indicate. In fact, he indicated to me that, again, he got cut because they were trying to take the knife away from him. That he was holding the knife, and he was depressed, and they thought he was suicidal, and they tried to take the knife from him, and that's when he got cut.
Q. Does the individual have a plan? What kind of plan is that referring to?
A. A suicide plan. Actually have a plan, you know, mapped out in their minds as to how they're going to kill themselves.
Q. How does that affect your assessment in terms of risk factors?
A. Well, it would certainly increase the risk factor if I'm talking to them and they indicate that they do have a plan



and know exactly how they're going to do it. They can, you know, tell me about it, tell me the plan. Again, that doesn't mean that it's for sure. I mean, you don't know, when someone tells you that, if they're serious or not, but it certainly has to be taken into consideration. You can't ignore the fact that they're telling you how they're going to kill themselves.
Q. What did you note about whether the defendant -- whether the individual has access to weapons?
A. Normally, if they're telling me that there's guns in the house, if they're telling me that there's things other than, you know, kitchen knives and that -- everybody has access to a weapon. In fact, you know, everybody could get hold of a kitchen knife. And so normally, I don't include that unless, again, if he specifically said he was going to kill himself and use a knife.
Q. What is a No Harm Contract?
A. A No Harm Contract would be -- it's a contract just saying that they promise not to harm themselves before coming to see us. Again --
Q. Did you feel the --
A. Legally, it really has very little effect, as they're saying they're going to hurt themselves, and you have them sign a contract saying, "Well, no, I'm not going to hurt myself." It's rather meaningless, but there still is this form that you could have them sign to reinforce the fact that

they will keep themselves safe. But in this case, he was being released to his family, so I did not feel it was necessary to go through that step.

Q. And what is a safety plan for suicidal/homicidal ideations and/or access to weapons. Why did you mark "Not applicable" there?

A. Again, I did not feel that we needed to have a specific plan in place. The family was going to keep him safe, so we did not have to do follow-up, you know, during the day and night to make sure he was okay. We did not need to have it -- someone watching him, you know, like law enforcement, or keep him in the jail until the next morning.

Q. And you mentioned medication history. You mentioned Darvocet and antibiotic. Is that what's written there?

A. Yeah, Darvocet and antibiotic. He told me that he had been on those, but they were making him ill, so he flushed them down the toilet.

Q. Did he tell you about any other legal or illegal medications?

A. No.

Q. As far as how he presented, you've probably had some experience with -- as both paramedic and as a risk assessment person, being around people who may be intoxicated as a result of methamphetamine.

A. Uh-huh.



Q. Tweaking or crashing, the various stages of it.

A. Yeah.

Q. Did you note anything like that? Did you see anything like that that would indicate --

A. No, there was no indication. Later in the report, when it goes through -- like, the motor skill, you know, the motor skills, the speech, I indicate that there was nothing out of the ordinary.

Q. Which doesn't mean that he may not have been using before or after. It just indicates that in your evaluation, you didn't see anything to indicate --

A. Yeah, in my evaluation, there were no indications of any problem.

Q. Now, here you have a -- you list name of physician. Then you have this: Is client willing to cooperate with treatment? What was the treatment specifically that you're referencing there?

A. That would be doing follow-up with the LPC the next day. He would come to an appointment, and he would talk with them. He actually seemed anxious to talk to somebody.

Q. And here at the bottom, you've just made the notation that the client had no history of inpatient or outpatient mental health treatment that you were aware of.

A. That's true.

Q. And up there under medication complaint, it says by



self-report. Is virtually all of this by self-report, except the part about the collateral?

A. Yeah. Everything except for, again, the notes that I have on there about having talked to his brother or what Shirley told me that the officers had said. Everything else is self-report. And so, again, you're having him tell you -- you know, he was telling me what was going on. I am listening to what he's saying, what he's not saying, to try to get some sense of if I believe him or not.

Q. And without telling us what Shirley told you, you're getting that secondhand anyway --

A. Yeah.

Q. -- through the officers, aren't you?

A. Oh, yeah.

Q. You didn't interview her directly, did you?

A. No. It's all just, you know, what someone is telling me has happened. And again, Shirley most likely just said, "Hey, he was brought in. We feel he needs to be evaluated, you know, to see if he could harm himself."

Q. Substance use history. What did you denote under substance use history?

A. He was telling me that he was not -- he did not have a history of taking drugs, and he had not been in a treatment program.

Q. I should have thought about this sooner, but rather



than having to keep looking over your shoulder, if you want to, I'm going to let you use my copy. Specifically, you denoted what under substance abuse history?

A. I just said he's not a reliable historian, because, again, what he's telling me really wasn't consistent with what others are telling me, but I -- you know, I don't know if, you know, what he's telling me is the truth or not, or, you know, what others were telling me was what's actually going on. I had to kind of assume that, because I was being told by others, that there was a problem, that that was possible, but again, I don't know, so I, again, just put no -- not a reliable historian.

Q. And to move past this next section, because of that, you're listing "not applicable" the treatment history or substances used, correct?

A. Yes, because again, he was telling me that there was nothing.

Q. This observation section, under appearance, what are you looking for there?

A. Basically, just how he was dressed, how he looked, as far as, you know, unshaven or if he was erratic-looking or dressed, you know, bizarre. In general, just how he appeared, his appearance looked.

Q. And you've got options, disheveled, bizarre, immaculate, seductive, eccentric, and appropriate. Which one

did you deem his appearance?

A. As appropriate.

Q. Intelligence, you have options of average, above average, below average, paucity of vocabulary, poor vocabulary. What did you denote here?

A. Average.

Q. Tell the jury what you base that on.

A. I'm basing that just on the fact that we were talking. He was giving -- you know, I was asking him questions. He was answering them appropriately. He was able to talk to me with adequate vocabulary. Didn't seem to have any lapses in his speech or memory. Just, again, it was a normal conversation and didn't appear to me that there was anything going on that was interfering mentally or chemically with him talking to me and carrying on the conversation and answering my questions.

Q. And what you're describing to the jury is this is based on your observation and your interaction with him. I mean, you're not giving him intelligence tests like the WAIS-IV --

A. No.

Q. -- or things like that?

A. No. This is just based on the fact that we were having a conversation, and he was volunteering some information to me and answering my questions as I asked them.



Q. Under speech, you've got the option to mark clear, pressured, slurred, excessive, slow, stuttering, noncommunicative. Which one did you mark?

A. I put clear.

Q. Tell the jury what you base that on.

A. Again, he was answering questions and speaking clearly to me. Didn't seem to have any impediment, either physical or mental impediment.

Q. Under judgment, you have adequate, inconsistent, poor, impulsive. Tell the jury which one you selected there and why.

A. Adequate. Again, you know, he's giving me an explanation for the cutting. Whether he's telling me all the truth or not, you know, he's still giving me an explanation. He's not -- you know, kind of eliminate the others in part -- in some regard. You know, he was consistent in what he was saying. He was not a poor judgment, again, by my observation, or impulsive.

Q. Motor behavior, you referenced this a moment ago when I was asking you about whether you observed any sort of signs of meth abuse --

A. Yeah.

Q. -- you know, at that time.

A. Yeah.

Q. What do you base your motor behavior as appropriate



upon?

A. Again, just my observation of him. There was no fidgeting. There was no jerky movement. Nothing that would indicate a problem of any sort, again, either physically or mentally. He was just -- again, appropriate movement and appropriate behavior.

Q. Affect. That's a term of art in your field, too, isn't it?

A. Yeah, affect has to do with how you observe him. He was a little bit what we call labile, which means he -- when he was talking about his father, he would be very sad. And in talking about, you know, being a screw-up, in his words, he was, you know, he was kind of sad. But then when we talked about other things, he would perk back up, and so he did have some movement of emotion during our conversation and did kind of move back and forth a little bit.

Q. Was that consistent with your assessment that he was depressed?

A. Yeah. That would go along with depression. Not a real serious depression in -- my observation is that if it's not a serious depression, sometimes you can pull them out of it for a brief period of time by getting them on another subject.

Q. And thought content, you have there -- you have the option of appropriate, illogical, impoverished, concrete, or



broad. Which one did you denote?

A. As appropriate, because again, his thoughts were consistent and he could carry on a train of thought.

Q. In the 50 minutes you spent with him, did he make any comments to you that struck you as illogical or bizarre?

A. No.

Q. Mood. Tell them which one you denoted under mood and why.

A. Well, it would be dysthymic, which means he did have that depression, and he keeps going back to the depression. If I wasn't questioning him in a way to get a response that would lighten up his mood, he would shift back into a depression and a sadness.

Q. And then in regard to delusions, what did you denote there?

A. I put none. I didn't see any delusions, anything that -- such as grandeur or persecution or being paranoid. I didn't see any of that.

Q. Did he share with you anything in that regard, anything that would indicate to you delusional behavior of any one of these, paranoid or grandeur or fixed or poverty?

A. No.

Q. Tell the jury what you're looking for under the heading marked insight.

A. Basically, looking to see -- the other possibilities

where "little" or "displaced blame." He said, you know, he had difficulty getting ahead in his life, and he really -- he wasn't paranoid and blaming others. He didn't try to shift the blame. Again, he had insight into what was going on. When we talked, he did want to see a therapist. He knew that, you know, things weren't right with him, and that he was having problems, and that the depression and the sadness over his father's death was interfering with him.

Q. And there under hallucinations, you've got boxes there for none, auditory, visual, tactile, olfactory, or other types of hallucinations. What did you list in regard to Blaine Milam for hallucinations?

A. Be none. There was no indication -- nothing he said or no indication that he was having hallucinations.

Q. Under thoughts, you've got a paragraph there or a box for organized, preservative, tangential, loose association, and so forth. Which one did you denote?

A. That would have been organized.

Q. What is it, based on your interview with him, that made you believe "organized" was appropriate?

A. Again, we're talking. He was able to carry on a conversation with me, stay on subject until we were done with that thought and then move on to another one. Did not jump from one thought to another. Did not, you know, drop the conversation in the middle of a thought.



Q. Tell the jury what oriented is referring to and what you denoted under that category?

A. Oriented just means what they're aware of as far as who they are, where he was. He knew where he was. He knew the situation. He knew why he was there. I didn't mark time, because I find -- especially in the jail or in a situation like this, very seldom is a person going to be able to give me an accurate time. I mean, they can tell me if it's daytime or nighttime now, but I don't even ask them, "Do you know what time it is?" because they're not going to be able to -- you know, it's been a very rough day so far for him. I wouldn't expect him to know what time it was. But he did know who he was, he did know where he was, and he did know the circumstances, why he was -- why he was at the jail, and he understood why I had been called.

Q. Under memory, you've got intact, impaired, recent, remote, immediate, sketchy. Which one did you denote here?

A. Intact. Again, he was able to tell me not only what had taken place that morning, but also talked to me about his father, as far as him being -- his sadness over his father's death. He was able to talk to me a little bit about what was going on in his life.

Q. And activity level, general interest in appetite, you marked unchanged?

A. Yeah.



Q. Tell the jury about that.

A. Well, I just -- again, in talking with him, his daily activities hadn't changed, either increased or decreased. He was doing his daily activities about the same from day to day. Interest, again, he didn't show any real change in his interest in life or in doing things. He was -- and appetite was unchanged. His activities were about the same day-to-day. The only change was sleep was decreased. He did indicate to me that he was having trouble sleeping.

Q. Did you look for delirium?

A. Yeah. Again, in the sense that we were carrying on conversation. There was no signs of anything that was interfering with that, so, no, there was no delirium.

Q. And just -- we've got a definition up there --

A. Yeah.

Q. -- but what in general terms are you looking for as to whether there is or is not delirium?

A. Delirium, you would be an indication of an abrupt change in his mental status. Flight of ideas. Inconsistent thoughts. Just a whole lot of -- whole lot that was interfering with him being able to concentrate or to maintain his activities.

Q. The next issue, ancillary information, you marked "No" on trauma issues. But the next one is sexual abuse issues. Why did you mark "No" on sexual abuse issues?



A. Again, in talking with him, and what -- the information I was being given was that there were no issues for sexual abuse.

Q. Now, is that -- on the sexual abuse issues, is that going to be the client as a perpetrator, or a client as a victim, or both?

A. That would be information on him, as far as if he had been abused. If he had been physically abused, if he was suffering verbal abuse. So yes, sexual abuse, again, would be what I was being told about him, you know, by him, about him.

Q. It's a self-report of no sexual abuse issues?

A. Yes. Self-report of no issues.

Q. Physical abuse issues. What did you denote there, as well as verbal?

A. Yeah, no verbal, no neglect.

Q. What do you mean generally by neglect issues?

A. Basically of having been abandoned by his family or not being given proper care by his family in the case of a child.

Q. And there's even a notation as to whether or not you reported any sort of issues as a result of this interview, and did you report any issues as a result of this interview?

A. No.

Q. That would be, for example, report it to the appropriate agency, Child Protective Services or something?

A. Yeah, child services, or adult services in the case of an elderly person with signs of neglect.
Q. Adult Protective Services? Crisis assessment and time tracking. What, in general terms, does this category denote?
A. Well, again, I was the primary crisis assessor. We've been called to have some -- come do an assessment: I did it, so I would be the primary. I don't know if anyone else was available that, you know, had gone from one person to another. As far as I know, at that moment I was the only assessor on duty, and so I was the primary person. If I had been called in, because the person who was assigned to it was busy and hadn't been able to get to it in a timely manner, then I would be considered as a backup assessor. Or if it was done in the office, then it would be in-house or office assessment.
Q. The next two sections refer to timeliness, whether you were able to respond within 15 minutes and have face-to-face within an hour of notification.
A. Yes.
Q. You denoted that you were, correct?
A. Yeah.
Q. Consultation log here. What did you denote down here?
A. Okay. Well, when I first got there, of course, I



talked with Shirley, the deputy in charge of --
Q. Shirley Broyles?
A. Shirley Broyles, the mental health officer and also the nurse for the jail. She's the one that called me. I checked in with her, then also did a review with her once I had talked with him some.
Q. Is Shirley --
A. Yeah, I talked with Shirley. Then I called Tenna at Behavioral Hospital, Longview, to check and see if they had a bed available, in case Russell saw something that I had not seen and felt that he needed to go into the hospital for a 72-hour hold.
Q. And ultimately, as you mentioned before, he didn't?
A. Yeah.
Q. Russell actually confirmed your assessment, correct?
A. Yes.
Q. Now, down here, we've got this bottom section. Tell me what this bottom section is. What's TRAG? What's this referring to?
A. TRAG is a state of determination of how severe the problem is, and they do it on the risk of harm. I felt that there was some risk of harm, so I put a 5.
Q. What's the scale here, so that the jury knows?
A. It would be 1 to 5.
Q. 1 to 5. So you did find a risk of harm. What about



"Support needs," what's that referring to?
A. Support needs, I put 2, because he did have family in place, so he did not need a lot of outside support. Psych-related hospitalization, he didn't have any history of having been in before, so it was a 1. Functional impairment, I did feel, you know, that he was impaired. His ability to function was impaired by the depression, and that it was significant enough to where he needed to be seen by someone.
Q. Employment problems?
A. Employment problems, again, he was unemployed. And no employment at all, and so that becomes a 5. Housing instability. Again, he lived with his family, so that's a 1. Recurring substance abuse. Again, I felt there was a possibility of that -- even though he was saying there was none that had been reported -- there was drugs, so I put 3. And criminal justice involvement, 1, because he was not incarcerated at that point, did not have a history, that I knew of, of incarceration for this type of an issue.
Q. Did you know whether or not he may have been on bond as a result of another case at that time?
A. No. I was not given any information about that.
Q. And depressive symptomology, why did you leave that one blank?
A. Only the doctor can put that in, either a psychiatrist or a medical doctor. His -- or a psychologist or



a psychiatrist would be able to make that determination. I'm not qualified for that.
Q. Over here on the other side, we haven't addressed it, because that's a place to denote it if it's a child, TRAG --
A. Yeah, if we're doing a child.
Q. What is this page that we're looking at now?
A. That's the crisis plan. Just, again, part of the paperwork, as to what we think is there --
*COURT REPORTER:* Part of what? I'm sorry.
A. Our treatment plan --
Q. Paperwork, I believe you said.
A. Yeah, paperwork.
Q. As far as suicidal potential, why didn't you list anything under that?
A. I did not feel he was suicidal. I felt he had some depression, might be self-injurious, as I later will talk about, but I didn't feel that he was actually suicidal, was actually planning to kill himself.
Q. And homicidal potential?
A. Again, there is no indication that he was homicidal. Nothing he said, nothing was indicated to me that he was homicidal.
Q. Self-injurious behavior. What did you denote there?
A. Again, I put that he needed to attend next working day crisis services appointment, because of the fact that he

had been holding a knife. He apparently had been waving it around. The family felt that he was suicidal. I don't think it was suicidal. He was in a position where he could harm himself, and I felt that there certainly was a potential of harming himself he already had, that he needed to be seen, but I did not feel that he was actually suicidal.

Q. And you marked the same thing in regard to depressed mood, correct?

A. Yeah, depression. Again, attend next working day crisis services appointment.

Q. As far as manic behavior or anxiety, why didn't you denote anything there?

A. I did not see anything to indicate that.

Q. And this is --

A. A continuation of that.

Q. Continuation?

A. Of that. Again, no aggression, no psychosis.

Q. Well, let me ask you specifically about aggression. Did he display any aggression in the 50 minutes you met with him?

A. No.

Q. Psychosis, which goes along with the ability to manage psychotic thinking. Did you see any evidence of psychosis in your interview with him?

A. No. Again, during the time that I saw him -- I was



seeing him, there was no indication of anything of that nature.

Q. What about paranoia?

A. No, he did not -- again, there was no signs of paranoia. He didn't feel anyone was out to get him or anyone was contributing to the fact that he was not being able to get ahead in life and he was having difficulty in getting ahead in his life.

Q. You mentioned earlier that you had at least some collaterals that raised the issue of substance abuse. So why didn't you denote anything about substance abuse?

A. That, again, in talking with him, there was no indication. You know, it was collateral, that he was not giving me any indication that there was a substance abuse problem. And I felt that what needed to be addressed immediately was the other issues that -- you know, what Russell really needed to be concentrating -- Russell would look at everything, but what I really wanted Russell to be tuning into was the self-injurious behavior and the depression.

Q. Then we've got here where you signed and dated this, correct?

A. Yes.

Q. And then we've got "LAR signature." What's LAR?

A. Client or LAR. LAR would be legal representative.



Q. And do you know who signed that one?

A. Well, I put incarcerated, because he was -- since he was incarcerated.

Q. So Mr. Milam didn't sign it?

A. Yeah, he didn't -- he did not sign the report.

Q. I mean, how does that come about? Did he refuse to sign it or did you not give him the option because he was incarcerated?

A. Yeah, since he was incarcerated, I did not ask for a signature.

Q. And you've got comments and additional information on this page.

A. Yes, sir.

Q. Help us make out what these comments are, sir.

A. Okay. This is just sort of a chronology, and it's check in with Shirley. Read reports. In other words, information I was being given from the officers on the scene. I believe I did see an officer report. Do the paperwork. I met with his brother and talked with him briefly. I met with the client. I talked with Shirley, and then with -- who is a mental health officer. Did pay for -- I called BHL, Behavioral Hospital, Longview. There is a bed available tomorrow if needed. Finished my paperwork and then made the appointment with my office for him to see Russell the next day.



Q. All right. Which ultimately, that appointment confirmed your assessment, correct?

A. Yes.

*MR. JIMERSON:* Pass the witness.

*THE COURT:* You may cross.

*MR. MOORE:* Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. MOORE:**

Q. Mr. Stover, my name is John Moore. I don't believe we've ever met before, have we?

A. No.

Q. All right. Let me ask you something. You've been through a lot since you took this report, correct?

A. Yes.

Q. Okay. Did you actually remember this or do you just remember from reading the assessment?

A. In looking at him, I vaguely remember, but, no, I don't really have a good memory of this, other than through my report.

Q. Okay. All right. So basically, all the information you've given us is just generalities. When you say, "I would get this, I would get this," you're just assuming you would ask these questions.

A. Yeah.

Q. Okay. All right. Now, you gave us a story, and like

it said on here, you don't want to go through it. You said you got fired from Community Healthcore?

A. Yes, sir.

Q. But you didn't do anything wrong, but you still got fired, correct?

A. Yes.

Q. All right. What happened in your professional practice up in Colorado? You said it wasn't doing well. What happened in that?

A. Well, just that I'm not real good at self-motivation. I was not going out and really beating the -- beating the woods to find clients, so I was not -- so I didn't have a good client base, enough to support me. Also, since I was not licensed, it was all private pay. For insurance companies to reimburse you in almost any state, you're going to have to be licensed. So in Colorado, I was, you know, a psychotherapist. I could practice, but it was all private pay. There was no insurance or Medicare or Medicaid or anything like that. So I would have to have clients who could pay me. Because of that, my rates had to be, of course, lower than what a professional counselor would be. And so then it also would mean I would need more clients to be able to get by. And quite frankly, I just -- I wasn't good at getting a good client base. With the people I did work with, I felt I did good and, you know, I had some that I saw a number of times on a continuing basis that



were working on issues, but again, I was not doing a good job of getting the client base.

Q. Okay. So because of that, basically your practice failed, so y'all moved to Longview?

A. Yes.

Q. Came to Longview. You went to work for Sabine Valley at that time?

A. After -- you know, after I had been here for a little while, the first thing I did was when I got down here, looking around, didn't find much, because again, I'm not licensed. So I worked actually for Sitel Corporation, which is incoming customer service. I was there for three months.

Q. Just basically working on the phone, taking orders?

A. On the phone, doing customer service and tech support for Verizon Wireless.

Q. Okay. All right. So you worked for them for a few months. And then how did you get on with Sabine Valley?

A. I, again, just kept checking into mental health agencies, you know, that I could get on with to work toward licensure, and I found that Community Healthcore -- actually, the position I originally had applied for was called ACC Team, which is the Accelerated Client Contact, where these are clients that need to have daily contact with someone, and you're going out to where they are. If they're homeless, you're going to the shelters, or into their home and meeting



with them, just to check on how they're doing, if they're taking their medications --

Q. I don't want to interrupt you, but --

A. Okay.

Q. -- did you ever get that job?

A. Well, actually, while I was applying for that -- I had an application in to that one -- Crisis Services found out that I had applied for it, and they actually asked me to come in to interview with them.

Q. Okay.

A. And it got to a point where the two parts of Community Healthcore actually wanted to hire me.

Q. Okay. All right. Now, how long did you work for Community Healthcore before you returned to Colorado?

A. I worked for them for three years.

Q. Okay.

A. From June of 2006 until August of 2009.

Q. Okay. And that was all in doing the crisis assessments?

A. In crisis assessments.

Q. When you got to the jail, you started -- did you take any notes? Or tell us what you do when you go in there.

A. Again, I met with Shirley to see what was going on, what they called me about, that all I knew was --

Q. Did you just take this piece of paper with you?



A. Yeah.

Q. Okay. You don't take any other notes or anything?

A. No. This is what I do the notes, and the back page would be, again, the little chronology of what was going on.

Q. Okay.

A. I met with Shirley. She would tell me why I was being called in. Gave me some information as far as from what the officers had seen. You know, she was telling me what was going on and why I was being asked to evaluate him.

Q. Okay. So you try to gather all the information you can before you ever go talk to the client?

A. I -- yeah, get what information they can give me as background, yes.

Q. I'm going to show you what's part of Defendant's Exhibit 575. You said you read the police officers' reports. I think on an emergency detention without a warrant, this is basically how someone gets held by the police, correct?

A. Yeah.

Q. Okay. And in this they provide the information, the arresting officer, basically, correct?

A. Yeah.

Q. Okay. And this would have been the reports you would have reviewed?

A. I may have. I don't recognize it, but they may have provided me with that.

Q. Okay. And this is the report with the application for emergency detention without a warrant, saying the State of Texas, in the best interest and protection of Blaine Milam, correct?
A. Yeah.
Q. Okay. All right. This is signed by the police officer.
A. Yeah.
Q. Do you have any information in here about what police officer you talked to?
A. No, because I never talked to a police officer.
Q. Okay, because you said earlier that you talked -- did you read his reports?
A. No, I didn't. I don't think I -- I don't know if I actually saw his report or not. I don't believe I actually saw a report. I think it was just Shirley telling me what the officer had said or, you know, why he had been brought into the jail.
Q. Okay.
A. I don't believe I actually saw the report, and I don't believe I saw that --
Q. Okay, because I was just saying, back here on your comments and additional information on the last page, 8 of 8, you wrote on there that you read reports. Were there any other reports that you read?



A. I think it was just, you know -- I'm not sure. I'm really not sure --
Q. Okay.
A. -- what else I saw, but I don't recognize that detention form.
Q. Okay. This -- as far as the reports, this is the detention form for Blaine Milam, correct?
A. Yes.
Q. Okay. I don't know if I can operate this, but just to show the jury, I'll publish this. This is part of the exhibit that -- in the State of Texas, for the best interest and protection of Blaine Milam. Because he wasn't under arrest for anything as you understand, correct?
A. As I understand, he was not under arrest.
Q. And this is the only one -- the only way that someone can be held in jail without a charge?
A. Yeah.
Q. Okay. Just for their best interest.
A. Yes.
Q. When you say that they are a hazard to themselves or to others?
A. Yeah. Again, this is what they would use to hold them until we saw them. And then this would also be part of the paperwork that would go to a judge, if we felt that they needed to go be put into a mental hospital. This would be



part of that, also.
Q. Okay. And this is what -- this basically shows the officer's evaluation before it ever gets to you.
A. Yeah.
Q. Okay. And in here it says, "I have reason to believe and do believe that the person evidences mental illness; and because of which demonstrated either by the person's behavior or by evidence of severe emotional distress and deterioration in said person's mental condition to the extent that the person cannot remain at liberty, and which risk of harm is specifically described as follows: Has cuts on wrist, attempted suicide." Correct?
A. Yeah.
Q. Okay. And then it goes in there to tell, believes he is -- "the risk of harm is imminent unless the person is immediately restrained." And, "My beliefs are based on specific recent behavior, overt acts, attempts or threats observed by me or have been reliably reported to me and which behavior, acts, attempts or threats are listed as follows: Mother and wife took gun from him and several knives."
A. Again, I don't think I ever saw this, because it mentioned guns in here and also says something about a wife. I don't have -- I didn't have either of that information.
Q. Okay. And then on here it references the same lady you talked about, Shirley Milam, correct?



A. No. My reference to Shirley is Shirley Broyles at the jail.
Q. Okay.
A. She's the mental health officer.
Q. Now, did you ever talk to his mother?
A. No.
Q. You talked to his brother, but not his mother?
A. Yeah. His brother was there.
Q. Okay.
A. I believe his brother was there. I think I talked to him in person, not by phone.
Q. Okay.
A. Or he called down there and wanted to talk to me.
Q. Okay. When you said you had got some background information and some collateral information, you said earlier --
A. Collateral, again, just the fact that, you know, he had had a knife. My understanding is he had a knife in his hand, and they felt he was suicidal, and that's why he decided they needed to take it away from him.
Q. Okay. But now we know at least the officer had information that they took guns and knives from him, correct?
A. Yes.
Q. Okay. When you're going down there to do the evaluation, you -- is it important that you talk to all the

people involved with this client?.
    A. Again, I'm going down to evaluate him and just make a recommendation to the jail or whoever, and so my main focus is talking with him. I do get some other information if it's provided to me.
    Q. Okay.
    A. But for the most part, it's -- I'm just focusing in on what he has to say, and this is the assessment of him and most of his self-report.
    Q. Would you agree with me when people are being detained against their will, they're generally not going to be open and honest to someone walking in your door to talk to you.
    A. That's true.
    Q. And this was the situation here.
    A. Yeah.
    Q. He was locked up in the jail. And you may not know it, but you said his brother called down there, but his brother was actually in jail at the same time.
    A. Oh, okay.
    Q. So that's why I was just curious. I mean --
    A. Yeah.
    Q. -- did you talk to him down there --
    A. Again, it's probably my fault. I didn't indicate exactly, you know, what the circumstances were that I talked



to his brother. I just noted that I had talked with his brother before I saw him.
    Q. Okay. So you talked to Danny, and you're not sure whether or not you talked to Shirley or not?
    A. His mother?
    Q. The mother, Shirley, yes.
    A. No, I know I didn't, because again, that would be on here. I'm pretty sure I didn't, because I think I would have put on there that I talked to his brother and his mother.
    Q. Do you find out, when someone's down there, if they have a pending criminal charge or if they're on probation, or anything like that?
    A. If that information is given me. I didn't -- again, I didn't ask for any criminal history of that, and nothing was provided to me.
    Q. Would it be important to ask the person?
    A. Again, I -- you know, my conversation with him, I would have just asked him what was going on. And him giving me history, I would expect it to come up if it was something that was significant to him.
    Q. Okay. So you're relying on this person that's being held against their will to give you all this information instead of you drawing it out from them?
    A. Yeah, I'm -- again, I'm asking him what's going on. And then if there's any other information provided to me, I



also take that into consideration. But most of it is, again, the self-report. I'm just finding out what he has -- what he has to say and then evaluating that.
    Q. Okay. You got this call at what time? 8:30 in the morning?
    A. Yeah, 8:23. And they told me that -- they notified me that the jail had called and wanted an assessment done.
    Q. Okay. Did you think it was unusual that you got an assessment or to be doing an assessment at 8:23 in the morning with someone with cuffed wrists?
    A. No. I get called, you know, at all hours. We have people available, you know, 24 hours a day, because we don't know, you know, when something like this is going to happen. Again, we don't know what delay there might have been while he was being held at the jail. We don't know, you know, what the time frame is until we actually get there as to, you know, how the call came in or -- I mean, what happened before we were called in.
    Q. So all you know, that you're going down to the jail to basically interview someone that has committed suicide -- or not committed, but attempted to commit suicide.
    A. No. Well, not even that. What I'm being told is that there's an assessment. Shirley is calling for an assessment of someone being held at the jail. Normally, that's all the information I have --



    Q. Okay.
    A. -- to begin with; I don't know what the circumstances are.
    Q. Okay. And so when you get down there -- you told the jury earlier that he had a knife, and someone took it away from him and cut him?
    A. No, he -- in the struggle, according to him -- you know, he had the knife. His family thought he was suicidal. They tried to take it away from him. In the struggle with his family that was there taking it away, that he was cut.
    Q. Did you see the cuts?
    A. Yeah. I believe there were some superficial cuts.
    Q. On his wrist?
    A. Yeah, I believe to the wrist. Again, I didn't put it in the report exactly where it was, but my recollection is that there were some superficial -- a superficial cut.
    Q. Okay, well, we know from the police officer report there are at least some cuts --
    A. Yeah.
    Q. -- on there and that he had guns and knives. You know, if you're taking a knife away from someone, is it common for them to be cut on the wrist whenever you're taking it away from them?
    A. Well, again, it would just depend on the circumstances. I wasn't clear, as far as what kind of -- you

know, how a struggle took place.
Q. Did you talk to Blaine about the struggle and how it took place?
A. He just said that he had a knife, and the family tried to take it away from him, and during that struggle that he had been cut.
Q. I'm sorry, I should have -- I don't want you to guess on here.
A. Yeah.
Q. I mean, you know what we're here for.
A. Yeah.
Q. This case is too important.
A. Yeah.
Q. I have your report, and you're saying he did this, he did this, but you didn't make any notes about any of this, did you?
A. No, I didn't.
Q. Okay. That's why I said, I mean, don't guess or --
A. Okay.
Q. I don't want you to try to help me with an answer or anything like that.
A. Yeah. Again, just going by what, you know, I have right here as to he cut himself when family tried to take a knife away from him. That's basically what he told me, and that's all the information I have.



Q. Okay. And going through your report here that the jury's already seen -- and I believe you have it in front of you -- on the educational background, you put unknown on there. Would that not be important, his education?
A. If I'd seen some signs that, you know -- again, that he was slow or that he was having trouble, either a physical impediment or something that might be -- but again, just for the evaluation and what was going on, and he was talking to me, he was carrying on a normal conversation, so no, it was not applicable. As far as I was concerned, it was not applicable.
Q. In your degree that you've had, in your Master's, did you study -- I'm sure psychological studies.
A. Yeah.
Q. What did you get your Master's in?
A. It was in counseling psychology.
Q. Okay. Do you do any -- or did you have any classes or taking any courses on I.Q. tests or anything like that?
A. I would have had some education as far as what I.Q. tests are used for, different disorders and that, but on Master's level, normally, you do not actually get into doing testing. That is more on the doctorate level where they do -- the psychologist does testing, does I.Q. tests and the actual testing. But for the most part, that's not a Master's level.
Q. Okay.



A. And again, I would have had a little bit of background as to what some of the different tests were, but no, I did not have any experience in giving tests or --
Q. In your own private practice you had, did you counsel people that were uneducated and educated, both?
A. Yes. And mainly adult, but some children.
Q. Okay. If someone didn't finish the -- or was pulled out of school in the fourth grade and never had any schooling, how would you classify that?
A. Well, again, if -- if there was an indication that -- you know, when talking with him, if there's some indication that he is having trouble talking or expressing himself, then, you know, I would be more inclined to ask him, you know, what kind of education he had, if he had any problems, if there was any history, any learning disability or that. But again, there was no -- I had no indication of a problem, when I talked with him, or any slowness or any deficit in his education or educational ability, and so I really had no reason to question it.
Q. Okay. Would you think someone that, in your professional opinion, that has finished the -- only the fourth grade would be of average intelligence?
A. Well, if he had finished fourth grade and had no further education and had not applied himself, then I think -- I would expect that would be somewhat obvious in talking to



them. But again, in talking to Blaine, Mr. Milam, I got no indication that he did not totally understand what was going on or that he was not able to express himself. And so it would be surprising to me that he did not have at least a high school education.
Q. Okay. Well, I can tell you he didn't.
A. Okay. I'm sorry.
Q. He never finished the fourth grade.
A. Okay.
Q. You said you deal with I.Q. tests. He's had I.Q. tests ranging from 65 to 75 on different ones, and one or two that reached the level of 80.
A. Uh-huh.
Q. Okay. What would make you think?
A. Again, I have no -- I have no experience working with I.Q. tests, and unless there was -- in talking to him, it became obvious to me that there was a deficit, I wouldn't know it.
Q. Okay. You said you spent, what, 50 minutes with him?
A. Yeah. Yes, sir.
Q. All right. And you're trying -- you're basically trying to see, at that time, whether someone has -- I don't know how to -- give me a term for it --
A. Okay.
Q. -- a term of art.

A. To see if he was in crisis.
Q. Okay. All right. Basically, with all the things you have in here, it's basically a blubbering idiot, for a different word. I mean, I don't know how to put it in layman's terms, that someone is going to kill themselves right then is what you're concerned with.
A. What I'm looking for is someone who is suicidal, homicidal or psychotic. In other words, someone who is not able to take care of themselves. And again, the levels of either emergent -- which means needs to be hospitalized, in my opinion; urgent, which indicates at least needs to be seen by someone, or a relatively short-term evaluation by someone more qualified than me, such as the LPC in our office; or routine, in which case, give them just some referral information. In his case, I felt he did need to be seen by someone else in our office, needed some follow-up immediately. And so that's why I had scheduled him to see someone the next morning.
Q. Okay. When you go through in doing these -- you've done hundreds of these things, haven't you?
A. Yes, sir.
Q. They're basically just a check-off.
A. Huh?
Q. You're just going through asking the questions, checking things off.
A. Well, yeah. Doing check-off, plus then a few areas



where we actually then get into more of what did they say, what was going on? But, yeah, most of it is a check-off, and you then -- looking at that and evaluating -- evaluate them on that basis of --
Q. How much time do you actually spend with a client?
A. Again, probably 30 to 50 minutes normally, is all I'm spending with the person.
Q. Okay. Because, I mean, on here, it showed on your report that you started at 9:05 and you stopped at 9:55.
A. Yeah, and I did make an error on that, because not all that time would have been spent face-to-face with him, because I also then talked with Shirley --
Q. Okay, I was --
A. -- I did --
Q. -- fixing to say on your consultation log -- I didn't want the jury to be misled. At 9:05, you actually met with Shirley. And then --
A. Yeah.
Q. -- I believe at 9:35 --
A. 9:55, I think, is when --
Q. It says 9:35, Shirley. And then you have the little marks like you talked with Shirley again at 9:35 on case review. And then it says at 9:40, you talked with the hospital, which would leave actually about 15 minutes to talk with the client.



A. I met with Shirley. The first thing for Shirley was 9:05. I consulted with her. In other words, that's when I checked in. 9:35 is when I reviewed it with her, and then 9:40, made sure I had a bed available for him. But then I would have talked with him to -- again, after that, just to tell him what the plan was. And again, he agreed to the treatment plan.
Q. Okay. So he was asking you for help.
A. Yes, he was --
Q. He was saying, "I need help."
A. Yeah. I mean, he isn't the one that asked for the assessment, but yeah, at the end of the thing, you know, when I said this is what the plan is, he was agreeable to coming in the next day. He wanted to -- the family said that they would make sure he was safe until the next morning.
Q. Okay, like -- well, and that's something else. You said the family is going to -- didn't he come from his family? He was at his family's --
A. Yes.
Q. -- when this happened, right?
A. Yes.
Q. Okay. And then you're going to put him right back in the same people that he's just been arrested with, just to keep him safe?
A. Well, yeah. They -- again, my understanding was that



they wanted him evaluated. And, you know, once I did that, and I said I think he -- you know, this is the plan I feel would be appropriate, that he come in and see us, they were agreeable to that.
Q. So basically all those questions that Mr. Jimerson went over with you, you did in 15 minutes, and then Blaine said, "Yes, I want help."
A. Well, no, because I would have continued talking with him in the course of seeing him, but the -- I'm not sure when I -- I don't know what time I actually saw him. I -- you know, again, I checked in with Shirley at 9:05 --
Q. And Mr. Stover, that's why I'm saying, because we can only go with what you've written down here.
A. Yeah.
Q. We know you started at 9:05, because you have that in two places.
A. Yeah.
Q. And then you stopped at 9:55.
A. Yeah.
Q. And we know you talked to Shirley at 9:05 and 9:35, and then you called the hospital at 9:40.
A. Yeah.
Q. You were out of there at 10:00, basically, 9:55.
A. Yeah. So between -- after seeing Shirley at 9:05 and then seeing Shirley again at 9:35, you know, I would have been

seeing him. So, yeah, more like 20 minutes --

Q. Okay.

A. -- 25 minutes.

Q. And that's what I'm saying.

A. Yeah. Oh, yeah.

Q. And that's all I'm trying -- I mean, it took you 20 minutes to go through here and check this stuff off, basically.

A. And talking to him, yeah.

Q. That's what I'm saying. As far as the information, you know, you have on here -- I mean, like on the ancillary information you have, it says that there were no trauma issues, but yet there were cuts on his wrist, correct?

A. Yeah. No trauma issues, as far as him being traumatized by someone else. You know, him being beat up or physical abuse or trauma to him.

Q. So cuts on the wrist, whenever someone has a knife to their wrist and they're cutting their wrist and they're going to kill themselves, that wouldn't be considered trauma?

A. Again, in this case, the trauma issue -- you know, trauma to him, you know, inflicted by others or trauma -- major trauma. Again, the knife cuts had already been indicated, so no, I did not indicate under "Trauma" that he had received any trauma.

Q. Okay. And your risk of harm down here, what does



TRAG stand for?

A. TRAG is Texas -- I'm not sure. I'm really not --

Q. Is it Texas Risk Assessment Guidelines?

A. It might be. I don't know. Again, it's something that, you know, we're given the scale, and that -- but I'm not sure what that term --

Q. What is the scale?

A. It would be 1 to 5, would be the scale, 5 being more serious.

Q. So he's -- in his risk of harm, he's in the most serious classification he can have for risk of harm, correct?

A. Yeah, risk of harm. But then as you go through the rest of them, that then tells you what, you know, what we feel -- or what I felt it would mean. If the risk of harm is 5, and then the impairment was 5, and, you know, there's other high marks, then the cumulative would be this is a person who needs to be put into the hospital immediately.

Q. Okay. And you have here risk of harm, 5. That's the most serious. Support needs. What is the formula for that? I mean, how do you determine that?

A. Support needs means what additional needs does he have for support? He has family. There was some conflict within the family, but there is family. They are supportive of him, and so it's low numbers, too.

Q. I have to ask you, how did you determine that?



Because his brother was in jail, and you said you did talk to his brother.

A. Again, what I was being told by Shirley Broyles was that the family was supportive. They, you know, had taken the knife away from him. They wanted him to get help. And so there was not a need for outside support, you know, a great deal of immediate outside support.

Q. Let me --

A. Family --

Q. I don't want to interrupt you --

A. Okay.

Q. -- but basically on this, you talked to Shirley Broyles, read the police report, and you didn't talk to any of the family members?

A. Yeah.

Q. You didn't have enough time, did you?

A. Well, yeah, you're right. Again, I talked with Shirley. That would be, you know, getting the information from her. I did not talk with the family, other than the -- previously with the brother. So yeah, I just -- from what she's telling me and what she's telling me the officers were saying.

Q. Okay. You did talk to the brother in jail?

A. Yeah. On my chart, it says I did talk to him. So apparently wherever he was, whether he was there or somewhere,



I talked to him briefly. But again, I don't have a good memory of this incident. I'm just going by my report, and it says I talked with the brother, so --

Q. Okay. Number three, on the psych-related hospital, what formula is that? You put him at the least needed, and I'm curious, because he gets arrested at his home for cutting his wrist.

A. Yeah.

Q. But you're sending him back to his home saying he's going to be safe.

A. Yeah.

Q. So how do you determine that?

A. Okay. Well, on psych-related hospital, he didn't -- as far as I know, he has no history of having been in a psych hospital, and that's what that one refers to, his past hospitalizations. And so that's why there's a 1 there, because he did not have -- as far as I know, he did not have a history of having been in a psych hospital before.

Q. I don't want to be rude, but you wouldn't have any idea, because you only talked to Shirley, didn't you?

A. That's true. Again, having talked with Shirley, and that --

Q. But then you're relying on --

A. Yeah, and --

Q. I'm sorry. I was fixing to say and then you're

relying on the person who's locked up to tell you whether they've ever been in a psych hospital.
A. Plus the fact that he did not have a Community Healthcore number, you know, a number with us before, so we had not had previous contact with him.
Q. What if he had gone over to Schumpert in Louisiana? Isn't there a big hospital in Louisiana, Shreveport?
A. Yeah. Again, if he had not had contact with mental health agencies in our six-county area, that's true, we would not have a record of that.
Q. Okay. What about functional impairment? You got him the next-to-the-highest rating on there. Tell us how that's determined.
A. Again, that was in talking with him and the depression. He was indicating that he was very depressed, and that he wasn't doing well, as far as functioning. He still was functioning in daily life, but he was kind of -- you know, kind of stagnate in his life. He wasn't doing anything. From what he was indicating to me, you know, things were just kind of day-to-day. His day routine was about the same everyday, and he was very sad and --
Q. Okay. Now, the next one is the highest. We all know he wasn't working, didn't have a job at that time. That's the reason he gets the highest rating on that, correct --
A. Yes.



Q. -- employment problems? The next one, the housing stability. Do you just say, okay, you've got someplace to live, so you get a 1?
A. Yeah. And the scale -- the fact that he did have a house. You know, it was a stable thing. You know, no indication -- he was not giving me any indication that he was going to get thrown out of the house --
Q. Does it --
A. -- the family was trying to help him.
Q. I'm sorry. Does it make any difference on the condition of the living -- the living conditions in the house?
A. Not on that -- that particular one, no. Again, it just has to do with the stability of the housing.
Q. Okay. And number seven is co-occurring substance abuse. You're saying that he was -- you give him a 3 on there, but you only got that from what this person who was locked up is telling you, plus his brother who's locked up, correct?
A. Yeah. Again, he's not -- he's telling me that there's no problem, that he doesn't have a drug abuse problem, that he flushed his meds down because they're making him sick, and yet I'm getting information from others, so I gave him a 3 on that.
Q. Okay. So you did talk to mom?
A. No. Again --



Q. I thought you said mother. I'm sorry.
A. No, I'm sorry. No, just from others.
Q. Okay. All right. Is it common in your job, or in your job at that time, for addicts to tell you they're an addict or do they generally try to hide that from you?
A. Normally, they're going to -- they will tell me things like that. They'll tell me that they're coming down or they're going up or they're having bizarre thoughts.
Q. When they're locked up in the jail or when you're in your setting in your office?
A. Well, no. Wherever I see them normally, which is in the E.R. or in the jail. I don't see them that often in the office.
Q. Okay. All right. And criminal justice involvement, you put a 1 in there, the least.
A. Yeah.
Q. While he was locked up in jail.
A. Well, again, he -- my understanding with that is he was not locked up. They were detaining him for me to evaluate him and then determine, you know, from my evaluation, plus again, that officer's report, determine if he needed to -- they needed to go to the Judge and try to get him put in the hospital. They were detaining him, but as far as I knew, he was not processed into the jail. He was being held there.
Q. Okay. But he was being held against his will.



A. Oh, yeah.
Q. That's what I mean.
A. Yeah.
Q. If you're being held up against your will, you're locked up, aren't you? I mean, you're not free to leave.
A. Well, yeah. But again, on the TRAG scale -- and I don't have in it in front of me, but on the TRAG, it actually means incarcerations, and it's a scale, and you give them --
Q. But he was incarcerated, wasn't he? He was in the jail locked up?
A. He was being held for evaluation, but he -- as far as I know, there were no charges against him at that time.
Q. Okay.
A. But again, that's just going by what I was being told.
Q. Did you know he was on work release --
A. No, sir.
Q. -- at the time? All right. So basically, you spent 15 minutes with this guy and then determined, even though he's got cuts on his arms, you know he had guns and knives, he wasn't a danger to himself, sent him back to the same place you just took him from?
A. I did not know about the guns. I knew he had -- again, the cuts, I knew about. But again, what he was telling me and from the information I was getting, the family could

keep him safe and make sure he didn't harm himself until he could be evaluated again in the morning.
Q. How did you determine that, based on him -- the family not keeping him safe and him having to be arrested and brought into jail?
A. Just that, again, what had happened at the house was that he had a knife, and the family took it away from him. In the process, he cut himself, he said, and -- but the family was supportive and wanted him to get help. And again, he was agreeable, and from what I was being told, the family was agreeable to keep him safe until the next day.
Q. Are you there also in a counseling-type --
A. No.
Q. Okay.
A. No. In the assessment, I'm not doing any follow-up with him.
Q. Tell us about this No Harm Contract. What is that?
A. No harm --
Q. Excuse me. Before you get started, is it real important? Because it's mentioned a couple of times, isn't it?
A. Yeah. No Harm -- a No Harm Contract is simply a piece of paper that the person signs saying, "I will not harm myself. You know, I promise not to harm myself for this period of time, because I will be seen by someone." And it --



again, it's one of those things that we have that is sometimes used if we feel that the person, you know, is going to be responsible for themselves, and we feel that they can be responsible for themselves with a little coaxing. But it really has no legal -- as far as I know, it has no real legal significance, because if the person -- if we're evaluating them, and we feel they need further evaluation, then maybe they -- you know, they're not telling us the truth and keeping themselves safe.
Q. Okay. That wasn't important enough to have him sign in this case, was it?
A. No. Again, since the family was going to keep an eye on him, and the Sheriff's Office was comfortable with that also, a No Harm Contract, you know, again, was kind of meaningless.
Q. Okay. You're there to evaluate his psychosocial environmental problems, correct?
A. Yeah.
Q. You didn't fill anything out on this, did you?
A. No. When I looked at this the other day, I was a little surprised that I hadn't put occupational problem --
Q. What about education -- you didn't even have enough information or even ask him about educational problems, did you?
A. Well, again, there was -- when I was talking to him,



there was no indication of an educational problem --
Q. But don't you have to ask someone that first? I mean, I won't know anything about you if I say, "Hey, tell me about you," and you say, "Hey, I'm good."
A. Yeah.
Q. You don't ask -- if I don't ask you any questions, I'm not going to know anything, am I?
A. But again, you know, if there is a problem -- there is no indication of a problem, so, no, I didn't ask.
Q. Wouldn't it be just easiest to say, "Hey, tell me about your support group. Tell me about your social environment."
A. Well --
Q. "Tell me about your education. What about your occupational problems" --
A. Yeah.
Q. -- "your housing problems, economic problems? Do you have access to health care?"
A. Yeah.
Q. "Problems related to interaction with the legal system?" Maybe then you would have found out he was on work release --
A. Yeah.
Q. -- or other, you know, social -- psychosocial environmental problems. But that one was just skipped



completely, wasn't it?
A. Well, but again, in talking with him, he told me -- you know, gave me information on the fact that he was not employed. He gave me the information that, you know, he was depressed. The issue of education and specifically what level of education he had didn't come up because --
Q. You didn't ask him.
A. -- we were having a conversation, and there was no indication, from talking to him, that there was a problem with that, and that that was an issue. And therefore, no, I did not ask him about it specifically.
Q. I mean, basically, this is a lot of information contained in these eight pages, correct?
A. Yeah, it's a lot of, again, information just looking for specific information. This form is something that's constantly revised, and the State has input into what we ask them, what kind of information the State wants us to be able to report. Other agencies, other mental health and mental retardation agencies, you know, have different forms. We all have a different form, but basically, a lot of the information is the same. It just might be worded differently and ordered differently.
Q. Okay. And in this basically, the question -- I mean, it only took you 15 minutes to go through all this, right?
A. I take 15, 20 minutes, again, of actual getting the

information from him.

Q. Right. Would you be surprised that you've been on the witness stand an hour and a half now?

A. Yeah.

Q. And I would submit to you that in an hour and a half, I don't think I could ask you all these questions, could I?

A. Yeah.

*MR. MOORE:* Nothing further, Your Honor.

*MR. JIMERSON:* No questions, Your Honor.

*THE COURT:* You may step down, sir. Is this witness excused? Any objections?

*MR. JIMERSON:* No objections to excuse him.

*THE COURT:* Any objection from the defense?

*MR. HAGAN:* Subject to recall, Your Honor.

*THE COURT:* All right. Ladies and gentlemen, we'll take our morning recess. We'll take a 20-minute recess. You're under all the instructions I've heretofore given you. Do not discuss the case among yourselves, nor with anyone else, nor allow anyone to discuss the case with you, nor obtain any information regarding this case. You may step down.

(Jury exited the courtroom.)

*THE COURT:* We'll stand in recess.

*MR. JIMERSON:* Your Honor, can we make a record on something?



*THE COURT:* Yes.

(Conference At the Bench:)

*MRS. TANNER:* Mr. Hagan gave me a list of things, and what I was able to discern were -- of these that were referenced to Dr. Proctor's list of things that we had provided him. The progress notes are on Discovery Disk D. Static-99's in Discovery Disk E.

*MR. HAGAN:* Okay.

*MRS. TANNER:* Whatever that letter is, it's in Discovery Disk E.

*MR. HAGAN:* Okay.

*MRS. TANNER:* He even put the numbers on it.

*MR. HAGAN:* Good, okay. Good deal.

*MRS. TANNER:* The only issue that we need to state for the record is he referenced some typed notes that were State's investigative interviews. We did some double-checking on that. That was just two telephone interviews that Missy Wolfe did of Sheila Edwards and Kim Powell, and I'm not certain that we turned those over.

*MR. HAGAN:* Dig them up. That's cool.

*MRS. TANNER:* We've got them right here.

*MR. JIMERSON:* They're dated April 29, 2010, so they're right before trial. I can't represent to you that I did get them to the defense, because I just can't recall.

*MR. HAGAN:* Okay.



*MR. JIMERSON:* So I'm not going to, but I am giving them to you now.

*MRS. TANNER:* We just released it in the course of this. That's your list.

*MR. HAGAN:* Thank you.

*MRS. TANNER:* You're very welcome. If we didn't give it to them, it wasn't intentional. It was just -- they went between e-mails, and stuff like that, and I thought he gave it, and he probably thought I gave it.

(Conclusion of Bench conference.)

(Recess.)

*THE COURT:* Bring in the jury.

(Jury returned to the courtroom.)

*THE COURT:* You may be seated. You may call your next witness.

*MR. JIMERSON:* Melynda Keenon.

(Court reporter asked witness to spell her last name.)

MELYNDA KEENON,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. JIMERSON:

Q. You spelled your name, but go ahead and state it for the record?

A. Melynda Keenon, K-e-e-n-o-n.



Q. And tell the jury how you're related to Blaine Milam.

A. My dad and his dad are half-brothers, so we're cousins.

Q. And what's your dad's name?

A. Ted Sipes.

Q. So he's a half-brother to Daniel Milam?

A. Uh-huh.

Q. Do you have some experience with homeschooling and are looked at as a reference in regard to the homeschooling in the Kilgore area?

A. Yes, sir.

Q. Tell the jury just a little bit about that.

A. I've been homeschooling 15 years. And I -- most of our kids are graduated and going to college. And people -- especially the library, I'm on the list for them to call when they needed advice in our homeschool group for the Kilgore area. If anyone needs advice, they call me, even if they're not for sure what they're looking at, I can advise them, whether they should or shouldn't, or give them trial areas to run through the summer.

Q. Are you also active in the community in regard to youth activities?

A. Yes.

Q. 4-H --

A. 4-H.

Q. -- and things like that?
A. I'm a club manager for 4-H. Our kids have played soccer, hockey, dance. I've coached hockey. I've coached soccer. We do arts. We do ballroom dancing. We do clogging. I don't know that there's many things out there we haven't experienced. We do art classes together. We're in co-ops together.
Q. How many children do you have?
A. Three.
Q. Did you homeschool all of them?
A. Yes, sir.
Q. And I mentioned that you live in the Kilgore area. Do you live in the City of Kilgore or out in the country?
A. We're in the country.
Q. And just in case the jury's not familiar with that, about where is Kilgore situated in relation to maybe Henderson or Longview?
A. Well, we're in Laird Hill. We sit in the middle of about 80 acres, and 10 of it's ours, and we've had access to about 200 of it most of my kids' lives. So it's just free, open, run, ride your bikes, have a good time country.
Q. And is that what the kids do? They play activities like that?
A. We have -- most summertime activities are all -- every kid that hasn't learned how to ride a bike comes to our



house to learn to do that.
Q. Did there come a time when you met with Blaine Milam about homeschooling?
A. Yes. When they called me to ask me about homeschooling, I said I would come get him and try to figure out the learning styles, because I'm a firm believer in finding out what makes you remember things. I have to write things down and read it out loud for my mind to remember it. And everybody learns different ways. So I did it about three times and pretty much --
Q. You say "them" --
A. I picked up -- well, everybody has learning styles that --
Q. Well, I mean back at the start, you said "they" called you about --
A. Shirley. Shirley called me about homeschooling.
Q. Shirley Milam, you're referring to the defendant's mother?
A. Yes, Shirley Milam. I said, well, I don't know -- typically, I don't recommend leaving schools with, you know, bridges torn between -- the relationship between the school and homeschooling, because I believe in homeschooling. I think it should be reputable and -- but I would try to figure out a learning style, see what kind of things he's interested in, and advise from there.



Q. You're making reference -- you don't have any personal knowledge or any detail, but you understand there was some sort of complaint about corporal punishment, and whether it was appropriate.
A. Right. I asked him why he wasn't in school, and they said because of paddling.
Q. Now, so you go and get Blaine Milam and bring him out to your house.
A. Yes, sir.
Q. I mean, do you immediately start working in school, or does he play with the kids? What --
A. I tried -- I tried to, you know, get everybody just to sit down. I have some extra books, and I run off things, you know, off the computer, and things like that. So I was trying to kind of get an idea of what we're going to be looking at. And my schedule is very crazy. I had a new baby at the time, just a couple of years old. And I could tell right from the beginning, it was going to be a very -- a big commitment on my part. And I couldn't -- I couldn't fight everybody, trying to make them come in, because everybody wanted to stay outside and play and ride go-carts and have a good time. And I was like I can't fight this every day, and I can't drive to Tatum to pick you up every day, so I suggested that they get on the Internet and sign up for online school on the computer.



Q. When you say everybody was outside --
A. My kids and Blaine, yeah, because everyone wanted to be out there. Which I have recess time, you know, when it's pretty. I don't remember what time of the year that was, exactly.
Q. When Blaine was -- when you got him over there to your house, and he was playing with the other kids, go-carts and things like that, was he conducting himself appropriately?
A. Yes. Yes. He wouldn't have been there if he hadn't.
Q. Did you try to get him focused on schoolwork, where you could try to do some diagnostic work with him and determine what level he was on?
A. Yes. I had no clue what we were working with, but I could tell right off the bat that the basics were going to be hard for me to start with, under the circumstances, you know. I didn't have the time to sit and devote to what I thought he was going to need. He would do whatever work I had in front of him. It's just that once everybody would take a break, then, you know, everybody wanted to take a break, and I couldn't fight that with my own kids or anyone else's. I couldn't take any more time from our schedule to do that.
Q. Getting him to focus on the studies, as opposed to the go-carts and stuff, that was hard to do?
A. Right. Right.
Q. Did he also express to you some concern about his

father --

A. That's pretty much --

Q. -- later on --

A. I attributed most of the lack of concentration to that. But I did try to emphasize that you still have to get your schoolwork done. That's why I said, "If you do it at home on the computer, then you can take care of your dad and get your studies done." Because he was exploring the Internet and learning how to listen to music, and things like that, and the Internet was kind of getting popular back then. So I said, "You can do online school. They'll grade your papers. They'll do everything you need to do, and you don't have to go to the classroom. You sit there and do it, and it's worth it. They'll work out payment plans. It's a great thing."

Q. Well, and you tried to go over this -- how many times did you go to his house and pick him up?

A. I picked him up about three times.

Q. Ultimately, were you able to get him into a program or get him into --

A. No. He was going to have to be their responsibility to do that. All I could do was advise what they needed to do. And then after that, it was almost like everybody kind of avoided the subject, because I guess no one knew the answer.

Q. As far as being able to determine by diagnostic any sort of level he was on, were you ever able to do anything like that?

A. No, sir.

Q. However, did you ever have any indication from any source, prior to the events that led us to be here today, of retardation or anything like that?

A. No, sir.

*MR. JIMERSON:* Pass the witness.

**CROSS-EXAMINATION**

BY MR. MOORE:

Q. Ms. Keenon, are you trained to do diagnostic work?

A. I have books with instructions to do diagnostic work, but it requires weeks and weeks of studying that I would have to do.

Q. All right. So basically, there's not much you can tell us about Blaine and his educational stuff. I mean, you tried, but you just didn't have the availability to do it.

A. Right. It would take more time, with me having a baby, to --

Q. Exactly.

A. I have almost every book that's available to homeschooling, and I pretty well let anybody borrow anything that they need to borrow that's available.

Q. Okay. And homeschooling, I believe, can be a great thing when it's done right.

A. Yes, sir.





Q. Apparently, your kids are in college, so it was done right with them?

A. Yes, sir.

Q. But as far as going to school and being trained and tested for disabilities or diagnostic work or anything like that, you've never done that, but you have the books on that, correct?

A. Yes, sir. I study a lot about it.

*MR. MOORE:* Nothing further, Your Honor.

*MR. JIMERSON:* Nothing further, Your Honor.

*THE COURT:* You may step down.

*MR. JIMERSON:* May she be excused, Your Honor?

*MR. MOORE:* Yes, Your Honor.

*THE COURT:* Yes, ma'am, you may be excused.

*MRS. TANNER:* State calls Sarah Hodges.

**SARAH HODGES,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MRS. TANNER:

Q. Would you state your name for the jury, please, ma'am?

A. Sarah Hodges.

Q. And Ms. Hodges, where do you live?

A. I live in Longview.

Q. How long have you lived in Longview?



A. I've been in Longview for about two years.

Q. And have you always lived up in the Northeast Texas area or have you moved around or --

A. Yes, I lived in that area. I was living in Henderson prior to that.

Q. Okay. How long did you live in Henderson?

A. Pretty much all my life.

Q. Okay. So you were kind of born and raised in that area?

A. Uh-huh.

Q. Okay. Now, I need to ask you a few questions before we get started, go ahead and get something out of the way --

A. Okay.

Q. -- so we can move on. Okay?

A. Okay.

Q. And you know I'm going to ask you about this, right?

A. Yes.

Q. We've talked about it already. Back in 1997, you were charged with a felony theft offense, a third degree felony, right?

A. Yes.

Q. And in 2001, you got 10 years of probation?

A. Uh-huh.

Q. Right? And that was revoked in '07?

A. Yes.

Q. Okay. And you had a 5-year sentence?
A. Uh-huh.
Q. And did 18 months or so --
A. That's correct.
Q. -- and were released and you're on parole?
A. Yes.
Q. Any of that have anything to do with what we're here about?
A. No.
Q. There's no connection between the two things, but we've just got to get it out there.
A. No, no connection.
Q. All right. You said you lived in Longview for the last couple of years?
A. Yes.
Q. That you grew up in the Henderson area?
A. Uh-huh.
Q. Did you go to school in Henderson?
A. I went to school in Tatum.
Q. In Tatum, okay. And Tatum's, what, 20, 30 minutes outside of Henderson?
A. Well, from my home, Tatum's like maybe 7 to 10 minutes.
Q. Okay. And you are -- you are not currently married, correct?



A. No, I'm single.
Q. Okay. And you've been married before?
A. Yes.
Q. And to whom were you married?
A. Thomas Hodges.
Q. And do you have children?
A. We have two children.
Q. And who are they?
A. Tarah and Karah Hodges.
Q. And how old is Tarah?
A. Tarah is 20.
Q. And what about Karah?
A. Karah is 14.
Q. And tell us primarily where your girls grew up.
A. My girls grew up at the Henderson address.
Q. Okay, which is what?
A. 11269 County Road 2119-D.
Q. Now, did you become aware or become familiar with the Milam family?
A. Yes. They were our neighbors.
Q. Okay. And tell me, how close of neighbors were they? Were they next door? Were they down the road? How close?
A. Well, our properties joined, so they were right there. I mean, we're just walking distance to each other.
Q. Okay. Now, how long did you live at that particular



property that you're making reference to now?
A. At that property, I lived there close to 20 years.
Q. Okay. So you guys moved there when?
A. When we married.
Q. Okay. So that was sort of your first home when you married Thomas?
A. Yes.
Q. And that's -- tell us, is that in the city or is that out in the country?
A. It's in the country.
Q. Did y'all have acreage?
A. Yes, we did.
Q. How much did you have?
A. It was -- our part was around five acres, but it joined, you know, his family.
Q. So his family had kind of -- this was sort of a family place?
A. Yeah.
Q. Okay. And so your girls were basically raised at that place?
A. Yes, they were.
Q. And how long did y'all live there before you moved away?
A. I don't understand.
Q. Well, you obviously don't live on that property



anymore.
A. Oh. I lived there until I divorced.
Q. Okay.
A. Yes.
Q. Which was when?
A. In '07.
Q. All right. Now, you said that you came to know the Milams, because they were your neighbors. Do you recall about when they moved to their home there close to yours?
A. Gosh. Probably -- I mean, around maybe like '96, '97.
Q. Okay.
A. That time frame.
Q. Do you remember whether -- let me ask you this. When they moved there, do you remember who the kids were in the home?
A. Oh, yes.
Q. And who were they?
A. Danny, Sherry, Blaine, and there's one other. There was another daughter.
Q. Teresa?
A. Teresa.
Q. Was Teresa still in the home when they moved there?
A. Teresa was in the home, but we didn't really see her that much.

Q. Okay. And as a result of being neighbors with the Milam family, did you come to have interactions with all of them, with Mr. and Mrs. Milam, with the kids?
A. Yeah. We would see them.
Q. Okay. Now, with regard to your daughters, were any of your daughters close in age to any of the Milam kids?
A. Tarah, my oldest one, was close to Blaine's age.
Q. Okay. And it was your understanding he was the baby; he was the youngest child in the family, right?
A. Yes.
Q. So your oldest and their youngest were the same age?
A. Around close, yes.
Q. Okay. Now, when you all were living there, tell me -- kind of describe for the jury what your daughter's schooling was.
A. We homeschooled the girls.
Q. And how long did you homeschool your girls?
A. I homeschooled the girls for, gosh, probably -- with Tarah, I homeschooled her until she started her freshman year of high school.
Q. Okay. So all the way from kindergarten, all the way up through eighth grade?
A. Tarah was like first grade through --
Q. Okay. What about Karah?
A. Karah was all the way.



Q. All --
A. Up until she started school in Tatum, in the second grade, second and third grade.
Q. Okay. Now, what sort of a curriculum would you use? Did you do it on the Internet? Did you have a particular group you worked with or --
A. Well, we were in that Henderson homeschooling co-op.
Q. Okay.
A. And then there's -- we used several different material: Alpha Omega, A Beka. I mean, there was just several different things we used with their homeschooling.
Q. Okay. Now, at any point in time, did you have any other kids living in your home?
A. Yes. We had a young boy named Dalton that we had took custody of, and he lived with us for about two years.
Q. And who had he belonged to or did he belong to?
A. He was a good friend of our nephew's, and we had ended up taking custody of him.
Q. Had he had some problems at home or something?
A. His grandmother had him, and she got ill and couldn't take care of him.
Q. Okay. And how long did Dalton live with you?
A. About two years.
Q. And how old was he in relation to either of your girls?



A. Dalton and my oldest one was around six months apart.
Q. So they were real close in age, and so as a result, is Dalton also very close in age to the defendant?
A. Yes.
Q. Okay. Now, when you first became acquainted with the Milam family, can you tell the jury whether or not Blaine Milam was still in school?
A. Blaine was still in school at that time.
Q. Okay. So you got involved -- or at least became acquainted with the family at some point prior to him being withdrawn from school.
A. Yes.
Q. And you, of course, became aware that he was withdrawn from school.
A. Yes.
Q. Okay. Did -- at any point in time, did you visit with Mrs. Milam or Mr. Milam about the possibility of homeschooling?
A. Mrs. Milam had asked me on different information after they had taken him out of school.
Q. Okay. So they took him out of school and then asked you -- was it asking you for curriculums?
A. Yes. Information where she could buy the different curriculum and who she might could talk to about it, and if there was anybody that could, you know, help her with setting



everything up for him.
Q. Okay. Do you know whether or not she followed up on that?
A. To my knowledge, she did not.
Q. Okay. Now, once the defendant is not in school anymore, is he obviously, you know, more there at the home place than he had been before?
A. Most definite.
Q. Okay. And your girls -- at that time, your girls were both being homeschooled by you?
A. That's correct.
Q. So were they there at your home as well, you know, throughout the day?
A. Oh, yes.
Q. Okay. Now, tell the jury, during this period of time after which the defendant was pulled out of school, did you have an occasion during the weekdays to spend a good bit of time with him?
A. Yes.
Q. How so?
A. We would be doing our school activities, and he would come to our home.
Q. Was that a rare occasion or was that a regular occasion?
A. No, it was pretty regular.

Q. Okay. Like, you know, you have five days, school days in a week. How many days a week would he usually be at your house?
A. Usually about -- at least three.
Q. At least three, sometimes four?
A. At least.
Q. Okay. Now, what was your schedule, as far as working with your girls? Is it the exact same as you do in a school or --
A. Yeah, we were very structured. We would get up, have breakfast, and we would start schooling around 8:30.
Q. Okay.
A. And we would do our school activities and then have lunch. Do a little bit more. And then usually by 2:00 or 2:30 in the afternoon, then they would go out and work with the horses and all.
Q. Okay. And would the defendant come to your home during the periods of time when your girls were in that time --
A. Yes.
Q. -- of schooling?
A. Yes, he would.
Q. So the girls would be working on their programs, whatever you had them doing?
A. That's correct.



Q. When he would do that, was there anything that you would do in relation to him?
A. I usually would give him some kind of work to work on, to keep him occupied, so that I could work with the kids and do what I needed to do with them.
Q. Now, when you would do that, you were giving him work out of the homeschooling curriculum that you had?
A. Yes.
Q. Okay. And was it your understanding, at the time that this was going on, that he was up to speed in his education or was he behind or --
A. He was behind.
Q. Okay.
A. Yeah, he was behind.
Q. Okay. Was that pretty evident to you?
A. Yeah.
Q. And when you were giving him -- was it, you know, kind of just -- I don't want to call them assignments, because that suggests that you have to do them, but were they basically work to do?
A. I gave him work to do, yes.
Q. Okay. And did you give him work that was at his grade level or a little lower?
A. It was lower.
Q. Okay. And was that -- was that because you had some



concerns about his mental abilities or was it because he was behind?
A. No, it was because he was behind.
Q. Okay. When you gave him stuff to do, different kind of work projects, and things like that, was he able to do them?
A. Yes. I mean, he would ask questions, just like my children would, and I would answer them, and he could go on and complete them.
Q. Okay. Now, were you -- since you were not officially homeschooling him, were you grading him or --
A. No, I never graded him. He would just take -- I would tell him to take them home to his mom so, you know, she could have them.
Q. Okay. So as this time went on, was it a pretty regular occurrence for you to give him work to do; he would do it, take it home to his mom?
A. Yes.
Q. Okay. Now, you said that around 2:00 or 2:30, your girls would be done with school, and it would be time to start doing stuff elsewhere?
A. Right.
Q. Okay. And was it a rare occurrence or a common occurrence for the defendant to be there at that point in time as well?



A. Oh, yeah. He would -- he would stay.
Q. Okay. And tell the jury what kind of stuff you were doing with your girls outside of just homeschooling.
A. Well, I mean, they were in 4-H and all, so they had their rabbits and chickens, and they showed pigs, and then they barrel-raced, so they would have, you know, all the animals to take care of, and do a lot of riding with the horses and all.
Q. And after -- once you got done with the school for the day, was that something then that that was sort of what the afternoon was filled with?
A. Yeah, pretty much. You know, just playing, and all.
Q. And did they have chores to do with the animals, the pigs, the rabbits?
A. Oh, yes, most definite.
Q. And you said that the defendant was around a lot. Did he participate in that with your girls?
A. Oh, yes. Whatever the children were doing, he was doing it with them.
Q. Okay. Did he seem to have any problems doing it?
A. No, he did just fine with it.
Q. Okay. I mean, as far as your daughter, Tarah -- and by the way, was Dalton -- at some point, Dalton is around in this, too?
A. Yes. Dalton's there, too, yes.

Q. And your daughter, Tarah, and your sort of foster son, if you will, Dalton, and the defendant are there. What kind of stuff have you having them do in the afternoon?
A. I mean, they would -- they would have to feed the horses. They would have to clean the stalls. They would have to tend to the animals.
Q. Okay. And did it appear, from where you were at, that, you know, the three kids that were all essentially of the same age, that they were at the same speed, doing whatever it was that they needed to do?
A. Oh, yeah.
Q. Now, you told us that that was kind of your schedule during the week.
A. Uh-huh.
Q. What about your schedule on weekends? Were you -- did you have other things that you were doing on the weekends?
A. Oh, on the weekends, I mean -- I mean, the kids still had their animals they had to get up in the morning and tend to. And then, you know, just whatever activities or whatever we were doing with the family, and all, on the weekends.
Q. And on the weekends, was it a common occurrence for the defendant to be at your home?
A. Oh, yeah. He would be in and out, yes.
Q. Okay. And was that okay as well?
A. Yeah.



Q. Okay. And whatever the kids were doing on the weekends, did he regularly participate in that?
A. Uh-huh.
Q. Did you all have -- when your girls were there at home, as well as Dalton, did y'all, you know, play games and do things like that?
A. Oh, yes.
Q. Did he participate in that?
A. Uh-huh.
Q. What kind of games would they play?
A. Oh, they would play anything from, like, Monopoly, Sorry, Uno. They did a lot of, like, video games. They played basketball, baseball.
Q. On the video or outside?
A. Oh, outside, the basketball, yeah.
Q. And from what you could observe and see, did it appear that the defendant had any problems keeping up with the kids in any of those regards?
A. Oh, no. No.
Q. Now, were you aware, living next door, of the defendant's father's health situation?
A. Yes.
Q. Okay. And at some point in time, did it kind of become clear that essentially during the day, it was mostly the defendant and his father at the house together?



A. Yes.
Q. Okay. And during that period of time, was it still a common occurrence for him to spend days at your house and a lot of time at your house?
A. Oh, yes. I mean, he would leave and say he was going to check on his dad, and he would be gone just for a little while, and then he would come back.
Q. Okay. And so if there was an impression that he was just, you know, sitting in a house all by himself with his father all day long, does that comport with what you recall of the situation?
A. No, I mean, huh-uh.
Q. Now, this process of you homeschooling your girls and the defendant kind of coming over and participating at some level, did that continue up until the point when your girls actually finally went into public school?
A. Yes. When they went to public school, you know, they were gone during the day, but like in the afternoon, when they came home and all, then he would come up and, you know, hang out with them and stuff.
Q. Okay. So a lot of that same kind of stuff was happening after school?
A. Uh-huh.
Q. As was happening after school when you were homeschooling?



A. Right, yes, uh-huh.
Q. Now, did you all have -- at your home, did you have four-wheelers and go-carts and things like that?
A. Yes.
Q. And would they regularly ride those and play with those, and stuff?
A. Oh, yes.
Q. And the defendant participated in that?
A. Uh-huh.
Q. Now, can you tell us whether or not he had a particular affinity for fixing things?
A. Oh, yes. He had a go-cart he worked on quite often. His -- they worked on their lawn mower. He worked on it quite a bit, too.
Q. Okay. And did he tinker around with things at your house?
A. Oh, yeah. If I ever had any problems with anything, he would help me with it.
Q. Like what?
A. With like my lawn mower or the weed-eater, not being able to work or, you know, not being able to get it to crank. He would change, I guess, the spark plug and stuff out on it.
Q. Okay. And so if you had problems with the stuff, you would get him to change the spark plugs or do whatever you needed to do with it?

A. Yes.
Q. Did it seem to work after he did it?
A. Oh, yeah, most definitely.
Q. Did it appear to you that he had a certain degree of mechanical ability?
A. Oh, yes. He was real good -- he was real good with fixing things.
Q. Okay. Did you trust him to fix your things?
A. Yeah. He did real good.
Q. Okay. Did you, through the course of these years where you had all this interaction, did you, you know, give him Christmas gifts, and things like that?
A. Yes, we did. And there was even a couple of years that our homeschooling group got together and got gifts for him for Christmas.
Q. Okay. Now, what kind of work were you and/or your husband doing back during this period of time that we're talking about?
A. My husband worked for Fluor Daniels out at Texas Utilities, and I -- I didn't really work. I stayed home with the children.
Q. Okay. And did you all, through the course of time, did y'all often take trips?
A. Yes, we did.
Q. And in what capacity?



A. Well, my husband had a contract with a company that hauled -- would pull travel trailers.
Q. Hold on a minute. Okay, go ahead.
A. He had a contract that they would pull travel trailers from, like, the manufacturer to different locations, because he worked seven on, seven off. And if there was any time that he wasn't able to do it, then I would pull for him.
Q. Okay. So the regular job your husband had was a seven days on, seven days off job?
A. Uh-huh.
Q. And then on his seven days off part of his job --
A. Right.
Q. -- would he do this extra job of --
A. Yes.
Q. -- hauling? So basically, was it kind of like, you know, delivering trailers?
A. Yes, it was. Travel trailers, yes.
Q. Okay. And when he would have to deliver the travel trailers, would it be just to a particular region or all over the country?
A. All over. Usually he would pick up in Indiana and then take anywhere from back down to Houston, some to Longview, Dallas, and those areas, and San Antonio.
Q. Now, typically when your husband would do that, would it be something he would go do on his own or would you make it



a family trip?
A. Occasionally, we would go with him. But for the most part, he would do that on his own, I mean, but occasionally we went with him.
Q. And you said that on occasions -- like I guess if he was on his seven "on" days --
A. Right.
Q. -- he would need to do one, and then you would fill in and do it for him?
A. I would do it for him.
Q. When you would, would you take the girls with you?
A. Of course. I would take Tarah, Karah, and Dalton with me.
Q. Okay. Were there occasions when you took the defendant with you as well?
A. Yes. Blaine went with us often.
Q. And did you -- when you did it that way, did you kind of make it into a little family trip of some sort?
A. Yeah, we would.
Q. Okay. How would you do that?
A. We would stop and do different, you know, activities for the kids and -- you know, then different areas, we would stop and go to the zoo or do something at some of the -- you know, we went to a water park in one place. So, yeah, we would make it fun for the kids, so it just wasn't them in the



vehicle all the time.
Q. So made it kind of like a road trip?
A. Yes.
Q. Okay. And there were occasions when the defendant would go on these trips with you?
A. Yes, that's correct.
Q. Now, you've told us that your girls were in 4-H. Did they also do another sort of outdoorsy, agriculturally-related activity?
A. Well, I mean, they barrel-raced, so they were all into that, and we did -- they did all the county shows, and all that.
Q. Okay. Did you have some traveling where that was related as well?
A. Yes, we did.
Q. Was that for the county shows, as well as the barrel-racing?
A. Yes.
Q. Okay. Would you have overnight trips or just day trips?
A. Usually those are just day trips.
Q. And when you would go for the barrel-racing or for the ag trips or the county shows, would -- sometimes would the defendant go with you?
A. Oh, yes. He was always welcome to go with us.

Q. And did he often go with you?
A. Uh-huh. He went with us quite often.
Q. Now, you told us that, you know, sometime after he was pulled out of -- shortly -- was it pretty shortly after he was pulled out of school that he started interacting a lot at your home and coming over a lot?
A. Uh-huh.
Q. And did that continue up through a number of years?
A. Yes, it did.
Q. Okay. And did it, for the most part, continue pretty consistently for this number of years?
A. Yes, it did.
Q. Okay. Now, at some point, it stopped.
A. It most definitely did.
Q. Okay. And the jury is aware of the offense for which the defendant was placed on probation. Is that an offense in relation to your daughter?
A. Most definite.
Q. And with regard to -- you said that the interaction stopped. Was it because of that offense?
A. Immediately.
Q. Prior to that, all the way up until that point in time, was he welcome in your home, and in your home quite regularly --
A. That is correct.



Q. -- and in your life?
A. Yes.
Q. And I don't want to suggest that he was a part of the family, but was he very close with you?
A. He was very close to our family.
Q. And your daughter, Tarah, you've told us that she was about the same age as the defendant?
A. That's correct.
Q. All the way up until the point in time when the interaction stopped, were they still -- to your perception, what you could see, were they still good friends and close and everything fine?
A. Yes.
Q. Okay. Now, I want to ask you about this situation that occurred. Tell the jury how that all came about.
A. My daughters -- we had a -- we were staying at a house in Longview, and my daughters had went by the home in Henderson. And they were packing some clothes up, and Karah, my youngest one, found dirty pictures, and everything, in her dresser drawer. And she got her older sister to come in there, and they called me immediately, and I told them to leave the house. And they left the house, and I met them and got the information from them, and I called the Sheriff's Department.
Q. Okay. Let me ask you this. You said that Karah



found pictures in her drawer?
A. Uh-huh.
Q. Which drawer?
A. Her underwear drawer.
Q. And she showed Tarah, and Tarah called you?
A. Yes.
Q. Were your girls scared?
A. Yes. They were very frightened.
Q. Were you scared?
A. Yes, I was.
Q. And you told the girls to get out of the house?
A. Immediately.
Q. What did you do? Did you come get them?
A. No. Tarah drove, you know, so she got in her vehicle, and she left, but I did end up meeting them.
Q. Okay. And then did you go back to the house?
A. I did not go back to the house.
Q. Did you actually see what Karah had found in her drawer?
A. Oh, yes. They brought it to me.
Q. So they pulled them out and brought these pictures to you?
A. Yes.
Q. Okay. And you looked at them?
A. Uh-huh.



Q. What was your reaction?
A. I was mortified. It was awful. Very disgusting, vulgar pictures.
Q. You said that the pictures were vulgar?
A. Yes.
Q. They were -- were they pictures of very graphic, vulgar sex acts?
A. Yes. Out of Hustler Magazine is what -- on the papers, you know, it said it was from Hustler Magazine.
Q. And did the pictures have any sort of writing on them?
A. Yes. It had writing all over it. It had circling different body parts on the female and had specific things wrote on there stating what -- wanted to happen and what -- could do.
Q. Was that, too, very vulgar?
A. Oh, very.
Q. Now, at the time that that first happened, did you know who had done it for certain?
A. No.
Q. And was that, in many ways, very terrifying and scary?
A. Yes, it was very terrifying.
Q. Eventually you learned that it was this defendant, Blaine?

A. Yes.
Q. And when you first learned that it was this defendant, did you have any idea of whether, you know -- were you sure it was directed at your youngest daughter or your older daughter?
A. Oh, it was most definitely directed to the youngest one. There were statements in there stating for her not to tell her mom, dad, or Tarah.
Q. When you saw that, did you know it was directed at Karah, your youngest?
A. Exactly.
Q. Do you recall how old Karah was when this happened?
A. Karah was around 11 years old.
Q. And how did that make you feel?
A. Terrible.
Q. And did it appear that it was very upsetting to Karah as well?
A. Oh, yeah, it was very upsetting to Karah.
Q. Did you -- had you ever given the defendant a key to your home?
A. No.
Q. To your knowledge, did he have a key to your home?
A. No.
Q. Do you know how he got in your home?
A. We do not know how he got in our home.



Q. Was -- however he got in your home, was it something that was permitted by you?
A. No, it was not.
Q. You said that as soon as it happened, you called the Sheriff's Office --
A. Yes.
Q. -- and you made a report?
A. (Moving head up and down.)
Q. And you, of course, knew that he was subsequently prosecuted for it?
A. Yes.
Q. He had spent a tremendous amount of time with your girls, leading up to this.
A. Oh, yes.
Q. Was it surprising and shocking to you --
A. Very shocking and surprising.
Q. Okay. Did you -- as soon as this happened, did you allow him to come around your home anymore?
A. Oh, no.
Q. Did you have any interaction with his mother in relation to this?
A. She came to our home one night.
Q. Did she -- was she okay with you pressing charges, or not?
A. No, she was not happy about it at all.



Q. Did she tell you -- did she make any reference to her perception of what it was?
A. That it was just --
*MR. MOORE:* Object to hearsay, Your Honor.
*THE COURT:* Sustained.
Q. (BY MRS. TANNER) Did she attempt to get you not to press charges?
A. Yes, she did.
Q. Okay. Did you, nevertheless, feel like you needed to pursue this?
A. Oh, most definite.
Q. And you did so.
A. I did.
Q. And did you feel like that was in the best interest of your daughter?
A. Yes, most definite.
Q. Let me ask you this. In all the time that you spent with this defendant, with all the lessons you gave him to work on, with all of the -- everything that he did in your home, did you ever have any perception or any belief that he was mentally retarded?
A. No.
Q. Did he appear to you to be a normal person?
A. Yes.
Q. And as far as all of the things that your girls and



Dalton were doing at your home, just regular, everyday things, like eating and dressing and chores, and all that, did he appear to be as capable of doing them as they were?
A. Oh, most definite.
Q. Ms. Hodges, do you see the person in the courtroom that you're referring to as Blaine Milam?
A. Uh-huh.
Q. Is this the first time you've seen him since that?
A. I didn't even see him during -- after that time.
Q. It's been a long time?
A. It's been a long time.
Q. Is he, of the individuals sitting at the table to my right, the one individual without a tie on?
A. Yes, he is.
*MRS. TANNER:* We would ask the record reflect the witness has identified the defendant.
*THE COURT:* The record will so reflect.
*MRS. TANNER:* No further questions.
*THE COURT:* You may cross-examine.
*MR. MOORE:* Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MOORE:
Q. Ms. Hodges, my name is John Moore, and I don't think we've ever talked before, have we?
A. No.

Q. I just have a few questions for you. How old are your daughters right now?
A. My daughters are 20 and 14.
Q. All right. And how long did you homeschool your oldest daughter? I didn't catch that.
A. My oldest daughter?
Q. Yes, ma'am. Her name is Tarah?
A. Tarah Renee.
Q. Okay.
A. She homeschooled from around second grade up until her -- she started her freshman year at Tatum.
Q. Okay. So that would have been -- how old would she have been? She graduated when she was 18?
A. Yes -- she graduated at 17. She graduated early.
Q. Okay. So she would have been 13, I guess, when she went back to school?
A. Something around that age, yes.
Q. So that would have been put Blaine at like 12, correct?
A. Pretty close to that.
Q. Okay. All right. So you were homeschooling Tarah from, what, 7 to 13, then?
A. Uh-huh.
Q. All right, and that's when you're saying Blaine would come over there?



A. Uh-huh.
Q. Okay. You wouldn't give him lessons to do, would you?
A. I would just give him, you know, papers to do. I never graded them or anything. If he needed any help, I would help him with them.
Q. Okay. And you said that he was -- it was very evident that he was behind. Explain that to me.
A. Well, I mean, things that Tarah, being very close to the same age, could do, Blaine could not do. He was -- he was a grade or two behind.
Q. Okay. Whenever you did homeschooling, did you go get any training for this or anything? I wouldn't expect you have, but have you any training to do that?
A. No.
Q. Okay. And most people -- most parents don't. They get their books and read them, and that's the reason I ask. Did you have any training in, like, trying to figure out if someone has a mental disability or anything?
A. No.
Q. Okay. All right. And I know this may sound stupid, but can you tell when someone's mentally retarded by looking at them?
A. By looking at them?
Q. Uh-huh.



A. Can I tell if somebody's mentally retarded by looking at them?
Q. Yes, ma'am.
A. No, you -- no.
Q. Okay. All right. So Blaine was a year or two behind your daughter, Tarah?
A. Uh-huh.
Q. Okay. Now, would he come over there for all six years?
A. Oh, he was in and out, yes. He was in and out our house all the time.
Q. Okay. For the first two years, Blaine was still in school when you homeschooled Tarah, correct?
A. Yes. That would be correct.
Q. Okay. All right. And then in fourth grade, were they in the same grade? Because it sounded like she went to the first grade.
A. She didn't attend Tatum.
Q. Okay. All right. Where did she go to school?
A. She went to a private school.
Q. Okay. All right. Were they supposed to be in the same grade?
A. They should have been, yes.
Q. Okay. So for the first two years you were homeschooling, Blaine was still in school?



A. Yes.
Q. Okay. And then he got pulled out of school in the fourth grade.
A. That's correct.
Q. Okay. What did you think about that?
A. Of him being pulled out of school?
Q. Uh-huh.
A. My concern was he was not getting an education.
Q. Okay. Was anyone educating him at all?
A. Not to my knowledge.
Q. You said you knew about the medical problems his dad was having.
A. Yes.
Q. Those started around the age of 11, correct?
A. (No response.)
Q. I can tell you, just from the evidence, it started around the age of 11.
A. No, sir, I'm not really definite on the age.
Q. Okay. It sounds like you had your hands full. You had three kids there.
A. Uh-huh.
Q. You were trying to homeschool.
A. Right. I was homeschooling.
Q. Raising animals.
A. Yes. The kids had school projects.

Q. Okay. When you say Blaine would go with you, how many times did y'all travel to shows, and things like that?
A. Oh, the -- I mean, to the shows, we traveled -- you know, during show season, that would be -- I don't know. We would do two or three different ones in a year. But then barrel racing, they barrel-raced anywhere from Thursdays to Sundays, and he would go with us, on and off, quite often.
Q. Okay. When you say quite often, explain that to me. I mean, it makes it sound like he went with y'all every time you would take off and go.
A. No. Like in a month, he might go three or four times with us.
Q. Okay. And y'all would go how many times?
A. We would go just -- it would vary. I mean, it just kind of varied, the different shows that they would attend on barrel racing. Some weeks, we would do, if they had big shows, Thursday through Sunday. The next week, we might just do a Sunday.
Q. Okay. All right. You answered a question also earlier Mrs. Tanner asked you. You would give him work. Was he behind or was he having mental problems with it? Could you tell?
A. No, I mean, just like Dalton and -- Dalton was behind a little bit in school, too, because he wasn't going to -- he missed a lot of school during the time before we took custody



of him. And they would just ask for help, and I would help them with it, and he could go on.
Q. Was Dalton as behind as Blaine?
A. Dalton wasn't as behind as Blaine, but Dalton was not as -- as advanced as Tarah was.
Q. Okay. So we don't know whether Blaine had any mental problems or not, we just know that he was way behind everybody else that was there?
A. He was behind -- he was behind the other two a little, yes, he was.
Q. Okay. All right. And you said earlier that he was at your house all the time, and he would go leave and check on dad, and things like that.
A. Uh-huh.
Q. Okay. And we believe Tarah went back to school at what age? At 12?
A. Tarah went back her freshman year of high school.
Q. So either 12 or 13?
A. Uh-huh. Be closer to 13. 13, 14.
Q. And that's -- she would have to be -- yeah, 13, because then she graduated at 17, right?
A. Uh-huh.
Q. All right. And that's when Blaine's dad was at home?
A. Yes.
Q. Okay. Did you ever go over to the house?



A. No. Very seldom, I would go over there.
Q. Okay. Did you ever go over there during the time when Blaine's dad was sick?
A. I went over there a couple of times, but I didn't really go into the home.
Q. Was the home kept up as nice when he was sick as before?
A. It was still kept up.
Q. It was? Okay.
A. Uh-huh.
Q. Did you ever see it decline at all?
A. The way the home looked?
Q. Yes, ma'am.
A. Not -- not really.
Q. Okay. All right. You said Blaine would come over to your house and say, "Hey, I've got to go check on my dad."
A. Uh-huh.
Q. Okay. And then come back to your house?
A. Yes.
Q. Okay. And was that at -- what I was asking, was that before Tarah was in school or after Tarah was in school?
A. Well, Blaine would only be at our home when the girls was being homeschooled during the day.
Q. Okay. So after basically the age of 12 or 13, you don't know what he did, because he didn't come over, because



Tarah was gone during the day.
A. He didn't come over during the day, because my children were in school.
Q. That's what I mean.
A. Yes.
Q. That's what I'm trying to say.
A. Yes.
Q. Your kids were gone, so he didn't come over then.
A. No. He would come over in the afternoons after school.
Q. All right. And you knew that he was there basically alone with his dad.
A. I'm not sure, at that point, what he was doing.
Q. Okay. But you know he wasn't in school?
A. No -- yeah, he was not in school.
Q. Do you know if Mom was over there or if she had to work after Dad got sick?
A. She worked, yes.
Q. Okay. Do you know if the other kids were in the house then?
A. Yes. Sherry still lived at home, and Danny Wayne still lived at home, too.
Q. Okay. So Danny still lived there at that time?
A. Danny was in and out a lot.
Q. Okay. Danny was in and out of jail a lot, wasn't he?

A. I'm not sure where he was. I just know he was in and out a lot.
Q. All right. And you said Blaine would work on your lawn mowers for you?
A. Yes. The weed-eater.
Q. How old was he when he was working on your lawn mower? Is this before school, before your kids went to school, or after?
A. No, it was most likely after, in the afternoons.
Q. Okay.
A. Uh-huh.
Q. So what age, 15, 16?
A. Something like that probably, yeah.
Q. Okay.
A. Because on different occasions, he would mow and weed-eat for me, too.
Q. All right. Okay. And you said he hung around -- well, let me ask you this. When he was hanging around at your house, who would he mostly play with? Tarah, Dalton, who?
A. All my children interact together, so, I mean, it wasn't -- they were always all together, so it wasn't like any individual.
Q. Oh, I understand, and I'm not trying to say that specifically. I've got a 19- and a 21-year-old, also. Kids would come to the house, and they would interact, but you



could tell who they were mainly wanting to play with, and that's all I was asking.
A. It was interaction with everyone. It wasn't anybody individual.
Q. Do you think Blaine had a crush on Tarah?
A. Blaine, I think he might have thought Tarah was pretty, but as in a -- what are you meaning by as a crush?
Q. Just whatever you saw. I mean, that's why I was asking. Just child crushes.
A. No. I mean, he didn't do anything in particular with Tarah, no.
Q. Okay. And they didn't more boyfriend or girlfriend or anything like that?
A. No.
Q. Okay. Now, when they started getting older, developing, they didn't really hang around each other much, did they?
A. Blaine was in and out of our home up until the time of the incident with my youngest daughter when he was no longer allowed at our home.
Q. I understand that. And we're talking about on week nights. And I'm not trying to pressure you into anything. I know other people have come in here. We talked about your daughters a lot. I'm sorry to say that. But, you know, there has been testimony where Blaine didn't mentally develop as



fast as Tarah did, as far as being, you know -- I don't know if "worldly" is the right thing, but getting along, because Tarah was in school. Blaine had --
A. He still hung out with Tarah. And when Tarah would have friends over, he would hang out with them, do activities with them, ride four-wheelers with them, do whatever Tarah and her friends were doing. He would be doing it, too.
Q. Did you ever see him bring a girlfriend over there?
A. A girlfriend? No.
Q. You said when this stuff was found in your house, you were living in Longview. Is this the time of your divorce? Were y'all getting a divorce then?
A. It was right before our divorce.
Q. So you had already moved out of the house?
A. We weren't staying at the house. We were staying -- but my husband at the time was staying up there with us.
Q. Staying in Longview?
A. Yes.
Q. Okay. So y'all basically moved out of the house, but you hadn't moved all your stuff.
A. No. We had both homes.
Q. Okay. All right. Was the house broken into?
A. No, the house was not broken into.
Q. Now, when you went on probation -- when did you go on probation for felony theft?



A. I went on 2001.
Q. Okay. What did you get convicted of stealing?
A. That was the theft.
Q. Yeah, what?
A. It was money.
*MRS. TANNER:* Objection, Your Honor. May we approach?
(Conference at the Bench:)
*MRS. TANNER:* Under 609, he's not allowed to go into anything other than the offense and not the facts of the case.
*THE COURT:* I'll sustain the objection.
(Conclusion of Bench conference.)
Q. (BY MR. MOORE) How long were you on probation before it got revoked?
A. Almost six years.
Q. Okay. You were on probation for six years, and then you went to the penitentiary for how long?
A. 18 months.
Q. 18 months. Okay. How much longer do you have on parole?
A. Until February of 2012.
*MR. MOORE:* I have nothing further, Your Honor.
*MRS. TANNER:* Just a few follow-up questions.

REDIRECT EXAMINATION

BY MRS. TANNER:
Q. So you told us that Tarah went back into public school in the ninth grade.
A. Yes, that's correct.
Q. And ninth grade is usually 13-, 14-years-oldish, right?
A. Uh-uh.
Q. So you homeschooled her after the defendant had been removed from public school for fourth grade, fifth grade, sixth grade, seventh grade, and eighth grade, right?
A. Yes.
Q. So basically 4 1/2 years of homeschooling?
A. Uh-huh.
Q. And in those 4 1/2 years, is that the period of time which you're talking about that you would give him assignments to do, and things like that, on a regular basis?
A. Yes.
Q. Okay. And even after the girls went back into public school, you've told us he still came over regularly after school, on the weekends, went on trips with you, still did all these things?
A. Oh, yeah.
Q. And you said if the girls had friends over, specifically Tarah -- if Tarah had other friends over, the defendant would interact with them, too, hang out with them



and do all the same stuff they were doing?
A. Oh, yeah.
Q. And did you ever have a perception, when you saw them all together, of the other kids being further developed than him or being mean to him or anything, or was it just normal teenage stuff?
A. It was just normal teenage stuff.
Q. Okay. Now, with regard to the pictures and what happened, can you tell the jury -- you said that the house was not broken into. You guys didn't find any sign of forced entry, right?
A. No, we did not.
Q. Okay. But obviously, from what you've told us, going into your home, as that happened, was not something that was permissible from you guys.
A. No, it was not.
Q. And had you ever conveyed to the defendant, you know, "Come on in any time you want"?
A. No.
Q. So in spite of the fact that you didn't find any broken windows or broken doors, or something like that, it was an unauthorized entry?
A. It was very unauthorized, yes.
Q. And when you found out about what had been put in your daughter's room -- in her underwear drawer, you said the



girls were both very upset, and you were upset?
*MR. MOORE:* Judge, I'll have to ask -- all these --
*MRS. TANNER:* I'm leading to the question.
*MR. MOORE:* I was going to say, all these questions have already been asked and answered.
*MRS. TANNER:* I'm leading to the question.
Q. (BY MRS. TANNER) Did you all -- did you or your girls stay in that house again until y'all found out who had done this?
A. We did not stay in the home.
Q. Did you feel safe staying at home?
A. No, we did not.
*MRS. TANNER:* Pass the witness.
*MR. MOORE:* No further questions.
*THE COURT:* All right. Ladies and gentlemen, we're going to take our noon recess. It's 10 after 12:00. We'll reconvene at 1:10, one hour. You're under all the instructions I've heretofore given you. Do not discuss the case among yourselves, nor with anybody else, nor allow anyone to discuss the case with you, nor access any information about this case. You may step down. We'll stand in recess.
(Recess.)
*THE COURT:* You may call your next witness.
*MRS. TANNER:* State calls Dr. Tim Proctor.



TIM PROCTOR,
having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MRS. TANNER:
Q. Would you state your name for the jury, please?
A. Yes. My name is Timothy Proctor.
Q. And how are you employed?
A. I'm a psychologist.
Q. And how long have you been a psychologist?
A. Well, I've been licensed for eight years.
Q. And can you give the jury your educational background?
A. Sure. Briefly, I have a Bachelor's degree from Texas A&M University. I've got a Ph.D. from the University of Texas, Southwestern Medical Center that's in clinical psychology. I did an internship in clinical psychology. Part of that was at a federal prison, where I did evaluations for the federal courts. After I got my doctorate, I went to Los Angeles and did a formal training program. It's called a fellowship in forensic psychology. I know you have already heard that forensic psychology is the application of psychology to the law. I've also done a two-year program in what's called psychopharmacology, which is the application of medicines for psychological problems.
Q. And do you have any particular certifications?

A. I do.
Q. And can you tell the jury about those?
A. Well, first of all, I'm licensed as a psychologist. That's my primary license. I have a secondary license as a licensed sex offender treatment provider. I'm also board certified in forensic psychology by the American Board of Professional Psychology.
Q. And how long have you been board certified in that respect?
A. I think it's been about 2 1/2 years now.
Q. Okay. Now, you told the jury that you're a psychologist. Tell the jury what -- kind of what your day-to-day job is.
A. Well, my practice is really divided into three parts, and the first is assessment and doing evaluations. That's the main thing I do, is either people come to my office or I go out to jails or prisons, and I interview them. I review records, often administer psychological tests, and come to opinions about whatever issue I'm being asked about. Some of them are forensic issues involving the legal system; some are not. In some cases, I'm asked to testify, like I'm doing today.
The second part of my practice is teaching. I am an assistant clinical professor at the University of Texas Southwestern Medical Center at Dallas. I have an intern in my



office 20 hours a week, who is a doctoral student completing their internship. I also teach a forensic psychology course there, serve on various committees, that type of thing. The smallest part of my practice is I do a little bit of treatment, not very much, but I often have a patient or two that I see to help with some kind of psychological issue.
Q. Okay. And are you in private practice?
A. I'm in private practice, yes, ma'am.
Q. Where?
A. In Dallas.
Q. And are you solo or do you have a partner or --
A. I am in a partnership with J. Randall Price, Randy Price, who is also a board certified forensic psychologist.
Q. Okay. Now, you said that as part of your practice, you do assessments and evaluations. Are you regularly retained by one side or the other in criminal cases as part of these assessments and evaluations?
A. I'm retained by both, yes.
Q. And so you are -- are you sometimes retained by the State to do the kind of work that you do?
A. Yes.
Q. Are you sometimes retained by defendants?
A. Yes.
Q. And, in fact, did you testify here in Conroe in another courtroom just a little while ago on another case?



A. I did.
Q. And what was the type case that was for?
A. It was a sexually-violent predator, civil commitment case.
Q. And do you have occasion to do a fair number of those?
A. I do.
Q. Okay. Now, were you retained by the State in this particular case?
A. I was.
Q. Were you retained just a month or two ago or all the way back when this murder first happened?
A. I was retained not long after the offense happened.
Q. Okay. And I'll go ahead and ask you, obviously you bill for your time?
A. Yes.
Q. And what's your hourly rate?
A. I bill at $200 an hour.
Q. And about how much have you billed thus far?
A. The bill is up to $9,000 that I've billed.
Q. That you've billed so far?
A. Yes.
Q. Have you done a whole bunch of work on this case since then?
A. I have.



Q. So we can expect more bills, but at this point, that's where we're at?
A. That's correct.
Q. Okay. Now, through the course of your involvement in this case, did you become aware that there may be an allegation that this defendant, Blaine Milam, is mentally retarded?
A. Yes.
Q. And in that vein, were you asked, as part of your retainment with the State in this case, to address that issue, should it come up?
A. Yes.
Q. In that vein also, did you eventually -- did you receive testing data from a Dr. Paul Williams?
A. Paul Andrews.
Q. Sorry, Paul Andrews. My mistake. And when I say testing data, what kind of stuff am I referring to?
A. Well, when we give these psychological tests that you've heard about, we either record the person's answers on forms or they write on forms. Those forms that have test results are called test data.
Q. Okay. And did you receive test data from Dr. Paul Andrews?
A. I did.
Q. Was that some long time ago or fairly recently?

A. It was recently.
Q. Okay. And eventually, did you get to see any reports from Dr. Andrews?
A. I did.
Q. And was that at the same time or was that even more recently?
A. That was more recently. I believe it was two days ago. It was when Dr. Cunningham in and started testifying.
Q. That was the first you had the opportunity to review any reports that he had issued?
A. Correct.
Q. Okay. And with regard to this case, did you -- you said that you got the testing data of Dr. Andrews, as well as eventually the report. Tell the jury, did his testing data indicate that the defendant in this case, Blaine Milam, is mentally retarded?
A. Well, and again, I had no -- I got no opinions from Dr. Andrews at that point. It was just the test data. My opinion, based on that test data, was that it basically dealt with the first prong of mental retardation, which would be the I.Q. testing. He gave I.Q. tests, tests of effort, various other tests. That testing, in my opinion, did not support the first prong of mental retardation, namely being severely sub-average intellectual functioning.
Q. Okay. And later on, did you -- you said that you



received his report just a matter of days ago?
A. Correct.
Q. And having reviewed his report, was there anywhere in the report where he indicated or reported out that he considered the defendant to meet the first prong, that he had significantly sub-average general intellectual functioning?
A. No.
Q. Now, you told us that you were retained in this case quite sometime ago. Through the course of your work, have you had the opportunity to interact with various experts that have been retained by the defense?
A. Yes, to some extent.
Q. Specifically, Dr. Cunningham, have you interacted with him through the course of this case?
A. Yes.
Q. And have there been other doctors that you've interacted with at some level?
A. Yes.
Q. Have you had any interaction with Dr. Andrews?
A. Yes.
Q. Okay. And do you know whether he's on the defense team at this point?
A. It's my understanding he's not, but really, all I talked about with Dr. Andrews was exchanging the test data, and then that was it.



Q. So you -- other than, "Can I get your data, and I'll give you mine," that was the sum total of your interaction with him?
A. It really was.
Q. Okay. Now, eventually, did you receive the opportunity to perform any sort of testing on the defendant yourself?
A. Yes.
Q. When was that?
A. It was March 26th of this year.
Q. And to your understanding, when you are retained by the State in a case, if you seek to do any sort of testing or analysis on the person, the defendant who's on trial, are there a number of procedural hoops that have to be gone through before you can do that?
A. Yes.
Q. And can you just, you know, call up and say, "Hey I want to test the guy"?
A. Well, you could, but you probably wouldn't get a response that was going to lead to much. I mean, you know, it's going to have to be -- and it wouldn't be proper. I mean, you have to wait until all the proper channels have been followed through.
Q. And does it require a court order?
A. Yes.



Q. Okay. Now, at the time that you did your testing on the defendant -- you said that was on March 26th of this year -- were you aware that he had already been tested?
*MR. JACKSON:* Objection, leading. I'll wait to object. Please, I'm sorry. Go ahead.
*MRS. TANNER:* Thank you.
*THE COURT:* Overruled.
Q. (BY MRS. TANNER) Were you aware of whether or not he had already been tested?
A. Yes.
Q. And specifically, were you aware of the testing of Dr. Andrews?
A. I was aware that two tests had been given, namely the WAIS-IV and the Stanford-Binet 5.
Q. Were you -- at the time he did the testing, were you aware of who conducted those tests?
A. No, I don't think I -- I don't think I had any idea who conducted them.
Q. Okay. So when you went in, all you knew was that he had been tested before?
A. Correct.
Q. And the two tests that had been administered?
A. Yes, ma'am.
Q. Okay. Now, at the time, therefore, when you conducted your test, did you have access to or was any of the

raw data from the previous testing even available to you?
A. No.
Q. Okay. Now, knowing that he had been tested before with the WAIS-IV and the Stanford-Binet 5, did that in any way limit your options or your scope of what you decided to do with regard to testing the defendant?
A. Yes.
Q. Tell the jury about that.
A. Well, when you're deciding what tests you're going to give, you have to look at what's been given before. There are basically four major options that you might choose from. The WAIS, as Dr. Cunningham testified, is the most commonly used. I knew that it had already been given, although it didn't -- this didn't happen in this case. What typically you see is if you give the same test a second time, you can see an increase in the person's score the second time. There's something that's called practice effect. So you have to keep in mind, are you giving the same test more than once? So knowing that the WAIS and the Stanford-Binet had been given, I chose to give the WAIS again and then also give another I.Q. test, which is the test you've heard about called the RIAS.
Q. And tell the jury a little bit about the RIAS.
A. The RIAS is a measure of intelligence. It's called the Reynolds Intellectual Assessment Scales. That's what RIAS stands for. It is a newer I.Q. test than some of the ones --



at least newer in that it's in its initial edition. When you hear us say something like Stanford-Binet 5 or WAIS-IV, that means they're in their Fourth or Fifth Edition.
It is a very well-thought-of test. There are lots of people that have been very complimentary. In psychological testing, just like in a lot of things, name brand tends to carry, and even when there's something that's really good, it can take a while to get a foothold over something that's been around. But the RIAS has made a lot of gains in that way. It's a test that is not a screening test. It is not a test that is only used for -- as a brief measure. It's considered a comprehensive intelligence test, and it's considered one that can be used for a variety of purposes, including, per the manual, the assessment of whether or not mental retardation is present.
Q. You heard -- you were here yesterday when Dr. Cunningham testified, correct?
A. I was.
Q. And you heard him essentially discount or pooh-pooh off the RIAS. Based on your experience with it and your usage of it, do you agree with that?
A. I disagree with his characterization of the test.
Q. Okay. And it is, according to folks in your field, an appropriate test to use to help you make a determination of whether or not somebody is mentally retarded?



A. Yes.
Q. Okay. Now, when did you actually meet with the defendant? On that same day?
A. On the same day.
Q. March 26th of 2010?
A. Yes, ma'am.
Q. And where did you meet with him?
A. I met with him at the Montgomery County Jail in two different rooms over the course of the day.
Q. And tell the jury, kind of describe where it was that you met with him.
A. Well, initially I met with him in a room inside the custody area. It was near some offices. It was a room that had a window in it, a table, a couple of chairs. That's where I did the initial testing. We were then informed that the interview needed to be in a room where it could be taped, and so we moved to a room that was outside the custody area, but still within the jail building. After the interview was finished, I went back with the defendant to the room we had been in previously and finished the testing.
Q. And with regard to the rooms that are chosen in a correctional facility when you go in to test, do you have a lot of control over where you're put, and that kind of thing?
A. You typically don't have much, if any, control. I mean, there usually are only so many options. I've found jail



staff to try to be very accommodating, but, you know, they have a lot going on, and there's only so much space.
Q. Now, on March 26th when you did this, were you working in conjunction with another mental health professional?
A. Yes.
Q. And who was that?
A. That was Dr. Edward Gripon, who is a psychiatrist.
Q. And I think we all know, but what's the difference between a psychologist and a psychiatrist?
A. Well, there are a number of differences. What we end up doing tends to be pretty similar, but the basics are a psychiatrist goes to medical school first. Then after they complete medical school, they do what's called a residency in psychiatry. So up until they complete medical school, they've probably only done like a few weeks of psychiatry, but then they do psychiatry for three or four years, at least current time, and a residency. Then they become a psychiatrist. They're medical doctors. They prescribe medications. They can admit and discharge people from the hospital. They typically don't do psychological testing, in almost all cases. They also don't typically do as much in the way of academic kind of research.
Psychologists, like myself, you go to graduate -- you get your undergraduate, and then you go to

what's called graduate school. And the whole focus of graduate school, which is on average is six to seven years, but can be less or more, is on psychology. And then once you get out of graduate school or get to the end, you have to do an internship, a year's supervision, before you get your license. Both psychiatrists and psychologists do treatment, do psychotherapy, assess people for mental problems, but again, in the practical sense, psychologists are typically the ones who give tests. Psychiatrists are typically, at least in this state, the ones who prescribe medication.

Q. And aside from those two differences, they're essentially in the same area of what they do?

A. Right. There tends to be a lot of overlap between the two professions.

Q. You don't have a usual quip, like a lot of psychologists that tell the jury, you know, how psychologists are smarter than psychiatrists?

A. No.

Q. Okay. Several of your colleagues do. When you met with the defendant, you said that Dr. Gripon was involved in that. Tell me kind of how that worked. What was the step-by-step that you guys did?

A. Well, Dr. Gripon and I did the interview together. And so I did testing in the morning. Dr. Gripon arrived. We went in the other room. We interviewed the defendant until



the interview was completed, taking a break halfway through. After I was finished with that, I went back in and completed the psychological testing.

Q. So he was there for kind of the middle portion?

A. I would say that's fair, yes.

Q. Okay. Now, when you do this, when you go and you engage in these kind of evaluations and testings, do you have any kind of an informed consent form that you have to use?

A. Yes. Whether or not I would call it informed consent or a notification form kind of varies, depending on the situation and whether it's court-ordered or whatever. But I have a form that goes through line by line and explains to the person why we're here, what we're doing, why we're doing it, how this can be used, you know, what their options are, that type of thing.

Q. Okay. And is it a fairly-detailed form?

A. I would say so. It's one page, but it's fairly detailed.

Q. Okay. And when you do the form, do you just hand it to somebody and let them read it or do you go through it with them and discuss it?

A. Regardless of the person, I go through it with them. I mean, usually my technique is that I sit down and kind of informally explain it to them, then I go through it with them. In particular cases, I will go through and have them tell me



line by line, you know, what their understanding of the information is, and that's what I did in this case.

Q. Okay. So you went through it line by line with the defendant. Was there anything striking to you about that particular part of the process?

A. Well, that, I mean, he did -- I know this is consistent with something Dr. Andrews wrote on his testing, but he read the form fairly well. There was some words he got hung up on. He would ask about them. But he tended to read them and do a good job of explaining what's kind of a sentence at a piece, what the sentences meant and kind of what his situation was.

Q. Okay. So as you're going through it line by line, do you, you know, read it to him and then essentially ask them what their understanding of it is, to make sure that their understanding is the same as what it's attempting to convey?

A. Right. Read it and hand it to them, where they can read it, and have them look at it and tell me, you know, what does this mean? What's your understanding?

Q. And as you did that with the defendant, did you feel like he had a really good understanding of it or was he lacking in his understanding of it?

A. No, I thought his understanding of it was good. I mean, he was complimentary. He said, "You know, look, I've been doing this. My attorneys have talked to me about this."



In fact, one of his attorneys was kind enough to be there in the morning and talk to him ahead of time, so he had some of this -- not all of this was new to him, but he was able to talk about it, use it and, you know, seemed very much aware of what we were doing.

Q. Okay. Now, you said that the first thing you did that morning, obviously after you did the informed consent, was that you conducted a test?

A. Yes.

Q. What did you -- what was the test that you conducted first thing that morning?

A. I believe the first test I conducted was the WAIS-IV.

Q. The one that had been administered in the past?

A. Yes. I also did the Rey 15-Item Test in there, which is kind of a quick effort test, and I don't remember if I did that first or second. I have it listed. I can tell you, but those were the first two tests.

Q. So the WAIS-IV, and then the Rey 15?

A. Yes, ma'am.

Q. Okay. And you did that one, and then you all engaged in this interview?

A. Yes. It was the Rey 15-Item first, and, yes, and then we did the interview.

Q. Okay. And that lasted for some hours; is that right?

A. Yes.

Q. And then after the interview, then you did another test?
A. Several tests.
Q. Okay. And what were the ones that you did after the interview?
A. After the interview, we did the -- in no particular order, we did the test of memory malingering, which is called the TOMM. We did the Dot Counting Test, which is another effort test like the TOMM. We did the RIAS, and we did the Wide Range Achievement Test, which you've heard mention before. It's called the WRAT. It's a measure of academic ability.
Q. And that was the sum total of what you did on that day?
A. Yes.
Q. I imagine this took a number of hours.
A. It was about ten hours, I believe.
Q. Okay. All right. Can you tell the jury, was it -- you said that you did not, at the time you started, have the data from Dr. Andrews?
A. Correct.
Q. Okay. You got it at some point thereafter?
A. Yes. Right before I provided my opinions to the Court.
Q. Okay. And were you then able to take the results



that you got and compare them to the results that Dr. Andrews got?
A. Yes.
Q. Okay. Let me talk with you then about the results that you got and Dr. Andrews got, as to each one of these tests.
A. Okay.
Q. Let's talk first about the WAIS, the WAIS-IV, the one that you both did. What was Dr. Andrews' results where the WAIS was concerned?
A. It was a 71.
Q. Okay. And tell us what that means in terms of mental retardation.
A. Well, a score -- I know you've had this bell-shaped curve put up before. Basically, with mental retardation, we're looking at I.Q.'s and whether it's approximately 70 or below. This is an I.Q. of 71, so it falls technically in the borderline range, but it's right on the edge between 70 and, obviously, 71. If you're accounting for the standard error of measurement, you can specifically look at the standard error for the test. That's something that's calculated. Plus or minus 5 is what is sometimes used as kind of a more crude measure. And so basically, this I.Q. is 71, plus or minus 5 points.
Q. So that put it in the borderline range?



A. That falls in the borderline range. It could be lower, it could be higher, but it falls in the borderline range, 71.
Q. And is this kind of a good demonstration of why the standard for meeting the definition of mental retardation isn't just based on testing?
A. Right. It's based on multiple pieces of information.
Q. Okay. And is this just one of the pieces of information?
A. It is.
Q. Okay. And you said Dr. Andrews had a 71. What was yours?
A. Mine was a 68.
Q. Okay.
A. Which would fall just below 70, and then, of course, plus or minus 5, roughly.
Q. And you had told the jury already about the practice effect.
A. Correct.
Q. That you are expected to do better on the second test, if it's the exact same test that's been given before, which just makes common sense, right?
A. I think it does, yes.
Q. Okay. And so did the results that you got on the WAIS-IV, were those somewhat unexpected or expected? How did



you perceive those?
A. Well, it was a little bit unexpected. I mean, on one hand, a score of 68 is within, you know, roughly plus or minus 5. I guess I should be more specific. Like for a score of 68, the true confidence in a score would be 65 to 73, so it's expected that your true I.Q. score would be somewhere in there. With a 71, you would expect it's going to be somewhere in the range of -- and I can give you the specific. It was basically 68 to 76. So I got a 68, which is at the very low end of what you would expect of someone who had a 71. What was a little bit surprising about that, was just that he had taken the test before. It had been six months, but he had taken it before. And when I ultimately compared, you know, there are items that he knows with Dr. Andrews he didn't know with me. So what you would expect is it would be about the same or a little bit higher, as opposed to a little bit lower.
Q. Okay. And did you -- and you may want to speak about this more in totality of the other situation -- or the other testing. Did you account for or attempt to account for this evident or apparent discrepancy?
A. Well, yes. You know, there's several things. I mean, one, there were other tests given. Two, there were effort tests that are given, that we can talk about. You know, a lot has been made of this background noise that was happening during the testing. I hope I can clear up kind of of

how that came about, but I certainly attempted to, you know, consider that. I also -- and I didn't really realize at the time, but I was able to observe what he was like with me in the morning and what he was like with me in the afternoon, and so I considered that as well.

Q. Okay. Why don't you go ahead and speak to the background noise issue.

A. Well, I mean, I should say that it was not there was a marching band going on outside of the door. I mean, there was some noise at times, as there often is when you test in an environment in a correctional facility. It was sporadic, and when it would occur, I would note it. There was a window. It made me think that maybe there was some distractions going on that -- you know, that that may have been an issue. It did not occur to me that there was the kind of issue where I would stop the test. And I also knew that I was giving these tests after he had already been tested. And part of what I was doing -- and Dr. Cunningham, I know, didn't do additional testing, but I did, as a means of kind of comparison with this other testing that I knew existed, even though I hadn't seen it yet. So I would kind of see how what I got matched up. I knew this wasn't the end of the testing and what results I would have, but I knew that, you know, it was acceptable conditions to, you know, continue with the testing. That's what I did. Ultimately, whether or not that background noise



had some impact, I think that it may have. I think there may have been some other issues as well.

Q. Okay. And that was with regard to the first test that you did?

A. Yes.

Q. Then in the afternoon, you went back, and that's when you did the RIAS?

A. Correct.

Q. And when you did the RIAS and a couple of others, tell the jury what the results you got on that were?

A. Well, the RIAS, I got a score of 80. And one thing that I respectfully differ with Dr. Cunningham is he did make an issue about, well, the RIAS score is not called an I.Q. score; it's called a composite intelligence index.

That, in my opinion, is a semantic issue. When someone creates these tests, they can call their overall index what they want. I mean, ultimately, it's created the same. It has the same components. It's on the same scale. Honestly, from a marketing standpoint, you're better off calling it an I.Q. score, because that's what people like to hear, because they're used to hearing it. But a lot of people think I.Q. is kind of outdated, and we need to be calling it something else. But whether they call it an I.Q. score or not, we're talking about the same thing. His score on that was an 80, his overall score.



Q. And 80 that you get in that, whether you call it a composite index or whether you call it an I.Q., is that the same 80 that goes into the bell curve, as you do in the WAIS, as you do in the Stanford-Binet, and all the other tests?

A. Correct.

Q. Okay. And so the 80 that he got in your RIAS, what does that tell you with regards the issue of mental retardation?

A. Well, that's a score that -- and this is one thing. Sometimes psychologists -- probably some people would argue lots of times -- make things more difficult than it should be. And one thing is, there's some overlapping definitions. An I.Q. score of 80, in terms of our scores, really falls in the low average range or the below average range, not the borderline range. However, when you're diagnosing someone -- you've heard about this book called the DSM. In the DSM, the borderline range goes up to 84. So you can have an I.Q. score like this that falls in the low average range, but still if you were diagnosing someone, you would call them borderline or say they're in the borderline range.

Q. Okay. So the book says it's within the borderline range, but when you put it on the curve, it shows it's below average.

A. Right.

Q. Okay. Now, you were aware -- or you became aware,



subsequent to this, of the Stanford-Binet result that Dr. Andrews had come to.

A. Yes.

Q. And that was what?

A. It was also an 80.

Q. Okay. And with regard to the fact that you're coming along kind of as the quality control, as the second tester, was that significant to you that the Stanford Binet 5 that Dr. Andrews got ended up being the exact same score as you got on the RIAS?

A. Well, I mean, you expect there to be some consistency, and, you know, we've got four scores here, so that was not surprising to me. It kind of fits within the realm of what we're seeing here.

Q. And the Stanford-Binet score that Dr. Andrews came up with, that, too, falls in the low average range, just as it does with the RIAS?

A. Yes, same explanation.

Q. Now, we've heard that there is -- that the discrepancy between or the variation between the WAIS result and then the two other results, the Stanford-Binet and the RIAS, was somewhat unusual. Tell the jury about that.

A. Yes. Well, particularly that the difference between his score on the Stanford-Binet and his score on the WAIS, on each of the WAIS administrations, was unusual. You don't

typically see someone do better on the Stanford-Binet than the WAIS. These tests have been studied a long time. Dr. Cunningham mentioned the study that compared the WAIS and the Stanford-Binet. In that study -- and he's absolutely right. These are older versions of the tests, but it's been consistent throughout the older versions.

But 74 people they had in this study that had taken the Stanford-Binet and had taken the WAIS, and in every case of all 74, they did better on the WAIS than the Stanford-Binet. I mean, that's all really -- I couldn't believe that that could be, but it is. He also talked about there was a huge difference, like 17 points, between the WAIS and Stanford-Binet. Typically, people don't do as well on the Stanford-Binet as they do on the WAIS. So having someone doing a lot better, you know, or somewhat better, at least, on the Stanford-Binet than the WAIS is an unusual finding. And Dr. Andrews, I mean, he put that in his report, and I agree with him.

Q. Dr. Andrews put that in his, just as you've referenced?

A. Yes.

Q. Okay. And the jury has heard various discussions about the various tests for effort. You looked into a number of different tests for effort, and were the findings in that regard somewhat unusual as well?



A. Well, they were certainly variable. I don't know if they were unusual. I mean, I think that they probably make sense, but they were definitely variable.

Q. In what respect?

A. Well, on many of the -- on some of the measures of effort, he did very well. Okay? So these are tests that you give to see if someone's putting forth effort on testing. Because one thing about testing is, it really is garbage in, garbage out, you know. I don't know how much it's been talked about how these tests are given, but you're asking people questions, asking them to do things. What they do is respond to you. And if they're not trying or they're not trying as hard as they can, that affects the test.

There are different effort tests you can give, and some effort tests are harder than others, but the idea is that these are tests that look difficult, but they're not nearly as difficult as they might seem. So even someone who is impaired should do very, very well on these tests.

On some of the easier effort measures, he did very well. On one of the harder ones, it was kind of on the border, but it seemed adequate enough. But there are two administrations that Dr. Andrews gave of a test called the Word Memory Test. And I can tell you, it's a test that, you know, has really gotten a lot of notoriety and is a test that I probably should have used myself, because one thing about it



is it does give you a different look, because it's more sensitive, as Dr. Andrews put in his report, to issues with effort than some of the other tests.

Dr. Andrews made a good point, and so did Dr. Cunningham. Mr. Milam did well on some effort tests. He didn't do so well on others. This is not a picture of someone who's going in saying, "I'm going to try to do bad. I'm going to try my hardest to do bad." If that was what he wanted to do, you wouldn't have expected, unless he was really well-coached by someone, for him to do so well on some of these effort tests.

However, it's not just about trying to do bad. If you're taking these tests and, for whatever reason, your mind's in another place, you're distracted, you're putting forth some good effort, but not all the way, it can make an impact. And the Word Memory Test is sensitive to that. And his performance on the two administrations of the Word Memory Test given by Dr. Andrews were both times indicating less than adequate effort. Less than adequate engagement in the process, which means that while he wasn't necessarily trying to do bad, and I don't think he was trying to do bad, you've got to consider that maybe those test results aren't his absolute high and the best he can do, and that it may be lowered, based on that.

Q. Now, when you have these Word Memory Tests that are



testing effort, those are designed for the whole spectrum of people who take these tests, right?

A. Yes, they are.

Q. So if you have somebody who's showing up on one of these as having inadequate effort, can you account for it by saying, "Well, you know, they're retarded. What do you expect?"

A. No, and you can't, and especially with the Word Memory Tests. I mean, it's to be commended for having numerous comparison groups. And you can take Mr. Milam's scores and put them right next to a group of mentally retarded individuals. You can put them right next to a group of children who are mentally retarded. You can put them right next to a group of, you know, people reading at the third grade level. You can compare them to those groups. And when you do, you see that his performance is below any expectation. And again, when you look at it in context, I'm not saying he was trying to not do well, but I do think you have to ask questions, as Dr. Andrews did in his report, about was motivation or effort somewhat in play somewhere in the testing situation?

Q. Okay. So the totality of it, as the jury's already heard, is you have the four scores. You have the two 80's, the 68, and the 71.

A. Yes.

Q. Based upon the scores that were done, all four of the scores, what was your ultimate opinion as to the defendant's -- whether or not he meets the definition of the first prong of mental retardation, that he has significantly sub-average general intellectual functioning?

A. Well, when I think you take into consideration everything, all these scores, the issues we mentioned about effort, with any other kinds of issues, whether there was distraction -- I don't think I said it: Mr. Milam seemed much more engaged with me in the afternoon. I didn't notice that in the morning, but in the afternoon, coming back from having spent a lot of time talking to me, I think there may be some more rapport. All of a sudden, he was doing things that are a similar task to what I gave him in the morning, but much better.

But when you factor in everything, I think this picture is someone whose intellectual functioning is in the borderline range. Okay? Not somebody whose intellectual functioning is average or low average. This is below average intellectual functioning. It's in the borderline range above mental retardation. But I don't see this constellation, this picture as being consistent with the first prong of mental retardation.

Q. Now, with regard to the results that you got, you know, we've heard these numbers about -- and I'm not going to



spend all afternoon with you on numbers, but you heard the numbers of, say, 68, the 71, and the two 80's. Those are the final scores, if you will, right?

A. Yes. Those are the full-scale I.Q. scores. I know it hasn't been talked about too much, but there are smaller scores that go into that full-scale.

Q. And with regard to the smaller scores, basically they're subsets, right?

A. Yes.

Q. Okay. And with regard to the smaller scores, the subsets of the defendant's tests, how did those rate?

A. Well, like when Dr. Andrews tested him, there's several other index scores you can get. You can get a General Abilities Index, which is kind of like a full-scale I.Q., but it measures less on some things outside of your kind of traditional verbal and nonverbal abilities. That fell at a 77, in the borderline range. His verbal comprehension, which looks at verbal abilities, that fell at a 74, which is in the borderline range. His perceptual reasoning, which is your nonverbal abilities, that fell at a 84, which is in the low average range. His working memory was at a 74. That's borderline range. His processing speed was a 68, which is in the extremely low range.

Q. And so with regard to a significant number of the subsets, he was above -- he was at borderline or even at low



average?

A. Yes.

Q. Now, with regard to the results, was there any particular finding that you made and/or that Dr. Andrews made that was particularly significant to you and solidified your view that essentially these results led you to a borderline conclusion, as to a -- as opposed to a mental retardation conclusion?

A. Well, I think the I.Q. scores on their own, as I said, spoke to that. And I put in my report I think -- just looking at the scores, I would say this is a borderline picture, without getting into any effort issues. I will say that his reading test score with me, his reading comprehension score was particularly striking, because, as Dr. Cunningham had on one of his slides and is also in the DSM, if someone's mildly mentally retarded, you expect them to get up to, at the top end, a sixth grade reading level. And Mr. Milam, not just in word reading, but in actual reading comprehension, was at the eighth grade level with me, a couple of grades above sixth, above that barrier. What's really surprising about that is, as you know, is just that he has one of the poorest educational backgrounds I've seen, especially for somebody who's so young. I mean, you don't see people with what I think of as a fourth grade education anymore. And so for someone with that education to be going above the top end of



what you would expect for a mentally-retarded person, that was striking.

Q. So a person who is mildly mentally retarded, let's say they do go all the way through school, twelfth grade or whatever it is, in whatever capacity they can go through, you still would expect that person to, at best, hit about a sixth grade school level?

*MR. JACKSON:* Your Honor, I would object to leading at this point. I'm trying to help the flow of the testimony, but an objection to leading.

*MRS. TANNER:* I'll rephrase it.

*THE COURT:* Restate the question.

Q. (BY MRS. TANNER) If you have a person who is mildly mentally retarded, and they have been educated fully, all the way through high school, where would you expect, even with that education, their best-case scenario to go in their reading abilities?

A. Well, I mean, in Dr. Cunningham's slide, it said it well. You would expect it to be sixth grade, regardless of how much education they've had. And even if they've been in school for 22 years, you know, you would expect that that's the top end.

Q. And the defendant, you said, was at the eighth grade level?

A. Yes. And that was, like I said, even in terms of

comprehension. His word reading was at the high end of sixth, which is just being able to read a word. But his ability to comprehend it, to read a sentence with a word missing, find the missing word, not multiple choice, was at an eighth grade level, a little bit above eighth. So, you know, I think that was definitely a striking thing.

Q. With regard to the bell curve that we've heard, the big curve, we've seen the lines, and we know that there's a margin for error on both sides of wherever the lines may lie. Essentially, does the margin -- can you tell us whether or not a margin for error allows you to either go to the small end or up to the big main part of the curve, one way or the other?

A. It goes either way.

Q. Okay. Based upon everything that you compile when you're doing testing, do you get a sense, in a case, of the numbers you're looking at, whether you ought to be shifting down to the small end or whether the margin for error is more accurately up at this higher end, at the big part of the curve?

A. Well, when you have multiple scores, you can kind of see where there's a constellation, to some extent.

Q. And in this case, with regard to all of the scores that you saw, can you tell us where you felt like the margin for error most appropriately fell?

A. Well, I mean, I think it's pulling towards the



middle, pulling towards the borderline range. You have two scores in the borderline -- well, actually three scores that are either borderline or low average, a 71 and an 80 and an 80. The 71, of course, is right on the line, and then you have this 68. I think when you take that all into combination with the other things I've talked about, the way people tend to do on the Stanford-Binet, all the other things, I think that picture is a picture of someone who has borderline intellectual functioning.

Q. Okay. Now, in fact, I meant to ask you this. With regard to the question of the defendant's reading comprehension -- or sentence comprehension being at the eighth grade level, did you see any notations in Dr. Andrews' data to suggest that he, too, may have found this significant?

A. Yes.

Q. And tell the jury about that.

A. Well, I noticed he gave the sentence comprehension test, too, and he wrote at the top of it, "Reads well." And, you know, that was the impression that I got, especially, you know, given the circumstances. I'm not saying this person, you know, reads like a college graduate. But given the circumstances, given his level of education, you know, his reading was definitely something that he did well with.

Q. Now, yesterday, there was some discussion with Dr. Cunningham regarding the kinds of things that can have



some effect on I.Q. testing. Specifically, can a lack of education have an effect on I.Q. testing?

A. Yes. And Dr. Andrews stated that in his report regarding the WAIS, and I agree with him.

Q. Okay. That the -- in what respect, with regard to this case?

A. Dr. Andrews said that he gave the Stanford-Binet because he gave the WAIS as a 71. He wondered about the influence of this man's education on his test results.

Q. So that was just an indication of what we talked about that can affect it?

A. Right. Yes.

Q. And can anxiety, depression, emotional upset, things like that, can they affect -- negatively affect I.Q. testing?

A. Yes.

Q. And can drug use negatively affect I.Q. testing?

A. Yes. I mean, in a couple of different ways.

Q. How so?

A. Well, I mean, one, if you're on drugs at the time, I mean, you know, it can affect it. And then if you've used drugs in the past, depending on what the drugs are, that can -- you know, some drugs can damage your brain, in a way, where you have the potential of scoring at a lower level.

Q. Okay. So regarding the first factor for a finding of mental retardation, that the person on trial has significantly



sub-average general intellectual functioning, your opinion in that regard was that he did not meet that prong?

A. Correct.

Q. Now the second factor we know is what we refer to as the adaptive functioning factor, right?

A. Yes.

Q. And basically, what is that looking for?

A. Well, the idea is that it's not just about how you score on an I.Q. test; it's also about how you function in the world. So adaptive behavior is looking at what a person's functioning is like in a variety of areas.

Q. And in order to meet the second prong, that being the deficits in adaptive functioning, is it just any deficits or do they have to be significant deficits?

A. They have to be significant. Dr. Cunningham explained it correctly. I mean, we're basically talking about just like I.Q. With I.Q., you're looking at does the person have an I.Q. that's in the bottom of approximately two percent -- two to three percent of society? That's what you're looking for. Is their adaptive behavior significantly deficient? So in the bottom two to three percent.

Q. Now, I failed to ask you this earlier. You told us that you were retained by the State in this case very shortly after the murder in this case. Have you received a tremendous amount of information in this case for your review?

A. Yes.
Q. You -- on the back page of your report, you actually listed out in single space everything that you received. And that was from the State, correct?
A. Correct.
Q. How many pages does that listing of everything in single space take?
A. Almost six full pages.
Q. And that's just a line-by-line list of each of the documents or items that you received for your review?
A. Yes.
Q. Did you review all of it?
A. Yes.
Q. Okay. And did you -- you've told us that you also -- you talked to the defendant. Did you also endeavor to talk to any other people?
A. I did.
Q. And who was that?
A. Well, there were people that I attempted to talk to and people that I did talk to.
Q. Okay. Tell us who you attempted to talk to and tell us who you did talk to.
A. I attempted to talk to Mr. and Mrs. Templeton, who were his former employees -- employers at M & M Express Lube. I had heard an audio interview of Mrs. Templeton, so I had



heard that before, but I was not able to get in contact with them. I also tried to reach the defendant's sister, Ms. Sherry Digby. Initially, the number was wrong. I found that out once I talked to his mother. His mother gave me the correct number. I called and left a message, but I didn't hear back from her.
Q. Okay. Go ahead. And then is that the folks you attempted to talk to and were unsuccessful?
A. Yes.
Q. And then what about the ones that you were successful in talking with?
*MR. JACKSON:* If you would like to lead through this, I have no objection.
*MRS. TANNER:* He can go through the list.
A. The people I talked to, in terms of family members, I talked to his mother, and I talked to his half-sister, Teresa Shea. Again, I wasn't successful in reaching Sherry. In terms of employers, I talked to Bryan Perkins from Big 5 Tire. I talked to Gary Jenkins from Big 5 Tire. I talked to Jim Wallace, who is someone who supervised him briefly at Nichols Marine, and I talked to a Ms. Dana McDonald, who was a former supervisor as well at Nichols Marine.
Q. Okay. Now, you heard yesterday about the adaptive functioning test that Dr. Cunningham gave to the defendant's mother in relation to the defendant.



A. Correct.
Q. Okay. And can you tell the jury if you have an opinion about that particular test, as well as the use of that particular test?
A. Well, yes. In general, it's my opinion that if you can use an adaptive behavior rating scale in a way that is going to be meaningful, just like any test, you should do it. What's been talked about a great deal in the literature -- and you heard some quotes that Dr. Cunningham was giving about this -- is that there are problems with using these types of measures, where you're interviewing a family member and having them rate a person who is currently incarcerated, hasn't been around for a while, and is waiting trial in a serious matter.
In my opinion, you typically cannot get valid information from the informants that are available. And some of these instruments have even made specific criteria, what kind of person you would need to have to use them as an informant. And one is that the person gets to regularly have contact with the person several hours a day. That's not possible for a family member to do that when someone's been incarcerated for a couple of years.
Even more importantly is the issue of bias. And again, it's not saying that people are necessarily sitting there scheming, saying, "I'm going to try to beat this test." It's more that you've got people who often very much love the



person involved, and there's a lot at stake. And you can get results that are not helpful to anyone, because they are garbage in, garbage out. It's responses that are biased that then give results that don't make sense.
Now, in particular, this measure that Dr. Cunningham gave, it's called the Adaptive Behavior Scale, Residential and Community. It was his choice to do that, just like we can all choose what we use. I disagree with choosing that measure, if you were going to choose one. The Social Security Administration put out a paper looking at different adaptive behavior measures and said, you know, this is one that's problematic, because what the manuals, like the DSM, are looking for, if you're going to formally assess adaptive behavior, is something where you can rate someone against the normal population to see if they're in the bottom two or three percent.
The problem with what Dr. Cunningham used is you're not comparing the person to the normal population. You're comparing them to a group of people who are developmentally disabled and living in the community, so it doesn't tell you if they're in the bottom two or three percent. That being said, you know, the results he got and the findings he got are an example of why I don't use these measures. I, in my opinion -- and I know Dr. Cunningham has his, and I respect that -- but in my opinion, these results do

not match up at all with what I know about Mr. Milam, and given my interaction with his mother, who I have no doubt cares about him greatly, but I am not surprised that these results came out the way they did.

Q. And when you say that you're not surprised that they came out the way they did, after your interaction with the mother, what are you referring to specifically?

A. She was very pleasant with me. She agreed to talk to me, but she clearly was thinking about getting across that her son is slow. And if you didn't ask an open-ended question, you could see where the result would go. I talked to her a couple of times. And when it became really striking is, the second time Teresa was there. And I started talking to Teresa, and Teresa would start to tell me something about something that Blaine was able to do, like working on cars or how he would behave at home. And his mother was shouting out in the background, "He's slow. He's slow. Yeah, but he got help with that." And, you know, I don't -- I understand the situation, but I have to be careful how much weight I put on different pieces of information. And while I really appreciated her talking to me, I think there's only so much weight you can put on what she's saying.

I will give one other example, and that's with these developmental milestones. I know some people have asked her -- and I think she was asked on the stand. Developmental



milestones are like when did you learn how to walk? When did you learn how to talk? When did you learn how to crawl? If she was just asked generally, "Were they slow?" "Oh, yes, they're slow." But if you ask her, "When did they occur?" she'll say, "Well, he learned to start saying words at seven or eight months. He learned to crawl at seven or eight months, learned to walk at eleven months." And those are normal. But I think my concern and my opinion was that the results I was getting from her might have been skewed in the direction of more impairment than was actually in play.

Q. And the developmental milestones, you were present for Mrs. Milam's testimony before this jury, were you not?

A. Yes.

Q. And when asked about the developmental milestones on direct examination, was her -- what was her answer? Just that they were slow?

A. They were slow. And then later, you follow up and said, "You know, haven't you said these particular milestones?" And she did agree to them at that point, but I --

Q. And these were what she told you during your interview with her through the course of your work in this case, right?

A. Yes.

Q. Okay. And the milestones that she told you she



characterized as slow, were those all within the normal realm of what you would expect to see with a child who's developing normally?

A. Yes.

Q. Okay. And you said that you talked with Teresa. Was this over the phone or in person?

A. Phone.

Q. Okay. And she was telling you things that the defendant was able to do, such as --

A. Well, you know, an example would be talking about him working on -- and you've heard testimony, I think, even today about him working on machinery, and she would start talking about him doing that. And then I would hear Mother saying, "Well, but, you know, the father and Danny, his brother, they helped him with that. They helped him with that." You know, interjecting.

Q. And when she would interject that, would Teresa then adopt that?

A. Yeah. She would then add that into the response.

Q. And as a result of that interaction, I mean, were there other examples of things that you saw that led you to believe that they were, albeit maybe unintentionally, biased reporters?

A. Well, I mean, yes. You know, one thing with Mrs. Milam -- I don't necessarily understand this, unless it



was in the moment, but, you know, I know she had told other people that Mr. Milam has a methamphetamine problem and has a drug problem. But when I asked her about it, she was like, "Well, I don't know about that. You know, I don't know about that. Maybe he does." Where she had apparently been very forthcoming to other people about that.

Q. As a result of those conversations, as well as a result on the test that Dr. Cunningham did, did you reach a conclusion and an opinion about the reliability of the defendant's family members as being reporters for these issues of adaptive functioning?

*MR. JACKSON:* Objection, Your Honor. I think that is an improper opinion from any expert, to judge whether or not they are credible or uncredible.

*MRS. TANNER:* I'll rephrase the question.

*MR. JACKSON:* Ask the jury to disregard that question.

*THE COURT:* The jury is instructed to disregard that question.

*MR. JACKSON:* Ask for mistrial, please.

*THE COURT:* Denied.

Q. (BY MRS. TANNER) Based upon your interaction with the defendant's mother and his sister, as well as the results that were obtained on Dr. Cunningham's exam, did you decide that you could rely on them for purposes of determining the

adaptive functioning, or not?

*MR. JACKSON:* Objection. Same objection as previous, Your Honor.

*THE COURT:* I'll overrule the objection.

*MRS. TANNER:* Thank you, Your Honor.

*MR. JACKSON:* May I have a running objection to that line of questioning?

*THE COURT:* You may.

*MR. JACKSON:* Thank you.

A. It was my opinion -- and again, as a forensic person, I have to decide what weight I'm going to put to everything I look at, and you could not put very much weight at all on that information. And I think that when you look at Dr. Cunningham's results, where there are ten areas of adaptive behavior he looked at, and seven of them he came out like a 4- or a 3-year-old. I know Dr. Cunningham thinks that's accurate, and I, again, respect his opinion, but I respectfully disagree, based on everything that I've seen, that that accurately characterizes his adaptive behavior.

Q. (BY MRS. TANNER) And one of those was that Domain 7 that you -- that was referenced yesterday. Was that one that was one of the most glaring examples of the issues that you have with that particular examination?

A. Well, it did jump out at me. I mean, you know, Dr. Cunningham testified about what this individual's work



history was like. I know you've heard other testimony. And for there to be a domain of vocational ability and him to fall in the realm of a 3-year-old, I think it's questionable. It makes me think, "What's going on here?" And it makes me wonder about the results.

Q. Okay. With regard to the second prong for the -- a determination of mental retardation, that being the adaptive functioning, did you reach an opinion, after your review of everything in the case that you reviewed, as to whether the defendant meets the second prong of significant deficits in adaptive functioning or not?

A. I did reach that opinion.

Q. And what was your opinion in that regard?

A. My opinion is I don't feel that he has significantly sub-average adaptive behavior or significant deficits in adaptive behavior. He certainly has deficits, as well as strengths, but I don't think they are significant deficits at the level required.

Q. Now, the third prong for a finding of mental retardation, of course, is that there's an onset prior to the age of 18, right?

A. Correct.

Q. Okay. And this -- in that regard, did you look at all five or six pages of records that you were -- all of the things that are listed in the five or six pages of records?



A. Yes.

Q. Did you find anything in the records to suggest or to tell us or to even imply that at any time prior to being charged with capital murder, there was ever a diagnosis or a reference or a question about this defendant being mentally retarded?

A. I found no evidence of that in the limited records that we had.

Q. Now, there were, as far as school records go, not much, right?

A. Correct.

Q. There were two records, one from TEA and one from the Tatum School District that you received, however, correct?

A. Yes.

Q. And were those significant to you in any way?

A. Yes.

Q. Tell the jury why those were significant to you.

A. Well, we do have that he was seen by special education services, and that he was given a diagnosis, and it was that of a speech impairment. There's also an indication or a place that you could list a secondary disorder, such as a learning disability, mental retardation, or a tertiary diagnosis, so yet another diagnosis, and there was nothing listed. Then on the letter from the school district, it indicated that in -- I believe, it was in 2000, he had



undergone a full and individual evaluation.

Q. What does a full and individual evaluation mean to you as a practicing psychologist?

A. It means --

*MR. JACKSON:* Objection, speculation, as to what it may mean for the Tatum ISD.

*MRS. TANNER:* It's a term of art, I believe, Your Honor.

*THE COURT:* All right, I'll overrule the objection. You may answer if you know.

A. In the school districts, when someone's referred for special education, they go through a full and individual evaluation. Different school districts may handle it differently, but it's usually a pretty similar format, where they're looking at what are the issues that we're going to deal with here.

Q. (BY MRS. TANNER) And what was the significance of seeing that there had been a full and individual evaluation of the defendant in 2000 with regard to this particular issue?

A. Well, in conjunction with there not being a diagnosis listed, other than speech impairment, I mean, it suggested that he had been in special education. They'd seen him. They picked a service, but they hadn't identified him as someone who had an intellectual deficit.

Q. And regarding this third prong, was that a

particularly significant aspect of the evidence?

A. That is one important aspect, yes.

Q. And ultimately, Doctor, with regard to all three prongs, the significantly sub-average substandard intellectual functioning, the significant deficits in adaptive functioning, and the onset prior to the age of 18, based on everything you've reviewed, including your tests, your interview, and all of the documents or materials that you have been provided, tell the jury whether, in your opinion, this defendant, Blaine Milam, meets the definition of a person with mental retardation?

A. It's my opinion that Mr. Milam does not meet the definition of a person with mental retardation.

Q. Okay. Now, you've told us that you spent a significant amount of time interviewing the defendant?

A. Yes.

Q. Were you permitted to talk to this defendant, Blaine Milam, about the facts of the capital murder case for which he has been convicted?

*MR. JACKSON:* Objection. Improper comment on the defendant's right or refusal to testify about the facts of the case.

*MRS. TANNER:* Your Honor, it's been brought up with Dr. Cunningham.

*MR. HAGAN:* Can we approach the Bench?



*MR. JACKSON:* We don't need a speaking objection, just --

*THE COURT:* I'll overrule the objection.

*MR. JACKSON:* May I have a running objection to this line of questioning?

*THE COURT:* Yes.

*MR. JACKSON:* Specifically, we're objecting under Article 1, Section 10, of the Texas Constitution. It violates our right to due course of the law, it violates our right to remain silent regarding the facts of the case, and not incriminate himself under the State Constitution and also the Federal Constitution, under the Fifth and Sixth Amendment and the Fourteenth Amendment of the U.S. Constitution.

*MR. HAGAN:* And, Your Honor can we approach for just one moment, please?

*MR. JACKSON:* Can I have a ruling on those objections also, please?

*THE COURT:* Yes.

(Conference at the Bench.)

*MR. HAGAN:* Judge, we went into this yesterday. They are -- they cannot comment on the fact of what he was allowed or not allowed to talk to this defendant about. They were allowed the LaGrone hearing after representations that my experts did not talk to this defendant concerning the offense, and we stayed true to that. He did not. And to now comment



that it would be helpful for him to make this determination, but it was not allowed to talk to this defendant, is using this defendant's silence against him in violation, first, of the Court's order; second, of the Constitution on his right to remain silent. And we talked about this yesterday. And it was my understanding this was an area of inquiry that could not be questioned by the State.

*MRS. TANNER:* That's absolutely not the case. The only thing the Court sustained was any discussion with regard to the fact that it was his lawyers that would not let their witness talk about it. It was with regard to the Counsel issue. The Court overruled the objections with regard to the fact, because the fact of the matter is, it's not a comment on his right to remain silent, because he didn't remain silent. He talked to them, and a waiver is a waiver is a waiver. Once you do a waiver, you do a waiver.

*THE COURT:* I'll only allow you to ask if he did, but that's the extent.

*MRS. TANNER:* Your Honor, he was not able to.

*MR. HAGAN:* Can we take this up outside the presence of the jury for just one minute, please, because I am very constrained here in what I am trying to say. And Counsel for the State keeps saying a waiver is a waiver is a waiver, and that is just simply and completely not true. It was a limited waiver. It was one that was indulged in on behalf of



the State on accommodating them, and it was not something that was taken advantage of by the defense. However, that is what she is attempting to do in this line of questioning, and it is for absolutely no other purpose than to show that he's choosing, through his lawyers, to remain silent.

*MRS. TANNER:* He didn't choose to remain silent.

*MR. HAGAN:* And, Judge, they are attempting to use that against him. And yes, Mrs. Tanner, he did, through his Counsel, choose to remain silent concerning the offense, and he would have that right, even if he testified about some things and then refused to testify, and you know that, and, Judge, I believe the Court knows that, too. He could be held in contempt, but you can still not tell this jury to use that silence against him, and that's what they're doing.

*MRS. TANNER:* We had this argument before. He wouldn't take the stand. There is no prohibition. There's no such thing as a limited waiver. If you're going to take the stand, the Court of Criminal Appeals said this is the exact same thing. If you choose to waive your right to remain silent to talk to an expert, then that's a waiver of your right --

*THE COURT:* I'll allow just the one question, and that's it.

*MR. HAGAN:* What's the question?

*MRS. TANNER:* That he was not -- he was not able

to talk to -- he was not permitted to talk to the --

*MR. HAGAN:* Absolutely not. He did not talk to the defendant about the facts. That's a factual assertion. He did not talk to the defendant about the facts. And to say he was not allowed to implies --

*MRS. TANNER:* He was not permitted to talk to the defendant --

*MR. HAGAN:* Judge, again, that's doing the exact same thing.

*THE COURT:* Can I speak?

*MR. HAGAN:* Absolutely.

*THE COURT:* Thank you.

*MR. HAGAN:* I'm sorry.

*THE COURT:* Just ask him, "Were you able to?"

*MRS. TANNER:* Just the point is --

*THE COURT:* He was not able to.

*MRS. TANNER:* -- that --

*THE COURT:* Okay.

*MRS. TANNER:* Okay.

*MR. JACKSON:* Your Honor, just for the record --

*MR. HAGAN:* We're clearly going to object to that as well.

*MR. JACKSON:* I'll agree objection's made to that question -- we would make to the question Mrs. Tanner is proposing to ask.



*THE COURT:* I'll overrule and give you a running objection.

*MR. HAGAN:* Thank you, Judge.

(Conclusion of Bench conference.)

*THE COURT:* You may proceed.

*MRS. TANNER:* Thank you, Your Honor.

*Q.* (BY MRS. TANNER) Dr. Proctor, were you able to speak with the defendant about the facts of the capital murder case for which he was convicted by this jury?

A. No.

*Q.* Now, you have been here through the defense's mental health experts who have testified, correct?

A. Yes.

*Q.* And you have heard both Dr. Cunningham, as well as a previous doctor, testify as to psychoses on the part of this defendant -- well, we'll just talk about this defendant. You heard Dr. Cunningham yesterday talk about psychosis, did you not?

A. Yes.

*Q.* And opine that this defendant had some type of psychosis?

A. Yes.

*Q.* In your field as a psychologist, as a forensic psychologist, is it appropriate to diagnose someone or to opine that someone is psychotic or delusional without having



talked to them?

A. Well, I think the best way for me to answer that is to tell you what I would do and what I would teach my students. And I believe that to make an assertion about what someone's mental state was like at the time of some offense, you have to have talked to them about that to have a meaningful opinion about that. And without doing that, I don't know how you can know, especially in the absence of some other piece of evidence where the person at issue has given a recitation of what happened.

*Q.* Thank you.

*MRS. TANNER:* No further questions.

*THE COURT:* You may cross.

*MR. JACKSON:* Thank you, Judge.

**CROSS-EXAMINATION**

BY MR. JACKSON:

*Q.* Dr. Proctor, it's good to see you again. I think we spent a little time together this morning, didn't we --

A. We did.

*Q.* -- kind of getting to know each other?

A. Yes, sir.

*Q.* Let me ask you. We may need to take a break here, but you brought a lot of notes with you, a lot of information that you take -- you reviewed prior to testifying today, did you not?



A. Yes, sir, I did.

*Q.* I think, as Mrs. Tanner said, several pages of single-spaced items, whether it's letters, notes, reports, things of that nature, correct?

A. Yes, sir, I did.

*Q.* And do you have those available for me to take a look at?

A. Yes, I do.

*MR. JACKSON:* Judge, may we take a 20-, 30-minute break, where I can review these documents?

*THE COURT:* Yes. Counsel is entitled by law to do this, ladies and gentlemen. Both sides are. So we'll take a break. I'm going to say 20 minutes. If it's five minutes sooner or whatever, later, we'll get to you as soon as it's finished. We'll stand in recess, again, under all the instructions I've given you. Do not discuss the case among yourselves, nor with anyone else, nor allow anyone to discuss the case with you. You may step down.

(Jury exited the courtroom.)

(Recess.)

*MRS. TANNER:* Your Honor, I need to ask one question of Dr. Proctor before I pass him.

*THE COURT:* You may bring in the jury.

(Jury returned to the courtroom.)

*THE COURT:* Mrs. Tanner, you have a question?

MRS. TANNER: That's correct, Your Honor. May I approach the witness?

THE COURT: Yes.

REDIRECT EXAMINATION

BY MRS. TANNER:

Q. Dr. Proctor, let me show you what's been marked State's Exhibit 301. Do you recognize this?

A. Yes, I do.

Q. And what is that?

A. That's a copy of my curriculum vitae which is like a resume.

Q. And is that a fair and accurate copy? And, in fact, did you just provide that to us today?

A. Yes.

MRS. TANNER: State would offer State's Exhibit 301.

MR. JACKSON: No objection, Judge.

THE COURT: 301 will be received.

Q. (BY MRS. TANNER) And does that recount your professional experience, as well as your training and education, in greater detail than what we went through here today?

A. Yes.

MRS. TANNER: Pass the witness.

MR. JACKSON: May I proceed?



THE COURT: Yes.

RECROSS-EXAMINATION

BY MR. JACKSON:

Q. All right, Dr. Proctor, how are you doing again?

A. Doing well, thank you.

Q. Okay. Let's start off -- you were, I guess, retained by letter -- was contacted by letter on December 5, 2008, by the Rusk County District Attorney's Office, were you not?

A. I don't remember the date off the top of my head, but it would have probably been around then.

Q. Give or take. Okay. So there would have been a letter written by Richard Kennedy, the Assistant D.A., to you, kind of outlining the case and introducing you to the case?

A. I did receive a letter.

Q. Okay. Would there be a significance why the State, three days after the offense, why they might want to let you know that mental retardation might be an issue in this case?

A. I don't know, other than if they're hiring you, letting you know what potential issues there might be.

Q. Would there be a reason why they might tell you that Jesseca Carson graduated from high school with honors? Why would they want to put that in the letter to you regarding Blaine Milam?

MRS. TANNER: Objection, Your Honor. It calls for speculation, first, and, secondly, is hearsay.



THE COURT: I'll sustain the speculation.

Q. (BY MR. JACKSON) Okay. Now, this is a letter that you reviewed, was it not?

A. It's been some time ago.

Q. I understand.

A. But I definitely did. Any of these letters that I get, I read, yes, sir.

Q. Okay. And could a situation occur -- actually, could a professional like yourself be influenced by information within a letter or correspondence?

A. Well, anything's possible. I certainly hope that someone wouldn't be. I mean, I know that I certainly wouldn't be influenced by anything like that.

Q. So could a professional be influenced by maybe a Prosecutor's Office when they put in a letter she -- meaning Jesseca Carson -- graduated from Longview High School with honors? Would that be something that might be influential in, I guess, your decision-making?

A. I may be a little slow on this one, because I don't know what -- how that would influence someone, like I don't know where that would be going. And I don't remember why -- I don't even know why it's in there. I don't remember that it was in there. But I don't know how that would influence. It didn't influence me, and I don't even really remember it.

Q. Okay. What about if the Assistant District Attorney



would have put in a letter --

MRS. TANNER: Judge, I'm going to object to all this as hearsay.

MR. JACKSON: It's not hearsay. I think she's an actual party to this, not to this case, but to her own case, being a defendant. It's a letter they used to, I guess, get his participation in this case. I just want to know if it affected him.

MRS. TANNER: He's already said it didn't, Judge. And it was on December 5th. It's hearsay as to the substance of all of this. Additionally, we may need to take this up outside the presence of the jury. May we approach?

THE COURT: Yes. You can approach.

(Conference at the Bench:)

(Mr. Jackson handed the Court a document.)

THE COURT: The record will reflect that Counsel has tendered me a copy of the proposed exhibit, the letter in question, Defendant's Exhibit 580. Okay.

MRS. TANNER: Your Honor, first of all, it's hearsay. Second of all, it's not something that he's relied on in forming his opinion. Under Rule 705, therefore, this is not admissible. Extrinsic evidence that he did not rely upon is not admissible.

MR. JACKSON: I just want to ask him to go line by line, if he formed an impression of the parties in this

case.

*MRS. TANNER:* It's hearsay within hearsay.

*THE COURT:* I'll let you show it to him and ask him without going line by line --

*MR. HAGAN:* Just for the record --

*THE COURT:* Can I finish please? Show him the exhibit, and you can ask him if he formed -- but as far as reading line by line, I'm not going to allow that. You can show it to him and ask if it had an effect, and if it did, you can do so.

*MR. HAGAN:* For the record, that letter is not hearsay. That's the admission by a party opponent. The State of Texas is a party to this charge, to this trial. That's a statement by a party opponent. It's being offered against them. It is not hearsay.

*MRS. TANNER:* I'm pretty sure this is not Richard Kennedy v. Blaine Milam.

*MR. HAGAN:* He is an agent. Wait a minute. That's ridiculous. He's an agent authorized by the party to make those statements. He signed it as an Assistant District Attorney. It is not hearsay, Judge.

*MR. JIMERSON:* It's hearsay within hearsay. He's got no personal knowledge of it. It's obvious hearsay within hearsay.

*THE COURT:* I ruled.



*MR. HAGAN:* Thank you, Judge.

(Conclusion of Bench conference.)

*MR. JACKSON:* May I approach the witness?

*THE COURT:* Yes you may.

*Q.* (BY MR. JACKSON) All right, Dr. Proctor, I'm showing you what I've marked as Defendant's Exhibit 580, a letter from the District Attorney's Office. Do you recognize this?

*A.* Actually, when I had a second, I found it in my file --

*Q.* Okay.

*A.* -- so I was able to look at it.

*Q.* Okay. I'll question from the table then. Was this the, I guess, contact letter you received from the Rusk County District Attorney's Office?

*A.* Yes. I'd initially, I think, spoken over the phone, and then this was a letter.

*Q.* Can you think of a reason why such statements would be put into a letter like this?

*MRS. TANNER:* Objection, calls for speculation.

*THE COURT:* You may answer if you know.

*A.* I don't -- I don't know.

*Q.* (BY MR. JACKSON) Okay.

*A.* It didn't mean anything to me.

*Q.* Okay. Now, I think it kind of goes without saying in your profession and in our profession as attorneys, we have



nothing to sell but time. Does that make sense?

*A.* I think that's pretty much true, yes.

*Q.* Because we don't produce products or inventory. We have only so many hours in the day, so we have to bill for our time.

*A.* You're correct.

*Q.* And it goes without saying, you're going to bill for your time, because your time is valuable.

*A.* I like to think it's valuable, but I definitely am going to bill for it, you're right.

*Q.* All right. Just like any expert that we might use, any expert the State might use, the attorneys' time, we have to make a living, and our educational value, our experience has value, right?

*A.* Yes.

*Q.* And I would hesitate to even think that -- you're not going to be embarrassed by the fact that you have billed for your hours and submitted a bill, are you?

*A.* No.

*Q.* Now, I think the expert, Dr. Cunningham, came in. His bill was somewhere around $30,000. I think you were here for that, right?

*A.* Right.

*Q.* And I've seen your bills up to about January were around $9,000, give or take.



*A.* Yes, sir.

*Q.* And in counting up your hours and looking at your hours and rate, your bill's going to come to about $30,000, also, I think the total bill.

*A.* I haven't added it up. That surprises me a little bit, because I bill $100 less, but maybe I put in more time. I haven't added it up.

*Q.* Based on the hours, I think you have some handwritten notes in there of kind of a time sheet you've kept. I counted up almost 100 hours, plus I think there's some days you haven't put in your time sheet yet. So 100 hours, $200 an hour, $20,000, plus the $9,000 already billed, so your bill might come to right around what Dr. Cunningham's is.

*A.* Yeah, if I do more hours, even though my rate is less, yes, that can happen.

*Q.* And that that would make total sense for you to submit a bill, as for me to submit a bill for my time, or anybody who works on this case?

*A.* Sure.

*Q.* Good. Okay. Now, you -- I think you made some reference you didn't know Dr. Andrews' test results before testing Blaine Milam, correct?

*A.* Yes, sir.

*Q.* And really what's important is not as much to know the results themself, but at times to make sure what the tests

were given, because that would be probably more important for you, would it not?

A. If I were picking -- if I only got to know one thing, I would pick that --

Q. Right.

A. -- to know who to test.

Q. Right. Because knowing what tests are given, it might make you decide that, hey, I may not want to give the WAIS again because of the practice effect or I may want to give Stanford-Binet instead of the RIAS or whatever.

A. I think that's fair.

Q. Fair enough? Okay. Now, let's talk a little bit about levels of mental retardation.

A. Sure.

Q. We have mild, moderate, severe, and profound, correct?

A. Yes.

Q. Okay. I'm starting to become an amateur psychologist here. I've asked probably every witness I've talked to about mild mental retardation, and it does go without saying, does it not, that you can't tell by looking at someone if they're mildly mentally retarded, can you?

A. Typically not.

Q. Because that's what's going -- you're going to have to have testing data, and really there's a lot to look at to



be able to make that kind of determination.

A. Yes.

Q. Because you can have someone obviously in that high level of mild mental retardation or you could have them in that low borderline area, and you're not, at times, going to be able to tell the difference without really digging into the history and the data and the psychological testing, right?

A. That can certainly be the case.

Q. Okay. This practice effect that you're talking about, it's basically a situation where -- I'll give you an example. If you were to give someone like Dr. Saunders here the -- one of these tests. Well, let's use someone who hasn't taken them. Let's say you give me this test, the Wechsler?

A. Okay.

Q. Okay? You give it to me. I might remember some of the questions on there. If I take it again, I might be able to go through that test faster, with more accuracy. That's kind of the practice effect, in a layman's way of putting it, is it not?

A. That's pretty close. I mean, the one thing is you might not even remember a certain question. It might be you just kind of remember how the test works in some way. That may help you.

Q. Okay. And someone could also, when they take the first test, they might be guessing at answers. Is that



possible? I mean, in taking these tests, can you guess at answers and get them right?

A. You can. Most of it's not multiple choice, so you're guessing free guess, which is much harder. I mean you're guessing with no options.

Q. Okay.

A. But you could guess, yes.

Q. Okay. And so you could guess correctly one time and guess incorrectly the next; would that be a fair statement?

A. It's possible, yes.

Q. And is that part of the error rate in giving these tests or -- I mean, why do we have this kind of error rate in these tests?

A. Well, and I think Dr. Cunningham explained it pretty well, with -- you know, error rate, it is kind of like -- I think he said stepping on a scale. If you ever take your temperature multiple times or take your blood pressure, I mean, for various reasons, it's not going to be -- whether it's temperature, weight, blood pressure, it's not going to be the same every time. There's a little bit of error built in, for various reasons, and that's true about an I.Q. test, too.

Q. Okay. And I think you've been practicing now five or six years?

A. I've been practicing with a license eight years, and then before that, it was fellowship and internship, and that



kind of stuff.

Q. Right. Now, you respect Dr. Cunningham as a professional in your field, do you not?

A. I respect him, Dr. Saunders, and all the professionals I work with.

Q. Right. Dr. Cunningham has been doing this, I believe, over 30 years, has he not?

A. He said a lot of things, and he probably said that, too, and I don't remember, but I would take your word for it.

Q. He's well-published, well-educated in continuing education in this field that he testified to, is he not?

A. Yes. I think his qualifications are certainly on record, and I don't dispute them, and I think they're great.

Q. Okay. Now, we've been talking about this I.Q. of 68. I think we've talked about a 68, a 71, and two 80's, correct?

A. Yes, sir.

Q. When we start talking about I.Q.'s of 80, that's still one standard deviation -- it's more than one standard deviation below the norm or the average of 100, is it not?

A. Right. I mean, he -- this is below average intelligence.

Q. Right.

A. I mean, it's considered low average on the I.Q. score, but again, diagnostically, it would fall in the borderline rate.

Q. When we start talking about borderline, you're then below the below-average people, are you not?
A. Yes.
Q. And this is still a serious situation, to have an I.Q. score or be tested at this level even at 80, is it not?
A. Well, I mean, "serious" is such a term of art. I mean, certainly we wouldn't call it severe in a lot of contexts, like social security, but it's something that's going to have an impact on what you can do, so --
Q. That's a good point. I mean, it's going to cause an impact in your life. It's not a positive impact in your life, is it?
A. Right. It's not something you would want to happen.
Q. It's not something we would want to see for any of our children. As much as we love them, we wouldn't want our children to test at an 80 I.Q., no?
A. No. If you were choosing, that's not what you would choose.
Q. And you mentioned something that I thought was striking in your testimony that -- talking about Social Security Administration, when they start doing some of their testing of people. They're looking for people in the two and three percentile range, right?
A. Well, they were talking about using definitions like the DSM for their work. And like the DSM and AMR and the



different definitions, they're talking two and three percent.
Q. Right. Now the two percent, we're talking about the bottom two percent of our population in regards to intelligence quotient, right?
A. If you're mentally retarded.
Q. Right. And M.R. falls in that two percent below.
A. Roughly two to three percent.
Q. So when we start talking you're one percent higher in M.R., that's still a significant deficit for a person, whether or not they're M.R. or not. There's still serious problems with this individual if they're in the bottom three percent of our population; would that be a fair statement?
A. Well, so you're thinking it's a 71, and that's at the third percentile.
Q. Sure.
A. That's the question. Well, yes, then you are someone who -- again, that wouldn't qualify for social security as a severe impairment, but it's certainly someone whose intelligence is at the very low end of the non-mentally retarded range. I mean, it's right on that edge.
Q. Right. You're still showing strong deficits, are you not?
A. Deficits. Not significant deficits, but deficits. Yes.
Q. I understand.



A. Yeah, I'm just making sure --
Q. Kind of semantics. These aren't trick questions. I'm just --
A. Right.
Q. These are still serious deficits in an individual. If you're testing at 71 or if it's 76, these are serious issues in your mental health or your intelligence; correct?
A. If your I.Q. is in that range, that indicates a -- you know, like I said, that level of intelligence, just above the mentally retarded range, if it were a 71.
Q. Right. Now, when we start talking about these pluses and minuses, these error rates, plus or minus of 5, if you're talking 68, he could be as low as a 63 and could be as high as a 73. 80, could be as high as a 85 or as low as a 75, based on the statistical error rates. It's within the statistical realm.
A. If you're using that crude plus or minus 5. I can be more specific.
Q. No, I understand what you're saying, because that's why we want to look at not only the scores, we also want to look at the adaptive functioning, also, right?
A. Yes, sir.
Q. And I notice that, based on your study in this case, you would say you might take the 68 and move it up; you would take the 80s and move them down, and you basically would meet



in the middle, which would bring us into that borderline range; is that correct? Is that a fair layman's way of saying it?
A. Well, I want to -- I mean, I know what you're trying to get at. It's a fair question.
Q. Okay.
A. I'm not -- I definitely want to make clear I'm not adjusting any scores.
Q. And I'm not accusing you of that at all. But I'm saying the way you told us, you look at these scores, and you have a score of 68, which puts Blaine in the mild mentally retarded range, correct?
A. Yes.
Q. We have a 71 that puts him at the borderline, right at the cusp of mild M.R.
A. Yes, sir.
Q. We have two 80's, which puts him in the -- I guess, depending on what you said, either borderline or the below average. The borderline goes up to about 84, give or take?
A. Well, and that's why I said we make things, as psychologists, more confusing than they need to be. It's -- for the test, an 80 is a low average, but if you look at the DSM, for some reason they don't use 80; they use 84, and I can't explain why.
Q. The DSM, I've heard people say that we kind of

consider this the Bible for psychologists. It's your go-to book in diagnosing individuals; is that a fair statement?
A. I won't call anything the Bible. I hear people say that all the time. But it is an important book in our profession, and it is the most commonly used book to make a diagnosis.
Q. All right. And in going to the DSM, which is now the Fourth Edition -- we've got a copy that looks like it's been eaten up and chewed here on my desk. The DSM-IV-TR, that's the current volume for, I guess, diagnosing individuals with psychological disorders?
A. Yes, sir.
Q. Okay. And a mild level of mental retardation, there's nothing really mild about being mentally retarded, is there?
A. Right.
Q. I mean, that is a serious situation, whether it's mild -- now, it can become more serious. Obviously, it becomes profound, correct?
A. Right. Mild is just saying it's a mild amount of M.R., not that it's a mild amount of intellectual impairment.
Q. Right, because it's a serious impairment, just a mild form of that serious impairment.
A. Correct.
Q. All right. Can mental retardation be caused by, I



guess, inherited chromosomal defects or -- does that make sense?
A. You mean, like can you inherit --
Q. Yes.
A. -- mental retardation? Yes, that can be one of the ways it comes about, is through your genetic makeup.
Q. Okay. Would it be a fair statement that the majority of the people that you interviewed on the Milam side were not highly intelligent individuals? And I know you didn't do any testing of them, but I'm talking just as lay people.
A. Yeah, I've just got to be careful with that. I mean, you know, I haven't tested any of those people.
Q. In general conversation, vocabulary used, the way they spoke, what you learned about them, they didn't come across as the smartest people in the world, did they?
A. They did not come across as being above average intelligence. They also didn't come across to me as being, you know, mentally retarded or even as borderline intelligence, but I couldn't be more specific than that.
Q. Okay. Now, part of your interviews -- and I guess I picked this up from reading the reports. And, I guess, to let everyone know, I wasn't the attorney that got to visit with you at the jail, was I?
A. No, you weren't.
Q. Okay. You and Dr. Proctor met alone with Blaine



Milam.
A. Me and Dr. Gripon, you mean.
Q. I'm sorry, yes, sir.
A. Yes.
Q. It's been a long 12 weeks. You and Dr. Gripon --
A. Yes.
Q. -- met alone with Blaine Milam.
A. We did.
Q. Yes. And Dr. Proctor -- Dr. Proctor. Dr. Gripon, did he do the majority of the interviewing process or did y'all both do this together?
A. I have never reviewed the video of it --
Q. Okay.
A. -- so I'm going off my memory.
Q. That's okay.
A. I felt like it was give-and-take, and it was both of us. That's what my memory is.
Q. And that's not a trick question, I promise you.
A. Okay.
Q. The point is that y'all both participated in the interview process.
A. Yes.
Q. And that's where opinions start to get formulated, where psychiatrists and psychologists are listening to the language that's being spoken or the types of words that are



being used. The responses, are they appropriate or inappropriate? Y'all start forming opinions from the word go, but you use the totality of the circumstances.
A. I mean --
Q. It's part of the process.
A. It's part of the process. You're collecting data.
Q. Okay. Now, Dr. Gripon did not do any testing, though.
A. Right.
Q. The testing falls more in the purview of the psychologist, not to the psychiatrist?
A. You're right about that.
Q. Now, the psychiatrist can also make diagnoses, can he not?
A. Yes.
Q. And the psychiatrist, Dr. Gripon, did diagnose or estimated intellectual level of Blaine Milam at 65 to 75, did he not?
A. Yes, I believe that's accurate.
Q. And, in fact, on Axis 5, Dr. Gripon said 65, based on his current ability to function in an incarcerated setting.
A. Isn't that the GAF score that you're talking about?
Q. Yes.
A. That's not an I.Q. That's something called a Global Assessment Functioning, and that would say -- mean mild

impairment.
Q. Okay.
A. Or maybe moderate. Moderate to mild impairment.
Q. And on Axis 2, he wrote mental retardation versus borderline intellectual potential.
A. Correct.
Q. Which falls in line with this 65 to 75, correct?
A. Right. That was his estimate, based on the interview.
Q. Okay. Now, you have a lot of respect for Dr. Gripon, do you not?
A. Yes.
Q. He's been a licensed medical doctor and psychiatrist for a long, long time, at least from talking to him.
A. He has.
Q. Okay. And he was also a psychiatrist or an expert hired by the State to, along with you, evaluate Mr. Milam, correct?
A. Correct.
Q. So now we have at least -- we have a test by you on the WAIS putting Blaine, at least from the test score, at a 68, correct?
A. There's a lot more to that score --
Q. I understand.
A. -- but that score is a 68.



Q. Okay. And we have Dr. Gripon, who says based on what he did and what he saw and what he heard puts Blaine at 65 to 75, correct, which would also leave open that Blaine is in the M.R. range per Dr. Gripon.
A. Right. That was -- he said it was in between those two.
Q. Okay. Now -- and basically what he said was based on -- in fact, do you know what reasonable psychiatric probability is?
A. Well, yes, I --
Q. I'll ask you a better question. When we start talking about reasonable psychological probability, reasonable medical probability, that, at times, is how professionals in y'all's group will state their opinion. "Based upon all reasonable psychiatric probability, I believe X." Right?
A. Yes.
Q. And Dr. Gripon said based on all reasonable psychiatric probability, he would be unable to state with certainty whether the I.Q. fell into the high range of mild mental retardation or the lower range of borderline intellectual functioning?
A. Right. When he wrote this, he didn't do any testing, and that was his opinion.
Q. Dr. Gripon states -- I think you've seen his reports -- this man's intellectual potential, associated with



a lack of formal education, creates a deficit that is in a range that can be conceivably in the upper mildly mentally retarded and lower borderline intellectual functioning. Would that be a fair statement on the last page of Dr. Gripon's report?
A. (No response.)
*MR. JACKSON:* May I approach the witness?
*THE COURT:* Yes.
A. I have it. I do have it, but I wasn't on the last page.
Q. Okay.
A. That sounds like what I remember.
Q. Okay. So basically, he puts a lot of emphasis, I think even as do you, about the severity of the lack of formal education that Blaine has.
A. Yes. I think that's -- in understanding in this case, I think it's really important.
Q. I noticed it in your report and also what you said on the stand; in your report, I think it was labeled an extreme lack of education. I think "extreme" is the word you used.
A. I would have to look to be sure, but that sounds like something I would say, because I thought it was an extreme.
Q. Okay. In fact, if you'll say that now, you believe it's an extreme lack of education?
A. Yes.



Q. And I appreciate your candor when you testified for the State, in regard to the education, that this may be the worse situation of failure to educate that you've seen in your career?
A. Well, certainly of someone of this age. You know, I see people who are much older who didn't get this kind of education. But, yes, at this -- you don't usually see someone who is 20 years old and in our society that has this limited education.
Q. Because we live kind of in a different era now. The era maybe our grandparents grew up in, there were some people, because of the depression or whatever, might not have gotten a formal education, because they had to go to work with their families. But in this day and time, failure to educate is almost unheard of at this level.
A. Right.
Q. What -- if you know this as a psychologist, what kind of deficits does this cause for a person who's now Blaine Milam's age, when you don't educate them?
A. Well, it -- that's why it's so important. It can result in several things that psychologists have to tease out. You know, is this low intelligence or is this lack of education or some combination of both? I mean, obviously, any kind of academic ability -- as much as we try with an intelligence test to separate out academic abilities, some of

the things we're asking people to do are define vocabulary word. I mean, a lot of that comes from school. So educational abilities, the ability to do things like read and write and math, you expect to be impacted. In his case, like I said, some of the areas like reading aren't as impacted as you would think, even by a long shot, but it's going to be impacted. And then socialization. I know you asked some questions of witnesses about that, but --

Q. While we're there --

A. Okay.

Q. -- and if I ever cut you off, please say, "I've got more to say," and I'm going to let you say it. But let's talk about the socialization.

A. Okay.

Q. I wanted to jump in about that. That's serious. We start -- we deny children the ability to be around kids their own age, what's the importance of that kind of peer contact, of age-appropriate contact?

A. Well, it helps promote your social development. It helps promote how you learn about how you interact with people, how you, you know, form relationships, interact in relationships. And while intelligence is one thing that interacts with our abilities in terms of social interaction, so does the opportunity to have social interaction. If you're deprived of it, you don't have as much. That can impact your



social functioning.

Q. I mean, it's -- to me, it's borderline -- no, actually, to me, it's child abuse when you don't educate your child --

*MRS. TANNER:* Objection, Your Honor, it's a mischaracterization. We would object to the question.

*THE COURT:* Restate the question.

*MR. JACKSON:* I will.

Q. (BY MR. JACKSON) Would you consider it an abuse of a child to not educate them to this extent?

A. I don't think I would put it under that --

Q. How would you characterize it then?

A. -- category. I would say -- and I understand -- I don't want to be too harsh to the people involved. I just want to say to them, I think it is something that has the potential to, you know, make things much more difficult for a child.

Q. You know, we have to make decisions on how to relate to other people, and that's part of this social interaction, is it not?

A. Yes.

Q. Okay. Now, in regard to this social interaction, you also have a situation, like in dating and in personal relationships, male-female relationships. You start learning this at an early age, do you not, on how to react around your



peers of the opposite sex?

A. Yes. And that intensifies around puberty, but, yes.

Q. Oh, absolutely.

A. Yes.

Q. As a psychologist, what kind of concerns do you have when you have a child who has been taken out of the mainstream with their peers on a day-to-day basis, when they start getting into puberty?

A. Well, my main concern is just that, again, they're not going to have the same opportunities, necessarily. He obviously had people around, like the Hodges, but as much of an exposure to other individuals to develop his social skills, his socialization skills, his, you know, skills in terms of interacting with other people in a dating situation.

Q. Now, I know -- I think I've read some literature. We really don't talk about mental age anymore, do we?

A. Yes. We do not.

Q. Okay. But maybe you can help me with the proper terminology, because I'm going to use mental age, and maybe you can work with me here. Somebody who is physically 16 years old, obviously the hormones are raging as a 16-year-old, but they have not had that type of peer -- normal peer interaction. Do we see people act -- I don't know the word. Do we see people act younger than they are? Like if they're 16, they may be acting and want to associate more with a



12-year-old than people of their own age.

A. You're saying does that ever happen?

Q. Sure.

A. That happens.

Q. In a situation like this, would it be inconsistent with what we've seen in Blaine's life, taken out of school, primarily being around just his sick father, not having kids his own age that he's around, that when he gets to the age of 15 and 16, that his -- I guess social skills or his -- or social interaction, is that more of a 12-year-old than what should be appropriate for a 16-year-old? And I know I'm not saying it right, but maybe you can help me.

A. I mean, I guess I don't know, you know. I mean, it's possible that you can -- that you're going to have some deficiencies in your social skills by lack of interaction. Whether or not it's going to make you more like a 12-year-old or 13-year-old or not, I don't know, and I certainly don't necessarily have that opinion about this particular person.

Q. Okay. Now, I think it's -- this might have been talked about a little bit, but it's true that, you know, only a small percentage of M.R. people show physical characteristics of being mentally retarded.

A. Yes.

Q. Okay. And the percentage of the population this falls into the M.R. range is about two percent?

A. Two to three percent.
Q. Okay. So we have that two to three percent, and it's an amount of that small percent that show physical characteristics of being mentally retarded.
A. Correct.
Q. Okay. People who are mentally retarded, at least in the mild M.R. range, are known to be able to work and hold jobs, correct?
A. This is the part where I started saying some of them can.
Q. Sure. And I agree, because, you know, we have to generalize here. We can't say specifics, but they have the ability to do so, or some do.
A. Some do; some don't.
Q. And it's not out of question to see them holding jobs in vocational situations, such as auto mechanics or whatever?
A. That one, I can tell you I have not had, in my experience, that auto mechanics are mentally retarded.
Q. Well, talking auto mechanics, in simple oil changes. You can teach people who are M.R. how to do things, can you not?
A. You can teach them how to do certain things.
Q. Okay.
A. Low-level kinds of things.
Q. And light mechanical duties would fall under a



vocational setting, would they not, or a vocational track?
A. I don't know if I know that. You mean like in high school or something?
Q. Well, I think it's a vocation. It's a vocational trade of sorts.
A. It's a trade.
Q. Okay. Now, individuals -- let's talk about maybe appropriate sexual conduct. You are a licensed sexual treatment provider, correct?
A. Yes.
Q. Okay. And when did you become so licensed to do that? It's been fairly recent, I think.
A. Pretty recent. Maybe two years, year and a half.
Q. Right. And that's what allows you to then go testify across the street in the violent predator trials.
A. Actually, you don't have to have that to testify.
Q. Really?
A. I'm one of the few people, and Dr. Saunders, who does have that. Most people don't. You only have to have that if you're going to do treatment.
Q. Treatment. And I think you're only treating one person right now, if I heard earlier today, but it's not really a sex offender of sorts?
A. You have that correct.
Q. Okay. Now, you interviewed Blaine, along with



Dr. Gripon, for quite a while?
A. Yes.
Q. A couple of hours. And you learned stuff about his -- I guess the prior sexual experience in his life, correct?
A. I did.
Q. Now, obviously it's self-report, so we have to go on what Blaine told you, right?
A. Right. And especially because it's been kind of inconsistent over the years.
Q. Right. Now, there was a situation where he told you he had been sexually assaulted by somebody, I guess a cousin, when he was like 9, 10 years old, somewhere in there.
A. That's what he told us, yes.
Q. Okay. Now, let's go -- let's say that's true. Okay? Now, if that's true, what kind of harm can that do to a child that's been sexually assaulted 20, 30, 40 times?
A. Well, you know, if a child has been sexually abused, sexual abuse can be very harmful to them.
Q. Right. And tell me more about that. I mean, because you've now -- you studied this about how to treat individuals, and you've dealt with cases where this has occurred. What kind of harm can it cause them? What kind of side effects can it cause them through their lives?
A. You know, that's -- it's a very fair question. It's



a very hard question to answer, because it varies so much. It varies in terms of age difference between participants. It varies in terms of what happened. So it's hard to know what it's going to do to someone, but anyone who's, you know, offended against in a sexual way, I mean, it obviously has the potential to have a significant impact on them.
Q. For the rest of their life, could it not?
A. It certainly could.
Q. Now, let's go to the next situation where we have -- I think Blaine said that at the age of 15, a 25-year-old woman who, I guess, knew Danny, his older brother, had sexual intercourse with him.
A. Correct.
Q. Y'all discussed that, correct?
A. (Moving head up and down.)
Q. I want you -- let's flip that situation, because for some reason in our society, that does not appear as offensive as if it's a 25-year-old man having sex with a 15-year-old girl. I mean, do you see the stereotype problem that we have here?
A. Well, I mean, that may be the perception in the general public.
Q. Right. But psychologically and medically, there is no difference, is there?
A. Well, I mean, legally, it would still constitute

abuse.
Q. It would constitute a crime.
A. Correct.
Q. Why do we criminalize that kind of behavior of a 25-year-old having sex with a 15-year-old boy?
A. Why do we criminalize it?
Q. Yes, sir. From a psychological standpoint, why is it bad? What kind of harm can it cause that 15-year-old?
A. I mean, if an adult is having sexual contact with a child, it can disrupt how they learn about sexuality, about sex, about how sexual relationships occur. And while I'm far from an attorney, I mean, my understanding is the laws are put in place to try to protect those people until they're ready for that kind of interaction.
Q. Right. It really wasn't meant as a legal question, as much as from a psychological standpoint to show the damage it can do to a child. Would that be a fair question or a fair statement, that it can cause a lot of damage to a child, and that's why we prohibit it?
A. Yes. Abuse -- sexual abuse can cause a lot of damage to a child, that's true.
Q. And it also changes their views on sex or their sexuality; would that be a fair statement?
A. It can.
Q. It can also change how they treat other people, can



it not, in regard to sexual situations?
A. It can.
Q. Now, the situation with Karah Hodges, Blaine leaving the pictures and the message in her drawer, that's a very juvenile way of trying to, I guess, elicit a response from her, wouldn't you agree?
A. I don't know. I mean, it also has a very strong predatory component to it, especially given the age of the victim.
Q. Okay.
A. I mean, you know, there's this enticement --
Q. Well, let's say that that wasn't the mind-set here. We're talking about something that Blaine -- I think was 17, and I think she was -- I think 11, if I recall.
A. You're right.
Q. If it wasn't meant as a predatory situation, where he had been close to this girl and didn't see this as doing something wrong, based on his upbringing, based on his mental status, or whatever. If he wanted to start a relationship with this person, this would not be, I guess, the most adult way to do it, would it?
A. Well, I've got to say, that's very much in contrast to what he told me about it and what I understand about it. As far as it being an adult, I mean --
Q. Maybe unsophisticated way?



A. It's certainly inappropriate. I mean, how sophisticated it is, I guess, depends on what your intentions are. He told me he actually had the crush on the older of the two sisters, but yet he gives the pictures with this enticement to the 11-year-old.
Q. Okay. Now, let's talk a little bit about the methamphetamine use or the drug use. Dr. Cunningham testified quite a bit about drug use on the brain. Tell me a little bit about your knowledge about -- when do our brains, I guess, stop growing or stop maturing? Am I using the proper terminology?
A. Well, I mean, growing, you know, in terms of size is one thing. It's more in terms of just how they develop.
Q. When does our brain stop developing then, maybe?
A. You know, there's some thought that, as Dr. Cunningham testified to, that the brain is continuing to develop up into our early 20's.
Q. Okay. What is the danger of teenagers, kids using drugs, especially with methamphetamine on the brain?
A. Well, I mean, kids or anybody is that it can be damaging to your brain.
Q. We're talking about kids where the brain is still developing. Is it more harmful, while the brain is developing, to be using these drugs versus later on in life, or do you know?



A. It's never good any time. It's probably especially not good when you're developing, but it's never -- never helpful.
Q. What kind of, I guess, detriments or problems do we see with people with methamphetamine use in their brains?
A. Well, I mean, it can be a range of things, you know. You can have, while they're on it -- I mean, there's agitation, can be aggression, decreased functioning in their life. You know, problems at work, problems in relationships, problems with family. Focused on drug use and on the getting the drug, as opposed to interacting with others. Prolonged use can cause deterioration of intellectual abilities, other kinds of abilities, like attention, concentration. And it can also affect psychiatric functioning, at least while you're on it, if not after, in terms of mood-related symptoms or, in some cases, even psychotic symptoms.
Q. Okay. Could it have impaired maybe his, I guess, already poor decision-making abilities? And that's the question. Could it have impaired his already poor decision-making abilities by his prior drug use?
A. Well, I don't know if I'd characterize his decision-making necessarily as poor when he's not using it, but I will tell you that, yes, when you're on meth, it can certainly -- no matter where your decision-making abilities are on the curve, it can certainly make them worse and

potentially a lot worse.
Q. The chemicals that make up meth are pretty scary, aren't they?
A. Well --
Q. If you're talking about ingesting them into your body. Individually, they're just chemicals. But you wouldn't think of ingesting some of these chemicals into our body.
A. For some of the chemicals, that's true. Some of them are Sudafed --
Q. Right.
A. -- which now you have -- they're behind the counter, but used to be something that was set out at the pharmacy. But, yes, these are not chemicals anyone would want to --
Q. Anhydrous ammonia, things of that nature, are very dangerous chemicals in and of themselves.
A. There are chemicals that make up meth that are dangerous, yes.
Q. Right. Substance abuse is hereditary, isn't it?
A. There is -- tends to be a genetic component to it, yes.
Q. And you saw, I guess, Dr. Cunningham's ---the family tree with, if we want to call it that, of the individuals in Blaine's family with, I guess, drug or alcohol abuse.
A. Correct.
Q. Correct? And is that a situation where a



psychologist or psychiatrist might start to think, "Wait a second; there may be some hereditary issues here in regards to substance abuse"?
A. Yes, there could be some hereditary issues.
Q. And hereditary issues, this doesn't guarantee that you're going to fall into alcohol or drug use; it just means you may be more prone to addiction or to using, correct?
A. Correct.
Q. Okay. What is it about the brain that makes us more addictive than some other people, do you know?
A. I don't know that I do know. I mean, it -- there are certainly -- it's certainly true that, as you say, some people have more proneness to be hooked on things than others. What exactly causes that, I don't think we know.
Q. We always say that a voluntary use of a drug, it's not a defense to criminal acts. I mean, it can be considered mitigating to lessen someone's blameworthiness to why it happened, but it won't prevent them from being convicted, but -- how do I say this? I might take a drink of alcohol and be fine. You, on the other hand, if you had an addiction to alcohol and you took one drink, that could trigger a huge response in your body that would force you to want more and more.
A. Force may be a little strong, but you're right. You can have one person who has a sip and can easily put it down,



and another person, once they have that one sip, they have much more of a strong compulsion to keep drinking.
Q. And that's something that you, at times, physically can't control, because your brain at times is telling you, "More, more." Correct?
A. I certainly -- I wouldn't characterize it that way. There are people who would.
Q. Okay. How would you characterize it?
A. I think it's a matter of that your mind or body is telling you it wants it, but ultimately you're making the decision if you put it in your body.
Q. I totally understand. I mean, it's always that voluntary decision to raise your hand to your mouth to put something in it or inject something in your body. But the brain is a powerful mechanism in telling you what to do or what not to do, is it not?
A. I mean, yes, the brain is a powerful mechanism, and yes, it gives you input about what it wants you to do, and the brain's also the part that's making the decisions.
Q. Right. In regard to the psychological testing, you and Dr. Andrews both did these, I guess, malingering tests, if we want to call it that.
A. Well, I wouldn't call them that, and it's fair to, and I think that's kind of how Dr. Cunningham was characterizing them. But malingering would indicate that all



we're looking at is if someone's trying intentionally to do that. It's really more effort testing.
Q. Okay.
A. And effort may not -- lack of effort may not be due to malingering.
Q. Happy to use that word, the effort testing, the TOMM test.
A. Yes.
Q. Now, the TOMM, if I've read some of the data correctly, even people with dementia should score 42 out of 50. They basically are like in the 92 percent, I think.
A. 45 out of 50 on Trial 2.
Q. Okay. Not bad for an amateur psychologist.
A. You're close.
Q. So the reason we give these tests is to at least try to ensure the validity of the real test.
A. Yes. That you're trying to ensure that the person is putting forth adequate effort.
Q. Right. And it appears, I think, on the TOMM, was Blaine like a 49 out of 50 on when you first gave it, and then a second part of the TOMM test is like a 50 out of 50. So basically, it appears he was putting forth the effort that you wanted on your test.
A. There is a strong caveat to what that means with this test, but I will tell you, he did very well on this test. And

he got a 47 out of 50, and then a 49 out of 50, which is very good for that test.
Q. Right. Now, and that is not an I.Q. test. That's not an intelligence test. That's the test, like you said, even someone with dementia is going to score in the 92 percentile or 42 out of 50?
A. That's right.
Q. Okay.
A. I'm sorry, 45 out of 50.
Q. 45.
A. Or above.
Q. Okay. Now, in regard to the WAIS, the WAIS is truly, I guess, what we've been calling the gold standard of I.Q. tests, at least up to this point. I think we now have the RIAS that's coming on board, correct, also?
A. I mean, I'm always -- like with the Bible comment -- careful about what I call the gold standard. I will say with the WAIS, there is no doubt it is the most commonly used. Just because something is the most commonly used doesn't necessarily mean it's the best, but it is the first I.Q. test psychologists reach for.
Q. How many times have you administered the WAIS?
A. Any version of it?
Q. Yes, sir.
A. A lot.



Q. And have you -- I would assume that you've given the WAIS much more than any other I.Q. test; would that be a fair statement?
A. That is fair.
Q. And it's what psychologists around the United States utilize, more often than not, for I.Q. tests?
A. Yes.
Q. Okay. You also would maybe want to look at -- well, back up. You know what a response pattern is?
A. Yes.
Q. Okay. A response pattern might be to look at comparison -- comparing maybe the two WAIS tests, the WAIS test that Dr. Andrews gave, to yours, to see if we're getting these same response patterns, such as is he answering the easy ones, and it kind of funnels down, unable to answer the more difficult ones, and doing the same thing on your test. Would that kind of be what I'm talking about, a response pattern?
A. Yes.
Q. And so that way, we don't see someone kind of picking and choosing, kind of messing up on certain things intentionally. You might be able to look at that and go, wait a second. There's a problem here. His response pattern is out of whack.
A. That can happen. It's fairly an unsophisticated way to do things, but it can happen.



Q. And you didn't see that here, did you?
A. I did see something odd, but it wasn't that.
Q. Okay. But it wasn't in the response pattern?
A. It was in the response pattern, but it wasn't like getting hard ones right and getting easy ones wrong.
Q. Okay.
*MR. JACKSON:* May I have just a minute, Your Honor?
*THE COURT:* Yes, you may.
Q. Now, on the WAIS-IV that you gave, this puts Blaine in the two percent -- in the -- his percentile was two, fell in the bottom two percent of the population; is that correct?
A. Second percentile; you're right.
Q. And is that of the United States or of Anglo-American individuals or the world? What is this two percent?
A. The two percent is of -- I believe it's the United States, not -- it's definitely not only Caucasians.
Q. I didn't mean it to mean Caucasians. What I meant was like North America, Europe. What group are we drawing from in this percentile?
A. I believe these are U.S. names.
Q. Do they use different tests over in Europe?
A. Either different tests -- well, in Europe, it's probably going to be mostly the same tests. There are different norms, like for Spanish-speaking populations, and



that kind of thing.
Q. Okay. Part of being, I guess, a forensic psychologist and being board certified is knowing, I guess, something of these legal issues that surround a mental retardation issue, correct?
A. I mean, to some extent. Not, of course, as an attorney, but I have some familiarity.
Q. You had to basically be somewhat familiar with, like, Atkins v. Virginia, the mental retardation case from the U.S. Supreme Court?
A. Like, have I read it?
Q. Sure.
A. Yes.
Q. Okay. In your opinion, based on your knowledge of psychology, why is it, in your opinion, that we no longer execute individuals under the age of 18 years old?
*MRS. TANNER:* Judge, I'm going to object to relevance.
*MR. JACKSON:* Judge, the reason it's relevant --
*MRS. TANNER:* May we approach --
*MR. JACKSON:* Sure.
*MRS. TANNER:* -- if he's going to go into a speaking --
*MR. JACKSON:* Sure. May I?
*THE COURT:* Yes.

(Conference at the Bench:)

*MR. JACKSON:* We are in a position that as information of -- expert knowledge about the development of an 18-year-old or pre-18-year-old, psychologically and emotionally, and that's where I'm going with this, that they're just not emotionally at the age of an adult.

*MRS. TANNER:* This defendant was two weeks from 19 at the time of this crime. Any issue with regard to people that are under the age of 18 is utterly irrelevant in this case.

*MR. JACKSON:* But youth is mitigating, and he has knowledge about developmental issues and youth.

*THE COURT:* I'll overrule the objection.

*MR. HAGAN:* Okay, because I was --

*THE COURT:* I may change my mind.

*MR. HAGAN:* I'll keep my mouth shut then. Okay.

(Conclusion of Bench conference.)

*Q.* (BY MR. JACKSON) Okay. I'll word the question again to you. From a psychological standpoint and, I guess, a developmental standpoint, why is it, in your opinion, that as a culture now, we have decided not to execute individuals under the age of 18?

*A.* Now, that's not referring to the Atkins case. You're asking me about --

*Q.* Well, I've changed that a little bit.



*A.* Okay. I mean, that's really -- I'm hesitating with the answer. I mean, I feel like that's more -- that was a legal decision. I don't --

*Q.* Well, let's talk about the developmental issues --

*A.* Okay.

*Q.* -- with someone who is under the age of 18.

*A.* Okay.

*Q.* Why is it, in your -- are we fully developed mentally and emotionally at the age of 18? I'm sorry, under the age of 18?

*A.* Well, I think where the person is in their development -- like physical development depends on the person, but as we talked about, there's some evidence that maturity, that brain development may continue on until the early 20's.

*Q.* Okay. And so the science and studies have shown that we're still developing mentally and emotionally into our 20's; is that a fair statement?

*A.* There's indication of that in the research, yes.

*Q.* Okay. Now, I think -- again, I asked you this, but I think he's not even below average. He is actually below the below average category; is that correct?

*A.* That's right. He's in the borderline range.

*Q.* And the average category constitutes about two-thirds of our population, does it not, give or take?



*A.* Correct.

*Q.* And then you go down from there, where you have, I guess, below average?

*A.* Low average.

*Q.* Low average, okay. And so you have low average, then you have below average?

*A.* You have -- and of course, they're all confusing, because there's lots of different ones. But basically, it's average -- if we're going down, it's average, low average, borderline, and then extremely low, which could also be considered the mentally retarded.

*Q.* The mentally retarded. What percentage of our population falls into, if you know, the low average or what I've been saying below average?

*A.* I think I have it right here. The low average range is 16 percent.

*Q.* Okay. So then after that, we have the percentage of the population that falls into the borderline. Actually, let's back up. The average two-thirds of our population is about 66 percent?

*A.* Well, I misspoke if we're -- depending on what terms we're using. The average range -- if we're just talking about average and not low averages or high averages -- is 50 percent of the population.

*Q.* Okay. And obviously, we can go up from there to get



the other statistics. But average, about 50 percent, and below is about 16?

*A.* Below average is 16 percent. 16.1, but 16.

*Q.* And borderline, how many people fall into that category?

*A.* 6.7, so roughly 7 percent.

*Q.* And then we have 2 percent of our population, 2 to 3 percent fall into the M.R. range?

*A.* Right.

*Q.* So no matter how we look at it, Blaine falls into the bottom, give or take, 8 percent of our population?

*A.* Yes. 8 or 9 percent, if you -- yes, the bottom 9 percent or so.

*Q.* And again, we have scores that put him in the bottom 2 percent from Dr. Gripon and also from the psychological testing by you on the WAIS, correct?

*MRS. TANNER:* Objection, Your Honor. Dr. Gripon has no scores whatsoever. Those are all estimates based upon an interview only. It's a misstatement of the evidence.

*THE COURT:* Sustained.

*MR. JACKSON:* I'll reword that.

*Q.* (BY MR. JACKSON) We have Dr. Gripon's statements in his report placing Blaine in the M.R. range or borderline M.R. range; is that correct?

*A.* Yeah. He estimated 65 to 75 --

Q. I understand that.
A. -- yes, sir.
Q. And that would put Blaine potentially into the lower 2 to 3 percent. We have the WAIS test that puts him into the lower 2 to 3 percent. We have a 71 that puts him into -- I would say maybe the 3 percent. Would that be a fair statement, with the 71?
A. That's the third percentile, yes.
Q. Right. And then we have the two 80's that put him somewhere in the top 8 to 9 percent; is that a fair statement?
A. It is. There's caveats that we've talked about with those scores. I wouldn't just take them as --
Q. No, I understand.
A. But yes, otherwise, I agree with how you characterize that.
Q. Okay. Just so we understand what we're talking about, as a psychologist, you make determinations, also, whether or not somebody is competent to stand trial or whether they're criminally insane, correct?
A. As a forensic psychologist, those are two things that I do regularly.
Q. And so the jury understands, being not guilty by reason of insanity means you did it, but you didn't understand the consequences or you didn't understand right from wrong at the time.



A. It means that at the time of the offense, due to a severe mental disease or defect, you didn't know that what you were doing was wrong.
Q. Very well put. Now, you also then have "incompetent to stand trial," which is different from insanity. Incompetent to stand trial, basically you're not able to assist your legal counsel in their defense, and many times -- you also may not know the defense attorney's role, the prosecutor's role or the judge's role. Those are some factors in determining whether or not someone's competent to stand trial, correct?
A. Those are some factors, yes.
Q. You can be mildly mentally retarded or just mentally retarded, but still be competent to stand trial.
A. Correct.
Q. Okay. And so just because someone is competent to stand trial does not mean that they're not mentally retarded?
A. That's correct.
Q. And I believe you have reviewed Jesseca Carson's statements, have you not?
A. Yes.
Q. Okay. And I think you reviewed letters from Jesseca Carson, to and from Jesseca Carson, while she's been incarcerated?
A. Yes.



Q. And I'm not asking you to formulate an opinion on her psychological or intellect, but you can definitely tell us that it's your belief that Jesseca is much more intelligent than Blaine Milam. Would that be a fair statement based on what you've seen?
A. I don't know probably enough to say. She certainly has a lot more education.
Q. Okay.
A. I think she overshot -- I mean, I think she described herself as being more -- doing better in school than she really did.
Q. She's been labeled in some literature as being an honor student at Longview High School?
A. When I looked at her grades, that didn't look right to me.
Q. I didn't go to Longview. I don't know.
A. Like a 2.7 GPA or something. That usually wouldn't qualify for honors.
Q. Typically. But there has been some literature that has stated that she was an honor student there or graduated with honors.
A. I think she's reported that to people, yes.
Q. Okay. Now, this adaptive functioning, the DSM, the book we've been talking about that y'all go to for diagnosis, part of diagnosing mental retardation is looking at this



adaptive --
(Cell phone ringing.)
Q. It helps break the tension occasionally when the cell phone goes off. The DSM gives us, basically, I think, ten categories in looking at adaptive functioning.
A. I think they meant for it -- it's probably supposed to be ten, but the way a comma was added, I think it's actually eleven.
Q. Okay. Communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety, correct?
A. Correct.
Q. And to make a determination of someone that would have deficits in adaptive functioning for a mental retardation diagnosis, if you had the first criteria and -- let's say you had the first criteria, that, yes, I found significant substandard intellectual functioning, then you, the jury, would come down and see, does he have the adaptive behavioral functioning issues? They would have to find, I guess, two issues there for, I guess, a continuation of an M.R. determination.
A. Right. They would be significant deficits.
Q. Right.
A. So bottom two to three percent.

Q. So it could be safety, it could be functional academic skills, self-direction, social interpersonal skills, home living. It could be any one of those.

A. Yes, and those deficits would need to be accounted for by mental retardation, as opposed to something else.

Q. Okay. Sure. Now, we heard Dr. Cunningham, I guess -- I guess kind of painstakingly went through the adaptive functioning test that took quite sometime. Interesting questions on that test, but it is -- nonetheless, it is a standardized test that is accepted and used in your profession; is that correct?

A. It is definitely standardized.

Q. And we talk standardized. Tell the ladies and gentlemen of the jury what we mean by a standardized test.

A. It means it's a test that is developed with a set way that it's administered, so that each person does it -- is supposed to be doing it in a way that's similar, so it means something. Then those tests are typically normed on another population, so we know what the score on the test means, as compared to others.

Q. And so this is a standardized test that, I guess, is used in the United States for adaptive functioning; is that fair?

A. Yes. Not to compare you to the normal population, but to compare you to these community developmentally-delayed



adults.

Q. Right. Now, did I read an article about, I think your partner, Dr. Price?

A. Yes.

Q. Did he write an article, I guess, criticizing the adaptive functioning test?

A. Yes, he did.

Q. I thought I had read that. Okay. And I guess you concur with your partner's conclusions or thoughts on that?

A. I do. I mean, it was a couple sentences in that article, but he was basically -- and he was taking that from the social security report I mentioned earlier by Risley, and he was saying, "I agree, this is not appropriate for this context." So he reviewed others that he thought should be considered, if any were going to be considered.

Q. And so you don't disagree -- actually, your partner doesn't disagree with using some adaptive functioning tests. You might not want to use this one.

A. Well, I mean, what both of us agree -- and he put it in the article -- is, you know, use one if it's possible, but in cases like this, it is very rarely, if ever, possible.

Q. See, at times you need a -- one, you need a historian. You would like to have a good historian, right?

A. Correct.

Q. And at times you're limited to the family, right?



A. Yes.

Q. This is kind of a rare situation, because we don't have the typical education, individuals who come up and say, "I've known this young man from kindergarten through high school." I mean, we don't have these unbiased people in his life, because he was taken out of that situation, right?

A. That's true. Even with those people, you could have potential problems in this context, but we don't have those people.

Q. Right. So we were sort of limited, unfortunately, to what we could get, which would have been the mom or family, because they would have had the best and most contact with him throughout his life, based on the circumstances.

A. Right. Still not enough contact for what's typically recommended, but more contact than anyone else, other than correctional officers, and most people wouldn't use correctional officers.

Q. And if we were going to use this test, using Mom might be the best resource at this point, because she would have been living with him at the time, correct?

A. She was not -- she hadn't lived with him for two years, but she was living with him at the time --

Q. At the time he got --

A. -- that he got incarcerated, yes.

Q. I think about maybe a year and a half, give or take?



A. Okay.

Q. Something like that?

A. 17 months.

Q. Sure. I understand your position, that it would be better, if we're going to use this test, to do it at the immediate time of incarceration and not have to wait 16, 17 months of incarceration. Right?

A. Right. Because then you start getting into some areas where you're not meeting the recommendations of someone that has frequent contact with the person on a regular extended basis.

Q. Right. But she would be -- but if we were going to do that at this point in time, going with someone who at the time was living with them, had that frequent contact, that would be, at least, the person to go to, if you had to do the test.

A. I mean, yeah. In my opinion, it would be what you would pick of very few options that are all not good enough.

Q. May not be good, but at times, it's what you're left with. Make sense?

A. What you're left with, but you still have to make a choice of what you do.

Q. Okay. But, you know, we have to start making a determination, because part of what we have to decide as part of this process is the adaptive function.

A. Sure.
Q. So you have to bring forth evidence somehow.
A. Yes.
Q. And that is one way in which to attempt to bring forth that kind of information.
A. It is a possible way to attempt to get -- yes.
Q. Okay. Now, the environment that Blaine grew up in, I guess after being pulled out of school, being left alone with his father during the day, at times to assist him, his caretaking based on his medical condition, how do you think -- or, I guess, in your psychological opinion or your medical opinion, how can that affect a child? What concerns would you have as a psychologist?
A. About him being at home, caring for his dad?
Q. Based on the fact he's about 11 years old. The father obviously had had a very serious stroke, is not able to care or take care of himself maybe the first two years. How can that psychologically impact a child? He's basically there as the one to help take care of Dad.
A. I'm not sure that I can answer that. I don't know. I mean, you know, that may be more responsibility, I think, than most people would give an 11-year-old. I mean, his family, I know, put that upon him. He had a close relationship with his dad. It would certainly be difficult to see your father in that condition, but how that would impact



someone, I don't necessarily know.
Q. Okay. Did Blaine report to you, I think, strong beliefs in magic?
A. He did.
Q. And also strong beliefs, I guess, in influencing -- or influence of the spirits?
A. He did. I don't know -- remember if I said if it was influences, but spirits, yes.
Q. He seemed to have a belief that Ouija boards could produce real results or real communication, did he not?
A. That's what he reported, yes.
Q. And you also saw the same from Jesseca Carson in what you read, correct?
A. I think with Jesseca, was mostly stuff that I saw.
Q. Okay.
A. I don't know -- I didn't read the transcript. I saw it, but --
Q. Fair enough.
A. -- yes, she reported those same kinds of things.
Q. That he was self-reported as being gullible?
A. Yes, he told me -- he said, "I'm gullible."
Q. You know, when individuals start -- and I don't know the terminology here -- start talking down about themself, is there a terminology for that, when they're downgrading their own personal self-worth or --



A. I'm sure there's probably lots of psychobabble talk for that. I mean, low self-esteem. I don't -- you know, there's probably lots of things to characterize that, yes.
Q. Would you characterize Blaine as being in that condition, I guess, having low self-esteem?
A. There may be some of that, I mean, you know, based on the conditions of the evaluation. I need to be careful how much I draw from that. But, you know, he was certainly willing to disclose negative information about himself.
Q. Blaine's aware of his, I guess, low I.Q. or his low intelligence, is he not?
A. He reported that he was, yes.
Q. Now, I found it interesting, you actually stopped the WAIS test in progress, did you not? Was it stopped prematurely when you administered it?
A. No. There was a subtest that was stopped prematurely, yes.
Q. Now, tell the ladies and gentlemen of the jury what a subtest is.
A. Okay. So when you're giving one of these I.Q. tests -- and I don't know that these still have been probably explained to you as well as I should, but you're sitting across the table from someone, and you're asking them to do various things. Like you're giving them a vocabulary word, and you're having them define the word, and that's one test.



Or you're giving them these blocks, and they have to put them together the right way while they're being timed, and that's another test. And so each one of these little tests within the bigger test is called a subtest.
Q. And I think I read your report correctly, and please correct me if I'm wrong, but one of the subtests was stopped prematurely.
A. Correct.
Q. And was this done because you assumed that he would not be able to complete it successfully, based on something you'd seen or read? What was the reason for stopping it?
A. The reason for stopping was he gave an answer to me that sounded like a poor answer. And the way these tests work is you don't keep asking people questions throughout the subtest if they're missing them. Like there's what we call a discontinue criteria or discontinue point. Example: You get three wrong in a row, we're done. We're not going to keep giving you questions at that point. I discontinued because it seemed he had met the -- let's say two in a row or three in a row, because he gave an answer that, to me, seemed like a poor answer. I mean, I had the manual right in front of me. I've given it many times. It didn't seem right.
Q. Are you allowed, in your profession, to tell us the question that he gave such a poor answer to? And I know -- listen, you and I have talked before, that y'all protect the

integrity of those tests. But can you give us an idea of the question that he did so poorly on that you decided to stop?

A. I can give you an idea. I mean, it's definitely better not to read test items into the record.

Q. If I were to have the Judge order you to do this, would that make you feel more comfortable in divulging that question?

A. I mean, if the Judge orders me to do it, I have to do it. There's no doubt about that.

Q. I want to make sure. Am I putting you in an ethical bind?

A. Well, yes, I mean, to some extent. And it's tough for me, because on one hand, people have a right to know where this stuff comes from. It's very important stuff. On the other hand, I'm bound by protecting -- you know, not putting things into the record I shouldn't.

*MR. JACKSON:* May I have just a minute, Judge?

*THE COURT:* Yes.

Q. I tell you what, I'm going to listen to my psychologist, and under your ethical concerns, I'm not going to do that to you. Okay?

A. Okay.

Q. But the reason why you stopped asking that question or stopped asking questions was because the question given to you -- or the answer he had given to you just was so blatantly



incorrect?

A. And I was wrong. It was right.

Q. Oh, really?

A. Yeah, he got a 1. That was the problem. It seemed like I read it -- when he said it, I thought that couldn't be a 1, and it was a 1, and so I had stopped too early.

Q. Okay.

A. And so I had to prorate the test.

Q. That was my next issue to go to. You prorated it. And I was impressed with your report here, because I saw how you wrote this. You prorated it, and you scored it a 68, but then you also came back and said it's of note that had the test have continued -- and I guess he had, I guess, missed -- I'm assuming if he had gotten the rest of them incorrect, like you assume that he would have, his score, the full-scale I.Q. would have actually dropped to a 67.

A. Right. And luckily, I had the benefit, and I knew that I would, of seeing Paul Andrews. And I saw he -- you know, how he did on that, so I could compare.

Q. Right. So it is within the realm of psychiatric -- psychology -- what's the word I'm looking for?

A. Psychological --

Q. Psychological probability -- I couldn't get that out -- that his score could have been a 67 instead of a 68 on your test?



A. I mean, you could argue that. I think the 68 is most appropriate, and it's why it's good that you have other test scores you can compare it to, but you could make that argument, and that's why I was very transparent about that.

Q. Right. Tell us about, I think there's a --

*MR. JACKSON:* May I have a second?

*THE COURT:* Yes.

*MR. JACKSON:* Let me have just a minute, Your Honor.

*THE COURT:* Yes.

Q. (BY MR. JACKSON) Now, we've talked about people with mild mental retardation can be taught how to do tasks, right?

A. Yes.

Q. And we talked a little bit about Blaine's work for, I think, Big 5 Tire and M & M Automotive. You also interviewed someone from Nichols Marine, correct?

A. Yes.

Q. The person with Nichols Marine seemed to, I guess, like Blaine, did they not?

A. I think -- I think her name was Dana. I think Dana certainly did.

Q. There was Jim Wallace, also, wasn't there?

A. Yes. And I don't recall if Jim Wallace said he did, but Dana -- that was basically what she recalled about him, was him being likable.



Q. And your interview with Jim Wallace resulted in Mr. Wallace saying that Blaine was a little bit slow.

A. Yes. I think he said he was a little bit on the slow bit.

Q. Okay. And that Blaine learned better from being shown things and not being told things.

A. That's what he said, yes.

*MR. JACKSON:* May I have just a minute, please?

*THE COURT:* Yes.

Q. Did Mr. Nichols also say that Blaine was childlike?

A. Yes, he did.

Q. Okay. Can you absolutely rule out the fact that at some point in Blaine Milam's life, he would be mentally retarded or has been mentally retarded?

A. Well, I assume that you're saying, you know, is it possible at some point --

Q. Yes, sir.

A. I mean, anything is possible. I don't think that's likely. I don't see evidence for it, but there's hardly anything I won't say is possible.

Q. Look through my notes here, and, sir, I might be able to pass you back to the State.

*MR. JACKSON:* Again, Your Honor, I need just one minute to look at my notes, please.

*THE COURT:* Okay.

Q. All right. Oh, some questions were propounded to Dr. Cunningham about that -- his timing of starting his work. Although you were actually, I guess, retained or put on notice, the State wanted you on this case December 5th of 2008. Am I correct your work didn't start until sometime around December of 2009?
A. I assume that would mean like when I got records to review for the first time?
Q. Yes.
A. Yes. November 18th of 2009.
Q. Okay. And did that give you plenty of time to do your job?
A. Yes.
Q. Okay. Had you needed more time, would you have asked for it?
A. Yes.
Q. And regarding the WAIS test, where Blaine scored at a 68 in the M.R. range, you said this was given in a room at the Montgomery County Jail, correct?
A. Yes.
Q. It's not uncommon for you to go to institutional facilities to give these tests, is it?
A. It's not uncommon at all.
Q. In fact, it happens a lot, at least with what you do, correct?



A. Yes.
Q. And being a professional and board certified at that, you would know when it would be appropriate to stop a test, if you thought that the situation or the surroundings were too much for this test to be relied upon.
A. Well, yes. I mean, if I thought it needed to be stopped, I know when to stop it, but I -- Dr. Cunningham and I see this kind of differently. I mean, I think it's always appropriate to make determinations about any factors that might have influenced and report it. I think he saw that as unprofessional.
Q. And I think it's appropriate for you to note what was going on, and that's appreciated. But the fact of the matter is, you would know when a situation or a setting was to such an extent to stop the testing, would you not?
A. Yes.
Q. Psychology is kind of -- I guess, do we call it a soft science?
A. Lots of people refer to it that way.
Q. And what's the difference between a hard science and a soft science?
A. Well, my understanding would be that both fall under science, but that there is less exactness in some areas of what's called a soft science.
*MR. JACKSON:* Your Honor, we pass the witness.



Thank you.
*THE COURT:* Mrs. Tanner.
*MRS. TANNER:* Thank you, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MRS. TANNER:
Q. Dr. Proctor, regarding all of these different I.Q. tests, if the only one that you had before you was the WAIS-IV that you did that first morning, March 26th, and it came out to be the 68, and that was the only test you had, going down the three prongs, might your opinion be different regarding whether or not the defendant met at least the first prong of the requirements to be mentally retarded?
A. If I considered that 68 to be valid, then, yes, the first prong would be different.
Q. Okay. However, you had a whole lot more to draw from than just that one test, right?
A. Yes.
Q. Okay. And was it the totality of everything you drew from, including the three other tests that were above it, that led you to the opinion and the conclusion that he did not meet the first prong of significantly substandard intellectual functioning?
A. Yes.
Q. Okay. Now, with regard to Dr. Gripon, you've told us he didn't do any testing like you did.



A. Right.
Q. Okay. And in order to know a range of where somebody's at, rather than just estimate, do you need to have some testing data in front of you?
A. Yes. I mean, you can estimate the range, but to have something that's really sound, it needs to be based on testing. Otherwise, it's just an estimate.
Q. Okay. And throughout his report, Dr. Gripon made it clear that that was all he was doing, was making an estimate based just on the interview, the face-to-face, correct?
A. Correct.
Q. Okay. Now, with regard to the second prong, the adaptive functioning prong, Counsel asked you about whether an auto mechanic could be mentally retarded, and you seemed to have a fairly strong opinion about the probability of that.
A. Yes. That seems very doubtful to me. I mean, that does not seem like the type of occupation a mentally retarded person would be able to do.
Q. Now, you heard the testimony yesterday of Gary Jenkins.
A. Yes.
Q. Correct? And you've talked to him before, correct?
A. I did.
Q. And you also received a statement from him that had been provided to you by the State?

A. Correct.
Q. And basically, what you heard him say yesterday, the statement the State gave you and your conversation with him, were those all consistent, as far as what he conveyed?
A. Yes.
Q. Okay. You also visited with Bryan Perkins at some point, right?
A. Yes.
Q. And you received a statement from him as well, an audiotaped statement?
A. Yes, I did.
Q. Okay. And I don't believe you were here for his testimony, were you?
A. No, I wasn't.
Q. Okay. The statement that he gave, as well as the audiotape -- excuse me, the audiotape statement he gave, as well as your interview of him, were the two consistent with each other, as far as the defendant's abilities?
A. Yes.
Q. Okay. And with regard to both of their recounting of the defendant's mechanical abilities, did those sound like mechanical abilities consistent with a person who was mentally retarded?
A. Well, it certainly seemed -- while people with mental retardation can have strengths and weaknesses, it seemed



beyond what I would expect of someone who was mentally retarded. I mean, I wouldn't make a "yes" or "no" diagnosis based on one piece of behavior, but that didn't seem consistent to me.
Q. Now, one of the other things Counsel asked you about with regard to the adaptive functioning was the various sets of criteria, and you indicated that it's not just a matter of whether there are deficits, but there have to be significant deficits --
A. Correct.
Q. -- in order to fall into the category. And then you said that the deficits also have to be accounted for by mental retardation instead of something else.
A. Correct.
Q. What did you mean by that?
A. Well, whether you're giving one of these measures, like Dr. Cunningham did, where he's asking the mother, or if you're just looking at someone's history, when you're deciding if there are significant deficits, you're looking at not only what the deficits might be, but is there another cause for them. Basically, for it to be mental retardation, it needs to be that the deficits are caused by low intelligence, not by drug use or lack of opportunity or a deprived environment where you didn't get the opportunity to learn it, or, you know, other drug use, those kinds of things.



Q. Or just being lazy?
A. Right.
Q. Or what if, you know, just that you're spoiled and don't have to do stuff?
A. Right. You want to take into consideration what are the possibilities.
Q. Now, a lot of the things, as Dr. Cunningham was recounting them yesterday in that adaptive functioning test, you know, wearing dirty clothes and not using a napkin and keeping a messy room and not doing laundry, and all that kind of stuff, are those all the kinds of things that, you know, probably a lot of people in here were thinking, "God, that sounds like my 18-year-old son"?
A. Well, yeah. I mean, you know, on one hand, I don't want to make too much light of it, because those are serious things, they're things to consider. But I'll say when I sit there and listen to it, I think back to myself in college, and it's kind of embarrassing, because there's things that, you know, I guess I'm expected to have been able to do that I wasn't very good at. But, yes, I mean, those are -- those things have to be taken in context, and you have to look at the reasons someone wasn't able to do them.
Q. Okay. And you took -- when you made your decision that the defendant did not meet this requirement for significant deficits of adaptive functioning, did you look at



everything and look at it in its appropriate context?
A. I certainly believe I did.
Q. Okay. And are you familiar with the fact that this jury, through the course of this trial, has heard from neighbors and coworkers and friends and, granted, teachers from a long time ago, but a whole variety of different people who interacted with this defendant throughout his life?
*MR. JACKSON:* Objection, leading.
Q. (BY MRS. TANNER) Do you know whether or not --
*THE COURT:* Sustained.
Q. (BY MRS. TANNER) Do you know whether or not those are a lot of the kinds of people who testified here?
A. Yes. And I've been present for a lot of the testimony.
Q. Okay. And are those the kind of people who can speak to the issue of whether somebody has adaptive functioning deficits or not?
A. They can certainly speak to the kinds of things that they observed him do in their experiences with him, yes.
Q. And if some test was going to be done on adaptive functioning by Dr. Cunningham or anybody else, it's your testimony it probably should have been a different test?
A. It's my opinion -- again, with all due respect, it is my opinion that, one, I don't think it's -- it would not be my choice, and I don't think it would be a proper choice to give

an instrument like this in this setting, under these circumstances, but if you were to do so, that's not the instrument I would give, based on the issues I discussed, that have been discussed. Generally, as far as the social security report, as well as specifically to these cases by Dr. Price's article.

Q. And would it have been a better practice or more appropriate, if you're going to do an adaptive functioning test with Mr. Milam, to perhaps have done it maybe back when Dr. Andrews was doing testing months ago?

A. Well --

Q. Or even earlier?

A. I mean, the time period does start to be concerning, especially if it is after the verdict has happened in terms of guilt/innocence, and we're on to sentencing, you know. And I think Dr. Cunningham saw this a little differently, but I think that the closer you do get to the trial, being in the trial, getting a verdict, going on to sentencing, I do think that that has the potential to matter.

Q. And the fact that that test was administered two days after the defendant was found guilty, was that concerning to you?

A. Yes. That was definitely one thing that caught my attention.

Q. Counsel asked you about Ms. Carson, and you said that



the records indicated she had a 2.7 GPA, or thereabouts?

A. Yes.

Q. Did it also indicate that she was in the 50th percentile of her class, or thereabouts?

A. I think that's right.

Q. So Longview High doesn't sound like a place where 2.7 is going to make -- be an honor grad, does it?

A. I wouldn't expect it, no.

Q. Okay. 50th percentile means you're basically in the middle of your class?

A. Right in the middle.

Q. Okay. And you said that was a self-report-type thing, correct?

A. About the honors?

Q. Yes.

A. Yes.

Q. That was actually also reported by the defendant, was it not?

A. That may very well be. I don't recall without looking.

Q. Okay. That's no problem. Counsel was asking you about questions regarding people that are under the age of 18. In fact, at the time of this case, the defendant was 10 days short of being 19 years old, right --

A. Yes.



Q. -- to your understanding?

A. Yes.

Q. And a person -- even a person who's under the age of 18 --

*MR. JACKSON:* Objection, leading.

*THE COURT:* Finish the question, then I'll rule.

*MRS. TANNER:* Thank you.

Q. (BY MRS. TANNER) A person who is under the age of 18, is that person able to make choices?

*THE COURT:* I'll overrule the objection.

A. Yes.

Q. And would they still know right from wrong?

A. I mean, most people, I mean, who are 17 know right from wrong, yes.

Q. Would they be responsible for their own conduct?

A. Yes.

Q. Let me ask you -- Counsel for the defendant was asking you about the Karah Hodges issue, and he was characterizing it as something that the defendant did not perceive as being wrong. Do you recall that line of questioning?

A. Yes.

Q. If the defendant did not perceive it as being wrong, would that be consistent with the defendant lying to the police about why he did it?



A. It would. And that occurred to me, yes.

Q. And you indicated that you felt like that action had a very strong predatory component to it. What did you mean by that?

A. Well, what I was saying is, he was asking could it be one thing, and I said, you know, also, I mean, it has a predatory element. Because, again, he's telling me he's interested in the person who's closer to him in age, but still a minor. It's picking someone who's quite young, 11, naive to these kinds of things, and it's basically saying -- showing sexual acts to someone who likely has never seen these things before, and basically exposing them to them and then saying, "Contact me," you know. So that could have the potential to bring someone in to that kind of sexual act.

Q. And in that regard, you know from the records that this incident that involved pornography, the defendant essentially accused someone else of molesting him to cause this, right? That was a terribly-asked question. Let me ask it a different way. With regard to that incident with Karah that involved him putting pornography into her drawer, he blamed that on someone sexually molesting him.

A. You know, I don't remember that he drew that connection totally with me. He did tell me that he was molested by the cousin and that he became very involved in pornography, and that that continued. And this involved

pornography, but I don't think he said that he felt one caused the other.

Q. What I'm getting at is the Robert Bradford situation.

A. Right.

Q. That when he talked to the police, he told the police that Robert Bradford had molested him --

*MR. JACKSON:* Objection, leading.

A. Now, I'm -- I'm sorry.

*MRS. TANNER:* I'll rephrase the question.

*THE COURT:* Sustained.

Q. (BY MRS. TANNER) That actually leads me to the issue with this cousin. He told you that he had been molested by a cousin?

A. Yes.

Q. Okay. And did that somehow tie in with pornography?

A. Yes.

Q. And how did that tie in with pornography?

A. He said that his cousin introduced him to pornography, and he got very into pornography, and that he said his cousin would basically give him pornography in exchange for the cousin having Mr. Milam perform oral sex on him or some other sexual act.

Q. And with regard to that particular incident or those alleged incidents, do you know whether or not that -- those allegations had ever come out in some other context, other



than after he's been charged with capital murder?

A. Not to my knowledge. And I think maybe even during other interviews since then, I'm not sure he's mentioned it, at least in all of them, but I don't -- I'm not aware of it before then.

Q. And during that interview, he did confirm to you that he had lied about this Robert Bradford sexual molestation?

A. Yes. He was open about that.

Q. And when you were here yesterday -- let me back up and ask it this way. In the materials you had, did you ever have an opportunity or able to be provided the transcript of an evaluation that was performed by a Dr. Theresa Vail on the defendant?

A. No, I've never reviewed it. I know one exists. I've heard it referenced. I've never seen it.

Q. And it was referenced yesterday.

A. Yes.

Q. And were you aware, other than hearing it in court yesterday --

*MR. JACKSON:* Objection, leading.

*MRS. TANNER:* I'll rephrase.

Q. (BY MRS. TANNER) Did you hear reference to the Vail interview as it related to sexual abuse?

A. Yes.

Q. And with that interview, did the defendant report



anything similar to Dr. Vail as he reported to you?

A. Again, I haven't seen it, but my recollection of the testimony was that it was not included.

Q. By the way, in talking about those sorts of things, the defendant told you that he had had a girlfriend when he was 12 or 13, right?

A. Yes.

Q. And that the interaction or the sexual, as it were, involvement involved kissing and fondling?

A. Correct.

Q. Okay. You indicated that there were odd results on the WAIS. You said there was -- with regard to Counsel's questions on response patterns, you said you did see something odd. What was that in reference to?

A. Well, it was that when I compared the two, like I said, that basically across the board, he answered -- when he answered questions differently one place than the other, he got them right with Dr. Andrews and wrong with me. There weren't hardly any questions that I can remember that he got right with me but wrong with Dr. Andrews. And since he was taking it the second time, and given the nature of some of the questions, that seemed a little odd. But, I mean, to be fair, on the other side, we are in -- still within this pretty tight band of 68 and 71, but that's not what I would have expected.

Q. Okay. Counsel asked you questions about issues of



competency and insanity. Do you recall that?

A. I do.

Q. And insanity basically means that due to mental disease or defect, you don't know right from wrong?

A. At the time you commit an offense, yes.

Q. And there's been a lot of talk here in court about having psychotic episodes and delusions, and things like that. What is kind of the hallmark of a delusion or a psychotic episode, as far as your recounting of the events afterwards?

A. Well, in terms of a delusion, you know, a delusion is a fixed belief that's not true. And when someone's delusional, they continue to have that belief. I mean, it's an experience of most young mental health professionals to try to think they can talk someone out of their delusions. They can just show them reason and say, "Look, it's not true." And by the end of it, you're part of the delusion, too, because they're so sure that that's the way it is. They don't believe you when you try to show them that it's not based in reality.

Q. Okay. And is the delusions -- is the delusions something that the person typically clings to?

A. Yes.

Q. And would you expect a delusional person, you know, if you're delusional and you do something, and you as a mental health professional asks, you know, "Why did you do that?" Is the delusional person usually going to answer to you within

the delusion or tell you "I didn't do it"?

A. Well, it would depend how close in time it was to the incident. I mean, you could have someone way far away, who's on medication and doing better, that can have some insight. Maybe not. But right after, you would expect that they're going to be still within the delusion and clinging to it, if that's what's fueling it.

Q. And those issues come up a lot with regard to when you're making determinations of sanity, do they not?

A. They do.

*MRS. TANNER:* I'll pass the witness.

*MR. JACKSON:* May I proceed, Judge?

*THE COURT:* Yes.

**FURTHER RECROSS-EXAMINATION**

**BY MR. JACKSON:**

Q. Are external forces important in considering one's behavior?

A. Yes.

Q. Okay. Now, you received some information that Jesseca Carson might be the driving force behind this offense, correct?

A. I know what you're referring to. It's not any information that I would put any weight on in doing my evaluation.

Q. No. That's fine.



A. But I think you're referring --

Q. The answer to that question is yes. You have received, at least via a letter, that Jesseca Carson --

*MRS. TANNER:* Judge, I'm --

Q. -- might be the driving force.

*MRS. TANNER:* Your Honor, I'm going to object. He's already said this isn't anything he relied upon. It's hearsay and therefore inadmissible.

*THE COURT:* I'll sustain the objection.

Q. (BY MR. JACKSON) Talking about delusions, it would be delusional, would it not, to believe that a Ouija board can tell you that you're talking to your dead father?

A. Not necessarily. I will say that I think the experts that have testified so far, I think they all think that's true, that if you believe that, that you're delusional. I think there are people who believe that that are not delusional. I don't think the only people who believe in that kind of thing are delusional.

Q. And I know this is a rhetorical question, but I have to ask it just in case. You don't believe that a Ouija board can allow you to talk to someone who's deceased?

A. I do not believe that.

Q. Okay. But you don't -- now, your belief is that does not necessarily mean that they're delusional.

A. Right. There are people who believe in magic,



spirits, Ouija boards, all kinds of religious elements, demons, that kind of thing, that are not what we would classify --

Q. Okay.

A. -- as mental health professionals as psychotic. There are also those who are psychotic, but that's -- I think some people believe that you have to be.

Q. Doesn't automatically include them, but it sure doesn't exclude them from it.

A. Absolutely.

Q. Okay. And someone who's delusional can still be competent to stand trial if they have delusional thoughts.

A. They can, as long as they're not interfering with the competency issue.

Q. Right.

A. That's correct.

Q. They can also know right from wrong, too.

A. Yes.

Q. You know, we've had this huge debate of whether or not Blaine is mentally retarded or not. You wouldn't disagree, would you, that a reasonable board certified psychologist or a psychologist could disagree on this matter, would you?

A. Well, I mean, we've seen that there's been disagreement.



Q. Exactly.

*MR. JACKSON:* We pass the witness.

*MRS. TANNER:* No further questions.

*THE COURT:* You may step down, sir. You may call your next witness.

*MR. JIMERSON:* Your Honor, the State rests.

*MR. JACKSON:* Can we have a few minutes?

*THE COURT:* Yes. All right, ladies and gentlemen, let me recess you back for 10 minutes, again, under all the instructions I've heretofore given you. Do not talk -- don't talk about the case among yourselves, nor with anyone else, nor allow anyone to discuss the case with you, nor access any information about the case. You may step down.

(Jury exited the courtroom.)

*THE COURT:* We'll stand in recess.

(Recess.)

*THE COURT:* All right, this is outside the presence of the jury. Do we have anything, prior to bringing the jury back in, that Counsel for the defense desires to make a record on?

*MR. HAGAN:* Yes, Your Honor, a couple of things. First off, I've discussed -- and not just in the last few minutes, but repeatedly over a long course throughout this trial, and before, with my client, and his -- whether or not he would testify either at this stage or the other stage.

After consulting with my client, he does not wish to testify in his own behalf.

*THE COURT:* All right. Do you desire to make a record with your client?

*MR. HAGAN:* Just very briefly. Blaine, if you could stand up for just one second.

**BLAINE MILAM,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. HAGAN:**

Q. Blaine, you heard the statements I just said, that you don't want to testify; is that right?
A. Yes, sir.
Q. That's your decision?
A. Yes, sir.
Q. And you understand, and we've talked about it, that if you testified, that could be beneficial for you, it could be very harmful, either way?
A. Yes, sir.
Q. That if you testified, it would certainly allow you an opportunity to present anything you wanted to to this jury beyond that we've already introduced. You understand that. There could be things that we could bring in, because you testify, that we haven't been able to bring in yet. Do you understand that?



A. Yes, sir.
Q. Considering all those things, all the risks, all the possible benefits, is it your decision that you do not want to testify?
A. That's correct.
Q. Okay.

*MR. HAGAN:* That's all.

*MR. JIMERSON:* Nothing, Your Honor, on that issue.

*THE COURT:* All right.

*MR. HAGAN:* A couple of things, Judge. First off -- and I believe this was raised by the last witness that the State called, their line of questioning concerning someone in a psychotic state, whether or not they would persist in that psychosis, whether or not -- obviously -- and I think that's the main one. In that regard, I would again urge under Rule 107, under optional completeness and to rebut that testimony, the statements of Jesseca Carson -- specifically, the statements against Jesseca Carson's interest where she says to Lieutenant Kenny Ray, "He didn't come up with this idea, I did, because I knew no one would believe us, that they would either put us in a mental institute or charge us with murder."

And it goes to rebut that false impression that this individual could have these delusions and yet still know



right from wrong enough to where she would make up a story to keep her from going to a mental institution or being arrested.

*THE COURT:* Mrs. Tanner?

*MRS. TANNER:* Judge, first of all, I didn't ask him any questions specifically about this case or about this defendant, because, as he said, he can't testify to anything regarding the mental state of any people he didn't talk to. So I didn't ask him about this specific defendant or this specific case, so therefore, the specific facts would not be relevant under the rule of optional completeness.

Secondly, any questions I did ask didn't have any relationship to Jesseca Carson. So therefore, again, it would not be as to the optional -- it would not fall under the rule of optional completeness.

*MR. HAGAN:* Well, Your Honor, I believe it would, because the witness gave testimony -- both on direct when Mrs. Tanner was questioning him, and also, I believe, on cross -- that he did review Jesseca Carson's statements. And, in fact, that was elicited from that witness by the State, and it would be under the rule of optional completeness.

In addition to that, Your Honor, it goes back to our Constitutional right to present a defense in this case. And again, the State is being allowed, through questioning their witnesses, who have listened to these statements, to not allow a full and complete statement as to what her statements



were. They're leaving the false impression that that's not out there, when, in fact, it is, and Counsel for the State knows it is.

It's impinging on our right to present a defense under the Constitution of the United States, under Article 4, under Article 5, Amendments 4, 5, and 6 -- not 4 -- 5, 6, 8, and 14 of the U.S. Constitution, and Article 1, Section 10, of the Texas Constitution, in that the State is essentially hiding behind an arbitrary rule of law -- or rule of evidence to prevent that defense from coming forward, when they have themselves opened the door by eliciting the fact that their witness listened to the audiotapes, listened to the statements of Jesseca Carson.

*THE COURT:* All right, I'll deny the request.

*MR. HAGAN:* Thank you, Judge.

*THE COURT:* Are we ready for the jury?

*MR. HAGAN:* Yeah. Let's go ahead and do some housecleaning on that, and we're going to rest.

*MRS. TANNER:* We can get them gone.

*THE COURT:* Yes, that's what I'm saying. We're going to bring them in.

*MR. HAGAN:* I'm ready.

(Jury returned to the courtroom.)

*THE COURT:* You may be seated. Does the defense have any rebuttal?

*MR. HAGAN:* Your Honor, we have nothing in surrebuttal.

*THE COURT:* Does the State rest and close?

*MR. JIMERSON:* Your Honor, the State closes.

*THE COURT:* Does the defense close?

*MR. HAGAN:* The defense closes.

*THE COURT:* All right. Ladies and gentlemen, all the evidence of the case concerning the second phase of this trial is now before you; however, you've not yet been read the Charge of the Court which contains the law applicable to this phase of the trial, nor have you heard closing arguments of Counsel. We will do that tomorrow morning at 8:30. At that time, I'll read you the Charge, and Counsel will deliver their closing arguments. It's basically much the same time period as we did the last time. And then you'll retire and begin your deliberations in this case.

Until then, until you begin your deliberations, you're not to discuss this case among yourselves, nor with anyone else, nor allow anyone to discuss this case with you, nor are you to obtain any information in any shape, form, or fashion about this case. Much the same as we did last week, again, bring you a travel bag and make arrangements, just like you did last week. In the event that the deliberations will continue, then again, we have made and we have provisions made to house you at that time. Okay? So y'all know the drill



now, but again, do you have any questions? All right. I see no questions. We'll see you tomorrow morning at 8:30. We'll stand in recess. To make it clear, you understand, bring you some clothes. I want to make sure you understand. Okay.

(Jury exited the courtroom.)

*THE COURT:* Here's copies of the proposed Charge. We'll go on the record outside the presence of the jury, both sides having rested and closed. And I'll note the defendant is here. For the record, I will note in all proceedings heretofore in this case, that in any court matters, the defendant has been present in all matters. Am I correct, Mr. Hagan?

*MR. HAGAN:* To the best of my knowledge.

*THE COURT:* Well, I know of -- to my knowledge, he has, too, so -- all right. And so the Charge of the Court having been prepared and delivered to Counsel, does the Counsel for State have any objections or exceptions to the Charge?

*MRS. TANNER:* Other than we would request to retain the instruction in the Charge as it is currently read regarding that the jury not be swayed by mere conjecture --

*COURT REPORTER:* I'm sorry?

*MRS. TANNER:* We would request that the Court retain the instruction: You are further instructed that you are not to be swayed by mere conjecture, passion, prejudice,



public opinion, or public feeling in considering all of the evidence before you and in answering the special issue.

*THE COURT:* All right, the Court will note your objection and overrule the same.

*MR. HAGAN:* Okay.

*THE COURT:* Mr. Hagan, for the defense.

*MR. HAGAN:* Yes, Your Honor. We submitted defendant's proposed Charge.

*THE COURT:* Yes.

*MR. HAGAN:* Your Honor, it contains essentially the same instructions. However, the differences are as follows. After each special issue, I simply want -- and it reflects it in the proposed Charge -- an instruction that states: You are instructed if the jury is unable to have ten or more jurors agree to an answer or is unable to unanimously agree to an answer, then the foreperson is instructed not to sign the jury form or answer the special issue, and the foreperson shall notify the Court in writing through the officer that has you in charge. And I would ask that for each special issue.

We would also -- to meet any objection that State would have, to abbreviate that to the language that was specifically approved of in -- hang on just a second -- McFarland v. State, 928 S.W.2d 482, Texas Criminal Appeals 1996, where primarily the challenge that I'm making, Your



Honor, is to the statutory scheme concerning the special issues, specifically that the jury is not allowed to know what the effect of an eleven-to-one vote is on any of the special issues, which, in fact, the result of that would be that this defendant would receive a life sentence. And I understand that it's a statute, and it's facially valid, but we're making a Constitutional challenge to it. And I understand the Court's overruling that challenge as well. Correct?

*THE COURT:* That's correct. The challenge will be overruled, and the requested instruction will be overruled. You've submitted it in writing. The Court has signed, on the submitted Charge, denied.

*MR. HAGAN:* Again, Your Honor, just to make sure, we would want to not only offer that version, but offer any abbreviated version, specifically the one that was approved of in the case that I just cited. And that reads -- hang on just a second. In the event the jury is unable to agree upon an answer to Special Issue Number -- and then it would be One, Two, Three or Four, as appropriate -- under the conditions and instructions outlined above, the foreman will not sign either form of answer to the special issue.

*THE COURT:* All right, I'll note that and receive it and overrule that request.

*MR. HAGAN:* Okay. And also, Your Honor, on Special Issue Number Three that we have crafted here -- and

that's the issue on mental retardation. Specifically request that instructions be given on that. Let me see that Charge for just a second. An instruction directly out of the Texas Health and Safety Code that defines a person with mental retardation. And it states a person with mental retardation means a person determined by a physician or psychologist licensed in this State or certified by the Texas Department of Mental Health and Mental Retardation to have sub-average general intellectual functioning concurrent with deficits in adaptive behavior exhibited prior to the age of 18. And again, that is directly out of the Texas Health and Safety Code, and it is Article 591.003. And that article and the definitions in the Texas Health and Safety Code have specifically been adopted in this state by the Court of Criminal Appeals in dealing with M.R. issues in capital cases, both at habeas and pretrial.

*THE COURT:* All right. I'll note that you've requested the same, and I've denied it, and I've signed the same as denied.

*MR. HAGAN:* Okay. And, Your Honor, just one other. Actually, and this -- this one, I just saw, and I didn't get a chance. I don't know if I took this out of my proposed Charge or not. And hang on just a second. Let me make sure, because if I did, I want to make the deletion. Okay. The instruction in deliberating on Special Issue Number



Three, the State has you shall consider all the evidence at guilt or innocence stage and the punishment stage, including evidence of the defendant's background and character and the circumstances of the offense. Well, wait a minute. She may have changed that. Is that -- no, this is my Charge. And that's where I would end it. The Court's Charge goes on to say that militates for or mitigates against the imposition of the death penalty. Your Honor, the M.R. issue is separate and apart from the other special issues.

*MRS. TANNER:* That's fine. I have no objection to that one.

*MR. HAGAN:* And that needs to be removed.

*THE COURT:* That's after Special Issue Number Three?

*MRS. TANNER:* Yes, sir.

*THE COURT:* All right, the Court will grant the objection.

*MR. HAGAN:* And actually, I would also --

*MRS. TANNER:* Oh, you had to do something more.

*MR. HAGAN:* Well, if you give a mouse a cookie. That specifically -- that it end after "including evidence of the defendant's background and character."

*MRS. TANNER:* "Or the circumstances of the offense."

*MR. HAGAN:* Right. And I would object to the



"or the circumstances of the offense," because again, M.R. is an issue that's raised by the evidence, that it was onset prior to age 18, and the circumstances of the offense should not be included.

*MRS. TANNER:* There you go.

*THE COURT:* Yes. And originally, what is it you're requesting?

*MR. HAGAN:* Okay. Here's what I'm fully requesting, and then I think I know what you're going to rule. I'm saying that in the instructions, it says, "In deliberating on Special Issue Number Three, you shall consider all the evidence at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background and character." Your Honor, that's where we say it should end. The State is saying that they're fine with it going on with "or the circumstances of the offense," and then eliminating the rest. Correct?

*MRS. TANNER:* That's correct, Your Honor. I have no problem with them eliminating "that militates for or mitigates against the imposition of the death penalty."

*MR. HAGAN:* So the Court rules.

*THE COURT:* And the Court rules that it will stop after the "character and the circumstances of the offense." Period. And I will remove "that militates or mitigates against the imposition of the death sentence."



*MRS. TANNER:* Actually, you know what? I just realized what the problem is here. This needs to be -- actually, this instruction is not with Special Issue Number Four, and it needs to be in there.

*MR. HAGAN:* What's that?

*MRS. TANNER:* In deliberating Special Issue --

*MR. HAGAN:* Oh, no, that doesn't go in there.

(Attorneys having a sotto voce discussion among themselves.)

*COURT REPORTER:* Is this off the record?

(Off the record discussion among the attorneys.)

*THE COURT:* We'll go back on the record. I'll note the defendant is still present. You may proceed, Mr. Hagan.

*MR. HAGAN:* Judge, on Special Issue Number Three, we want the definition of proof of a preponderance of the evidence, specifically that says, "Proof by a preponderance of the evidence means that, when taken as a whole, something is shown to be more probable than not."

*THE COURT:* The Court will deny that request. The Court is going to submit the definition that states, "A preponderance of the evidence means the greater weight and degree of the evidence."

*MR. HAGAN:* And we would object to that, Your Honor. In that case, we would just simply say that the Court

not define preponderance of the evidence at all.

*THE COURT:* All right. I'm going to leave this in.

*MR. HAGAN:* What else have we got?

*THE COURT:* So as to make sure -- I think we've talked about this. I'm not trying to guide Counsel in any way whatsoever or try to shape any objection, but it is now the intent of the Court to put in Roman Numeral V -- in the next-to-the-last paragraph, Roman Numeral V, to state in deliberating on Special Issue Number Four, "You shall consider all the evidence at the guilt or innocence stage and the punishment stage, including evidence of defendant's background and character and the circumstances of the offense that militates for or mitigates against the imposition of the death penalty."

*MR. HAGAN:* What? On Four?

*MRS. TANNER:* Yeah, on Special Issue Four which is where --

*MR. HAGAN:* That clearly does not go in there --

*MRS. TANNER:* Sure. That's exactly --

*MR. HAGAN:* -- for or against the death penalty --

*MRS. TANNER:* Militates for or mitigates against the death penalty.

*MR. HAGAN:* 37.07 is very specific. That only



goes on the first two special issues. That does not go on the mitigation issue at all. That specifically says on the first two issues.

*MRS. TANNER:* You're right.

*THE COURT:* As far as I can see, I believe that's right.

*MRS. TANNER:* You're right. You win.

*THE COURT:* Take that out.

*MRS. TANNER:* That's what happens when you start blocking and copying charges.

*MR. HAGAN:* And again, I mean, because the M.R. issue is so related to that issue and it's not covered in the statute, I would -- that's the reason why I'm saying that should not be in there --

*MRS. TANNER:* Well, I mean --

*MR. HAGAN:* -- in that section either. I understand -- that's why I think it should stop after "defendant's background and character." And I understand the Court already made its ruling. I'm just saying that's the reason why I'm objecting to it.

*MRS. TANNER:* Let me just say for the record, under Briseno, the Court of Criminal Appeals has said the circumstances of the offense are relevant to the issue of mental retardation.

*THE COURT:* All right. And I'll leave it in.



(Discussion off the record.)

*MR. HAGAN:* And we're back on the record. Also, as -- the way the verdict forms are set forth, I would request that they all be placed in a "Yes" or "No" format, "Yes" coming first, "No" coming second throughout the special issues. It's just confusing to put "Yes" on some as the first choice, "No" on some of the others. As it turns out, it's the majority. It's the unanimous verdicts that are all placed first. And it leads forth a suggestion that that answer is the preferred one, whereas leaving them at simply "Yes" and "No" throughout keeps it neutral and lets the jurors know that they're set forth in no particular order.

*THE COURT:* All right. I'll deny that request.

*MR. HAGAN:* Thank you, Judge.

(Discussion off the record.)

*THE COURT:* Back on the record.

*MR. HAGAN:* Judge, you had carried a couple of motions that are appropriate to have you rule on at this time. One of them was motion before you to include the death penalty based on mental age of the defendant. I believe we presented evidence that shows although Blaine Milam at the time of this offense was 18 years of age, he had the mental age and capacity of someone much younger, and by some accounts as young as 10 or 11 years old. And we would ask the Court to find that it would be unconstitutional under the Constitution



and the other arguments made and set forth in our motion that you carried.

*THE COURT:* All right. I'll deny the motion.

*MR. HAGAN:* Okay. Your Honor, also -- let's see. We also filed a requested instruction to the jury to answer the final question affirmatively. I'm going to go ahead and just let the Court refamiliarize with that motion. And I believe it's also supported by the evidence, that the jury -- especially considering the notes sent out by the jurors in the guilt/innocence phase -- that Mr. Milam was a party to this offense.

*THE COURT:* All right. And I will deny the requested instruction to the jury to answer the final question affirmatively.

*MR. HAGAN:* Okay. And, Your Honor, I would move for a directed verdict on Special Issue Number Three on the M.R. issue. We believe that we have attained that burden as a matter of law and proved that this defendant is a person with mental retardation, as defined by the Texas Health and Safety Code, as well as the standards set forth by the Texas Court of Criminal Appeals.

*THE COURT:* And I'll deny the motion for instructed verdict. And again, Madame Court Reporter, I'll note for the record that the defendant is present at this time.

(Overnight recess.)

STATE OF TEXAS

COUNTY OF RUSK

I, Terri Boling, Official Court Reporter in and for the 4th District Court of Rusk County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

WITNESS MY OFFICIAL HAND, this the 22nd day of October, 2010.

Terri Boling

Terri Boling, Texas CSR 1508
Expiration Date: 12/31/11
Official Court Reporter
4th District Court
Rusk County Courthouse
115 N. Main Street
Henderson, Texas 75652
Telephone: (903) 657-0359